UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED,<br><br>                      Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP<br><br>                      Defendants | CIVIL ACTION NO. 3:02 CV 1379(CFD)<br><br><br><br><br><br><br><br><br><br>JANUARY 8, 2004 |

**FIRST AMENDED COMPLAINT**

**COUNT ONE**
**(Negligence)**

**The Parties**

     1.     The Plaintiff, Golden West Refining Corporation Limited (**"GWRC"**), is a public company incorporated in New South Wales, Australia.

     2.     At all times relevant to this complaint, GWRC was the holding company for four subsidiaries: Golden West (Australasia) Pty Ltd. (**"GWA"**); Metals Refining Operations Ltd. (**"MRO"**); Golden West Refining (Canada) Ltd. (**"GWC"**); and Handy & Harman Refining Group (**"HHRG"**) located in South Windsor, Connecticut, all except MRO (45%), being wholly owned by GWRC.

     3.     The defendant PricewaterhouseCoopers LLP (**"PwC"**) is a Delaware limited liability partnership with an office and place of business located at 100 Pearl Street, Hartford,

CT 06103. PwC formerly did business as Coopers & Lybrand LLP in Connecticut in connection with services rendered to HHRG from 1996-1998.

4.  The defendant Coopers & Lybrand LLP (**"C&L"**) is a predecessor in interest of PricewaterhouseCoopers. For the period 1998 and 1999, C&L and its successor in interest, PwC, performed professional services to HHRG in Connecticut.

5.  At all times relevant hereto, C&L was related to and under common control with Coopers & Lybrand Australia (**"C&L/Australia"**).

## Jurisdiction

6.  This matter involves a controversy between citizens of different states, with the matter in controversy being in excess of $75,000, exclusive of interest and costs, and this Court has jurisdiction pursuant to 28 U.S.C. § 1332.

7.  Venue is proper in this Court under 28 U.S.C. § 1391(a).

8.  On or about July 1, 1998, C&L merged with Price Waterhouse (**"PW"**) to form PricewaterhouseCoopers LLP (**"PwC"**), and the newly formed PwC succeeded to the liabilities of C&L.

## The Relationship Between the Parties

9.  On or about 1995, GWRC became aware that the precious metals refining division (**"PMRD"**) of Handy & Harman, Inc. (**"H&H"**), a company incorporated in Delaware with headquarters in [Fairfield, Connecticut], was available for sale.

10. PMRD was comprised of a refinery engaged in high-grade refining located in Attleboro, Massachusetts, as well as three low-grade collection and sorting depots in South Windsor, Connecticut, Phoenix, Arizona and Villa Park, Illinois.

2

11. On or about April 2, 1996, GWRC engaged the services of C&L NY to provide professional auditing and consulting services in performing due diligence on the GWRC's purchase of the assets of PMRD, including a review of the books and records of H&H and PMRD.

12. GWRC had a longstanding relationship with C&L worldwide as its auditors, and on the basis of this relationship GWRC relied on C&L in its decision and negotiations to purchase PMRD.

13. GWRC's purchase of PMRD was completed in August 1996 at a cost of $9 million.

14. HHRG was incorporated by GWRC under the laws of the state of Connecticut in June 1996, and took title to PMRD pursuant to an asset purchase agreement ("Asset Purchase Agreement"). The rights and interests of GWRC in PMRD were assigned by GWRC to HHRG in August 1996.

15. In July 1996, Attleboro Refining Company (**"ARC"**) was formed as a subsidiary of HHRG enabling the funding of the precious metal inventory necessary for the operations of the HHRG high-grade operations in Attleboro.

16. HHRG was, at all times relevant to this complaint, engaged in the business of precious metals refining and trading (principally, gold and silver).

17. HHRG commenced operations on August 16, 1996.

18. GWRC appointed an Audit Committee comprising of Messrs. Rodney Warren and Christopher Wiggins of GWRC, who met with C&L/Australia in certain months only during

each year from 1996 to 2001, to organize and oversee the audit of GWRC, HHRG and other GWRC subsidiaries and to review C&L's preparation of its account reports.

19. The GWRC Audit Committee also met with C&L in Hartford and other locations in Connecticut, and reported on those meetings to the GWRC Board of Directors.

20. On information and belief between February and April 1997, HHRG engaged the services of C&L to provide professional auditing, accounting and consulting services.

21. On March 26, 1997, the GWRC Audit Committee and C&L/Australia's designated Audit Partner for HHRG, Mr. Alan Good **("Good")**, met by teleconference with the management team of HHRG and the relevant audit partners from C&L (Hartford), at which time Mr. Alan Good of the Perth C&L/Australia office expressly undertook responsibility for the audit of both HHRG and GWRC.

