UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORP., LTD., <br><br> Plaintiff, <br><br> v. <br><br> PRICEWATERHOUSECOOPERS, LLP, <br> And COOPERS & LYBRAND, LLP, <br><br> Defendants. | No.: 3:02CV1379 (CFD) <br> MRK |
| ALEC SHARP, et al., <br><br> Plaintiffs, <br><br> v. <br><br> PRICEWATERHOUSECOOPERS, LLP, <br> d/b/a PRICE WATERHOUSE, LLP, <br><br> Defendant. | No. 3:02CV1572 (CFD) |

**MEMORANDUM OF LAW IN SUPPORT OF UNDERWRITERS' MOTION TO DISMISS THE COUNTERCLAIMS OF PRICEWATERHOUSECOOPERS**

**I.     INTRODUCTION**

PricewaterhouseCoopers ("PWC") has asserted two counterclaims in response to the Complaint issued by Plaintiffs Alec Sharp et al. ("Underwriters"). Both counterclaims are based upon a clause in a Coopers and Lybrand L.L.P. engagement letter in which Handy & Harman Refining Group, Inc. ("HHRG") purportedly agreed to indemnify PWC arising out of claims or liabilities in circumstances where there is a misrepresentation by HHRG's management.

This provision cannot support PWC's counterclaim against Underwriters. Underwriters have not agreed to indemnify PWC, nor have they assumed HHRG's liability to do so by virtue

729862.1

of their subrogated claim or the assignment by HHRG to Underwriters of its claims against PWC. Thus, this Counterclaim is not properly brought against Underwriters.

In addition, the clause in question does not require that HHRG indemnify PWC for its own misconduct. Since the allegations against PWC are for its negligence and/or failure to perform its contractual obligations, the indemnification clause cannot be a basis for recoupment or setoff against HHRG.

Thus, this Court should dismiss the counterclaims asserted by PWC against Underwriters since they fail to state a claim for relief against Underwriters.

## II.   MATERIAL FACTS

The March 30, 1998 engagement letter produced by PWC[1] contains the following pertinent language:

> The Company hereby indemnifies Coopers & Lybrand L.L.P. and its partners, principals, and employees, and holds them harmless from all claims, liabilities, losses, and costs arising in circumstances where there has been a knowing misrepresentation by a member of the Company's management, regardless of whether such person was acting in the Company's interest.

*See* Ex. A.

The "Company" is defined as Handy & Harman Refining Group, Inc. *See* Ex. A. Underwriters were not a party to this agreement. *See Id.*

After paying on the insurance claim asserted by HHRG, Underwriters were assigned all of HHRG's various claims against the parties which had contributed toward

---

[1] The letter is attached as Exhibit A. This is a true and correct copy of a letter produced by PWC. Since this letter is the basis of the PWC counterclaim, it may be considered by this Court, without the need to convert the motion to dismiss into a motion for summary judgment. *See Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2nd Cir. 2001) (court considered a cardholder agreement, account history and monthly statements not attached to a complaint); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2nd Cir. 1991) (court considered prospectus not attached to a complaint). It should be noted that the letter produced was unsigned. In order to establish that this indemnity provision was even agreed to by HHRG, PWC should be required to produce a signed engagement letter.

causing its claimed loss including PWC. *See* Ex. B. This assignment was supposed to be attached to Plaintiff's Complaint against PWC.[2] It provides in pertinent part:

> HHRG assigns to Underwriters all rights, title and interest in any and all claims which HHRG has, had, or may ever have as to all losses asserted by HHRG in the written claim of 22 February 2000 submitted by HHRG to Underwriters under the Policy, and which were more fully explained in a memorandum submitted to Underwriters on 9 March 2000 and more fully documented in a proof of loss submitted to Underwriters dated 9 October 2000, and which were the subject of claims submitted to Chubb and/or Federal Insurance Company and to Hiscox ("the Losses"), plus interest, costs, and punitive damages arising from the Losses, including but not limited to, any and all such claims against (a) Barry Wayne, Richard L. Searle, Louis Posado, Michael Verleysen, Manuel Seaone, Carlos Augspach, Frank Phillips, Jorge Washington, Erick Claudet, Linneo Klocker, Fernando Limo, Mario Seaone, and Jorge Passaro and their relatives, corporations, affiliates, and assigns; (b) Panexim and any and all employees or agents of Panexim or related entities; (c) SUNAT; (d) The Peruvian Government; (e) PriceWaterhouseCoopers and its predecessors, successors, agents and assigns; (f) Hermes; (g) Alex Stewart Assayers; (h) The Chubb Corporation or Federal Insurance Company and Hiscox.

