On September 26, 2002, the plaintiff filed a motion to strike all three counterclaims, accompanied by a memorandum in support. On October 16, 2002, Prudential filed a memorandum in opposition.

## DISCUSSION

"A motion to strike tests the legal sufficiency of a cause of action and may properly be used to challenge the sufficiency of a counterclaim." *Fairfield Lease Corp. v. Romano's Auto Service, 4 Conn.App. 495, 496, 495 A.2d 286 (1985);* see also Practice Book § 10-39(a). "In determining the sufficiency of a [counterclaim] challenged by a [plaintiff's] motion to strike, all well-pleaded facts and those facts necessarily implied from the allegations are taken as admitted." (Internal quotation [*4] marks omitted.) *Gazo v. Stamford, 255 Conn. 245, 260, 765 A.2d 505 (2001).* "A motion to strike admits all *facts* well pleaded; it does not admit *legal conclusions or the truth or accuracy of opinions* stated in the pleadings." (Emphasis in original; internal quotation marks omitted.) *Faulkner v. United Technologies Corp., 240 Conn. 576, 588, 693 A.2d 293 (1997).* "A motion to strike is properly granted if the [counterclaim] alleges mere conclusions of law that are unsupported by the facts alleged." *Novametrix Medical Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 215, 618 A.2d 25 (1992).* "If facts provable in the [counterclaim] would support a cause of action, the motion to strike must be denied." (Internal quotation marks omitted.) *Gazo v. Stamford, supra, 260.*

Royal moves to strike all three counterclaims on the ground that Prudential may not assert counterclaims against it as subrogee in this subrogation action. Although the plaintiff concedes that it, as subrogee of its insured, John Helmers, stands in the place of its insured and is, therefore, subject to any and all defenses that Prudential has [*5] against its insured, it argues that a counterclaim is not a defense. Prudential counters that the plaintiff, as subrogee, stands in the shoes of its insured and is, therefore, subject to any claims that arose out of the transaction that is the subject of the plaintiff's complaint.

"In its simplest form, subrogation allows a party who has paid a debt to 'step into the shoes' of another . . . to assume his or her legal rights against a third party to prevent that party's unjust enrichment . . . In that way, an insurance company, for example, can be substituted for the insured in an action against a third-party tortfeasor. The insured, having been paid by the insurer, in essence, transfers his rights against the tortfeasor to the insurer. The insurer, thus, can attempt to collect from the party that caused the loss to the extent expended by the insurer in satisfying the claim." (Citation omitted.) *Wasko v. Manella, 74 Conn.App. 32, 35-36, 811 A.2d 727 (2002).*

"The insurer's right of subrogation against third persons causing the loss paid by the insurer to the insured . . . arises out of the contract of insurance and is derived from the insured alone. Consequently, [*6] the insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses. The principle has been frequently expressed in the form that the rights of the insurer against the wrongdoer cannot rise higher than the rights of the insured against such wrongdoer, since the insurer as subrogee . . . stands in the place of the insured and succeeds to whatever rights he may have in the matter. Therefore, *any defense* which a wrongdoer has against the insured is good against the insurer subrogated to the rights of the insured." (Emphasis added; internal quotation marks omitted.) *Orselet v. DeMatteo, 206 Conn. 542, 546-47, 539 A.2d 95 (1988).*

Although the Connecticut Supreme and Appellate Courts have not ruled on the question of whether a defendant may assert a counterclaim against an insurer in a subrogation action, other authorities have distinguished the defendant's right to bring a special defense from the defendant's right to bring a counterclaim. According to one such authority, "as a qualification to the concept that the subrogated insurer stands in the identical position as the insured subrogor, it may [*7] be held that the subrogee is not subject to counterclaims which the wrongdoer could have asserted had he been sued by the insured." 16 G. Couch, Insurance (2d Ed. 1983) § 61:236, p. 296. For example, in both *Seaco Ins. Co. v. Devine Bros., Inc.,* Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 00 0374721 (June 13, 2001, Skolnick; J.) (29 Conn. L. Rptr. 742), and *Liberty Mutual Ins. Co. v. Luna, 40 Conn.Sup. 89, 481 A.2d 427 (1984),* the Superior Court rejected the proposition that a defendant is entitled to assert a counterclaim against a subrogee for the tortious conduct of its insured. In the former case, in which the insured was not a party to the action, the court explained that while a subrogee succeeds to the rights of the insured and is subject to all defenses which would have been available against the insured, "a counterclaim is not one of these rights or defenses and, therefore, cannot be asserted against a nonparty to the action." *Seaco Ins. Co. v. Devine Bros., Inc., supra,* 29 Conn. L. Rptr. 742-43.

Likewise, in *Liberty Mutual Ins. Co. v. Luna, supra, 40 Conn.Sup. 89-90,* a motor vehicle collision [*8] case, the defendant filed a counterclaim against the plaintiff, alleging that the plaintiff's insured was responsible for the collision. The court granted the plaintiff's motion to strike the counterclaim, concluding that "while the negligence of [the insured] may constitute a defense to the plaintiff's action, that is not to say that it provides the basis for [a counterclaim] against the plaintiff." *Id., 90.*

Other Superior Court decisions addressing this issue have rejected the proposition that a defendant is entitled to assert a counterclaim against a subrogee for the tortious conduct of its insured, albeit by implication. For example, in *Allstate Ins. Co. v. Appell*, 39 Conn.Sup. 85, 85-86, 468 A.2d 949 (1983), and *Hartford Fire Ins. Co. v. Lewis*, 16 Conn.Sup. 90 (1948), both courts ordered the subrogee's insured to be cited in to respond to the defendant's proposed counterclaims. n1

n1 This policy is consistent with the procedure enunciated in Practice Book § 10-10: "In any action for legal or equitable relief, any defendant may file counterclaims against any plaintiff and cross claims against any codefendant provided that each such counterclaim and cross claim arises out of the transaction or one of the transactions which is the subject of the plaintiff's complaint; *and if necessary, additional parties may be summoned in to answer any such counterclaim or cross claim.*" (Emphasis added.)

[*9]

The above cases, both explicitly and implicitly, have rejected the contention that a defendant can assert a counterclaim against a subrogee for the tortious conduct of its insured. Although these decisions are not binding on this court, their reasoning is nonetheless persuasive. Prudential's first and second counterclaims are both premised upon a contract between Prudential and the Helmers, a contract to which the plaintiff was not a party. Given that a contract cannot be enforced against a plaintiff who is not a party to the contract; *Reynolds v. Owen*, 34 Conn.Sup. 107, 111, 380 A.2d 543 (1977); the court grants the plaintiff's motion to strike the first and second counterclaims. n2

n2 It should be noted that in counts three and four of its third-party complaint, filed July 12, 2002, Prudential alleges causes of action for both breach of contract and indemnification against the Helmers. These counts track almost verbatim the language of the first and second counterclaims filed against the plaintiff.

[*10]

In the third counterclaim, Prudential asserts a cause of action against the plaintiff for vexatious litigation. This presents a different situation, because this claim is based upon the plaintiff's alleged conduct, and not upon that of its insured. Prudential alleges that the "plaintiff has commenced and prosecuted the instant action against

Prudential Relocation without probable cause and with malicious intent to unjustly vex and trouble Prudential." Royal argues that the vexatious litigation claim is legally insufficient because Prudential cannot bring the claim when the underlying action is still pending. The defendant counters that pursuant to the policy of judicial economy, it may assert a counterclaim for vexatious litigation while the underlying case is still pending.

"In suits for vexatious litigation, it is recognized to be sound policy to require the plaintiff to allege that prior litigation terminated in his favor. This requirement serves to discourage unfounded litigation without impairing the presentation of honest but uncertain causes of action to the courts . . . The requirement furthermore serves the interest of finality of judicial decisions by preventing a person [*11] who was unsuccessful in the original proceeding from relitigating the same issues in a subsequent action for vexatious litigation." (Citation omitted; internal quotation marks omitted.) *Zeller v. Consolini*, 235 Conn. 417, 424, 667 A.2d 64 (1995). The Supreme Court endorsed this policy recently in dicta in *QSP, Inc. v. Aetna Casualty & Surety Co.*, 256 Conn. 343, 361, 773 A.2d 906 (2001). A majority of Superior Court decisions have accepted this premise and have stricken vexatious litigation counterclaims when they are asserted within the same case that the counterclaiming party alleges to be vexatious. See, e.g., *Classic Limousine Airport Service, Inc. v. Alliance Limousine*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 99 0174911 (August 13, 2002, D'Andrea, J.T.R.), and cases cited therein; *Traba v. New Haven Ballet*, Superior Court, judicial district of New Haven, Docket No. CV 01 0453157 (October 2, 2001 Robinson, J.); *Gilbert v. Beaver Dam Assn., Stratford*, Superior Court, judicial district of Fairfield at Bridgeport, Docket No. CV 00 0374905 (July 24, 2001, Rush, J.). n3 This court agrees with the policy [*12] stated in *Zeller v. Consolini* and with the majority of Superior Court decisions that have addressed this issue. In the present action, Prudential does not allege that prior litigation has terminated in its favor, but, rather, that "upon information and belief, the instant action will be terminated in [Prudential's] favor." For the above reasons the court grants the plaintiff's motion to strike the third counterclaim.

n3 But see *DeSarbo & Reichert P.C. v. Cardow*, Superior Court, judicial district of New Haven, Docket No. CV 94 0360368 (December 5, 1996, Hodgson, J.) (18 Conn. L. Rptr. 301); *Pattrell v. Ayers*, Superior Court, judicial district of Litchfield, Docket No. FA 89 0049825 (March 31, 1994, Dranginis, J.) (11 Conn. L. Rptr. 346, 9 C.S.C.R. 442); *Sonitrol Security Systems of*

2003 Conn. Super. LEXIS 372, *

*Hartford, Inc. v. Dept. of Administrative Services*,
Superior Court, judicial district of Hartford-New
Britain, Docket No. 702181 (November 10, 1992,
Schaller, J.).

TAGGART D. ADAMS

SUPERIOR COURT JUDGE

LEXSEE 1999 CONN. SUPER. LEXIS 780

**SCP Corp. v. BankBoston fka Bank of Boston, Connecticut et al.**

XO1CV 980116198

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF
WATERBURY, AT WATERBURY**

*1999 Conn. Super. LEXIS 780*

**March 18, 1999, Decided
March 18, 1999, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Motion to strike granted as to both counts of complaint addressed to WHTR Real Estate Limited Partnership.

