March 30, 1998

Mr. William Myles
Controller
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074

Dear Mr. William Myles:

This letter of arrangement between Handy & Harman Refining Group, Inc. (the "Company") and Coopers & Lybrand L.L.P. sets forth the nature and scope of the services we will provide, the Company's required involvement and assistance in support of our services, the related fee arrangements and other terms and conditions designed to assure that our professional services are performed to achieve the mutually agreed upon objectives of the Company.

## SUMMARY OF SERVICES

We will audit the consolidated financial statements of the Company as of and for the period ending March 31, 1998, in accordance with generally accepted auditing standards. The objective of an audit is the expression of our opinion concerning whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Company in conformity with generally accepted accounting principles. We expect to deliver our report on or about April 23, 1998. If, for any reason, we are unable to complete the audit, we may decline to issue a report as a result of this engagement.

The Company may wish to include these financial statements in a registration statement proposed to be filed under the Securities Act of 1933 or in some other offering at some future date. Since such participation was not contemplated at the time of this audit, this would constitute a new engagement and, accordingly, you agree that the aforementioned financial statements and our audit report, or reference to our Firm, will not be included in any such offering without our prior written permission.

Any additional services that you may request, and that we agree to provide, will be the subject of separate written arrangements.

The engagement will be led by:

> George A. Ingram, partner, who will be responsible for assuring the overall quality, value, and timeliness of our services to you

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998                                             PWC/H&H017381
Page 2

> Joseph J. Tiroletto, director, who will be responsible for managing the delivery of our service to you

EXHIBIT A

David L. DeVore will serve as the concurring review partner and will be available in the absence of the engagement partner. This team will have access to a full range of specialists to assist as necessary.

## YOUR EXPECTATIONS

As part of our planning process, we have met with you to discuss your expectations of Coopers & Lybrand L.L.P., your concerns about your business, changes in your business and industry, your views on risks facing you, any relationship issues with Coopers & Lybrand L.L.P., and specific engagement arrangements and timing. Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the engagement objectives and meet, and/or exceed, your expectations. Our service plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance.

## TERMS AND CONDITIONS SUPPORTING FEE

As a result of our planning process, the Company and Coopers & Lybrand L.L.P. have agreed to a fee, subject to the following conditions.

To facilitate meeting our mutual objectives, the Company will provide in a timely manner audit schedules and supporting information, including timely communication of all significant accounting and financial reporting matters, as well as working space and clerical assistance as mutually agreed upon and as is normal and reasonable in the circumstances. When and if for any reason the Company is unable to provide such schedules, information and assistance, Coopers & Lybrand L.L.P. and the Company will mutually revise the fee to reflect additional services, if any, required of us to achieve these objectives. Such revisions will be set forth in the form of the attached "Amendment to Letter of Arrangement."

In providing our services, we will consult with the Company with respect to matters of accounting, financial reporting or other significant business issues. Accordingly, time necessary to effect a reasonable amount of such consultation is reflected in our fee. However, should a matter require research, consultation or audit work beyond that amount, Coopers & Lybrand L.L.P. and the Company will agree to an appropriate revision in services and fee. Such revisions will also be set forth in the form of the attached "Amendment to Letter of Arrangement."

Except for any changes in fees which may result from the circumstances described above, our fees will be limited to those set forth below.

PWC/H&H017382

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 3

## FEE

Our fees for the services described above will be $85,000, plus out-of-pocket expenses, subject to the terms and conditions above. Such expenses will include all travel, lodging, subsistence and an allocation of office charges in support of our services including computer usage, telephone, facsimile transmission, postage, photoreproduction and similar expenses.

Our fees and out-of-pocket expenses will be billed periodically as incurred. Invoices rendered are due and payable upon receipt.

## LIMITATIONS OF THE AUDITING PROCESS

Our audit will include procedures designed to obtain reasonable assurance of detecting misstatements due to errors or fraud that are material to the financial statements. As you are aware, however, there are inherent limitations in the auditing process. For example, audits are based on the concept of selective testing of the data being examined and are, therefore, subject to the limitation that misstatements due to errors or fraud, if they exist, may not be detected. Also, because of the characteristics of fraud, including attempts at concealment through collusion and forgery, a properly designed and executed audit may not detect a material misstatement due to fraud.

Similarly, in performing our audit we will be aware of the possibility that illegal acts may have occurred. However, it should be recognized that our audit provides no assurance that illegal acts generally will be detected, and only reasonable assurance that illegal acts having a direct and material effect on the determination of financial statement amounts will be detected. We will inform you with respect to material errors and fraud, or illegal acts that come to our attention during the course of our audit.

## RESPONSIBILITIES AS TO INTERNAL CONTROL

As a part of our audit, we will consider the Company's internal control, as required by generally accepted auditing standards, sufficient to plan the audit and to determine the nature, timing, and extent of auditing procedures necessary for expressing our opinion concerning the financial statements. You recognize that the financial statements and the establishment and maintenance of effective internal control over financial reporting are the responsibility of management. Appropriate supervisory review procedures are necessary to provide reasonable assurance that adopted policies and prescribed procedures are adhered to and to identify errors and fraud or illegal acts. An audit is not designed to provide assurance on internal control, including whether the
Company has addressed or will be able to address on a timely basis any Year 2000 issues relating to computerized operations. As part of our consideration of the Company's internal control, however, we will inform you of matters that come to our attention that represent significant deficiencies in the design or operation of the internal control.

PWC/H&H017383

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 4

We are prepared at your request to perform a more in-depth assessment of the Company's internal control, and report our findings and recommendations, or to conduct an examination engagement on the effectiveness of your internal control. We would be pleased to discuss fees for these services, which depend on their scope.

