# EXHIBIT D

Document6

LEXSEE 2001 CONN. SUPER. LEXIS 29

**SCP Corporation v. BankBoston fka Bank of Boston, Connecticut et al.**

**X01CV980150598**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY, AT WATERBURY**

**2001 Conn. Super. LEXIS 29**

**January 3, 2001, Decided**
**January 3, 2001, Filed**

**NOTICE:** [*1]   THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** BankBoston's motion for summary judgment denied.

**LexisNexis(R) Headnotes**

**JUDGES:** Beverly J. Hodgson, Judge of the Superior Court.

**OPINIONBY:** Beverly J. Hodgson

**OPINION:** MEMORANDUM OF DECISION ON DEFENDANT BANK BOSTON'S MOTION FOR SUMMARY JUDGMENT

On October 18, 2000, two weeks after the plaintiff filed its motion for summary judgment on liability, the defendant, BankBoston ("bank") filed cross motion for summary judgment asserting that the undisputed facts establish that it did not breach its contract with SCP Corporation ("SCP") in either of the ways claimed in the two counts of the complaint dated February 1, 2000. n1

n1 Though this complaint is titled "Second Amended Complaint Against Defendant BankBoston," a second amended complaint was filed in 1999, so that the February 2000 complaint is actually the third version of the complaint.

In the first count of the complaint, SCP claims [*2] that the bank breached a duty to use its best efforts to achieve judgment in a foreclosure action so that SCP could acquire the bank's interest in the obligation after judgment had entered and between specified dates. In the second count, SCP claims that the bank breached the implied covenant of good faith and fair dealing with regard to its pursuit of the foreclosure action.

Standard of review

Summary judgment "shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Practice Book § 17-49; *Sherwood v. Danbury Hospital*, 252 Conn. 193, 201, 746 A.2d 730 (2000); *Alvarez v. New Haven Register, Inc.*, 249 Conn. 709, 714, 735 A.2d 306 (1999); *Rivera v. Double A Transportation, Inc.*, 248 Conn. 21, 24, 727 A.2d 204 (1999); *Nichols v. Lighthouse Restaurant, Inc.*, 246 Conn. 156, 163, 716 A.2d 71 (1998); *Peerless Ins. Co. v. Gonzalez*, 241 Conn. 476, 481, 697 A.2d 680 (1997).

The party moving for summary judgment bears the burden of proving [*3] the absence of a dispute as to any material fact which, under applicable principles of substantive law, entitle him to a judgment as a matter of law; and the party opposing such a motion must provide an evidentiary foundation to demonstrate the existence of a genuine issue of material fact. *Rivera v. Double A Transportation, Inc., supra*, 248 Conn. 24. "To satisfy his burden the movant must make a showing that it is quite clear what the truth is, and that excludes any real

doubt as to the existence of any genuine issue of material fact." *Witt v. St. Vincent's Medical Center*, 252 Conn. 363, 373 n.7, 746 A.2d 753 (2000).

In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. The test is whether a party would be entitled to a directed verdict on the same facts. *Sherwood v. Danbury Hospital, supra*, 252 Conn. 201; *Serrano v. Burns*, 248 Conn. 419, 424, 727 A.2d 1276 (1999); *Connell v. Colwell*, 214 Conn. 242, 246-47, 571 A.2d 116 (1990). In Connecticut, a directed verdict may be rendered only if, on the evidence viewed [*4] in the light most favorable to the nonmovant, the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed. *United Oil Co. v. Urban Redevelopment Commission*, 158 Conn. 364, 380, 260 A.2d 596 (1969); *Vuono v. Eldred*, 155 Conn. 704, 705, 236 A.2d 470 (1967).

In ruling on a motion for summary judgment, the court's function is not to decide issues of material fact, but rather to determine whether any such issues exist. *Nolan v. Borkowski*, 206 Conn. 495, 500, 538 A.2d 1031 (1998); *Telesco v. Telesco*, 187 Conn. 715, 718, 447 A.2d 752 (1982).

Claim that Agreement Does Not Require Use of Best Efforts

The bank asserts in its motion that it is entitled to judgment because the Sale and Assignment Agreement ("agreement") on which SCP bases its claims did not, by its terms, require it to use "best efforts" to achieve a judgment in its foreclosure case against obligors under a mortgage loan that SCP the agreement gave SCP an option to purchase. The agreement provides at paragraph 4 for pursuit of foreclosure, but at paragraph 19 it provides that the bank may abandon the foreclosure [*5] action. In its March 17, 1999, decision on the bank's motion to strike the complaint, this court reconciled these provisions as imposing a duty on the bank to use best efforts to achieve a judgment in the foreclosure case before March 31, 1993, if it chose to proceed with the foreclosure at all.

The bank's present argument concerning the content of paragraph 4 of the agreement does not persuade this court that its prior interpretation was incorrect. That provision states in pertinent part as follows:

(b) the Assignor will use, to the extent of its legal and contractual ability, best efforts to (i) join Louis Evangelista and LE/SE Corp. as defendants in the Foreclosure Proceedings or any subsequent foreclosure or enforcement

actions commenced by the Assignor in connection with the Claims and (ii) cause the "Law Day" of the Obligor in the Foreclosure Proceedings to occur no earlier than December 15, 1992. In addition, the Assignor will also agree to use best efforts to extend such Law Day upon the written request of the Assignee; provided, that in no event and under no circumstances shall such Law Day be extended beyond March 31, 1993 . . .

