UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED,<br>               Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP,<br>               Defendants. | : <br>: <br>: <br>: CIVIL ACTION NO.<br>: 3:02 CV 1379 (MRK)<br>: <br>: <br>: |
| ALEC SHARP, et al.,<br>               Plaintiffs,<br>VS.<br>PRICEWATERHOUSE COOPERS LLP d/b/a PRICE WATERHOUSE LLP<br>               Defendant. | : <br>: <br>: CIVIL ACTION NO.<br>: 3:02 CV1572 (MRK)<br>: <br>: <br>: |
| HANDY & HARMAN REFINING GROUP, INC.,<br>               Plaintiff,<br>V.<br>PRICEWATERHOUSECOOPERS LLP,<br>               Defendant. | : <br>: <br>: CIVIL ACTION NO.<br>: 3:02 CV 1803(MRK)<br>: <br>: JANUARY 18, 2005 |

**PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW REGARDING PRODUCTION OF UNDERWRITERS' DOCUMENTS**

**I.     INTRODUCTION**

PricewaterhouseCoopers LLP ("PwC"), in accordance with this Court's order following its telephonic conference with all counsel on December 23, 2004, submits this brief in support of its position regarding two discrete discovery disputes it has been unable to resolve with the plaintiff insurance companies subscribing to Policy No. 834/FB9700166 (collectively, the "Underwriters"). First, this Court should compel Underwriters to produce all documents related to its decision to provide coverage for the claims asserted by Handy & Harman Refining Group, Inc. ("HHRG"), Underwriters' insured and one of the other plaintiffs in these consolidated cases,

under Policy No. 834/FB9700166 (the "Policy"). Such documents are relevant to this litigation and are not protected from production by the attorney client privilege or work product doctrine as Underwriters claim. Second, PwC has requested that Underwriters produce any and all electronic documents that are responsive to any of PwC's document requests propounded upon Underwriters. Counsel for Underwriters has not been able to confirm that they conducted an appropriate search for such responsive electronic data. This Court should order Underwriters to perform such a search and produce all such responsive documents.

## II.   BACKGROUND

On April 13, 2004, PwC served its First Request for Production of Documents (the "April 13 Document Requests") on Underwriters. In this first set of document requests, PwC requested that, among other things, Underwriters produce to it documents related to its determination of whether there was coverage for the alleged HHRG losses that HHRG claimed were covered under the Policy. Specifically, PwC requested that Underwriters produce the following documents:

> All documents relating to the determination by Underwriters that there was coverage under the Policy for the Bond Claim submitted by HHRG. (Document Request 6)

> All documents relating to HHRG's submission of claims to any insurer for losses incurred as a result of events at issue in this action, including without limitation all documents related to all reports prepared by Dempsey, Myers & Company LLP or Hagen, Streiff, Newton & Oshiro Accountants, P.C. (Document Request 18)

PwC also requested that Underwriters produce all electronic documents responsive to any of the enumerated requests by defining the term "document" to mean "anything subject to discovery under Federal Rule of Civil Procedure 34 including but not limited to any writing,

-2-

drawing, graph, chart, photograph, photorecord or electronic data compilation." (April 13 Document Requests, Definitions and Instructions.)

On May 13, 2004, Underwriters served their responses and objections to PwC's April 13 Document Requests (the "May 13 Responses and Objections") in which Underwriters took the position that they would produce no documents responsive to PwC's requests number 6 and 18. Specifically, in response to both request 6 and 18 Underwriters stated as follows:

> Underwriters object to this request on the grounds that it seeks documentation that is protected by the attorney-client privilege and/or the work product doctrine. PWC has not made any showing, pursuant to F.R.Civ.P. 26(b)(3) such that it needs these materials and is unable without undue hardship to obtain the substantial equivalent of these materials by other means.

During the months of June, July, and August, counsel for PwC and counsel for Underwriters engaged in numerous discussions and wrote various letters to each other outlining their respective positions regarding whether the documents relating the Underwriters' analysis of whether there was coverage under the Policy and its ultimate decision to provide coverage (the "Claims Coverage Documents") should be produced. On September 7, 2004, Underwriters produced to PwC certain documents responsive to PwC's April 13 Document Requests and a privilege log listing various document withheld from production. Underwriters refused to produce certain Claims Coverage Documents.