22. At the time of GWRC's purchase of PMRD and the formation of HHRG, GWRC knew that some of the gold and silver refined by PMRD originated in South America.

23. GWRC did not know and was not informed at the time that some of PMRD's trading operations in South America were conducted through "consultants" whose activities, on information and belief in conjunction with certain members of the PMRD operation later employed by HHRG, were fraudulent.

24. GWRC also did not know and was not informed at the time by PwC or any GWRC or HHRG employee that HHRG was participating in making advances of money globally, such as advances for VAT payments to a company in Peru.

25. Unbeknownst to GWRC, these fraudulent and/or improper business transactions and activities were in fact occurring, including but not limited to:

a. the payment of millions of dollars to South American "consultants" in connection with the purchase of gold in various South American countries, including but not limited to Peru;

b. the formation of companies in South America funded by HHRG on the instructions of Barry Wayne (**"Wayne"**), who had been president and senior executive officer of PMRD, and who became President of HHRG upon its formation;

c. receipt and return payment of large amounts of cash (approximately $200 million) in transactions unrelated to HHRG business, apparently with the purpose of moving those funds between companies within the Indian Geekay Group of Companies (**"Geekay"**) in transactions related to the import, purchase or manufacture of useless material subsequently re-exported as useful products without any improvement;

d. unsecured advances made to certain of the aforementioned South American companies in violation of express GWRC policy.

26. A certain company called Panexim S.A. was organized in Lima, Peru on September 9, 1996, on information and belief on the instructions of Wayne and in conjunction with the aforementioned consultants working with HHRG.

27. HHRG was Panexim's primary customer, accounting for over 95% of Panexim's sales between 1996 and 2000.

28. Between September 1996 and July 1998, Panexim bought gold from local Peruvian mines, converted the gold to "products," and exported the "products" to HHRG.

29. At all times relevant to this action, Peruvian law required all domestic purchasers of gold to pay 18% value added tax (VAT) to the government.

30. The law further provided that this VAT was fully refundable if the gold were exported, with refunds to be remitted ten days after the payment of the VAT.

31. Under Peru's export incentive program, exporting companies were also to receive a 5% export incentive credit.

32. Under Panexim's arrangement with HHRG, Panexim shared a portion of its recouped "export incentive credit" with HHRG.

33. Panexim had insufficient internal resources with which to pay its VAT obligations.

34. Initially Panexim obtained a line of credit with Banco de Lima Sudameris to fund the VAT.

35. The line of credit was secured by HHRG gold purchased from Panexim as collateral held in Banco de Lima vault.

Following the removal of the export credit, and the need to manufacture product, Panexim's business grew rapidly and substantially.

36. By mid-1998, Panexim's VAT requirements exceeded approximately $1,500,000 per month. Banco de Lima refused a request to increase the line of credit beyond the $1.5 million already in use. Panexim entered into an agreement with one or more persons at HHRG (hereinafter "VAT Advance") by which HHRG agreed to advance to Panexim the VAT tax payments due on each sale to HHRG.

37. In 1998 and 1999, GWRC had no knowledge of the VAT Advances for gold made to Panexim.

38. The VAT Advances violated GWRC and HHRG express company policy, which provide, *inter alia*, that "[i]t is the clear policy of the Company not to permit any exposures in credit, currency or bullion, which would create a material risk to the Company."

39. PwC discovered, but did not share with GWRC, evidence of the VAT Advances in April of 1998, when an HHRG employee named Luis Posada told PwC that HHRG was including "in Panexim advances an amount for a value added tax that Panexim has to pay. Once Panexim pays this, Panexim reimburses HHRG the amount that was over advanced."

40. PwC audit partners and team members received and reviewed a memorandum prepared by a PwC team member which specifically quoted Mr. Posada regarding advances for VAT to Panexim and Orion.

41. PwC therefore knew that employees of HHRG had made advances to companies in South America that violated HHRG's policy and PWC's assurances to HHRG.

42. HHRG financed Panexim's payment of VAT after Peru abolished the "export credit" program in July 1998 and Panexim ceased the "export credit" phase of its business.

43. Between July and December of 1998, HHRG purchases from Panexim amounted to approximately $20,000,000 per month, which included unsecured advances on VAT.

44. In November 1998, the Peruvian government began to withhold payment of VAT refunds.

45. In February 1999, HHRG learned that the refunds were being withheld by the Peruvian government as the result of a tax fraud investigation.