*See* Ex. B.

Underwriters allege that PWC was engaged as an outside auditor which performed professional auditing services for HHRG. Complaint, paragraph 3. Underwriters further aver that although PWC knew that various transactions were taking place, which were contrary to HHRG policy, PWC never disclosed or reported such transactions to HHRG's board of directors, despite an obligation to do so. *Id.* Underwriters have asserted claims for negligence and breach of contract against PWC. *See* Complaint, generally.

PWC claims that the losses claimed by Underwriters arose in circumstances in which there was a knowing misrepresentation by an officer of HHRG. Counterclaim,

---

[2] Underwriters inadvertently failed to attach the assignment document itself, although its attachment is referenced in the complaint. Underwriters have since filed this assignment document with the court.

paragraph 4. Pursuant to the engagement letter language set forth above, PWC claims that HHRG agreed to indemnify it under circumstances "where there has been a knowing misrepresentation by a member of HHRG management." Ex. A; counterclaim, paragraph 3. This indemnification language is the basis of PWC's counterclaim. *Id.*

### III.   ARGUMENT

Dismissal of a complaint or counterclaim pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted is warranted if it appears beyond doubt that the claimant can prove no set of facts in support of his claim which would entitle him to relief. *Sims v. Artuz*, 230 F.3d 14 (2nd Cir. 2000); *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774 (2nd Cir. 1984) ("The function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."); *see also Kaltman-Glasel v. Dooley*, 156 F.Supp.2d 225 (D. Conn. 2001) (this court dismissed counterclaim because it failed to state a claim); *Citizens Trust Company v. New England Dredge & Dock Co.*, 260 F.Supp. 800 (D. Conn. 1966) (counterclaim by entity attempting to shift liability away from itself dismissed for failing to state a claim). PWC's counterclaims are deficient as a matter of law, and thus, they must be dismissed.

#### A.   PWC's counterclaims cannot be brought against Underwriters.

As the subrogee and assignee of HHRG, Underwriters possessed the rights of HHRG to assert certain claims against PWC, but Underwriters did not assume any obligations of HHRG – including any obligation to indemnify PWC. As such PWC has no valid claim against Underwriters.

729862.1

- 4 -

In its simplest form, subrogation allows a party, such as an insurer who has paid a debt, to step into the shoes of another so as to assume *his or her legal rights* against a third party. *Wasko v. Manella*, 74 Conn.App. 32, 35, 811 A.2d 727 (2002). Since the insurer's right of subrogation against third persons arises out of the contract of insurance, *the insurer can take nothing by subrogation but the rights of the insured. Orselet v. DeMatteo*, 206 Conn. 542, 546, 539 A.3d 95 (1988). A search of Connecticut case law has failed to yield any legal authority which states that a subrogating insurer takes both the rights <u>and the liabilities</u> of its insured.

Meanwhile, the viability of counterclaims like those asserted by PWC has been addressed in Connecticut Courts. These courts have held that counterclaims which might otherwise be asserted against an insured may not be asserted against a subrogated insurer who stands in the shoes of the insured. *See Royal Insurance Co. v. Prudential Residential Services, L.P.*, 2003 Conn.Super. Lexis 372 (February 13, 2003) (attached); *Liberty Mutual Insurance Company v. Luna*, 30 Conn.Supp. 89, 481 A.2d 427 (1984) (Superior Court granted motion to strike counterclaim finding that since there was no allegation that the insurance company had anything to do with the accident, there was no basis for bringing an action against the insurance company.); *see also* 16 G. Couch, Insurance (2d Ed. 1983) § 61:236, p. 296 (qualifying the notion that an insurer stands in the shoes of its insured to exclude an insurer's liability for counterclaims which could be brought against the insured).

Connecticut Courts have drawn a similar conclusion regarding assigned claims as well. *See ICC Performance 2 Limited Partnership v. Pollack*, 1997 Conn.Super.LEXIS 1042 (attached) (granting motion to strike counterclaim on the basis that assignee could not be liable for conduct of assignor); *SCP Corp. v. BankBoston f/k/a Bank of Boston*, 1999 Conn.Super.LEXIS 780 (attached) (granting assignee's motion to strike counterclaim by a

- 5 -

729862.1

defendant asserting a counterclaim for breaches by the assignor); *see also New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc.*, 2002 U.S.Dist.LEXIS 2596 (D.Conn. 2002) (attached) ("in the absense of an express contract provision, an assignee is not required to assume the original responsibilities of the assignor.").