**LexisNexis(R) Headnotes**

**JUDGES:** Beverly J. Hodgson, Judge of the Superior Court.

**OPINIONBY:** BEVERLY J. HODGSON

**OPINION:** Memorandum of Decision on Motion to Strike of WHTR Real Estate Limited Partnership

The defendant WHTR Real Estate Limited Partnership ("WHTR"), which purchased loan documents and a mortgage from the co-defendant bank, has moved to strike claims of breach of contract and conversion brought by the plaintiff SCP Corporation ("SCP"), a party that had held an option to purchase the same obligations.

The counts that are the subject of the motion to strike filed by WHTR are the third count, in which SCP alleges that WHTR is liable for an alleged breach of a contract signed by SCP and Bank of Boston Connecticut, the precursor to co-defendant BankBoston ("bank"), and the fourth count, in which SCP alleges that WHTR

unlawfully converted to its own use a claim for deficiency that the plaintiff alleges should have been conveyed to it [*2]  by the bank.

The contract upon which the plaintiff bases its claims against WHTR has been appended to and incorporated by reference into the allegations of the complaint.

WHTR asserts that the plaintiff has not stated a cognizable claim against it in breach of contract because as a matter of law it had no obligation to SCP under the contract invoked. WHTR asserts that SCP has failed to state a cause of action in conversion and that, alternatively, the statute of limitation has expired on the plaintiff's conversion claim.

Standard of review

The function of a motion to strike is to test the legal sufficiency of the allegations of a complaint to state a claim upon which relief can be granted. *Novametrix Medical Systems, Inc. v. BOC Group, Inc., 224 Conn. 210, 214-15, 618 A.2d 25 (1992); Ferryman v. Groton, 212 Conn. 138, 142, 561 A.2d 432 (1989);* Practice Book 10-39.

In adjudicating a motion to strike, the court must construe the facts alleged in the complaint in the manner most favorable to the plaintiff. *Bohan v. Last, 236 Conn. 670, 675, 674 A.2d 839 (1996); Sassone v. Lepore, 226 Conn. 773, 780, 629 A.2d 357 (1993); Novametrix Medical Systems, [*3] Inc. v. BOC Group, Inc., supra, 224 Conn. 215; Gordon v. Bridgeport Housing Authority, 208 Conn. 161, 170, 544 A.2d 1185 (1988).* The requirement of favorable construction does not extend, however, to legal opinions or conclusions stated

in the complaint, but only to factual allegations and the facts "necessarily implied and fairly provable under the allegations." *Forbes v. Ballaro, 31 Conn. App. 235, 239, 624 A.2d 389 (1993).* Conclusory statements or statements of legal effect not supported by allegations of fact will not enable a complaint to withstand a motion to strike. *Mingachos v. CBS, Inc., 196 Conn. 91, 108, 491 A.2d 368 (1985); Fortini v New England Log Homes, Inc., 4 Conn. App. 132, 134-35, 492 A.2d 545 (1985),* cert. dismissed, *197 Conn. 801, 495 A.2d 280 (1985).*

Breach of contract claim (Third Count)

In the first forty-six paragraphs of its amended complaint, the plaintiff alleges that on June 19, 1992, it entered into a contract titled "Sale and Assignment Agreement" ("the Agreement") with the bank, which had loaned ten million dollars to a general partnership known as Sursum Corda Properties, which was developing a research facility with Yale University School of [*4] Medicine. The loan is alleged to have been evidenced by a promissory note and secured by a first mortgage on real property that the borrower was purchasing for the project. The bank is alleged to have commenced a foreclosure action and other enforcement actions against the borrower and guarantors and, while those actions were pending, to have entered into the Agreement with SCP.

Construction of the terms of a contract is a matter of law, and "where there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Pesino v. Atlantic Bank of New York, 244 Conn. 85, 92, 709 A.2d 540 (1998).*

By the terms of the Agreement, SCP acquired the right to buy the loan documents and seek to substitute itself as the plaintiff in the foreclosure action upon payment of $ 2,250,000 if the purchase was made before December 15, 1992, or $ 3,250,000 if the purchase was made after that date but before March 31, 1993. The Agreement further provided that if the bank had taken title between the December and March dates, such that the claim remaining against the debtor was a claim for a deficiency, what would be conveyed [*5] to SCP at a closing, would be the deficiency claim only. The Agreement provides at paragraph 1(b) that the closing "shall occur on or before that date . . . which is the earlier to occur of (i) March 31, 1993 and (ii) fifteen (15) days following the date (the 'Title Date') on which the Assignor acquires fee simple absolute title to the Property . . ." The same paragraph provides that "if the Closing does not occur on or before the earlier of the dates set forth above, then, except as set forth in paragraph 18 hereof, all of the rights and obligations of

the parties hereto under this Agreement shall terminate immediately without notice or action of any kind whatsoever." In paragraph 18, the parties agreed to keep the Agreement and its terms confidential.

The plaintiff alleges that the bank breached the contract by failing to use its best efforts to pursue the foreclosure and enforcement actions in such a way that the deficiency claims would come into existence between December 15, 1992 and March 31, 1993. The plaintiff claims that the bank delayed the action, declared the plaintiff's rights to have expired as of March 31, 1993, and then sold the loan documents as part of a multi-million [*6] dollar sale of a pool of many loans to WHBB Real Estate Limited Partnership, a predecessor of WHTR, in September 1994.

This court has stricken claims against the bank except the claim of breach of the implied covenant of good faith and fair dealing with regard to the obligations set forth in paragraph 4(b) of the Agreement and the claim of breach of the confidentiality agreement.

The plaintiff claims that WHTR is liable because "it assumed and accepted the Bank's unperformed duties, including the Bank's obligation to convey to the plaintiff deficiency claims against Sursum and the Guarantors." The plaintiff also alleges that the agreement was "one of the documents assigned to WHBB by the Bank" and that SCP assumed the bank's duties and liabilities under that agreement because it honored certain obligations of the bank under other agreements, specifically, a Forbearance Agreement with the guarantors of the Sursum loan.

The plaintiff also alleges that "pursuant to paragraph 13 of the Sale and Assignment Agreement, and by virtue of the foregoing, WHBB and WHTR, as WHBB's successor by merger, are bound by the sale and Assignment Agreement to the same extent as was the Bank." [*7] The cited provision in the Agreement, paragraph 13, states that "this Agreement shall be binding on, and inure to the benefit of, the parties hereto and their successors and assigns."

The plaintiff has not alleged that WHBB or WHTR ever agreed to assume any liability of the bank for prior breaches of the Agreement. The plaintiff does not directly allege that the bank assigned the Agreement to WHBB; however, it alleges at paragraph 38 of the amended complaint that the bank assigned "the Note, the Mortgage and all other documents and claims relating to the Loan [to WHBB]." The plaintiff argues that this allegation supports the implication that the bank assigned the Agreement as a document "relating to the Loan."

In its motion to strike, WHTR asserts that there is no cause of action against an assignee for an expired obligation, and that the allegations of the complaint are insufficient to state a cause of action against it for the liabilities of the bank for any breach occurring before the expiration date.

This court has stricken claims against the bank that were based on the assertion that the bank's obligation to convey deficiency claims existed after March 31, 1993. [*8] The plain words of the contract defeat the plaintiff's conclusory allegations that such an obligation existed after March 31, 1993. Accordingly, even if the bank had assigned the Agreement to WHBB as the plaintiff has barely alleged, there was no obligation left to perform under that agreement because the bank's duty to convey any rights under the loan documents, including deficiency claims, ended on March 31, 1993, almost eighteen months before the transfer of the loan documents to WHBB.

The plaintiff asserts, however, that WHTR is liable for breaches of the Agreement by the bank that occurred before the alleged assignment of the Agreement to WHBB. While Connecticut's appellate courts do not appear to have had an occasion to consider precisely the issue of the liability of an assignee for pre-assignment breaches by the assignor, numerous other courts have ruled that to be liable for the assignor's nonperformance of duties under a contract, the assignee must have expressly assumed liability for the prior breaches. See, e.g., *Homa v. Friendly Mobile Manor, 93 Md. App. 337, 612 A.2d 322, 329-30 (Md. App. 1992)*, appeal dismissed, *330 Md. 318, 624 A.2d 490 (Md. 1993); Rittenberg* [*9] *v. Donohoe Construction Co., Inc., 426 A.2d 338, 341-42 (D.C.App. 1981); Pumphrey v. Kehoe, 261 Md. 496, 276 A.2d 194 (Md. 1971); Tel-Hotel Corp. v. Lexnott Corp., 205 Misc. 576, 124 N.Y.S.2d 159 (1953); Litton ABS v. Red-Yellow Cab Co., 64 Ohio App. 2d 111, 411 N.E.2d 808, 810 (Ct.App. Ohio 1978); Quest v. Robertson, 71 Ill. App. 3d 678, 388 N.E.2d 1335, 27 Ill. Dec. 286 (2d Dist. Ill.)*, appeal denied, *79 Ill. 2d 617 (1979).*

Illustratively, in *Rittenberg v. Donohue Construction Co., Inc., supra, 426 A.2d 338,* a plaintiff sought to hold an assignee liable for past breaches of the assigned contract by the assignor. Noting that the complaint did "not allege that [the assignee] bound itself in any way to be responsible for performance of any lease covenants," the court ruled that an assignee is not liable for pre-assignment breaches absent an allegation that it assumed liability for those past breaches. *Id., 341.* Similarly, in *Litton ABS v. Red-Yellow Cab Co., supra, 411 N.E.2d 810,* the Ohio Court of Appeals ruled that "an assignment

does not cast upon the assignee any affirmative liability on the contract assigned unless there is an assumption [*10] of the assignor's obligations under the contract." The Ohio court observed that a third party's claims of fraud, misrepresentation and breach of warranty could be asserted only against the assignor, not against the assignee. See also *American National Co. v. Thompson Spot Welder Co., 30 Ohio App. 156, 164 N.E. 435 (Ohio App. 1928).*

Where, as in the case before this court, the assigned contract merely states that it is to be binding on assigns, an assignee does not become liable for any pre-assignment breaches or liabilities of the assignor, unless there is also an express acceptance of such liability at the time of assignment. *Rittenberg v. Donohoe Construction Co., Inc., supra, 426 A.2d 341-42.* This principle was applied in *Quest v. Robertson, supra, 388 N.E.2d 1335.* In that case, buyers of a car wash entered into an installment contract with the sellers. The contract contained the statement that it was "binding upon . . . the assigns of the seller and the buyer." The buyers assigned their interest to assignees who did not make the installment payments to the sellers. The Appellate Court of Illinois ruled that the buyers' assignees were not liable for the buyers/assignors [*11] obligation to pay installments because they had not expressly agreed to assume that obligation. Accordingly, the court held that only the original buyers were responsible for the installment payments required by their contract with the sellers.