## REPRESENTATION FROM MANAGEMENT

Management is responsible for the fair presentation of the financial statements in conformity with generally accepted accounting principles, for making all financial records and related information available to us, and for identifying and ensuring that the entity complies with the laws and regulations applicable to its activities. At the conclusion of the engagement, the Company's management will provide to us a representation letter that, among other things, addresses these matters and confirms certain representations made during the audit, including, to the best of their knowledge and belief, the absence of fraud involving management or those employees who have significant roles in the entity's internal control, or others where it could have a material effect on the financial statements.

The Company hereby indemnifies Coopers & Lybrand L.L.P. and its partners, principals and employees, and holds them harmless from all claims, liabilities, losses, and costs arising in circumstances where there has been a knowing misrepresentation by a member of the Company's management, regardless of whether such person was acting in the Company's interest. This indemnification will survive termination of this letter of arrangement.

## COMMUNICATIONS

At the conclusion of the engagement, we will provide management, in a mutually agreeable format, our recommendations designed to help the Company make improvements in its internal control and operations, and other matters that may come to our attention (see "Responsibilities as to Internal Control" above).

As part of this engagement we will ensure that certain additional matters are communicated to the appropriate members of management. Such matters include (1) the initial selection of and changes in significant accounting policies and their application; (2) the process used by management in formulating particularly sensitive accounting estimates and the basis for our conclusions regarding the reasonableness of those estimates; (3) audit adjustments that could, in our judgment, either individually or in the aggregate, have a significant effect on your financial reporting process; (4) any disagreements with management, whether or not satisfactorily resolved, about matters that individually or in the aggregate could
be significant to the financial statements or our report; (5) our views about matters that were the subject of management's consultation with other accountants about auditing and accounting matters; (6) major issues that were discussed with management in connection with the

PWC/H&H017384

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 5

retention of our services, including, among other matters, any discussions regarding the application of accounting principles and auditing standards; and (7) serious difficulties that we encountered in dealing with management related to the performance of the audit.

As part of our ongoing process of assessing the quality of our services, you may receive questionnaires from us and/or visits from senior partners not directly involved in providing services to you. We appreciate the attention that you give to these and value your commentary. Additionally, if you have questions or concerns about our services, you may contact Philip Schulz, the Business Assurance Partner-In-Charge responsible for the engagement team serving you.

## ACCESS TO WORKING PAPERS

The working papers for this engagement are the property of Coopers & Lybrand L.L.P. and constitute confidential information. Except as discussed below, any requests for access to our working papers will be discussed with you prior to making them available to requesting parties.

Our Firm, as well as all other major accounting firms, participates in a "peer review" program, covering our audit and accounting practices. This program requires that once every three years we subject our quality assurance practices to an examination by another accounting firm. As part of the process, the other firm will review a sample of our work. It is possible that the work we perform for you may be selected by the other firm for their review. If it is, they are bound by professional standards to keep all information confidential. If you object to having the work we do for you reviewed by our peer reviewer, please notify us in writing.

We may be requested to make certain working papers available to regulators pursuant to authority given to it by law or regulation. If requested, access to such working papers will be provided under the supervision of Coopers & Lybrand L.L.P. personnel. Furthermore, upon request, we may provide photocopies of selected working papers to the regulators. The regulators may intend, or decide, to distribute the photocopies or information contained therein to others, including other governmental agencies.

## SUBPOENAS

In the event we are requested or authorized by you or required by government regulation, subpoena, or other legal process to produce our working papers or our personnel as witnesses with respect to our engagement for you, you will, so long as we are not a party to the proceeding in which the information is sought, reimburse us for our professional time and expenses, as well as the fees and expenses of our counsel, incurred in responding to such a request.

**********************

PWC/H&H017385

Mr. William Myles
Handy & Harman Refining Group, Inc.
March 30, 1998
Page 6

If the foregoing is in accordance with your understanding, please sign the copy of this letter in the space provided and return it to us. If you have any questions, please call George Ingram at (860)241-7010.

Very truly yours,


Attachment



SUBMITTED BY: George Ingram

ACCEPTED BY:                                          DATE

TITLE

PWC/H&H017386

AMENDMENT #___ TO LETTER OF ARRANGEMENT

(Date)

Mr. William Myles
Controller
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074

Dear Mr. William Myles:

The letter of arrangement dated March 30, 1998 between Coopers & Lybrand L.L.P. and Handy & Harman Refining Group, Inc. is hereby amended to reflect the following:

| Description of/Causes for Amendment | Estimated Fees Impact $ |
|---|---|
| Total this amendment | |
| Previous fee estimate | 85,000 |
| Revised fee estimate | $ |

Please sign the copy of this letter in the space provided and return it to us. If you should have any questions, please call George Ingram at (860)241-7406.

Very truly yours,


SUBMITTED BY: George Ingram

ACCEPTED BY:                                                DATE

TITLE

PWC/H&H017387

**Westlaw.**

Not Reported in A.2d
2004 WL 1462653 (Conn.Super.)—
(Publication page references are not available for this document.)

Page 1

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Robert J. Brown et al.
v.
Diane Sol et al.

CV020087487S

Superior Court of Connecticut.

File Date:June 8, 2004

Brunetti, J.

*Memorandum of Decision*

This matter came before the court on April 26, 2004 on the defendant Skip Barber Racing School LLC (hereinafter Skip Barber) motion for Summary Judgment, as to Counts Five and Six of the Plaintiff's second amended complaint.

The plaintiff Robert Brown, (hereinafter referred to as the plaintiff) was an instructor at the Skip Barbers racing school located at Lime Rock Race Track in Salisbury, Connecticut. In the course of his employment the plaintiff was injured by the Defendant Diane Sol, who was a student of the school. The complaint alleges, that the plaintiff was injured when a vehicle driven by the defendant Diane Sol, during a practice exercise skidded out of control and struck the plaintiff. Skip Barber moves for summary judgment as to Counts Five and Six solely based upon a release signed by the Plaintiff which Skip Barber claims releases and holds harmless Skip Barber from any claims of negligence by the plaintiff.