"Where there is definitive contract [*6] language, the determination of what the parties intended by their contractual commitments is a question of law." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission System. L.P.*, 252 Conn. 479, 495, 746 A.2d 1277 (2000); *Levine v. Massey*, 232 Conn. 272, 277, 654 A.2d 737 (1995); *Bank of Boston Connecticut v. Schlesinger*, 220 Conn. 152, 158, 595 A.2d 872 (1991). Where, as in the instant case, the parties to the contract are sophisticated business entities, the Supreme Court has recognized a presumption of definitiveness in the words of the contract and has concluded that "the intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract." *Tallmadge Bros., Inc. v. Iroquois Gas Transmission System. L.P., supra*, 252 Conn. 498; *Lawson v. Whitey's Frame Shop*, 241 Conn. 678, 686, 697 A.2d 1137 (1997).

It would be a strained reading of the words of the contract to conclude, as the bank urges, that [*7] it was obligated to use best efforts only with regard to the timing, but not with regard to obtaining the judgment, where the clear import of the agreement was that SCP should have the opportunity to purchase the loan after judgment had entered, and between December 15, 1992, and March 31, 1993, if that could be achieved by exercise of the bank's best efforts. Use of best efforts to conclude the foreclosure within the desired time frame is identified in the contract, at paragraph 4, as an inducement to SCP, and it cannot be read in a manner that would make it an illusory inducement, as would be the case if the provision on best efforts were read to relate only to the date of judgment, and not to attainment of judgment.

The bank has not attempted to demonstrate in connection with its motion that it used best efforts; rather, it claims summary judgment on the first count of the complaint on the ground, rejected by this court, that the agreement did not require it to use best efforts to achieve a judgment. The bank has not established that it

is entitled to judgment as a matter of law on the first count of the operative complaint.

Breach of Duty of Good Faith and Fair Dealing

"Every [*8] contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain General Hospital*, 239 Conn. 574, 598, 687 A.2d 111 (1996); *Habetz v. Condon*, 224 Conn. 231, 238, 618 A.2d 501 (1992). In the second count of the operative complaint, SCP alleges that the bank breached this implied covenant in the manner in which it pursued the foreclosure action. The bank asserts that the contract did not impose an obligation on it to use its best efforts to conclude the foreclosure proceedings by March 31, 1993, and that an implied covenant of fair dealing cannot be used to impose on it a duty not set forth in the contract. Since the only basis advanced by the bank for summary judgment on the second count is the asserted conflict of that duty with the express terms of the contract, and since this court has rejected the bank's interpretation of the "best efforts" obligation, the bank has failed to establish entitlement to summary judgment.

Allegations Regarding Breach of Confidentiality

The bank notes that at paragraph [*9] 43 of both the first and second counts of its complaint, SCP alleges that "to

the extent BankBoston, in connection with the offering of the Loan for sale, disclosed the Sale and Assignment Agreement to WHBB or other potential purchases, it violated paragraph 18 of the Sale and Assignment Agreement requiring confidentiality." The bank observes that SCP has not, in this paragraph of the complaint or in any other paragraph, actually alleged that BankBoston disclosed any confidential information, but has veiled its statement in the hypothetical phrase, "to the extent," without alleging whether such conduct occurred to any extent whatever. The bank seeks imposition of summary judgment as the cure for this ambiguous pleading. That is not the procedure applicable to obtain compliance with the requirement of Practice Book § 10-1, which provides that "each pleading shall contain a plain and concise statement of the material facts on which the pleader relies . . ."; rather, the ambiguity and murkiness of this pleading should have been addressed by filing a request to revise. Practice Book § 10-35.

Conclusion

For the reasons set forth above, BankBoston's motion for summary judgment [*10] is denied.

    Beverly J. Hodgson

January 3, 2001

Judge of the Superior Court

# EXHIBIT E

Document6

LEXSEE 1996 CONN. SUPER. LEXIS 2667

**Raymond M. Lodge, et al. v. Arett Sales Corp. et al. Patricia Hughes, Admx., et al. v. Arett Sales Corp., et al., Maritza Rivera, Admx., et al. v. Arett Sales Corp., et al., James A. Morotto, Jr., et al. v. Arett Sales Corp., et al.**

**CV 90-0098122S, CV 90-0097106S, CV 90-0097840S, CV 91-0100377S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF WATERBURY, AT WATERBURY**

**1996 Conn. Super. LEXIS 2667**

**October 8, 1996, Decided**
**October 11, 1996, Filed**

**NOTICE: [*1]** THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** Judgment entered for Arret Sales on the cross complaint for indemnity of Wells Fargo. Judgment entered for Wells Fargo and Arret Sales on the cross complaints of Advanced. Judgment entered for Wells Fargo and Advanced on the cross complaints of Arret Sales.

**LexisNexis(R) Headnotes**

**JUDGES:** L. Paul Sullivan, J.

**OPINIONBY:** L. Paul Sullivan

**OPINION:** MEMORANDUM OF DECISION ON CROSS-CLAIMS OF DEFENDANTS

These are actions for indemnification by the three defendants as against each other arising out of the claims of the plaintiffs, herein referred to as "firefighters," in the above-captioned cases, hereinafter referred to as the underlying claims. The underlying claims were tried to the jury, this judge, L. Paul Sullivan, presiding. On April 17, 1996 the jury returned substantial verdicts for each of the named plaintiffs and verdicts for three spouses on their consortium claims. The total amount of the verdicts is in excess of four million dollars.