### III. ARGUMENT

#### A. Underwriters Must Produce Each Document Relating To Its Claims Coverage Determination.

Underwriters is obligated to produce to PwC the Claims Coverage Documents because they are relevant to the claims and defenses asserted in these cases, they are not protected from production by any privilege, and even if a privilege did apply, Underwriters has waived such privilege by putting in issue its decision to provide coverage under the Policy.

-3-

1.  The Claims Coverage Documents Are Relevant.

Underwriters are plaintiffs in this litigation as "assignees and subrogees of [HHRG] arising from losses incurred by HHRG that were insured by [Underwriters]." (Underwriters Complaint dated August 9. 2002 (the "Complaint"), ¶ 1.) Underwriters affirmatively alleges that it "determined there was coverage under the Policy for the Bond Claim submitted by HHRG and HHRG and Underwriters entered into a settlement agreement that included . . . an assignment by HHRG to Underwriters of any and all claims for recovery concerning all losses incurred by HHRG relating to the Bond Claim." (Complaint, ¶ 5.) As set forth in the Settlement Agreement between HHRG and Underwriters, HHRG made a claim under the Policy for losses "arising from acts, errors, or omissions on the part of former employees/consultants of HHRG." (Settlement Agreement, p. 1.)  In such Settlement Agreement, Underwriters acknowledged that a covered loss existed under the Policy for the claim asserted by HHRG and agreed to pay HHRG $12.5 million to settle HHRG's claim.[1]

In its Amended Answer to the Complaint dated November 17, 2004, PwC set forth a number of defenses to Underwriters' claims including the following: (i) Underwriters lack standing because the wrongful acts it alleges should have been discovered by PwC were perpetrated by HHRG or its agents and are imputed to Underwriters (Second and Fifteenth Affirmative Defenses); (ii) the harm or injury suffered by Underwriters, if any, was caused by the negligence and carelessness of HHRG which is imputed to Underwriters (Twelfth Affirmative Defense); and (iii) PwC is entitled to indemnification and recoupment from Underwriters because the claims asserted against PwC arise out of circumstances where there has been a knowing misrepresentation by one or more members of HHRG's management, HHRG

---

[1] A copy of the Settlement Agreement is attached hereto as Exhibit __.

agreed to indemnify PwC for such losses pursuant to the terms of the engagement letters, and Underwriters stands in the shoes of HHRG for purposes of indemnification and recoupment. (Seventeenth and Eighteenth Affirmative Defenses.)

Based on the claims and defenses asserted by Underwriters and PwC, the Claims Coverage Documents are relevant in this case. Such documents likely will set forth the reasons why Underwriters determined that HHRG's claim for losses arising out of acts, errors, or omissions on the part of HHRG's employees and consultants constituted a "covered loss" under the Policy. This information is vital to PwC's defenses because it will tend to prove that the losses Underwriters and the other plaintiffs seek to recover from PwC were not caused by anything PwC did or failed to do, but rather were caused by the acts and omissions of HHRG's own employees and consultants. Moreover, it is quite likely that some of the Claims Coverage Documents will indicate that the Underwriters, their agents and representatives, or both concluded that the actions of former HHRG employees caused the losses alleged in the Complaint and, as such, may constitute admissions that PwC is entitled to use affirmatively against Underwriters.

2. The Claims Coverage Documents Are Not Protected By The Attorney-Client Privilege or The Work Product Doctrine.

Documents "prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation" are not protected from disclosure by the work-product doctrine. United States v. Adlman, 134 F.3d 1194, 1202 (2d Cir. 1998) Insurers, like Underwriters, are in the business of determining whether a claim presented by one of its insureds is covered under its insurance policy. Many courts in this Circuit, and others, have presumed that "if the claim has not yet been rejected, the documents are part of the claim investigation process and are not work product." Arkwright Mutual Ins. Co. v. National Union