46. Between October 1998 and February 1999, HHRG had made VAT Advances to Panexim of over $10,000,000, which amounts were not repaid by Panexim, on information and belief because this was the total VAT refund due to Panexim by the government.

47. On March 28, 2000, HHRG filed for Chap. 11 protection in the United States Bankruptcy Court for the District of Connecticut.

48. GWRC had depended on anticipated cash flow realized through HHRG revenues of $1.75 million per year and took on loan obligations in reliance on, and to be substantially repaid through, that expected cash flow.

49. As the direct result of the depletion of HHRG's assets and its insolvency, GWRC could not meet its loan obligations and defaulted on those loans.

50. Unable to pay the aforementioned loans, GWRC was forced to sell, at below market prices, its partnership interest in AGR, a joint venture with Gold Corporation, a major precious metals refining company in Western Australia.

51. As the direct result of the aforestated forced sale of its partnership interest in the Gold Corporation joint venture, GWRC became devoid of assets and now has zero net worth.

52. GWRC is also the object of a claim by CSFB of $2.174 million against guaranty obligations issued to Attleboro Refining Company, a subsidiary of HHRG to which both HHRG and GWRC had pledged guarantees.

53. GWRC has filed for the appointment of an administrator on August 17, 2001 in Perth, Australia, under section 436A of Australia's Corporations Act, with the subsequent filing of a Deed of Company Arrangement, dated November 29, 2001.

54. Since 1990, GWRC regularly relied on PwC/Australia for accounting and audit services, and was under contract with PwC/Australia for the accomplishment of Golden West Group's auditing and reporting.

55. PwC/Australia held itself out to GWRC as being part of the same worldwide enterprise as PwC/US.

56. After HHRG was formed, HHRG entered into a contract for accounting and audit services with PwC in Hartford, Connecticut. Part of this contract, which was first discussed by PwC and HHRG in or about February 1997, was executed in the form of a Service Plan.

57. On March 24, 1998, PwC issued its 1998 Service Plan to HHRG, sending it to William Myles, HHRG's controller at the time.

58. In the cover letter sent with the Service Plan to William Myles, PwC stated: "As part of our audit planning process we prepare a service plan which includes a summary of the expectations you and others within your organization have of [PwC], key issues related to the audit, timetable and other matters to insure our [PwC] service team members understand your needs and exceed your expectations. This service plan will be updated periodically to track our progress on meeting your expectations and document any new needs and expectations that arise. This service plan will become the baseline against which you will be able to measure our performance."

59. The Service Plan also stated, *inter alia*, that PwC "will assure advances to third world countries are not made unless material is in the possession of [HHRG]."

60. PWC was aware that assuring compliance with the policy of prohibiting advances to companies in third world countries unless precious metal was in the possession of HHRG was part of the business service to be rendered in addition to regular audit services.

61. PWC knew this policy was designed to avoid any risk of financial loss to HHRG and to protect the financial condition of HHRG.

62. After execution of the Service Plan, PwC met regularly with GWRC's Audit Committee in Hartford, Connecticut (either in person or through teleconference meetings) to discuss, *inter alia*, PwC's audit of HHRG.

63. The aforementioned meetings took place in or about May of each year from 1997 to 1999.

64. PwC issued a report on HHRG's 1998 financial statements dated June 19, 1998. In that report, PwC made no mention of the improper unsecured loan advances to South America, no mention of the suspicious transfers to and from Geekay, and no mention of concern regarding other South American transactions.

65. If PwC had included this information in its 1998 HHRG report, GWRC would have investigated the transactions further, would have investigated the activities of Wayne and other people working in concert with him, would have avoided the losses that subsequently were suffered by HHRG and also the separate and distinct losses subsequently suffered by GWRC as the direct and proximate result of the aforestated acts and/or omissions.

66. Because of the nature and extent of the relationship between PwC/US and PwC/Australia and GWRC, PwC/US knew or should have known of GWRC's dependence on HHRG revenues for GWRC's payments on its loan obligations.

67. PwC/US owed a duty to GWRC, owing to the nature and extent of the relationship among PwC/US, PwC/Australia, GWRC and HHRG, independent of the duty owed to HHRG by PwC/US.

68. PwC owed a duty to GWRC to exercise reasonable and ordinary care in carrying out its Service Plan, including but not limited to the conducting of its due diligence review, compilation of reports, preparation of analyses, communications with GWRC, and other services and activities encompassed within the Service Plan.

69. PwC further owed a duty to GWRC by virtue of the express promise made by Mr. Alan Good of PwC/Australia, as PwC Audit Partner, that he would be responsible to both GWRC and HHRG for the proper and complete conduct of the audit of HHRG's business after 1996.