*Royal Insurance* is directly on point. In that case the counterclaims were premised on a contract between the insured and the defendant. In fact, one of the counterclaims was based upon a claimed obligation of indemnity. Nevertheless, in granting the insurer's motion to strike the counterclaims, the trial court held that since the insurer was not a party to that indemnification contract, the contract could not be enforced against that insurer. The court rejected the notion that the insurer left itself open to a claim by the defendant simply because it assumed the insured's rights to sue the defendant.

The present case is no different. PWC is attempting to enforce a contract it has with HHRG by asserting claims for setoff and recoupment against Underwriters. Since Underwriters were not a party to this contract, Underwriters do not have any obligations to indemnify PWC by virtue of their subrogated or assigned rights. Accordingly, the counterclaims PWC has asserted against Underwriters should be dismissed because the counterclaims do not state claims upon which relief can be granted.

### B.    HHRG did not agree to indemnify PWC for its own misconduct.

The indemnification language at issue is, in any event, insufficient under Connecticut law to allow PWC to be indemnified for its own misconduct. Underwriters' claims against PWC are based upon its negligent performance of its contract with HHRG, or alternatively, its failure to

perform its contractual obligations altogether. Thus, without misconduct on the part of PWC with respect to its obligations to HHRG, PWC will not be liable to Underwriters.

To the extent that PWC is found to be liable to Underwriters, PWC is asserting in its counterclaims that Underwriters has an obligation to indemnify it and that this indemnification should serve as either a setoff or recoupment for any obligation that PWC has to Underwriters. Nevertheless, it is well established in Connecticut that one cannot indemnify itself for one's own misconduct unless the indemnity provision explicitly provides for such indemnity. *Hyson v. White Water Mountain Resorts of Connecticut, Inc.*, 265 Conn. 636, 829 A.2d 827 (2003) (Connecticut Supreme Court concluded that indemnification agreements like releases must contain explicit language whereby the indemnitor indemnifies the indemnitee for its own negligence); *Griffin v. Nationawide Moving & Storage Co.*, 187 Conn. 405, 413, 446 A.2d 799 (1982) ("the law does not favor contract provisions which relieve a person from his own negligence").

Furthermore, to the extent that PWC is found to have breached its engagement, it is not entitled to enforce the indemnity provision against HHRG, or Underwriters. *Bouchard v. Bouchard*, 2001 Conn. Super. LEXIS 803 (attached) ("Under contract law, a material breach by one party discharges the other party's subsequent duty to perform on the contract"); *see also* 2 Restatement (Second), Contracts Section 237, p. 215 (1979) ("It is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.")

It is clear that the indemnity provision in the PWC engagement letter does not contain explicit language whereby HHRG will indemnify PWC for its own negligence. Moreover, it is

clear that before PWC will require indemnification, PWC will have to have been found to have breached the agreement itself either through its non-performance or its negligent performance. As such, since PWC's misconduct is a condition precedent for its entitlement for indemnification under the agreement, and since PWC is not entitled to indemnification for its own negligence or its prior breach of the agreement, PWC cannot state a claim for indemnity through its counterclaims against Underwriters. PWC's counterclaims against Underwriters lack legal sufficiency, and therefore, they must be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, this Court should dismiss the counterclaims asserted by PWC and grant Underwriters any such other and further relief that this Court deems just and equitable.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

By: _____
Fred Knopf (Ct-09427)
3 Gannett Drive
White Plains, New York 10604-3407
Phone (914) 323-7000, Ext. 4217
Facsimile (914) 323-7001
Knopff@wemed.com

One Stamford Plaza
263 Tresser Boulevard
9th Floor, Stamford, CT 06901
Tel: (203) 564-1900

Edward J. Boyle, Esq.
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
150 E. 42nd Street
New York, NY 10017
Phone: 212-490-3000
Fax: 212-490-3038

729862.1

Daniel J. McMahon, Esq.
Stefan R. Dandelles, Esq.
WILSON, ELSER, MOSKOWITZ, EDELMAN &
DICKER LLP
120 N. LaSalle Street
26th Floor
Chicago, IL 60602
Phone: 312-704-0550
Fax: 312-704-1522