More recently and closer to home, another Superior Court Judge has granted a motion to strike claims against an assignee for pre-assignment breach, where the plaintiff did not allege any express agreement by the assignee to assume liability for such breach. *ICC Performance 2 Limited Partnership v. Pollack, 1997 Conn. Super. LEXIS 1042,* Superior Court, Judicial District of Fairfield at Bridgeport, Docket No. 313596, 19 CONN. L. RPTR. 384, *1997 WL 200795* (April 16, 1997) (Levin, J.).

The Restatement of Contracts (Second) provides no definitive guidance on the issue of an assignee's duties with regard to prior breaches by an assignor. In the illustrations to 238 of the Restatement, which concerns delegation of duties to be performed by an assignor, the commentators cite a case indicating that the delegation does not include delegation of liability for past breaches by the assignor. The cited case is *Daniels v. Parker, 209 Ore. 419, 306 P.2d 735 (Ore. 1957).* [*12] In that case, a car dealership sold a car to a customer, then assigned the car loan to the defendant, who collected all payments. After the customer sold the car to another buyer, it was

discovered that the original car dealership had not held valid title to the car, which was a stolen car. The Oregon Supreme Court ruled that the defendant assignee was not liable for the original dealer's breach of contract.

All of the cases cited by the plaintiff concern an assignee's duty to perform the unperformed duties of the assignor under a contract which is still in force, not the duty to compensate the other party for breaches by the assign that occurred prior to the assignment. *Pargman v. Maguth, 2 N.J. Super. 33, 64 A.2d 456 (App. Div. N.J. 1949),* on which the plaintiff relies, in fact applies the principle that the assignee is not liable for past acts of the assignor.

The plaintiff has not alleged that WHBB expressly agreed to assume liability for past breaches of the Agreement by the bank. As the cases cited above make clear, the provision in the Agreement itself that the agreement will be binding on assigns does not constitute express assumption of such liability. Without [*13] such an express assumption of the liabilities of another, the assignee is not liable for the pre-assignment breaches simply on the basis of the alleged assignment itself. The plaintiff has failed to state a cause of action in breach of contract against WHTR.

Conversion Claim (Count Four)

WHTR has moved to strike the fourth count of the complaint, in which the plaintiff alleges that WHTR converted to its own use deficiency claims that were the property of the plaintiff. The movant asserts two grounds: (1) the plaintiff has not described an ownership interest to which a conversion claim applies, and (2) the statute of limitation has passed on a conversion claim if one exists.

"Conversion" of an unadjudicated claim

WHTR asserts that the allegation that it acquired the loan documents by assignment after March 31, 1993, does not state a cause of action in conversion. Conversion is

an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. It is some unauthorized act which deprives another of his property permanently or for an indefinite time, some unauthorized assumption and exercise of the [*14] powers of the owner to his harm. The essence of the wrong is that the property rights of the plaintiff have been dealt with in a manner adverse

to him, inconsistent with his right of dominion and to his harm.

*Aetna Life & Casualty Co. v. Union Trust Co., 230 Conn. 779, 790-91, 646 A.2d 799 (1994).*

As the movant points out, a party claiming conversion must have a property interest in the thing that is claimed to have been converted. The plaintiff in this case alleges only that it should have been the owner of the deficiency claim, had the bank not breached its obligation to pursue the foreclosure action so that the deficiency claim would have come into existence before the Agreement terminated on March 31, 1993. The text of the Agreement defeats any claim that the plaintiff had a right to the deficiency claim even if that claim did not come into existence until after March 31, 1993, since the Agreement provides at paragraph 1(b) that if the closing does not occur on or before that date or within fifteen days of any earlier date on which the bank acquired title to the mortgaged property, "all the rights and obligations of the parties hereto under this Agreement shall [*15] terminate immediately without notice or action of any kind whatsoever" except the confidentiality rights specified in paragraph 18.

The plaintiff has not alleged that the deficiency claims came into existence before the termination date and that it was the owner of the claim before that date. While the plaintiff has a claim for breach of contract for the bank's alleged failure to use its best efforts to make these claims come into existence before the expiration date, its complaint in this regard is clearly that it should--but does not--own the deficiency claims; and it has asserted a claim against the bank for their value.

Even assuming that property other than chattels is subject to a conversion claim, an issue left open by the Supreme Court in *Aetna Life & Casualty Co. v. Union Trust Co., supra, 230 Conn. 790 n.6,* an essential element of a claim in conversion is an allegation of actual ownership of the asset claimed to have been converted. The plaintiff has alleged only a claim to ownership, not actual ownership.

The consequences of recognizing a claim for conversion where the property at issue is merely the subject of a claim, not of an established property right, [*16] are enormous. If this tort applied wherever a party had a claim to property, rather than actual ownership, no buyer could acquire contested property without being subject to tort liability from unknown and perhaps undiscoverable claimants of an asset.

The plaintiff has cited no case in which a party that alleged only a claim to property, not ownership of it, has been held to have stated a claim in conversion when another party acquired the asset from its ostensible owner. This court concludes that the allegations of the complaint, including as they do the incorporated text of the Agreement, do not state a cause of action in conversion against WHTR.

### Statute of limitation

Even if the allegation that acquisition of loan documents after expiration of another party's option were viewed as stating a cause of action in conversion, the statute of limitation bars the claim.

The event that the plaintiff identifies as the act of conversion was WHBB's and WHTR's receipt by transfer from the bank of the deficiency claims "with the intent to acquire such claims for themselves." (Amended complaint, paragraphs 54, 55.) The receipt by transfer is the only conduct claimed to give rise [*17] to the conversion claim. The plaintiff alleges that the transfer took place in September 1994 (Amended complaint, paragraph 38). The plaintiff did not commence its action against WHTR until January 15, 1998.

In its brief, the plaintiff claims that it alleged a continuous course of conduct by which WHTR asserted ownership of the deficiency claims. The text of the complaint does not support this argument. In paragraph 54 of the amended complaint, the plaintiff alleges that "WHBB and WHTR received by transfer from the Bank the deficiency claims with the intent to acquire such claims for themselves." Paragraph 55 expressly limits the claimed act of conversion to the acquisition of the claim, referring back to paragraph 54: *"By virtue of the foregoing,* WHBB and WHTR have asserted ownership rights over the deficiency claims to the exclusion of the plaintiff." (Emphasis added.)

Conversion is a tort, and the general three-year statute of limitation applicable to tort actions, *Conn. Gen. Stat. 52-577* applies. The plaintiff has not alleged any facts that would support any tolling doctrine. On its face, therefore, the conversion claim is time-barred.

### Conclusion

The motion [*18] to strike is granted as to both counts of the complaint addressed to WHTR Real Estate Limited Partnership.

Beverly J. Hodgson

Judge of the Superior Court

LEXSEE 2001 CONN. SUPER. LEXIS 803

**Janet Bouchard v. Donald Bouchard**

**FA910502794S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF HARTFORD, AT HARTFORD**

*2001 Conn. Super. LEXIS 803*

**March 16, 2001, Decided**
**March 16, 2001, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**PRIOR HISTORY:** *Bouchard v. Sundberg, 2000 Conn. Super. LEXIS 1571 (Conn. Super. Ct., June 8, 2000)*

**DISPOSITION:** Accordingly, evidence of such an agreement is relevant, and the motion in limine is denied.

**LexisNexis(R) Headnotes**

**JUDGES:** Gruendel, J.

**OPINIONBY:** Gruendel

**OPINION:** MEMORANDUM OF DECISION RE: MOTIONS IN LIMINE

The plaintiff has filed two motions in limine to preclude the defendant from introducing certain evidence concerning the defendant's asserted defenses to the plaintiff's motion seeking to have him held in contempt for his alleged failure to contribute to the college expenses of the parties' children. The defenses are breach of contract by the plaintiff and accord and satisfaction.

DISCUSSION

I. MOTION IN LIMINE

In deciding these motions in limine, the court is not called upon to determine whether the asserted defenses are legally sufficient, n1 but rather to determine whether the evidence sought to be introduced is relevant. *State v. Lo Sacco, 26 Conn. App. 439, 444, 602 A.2d 589 (1992),* citing *State v. Bell, 188 Conn. 406, 414, 450 A.2d 356 (1982).* The defendant bears the burden of proving his defenses. [*2] *Lumbermens Mutual Casualty Co. v. Scully, 3 Conn. App. 240, 245 n.5, 486 A.2d 1141 (1985).* The court has the right and the duty to exclude irrelevant evidence. *Matto v. Dermatopathology Associates of New York, 55 Conn. App. 592, 598, 739 A.2d 1284 (1999).* "As a general matter, evidence is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree." *Burns v. Hanson, 249 Conn. 809, 825, 734 A.2d 964 (1999)* (internal quotation marks omitted). The test for admissibility is whether the evidence will assist the trier of fact in evaluating the claim. *Id. at 826-27.*

n1 The plaintiff has not moved to strike the defenses and has not moved for summary judgment on them.

Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that all things considered, the former is not worthy or safe to be admitted in proof of the latter . . . Evidence is not rendered [*3] inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. (Citations omitted; internal quotation marks omitted.)

*State v. Prioleau, 235 Conn. 274, 305, 664 A.2d 743 (1995).*

## II. ADMISSIBILITY OF EVIDENCE OF BREACH OF CONTRACT

The June 26, 1995 stipulated judgment dissolving the parties' marriage included a provision requiring "mandatory therapy and counseling involving the minor children and the parents." The purpose of the therapy was "to re-establish the relationship between the Husband and the children so the above described visitation may occur." The defendant repeatedly filed motions to compel the therapy, and several of those motions were granted by the court. On January 26, 1999, the court (Hon. John Brennan) denied the defendant's final motion to compel and vacated the order requiring counseling. The defendant asserts that no meaningful counseling ever took place, that the plaintiff breached the stipulated judgment and that her breach is a defense to the alleged contempt. The court finds that evidence of the [*4] alleged breach is not relevant in this proceeding and grants the motion in limine.