Pursuant to Connecticut Practice Book Section 17-49, summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." A material fact is one that will make a difference in the outcome of the case. *Yanow v. Teal Industries, Inc.,* 178 Conn. 262, 268 (1979). Summary judgment should be granted if the "moving party would be entitled to a directed verdict on the same facts." *Wilson v. New Haven,* 213 Conn. 277, 279-80 (1989). "The motion for summary judgment is designed to eliminate the delay and expense of litigating an issue when there is no real issue to be tried." *Id.* at 279.

"The party seeking summary judgment has the burden of showing the absence of any genuine issue as to all the material facts which, under applicable principles of substantive law, entitled [that party] to a judgment as a matter of law." (Internal quotation marks omitted.) *Suarez v. Dickmont Plastics Corp.,* 229 Conn. 99, 105 (1994). "Although the moving party has the burden of presenting evidence that shows the absence of any genuine issue of material fact, the opposing party must substantiate its adverse claim with evidence disclosing the existence of such an issue." *Haesche v. Kissner,* 229 Conn. 213, 217 (1994). "Mere assertions of fact ... are insufficient to establish the existence of a material fact and, therefore, cannot refute evidence properly presented to the court. *Bartha v. Waterbury House Wrecking Co., Inc.,* 190 Conn. 8, 12 (1983) In this case the plaintiff, on September 19, 2001 the day that he was injured, signed a document titled "RELEASE AND WAIVER OF LIABILITY, ASSUMPTION OF RISK AND INDEMNITY AGREEMENT" prior to working the event taking place that day.

Paragraph two of this agreement, [FN1] states in capital letters the plaintiff hereby RELEASES, WAIVES, DISCHARGES AND COVENANTS NOT TO SUE the promoters, participants, racing association, sanctioning organizations or any subdivision thereof, track owners, officials, car owners, drivers, pit crews, rescue personnel, any persons in any Restricted Area. "FOR ANY AND ALL LOSS OR DAMAGE, AND ANY CLAIM OR DEMANDS THEREFOR ON ACCOUNT OF INJURY TO THE PERSON OR PROPERTY OR RESULTING IN THE DEATH OF THE UNDERSIGNED ARISING OUT OF OR RELATED TO THE EVENT(S), WETHER CAUSED BY THE NEGLIGENCE OF THE RELEASEES OR OTHERWISE."

> FN1. See Exhibit B attached to the motion for Summary Judgment.

In *Hyson v. White Water Mountain Resorts,* 265

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT B

Case 3:02-cv-01379-MRK    Document 73-2    Filed 07/08/2004    Page 9 of 17

Not Reported in A.2d                                                                                  Page 2
2004 WL 1462653 (Conn.Super.)
(Publication page references are not available for this document.)

Conn. 636, 829 A.2d 827 (2003), the Connecticut Supreme Court, concluded "that a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides," *Hyson supra* at page 643. In this case the court finds the language in this release meets the standard set forth in *Hyson*. Prior to *Hyson* there were numerous Superior Court cases dealing with this question as set forth in the lengthy discussion of the issue by Judge Aurigemma, in *Fischer v. Rivest*, 33 Conn. L. Rptr. 119, 2002 Ct.Sup. 10318 Judicial District of New Britain Complex Litigation August 15, 2002. The release in this case specifically refers to actions based on the negligence of the releasees, not only in paragraph two, but also in paragraphs 3, 4, 5 and six.

The plaintiff in his objection to the motion for summary judgment claims the release is ambiguous for the following reasons, 1) it does not supply a comprehensible description and location of the events, 2) the time of the signing of the release, 3) a completed release that includes a description of the duties associated with the release, 4) a clear definition of the location where the release applies, 5) proof that Brown was in a "restricted area" and 6) the actual name of the entity being released. The plaintiff admits that he signed the release but postures that he did not understand what event the release referred to, and that he did not see or read the body of the release. The court finds all of these arguments unavailing. The court finds the language of the release satisfies and identifies all the areas of concern posed by the plaintiff. The general rule in our state is that where a person who is of mature years and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is the persons' duty to read it and notice of its contents will be imputed to [that person] if [that person] negligently failed to do so, *Phoenix Leasing, Inc. v. Kosinski*, 47 Conn.App. 650, 654 (1998). The court finds from the plaintiff's deposition attached as Exhibit A to Skip Barber's motion that the plaintiff was an adult who had extensive prior experience with the dangers associated with automobile racing and race tracks. In fact the plaintiff signed an identical release on August 6, 2001.

In the present case the court finds the defendant has met its burden that no genuine issue of material fact exists. The waiver contains express language relieving the defendant of liability for injuries arising out of the negligence of the defendant. For the reasons stated the defendant Skip Barber's motion for summary judgment as to Counts five and six of the amended complaint is GRANTED.

Brunetti, J.

2004 WL 1462653 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**Westlaw.**

Not Reported in A.2d
(Cite as: 2004 WL 304315 (Conn.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Litchfield.

Ellen J. EHRENREICH, as personal representative of the Estate of Emily
Ehrenreich et al.
v.
MOHAWK MOUNTAIN SKI AREA, INC.

No. CV030090988S.

Jan. 30, 2004.

Gallagher Law Firm, New Haven, for Ellen and Mark J. Ehrenreich.

Howd & Ludorf, Hartford, Charles Price Jr., Bartholomew & Price LLC, New Haven, for Mohawk Mountain Ski Area Inc.

VANESSA L. BRYANT, J.