The jury returned verdicts as against the defendant Wells Fargo Alarm Services, Inc. **[*2]** and the defendant Advanced Automatic Sprinkler Protection, Inc. Two of the verdicts, Rivera and Estate of Hughes, found Wells Fargo to be 75% negligent and Advanced 25% negligent. As to Lodge the jury found Wells Fargo 67.5%, Advanced 22.5% negligent and the plaintiff 10% negligent. As to Morotto the jury found Wells Fargo 71.25% negligent, Advanced 23.75% negligent, and the plaintiff 5% negligent. The jury found Arret Sales to be zero (08), i.e no negligence attributable to Arret Sales. Arret Sales had settled with the plaintiffs during the course of the trial. However, in accordance with General Statutes 52-572g(f) and (n) the jury was required to determine the percentage of "negligence that proximately caused the injury" as concerns this former party, and the jury did make such finding in each case.

Although originally a part of the jury case, each of the defendants requested and stipulated that the claims as between them be determined by the court. As intended by the stipulation to try to the court, the jury was unaware of any of the claims for indemnity or of the pleadings setting forth such claims.

It is noted, as a preliminary matter, that the claims for indemnification **[*3]** fell into two separate categories. One claim, that of Wells Fargo against Arret sets forth a claim for indemnification under the specific terms of their contract. Hence this contract claim is an action at law, tried specifically to the court as a court trial. The second category of claims for indemnification seeks

indemnity under the common law theory of indemnification. This second category of claims are in essence actions in equity.

> Indemnity is the right which a person has who has been compelled to pay what another should be forced to pay in full. It is also called exoneration. Like contribution, the doctrine affording reimbursement is based on equitable principles.

*Lockwood v. Nagy Bros., Inc.*, 150 Conn. 691, 692, 186 A.2d 82 (1962).

None of the three defendants requested that for these actions for indemnity the court order that issues of fact be tried by the jury, pursuant to General Statutes 52-218. Hence the court must make its own determination of facts as concerns the indemnity claims. In so doing the court is not bound by a determination of the same, or similar factual issues as was decided by the jury in the underlying actions. The court is, of [*4] course, bound by the *fact of existence of the judgment* against Wells Fargo Alarm Services, Inc. and fact of the judgment against Advanced Automatic Sprinkler Protection, Inc.

I

Facts

The court finds the following facts as concerns the occurrence which gave rise to the underlying action. On May 10, 1990 at 11:09 a.m. the defendant Wells Fargo received a fire alarm signal from the facility of Arret Sales in Waterbury, Connecticut. The defendant then promptly transmitted notice of the alarm to the Waterbury Fire Department. The department dispatched a fire vehicle to respond to the alarm. The fire vehicle's brakes were so defective as to be unable to effectively impede the speed of the vehicle. The vehicle struck a curb, became airborne and smashed into a large tree. Firemen Hughes and Rivera met their death in this accident. Fireman Lodge was severely and permanently injured. Fireman Morotto sustained lesser physical injuries but suffers from severe psychological injury and dysfunction as a result of the occurrence.

Prior to the receipt of the fire alarm at 11:09 a.m. Wells Fargo had received two "supervisory" alarm signals from the Arret premises that day. The first [*5] "supervisory" signal was received at 9:21 a.m. and the second signal was received at 11:07 a.m.. A "supervisory" alarm is a signal which is transmitted by an alarm system as an alert that the system itself is being worked on. Such a signal alerts the recipient to take the system out of

service, and guards against signals generated by work being done on the system as being misinterpreted as if they were actual signals of a casualty in progress. Thereafter, communication from the person working on the alarm system informing that the work was finished would then result in the alarm service being put back on an operational status.

The defendant Wells Fargo negligently failed to heed the two supervisory signals and to take the system out of service and consequently it transmitted to the Fire Department the fallacious fire alarm signal, thus causing the dispatch of the fire truck. Additional facts will be set forth as required.

II

> A. Wells Fargo's claim against Arret Sales for indemnity, asserted solely under the terms of the contract.

The contract between Wells Fargo and Arret Sales is dated November 10, 1988. The significant provisions of the contract, for the purposes [*6] of the issue presented herein are as follows:

"Terms and Conditions"

"1. If manual fire alarm, waterflow alarm or automatic fire alarm service is *furnished*, Wells Fargo Alarm agrees to transmit notice of the alarm to the appropriate municipal fire department after receipt in its Central Station of all fire alarm signals from subscriber's premises, but Wells Fargo Alarm retains the right to investigate first the cause of such signals by telephoning Subscriber and dispatching its agent to subscriber's premises, if in its sole judgment such investigation is proper . . .

2. If Sprinkler Supervisory Service is furnished under this agreement Wells Fargo Alarm agrees that it will, after receipt in its Central Station of all signals indicating the existence of a condition requiring Subscriber's attention, make reasonable efforts to transmit notice of such signals to Subscriber by public telephone at such telephone number as has been provided in writing by subscriber for this purpose."

The court finds that neither of the three parties, Wells Fargo, Arret Sales or Advanced Sprinkler were of the opinion that the system was being monitored by Wells Fargo. Neither of the parties [*7] were of the opinion that the system, as then being constructed, was capable of sending any signal to the Wells Fargo monitoring facility. The court finds that "Supervisory Service" was not being *furnished* by Wells Fargo. The equipment was

in the process of being installed, so that the system could ultimately be placed into operation for the contract purpose of receiving and transmitting to the proper authorities, here the Fire Department, an electronic notice that a fire was in progress, or, alternatively, a notice that the system was either being worked upon or that the system was being tampered with or otherwise disrupted, the latter being referred to as a "supervisory signal."