Fire Ins. Co. of Pittsburgh, 1994 U.S. Dist. LEXIS 17768, at *5 (S.D.N.Y. 1994); see also Amoco Oil Co. v. Hartford Accident & Indemnity Co, et al., 1995 U.S. Dist. LEXIS, at *2-3 (S.D.N.Y. 1995). Other courts have followed a more flexible case-by-case analysis. See Mount Vernon Fire Insurance Co. v. Try 3 Building Services, Inc., 1998 U.S. Dist. LEXIS 16183, * 19-20 (Oct. 16, 1998 S.D.N.Y.) and cases cited therein. Underwriters, as the parties withholding documents from production, bear the burden of demonstrating that each of the Claims Coverage Documents is protected from production. Underwriters "may not rest on conclusory allegations of privilege, but must establish, by objective evidence, that the author of the document anticipated litigation at the time that the document was created, and would not have created the document in essentially the same way had the prospect of litigation not existed." Weber v. Paduano, 2003 U.S. Dist. LEXIS 858, at *12-13 (S.D.N.Y. 2003), citing Adlman, 134 F.3d at 1202; see also U.S. v. Construction Products Research, Inc., 73 F.3d 464, 473 (2d Cir.) cert. denied 519 U.S. 927, 136 L. Ed. 2d 213, 117 S. Ct. 294 (1996) (proponent of privilege claim must prove such claim by competent evidence).

The court in Weber v. Paduano et al. 2003 U.S. Dist. LEXIS 858 (S.D.N.Y. 2003) faced a similar situation concerning documents similar to the Claims Coverage Documents at issue here. In that case, a fire that began at the defendant Paduano's apartment caused damage to the apartment owned by the Plaintiff. The plaintiff sued Paduano and sought certain documents from his insurer's file. The defendants refused to produce correspondence between the insurance company, a law firm hired by the insurance company, and two companies the insurance company retained to investigate the fire. Id. at 22. In determining whether the correspondence between the insurance company and the law firm it retained should be produced, the court observed that until an insurer has made a decision regarding subrogation, "an investigation into the potential for

subrogation is simply part of an insurer's ordinary practice of investigating all issues arising from an accident involving its insureds, and documents created as part of this process would have been created in the same form regardless of the insurer's eventual decision as to litigation." Id. at 23-24. The court determined that none of the documents was protected by the work product doctrine. Id. at 26-27.

Accordingly, documents that evidence what Underwriters did to investigate the claim asserted by HHRG under the Policy and to reach its ultimate conclusion that there was coverage under the Policy are not protected from disclosure by the work product doctrine. This is true whether such documents were created by Underwriters or by some other person or entity on their behalf. It matters not that Underwriters may have contemplated asserting a claim against PwC. Underwriters, as part of its ordinary business, had an obligation to determine in good faith whether the HHRG claim was covered under the Policy. Such documents are not protected from disclosure by the work product doctrine.

Such documents are also not protected from disclosure by the attorney-client privilege. Based on discussions with counsel for Underwriters, Underwriters appear to believe that the Claims Coverage Documents created by Underwriters' counsel or communicated between Underwriters and Underwriters' counsel are protected from disclosure by the attorney-client privilege regardless of the role Underwriters' counsel played at the time the document was created, regardless of when such document was created, and regardless of whether a decision had been made to assert a subrogation claim against PwC. Again, Underwriters is not correct.

From the documents that have been produced, a few facts are clear. First, Wilson, Elser, Moskowitz, Edelman & Dicker LLP ("WEMED") was first retained by Underwriters at some

point prior to December, 2000. (UL 02135-02154, WEMED "1 December 2000 Report No. 1.") Underwriters retained WEMED to "evaluate coverage and protect their interests with respect to" the HHRG claim under the Policy. Based on discussions with Underwriters' counsel and a review of its production, in addition to Report No. 1 dated December 1, 2000 that Underwriters produced, there are at least five other reports authored by WEMED that appear to involve an analysis of whether there was coverage under the Policy for the HHRG claim and whether Underwriters would, or should, provide such coverage.[2] These reports were not produced, are not identified on Underwriters' privilege log, and it is unclear when each of them was created. On or about December 21, 2001, Underwriters entered into the Settlement Agreement with HHRG and agreed to pay HHRG $12.5 million under the Policy. On August 9, 2002, Underwriters commenced this action against PwC.