70. For the years ending March 31, 1997, 1998 and 1999, PwC breached its duty to GWRC in one or more of the following ways:

   a. in performing the due diligence leading up to the 1996 Asset Purchase of PMRD, by failing to include any report of developments in South America involving Casa Piana, a former customer of PMRD;

   b. by failing to comply with Generally Accepted Auditing Standards (GAAS) and the AICPA Guidelines;

   c. by negligently issuing audit opinions and management reports which were not prepared in accordance with GAAS or other applicable professional standards;

d. by failing to properly supervise and review the work performed by its staff;

e. by failing to properly review and examine the documentation and legitimacy of business transactions with companies in third world countries; and

f. by failing to warn GWRC of irregularities, discrepancies and violations of HHRG policies and credit procedures, in the operation of its business by some of its employees.

71. PwC further breached its duty to GWRC by failing to apprise GWRC and/or the GWRC Audit Committee during its due diligence investigation of H&H's PMRD of the fact that executives of Casa Piana had been arrested on various charges relating to a scheme to defraud the Argentine government. PwC knew or reasonably should have known of these arrests and the potential impact on GWRC and/or HHRG in the ongoing negotiations relating to the Asset Purchase and/or the ongoing audit of HHRG, and failed to bring these activities to the attention of GWRC.

72. PwC further breached its duty to GWRC by failing to investigate or to follow up on H&H's communications to PwC prior to 1996 that PMRD had had significant losses in Argentina prior to 1996, and by failing to determine the ongoing PMRD activities in Argentina, the true nature of the situation with Casa Piana, and the impact it would have had on the negotiations for the purchase of H&H.

73. PwC further breached its duty to GWRC by failing to properly investigate and report on HHRG's activities after its formation, or, alternatively, failing to discover the improper

conduct, transactions and activities of certain HHRG employees in the company's transactions with South American companies and/or Geekay or other enterprises, including but not limited to the activities listed in paragraph 23 above.

74. PwC further breached its duty to GWRC in failing to apprise HHRG and GWRC about the statements made by Luis Posada to PwC in April 1998 regarding HHRG's VAT advance loans.

75. As a direct and proximate result of PwC's breach of duty to GWRC, GWRC has suffered pecuniary loss and damage, distinct and separate from HHRG's own loss of assets and depletion of corporate assets caused by PwC.

76. GWRC's separate and distinct damages include, but are not limited to, the economic and commercial loss of all its business assets, caused directly by the insolvency of HHRG, to wit:

    a. GWRC's default on its loan obligations to N M Rothschild & Sons (Australia) Limited; the loss of equity in those loans; the payment of penalties on account of GWRC's default on those loans;

    b. GWRC's loss of its initial investment in HHRG;

    c. GWRC's losses due to the forced sale of its partnership interest in the AGR Joint Venture, amounting to approximately $4.5 million;

    d. the loss of net future profits that GWRC would have earned had it continued as a going concern;

    e. the obligations claimed by CSFB pursuant to GWRC's guaranty obligation.

## COUNT TWO
## (Negligent Misrepresentation)

1.-75.   Paragraphs 1-75 of Count One are hereby repeated and incorporated as paragraphs 1–75 of Count Two.

76.   PwC failed to exercise reasonable care and competence in obtaining and communicating the information contained in its due diligence reporting on H&H, in the period leading up to the Asset Purchase.

77.   As a result of such failure and during the course of PwC's conduct of its investigation and reporting on H&H, PwC supplied GWRC with false and/or misleading information in its reports and valuations, upon which GWRC relied to its detriment.

78.   PwC also failed to exercise reasonable care and competence in obtaining and communicating the information contained in its Reports on and Audits of HHRG.

79.   As a result of such failure and during the course of PwC's conduct of its business, reporting to PwC/Australia, and reporting to GWRC's Audit Committee and HHRG, PwC supplied GWRC with false and/or misleading information upon which GWRC relied.

80.   As a direct and proximate cause of PwC's misrepresentations, GWRC has suffered pecuniary loss and damage, including but not limited to:

  a.   Pecuniary loss in improperly valuing PMRD in its purchase from H&H;

  b.   Pecuniary loss in relying on incorrect information supplied by PwC with respect to HHRG, which caused GWRC to make investments, take on loan obligations, expend funds, and otherwise rely on a projected income stream from HHRG in the conduct of its business;

  c.   Loss of initial investment in HHRG; and

      d.      Inability to fulfill loan obligations caused by the loss of HHRG income stream, resulting in a forced sale of GWRC's interests in the AGR Joint Venture, and the depletion of its corporate assets.