729862.1

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was mailed on June 21, 2004 postage prepaid to all counsel of record as follows:

>David Elliott, Esq.
>William H. Erickson, Esq.
>Day, Berry & Howard
>CityPlace I
>Hartford, CT 06103
>
>William Champlin, III, Esq.
>William S. Fish, Jr., Esq.
>Tyler, Cooper & Alcorn
>CityPlace –35th Floor
>Hartford, CT 06103
>
>Steven Humphrey, Esq.
>Dina Fisher, Esq.
>Robinson & Cole
>280 Trumbull Street
>Hartford, CT 06103

_____
Fred N. Knopf, Esq.

729862.1

March 30, 1998

Mr. William Myles
Controller
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074

Dear Mr. William Myles:

This letter of arrangement between Handy & Harman Refining Group, Inc. (the "Company") and Coopers & Lybrand L.L.P. sets forth the nature and scope of the services we will provide, the Company's required involvement and assistance in support of our services, the related fee arrangements and other terms and conditions designed to assure that our professional services are performed to achieve the mutually agreed upon objectives of the Company.

## SUMMARY OF SERVICES

We will audit the consolidated financial statements of the Company as of and for the period ending March 31, 1998, in accordance with generally accepted auditing standards. The objective of an audit is the expression of our opinion concerning whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Company in conformity with generally accepted accounting principles. We expect to deliver our report on or about April 23, 1998. If, for any reason, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

The Company may wish to include these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other offering at some future date. Since such participation was not contemplated at the time of this audit, this would constitute a new engagement and, accordingly, you agree that the aforementioned financial statements and our audit report, or reference to our Firm, will not be included in any such offering without our prior written permission.

Any additional services that you may request, and that we agree to provide, will be the subject of separate written arrangements.

The engagement will be led by:

> George A. Ingram, partner, who will be responsible for assuring the overall quality, value, and timeliness of our services to you

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 2


PWC/H&H017381

> Joseph J. Tiroletto, director, who will be responsible for managing the delivery of our service to you

EXHIBIT A

David L. DeVore will serve as the concurring review partner and will be available in the absence of the engagement partner. This team will have access to a full range of specialists to assist as necessary.

## YOUR EXPECTATIONS

As part of our planning process, we have met with you to discuss your expectations of Coopers & Lybrand L.L.P., your concerns about your business, changes in your business and industry, your views on risks facing you, any relationship issues with Coopers & Lybrand L.L.P., and specific engagement arrangements and timing. Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the engagement objectives and meet, and/or exceed, your expectations. Our service plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance.

## TERMS AND CONDITIONS SUPPORTING FEE

As a result of our planning process, the Company and Coopers & Lybrand L.L.P. have agreed to a fee, subject to the following conditions.

To facilitate meeting our mutual objectives, the Company will provide in a timely manner audit schedules and supporting information, including timely communication of all significant accounting and financial reporting matters, as well as working space and clerical assistance as mutually agreed upon and as is normal and reasonable in the circumstances. When and if for any reason the Company is unable to provide such schedules, information and assistance, Coopers & Lybrand L.L.P. and the Company will mutually revise the fee to reflect additional services, if any, required of us to achieve these objectives. Such revisions will be set forth in the form of the attached "Amendment to Letter of Arrangement."

In providing our services, we will consult with the Company with respect to matters of accounting, financial reporting or other significant business issues. Accordingly, time necessary to effect a reasonable amount of such consultation is reflected in our fee. However, should a matter require research, consultation or audit work beyond that amount, Coopers & Lybrand L.L.P. and the Company will agree to an appropriate revision in services and fee. Such revisions will also be set forth in the form of the attached "Amendment to Letter of Arrangement."

Except for any changes in fees which may result from the circumstances described above, our fees will be limited to those set forth below.

PWC/H&H017382

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 3

**FEE**

Our fees for the services described above will be $85,000, plus out-of-pocket expenses, subject to the terms and conditions above. Such expenses will include all travel, lodging, subsistence and an allocation of office charges in support of our services including computer usage, telephone, facsimile transmission, postage, photoreproduction and similar expenses.

Our fees and out-of-pocket expenses will be billed periodically as incurred. Invoices rendered are due and payable upon receipt.