A stipulated judgment must be construed and regarded as a binding contract between the parties. *Griffin v. Planning and Zoning Commission of the Town of New Canaan, 30 Conn. App. 643, 650, 621 A.2d 1359 (1993); Caracansi v. Caracansi, 4 Conn. App. 645, 650, 496 A.2d 225,* cert. denied, *197 Conn. 805, 499 A.2d 56 (1985).* This principle applies to agreements for post-majority support which are incorporated into dissolution decrees. *Legg v. Legg, 44 Conn. App. 303, 306, 688 A.2d 1354 (1997).* Stipulated judgments must be interpreted consistently with accepted contract principles. *Guille v. Guille, 196 Conn. 260, 265, 492 A.2d 175 (1985).* Where the language of the contract is clear and unambiguous, as in this case, the scope and meaning of the language is a question of law rather than a question of fact. *Zadravecz v. Zadravecz, 39 Conn. App. 28, 31, 664 A.2d 303 (1995); Greenburg v. Greenburg, 26 Conn. App. 591, 596, 602 A.2d 1056 (1992).* The court may not add a term to the agreement. *Albrecht v. Albrecht, 19 Conn. App. 146, 157, 562 A.2d 528,* [*5] cert. denied, *212 Conn. 813, 565 A.2d 537 (1989).*

In a contempt action to enforce a judgment providing for post-majority support for the parties' children, the defenses available in an action for breach of contract are available to a party defending a contempt. n2 That is so because when the legislature amended *General Statutes Section 46b-66* to authorize such agreements to be incorporated into a stipulated judgment, the "limited

purpose" of the amendment was to permit those agreements to be enforced by contempt instead of by an independent action on the contract. *Albrecht v. Albrecht, supra, 19 Conn. App. 156-57.* Public policy considerations mandate this conclusion. First, proceeding in contempt is likely to be more efficient in terms of the time necessary to litigate the matter, an important consideration when the children are in college and the parties need a more immediate resolution of the issue. Secondly, because the right to enforce the judgment by contempt does not necessarily preclude an independent action on the contract, judicial economy requires that the same defenses be available in both.

> n2 The court has found no case holding that breach of contract is generally available as a defense to an action for contempt of a stipulated judgment. The court does not reach the question of whether breach of contract is available as a defense to an alleged contempt in any other context.

[*6]

Under contract law, a material breach by one party discharges the other party's subsequent duty to perform on the contract. "It is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." 2 *Restatement (Second), Contracts Section 237,* p. 215 (1979); see also *State v. Lex Associates, 248 Conn. 612, 624, 730 A.2d 38 (1999).* Whether a breach is material depends on the circumstances of the case. *669 Atlantic Street Associates v. Atlantic-Rockland Stamford Associates, 43 Conn. App. 113, 128, 682 A.2d 572 (1996),* citing to 2 *Restatement (Second), Contracts, Section 241,* 237-38, comment (a) (1989).

In this case, the plaintiff's alleged breach is not relevant to the defendant's obligations to perform under the judgment. The alleged breach by the plaintiff asserted as a defense is that she failed to engage the children in counseling to promote visitation between them and the defendant. Generally, promises within a property settlement agreement in a divorce action are independent [*7] unless one promise is conditioned upon the performance of another promise. n3 15 S. Williston, Contracts (4th Ed., 2000) Section 44:19 p. 122. First, the promise on the part of the defendant to provide post-majority educational support in this case is not conditioned on the requirement that counseling take place. The agreement to engage the children in counseling was modifiable both by the terms of the

agreement and by the requirements of law. Indeed, in this case, the plaintiff was explicitly released from that obligation when the court modified the counseling requirement in 1999, when two of the parties' four children were still minors. The court retains jurisdiction to modify orders concerning custody and visitation to determine what is in the best interests of the children at a future time. *General Statutes, Section 46b-56.* The agreement by both parties to pay post-majority educational expenses, in contrast, was not modifiable either by the terms of the agreement n4 or in the law. *Albrecht, supra,* 19 Conn. App. 157. The fact that one promise was modifiable, and ultimately modified, while the other was not underscores the court's conclusion that the [*8] promises were not mutually dependent.

> n3 The judgment also provided that the plaintiff would establish a trust for the children's education. That requirement was a condition precedent to the defendant's obligation to contribute to educational expenses, and the defendant's promise was necessarily conditioned on it. The plaintiff's failure to have made the contribution would likely have been a defense.

> n4 The stipulation for judgment in this case provided that the college support obligation was not modifiable except for certain financial reasons. Those are not relevant here because the defendant has stipulated that he will not claim inability to pay as a defense to the claimed contempt.

In addition, evidence of breach of contract is irrelevant in this case because in Connecticut, the duty of a party to provide support is wholly independent of the right of a party to have visitation. *Bozzi v. Bozzi,* 177 Conn. 232, 237-38, 413 A.2d 834 (1979); *Emerick v. Emerick,* 28 Conn. App. 794, 802, 613 A.2d 1351, [*9] cert. denied, 224 Conn. 915, 617 A.2d 171 (1992). The general rule against construing promises as dependent in a stipulated agreement dissolving a marriage is particularly applicable here, where one promise related to visitation and the other to support.

## III. ADMISSIBILITY OF EVIDENCE OF ACCORD AND SATISFACTION

The defendant asserts an accord and satisfaction between the parties as a defense against the plaintiff's motion for contempt. The defendant seeks to offer evidence that on October 6, 1999, after more than four years of contentious post-judgment litigation, the parties entered into an agreement that the plaintiff would not pursue her

claim for contributions from the defendant to the children's college expenses and that the defendant would not pursue other claims against the plaintiff including a civil suit alleging, *inter alia,* that the plaintiff and her present husband had alienated the children's affections. n5 A stipulation was drafted but was not signed by either party or by the party's respective attorneys. The defendant served requests to admit on the plaintiff seeking to establish that the alleged settlement had been reached by the parties, [*10] but the answers are not conclusive. It is undisputed that the children did not participate and were not represented in the settlement negotiations.

> n5 Several counts in the civil case were stricken by the court, including the counts alleging alienation of the children's affections. *Bouchard v. Sundberg,* 27 Conn. L. Rptr. No. 11, 407 (August 28, 2000).

The defendant does not claim that this purported settlement is to be summarily enforced, and his asserted defense would not lead to that result. The defendant only claims an accord and satisfaction.

To prove the defense of accord and satisfaction, the defendant must show that there was a dispute between the parties as to the existence or the amount of a debt and that the creditor and debtor negotiated a new agreement to settle the claim. *Munroe v. Emhart Corp.,* 46 Conn. App. 37, 42, 699 A.2d 213, cert. denied 243 Conn. 926, 701 A.2d 658 (1997). The accord is the contract for the settlement, and the execution or performance [*11] of the agreement is the satisfaction. *Davis v. Forman School,* 54 Conn. App. 841, 849, 738 A.2d 697 (1999); *W. H. McCune, Inc. v. Revzon,* 151 Conn. 107, 109, 193 A.2d 601 (1963). Unless there is mutual agreement or a meeting of the minds, there cannot be a valid accord. *Herbert S. Newman & Partners v. CFC Construction Ltd. Partnership,* 236 Conn. 750, 764, 674 A.2d 1313 (1996).

There has been no evidentiary hearing to establish whether there is a factual basis to establish the defense of accord and satisfaction. The only evidence before the court is the unsigned stipulation between the parties and the lawsuit that the defendant served upon the plaintiff and her husband contemporaneously with the alleged stipulation. Because the lawsuit is still pending, the defendant has not performed any accord to date. Nevertheless, the question before this court is not whether an accord and satisfaction has been proven, or even can be proven, but rather whether evidence of one is relevant. Whether there has been a mutual assent to an

2001 Conn. Super. LEXIS 803, *

accord is a question of fact reserved to the finder of fact. *Gillis v. Gillis, 21 Conn. App. 549, 552-53, 575 A.2d 230,* [*12] *cert. denied, 215 Conn. 815, 576 A.2d 546*

*(1990).* Accordingly, evidence of such an agreement is relevant, and the motion in limine is denied.

Gruendel, J.

LEXSEE 2002 U.S. DIST. LEXIS 2596

**NEW ENGLAND DAIRIES, INC., Plaintiff, v. DAIRY MART CONVENIENCE STORES, INC. and DAIRY MART, INC., Defendants.**

Civil Action No. 3:97CV894(CFD)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

*2002 U.S. Dist. LEXIS 2596; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480*

February 4, 2002, Decided

**DISPOSITION:** [*1] Plaintiff entitled to lost profit damages as a lost volume seller until November 1998, NED awarded total damages of $ 960,194. Dairy Mart denied that it breached the contract, and disputes Plaintiff's status as a lost volume seller.

**LexisNexis(R) Headnotes**

**COUNSEL:** For NEW ENGLAND DAIRIES, INC, plaintiff: Richard C. Robinson, Pullman & Comley, Hartford, CT.

For DAIRY MART CONVENIENCE STORES, INC, DAIRY MART, INC., defendants: Charles D. Ray, Moyahoena N. Ogilvie, Cummings & Lockwood, Hartford, CT.

For DAIRY MART CONVENIENCE STORES, INC, DAIRY MART, INC., defendants: Karen L. Wagshul, Cummings & Lockwood, Stamford, CT.

For DAIRY MART CONVENIENCE STORES, INC, DAIRY MART, INC., defendants: Paul P. Eyre, John Heffernan, Thomas L. Anastos, Baker & Hostetler, Cleveland, OH.

**JUDGES:** Christopher F. Droney, United States District Judge.

**OPINIONBY:** Christopher F. Droney

**OPINION:**

**MEMORANDUM OF DECISION**

I. Introduction

The plaintiff, New England Dairies, Inc. ("NED") brings this action against defendants Dairy Mart Convenience Stores, Inc. and Dairy Mart, Inc. for breach of a contract whereby Dairy Mart agreed to purchase certain dairy products produced and distributed by NED. The plaintiff maintains that it is a [*2] lost volume seller entitled to lost profit damages under *Conn. Gen. Stat. § 42a-2-708(2)*, which incorporates *§ 2-708(2) of the Uniform Commercial Code ("UCC")*. NED also requests reasonable attorney's fees as provided by the contract. Dairy Mart denies that it breached the contract, and disputes NED's status as a lost volume seller, as well as its calculation of damages.

II. Liability for Breach of Contract

A. Findings of Fact

The Court finds the following facts with respect to NED's claim that the defendants breached the contract at issue:

1. Background

At all times relevant to this dispute, NED was a Connecticut corporation in the business of producing and distributing milk and other dairy products to retail stores and institutions. n1 It was headquartered in Hartford, Connecticut. Frank Starvel ("Starvel") was the chief executive officer of NED. Starvel also was the majority controlling shareholder until the December 1997 sale of all of NED's stock to Mid America Dairymen, an entity that later became Dairy Farmers of America.

n1 In January 1999, New England Dairies, Inc. became New England Dairies, LLC, a Delaware

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 14 of 24

Page 2
2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

limited liability company. Defendant Dairy Mart Convenience Stores, Inc. also is a Delaware company. At the time the suit was filed, however, NED was a Connecticut corporation and was diverse from both defendants. Therefore, the Court has diversity jurisdiction over this dispute, as diversity jurisdiction is evaluated at the time a suit is filed and is not generally affected by subsequent changes in citizenship. See *In re Agent Orange Prod. Liability Litig., 818 F.2d 145, 163 (2d Cir. 1987)*, cert. denied, *484 U.S. 1004 (1987)*.