*1 The defendant, Mohawk Mountain Ski Area, Inc. ("Mohawk"), seeks to implead Stanley Jaworoski ("Jaworoski") as a defendant in this action pursuant to Practice Book § 10-11. The Motion to Implead was filed on September 17, 2003, 5 weeks after the return date. The plaintiff has filed an Objection to Motion to Implead. Section 10-11 provides that:
(a) A defendant in any civil action may move the court for permission as a third-party plaintiff to serve a writ, summons and complaint upon a person not a party to the action who is or *may* be liable to such defendant for all or part of the plaintiff's claim against him or her. Such a motion may be filed at any time before trial and such permission may be granted by the judicial authority if, in its discretion, it deems that the granting of the motion will not unduly delay the trial of the action or work an injustice upon the plaintiff or the party sought to be impleaded. (Emphasis added.)
Practice Book § 10-11 (2003). The defendant's motion to implead is accompanied by a third-party complaint in two counts, the first of which asserts a claim of contractual indemnification and the second of which asserts a claim of common-law indemnification. The underlying complaint alleges negligence and wanton or reckless misconduct in the operation of a ski area resulting in the death of the plaintiffs' decedent Emily Ehrenreich ("Emily").

The undisputed facts are that on December 27, 2001, Emily, an 11-year-old child, was taken by Jaworoski to a ski area owned and operated by the defendant Mohawk. Jaworoski rented skis for Emily to use from Mohawk. As an express condition of the rental, Jaworoski signed a rental agreement which said, "I agree to hold harmless and indemnify the ... ski area and their owners ... for any loss or damage, *including* any that result from ... personal injury [or] death ... related to the use of this equipment." (Emphasis added.)

The plaintiffs object to the motion to implead Jaworoski for four reasons. First, the plaintiff claims the defendant's claim against the third-party defendant is barred as a matter of law because indemnification does not apply to the accident because the consideration for the agreement was the use of the ski equipment not the use of the ski area. Second, the third-party defendant is entitled to a judgment as a matter of law because the indemnity is unenforceable in that it is not sufficiently clear, unambiguous and understandable. Third, relying on *Hyson v. White Water Mountain Resorts of Connecticut, Inc,* 265 Conn. 36, 829 A.2d 827 (2003), the indemnification cannot absolve Mohawk of its own negligence. Fourth, the third-party complaint is insufficient in that it fails to set forth well-pleaded facts. For their fourth proposition, the plaintiffs rely on *Commissioner of Environmental Protection v. Lake Phipps Land Owners Corp.,* 3 Conn.App. 100, 485 A.2d 580 (1985), in which the party impleaded filed a Motion to Dismiss.

*2 A defendant may file a motion to implead any party who may be liable for all or part of the plaintiff's claims. *DeJesus v. Craftsman Machinery Co.* 16 Conn.App. 558, 566 (1988). The defendant need not prove the third-party defendant's liability before it is entitled to implead him. The third-party defendant need not be liable for all the plaintiff's damages. The third-party complaint must allege that the third-party defendant is or may be liable to the third-party plaintiff for all or some of the plaintiff's claims. *Commissioner v. Lake Phipps Land Owners*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

EXHIBIT
C

*Corp.*, 3 Conn.App. 100, 102 (1985). The plaintiff does not assert that the defendant has failed to allege in its third-party complaint that the third-party defendant may be liable for all or a part of the plaintiff's claims.

An objection to a motion to implead is not the appropriate procedural tool to challenge a complaint for the reasons asserted by the plaintiffs. With respect to the first and second bases for the plaintiffs' objection to the Motion to Implead, a motion to strike is the procedural tool to challenge the legal sufficiency of a complaint. Practice Book § 10-39(a). Alternatively a Motion for Summary Judgment would be appropriate if there are no questions of fact and the party cited-in is entitled to a judgment as a matter of law. Practice Book § 17-44 et seq.

With respect to the fourth basis for the plaintiffs' objection, a "request to revise is a motion for an order directing the opposing party to revise his pleading in the manner specified." *Royce v. Westport*, 183 Conn. 177, 180, 439 A.2d 298 (1981). "The purpose of a request to revise is to secure a statement of the material facts upon which the adverse party bases his complaint or defense ... The test is not whether the pleading discloses all that the adversary desires to know in aid of his own cause, but whether it discloses the material facts which constitute the cause of action or ground of defense." (Citation omitted; internal quotation marks omitted.) *Knight v. Southeastern Council on Alcoholism & Drug Dependency*, Superior Court, judicial district of New London, Docket No. CV-01-0557182 (September 21, 2001, Hurley, J.T.R.). citing *Kileen v. General Motors Corp.*, 36 Conn.Sup. 347, 348, 421 A.2d 874 (1980).

The plaintiffs' reliance on *Commissioner of Environmental Protection v. Lake Phipps, supra,* is misplaced. In that case the Appellate Court held that a defendant could not implead a third-party defendant claiming that the party sought to be impleaded was liable to the plaintiff. Both counts of the third-party claim that the third-party defendant is liable, not to the plaintiff, but to the defendant and third-party plaintiff based upon indemnification.

In *Hyson, supra,* our Supreme Court expressly rejected the notion that one party could implicitly agree to indemnify another person against his or her own negligence and concluded that "the better rule is that a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides ... A requirement of express language releasing the defendant for its negligence prevents individuals from inadvertently relinquishing valuable rights. Furthermore, the requirement that parties seeking to be released from liability for negligence expressly so indicate does not impose on them any significant cost." *Hyson, supra,* at 645. Because the indemnification in this case does not expressly release Mohawk from its own liability, it cannot operate as an indemnification if and to the extent Mohawk was negligent. The amended complaint alleges that Mohawk's acts and omissions were either negligent or wanton and reckless. Mohawk could only be found liable, thus triggering indemnification if the trier of fact found it to have been negligent or worse, reckless and wanton. Due to the absence of express language in the indemnification releasing Mohawk from its own negligent or wanton and reckless conduct, the plaintiff correctly asserts that there is no right of indemnification for the acts alleged in the complaint and therefore the motion to implead Jaworski predicated on express indemnity should be denied.