The court determines that at the time of this occurrence "Manual Fire Alarm, Waterflow Alarm on Automatic Fire Alarm Service" was not in fact being furnished by Wells Fargo Alarm Services. Wells Fargo was not billing for said services as of that date. The service was not placed into effect until *after* the date of this occurrence, at which time certain electrical connections were made by Wells Fargo to initiate and to effectuate the implementation of such service. Hence this court determines that [*8] the incident was not caused by "the failure of its equipment or service in any respect." Said "equipment or service" was never placed into operation, and consequently cannot have *failed* in either respect so as to constitute an activity arising out of the furnishing of alarm services. Hence the hold harmless provisions relating to the "failure of its equipment or service in any respect," which pertains to the performance or nonperformance of the contract to monitor the facility is not effective because the performance of the contract was not required of either party until the contract, the mutual agreement, to monitor the facility, and to pay for such services became operative and that did not occur until a time subsequent to this occurrence.

A general discussion of the law pertaining to these types of contracts is helpful.

The parties, at the request of the Court, have extensively briefed the question of whether, hypothetically as it turns out, such indemnity provisions apply only to claims asserted by third parties as against the alarm company for *failure* to transmit alarms pertaining to a *casualty in progress*; or, conversely, whether such indemnity provisions [*9] also pertain to the mistaken transmittal of *mistaken alarms* where there is in fact no casualty in progress.

All of the cases cited by the parties, initially, dealt with the question of failure to properly transmit notice of a casualty in progress. The decisions appear to be in agreement that the obligations imposed by the contract as to indemnity, or limitations concerning the amount of reimbursement to the customer for failure to properly transmit an alarm for the reporting of a *casualty in progress*, i.e. liquidated damages, are in fact enforceable.

There are a multitude of reported cases which uphold these indemnity and liquidated damage clauses in circumstances where the damages are claimed to be caused by failure to properly report a casualty in progress. There appear to be no reported cases concerning the mistaken report and transmittal of a signal for a casualty which was not in fact in progress. However, such inquiry would only be appropriate if the contract had become operative.

The Appellate Court case *Burkle v. Car & Truck Leasing Co.*, 1 Conn. App. 54, 467 A.2d 1255 (1983), appears to stand for the proposition that if the language of the indemnity [*10] agreement clearly states that the indemnitor agrees to indemnify the indemnitor "against all liabilities, claims or demands . . . growing out of the performance of this contract" that language is sufficient to cover claims arising out of the indemnitee's own negligence.

Indemnity provisions of this nature are not violative of public policy. The general proposition as to the enforceability of the enforceability of indemnity contracts whereby the indemnitor agrees to indemnify the indemnitee from claims or losses caused by the indemnitee's own negligence appears to be generally accepted. See *Burkle v. Car & Truck Leasing Co.*, *supra*. Also see *Laudano v. General Motors Corporation*, 34 Conn. Supp. 684, 388 A.2d 842 (1977).

"The unambiguous language in an indemnity clause should be given effect as expressing the parties intention." *Laudano*, *supra*, p. 687.

However, the above quoted verbiage is not intended to be all encompassing.

> An intention to indemnify one against his own negligence must be expressed in clear and unequivocal language.

*Burkle v. Car & Truck Leasing Co.*, *supra*, p. 56.

The United States Supreme Court has clearly [*11] stated, in the case cited and adopted by the Connecticut Appellate Court in *Burkle v. Car & Trust Leasing Co.*, *supra*, page 56:

> More specifically, we agree with the Court of Appeals that a contractual provision should not be construed to permit an indemnitor to recover for his own negligence unless the court is firmly

convinced that such an interpretation reflects the intention of the parties.

*United States v. Seckinger*, 397 U.S. 203, 205, 90 S. Ct. 880, 25 L. Ed. 2d 224 (1970).

The United States Supreme Court proceeds to reiterate a basic rule of construction of contracts, which is deeply ingrained in the Common Law of this state:

> Finally our interpretation adheres to the principle that, as between two reasonable and practical constructions of an ambiguous contractual provision, such as that proffered by the Government, the provision should be construed less favorably to that party which selected the contractual language. This principle is accorded considerable emphasis in the case because of the Government's vast economic resources and stronger bargaining positions in contract negotiations.

*United States v. Seckinger, supra* [*12], p. 276.

The contract in question undoubtedly was prepared by Wells Fargo. It is on a Wells Fargo printed form containing preprinted provisions, which leave blank for filling in the name of the customer, the dollar costs, and the name and signature space of the customer. In the blank space entitled "Schedule of Protection" the performance terms of the contract are stated as follows, in all capitals and underscored:

> WELLS FARGO CENTRAL STATION MULTIPLEX WATERFLOW, SPRINKLER SUPERVISION SERVICE WITH BI-MONTHLY INSPECTIONS IN ACCORDANCE WITH NATIONAL FIRE PROTECTION ASSOCIATION STANDARDS.
>
> CONTRACT, PAGE 1

The subscriber did not agree to purchase or to itself install any equipment to enable Wells Fargo to commence performing the contract. In fact, although the subscriber agreed to pay a one time only installation charge the contract specifically excludes anything which might be considered to be a purchase, or lease, or any other type of acquisition of an interest in the equipment; to wit:

> . . . SUCH ENTIRE SYSTEMS ARE AND SHALL REMAIN THE

> PROPERTY OF WELLS FARGO ALARM."
>
> CONTRACTS PAGE ONE

The court determines that this agreement was not a contract [*13] for the purchase or lease of equipment. Payment of installation cost is totally incidental to the sole purpose of the contract. No sale or lease provision is even alluded to in the contract. In essence this is a contract for monthly "Sprinkler Supervision Services," and supervision services only. The customer, Arret Sales, had no interest whatsoever in acquiring any interest in any type of monitoring equipment. The customer would have been quite content if Wells Fargo could have accomplished the monitoring without any type specialized equipment or any type of disruption caused by the installing of any specially adapted equipment or devices. The only performance that the customer desired was "SPRINKLER SUPERVISION SERVICE," and nothing more. The fact that Arret Sales agreed to pay Wells Fargo for the cost of Wells Fargo installing its equipment does not alter that conclusion.