As the Connecticut Supreme Court has stated, "the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice." Olson v. Accessory Controls and Equipment Corp., 254 Conn. 145, 157 (2000) quoting Metropolitan Life Ins. Co. v. Aetna Casualty & Surety Co., 249 Conn. 36, 52 (1999) The Claims Coverage Documents, even those created by or communicated to WEMED while conducting its evaluation of coverage, are not protected by the attorney-client privilege because WEMED was not acting in its capacity as a legal advisor but rather was assisting Underwriters in determining whether there was coverage under the Policy

    3.    If A Privilege Had Applied To The Claims Coverage Documents, Underwriters Waived Such Privilege.

---

[2] See ____ referring to "WEMED Report No. 6."

Underwriters have waived any privilege they might otherwise have had with respect to the Claims Coverage Documents by putting in issue its determination that there was coverage under the Policy. The documents which evidence Underwriters' determination that there was coverage may, and quite possibly do, undermine Underwriters' claims against PwC and support PwC's affirmative defenses. "It is well established doctrine that in certain circumstances a party's assertion of factual claims can, out of considerations of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted." In re Grand Jury Proceedings John Doe Co. v. United States, 350 F.3d 299, 302 (2d Cir. 2003). The work-product and attorney-client privilege can be waived "where a party makes assertions in the litigation or 'asserts a claim that in fairness requires examination of protected communications.'" United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991) In this Circuit, courts will look at the following factors to determine whether there has been an implied or "at issue" waiver of a privilege: "(1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." Granite Partners L.P. v. Bear, Stearns & Co., Inc., 184 F.R.D. 49, 55 (S.D.N.Y. 1999) (internal quotations omitted.)

Each of these factors is present here. First, Underwriters' standing is premised upon it having determined there was coverage under the Policy and Underwriters have affirmatively alleged that such coverage in fact existed. By bringing this lawsuit, Underwriters has placed in issue its determination that coverage existed. Second, Underwriters has made the Claims Coverage Documents relevant because it alleges that PwC's acts and omissions caused the Underwriters' alleged loss – that is, the payment to HHRG for the claims asserted under the

Policy -- even though the Claims Coverage Documents likely will show that there was, in fact, a different cause for such loss – that is, the acts and omissions of HHRG's employees and consultants. Third, if the privilege were applied, PwC would be denied the opportunity to use the Claims Coverage Documents which, as noted above, quite likely contain information that supports PwC's defenses.

### B. This Court Should Order Underwriters to Produce All Requested Electronic Documents

PwC has requested that Underwriters produce all electronic documents that are responsive to PwC's document requests. Although Underwriters has produced copies of a limited number of e-mails, those documents originated from employees at WEMED and not the Underwriters. Counsel for Underwriters has been unable to confirm that Underwriters have conducted a comprehensive search of all relevant electronic files, including the electronic files of each of the relevant persons associated with each of the Underwriters, so that all responsive electronic documents were retrieved and produced. Given the limited number of documents produced by Underwriters, , a comprehensive electronic data search is all the more necessary.

DEFENDANT,
PRICEWATERHOUSECOOPERS LLP

By _____
Thomas D. Goldberg (ct 04386)
E-mail: tdgoldberg@dbh.com
David J. Elliott (ct04301)
E-mail: djelliott@dbh.com
William H. Erickson (ct18117)
E-mail: wherickson@dbh.com
Day, Berry & Howard LLP
CityPlace I
Hartford, Connecticut 06103
Telephone: (860) 275-0100
Fax: (860) 275-0343
Its Attorneys

CERTIFICATION

THIS IS TO CERTIFY that a copy of the foregoing was sent via facsimile and electronically on this date to each of the following counsel of record::

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017-5639

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
120 N. LaSalle Street
Chicago, IL 60602

Michael T. McCormack, Esq.
William H. Champlin III, Esq.
William S. Fish, Jr., Esq.
Tyler, Cooper & Alcorn
CityPlace – 35th Floor
Hartford, CT 06103

Steven R. Humphrey, Esq.
Dina S. Fisher, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
3 Gannett Drive
White Plains, NY 10604-3407

_____
William H. Erickson