## COUNT THREE
### (Breach of Third Party Beneficiary Contract)

1.-69.    Paragraphs 1-69 of Count One are hereby repeated and incorporated as paragraphs 1 through 69 of Count Three.

70.    PwC owed a contractual duty to GWRC to report all incidents, transactions, communications, or signs of any conduct that it knew or should have known violated GWRC's and/or HHRG's policies with respect to loan advances.

71.    GWRC was the intended beneficiary of HHRG's contract with PwC/US, including the Service Plan and WorkPlan.

72.    It was understood between the parties to the PwC/HHRG contracts, and PwC itself knew, that GWRC was the sole shareholder of HHRG; that GWRC was an intended third-party beneficiary of HHRG's contract with PwC.

73.    It was further understood between PwC, HHRG and GWRC that GWRC would rely on PwC's reporting, due diligence and auditing activities and reports concerning HHRG in the conduct of GWRC's business; in the activities of the GWRC Audit Committee; in its supervision of Wayne and others' activities and in numerous other aspects of GWRC's business and decisionmaking.

74.    PwC breached its duty to GWRC as a third party beneficiary of its contract with HHRG, and the ongoing contractual obligations of PwC/Australia to GWRC.

75. As the direct and foreseeable result of that breach, GWRC has suffered pecuniary loss and damage, as set forth above in paragraph 79 of Count One, which is incorporated herein as if fully set forth.

## COUNT FOUR
### (Breach of Fiduciary Duty)

1.-69. Paragraphs 1-69 of Count One are hereby repeated and incorporated as paragraphs 1 through 69 of Count Four.

70. PwC had a fiduciary duty to GWRC separate and distinct from its fiduciary duty to HHRG.

71. PwC breached its fiduciary duty in its actions and omissions stated above in paragraphs 37 through 83, which are incorporated herein as if fully stated.

72. As a direct and proximate cause of PwC's misrepresentations, GWRC has suffered pecuniary loss and damage, including but not limited to:

    a. Pecuniary loss in improperly valuing PMRD in its purchase from H&H;

    b. Loss of its initial investment in HHRG;

    c. Pecuniary loss in relying on incorrect information supplied by PwC with respect to HHRG, which caused GWRC to make investments, take on loan obligations, expend funds, and otherwise rely on a projected income stream from HHRG in the conduct of its business;

    d. Inability to fulfill loan obligations caused by the loss of HHRG income stream, resulting in a forced sale of GWRC's interests in the AGR Joint Venture, and the depletion of its corporate assets.

As a proximate result of defendants' actions as set forth in each Count above, plaintiff has been damaged in an amount in excess of Ten Million ($10,000,000.00) Dollars and hereby prays for the following relief:

a. judgment against the defendant, PricewaterhouseCoopers, on all counts of this Complaint;

b. full, fair and complete compensatory damages for GWRC's common law and statutory claims;

c. all appropriate costs, attorneys fees, expenses and pre- and post-judgment interest authorized by law on the judgments which enter in its behalf; and

d. such other relief as is deemed just and appropriate.

**PLAINTIFF**
**GOLDEN WEST REFINING**
**CORPORATION LIMITED**

By _____
Dina S. Fisher (ct14896)
dfisher@rc.com
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT  06103-3597
Tel. No.: (860) 275-8200
Fax No.: (860) 275-8299

**PLAINTIFF REQUESTS**
**TRIAL BY JURY**

17

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was mailed, postage prepaid to the following counsel of record on January 8, 2004:

David J. Elliott, Esq.
William H. Erickson, Esq.
Steven D. Goldberg
Day, Berry & Howard LLP
CityPlace - 25th Floor
185 Asylum Street
Hartford, CT 06103

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman &
  Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Wilson, Elser, Moskowitz, Edelman &
  Dicker LLP
120 N. LaSalle Street
Chicago, IL 60602

James McCullogh, Esq.
Joseph A. Oliva, Esq.
Sedgwick, Detert, Moran & Arnold LLP
125 Broad Street, 39th Floor
New York, NY 1004-2400

William H. Champlin, III, Esq.
Tyler Cooper & Alcorn, LLP
Wlliam S. Fish, Jr., Esq.
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman &
  Dicker LLP
3 Gannett Drive
White Plains, NY 10604-3407

Charles T. Lee, Esq.
Paul, Hastings, Janofsky & Walker
1055 Washington Boulevard
Stamford, CT 06901

Joseph J. Koltun, Esq.
Philip H. Kalban, Esq.
Fishbein-Badillo-Wagner-Harding
909 Third Avenue
New York, NY 1022

_____
Dina S. Fisher