**LIMITATIONS OF THE AUDITING PROCESS**

Our audit will include procedures designed to obtain reasonable assurance of detecting misstatements due to errors or fraud that are material to the financial statements. As you are aware, however, there are inherent limitations in the auditing process. For example, audits are based on the concept of selective testing of the data being examined and are, therefore, subject to the limitation that misstatements due to errors or fraud, if they exist, may not be detected. Also, because of the characteristics of fraud, including attempts at concealment through collusion and forgery, a properly designed and executed audit may not detect a material misstatement due to fraud.

Similarly, in performing our audit we will be aware of the possibility that illegal acts may have occurred. However, it should be recognized that our audit provides no assurance that illegal acts generally will be detected, and only reasonable assurance that illegal acts having a direct and material effect on the determination of financial statement amounts will be detected. We will inform you with respect to material errors and fraud, or illegal acts that come to our attention during the course of our audit.

**RESPONSIBILITIES AS TO INTERNAL CONTROL**

As a part of our audit, we will consider the Company's internal control, as required by generally accepted auditing standards, sufficient to plan the audit and to determine the nature, timing, and extent of auditing procedures necessary for expressing our opinion concerning the financial statements. You recognize that the financial statements and the establishment and maintenance of effective internal control over financial reporting are the responsibility of management. Appropriate supervisory review procedures are necessary to provide reasonable assurance that adopted policies and prescribed procedures are adhered to and to identify errors and fraud or illegal acts. An audit is not designed to provide assurance on internal control, including whether the Company has addressed or will be able to address on a timely basis any Year 2000 issues relating to computerized operations. As part of our consideration of the Company's internal control, however, we will inform you of matters that come to our attention that represent significant deficiencies in the design or operation of the internal control.

PWC/H&H017383

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 4

We are prepared at your request to perform a more in-depth assessment of the Company's internal control, and report our findings and recommendations, or to conduct an examination engagement on the effectiveness of your internal control. We would be pleased to discuss fees for these services, which depend on their scope.

## REPRESENTATION FROM MANAGEMENT

Management is responsible for the fair presentation of the financial statements in conformity with generally accepted accounting principles, for making all financial records and related information available to us, and for identifying and ensuring that the entity complies with the laws and regulations applicable to its activities. At the conclusion of the engagement, the Company's management will provide to us a representation letter that, among other things, addresses these matters and confirms certain representations made during the audit, including, to the best of their knowledge and belief, the absence of fraud involving management or those employees who have significant roles in the entity's internal control, or others where it could have a material effect on the financial statements.

The Company hereby indemnifies Coopers & Lybrand L.L.P. and its partners, principals and employees, and holds them harmless from all claims, liabilities, losses, and costs arising in circumstances where there has been a knowing misrepresentation by a member of the Company's management, regardless of whether such person was acting in the Company's interest. This indemnification will survive termination of this letter of arrangement.

## COMMUNICATIONS

At the conclusion of the engagement, we will provide management, in a mutually agreeable format, our recommendations designed to help the Company make improvements in its internal control and operations, and other matters that may come to our attention (see "Responsibilities as to Internal Control" above).

As part of this engagement we will ensure that certain additional matters are communicated to the appropriate members of management. Such matters include (1) the initial selection of and changes in significant accounting policies and their application; (2) the process used by management in formulating particularly sensitive accounting estimates and the basis for our conclusions regarding the reasonableness of those estimates; (3) audit adjustments that could, in our judgment, either individually or in the aggregate, have a significant effect on your financial reporting process; (4) any disagreements with management, whether or not satisfactorily resolved, about matters that individually or in the aggregate could
be significant to the financial statements or our report; (5) our views about matters that were the subject of management's consultation with other accountants about auditing and accounting matters; (6) major issues that were discussed with management in connection with the

PWC/H&H017384

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 5

retention of our services, including, among other matters, any discussions regarding the application of accounting principles and auditing standards; and (7) serious difficulties that we encountered in dealing with management related to the performance of the audit.

As part of our ongoing process of assessing the quality of our services, you may receive questionnaires from us and/or visits from senior partners not directly involved in providing services to you. We appreciate the attention that you give to these and value your commentary. Additionally, if you have questions or concerns about our services, you may contact Philip Schulz, the Business Assurance Partner-In-Charge responsible for the engagement team serving you.