[*3]

Dairy Mart, Inc. is a wholly owned subsidiary of Dairy Mart Convenience Stores, Inc. (collectively, "Dairy Mart"). Dairy Mart currently operates a chain of retail convenience stores in Ohio, Kentucky, Michigan, Pennsylvania, Indiana, North Carolina, and Tennessee. Until June 1997, Dairy Mart also had a New England Division consisting of at least 161 stores in Connecticut, Massachusetts, Rhode Island, and parts of New York.

2. Prior negotiations

In 1995, Dairy Mart owned and operated a dairy processing plant in Enfield, Connecticut, where its headquarters also was located. The plant produced and supplied the dairy products required by the stores in Dairy Mart's New England Division. In early 1995, however, Dairy Mart was exploring the possibility of closing the plant, selling the plant's assets, and contracting with an outside vendor to supply the New England Division stores. NED submitted a written proposal to Dairy Mart for NED to supply the stores. At or about the time NED made its written proposal, it communicated to Dairy Mart's Jeff Leedy ("Leedy") that it wanted any resulting contract to be assumed by any prospective buyer of Dairy Mart's New England division stores. Leedy [*4] transmitted the proposal to Robert Stein ("Stein"), who was the president of Dairy Mart at the time, along with a handwritten analysis of its terms. His analysis included a statement indicating that NED wanted the "contract to be assumed by a prospective buyer." (Pl.'s Ex. 2.) The proposed pricing and terms were attractive to Dairy Mart, and the parties began negotiating a formal supply agreement.

Dairy Mart's Vice-President and Corporate Counsel, Gregory Wozniak, prepared the first two drafts of the agreement, transmitting them on March 28, 1995 and March 31, 1995 to Joseph E. Silverman ("Silverman"), NED's outside general counsel. Each of these drafts contained a provision requiring Dairy Mart to purchase from NED all of its New England division stores' requirements for specified products at specified prices

until the last day of April 2000. (Pl.'s Exs. 4 & 5.) The drafts also contained a provision stating that Dairy Mart's purchase obligation would cease if it no longer operated its New England division stores. (Id.) Finally, the drafts included an assignment clause that provided: "This agreement may not be assigned by either party without the express written consent of the other [*5] party, such consent not to be unreasonably withheld." (Id.)

Wozniak's draft was not acceptable to NED for, among other reasons, NED wanted assignment and assumption to be mandatory in the event that Dairy Mart sold the stores in its New England division. Walter "Dub" Garlington ("Garlington"), who was NED's president at the time, sent a letter to Silverman dated March 27, 1995, that outlined several of his thoughts concerning the Dairy Mart agreement. (Pl.'s Ex. 3.) He wrote: "NED and Dairy Mart need protection for either party selling out so that the new owner assumes this agreement or has the right to buy out the affected party . . . assignability?" (Id.) Silverman rewrote several of the provisions of the Wozniak drafts. For example, his draft expressed the terms of the contract in volume rather than time, and he also included a different assignment clause, which read:

> This agreement may not be assigned or transferred by either party without the written consent of the other party, excepting only as part of the sale or transfer of all or substantially all of the business to which this Agreement relates, in which case any such sale or transfer shall be made specifically subject [*6] to the assignee's or transferee's assumption of this Agreement.

(Pl.'s Ex. 6.) The draft retained the provision that called for Dairy Mart's obligation to cease if it no longer operated the New England division stores. On April 6, 1995, a representative of Silverman's office sent a copy of this revised draft to Dairy Mart.

The following day, the parties discussed this clause during a conference call in which Silverman, an associate at his firm, Garlington, Stein, and Wozniak participated. The issue, however, was not resolved at that time.

At some point during the negotiations, Garlington and Stein had at least one conversation with respect to assignability of the agreement and whether NED would agree to a buyout provision as an alternative to the proposed assignment clause.

3. The Agreement

The "Agreement to Supply Requirements" (the "Agreement") was executed on April 25, 1995. (Pl.'s Ex.

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 15 of 24

Page 3

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

10.) The parties also executed an asset purchase agreement that is not at issue in this case.

In Section 1 of the Agreement, Dairy Mart agreed to cause the stores it operated (defined as the stores Dairy Mart operated rather than the stores it franchised) in Massachusetts, Rhode Island, [*7] Connecticut, and New York to purchase their dairy requirements from NED for the term of the Agreement. (Id. PP1, 1a.) Specifically, Dairy Mart stores were required to purchase certain products set forth in Exhibit B exclusively from NED at prices specified in Exhibit A of the Agreement until the volume of Exhibit B product reached 24,700,000 gallons and gallon equivalents. (Id. PP 1a, 3, 11.) According to Carl Herbein, a certified public accountant and plaintiff's expert, it would take approximately five years for this level of volume to be reached. NED was permitted to adjust the Exhibit A prices, which were different for stores located in New York and stores located in New England, for several reasons, including fluctuations in the price of raw milk according to the Federal Milk Order and fluctuations in price for other raw materials. (Id. PP 3a-b.) The Agreement also required NED to notify Dairy Mart of any such changes. (Id.)

NED also was obligated to make certain payments to Dairy Mart. First, NED was required to make payments to Dairy Mart totaling $ 2 million "as an inducement for Dairy Mart to enter into this Agreement with NED to be the exclusive supplier to the Stores of [*8] the Products." (Id. P 4.) The initial payment was made at the onset of NED's service to Dairy Mart. The remaining four payments of $ 400,000 each were to be made as Dairy Mart's purchases from NED attained increments of 4,940,000 gallons. (Id. PP 4a-b.) According to Mr. Herbein, this would have occurred approximately once a year. Second, NED was obligated to make certain payments to Dairy Mart based on the number of points purchased by Dairy Mart. This discount or rebate was 1.25 cents per point purchased in New York and 1.75 cents per point purchased in New England. (Id. P 4c.)

In addition, paragraph 1a of the Agreement called for Dairy Mart's purchase obligation to cease if it no longer operated its New England division stores. Paragraph 1b obligated Dairy Mart to purchase its dairy requirements from NED with respect to any new stores added to the New England division.

The Agreement states that it "constitutes the entire agreement of the parties, whether written or oral, express or implied." (Id. P 24.)

Perhaps most significantly for this litigation, the Agreement contained the assignment clause drafted by Silverman. (Id. P 18.)

### 4. The breach

The parties operated under the [*9] terms of the Agreement from May 1995 through June 20, 1997. NED had to expand its service territory to supply the Dairy Mart stores. According to NED's 1997 customer list, approximately 44 were located in Connecticut, approximately 61 were located in Massachusetts, approximately 40 were located in New York, and approximately 16 were located in Rhode Island.

In late February or early March 1997, NED began hearing rumors that Dairy Mart was planning to sell its New England division stores to DB Marketing Company, Inc. ("DB"), a Providence, Rhode Island-based convenience store operator. On March 6, 1997, Richard Toth ("Toth"), NED's president at the time, telephoned Stein to determine whether the rumor was true. Stein returned the call and confirmed it. On March 10, 1997, Toth wrote to Stein, thanking him for notifying him of the pending sale, confirming his statement as to an expected 1997 closing and asking him for assurances that the supply Agreement would be assigned to DB as part of the sale. On March 14, 1997, Toth twice discussed the assignment clause and the impending sale to DB with Dairy Mart's Leedy, who told him that he believed that the supply Agreement would have to "go [*10] to" to DB as part of the sale, and he later confirmed that Wozniak agreed with this interpretation. (Pl's Ex. 12.)

In March 1997, DB and Dairy Mart entered into a purchase and sale agreement for DB to acquire the 156 stores in Dairy Mart's New England division. At that time, DB had about 60 convenience stores: half were in Rhode Island and southern Massachusetts and the rest were in the greater Hartford area. DB's dairy supplier in March 1997 was a milk producer known as Nature's Best. In connection with that transaction, DB reviewed all of Dairy Mart's vendor contracts and was interested in the possibility of contracting with some or all of Dairy Mart's vendors. Dairy Mart asked DB if it would be willing to talk with NED about the possibility of doing business with NED following the acquisition of the Dairy Mart stores. Dairy Mart told DB that NED was a good supplier and suggested that the transition of the 156 stores from Dairy Mart to DB would be facilitated if DB stayed with Dairy Mart's supplier.

On March 25, 1997, NED's counsel sent a letter to Stein seeking prompt written assurance that the sale to DB would not go forward unless the Agreement was assigned to DB. Following [*11] this letter, Leedy and Toth had a telephone conversation regarding possible assignment. In this conversation, Leedy told Toth that Dairy Mart was working to get DB to assign the contract. Toth told Leedy that he had not yet received formal recognition by Dairy Mart that the contract had to be

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 16 of 24

Page 4

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

assigned to DB for there to be a sale to DB, and Toth said that NED still needed such assurance. NED's counsel sent a similar letter on April 10, 1997 to Wozniak. Representatives from DB and NED met in mid-April regarding the possibility of NED supplying the dairy products for the DB stores.

On April 17, 1997, NED sued Dairy Mart for anticipatory breach of contract. On that day, Starvel called Stein to tell him of the litigation. According to his memorandum of that day, Stein told Starvel that it had been his intention all along that the Agreement would be assigned, but that he wanted DB to do it on their own volition rather than being forced. (Pl.'s Ex. 14.) Stein maintains that he merely expressed to Starvel that he would assist NED in entering into an agreement with DB to supply its dairy requirements. Representatives from DB and NED met again in mid-May 1997, but no agreement ever was reached. [*12]

DB completed its acquisition of the Dairy mart stores on June 20, 1997. DB did not assume the Agreement.

B. Conclusions of Law

Pursuant to paragraph 19, the Agreement will be interpreted under Connecticut law.

The provision of the Agreement principally at issue is the assignment clause, paragraph 18. Dairy Mart does not dispute that the sale of its stores to DB was completed without DB assuming the contract with NED, but maintains that its failure to insist on assumption did not constitute a breach. Thus, a determination of whether Dairy Mart breached the contract will depend on the interpretation of the assignment clause in light of the other provisions of the contract, as well as evidence of the circumstances surrounding the Agreement. NED essentially argues that the clause required Dairy Mart to condition any sale of its stores on an assignment of the contract to the purchaser and on the purchaser's assumption of Dairy Mart's obligations under the contract. Dairy Mart maintains that the assignment clause was not mandatory and that it did not require Dairy Mart to insist on assignment and assumption of the contract in the event that it sold its stores serviced by NED.

A [*13] contract is to be interpreted as a whole, with all relevant provisions to be considered together, and it must be construed to effectuate the intent of the contracting parties. *Barnard v. Barnard, 214 Conn. 99, 570 A.2d 690, 696 (Conn. 1990).*

> In ascertaining intent, we consider not only the language used in the contract but also the circumstances surrounding the

making of the contract, the motives of the parties and the purposes which they sought to accomplish. . . . The intention of the parties to a contract is to be determined from the language used in light of the situation of the parties and the circumstances connected with the transaction. The question is not what intention existed in the minds of the parties but what intention is expressed in the language used. . . . This is so where the parties have their agreement in writing . . . In interpreting contract items, we have repeatedly stated that the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and that the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract.