*3 Under Practice Book § 10-11 and General Statutes § 102a, a defendant may move to serve a third-party complaint by writ summons and complaint against a party who he claims may be liable for some or all of the damages sought from him if the court "deems that the granting of the motion will not unduly delay the trial of the action nor work an injustice upon the plaintiff or the party sought to be impleaded." The holding in *Hyson* clearly presages a Supreme Court ruling that there is no common-law right to indemnification against one's own negligence. Since the sole bases for liability asserted against Mohawk sound in negligence and Jaworoski cannot be liable to indemnify Mohawk for its own negligence, granting the motion to implead would unduly delay the trial and work an injustice on the plaintiff and Jaworoski. The motion to implead is denied and the objection is sustained.

2004 WL 304315 (Conn.Super.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in A.2d                                                                      Page 1
35 Conn. L. Rptr. 640
(Cite as: 2003 WL 22480968 (Conn.Super.))

C
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of New Haven.

Barry DIMAGGIO, Administrator for the Estate of Christina Beaudry,
v.
Daniel LABREQUE et al.

No. CV000438800S.

Oct. 9, 2003.

Kevin Collins, Stamford, for Barry Dimaggio.

Matthew Woermer, Watertown, for Daniel Labrecque.

O'Connell Flaherty & Attmore, Hartford, for Six Chuter Inc.

ARNOLD, J.

*1 The plaintiff administrator, commenced this action by way of complaint dated April 18, 2000, bringing an action for injuries suffered by the decedent, which resulted in her death. Thereafter, the plaintiff filed a revised complaint. The injuries were sustained as a result of an accident wherein the decedent was a passenger in a powered parachute, assembled and manufactured, in part, by the defendant Six Chuter, Inc. The defendant, Six Chuter Inc., pursuant to Practice Book § 17-44 has filed a motion for summary judgment arguing that the decedent signed an Indemnity Agreement and Release of Liability, that specifically released the defendant from liability caused by its own negligence, and that the "release," constitutes a complete defense to the plaintiff's claim.

The revised complaint dated June 21, 2001 contains two counts. The first count alleges negligence as to defendant Labreque. The second count against the defendant Six Chuter, Inc. alleges product liability. The first count was withdrawn on September 11, 2001. The motion for summary judgment applies only to the remaining second count sounding in product liability against Six Chuter, Inc. The plaintiff bases his complaint against Six Chuter on its alleged negligence in the design and manufacture of the parachute; its failure to warn of its dangers; and its failure to properly train instructors in the use of the product.

The court first reviews the standards of law applicable to summary judgments. "A Motion for Summary Judgment is designed to eliminate the delay and expense of litigating an issue where there is no real issue to be tried." *Wilson v. New Haven*, 213 Conn. 277, 279, 576 A.2d 829 (1989). "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." *Hertz Corp. v. Federal Ins. Co.*, 245 Conn. 374, 381, 713 A.2d 820 (1998). In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any issues exist. *Nolan v. Borkowski*, 206 Conn. 495, 500, 538 A.2d 1031 (1988). The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Hertz Corp. v. Federal Ins. Corp., supra*, 245 Conn. at 381. "The opposing party must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact." *Id.* "A material fact is a fact which will make a difference in the result of a case." *Suarez v. Dickmont Plastics Corp.*, 229 Conn. 99, 639 A.2d 507 (1994).

The test used by the court is to determine if the moving party would be entitled to a directed verdict if the same set of facts were presented at trial. *Connell v. Colwell*, 214 Conn. 242, 246-47, 571 A.2d 116 (1990). A directed verdict is properly rendered if a trier of fact cannot reasonably and legally find in any fashion other than that directed. *Santopietro v. New Haven*, 239 Conn. 207, 225, 682 A.2d 106 (1996).

*2 A summary of the plaintiff's allegations, indicates that on or about July 27, 1999, the decedent was a passenger in an "ultra lite powered parachute" manufactured, designed and or marketed by Six Chuter. The powered parachute was being operated by the co-defendant, Daniel Labreque. The decedent at that time was being instructed by Labreque on how to fly and control the powered parachute. Labreque had represented to the decedent that he was qualified

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works



Not Reported in A.2d
35 Conn. L. Rptr. 640
(Cite as: 2003 WL 22480968 (Conn.Super.))

to instruct her, and that the parachute was safe for use by two persons. He allegedly also told the decedent that the location used for the flight was safe and that the weather conditions were acceptable. Labreque possessed a certification from defendant, Six Chuter that he was a qualified trainer or flight instructor for the powered parachute. Shortly after the flight commenced, Labreque lost control of the powered parachute which then crashed in a nearby field. The crash resulted in fatal injuries to the decedent.

The decedent had signed a document titled "Acknowledgment of Risks of Hazards, Waivers, or Rights, Release and Indemnity Agreement" at Labrecque's house on the day of the flight, immediately prior to leaving for the field where the flight was to occur. A review of Labrecque's deposition testimony reveals that the decedent had a basic understanding that the "release" relieved Labrecque of any fault. In signing the release, the decedent acknowledged that she had inspected the "land facilities," where the flight would take place, but this inspection did not occur until a subsequent time when she and Labrecque arrived at the field. While this physical inspection did take place subsequent to the signing, it was prior to the fatal flight of the powered parachute. There is no claim that after the decedent inspected the facilities that she found them unsatisfactory, and the inspection did not deter her from commencing the fatal flight.

The "release agreement" sets forth in detail the risks involved with participation in power parachute activities and warns that the activity is "subject to mishaps, injury or possibly death." The release agreement specifically states that by signing the agreement the decedent was giving up valuable legal rights in the event she was injured and attempted to sue someone or "otherwise make a claim for those injuries." The agreement states in relevant part:

> I hereby forever Release and Discharge, Chuting Star, Inc., Daniel Labrecque and Six Chuter Corporation ... from any and all liabilities, claims, demands, or causes of action that I may hereinafter have for injuries or damages arising out of my participation in Power Parachute activities, including but not limited to losses, CAUSED BY PASSIVE OR ACTIVE NEGLIGENCE OF THE RELEASED PARTIES or hidden, latent, or obvious defect with the equipment sold or used. I further agree that I WILL NOT SUE OR MAKE CLAIM AGAINST THE RELEASED PARTIES for damages or losses ... I also agree to INDEMNIFY AND HOLD THE RELEASED PARTIES HARMLESS from all claims, judgments and costs ... CAUSED BY THE PASSIVE OR ACTIVE NEGLIGENCE OF THE RELEASED PARTIES.