All parties agree, and the evidence is clear, that Wells Fargo had not commenced to render supervision services as of the time of this incident. The service was not in place and was not effectuated until the day after the date of the incident, when Wells Fargo made the electrical connections on its equipment [*14] which enabled the "supervision service" to be activated and to be "on line," so to speak. Wells Fargo does not claim, and properly so, that it charged the customer, or that it had the right to charge the customer, Arret Sales, any fees or charges for the service, sprinkler supervision service, for any period of time prior to its final installation of the system. UNDER NO RATIONAL REASONING COULD THE SYSTEM BE CONSIDERED TO BE "INSTALLED" UNTIL subsequent to the date of this incident.

The indemnity and hold harmless agreement, paragraph 12, provides "In the event any person not a party to this agreement shall make any claim or file any lawsuit against Wells Fargo Alarm for *failure* of its *equipment* or *service* in any respect . . ." The equipment did not "fail." It was never installed and operational. There was no failure of "service." No "service" was placed into operation or requested to be placed into operation under the terms of the contract, or otherwise, as the equipment was not thought to be capable of transmitting a signal. Neither Wells Fargo nor Arret Sales remotely believed or contemplated otherwise.

Had Wells Fargo intended that the indemnity provision [*15] of the contract to render "SPRINKLER SUPERVISION SERVICE" would apply to the

installation of equipment in preparation for the performance of the contract to provide such service, Wells Fargo would have stated that proposition in clear and definite terms in the body of its two-page detailed printed contract. HAD WELLS FARGO WISHED TO, AND HAD THE PARTIES INTENDED, THAT THE INDEMNITY PERTAIN TO INSTALLATION ACTIVITY, IT COULD HAVE UTILIZED THAT SPECIFIC LANGUAGE IN THE INDEMNITY AGREEMENT. See the indemnity language in *OFFICE FURNISHINGS LTD VS CHICAGO CONTRACTORS SUPPLY INC. 1989 WL 27/20 (N.D. ILL).* TO WIT: . . . "FOR ANY REASON WHATSOEVER, INCLUDING BUT NOT LIMITED TO THE *INSTALLATION*, MAINTENANCE, MISOPERATION, NON OPERATION . . ." It failed to do so. Erratic electronic behavior of the equipment in the process of its installation, prior to the initiation of sprinkler supervision service, is simply not covered by, or even alluded to, in the provisions of the contract. The court determined that the indemnity and hold harmless provisions of the contract do not apply to this installation activity.

III

It should be noted that the defendant Arret Sales further claims that [*16] the provisions of General Statutes 52-572k would preclude the enforceability of the indemnity provisions of this contract. The statute provides as follows:

> Sec. 52-572k. Hold Harmless clause against public policy in certain construction contracts. (a) Any covenant, promise, agreement or understanding entered into in connection with or collateral to a contract or agreement relative to the construction, alteration, repair or maintenance of any building, structure or appurtenances thereto including moving, demolition and excavating connected therewith, that purports to indemnify or hold harmless the promisee against liability for damage arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of such promisee, his agents or employees, is against public policy and void, provided this section shall not affect the validity of any insurance contract, workers' compensation agreement or other agreement issued by a licensed insured.

> (b) The provisions of this section shall apply to covenants, promises, agreements

or understandings entered into on or after the thirtieth day next succeeding October 1, 1977.

This [*17] court is in agreement with the defendant Arret Sales to the effect that the activity which gave rise to this incident, while not a part of the contract, might be considered to be "collateral to a contract or agreement," although that statutory term is somewhat nebulous. This court further agrees that this preliminary activity might be considered to be a preliminary step by Wells Fargo for the purpose of its eventually providing contract "supervisory sprinkler supervision service." This court is in agreement with Arret Sales that this preliminary activity might be construed to be activity pertaining to "construction, alteration, repair or maintenance of any building, structure or maintenance thereto . . ." The water pipes which were being altered by having new switches affixed thereto are indisputably fixtures and as such are at law a part and parcel of the building.

However, the statutory prohibition against indemnity clauses pertain only to circumstances concerning "damages arising out of bodily injury to persons or property caused by or resulting from the *sole negligence* of such promisee," here Wells Fargo.

The jury verdict clearly articulates, and this court is in [*18] agreement therewith, that this incident, and the injuries sustained thereby was not caused by or resulting from the *sole negligence* of Wells Fargo. For this reason the court determines that the provisions of General Statutes 52-572k would not be applicable to this action. This analysis does not however alter the conclusions of the court set forth in Section I of this decision.

IV

Arett Sales further claims that Wells Fargo cannot prevail on the indemnity provisions of the contract because Wells Fargo did itself breach the contract. Arret cites the following:

> It follows from an uncured material failure of performance that the other party to the contract is discharged from any further duty to render performance yet to be exchanged.