## ACCESS TO WORKING PAPERS

The working papers for this engagement are the property of Coopers & Lybrand L.L.P. and constitute confidential information. Except as discussed below, any requests for access to our working papers will be discussed with you prior to making them available to requesting parties.

Our Firm, as well as all other major accounting firms, participates in a "peer review" program, covering our audit and accounting practices. This program requires that once every three years we subject our quality assurance practices to an examination by another accounting firm. As part of the process, the other firm will review a sample of our work. It is possible that the work we perform for you may be selected by the other firm for their review. If it is, they are bound by professional standards to keep all information confidential. If you object to having the work we do for you reviewed by our peer reviewer, please notify us in writing.

We may be requested to make certain working papers available to regulators pursuant to authority given to it by law or regulation. If requested, access to such working papers will be provided under the supervision of Coopers & Lybrand L.L.P. personnel. Furthermore, upon request, we may provide photocopies of selected working papers to the regulators. The regulators may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies.

## SUBPOENAS

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

**********************

PWC/H&H017385

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 6

If the foregoing is in accordance with your understanding, please sign the copy of this letter in the space provided and return it to us. If you have any questions, please call George Ingram at (860)241-7010.

Very truly yours,


Attachment



SUBMITTED BY: George Ingram

ACCEPTED BY:                                                    DATE

TITLE

PWC/H&H017386

## AMENDMENT #___ TO LETTER OF ARRANGEMENT

(Date)

Mr. William Myles
Controller
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074

Dear Mr. William Myles:

The letter of arrangement dated March 30, 1998 between Coopers & Lybrand L.L.P. and Handy & Harman Refining Group, Inc. is hereby amended to reflect the following:

| Description of/Causes for Amendment | Estimated Fees Impact |
|---|---|
| | $ |
| Total this amendment | |
| Previous fee estimate | 85,000 |
| Revised fee estimate | $ |

Please sign the copy of this letter in the space provided and return it to us. If you should have any questions, please call George Ingram at (860)241-7406.

Very truly yours,


SUBMITTED BY: George Ingram

ACCEPTED BY:                                    DATE

TITLE

PWC/H&H017387

We believe that if the client is able to satisfy the criteria in paragraph 9 of FAS 80 regarding anticipated transactions, hedge accounting would be appropriate for both situations. Specifically, if H&H can accurately predict that it will have future sales of silver (that will result from purchasing the metal up front from its customers and then reselling the silver once the metal has been through the refining process), hedge accounting could be applied, where gains and losses on the indexed debt are deferred.

We also believe that paragraph 9 of FAS 80 would apply to situations regarding H&H's ability to deliver retention to satisfy debt payment. Specifically, changes in the amount of the debt obligation would be deferred on the balance sheet to the extent H&H could demonstrate that it will generate retention in the future that will yield gains and losses equivalent to those deferred on the debt (i.e., ounces of silver borrowed would have to be matched to ounces of silver expected to be produced and delivered to repay the debt). In this situation, however, the ounces of retention (that will be used to repay the debt) would have to be recognized on the accounting records at the spot price in existence at the time of the borrowing.

Lastly, we also believe H&H could apply hedge accounting by analogy in those situations where it has a firm commitment to refine silver in future months, and the initial amount of the debt (i.e., in ounces) can be matched to the expected quantity of silver to be refined.

Documents Attached

1. EITF Issue No 86-28 "Accounting Implications of Indexed Debt Instruments"
2. CM 87-12-014
3. FARM Section 80 Debt/Indexed Debt Instruments
4. Data Line 1996-87 Indexed Debt Instruments
5. Data Line 1986-75 FASB Emerging Issues Task Force Activities

PWC/H&H017388

## ACKNOWLEDGMENT OF ASSIGNMENT AND SUBROGATION

In consideration for the payment made by Those Certain Underwriters subscribing to Policy No. 834/FB9700166 ("the Policy") issued for the policy period 24 June 1997 to 24 June 2000 ("Underwriters"), and the other promises made by Underwriters in the Settlement Agreement between Underwriters and Handy & Harman Refining Group, Inc. ("HHRG"), executed contemporaneous with this document, HHRG agrees as follows:

1. HHRG assigns to Underwriters all rights, title and interest in any and all claims which HHRG has, had, or may ever have as to all losses asserted by HHRG in the written claim of 22 February 2000 submitted by HHRG to Underwriters under the Policy, and which were more fully explained in a memorandum submitted to Underwriters on 9 March 2000 and more fully documented in a proof of loss submitted to Underwriters dated 9 October 2000, and which were the subject of claims submitted to Chubb and/or Federal Insurance Company and to Hiscox ("the Losses"), plus interest, costs, and punitive damages arising from the Losses, including but not limited to, any and all such claims against (a) Barry Wayne, Richard L. Searle, Louis Posado, Michael Verleysen, Manuel Seaone, Carlos Augspach, Frank Phillips, Jorge Washington, Erick Claudet, Linneo Klocker, Fernando Limo, Mario Seaone, and Jorge Passaro and their relatives, corporations, affiliates, and assigns; (b) Panexim and any and all employees or agents of Panexim or related entities; (c) SUNAT; (d) The Peruvian Government; (e) PriceWaterhouseCoopers and its predecessors, successors, agents and assigns; (f) Hermes; (g) Alex Stewart Assayers; (h) The Chubb Corporation or Federal Insurance Company and Hiscox. With the exception of any claims asserted against Chubb, Federal Insurance Company, or Hiscox, which are subject to paragraphs 11 and 12 of the Settlement Agreement referenced above, HHRG acknowledges that this assignment is full and complete and without reservation, for Underwriters to pursue recovery of the Losses.

2. In addition to the assignment set forth in paragraph one, above, HHRG further acknowledges Underwriters as subrogee pursuant to the Policy as to the Losses asserted by HHRG.

HANDY & HARMAN REFINING GROUP, INC.

By: _____

Title: Joe Harwith Capacity custodian LLC

Date: 12/28/01


EXHIBIT B

124530.1

LEXSEE 2003 CONN.SUPER.LEXIS 372

Royal Insurance Co. v. Prudential Residential Services, L.P.

CV010185458

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF STAMFORD-NORWALK AT STAMFORD

*2003 Conn. Super. LEXIS 372*

February 13, 2003, Decided
February 13, 2003, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Plaintiff's motion to strike third counterclaim granted.

**LexisNexis(R) Headnotes**

**JUDGES:** TAGGART D. ADAMS, SUPERIOR COURT JUDGE.

**OPINIONBY:** TAGGART D. Adams

**OPINION:** MEMORANDUM OF DECISION RE MOTION TO STRIKE (125.00)

FACTS

On August 21, 2001, the plaintiff, Royal Insurance Company (Royal) commenced this subrogation action by service of the summons and complaint on the defendant, Prudential Residential Services Limited Partnership, doing business as Prudential Relocation Management (Prudential). In its single-count complaint against Prudential, the plaintiff alleges that Prudential breached its contract with the plaintiff's insured, John Helmers. Specifically, Royal alleges that John and Adele Glenn Helmers (Helmers) entered into a contract with Prudential for the purchase of a property owned by Prudential in Darien, Connecticut. The plaintiff further alleges that, pursuant to paragraph eighteen of the seller's rider, Prudential represented that the property did not contain any leaking fuel tanks, oil contamination or abandoned underground fuel oil tanks. [*2] The sale was consummated on February 11, 1997, after which the Helmers allegedly discovered fuel oil in a stream located on the property, an oil leak from an underground fuel line and an abandoned underground fuel oil tank. Due to Prudential's alleged breach of contract, Royal, in its capacity as John Helmers' insurer, allegedly paid $ 65,000 in insurance proceeds to John Helmers for remediation of the property. Royal claims that, as a result, it is subrogated to the rights of its insured against Prudential to the extent of that payment.

On May 22, 2002, Prudential filed a motion to implead the Helmers and two additional parties as third-party defendants, alleging that they are potentially liable to Prudential for the plaintiff's claim. The motion was granted by the court (Ryan, J.) on June 4, 2002.

On September 12, 2002, Prudential filed a second amended answer, special defenses, and counterclaims. In its first counterclaim, for breach of contract, Prudential alleges that it entered into a contract with the Helmers in which the Helmers agreed to notify Prudential of any defects in the property within a specific time limit. Prudential alleges that the Helmers breached the contract [*3] because they failed to notify it of any defects within that time limit. In its second counterclaim, Prudential alleges that, pursuant to its contract with the Helmers, Royal, as subrogee of John Helmers, is obligated to defend and indemnify Prudential in connection with the present action. In its third counterclaim, Prudential asserts a cause of action against Royal for vexatious litigation, based on the plaintiff's conduct in initiating and prosecuting the present action.