[*14]

Id. (citations and quotations omitted). "A contract is ambiguous under Connecticut law if its meaning regarding the point at issue is not clear simply from reading it, and a trier of fact interpreting the document is thus forced to choose between two or more possible meanings." *Travelers Indem. Co. v. Scor Reinsurance Co., 62 F.3d 74, 78 (2d Cir. 1995).*

Here, the assignment clause at issue is ambiguous because it has at least two possible meanings. The clause states:

> This agreement may not be assigned or transferred by either party without the written consent of the other party, excepting only as part of the sale or transfer of all or substantially all of the business to which this Agreement relates, in which case any such sale or transfer shall be made specifically subject to the assignee's or transferee's assumption of this Agreement.

The first phrase, "This Agreement may not be assigned or transferred by either party without the written consent of the other party," makes it clear that both parties are prevented from assigning their duties under the contract without the consent of the other party, and both NED and Dairy Mart appear to agree [*15] on this interpretation.

The parties' dispute appears to begin with the next phrase: "excepting only as part of the sale or transfer of all or substantially all of the business to which this

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 17 of 24

Page 5
2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

Agreement relates." Dairy Mart maintains that this phrase, which provides an exception to the general rule, is permissive. In other words, it maintains that it is missing a key word: that in the event of the sale of either of the parties' business, that party *may* (not *must*) assign the contract to the purchaser. However, another plausible interpretation of the phrase is that it *requires* that the party seeking to sell its business assign the contract to the purchaser, an interpretation that would have obligated Dairy Mart to assign the Agreement to DB.

Finally, the third phrase of the assignment clause describes the sale or transfer situation: "in which case any such sale or transfer shall be made specifically subject to the assignee's or transferee's assumption of the Agreement." NED focuses on this clause, arguing that it indicates that if a sale should occur, the seller would have a duty to make the sale specifically subject to the assignee's assumption of the Agreement, and that [*16] failure to do so would result in a breach. This interpretation is plausible, given that "in the absence of an express contract provision, an assignee is not required to assume the original responsibilities of the assignor." *ICC Performance 2 Ltd. P'ship v. Pollack, 1997 Conn. Super. LEXIS 1042, No. CV 94313596, 1997 WL 200795,* at *2 (Conn. Super. Ct. Apr. 16, 1997) (quotation and citation omitted); see also *Lachmar v. Trunkline LNG Co., 753 F.2d 8, 9-10 (2d Cir. 1985)* (stating that under New York law "the assignee of rights under a bilateral contract is not bound to perform the assignor's duties under the contract unless he expressly assumes to do so"). Thus, NED would not receive full protection from a clause that required only assignment; such a clause would permit the assignee to choose not to assume Dairy Mart's duties under the Agreement and thus the assignment clause would be useless to NED. In contrast, Dairy Mart maintains while assumption may be mandatory if a party chooses to assign the contract in the event of a sale, it was not required to insist that DB assume the contract since it did not choose to assign it as part of the sale. Thus, there are two possible interpretations [*17] of this provision, rendering it ambiguous.

This ambiguity is not entirely resolved when the assignment clause is considered in conjunction with the other provisions of the Agreement, as well as the circumstances surrounding the contract and the motivations of the parties. The agreement made NED the exclusive supplier of dairy products for Dairy Mart, and NED understandably was motivated to protect its exclusive rights in the event that Dairy Mart sold its stores. Further, the Agreement was a large undertaking for NED. It required that NED supply dairy products for a fairly long period of time, and it makes sense that NED would want its commitment to continue for the life of the

contract, given the preparation the contract required, such as the addition of additional delivery routes. At the same time, Dairy Mart's motivation may also be inferred from the circumstances. It was closing its dairy processing plants, consolidating its operations, and it is possible that it was anticipating a future sale. Agreeing to a contract with NED that made assignment and assumption by a potential purchaser mandatory may have inhibited such a transaction from occurring.

Dairy Mart argues that the [*18] contract as a whole--and in particular paragraph 1a--supports its construction. That paragraph provides that Dairy Mart's undertaking to purchase its dairy requirements from NED extended only "so long as [the Stores] continue to be operated by Dairy Mart and/or its subsidiaries." Dairy Mart maintains that this provision indicates that the assignment clause was permissive because it encompasses both possible scenarios: if it chose to assign the contract and when it chose not to assign the contract. In other words, if Dairy Mart elected not to assign the Agreement to the purchaser of the stores, then it would be under no further obligation to NED because it no longer owned the stores. Similarly, if it elected to make the Agreement a part of any such sale, it would assign the Agreement to its purchaser and be obligated to cause its purchaser to assume the Agreement (and, presumably, its own obligation would cease). However, this provision also is consistent with NED's interpretation. Assuming that assignment was mandatory, if the stores were no longer operated by Dairy Mart, the contract would have been assigned to a different company and that company would have assumed Dairy Mart's [*19] obligations. The fact that paragraph 1a states that Dairy Mart's obligations would cease under those circumstances is consistent with mandatory assumption.

Given this ambiguity and the fact that the Agreement was an integrated contract, see P 24, the Court may look to extrinsic evidence to aid in interpretation of the assignment clause. *Associated Catalog Merchandisers, Inc. v. Chagnon, 210 Conn. 734, 557 A.2d 525, 529 (Conn. 1989).* "Although the parol evidence rule prohibits the introduction of evidence that varies or contradicts an exclusive written agreement; . . . that rule does not bar the use of extrinsic evidence to aid in the interpretation of contractual language." *Hare v. McClellan, 234 Conn. 581, 662 A.2d 1242, 1251 (Conn. 1995)* (quotations and citations omitted); see also *Scinto v. Sosin, 51 Conn. App. 222, 721 A.2d 552, 563 (Conn. App. Ct. 1998)* (stating that the rule "does not prevent the introduction to evidence to show the facts and circumstances existing at the time of the execution" (quotation omitted)); *Travelers Indem. Co., 62 F.3d at 78.* Thus, a court may admit extrinsic evidence to interpret ambiguous provisions of contracts, among other

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 18 of 24

Page 6

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

[*20] reasons. *HLO Land Ownership Assocs. Ltd. P'Ship. v. City of Hartford, 248 Conn. 350, 727 A.2d 1260, 1265 (Conn. 1999)* (citing *Jay Realty, Inc. v. Ahearn Dev. Corp., 189 Conn. 52, 453 A.2d 771, 773 (Conn. 1983)); Hare, 662 A.2d at 1251.* n2 As part of its examination of extrinsic evidence, courts may look to the parties' actions and declarations subsequent to the agreement. See *Hydro-Hercules Corp. v. Gary Excavating, Inc., 166 Conn. 647, 353 A.2d 714, 718 (Conn. 1974); 29A Am. Jur. 2d Evidence § 1141* (1994). However, the evidence must be relevant to the interpretation of the ambiguous provision. *Travelers Indem. Co., 62 F.3d at 78.*

        n2 The defendants' argument is centered around their assertion that paragraph 18 is missing a term. While the Court instead views this provision as ambiguous, parol evidence also is admissible "to add a missing term in a writing which indicates on its face that it does not set forth the complete agreement." *Jay Realty, Inc., 453 A.2d at 773.*

[*21]

    During negotiations, NED's insistence on a mandatory assignment/assumption clause was made known to Dairy Mart on several occasions: its communication to Leedy prior to the first draft of any agreement that it would require such a clause; the discussion of the change in the assumption clause in the Silverman draft during the telephone conference call; and in the conversation between Garlington and Stein. The evidence revealed that Dairy Mart crafted the initial drafts and that these requirements imposed no mandatory assumption requirement. NED noticed the rejection of its insistence on the mandatory clause and responded accordingly. Conversely, Dairy Mart objected to the revised assignment clause but nevertheless signed the Agreement. Thus, even if Dairy Mart was unclear of the meaning of the assumption clause in the Silverman draft, it had been notified of NED's intention in drafting it and the mandatory nature of the clause. Further, if the clause were intended to be permissive, NED would lack a motivation for insisting on its conclusion. Thus, Dairy Mart was aware that assignment was mandatory, and that it should have insisted that DB assume the contract.

    In addition, there are [*22] Dairy Mart's admissions during the time when it was working to persuade DB to assume the contract, and in particular, the admission of Leedy and through Leedy, the admission of Wozniak, its general counsel at the time. In conversations with NED's Toth, Leedy admitted that paragraph 18 obligated Dairy Mart to make its sale to DB subject to DB's assumption

of NED's contract and that he was not the only one who understood this, that Wozniak had told him that this was his understanding as well.

    Accordingly, based upon the language of paragraph 18, interpreted in light of the contract as a whole, the circumstances in which it was made, and the extrinsic evidence of the parties intent, the Court concludes that assignment to DB and assumption by DB was mandatory. n3 Therefore, by failing to insist on such terms in its contract with DB, Dairy Mart breached the Agreement with NED.

        n3 It should be noted that the Court is mindful of the rule of contract interpretation providing that ambiguous provisions shall be construed against the drafter. *Rund v. Melillo, 63 Conn. App. 216, 772 A.2d 774, 778 (Conn. App. Ct. 2001).* However,

            The rule that expressions will be interpreted against the party selecting and using them applies only where, after the ordinary rules of construction have been applied, the agreement is still ambiguous. The rule does not justify the taking or adopting of an isolated clause in dispute without examining the entire contract, the relations of the parties, their intention, and the circumstances under which they executed the contract.

        *17A Am. Jur. 2d Contracts § 348* (1991).

[*23]

III. Damages

    A. Findings of Fact

    The Court makes the additional following findings of fact with respect to damages. n4

        n4 Certain of the findings of fact set forth in the previous section also apply to the calculation of damages.

    1. Gross margin

    Dairy Mart's breach caused NED to lose the Dairy Mart business and the profits that business would have

Page 7

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

generated. NED's gross margin (or, in other words, gross profit) for each product sold to Dairy Mart is equal to the price of each product multiplied by the volume of the product supplied, minus standard cost of producing the product. This calculation is somewhat complicated given the variation in prices and volume under the Agreement.

The prices for NED products under the Agreement were variable, as NED was required to adjust its pricing as costs for certain raw materials fluctuated. (Pl.'s Ex. 10, PP 3a-b.) Products also were priced differently depending on whether they were to be supplied to Dairy Mart's New York or New England stores. (Id. [*24] at Exh. A.) At the time of the breach, June 1997 prices were in effect.