*3 Besides the language of the release agreement quoted above, the entire agreement contains similar language releasing the defendants' active or passive negligence in four different paragraphs. Each time such language appears it is in bold type. The release consists of five pages with eleven paragraphs. After reading each paragraph the decedent was required to sign her initials. At the very end of the release agreement form the following language appears in bold type.

> I HAVE CAREFULLY READ THIS AGREEMENT AND RELEASE OF LIABILITY. I FULLY UNDERSTAND ITS CONTENTS AND SIGN IT OF MY OWN FREE WILL. I have had ample opportunity to have this legal document reviewed by an attorney prior to signing it.

Following this paragraph the decedent signed her full signature on the release agreement on July 27, 1999. The decedent's signing of the agreement was witnessed by Paul DaSilva on the same date.

The plaintiff claims that there is a genuine issue of material fact as to whether the decedent's consent to a "release of liability" was informed and voluntary. The court disagrees. The decedent was over the age of twenty-one. The face of the agreement shows that she placed her initials after each of the paragraphs and signed her full signature before a witness on the last page. The document is replete with warnings of danger and the possibility of injury and even death. These warnings, as well, as the release of liability warnings for active or passive negligence of the defendants, are in bold type with upper case letters. There is no evidence that the decedent could not read or write and that she was not of mature years. "The general rule is that where a person of mature years and who can read and write signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it and notice of its contents will be imputed to him if he negligently fails to do so." (Internal quotation marks and citations omitted.) *DiUlio v. Goulet*, 2 Conn.App. 701, 483 A.2d 1099 (1984).

Agreements releasing owners and operators of sports facilities from liability for negligence have generally been held enforceable against a patron. *Bashura v. Strategy Plus, Inc.*, Superior Court, judicial district of Ansonia-Milford, Docket No. 050871 (November 20, 1997) (Corradino, J.) (21 Conn. L. Rptr. 59); see also *Connors v. Reel Ice, Inc.*, Superior Court, judicial district of Hartford, Docket No. 579993 (July 24,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 3:02-cv-01379-MRK   Document 73-2   Filed 07/08/2004   Page 14 of 17

Not Reported in A.2d                                                                 Page 3
35 Conn. L. Rptr. 640
(Cite as: 2003 WL 22480968 (Conn.Super.))

2000) (Wagner, J.) (27 Conn. L. Rptr. 610) (language in the waiver specifically releases the parties from injuries or death caused by their own negligence). The court also takes guidance from the holding of the Connecticut Supreme Court in *Hyson v. White Water Mountain Resorts,* 265 Conn. 636 (2003), which was officially released on September 2, 2003.

In *Hyson,* the plaintiff, claiming that the defendant ski area operator was negligent, sought to recover damages for personal injuries she sustained while riding on a snow tube at the defendants facility. The defendant filed a motion for summary judgment on the ground that the plaintiff was precluded from recovery for her injuries because she had signed a document purporting to release the defendant from liability. The trial court granted that motion and rendered judgment for the defendant, from which the plaintiff appealed. The Supreme Court, thereafter, held that the trial court improperly granted the defendant's motion for summary judgment because the release signed by the plaintiff did not expressly provide that the plaintiff was releasing the defendant from liability for the defendants future negligence and, therefore, did not preclude the plaintiff from recovering for injuries sustained as a result of the defendant's negligence; because a person of ordinary intelligence reasonably could believe that, by signing a release that does not expressly refer to the negligence of the party seeking the release, he or she is releasing that party from liability only for injuries caused by dangers inherent in the activity that is the subject of the release. The court reasoned that a party cannot be relieved of liability for damages resulting from its future negligence in the absence of language that expressly so provides.

*4 We note first that the release signed by the plaintiff does not specifically refer to possible negligence by the defendant. Instead, it refers to inherent and other risks involved in [snowtubing], provides examples of some such risks, none of which refers to possible negligence, and states that [a]ll of the inherent risks of [snowtubing] present the risk of serious and/or fatal injury. Following this language, the release states that the plaintiff agrees to hold harmless and indemnify [the defendant] for loss or damage, including any loss or injuries that result from damages related to the use of a snowtube or lift.
(Internal quotation marks omitted.) *Id.* at 640.

In reversing the trial court's granting of the motion for summary judgment the court stated:
[W]e conclude that the better rule is that a party cannot be released from liability for injuries resulting from its fixture negligence in the absence of language that expressly so provides. The release signed in the present case illustrates the need for such a rule. A person of ordinary intelligence reasonably could believe that, by signing this release, he or she was releasing the defendant only from liability for damages caused by dangers inherent in the activity of snowtubing. A requirement of express language releasing the defendant from liability for its negligence prevents individuals from inadvertently relinquishing valuable legal rights. Furthermore, the requirement that parties seeking to be released from liability for their negligence expressly so indicate does not impose on them any significant cost. Because the release signed by the plaintiff in the present case did not expressly provide that, by signing it, she released the defendant from liability for damages resulting from its negligence, the trial court improperly granted the defendant's motion for summary judgment.
*Id.* at 643

Unlike the release and indemnity agreement in *Hyson v. White Water Mountain Resorts, supra,* 265 Conn. at 636, the release and indemnity agreement in the present case contains multiple and specific references to the release of active or passive negligence by the defendants. This language employed in the release agreement was sufficient to inform the decedent not only of the inherent dangers associated with power parachuting, but it was more than sufficient to give the decedent prior warning that she was not only releasing the defendants from "liability," but was also releasing them from any acts of active or passive negligence of their own.