*Bernstein v. Nemeyer*, 213 Conn. 665, 672, 673, 570 A.2d 164 (1990).

The provision that Arett Sales refers to is Paragraph 2 of the "Terms and Conditions" section of the contract, to wit:

2. IF SPRINKLER SUPERVISORY SERVICE is furnished under this agreement, Wells Fargo Alarm argues that it will, after receipt in its Central Station of all signals indicating the existence of a condition requiring subscribers attention, [*19] make reasonable efforts to transmit notice of such signals to subscriber by public telephone at such telephone number as has been provided in writing by subscriber for this purpose.

Arret claims that the failure of Wells Fargo to contact Arret by phone upon the detection of what appeared to be supervisory signals; in reality caused by the erratic electronic behavior of the equipment while being installed, would call for the application of the rule of law set forth in *Bernstein v. Nemeyer, supra.* Wells Fargo responds that it is precisely such a set of circumstances that the indemnity and liquidated damages provisions were designed to cover, which provides for indemnity for failure of its equipment or service in any respect whether or not caused by the negligence of Wells Fargo. The argument of Wells Fargo is persuasive. However, this court has determined that there was no "Sprinkler Supervision Service" in operation at the time of the incident. There was no "Sprinkler Supervising Service" either requested or being afforded at the time of this occurrence. No such service was placed into operation until after the day of the occurrence. Just as Wells Fargo is not entitled [*20] to the benefits of the indemnity provision of the contract as aforesaid, so also Arret Sales would not be entitled to a superfluous breach of contract defense against the nonoperative indemnity provision.

In summary, the court finds for the defendant Arret Sales as concerns the claims of Wells Fargo for indemnity, defense, and hold harmless under the provision of the contract.

V

The defendant Arett Sales counterclaims against the defendant Wells Fargo, and against the defendant Advanced.

These claims seek indemnity for the sums which Arett Sales paid to the plaintiffs, collectively, approximately forty thousand dollars, to settle the plaintiff's claims, and additionally, for attorneys fees of approximately ninety seven thousand dollars for defense against the plaintiff's claims.

The defendant Advanced also counterclaims against Wells Fargo and against Arret seeking indemnity for the judgment which was rendered against Advanced and

costs, expenses and attorney fees in defense of these actions.

These claims for indemnity are noncontractual claims for indemnity. The defendant Wells Fargo does not press a claim for common law, (Equity) indemnity against either [*21] Arret or Advanced. The court has heretofore decided the sole claims for indemnity by Wells Fargo, as asserted under the terms of its contract with Arret.

Claims for common law indemnity are controlled by the principles enunciated by our Supreme Court in the case of *Kyrtatas v. Stop and Shop Inc.*, 205 Conn. 694, 535 A.2d 357 (1988).

"Ordinarily there is no right of indemnity or contribution between joint tort feasors." *Kyrtatas, supra,* p. 697 "Indemnity shifts the impact of liability from passive joint tort feasors to active ones." (*Kyrtatas, supra,* p. 698.)

"The party seeking indemnity must establish four separate elements: (1) that the other tortfeasor was negligent; (2) that his negligence, rather than the plaintiff's, was the direct, immediate cause of the accident and injuries; (3) that he was in control of the situation to the exclusion of the plaintiff; and (4) that the plaintiff did not know of such negligence, had no reason to anticipate it, and could reasonably rely on the other tortfeasor not to be negligent." *Kyrtatas, supra,* p. 698. The court finds the following facts as pertains to these actions. The contract to provide Sprinkler [*22] Supervision Service was entered into between Wells Fargo and Arret Sales on November 7, 1988. The switches at the Arret Sales premises were thought by Wells Fargo to be inadequate to provide such service, as they were thought to be electronically incompatible with the proposed Wells Fargo monitoring system. The existing switches were part of an internal system which rang alarm bells on the premises.  Several years after 1988 Wells Fargo billed Arret Sales as if the monitoring system was in operation. The purpose of this billing was to get the attention of Arret Sales, as a reminder to Arret Sales that the system needed to be completed in order to place the Wells Fargo Sprinkler Supervision Service into operation.

What was thought to be needed was that new switches were required to be placed in or on the water pipes to transmit a signal to the Wells Fargo monitoring center, in the event water started flowing through the pipes to extinguish a fire in progress, and to provide supervisory signals to give alert to a tampering with or disturbance of the system. Wells Fargo did not have a plumber's license. Arret indicated that a plumber firm, Advanced, was

known to them and may be able [*23] to do the plumbing work. What was needed was for the plumber to remove the existing switches from the pipes and install the new switches. Wells Fargo would then electrically connect the switches to the control box, which would then allow a fire-in-progress signal or a supervisory signal to be transmitted to Wells Fargo.

On May 9, 1990, the day before the day of this occurrence, Mr. Douglas Albert, a principal of Advanced, met with Mr. Felsted of Wells Fargo and Mr. Sigler of Arret Sales at the premises of Arret Sales. Both Mr. Felsted and Mr. Sigler told Mr. Albert that the fire alarm system was not being monitored by Wells Fargo. The new switches, which were to be furnished by Wells Fargo had to be installed on the pipes in order to effectuate a monitoring of the fire sprinkler system. That is why Advanced was being retained -- to do the plumbing, i.e. to remove the old switches and to install the new switches into the pipes. Mr. Albert inspected the sprinkler room that day, May 9, and observed that there were no signs or stickers of any kind, or any other information, indicating that there was any monitoring of the sprinkler system.