The composition of the products purchased by Dairy Mart, and thus the volume of the products, varied monthly because demand for dairy products is seasonal. The Agreement expressed volume in terms of "points." One point is equal to one quart. 1996 was the only full year in which the contract was performed.

Standard costs are target costs established by the company for each type of product produced by ND. The standard cost for each product included the cost of the container, the cost of the ingredients, and the costs of the raw materials that are included in the product. At the time of the breach, June 1997 standard costs for NED products were in effect.

In 1996-the only full year under the Agreement--the total gross margin for all Dairy Mart products was $ 2,852,019. n5 Subtracting the value of the .2% of products sold to Dairy Mart but returned because they were damaged--$ 18,671--yields a figure of $ 2,833,348.

n5 The Court again notes that June 1997 prices are used here.

[*25]

2. Variable costs

Variable costs attributable to the Dairy Mart business included certain production and distribution expenses, as well as the overtime paid to employees in all of NED's departments.

As to production-related variable costs, 20.51% of such expenses is attributable to Dairy Mart because the Dairy Mart business required 20.51% of NED's production capacity. There are two exceptions to this calculation. The Dairy Mart business required the addition of two new employees: one in the production department (representing a 3% increase in that department), and one in the maintenance department

(representing a 17% increase in that department). In addition, all overtime paid to employees in the production, maintenance, and laboratory departments is attributable to the Dairy Mart business. This is because NED generally compensated for the addition of the Dairy Mart business by requesting that existing employees work additional hours rather than by hiring new employees. Thus, one hundred percent of the costs associated with the addition of the new employees and the overtime paid to employees is attributable to the Dairy Mart business. NED's total yearly production expenses, [*26] including Dairy Mart payroll and benefits and all overtime expenses, based on June 1997 prices were $ 827,508. Total yearly production expenses attributable to Dairy Mart alone (including one hundred percent of Dairy Mart payroll and benefits and all overtime expenses, and 20.51% of all other production expenses) were $ 436,140.

As to distribution-related variable costs, 20.51% of such expenses is attributable to Dairy Mart because the Dairy Mart business required 20.51% of NED's production capacity. Again, there are two exceptions to this calculation. The Dairy Mart business required the addition of six employees: three in the delivery department (representing an increase of 7%), and three in the shipping department (representing an increase of 10%). In addition, all overtime paid to employees to in the delivery and shipping departments is attributable to the Dairy Mart business, as NED generally compensated for the addition of the Dairy Mart business by requesting that existing employees work additional hours rather than by hiring new employees. Total yearly production expenses, including Dairy Mart payroll and benefits and all overtime expenses, based on June 1997 prices were $ [*27] 2,516,374. Total yearly distribution expenses attributable to Dairy Mart alone (including one hundred percent of Dairy Mart payroll and benefits and all overtime expenses, and 20.51% of all other distribution expenses) were $ 924,001.

In addition, the overtime costs of $ 9,842 incurred in the shipping, accounting, and data processing departments are attributable to the Dairy Mart business.

3. Other costs and expenses attributable to Dairy Mart

Under paragraph 4c of the Agreement, NED was obligated to make certain discount payments to Dairy Mart. For the products that would have been delivered over the lifetime of the Agreement, or approximately 39 months based upon the number of points typically purchased in a year, would have totaled $ 877,562, or $ 270,019 a year.

NED also was obligated to make certain incentive payments of $ 400,000 pursuant to paragraph 4 of the

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

Agreement. These payments would have been made approximately on an annual basis.

### 4. Incidental damages

NED leased certain delivery vehicles to service the Dairy Mart business. When Dairy Mart breached the Agreement, those vehicles were idle for a certain amount of time before they were returned to Edart, the [*28] company from which they were leased.

NED laid off eight individuals as a result of the loss of the Dairy Mart business.

NED continued to service some of the Dairy Mart franchise stores even after the loss of the Dairy Mart business. Annually, NED retained sales to DB, in the amount of 1,360,750 points. This was 7.91% of NED's Dairy Mart business. NED had a certain amount of Dairy Mart labeling and packaging materials on hand at the time of the breach.

### 5. Calculations

Gross Dairy Mart margin, minus the costs and expenses outlined above yields a yearly Dairy Mart lost profit of $ 1,463,565. When 7.91% of this figure (or $ 115,768) is subtracted for the amount of Dairy Mart business that NED retained, $ 400,000 for the yearly incentive payments, and $ 270,019 for discount payments, NED's yearly lost profit is $ 677,778.

### 6. Production capacity

With the addition of the Dairy Mart business, NED was operating at 97-98% of its capacity. In approximately July 1995, NED lost the business of a Long Island dairy distributor known as Terrace Dairy ("Terrace"), and NED's plant utilization dropped to 83-84%, where it remained until [*29] June 1997. Immediately following the breach, NED's production capacity was 66-67%.

However, NED acquired two substantial pieces of business in the second half of 1998. The first business was Terrace, a company that had previously been a customer of NED. In a transaction that closed on June 30, 1998, NED acquired a 44% interest in Terrace. At the same time, NED and Terrace entered into a long-term supply agreement whereby NED supplied Terrace's dairy requirements. NED's owner, DFA, financed the $ 1.5 million acquisition. The annual volume of the Terrace Dairy business was approximately 14 million points. The Terrace business used 16-17% of NED's production capacity, and raised NED's plant utilization to approximately 82%. Terrace produced annual sales for NED in the amount of $ 6.5 million. NED's gross margin reports indicated that NED was making an annual profit on the Terrace Business of approximately $ 700,000.

In 1998, NED also acquired Meola Dairy ("Meola"), a small dairy in Worcester, Massachusetts. The acquisition of Meola closed on September 30, 1998. Meola's annual sales volume was $ 5 to $ 6 million. The Meola business was profitable to NED, but not as profitable as the [*30] Terrace business. After the acquisition, NED closed Meola's plant and moved the business to the NED plant in Hartford. NED gradually introduced this volume into its plant, and by the end of November 1998 the Meola plant was closed and all the Meola business was being serviced out of NED's Hartford plant. The Meola business added 18 million points of production to NED's plant. Servicing this new business required 15% of NED's production capacity. With the additions of Terrace and Meola, and the consolidation of the Meola business into NED, by the end of November 1998 NED was operating at approximately 97% capacity.

Lost profits until November 1998 (or for 17 months of the Agreement), when NED could no longer be considered a lost volume seller, equal $ 960,194.

### B. Conclusions of Law

The parties in this case have stipulated that damages are governed by UCC § 2-708. Dairy Mart, however, argues that NED is not entitled to lost profits as a measure of damages because it did not first show that the damages method under Section 2-708(1) is inadequate.

#### 1. Lost volume seller

*Section 42a-2-708 of the Connecticut General Statutes* provides:

(1) Subject to subsection (2) [*31] and to the provisions of section 42a-2-723 with respect to proof of market price, the measure of damages for non-acceptance or repudiation by the buyer is the difference between market prices at the time and place for tender and the unpaid contract price together with any incidental damages provided in section 42a-2-710, but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done, then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in

Case 3:02-cv-01379-MRK     Document 70-2     Filed 06/21/2004     Page 21 of 24

Page 9
2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

section 42a-2-710, due allowance for cost reasonably incurred and due credit for payments or proceeds of resale. n6

*Conn. Gen. Stat. § 42a-2-708.* One of the categories of sellers entitled to damages under § 2-708(2) is the lost volume seller. 1 James J. White & Robert S. Summers, *Uniform Commercial Code § 7-9 (4th ed.).* "A lost volume seller is one who has the capacity to perform the contract which was breached as well as other potential contracts, due to their [\*32] unlimited resources or production capacity." *Bill's Coal Co. v. Board of Public Utils., 887 F.2d 242, 245 (10th Cir. 1989); see also Nederlandse Draadindustrie NDI B.V. v. Grand Pre-Stressed Corp., 466 F. Supp. 846, 854 (E.D.N.Y. 1979)* (commenting that the plaintiff, a lost volume seller and manufacturer, had sufficient capacity to supply not only the materials required by the defendant under the contract at issue, but also additional materials that were sold to third-parties). "A lost volume seller can have two expectations, a profit from the breached contract and a profit from one or more other contracts that the seller can perform simultaneously with the breached contract." *Gianetti v. Norwalk Hosp., 64 Conn. App. 218, 779 A.2d 847, 852 (Conn. App. Ct. 2001).* Whether a plaintiff is a lost volume seller is a question of fact. *Id.* n7

n6 The phrase, "and due credit for payments or proceeds of resale," has been held not to apply to lost volume sellers. *Trienco, Inc. v. Applied Theory, Inc., 102 Ore. App. 362, 794 P.2d 1239, 1241 (Or. Ct. App. 1990); Van Ness Motors, Inc. v. Vikram, 221 N.J. Super. 543, 535 A.2d 510, 511 (N.J. Super. Ct. App. Div. 1987); Snyder v. Herbert Greenbaum & Assoc., Inc., 38 Md. App. 144, 380 A.2d 618, 625-26 (Md. Ct. Spec. App. 1977). [\*33]*

n7 Although a plaintiff's lost volume seller status is a question of fact, the Court will discuss its reasoning in this section because its explanation of damages is dependent on its interpretation of several points of law.

Here, NED has shown by a preponderance of the evidence that it is a lost volume seller. After Dairy Mart breached the Agreement and NED lost the Dairy Mart business, NED's production capacity was 66-67%. The Dairy Mart business had represented 20.51% of NED's production capacity. NED retained 7.91% of the Dairy Mart business in the form of franchise stores following the breach, which represents 1.62% of NED's total production capacity. Thus, NED actually lost 18.89% of its production capacity as a result of the breach. Thus, while NED's production capacity was not, in a strict

sense, unlimited, it did have the capacity to enter into other supply agreements even if Dairy Mart had not breached the Agreement at issue here: in the event Dairy Mart had not breached the contract, NED still would have had roughly 15% production capacity that it could have filled through other [\*34] contracts. Thus, NED could have performed a second contract simultaneously with the Dairy Mart Agreement. In fact, the evidence showed that NED did enter into such a contract with Terrace and Meola, and that each of the contracts was profitable. *See Gianetti, 779 A.2d at 852.* Thus, NED is a lost volume seller under Section 2-708(2), and lost profits are the appropriate measure of damages in this case.

2. Time span during which NED is entitled to lost profits

When a seller has more orders than it can fill such that it could not have supplied a defendant buyer as well as an alternate buyer, it is not a lost volume seller. *Ragen Corp. v. Kearney & Trecker Corp., 912 F.2d 619, 627-28 (3d Cir. 1990).* For this reason, NED only can be considered a lost volume seller for a limited period of time: through November 1998, or for 17 months after the breach.