The court notes Justice Norcott's dissent in *Hyson,* in which Justice Borden joined. The dissent would impose a less exacting language standard than that required by the majority in Hyson in order to make a release enforceable. However, the release agreement in the present case meets the more exacting standard required by the majority opinion written by Chief Justice Sullivan, and accordingly the motion for summary judgment filed by the defendant Six Chuter, Inc., is hereby granted.

2003 WL 22480968 (Conn.Super.), 35 Conn. L. Rptr. 640

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*359036**   Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut.

Janet **BOUCHARD**,
v.
Donald **BOUCHARD**.
No. FA910502794S.

March 16, 2001.

MEMORANDUM OF DECISION RE: MOTIONS IN LIMINE

GRUENDEL.

**\*\*1** The plaintiff has filed two motions in limine to preclude the defendant from introducing certain evidence concerning the defendant's asserted defenses to the plaintiff's motion seeking to have him held in contempt for his alleged failure to contribute to the college expenses of the parties' children. The defenses are breach of contract by the plaintiff and accord and satisfaction.

DISCUSSION

I. MOTION IN LIMINE

In deciding these motions in limine, the court is not called upon to determine whether the asserted defenses are legally sufficient, (FN1) but rather to determine whether the evidence sought to be introduced is relevant. *State v. LoSacco,* 26 Conn.App. 439, 444, 602 A.2d 589 (1992), citing *State v. Bell,* 188 Conn. 406, 414, 450 A.2d 356 (1982). The defendant bears the burden of proving his defenses. *Lumberman's Mutual Casualty Co. v. Scully,* 3 Conn.App. 240, 245 n. 5, 486 A.2d 1141 (1985). The court has the right and the duty to exclude irrelevant evidence. *Matto v. Dermatopathology Associates of New York,* 55 Conn.App. 592, 598, 739 A.2d 1284 (1999). "As a general matter, evidence is admissible if it has a tendency to support a fact relevant to the issues if only in a slight degree." *Burns v. Hansen,* 249 Conn. 809, 825, 734 A.2d 964 (1999) (internal quotation marks omitted). The test for admissibility is whether the evidence will assist the trier of fact in evaluating the claim. *Id.,* 826-27, 734 A.2d 964.

Evidence is irrelevant or too remote if there is such a want of open and visible connection between the evidentiary and principal facts that all things considered, the former is not worthy or safe to be admitted in proof of the latter ... Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. (Citations omitted; internal quotation marks omitted.)

*State v. Prioleau,* 235 Conn. 274, 305, 664 A.2d 743 (1995).

II. ADMISSIBILITY OF EVIDENCE OF BREACH OF CONTRACT

The June 26, 1995 stipulated judgment dissolving the parties' marriage included a provision requiring "mandatory therapy and counseling involving the minor children and the parents." The purpose of the therapy was "to re-establish the relationship between the Husband and the children so the above described visitation may occur." The defendant repeatedly filed motions to compel the therapy, and several of those motions were granted by the court. On January 26, 1999, the court (Hon. John Brennan) denied the defendant's final motion to compel and vacated the order requiring counseling. The defendant asserts that no meaningful counseling ever took place, that the plaintiff breached the stipulated judgment and that her breach is a defense to the alleged contempt. The court finds that evidence of the alleged breach is not relevant in this proceeding and grants the motion in limine.

A stipulated judgment must be construed and regarded as a binding contract between the parties. *Griffin v. Planning and Zoning Commission of the Town of New Canaan,* 30 Conn.App. 643, 650, 621 A.2d 1359 (1993); *Caracansi v. Caracansi,* 4 Conn.App. 645, 650, 496 A.2d 225, cert. denied, 197 Conn. 805, 499 A.2d 56 (1985). This principle applies to agreements for post-majority support which are incorporated into dissolution decrees. *Legg v. Legg,* 44 Conn.App. 303, 306, 688 A.2d 1354 (1997). Stipulated judgments must be interpreted consistently with accepted contract principles. *Guille v. Guille,* 196 Conn. 260, 265, 492 A.2d 175 (1985). Where the language of the contract is clear and unambiguous, as in this case, the scope and meaning of the language is a question

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.



of law rather than a question of fact. *Zadravecz v. Zadravecz,* 39 Conn.App. 28, 31, 664 A.2d 303 (1995); *Greenburg v. Greenburg,* 26 Conn.App. 591, 596, 602 A.2d 1056 (1992). The court may not add a term to the agreement. *Albrecht v. Albrecht,* 19 Conn.App. 146, 157, 562 A.2d 528, cert. denied, 212 Conn. 813, 565 A.2d 537 (1989).

**\*\*2** In a contempt action to enforce a judgment providing for post-majority support for the parties' children, the defenses available in an action for breach of contract are available to a party defending a contempt. (FN2) That is so because when the legislature amended General Statutes Section 46b-66 to authorize such agreements to be incorporated into a stipulated judgment, the "limited purpose" of the amendment was to permit those agreements to be enforced by contempt instead of by an independent action on the contract. *Albrecht v. Albrecht, supra,* 19 Conn.App. 156-57. Public policy considerations mandate this conclusion. First, proceeding in contempt is likely to be more efficient in terms of the time necessary to litigate the matter, an important consideration when the children are in college and the parties need a more immediate resolution of the issue. Secondly, because the right to enforce the judgment by contempt does not necessarily preclude an independent action on the contract, judicial economy requires that the same defenses be available in both.

Under contract law, a material breach by one party discharges the other party's subsequent duty to perform on the contract. "[I]t is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time." 2 Restatement (Second), Contracts Section 237, p. 215 (1979); see also *State v. Lex Associates,* 248 Conn. 612, 624, 730 A.2d 38 (1999). Whether a breach is material depends on the circumstances of the case. *669 Atlantic Street Associates v. Atlantic-Rockland Stamford Associates,* 43 Conn.App. 113, 128, 682 A.2d 572 (1996), citing to 2 Restatement (Second), Contracts, Section 241, 237-38, comment (a) (1989).