It is common, perhaps universal, practice [*24] that if there is monitoring there is such information prominently displayed, including fire department telephone numbers and phone numbers contacting the alarm service to alert the monitoring party that the system is being worked on. The purpose of these stickers is for a person working on the system to notify the monitoring agency and/or the fire department when a system is about to be worked upon, to avoid inadvertent transmittal of what may be mistaken to be an alarm designating a fire in progress.

The following day, May 10, 1990 when Mr. Albert arrived at Arret Sales to install the new switches, which were being delivered by Wells Fargo that morning, Mr. Albert again had a conversation with Mr. Sigler of Arret, describing what Advanced was going to do that morning. He was again informed by Mr. Sigler that the system was not being maintained. This was at approximately nine AM.

On May 9, Mr. Sigler, in response to a question by Mr. Albert as to whether the system might have been tied into Wells Fargo at all had told Mr. Albert (here quoting the testimony of Mr. Albert) ". . . no. He said I believe that if we're getting . . . if the system was tied we would have been getting [*25] bills for the fire alarm system and we've never been billed for that." That statement, though innocently made, was not entirely accurate, as Wells Fargo had once previously billed Arret for fire

alarm protection, later explained by Wells Fargo as a stimulus to get the installation completed.

The system as composed on May 9 was not operational, but the status of the electronic mechanism at this stage of installation inadvertently had the capacity of mistakenly sending out signals, although neither Advanced, nor Arret nor the Wells Fargo representative Mr. Felsted actually knew that to be the case.

On May 10, 1990 when Advanced was working on removing the old switches and the installation of the new switches of proper capacity, furnished by Wells Fargo, and relying upon what was told to it by Arret Sales and Wells Fargo, several electronic signals were inadvertently dispatched into the transmission device, inadvertently sending out unintended signals. Advanced did not have actual knowledge that this did occur; or that it was capable of occurring, because of what was told to it by Arret Sales and Wells Fargo. Advanced did not contact Wells Fargo or the fire department to notify [*26] either or both agency that it was going to work on the system, although the industry standards provide that ". . . the control station should always be notified before operating any valve or otherwise disturbing the sprinkler system."

The first supervisory alarm at 9:21 AM was inadvertently overlooked by Wells Fargo. After the second supervisory alarm occurred, at 11:07 and was in essence mistakenly overlooked by or confusing to, Wells Fargo, a third alarm, purporting to be an actual fire alarm was inadvertently and mistakenly transmitted through the system at 11:09. Wells Fargo transmitted the mistaken fire alarm to the Waterbury Fire Department, which then dispatched the truck which had defective brakes, thus causing the truck to crash.

The principles which govern the complaint for indemnity, Arret Sales vs. Wells Fargo and Advanced, and Advanced against Wells Fargo and Arret Sales are as follows:

> The party seeking indemnity against another must prove: (1) that the other was negligent; (2) that the negligence with which the other was found chargeable, was the direct immediate cause of the accident and the resulting injuries and death; (3) the other was in control [*27] of the situation to the exclusion of the seeker; (4) the seeker did not know of the other's negligence, had no reason to anticipate it, and could rely on the other not to be negligent.

*Kaplan v. Merberg Wrecking Corporation*, 152 Conn. 405, 416 (1965).

Turning first to the claims of Advanced as against Wells Fargo and Arret Sales. The jury found, by special interrogations that Advanced was negligent, that its negligence was a proximate cause of the collision. The jury also assessed the percentage of negligence attributable to Advanced as a 25% in two of the cases, Rivera and Hughes, 23.75% as to Morratta, and 22.5% as to Lodge. (The difference in percentages were based upon an assessment of comparative negligence as against the plaintiffs in the Morrotta and Lodge cases.) The jury assessed the remainder of the negligence, the highest percentage, against Wells Fargo, and attributed no negligence against the settled party Arret Sales. The jury further found that the negligence of Advanced was not superseded by any negligence of Wells Fargo or the City of Waterbury or Arret Sales.

"It is settled that an indemnities in this action to recover from the indemnitor the [*28] amounts paid in satisfaction of a judgment obtained against him by an injured person, is bound by all findings without which the judgment could not have been rendered and . . . if the judgment is the earlier action resulted in a fact fatal to recovery in the action against the indemnitor, the latter action cannot be successfully maintained." *Kaplan v. Merberg Corporation*, *supra*, p. 413, 414.

The jury verdict in the underlying cases indicates that the negligence of Advanced was neither passive nor secondary.

Prior to tort reform, where the common law rule of joint and several liability was in full effect, a jury verdict would be a single total verdict against all defendants for one total specified amount. Jury verdicts, in such cases, left unanswered questions as to whether each of the defendants were active or primarily responsible, on the one hand, or whether one of the parties was passively or secondarily negligent.

The principle of indemnity applies where "the defendant was primarily liable for the wrongful act which occasioned the injury in respect of which the plaintiff has been _____ to pay damage." *Preferred Accident Insurance Co.*, *supra*, P. 542, [*29] 543.

    . . . the applicability of the rule is received whenever it appears that the party seeking indemnity was himself guilty of affirmative misconduct which was a

proximate cause of the injury in question. Preferred Accident Ins. Co. p.542.

    We have held that where the negligence of each of two defendants enters directly into the production of the accident neither should have a right to contribution.

Preferred Accident Ins. Co., *supra*, p. 541.

These principles pertaining to "Contribution" are specifically applicable to action for indemnity. See *Kaplan v. Merberg Wrecking Corporation*, *supra*, p. 415.