From a production standpoint, by the end of November 1998 NED had replaced the Dairy Mart business and more importantly, had used up nearly all of the excess capacity it had even while it was servicing the Dairy Mart stores. In 1996, the last full year that NED had the Dairy Mart business, NED produced [\*35] 95,622,700 points of dairy products, 20.51% of which were for Dairy Mart. With the additions of the Terrace and Meola business in 1998--and even with the loss of two other accounts--NED anticipated that in 1999 it would sell 106,717,100 points of dairy products. As Mr. Toth testified, by the end of November 1997, NED was operating at 97% capacity. A necessary prerequisite for a manufacturer to be a lost volume seller is capacity sufficient to have performed two sales. *Advanced Medical, Inc. v. Arden Medical Sys., Inc., 955 F.2d 188, 201 (3d Cir. 1992).* Therefore, by the end of November 1998, NED lacked the capacity to service the Dairy Mart stores in addition to its existing business.

The evidence also shows that the Terrace and Meola accounts were profitable. NED's annual lost profit on the Dairy Mart business was $ 677,778, and thus the Terrace Business, with an annual profit of $ 700,000, did indeed replace the Dairy Mart business. Whatever profit NED made on the Meola business it could have made while servicing Dairy Mart, and the business from Terrace replaced in full the loss of the Dairy Mart business. Accordingly, NED is not entitled to lost profits after [\*36] November 1998.

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 22 of 24

Page 10
2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

Accordingly, under *U.C.C. § 2-708*, NED's only recourse after November 1998 would be damages under § 2-708(1). However, NED failed to introduce any evidence with respect to the market price for its products in November 1998, and thus there is no evidence in the record from which the market-contract differential could be determined. NED failed to sustain its burden of proof with respect to its damages under 2-108(1) and it is therefore entitled to damages only through November 1998. An award of damages for the period after November 1998 would also not be appropriate because it would put NED in a better position than it would have been had Dairy Mart performed.

### 3. Calculation of lost profits

As to lost profits, they must be proved with reasonable certainty, *Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 247 Conn. 48, 717 A.2d 724, 736 (Conn. 1998)*, and "mere uncertainty as to the amount of lost profits may be dispelled by the same degree of proof as is required in other civil actions, that is, the amount may be determined approximately upon reasonable inferences and estimates." *Torosyan v. Boehringer Ingelheim Pharms., Inc., 234 Conn. 1, 662 A.2d 89, 105 (Conn. 1995)* [*37] (quoting *West Haven Sound Dev. Corp. v. West Haven, 201 Conn. 305, 514 A.2d 734, 742 (Conn. 1986))*. They may be calculated by extrapolating from past profits, but a plaintiff cannot recover for the mere possibility of making a profit. *Beverly Hills Concepts, 717 A.2d at 736*. Further, a plaintiff's prior experience in the same business has been held to be probative of lost profits, "as has a plaintiff's experience in the same enterprise subsequent to the interference." Id. "Lack of prior profitability does not *necessarily* prohibit a trial court from awarding future lost profits, although it serves as a strong indicator that future profits are uncertain." Id. at 739.

"All the reported cases are in agreement that profit (including reasonable overhead) is the equivalent of net profit plus overhead, or of gross profit including overhead." *Bead Chain Mfg. Co. v. Saxton Prods. Inc., 183 Conn. 266, 439 A.2d 314, 320 (Conn. 1981)*. "Net profit can be defined as the gross amount that would have been received pursuant to the business less the cost of running the business. . . . To determine the cost of operating a business, the factors of production [*38] must be analyzed. One important factor of production is labor." *Gordon v. Indusco Mgmt. Corp., 164 Conn. 262, 320 A.2d 811, 819 (Conn. 1973)*. Damages for breach of contract are measured as of the date of the breach. *Willow Springs Condo. Assoc., Inc. v. Seventh BRT Dev. Corp., 245 Conn. 1, 717 A.2d 77, 108 (Conn. 1998)*.

In support of its lost profit argument, NED relies upon the expert report of Mr. Herbein. The Court agrees

that Mr. Herbein's report provides a basis for a proper damages calculation in this case, and in fact it is the source of many of the Court's conclusions regarding lost profits. Dairy Mart makes much of the fact that Mr. Herbein's analysis uses data from two different years: 1996 volume figures and 1997 prices. However, Mr. Herbein has provided a sound rationale for doing so. As explained above, demand for dairy products is seasonal, and thus an accurate picture of the volume of products supplied to Dairy Mart requires one to examine an entire year's output. Since 1996 is the only full year that the contract was performed, it was reasonable for Mr. Herbein to base his volume estimates on these figures. Similarly, it was reasonable for Mr. Herbein to use [*39] June 1997 prices, as damages are to be determined as of the date of the breach. Given that demand is, of course, affected in part by prices, it is possible that the use of figures from two different years could result in a certain lack of precision in the damages estimate. However, the Court finds that Mr. Herbein's method successfully estimates damages with reasonable certainty.

Nevertheless, some adjustments are necessary to Mr. Herbein's analysis. First, as explained above, NED is entitled to lost profit damages only through November 1998. Second, Mr. Herbein assumed that the overtime worked by NED employees was a fixed cost that should not reduce the profits that would have been earned by NED under the agreement. However, this overtime is properly characterized as a variable cost attributable to the Dairy Mart business. As Mr. Herbein testified, NED was able to absorb the Dairy Mart business in 1995 by taking on a disproportionately low number of new employees and asking its entire workforce to work overtime. Mr. Herbein, however, did not expense all of this overtime against the Dairy Mart gross margin in calculating NED's damages. Some of the overtime he did not attribute at [*40] all to the Dairy Mart business--that incurred in NED's Sales, Accounting and Data Processing departments. Then, only 20.51% of the overtime NED incurred in its Production, Maintenance, Laboratory, Shipping and Delivery departments was allocated against the Dairy Mart business. Accordingly, the variable expenses associated with the Diary Mart business must be increased by 79.49% of the overtime incurred in NED's Production, Maintenance, Laboratory, Shipping and Delivery departments and by any overtime that incurred in NED's Sales, Accounting and Data Processing Departments. Calculations of overtime expenses are set forth in the findings of fact.

The Court also does not agree with Mr. Herbein's estimates of incidental damages. Such damages are set forth in *Conn. Gen. Stat. § 42a-2-710*, which is equivalent to *UCC § 2-710*. It provides:

Case 3:02-cv-01379-MRK    Document 70-2    Filed 06/21/2004    Page 23 of 24

Page 11

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

*Conn. Gen. Stat. § 42a-2-710.* [*41]

The incidental expenses attributed by Mr. Herbein to the breach were not proper. First, NED claims that it is entitled to incidental damages in the amount of $ 215,440 relating to certain tractor and trailer leases with respect to delivery vehicles that were idled as a result of Dairy Mart's breach of the Agreement. There are two components to this amount as set forth in Mr. Herbein's expert report: $ 65,190 for lease payments and $ 150,250 for an early termination fee. Mr. Toth also testified that NED incurred some costs for the lease and termination fee. However, NED did not present any evidence indicating how long it continued to pay the truck leases or any evidence of the actual early termination fee. Thus, NED did not meet its burden of proof with respect to this category of incidental damages because it did not prove by a preponderance of the evidence that NED actually incurred expenses in these amounts.

Second, NED claims that it is entitled to incidental damages in the amount of $ 32,541 for additional unemployment compensation paid as a result of Dairy Mart's breach of the Agreement. However, while it is clear that Dairy Mart laid off eight employees, there was no evidence [*42] regarding how long these employees collected unemployment compensation or the amount of unemployment compensation tax incurred as a result. Thus, NED did not meet its burden of proof with respect to these damages.

Third, NED claims that it is entitled to incidental damages in the amount of $ 15,067 with respect to certain Dairy Mart labeling and packaging material it had on hand at the time of the breach. At the time he prepared his analysis, Mr. Herbein was not aware that after the sale of the Dairy Mart stores, NED had continued to service certain Dairy Mart stores owned at the time by DB. Mr. Herbein admitted that if these labels and packaging materials were put to use for the Dairy Mart stores serviced by NED after June 20, 1997, then NED did not suffer the claimed incidental damage. Based on the evidence presented at trial, it is just as likely that these labels were subsequently used by NED as it is that they were not and, accordingly, NED did not meet its burden of proof with respect to this category of incidental damages.

Finally, the defendants argue that NED failed to mitigate damages. The defendants have the burden of proving that the plaintiff failed to mitigate its damages. [*43] *Town of Newington v. General Sanitation Serv. Co., 196 Conn. 81, 491 A.2d 363, 366 (Conn. 1985).* However, the doctrine of mitigation of damages is not applicable here. "The philosophical heart of the lost volume theory is that the seller would have generated a second sale irrespective of the buyer's breach. It follows that the lost volume seller cannot possibly mitigate damages. For this reason, the majority of both courts and commentators have recognized the illegitimacy of the mitigation argument." *Gianetti, 779 A.2d at 852-53* (quotation omitted). In other words, "the key to when plaintiffs can keep the monetary benefits of the contract, undiminished by the doctrine of mitigation of damages, lies in whether the plaintiffs could have and would have entered a second contract simultaneously with the breached contract, in which event, the second contract is not a substitute for the first." Id. at 852. Thus, while Dairy Mart argues that NED is not entitled to damages because it failed to mitigate its damages, this generally is not requirement for a lost volume seller in the sense of selling the rejected goods to others. Nevertheless, "the lost volume [*44] seller has the obligation to sell the goods under the original contract if the original buyer has found a substitute buyer." 4A Ronald A. Anderson, Uniform Commercial Code § 2-708(2):43 (1997). Here, however, DB cannot be considered a substitute buyer, as their acquiescence to the contract would have undoubtedly required a change in the terms of the contract, which NED was not required to do.

## IV. Conclusion

As stated above, gross Dairy Mart margin (which equals the price of the products multiplied their volume minus their standard cost), minus the costs and expenses outlined above yields a yearly Dairy Mart lost profit of $ 1,463,565. When 7.91% of this figure is subtracted for the Dairy Mart franchise business that NED retained, as well as $ 400,000 for the yearly incentive payments, and the discount payments, NED's yearly lost profit is $ 677,778. Accordingly, given that NED is entitled to lost profit damages as a lost volume seller until November 1998, NED is awarded total damages of $ 960,194.

The parties have not addressed the issues of attorney's fees and statutory prejudgment interest under *Conn. Gen. Stat. § 37-3a.* Accordingly, the plaintiff may move in a post-judgment [*45] motion for an award of attorney's fees and/or interest, and the Court will consider any memoranda submitted by the parties on whether either is appropriate.

SO ORDERED this 4th day of February, 2002 at Hartford, Connecticut.

2002 U.S. Dist. LEXIS 2596, *; 47 U.C.C. Rep. Serv. 2d (Callaghan) 480

/s/                                                    United States District Judge

Christopher F. Droney