In this case, the plaintiff's alleged breach is not relevant to the defendant's obligations to perform under the judgment. The alleged breach by the plaintiff asserted as a defense is that she failed to engage the children in counseling to promote visitation between them and the defendant. Generally, promises within a property settlement agreement in a divorce action are independent unless one promise is conditioned upon the performance of another promise. (FN3) 15 S. Williston, Contracts (4th Ed., 2000) Section 44:19 p. 122. First, the promise on the part of the defendant to provide post-majority educational support in this case is not conditioned on the requirement that counseling take place. The agreement to engage the children in counseling was modifiable both by the terms of the agreement and by the requirements of law. Indeed, in this case, the plaintiff was explicitly released from that obligation when the court modified the counseling requirement in 1999, when two of the parties' four children were still minors. The court retains jurisdiction to modify orders concerning custody and visitation to determine what is in the best interests of the children at a future time. General Statutes, Section 46b-56. The agreement by both parties to pay post-majority educational expenses, in contrast, was not modifiable either by the terms of the agreement (FN4) or in the law. *Albrecht, supra,* 19 Conn.App. 157. The fact that one promise was modifiable, and ultimately modified, while the other was not underscores the court's conclusion that the promises were not mutually dependent.

**\*\*3** In addition, evidence of breach of contract is irrelevant in this case because in Connecticut, the duty of a party to provide support is wholly independent of the right of a party to have visitation. *Bozzi v. Bozzi,* 177 Conn. 232, 237-38, 413 A.2d 834 (1979); *Emerick v. Emerick,* 28 Conn.App. 794, 802, 613 A.2d 1351, cert. denied, 224 Conn. 915, 617 A.2d 171 (1992). The general rule against construing promises as dependent in a stipulated agreement dissolving a marriage is particularly applicable here, where one promise related to visitation and the other to support.

### III. ADMISSIBILITY OF EVIDENCE OF ACCORD AND SATISFACTION

The defendant asserts an accord and satisfaction between the parties as a defense against the plaintiff's motion for contempt. The defendant seeks to offer evidence that on October 6, 1999, after more than four years of contentious post-judgment litigation, the parties entered into an agreement that the plaintiff would not pursue her claim for contributions from the defendant to the

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.

children's college expenses and that the defendant would not pursue other claims against the plaintiff including a civil suit alleging, *inter alia,* that the plaintiff and her present husband had alienated the children's affections. (FN5) A stipulation was drafted but was not signed by either party or by the party's respective attorneys. The defendant served requests to admit on the plaintiff seeking to establish that the alleged settlement had been reached by the parties, but the answers are not conclusive. It is undisputed that the children did not participate and were not represented in the settlement negotiations.

The defendant does not claim that this purported settlement is to be summarily enforced, and his asserted defense would not lead to that result. The defendant only claims an accord and satisfaction.

**\*\*4.** To prove the defense of accord and satisfaction, the defendant must show that there was a dispute between the parties as to the existence or the amount of a debt and that the creditor and debtor negotiated a new agreement to settle the claim. *Munroe v. Emhart Corp.,* 46 Conn.App. 37, 42, 699 A.2d 213, cert. denied 243 Conn. 926, 701 A.2d 601 (1997). The accord is the contract for the settlement, and the execution or performance of the agreement is the satisfaction. *Davis v. Forman School,* 54 Conn.App. 841, 849, 738 A.2d 697 (1999); *W.H. McCune, Inc. v. Revzon,* 151 Conn. 107, 109, 193 A.2d 601 (1963). Unless there is mutual agreement or a meeting of the minds, there cannot be a valid accord. *Herbert S. Newman & Partners v. CFC Construction Ltd. Partnership,* 236 Conn. 750, 764, 674 A.2d 1313 (1996).

There has been no evidentiary hearing to establish whether there is a factual basis to establish the defense of accord and satisfaction. The only evidence before the court is the unsigned stipulation between the parties and the lawsuit that the defendant served upon the plaintiff and her husband contemporaneously with the alleged stipulation. Because the lawsuit is still pending, the defendant has not performed any accord to date. Nevertheless, the question before this court is not whether an accord and satisfaction has been proven, or even can be proven, but rather whether evidence of one is relevant. Whether there has been a mutual assent to an accord is a question of fact reserved to the finder of fact. *Gillis v. Gillis,* 21 Conn.App. 549, 552-53, 575 A.2d 230, *cert. denied,* 215 Conn. 815, 576 A.2d 546 (1990). Accordingly, evidence of such an agreement is relevant, and the motion in limine is denied.

(FN1.) The plaintiff has not moved to strike the defenses and has not moved for summary judgment on them.

(FN2.) The court has found no case holding that breach of contract is generally available as a defense to an action for contempt of a stipulated judgment. The court does not reach the question of whether breach of contract is available as a defense to an alleged contempt in any other context.

(FN3.) The judgment also provided that the plaintiff would establish a trust for the children's education. That requirement was a condition precedent to the defendant's obligation to contribute to educational expenses, and the defendant's promise was necessarily conditioned on it. The plaintiff's failure to have made the contribution would likely have been a defense.

(FN4.) The stipulation for judgment in this case provided that the college support obligation was not modifiable except for certain financial reasons. Those are not relevant here because the defendant has stipulated that he will not claim inability to pay as a defense to the claimed contempt.

(FN5.) Several counts in the civil case were stricken by the court, including the counts alleging alienation of the children's affections. *Bouchard v. Sundberg,* 27 Conn.L.Rptr. No. 11, 407 (August 28, 2000).

© 2004 West, a Thomson business. No claim to original U.S. Govt. works.