The jury verdict, assessing wholly disproportionate allocations of negligence against Arret Sales and against Wells Fargo is directly indicative of the fact that the jury was not applying a vicarious concept of liability to the defendant Advanced. Rather in each of the cases, the jury specifically found that the defendant Arret was individually negligent and that the defendant Arret's negligence was a proximate cause of the injuries sustained.

Whether or not the jury verdict is to be considered preclusive, the court finds that the defendant [*30] Advanced has not proven by a fair preponderance of the evidence that its negligence, as alleged and proven in the underlying complaints -- was passive or secondary negligence; or that the negligence of Wells Fargo was the direct, immediate cause of the accident; or that Wells Fargo was in control of the situation to the exclusion of Advanced, who was in fact physically working on the installation of the system and whose activity caused the mistaken signals to be transmitted.

The court makes similar findings as concerns Advanced's claim for indemnity as against Arret Sales. Although defendant Advanced can proffer a persuasive argument that Arret Sales was negligent in telling Advanced that the system was not being monitored, this argument falls far short of any possible contention that Arret Sales was in control of the situation *to the exclusion* of Advanced or that any negligence of Arret Sales was *the* direct immediate cause of the accident.

The court enters judgment for the defendant Wells Fargo and for the defendant Arret Sales in the actions of Advanced for indemnity for these defendants.

    VI

    The claims of Arret Sales against Wells Fargo and Advanced for Indemnity

By [*31] way of cross complaint Arret Sales filed claims as against both Wells Fargo and Advanced for indemnity. To prevail on its cross complaint against either Wells Fargo or Advanced, Arret Sales is required to carry the burden of proof as to each of the four elements articulated in *Kaplan v. Merberg Wrecking Corporation*, *supra*, p. 416.

Arret Sales settled the claims of the plaintiff, during the course of the trial, for a combined amount of approximately forty thousand dollars, and now seeks reimbursement of that amount, plus reimbursement of approximately ninety seven thousand dollars in attorneys fees incurred by it in defense of the underlying claims up to the time of settlement.

Had the evidence in this case, as tried to the court as concerns the claims of Arret Sales for indemnification, proved that any negligence of Arret Sales involved a "situation in which a person has a nondelegable duty with respect to the condition of his premises but has entrusted the performance of this duty to a third person, either a servant or an independent contractor" this would give rise to a strong argument that negligence of Arret Sales would be passive or secondary negligence. See [*32] *Preferred Accident Ins. Co. v. Muscarte Bronson and Steinberg Co.*, *supra*, p. 543. Stated otherwise if the negligence of the person seeking indemnity arises solely out of his common law obligation to maintain his premises in a reasonably safe condition -- a nondelegable duty, -- and had the injury taken place solely because of the negligence of a party to whom he had entrusted the performance of this duty, that person may have a viable cause of action for indemnity.

The evidence in this case clearly demonstrates, and the court finds, as aforesaid, that Arret Sales negligently informed Advanced that the system was not being monitored by Wells Fargo. (Wells Fargo was the only potential alarm service agency who could possibly have been involved in monitoring.) This representation was made to Advanced, once in the presence of Wells Fargo on May 9, and once outside the presence of Wells Fargo, on May 10. The effect of these representations was to lull Advanced into believing that the system was not capable of transmitting a signal to Wells Fargo, and hence caused Advanced to commence and continue to work on the system without telephoning either Wells Fargo or the Fire Department.

Although [*33] this claim may not have been placed specifically before the jury in direct terminology in the underlying complaints of the firefighters, it certainly was placed specifically and directly to this court in the indemnity actions. For example Advanced, in asserting its cross complaint against Arret Sales, states in its answer-crossclaim dated November 14, 1991 filed in response to Arret Sales cross complaint stated: "6C. It represented, and Advanced relied upon said representation, that the sprinkler system was not alarmed."

The court finds that Advanced did rely upon the representation of Arret Sales that the system was not alarmed, which is merely another way of stating that the existing system was not so constituted as to send alarm signals to Wells Fargo.

The fact that the jury determined no negligence in evaluating the conduct of Arret Sales as a "settled on withdrawn" party, is not controlling upon this court's in this court's determination of the indemnity action tried as a trial to the court. The court finds that neither Advanced nor Wells Fargo were in control of the situation to the exclusion of the herein plaintiff for indemnity, Arret Sales. In fact, as the work was [*34] being performed on the premises of Arret Sales throughout the entire course of the morning, Arret Sales (Mr. Sigler) would have had every realistic opportunity at all times to retract or modify his representation.

The court finds that Arret Sales had every reason to anticipate that Advanced would not contact Wells Fargo or the Fire Department, in partial reliance upon Arret Sales' negligently making those affirmations. This, of course, is not to excuse either the conduct of Advanced or Wells Fargo, but rather is a further articulation of this finding that the negligence of Arret Sales was neither passive or secondary. Even though the negligence of Arret Sales may be minor or very small as compared to that of Advanced or Wells Fargo, yet this court finds that it was present, and that the herein plaintiff Arret Sales for indemnity, on its cross complaint, has failed to sustain its burden of proof against either Advanced or Wells Fargo in its cross complaints for indemnity.

The court enters judgment for the defendant Advanced and for the defendant Wells Fargo in the cross complaint for indemnity of Arret Sales.

In summary: the court enters judgment for Arret Sales on the [*35] cross complaint for indemnity of Wells Fargo. The court enters judgment for Wells Fargo and for Arret Sales on the cross complaints of Advanced. The court enters judgment for Wells Fargo and Advanced on the cross complaints of Arret Sales.

L. Paul Sullivan, J.