# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

120 North LaSalle Street, Chicago, Illinois 60602   Tel: (312) 704-0550   Fax: (312) 704-1522

New York • Los Angeles • San Francisco • Washington, DC • Newark • Philadelphia • Baltimore • Miami
Chicago • White Plains, NY • Dallas • Albany, NY • San Diego • Houston • Garden City, NY • London
Affiliate Offices: Paris • Berlin • Cologne • Frankfurt • Munich • Wiesbaden

www.wemed.com

1 December 2000

## REPORT NO. 1

**VIA UPS**

**PRIVILEGED AND CONFIDENTIAL**
**ATTORNEY-CLIENT COMMUNICATION**

To The Underwriters At Interest
c/o Aon Group Limited
8 Devonshire Square
London EC2M 4PL England

Attention: Simon Witham -- Financial Institutions & Professional Risks

| Re: | | |
|---|---|---|
| | ASSURED: | ROTHSCHILD CONTINUATION LTD. |
| | Type of Claim: | Bankers Blanket Bond |
| | Type of Loss: | Fidelity |
| | Claimed Loss: | U.S. $12,000,000-$14,000,000 |
| | Subject Employee: | Barry Wayne |
| | Bond Period: | 24 June 1997-24 June 2000 |
| | Bond Limits (each claim): | GBP 25,000,000 |
| | Bond Limit (aggregate): | GBP 50,000,000 |
| | Blanket Bond Retention: | GBP 500,000 |
| | Discovery Date: | January 2000 |
| | Date of Notice: | 22 February 2000 |
| | LCO Ref.: | TBA |
| | Aon Ref. No.: | F5016446 |
| | WEMED File No.: | 06118.00003 |

Gentlemen:

We wish to provide you with our preliminary report concerning the above-captioned claim, and recommend that Underwriters post an initial reserve of U.S. $5 million for indemnity, and U.S. $100,000 to cover WEMED fees and expenses of investigation.

87361.1

UL-02135

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 2

## EXECUTIVE SUMMARY

This file involves a fidelity claim under a Bankers Blanket Bond. The Assured's subsidiary is a precious metal refining company in the United States which had agreements in place since 1986 to purchase gold and silver from Panexim, a Peruvian company. The Assured discovered by February 2000 that gold believed to be held in its account in a safe depository at a bank in Peru pursuant to the transactions with Panexim was not, in fact, in the safe depository. The former Chief Executive Officer of the Assured's subsidiary, and other employees, have been implicated in the loss and were purportedly acting in collusion with Panexim. At the current time, the loss is estimated to be in excess of U.S. $14,000,000.

The Assured has provided Underwriters with notice of the loss. Preliminary investigation material obtained from the Assured indicates there may be coverage under the Bond section of the policy issued by Underwriters. More importantly, there may also be coverage under the Crime Coverage Section of an Executive Protection Policy issued by Chubb, and an all-risks policy led by Hiscox, to the subsidiaries of the Assured.

We have commenced our own investigation, and will coordinate with the Assured and its subsidiaries, as well as the representatives of the other insurers in developing further facts. In the meantime, we recommend that Underwriters post an initial reserve of U.S. $5 million for indemnity, and U.S. $100,000 to cover WEMED fees and expenses in the investigation.

We recently received voluminous documents from the Assured which the Assured presented as its proof of loss, making claim for a total of U.S. $18,330,477. We are reviewing the proof of loss material and will provide a further report when that review is completed. We do note preliminarily the claimed loss consists of (1) U.S. $14,547,054.10 arising from losses directly related to the precious metal scheme; (2) U.S. $160,000 in claim preparation costs; (3) U.S. $3,118,039 in payments to consultants; and (4) U.S. $505,384 in excessive remuneration in the form of bonuses. All of the amounts will need to be scrutinized, and at first blush the last two items may very well not be the type of loss covered under the Bond even if the first two items are covered. Based upon our review of the documents previously provided to us, the following is our preliminary report, including our summary of the facts currently known, our analysis of the facts in light of the Policy terms at issue, and our recommendations for further handling.

## FACTS

### THE ASSUREDS

For the policy period 24 June 1997 to 24 June 2000, Underwriters issued its Bankers Insurance Policy ("the Policy") to the Assureds: "Rothschild Continuation Ltd. and/or Rothschild Continuation Holdings A.G. and/or NM Rothschild & Sons Ltd. and/or Rothschild Asset Management International Holdings BV Group and/or their majority owned and/or management controlled entities at inception, or companies hereinafter constituted subject to policy

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02136

conditions." The Policy contains two sections: Section 1 for comprehensive crime, including a Bankers Blanket Bond ("the Bond"), and Section 2 for professional indemnity.

Since at least prior to August 1996, one of the Assured entities owned 50.1% of an Australian company, Golden West Refining Corporation Ltd ("GWRC").

In August 1996, Handy & Harman Refining Group, Inc. ("HHRG") became a wholly-owned subsidiary of GWRC. HHRG is a gold and silver refiner, with its head office in South Windsor, Connecticut, USA and with refineries in several cities including Attleboro, Massachusetts.[1] HHRG acquired the assets of the Precious Metals Refining Division of Handy & Harman ("H&H") on 16 August 1996. H&H was one of the oldest and largest North American precious metal refining companies. Barry Wayne had been President of H&H's refining division for a number of years prior to the acquisition, and was hired on a three-year contract to run HHRG for GWRC after the acquisition.

## NOTICE OF CLAIMS

On or about 22 February 2000, Isobel Baxter of NM Rothschild & Sons Ltd. sent a letter to Lucy Harris of Aon Group, Ltd., the entity designated in the Policy for notice of loss, which stated, in part:

### INSURANCE CLAIM NOTIFICATION

We wish to notify insurers of a potential claim under the RCH Group Bankers' insurance policies. We have become aware of a shortfall of U.S. $12-14,000,000 in the assets of Handy & Harman Refining Group, Inc. ("HHRG"), an assured company under our group policies. HHRG has discovered that gold believed to be held to its account in a safe depository in Peru is not, in fact, in the safe depository. The former Chief Executive of HHRG and other employees may be implicated in this matter. A detailed statement of the relevant facts is being prepared and will be forwarded to insurers as soon as possible.

HHRG has a bullion insurance policy and a crime policy; claims notifications are also being made today to the insurers on each of these policies.

---

[1] In August 1996 Handy & Harman sold the assets of its domestic precious metals refining business to GWRC. Under the agreement, GWRC retained the right to use the name Handy & Harman Refining Group, Inc. for a period of ten years.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02137

> I should be grateful if you could advise insurers accordingly. KPMG are being appointed as investigating accountants in this matter and a KPMG partner is in route to New York. I should be grateful if you could confirm that insurers have no objection to KPMG commencing their investigations.

On 23 February 2000, GWRC requested a halt in the trading of its shares on the Australian stock exchange pending completion of inquiries concerning certain assets.

## THE PURPORTED LOSS AND THE ASSUREDS' INVESTIGATION

### Background

Since 1996, HHRG had a trading relationship with Panexim SA, a Peruvian company based in Lima. Panexim's business was the purchase, smelting and sampling of primary and scrap gold and silver.

Since on or about 25 August 1996, HHRG through itself or its subsidiaries had agreements in place with Panexim pursuant to which Panexim sold gold and silver to HHRG while the metals remained in Peru.

Pursuant to those agreements between HHRG and Panexim, in order for HHRG to release funds to purchase precious metals in Peru, Panexim was required to deliver to HHRG's trading desk (1) pre-pricing confirmations including a Panexim invoice referencing a Panexim lot number, (2) a certificate issued by an assayer acceptable to HHRG (generally Alex Stewart Assayer's del Peru SR Ltd.) certifying the Panexim lot number as well as the gold and silver content and the weight of the material, and (3) a "proof of receipt" certificate issued by Impressa Hermes (an affiliate of Brinks, Inc.) or another secured carrier acceptable to HHRG which confirmed that the material was delivered into secured storage and consigned to HHRG.

Upon receipt of the appropriate documentation, HHRG paid Panexim by means of a wire transfer to Panexim's bank account at any of the following banks: Banca Commerciale Italiana in New York, Chase Manhattan Bank in New York, or Banco de Credito del Peru in New York.

HHRG recorded an asset in its accounting records representing the amount it had paid to Panexim for the metal. Once the metal was melted, sampled and weighed at the HHRG refinery at Attleboro, Massachusetts, USA, a bookkeeping settlement was made, and the receivable balance was reduced and the metal recorded as stock.

### Peruvian Value-Added Tax

Exporters of gold in Peru, such as Panexim, were required to pay the Peruvian value-added tax on gold exports to sellers (in this case, the Peruvian mining companies and larger buying groups who represented Alluvil miners from whom Panexim purchased the material),

who in turn were required to lodge the payments with SUNAT, the Peruvian tax authority. The exporter was then to make a claim for repayment from SUNAT once the material was exported.

During late 1998 and the first half of 1999, the Peruvian government undertook a general investigation of Peruvian gold refiners relating to possible fraudulent reclaims of the value-added tax. During the period of the investigation, SUNAT stopped making the refunds.

### Independent Audits

HHRG received an unqualified audit opinion by PriceWaterhouseCoopers ("PWC") on 31 March 1999, which purportedly included the Panexim gold held in the Impressa Hermes vault.

In September 1999, Alex Stewart Assayers ("ASA") were instructed by HHRG (which had been instructed by GWRC) to inspect and assay the material held to HHRG's account in Hermes' vaults. HHRG used the report to confirm that the amount of metal held in the vault was in accordance with HHRG's records. ASA advised that the inspection was carried out in accordance with precise instructions issued through Panexim.[2]

### Initial Discovery of Loss

Over a period of several months in late 1999 and early 2000, the Chief Executive of HHRG, Barry Wayne, and HHRG Chief Financial Officer, Frederick Ollett, purportedly made misleading statements to the Boards of HHRG and GWRC in response to requests for information on the nature of the Panexim receivable balance. The Boards claim they were led to believe that metal was held in the vault of Impressa Hermes and that the export of the metal to HHRG was delayed as a result of the Peruvian government's tax investigation. As a result of the continued failure of Panexim to meet projected shipments of outstanding material, GWRC directors instructed HHRG management to notify its insurance brokers in September 1999 of a possible deprivation claim under its bullion insurance policy.

The Boards also became aware that approximately US $2.3 million of the receivable balance represented unpaid refining fees and transportation charges, as well as amounts used by Panexim to fund the value-added tax payments for silver purchases which were subsequently exported.

HHRG learned that Wayne was directly involved in HHRG's business relationship with Panexim and supervised the HHRG employee, Luis Posada, who dealt with the administration

---

[2] HHRG now believes these instructions were deliberately designed to present a false impression that material held in the Impressa Hermes vault was gold, when in fact it was largely silver.

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 6

and documentation of the gold purchases from Panexim. A consultant to HHRG, Michel Verleysen, was also closely involved in HHRG's dealings with Panexim and received a 3% commission on the refining fee.

HHRG terminated Wayne's employment on 24 January 2000. Ollet resigned on 11 January, effective 31 January 2000.

### Assured's Investigation

The Boards of GWRC and HHRG retained the U.S. law firm of Robinson & Cole in Connecticut to investigate and advise concerning the loss. That firm purportedly interviewed Wayne, Posada, Verleysen, and others. The chairman of the HHRG Finance Committee (Shawn Russo) and the HHRG internal auditor (John Downie) purportedly also traveled to Peru for purposes of obtaining documentation from Panexim, securing HHRG's interests in the value-added tax refunds due Panexim, and examine possible claims against Impressa Hermes and Alex Stewart. The GWRC Board also appointed KPMG as investigating accountants to examine the financial positions of HHRG and Panexim.

HHRG believes that part of the cash paid to Panexim by HHRG for the purchase of gold was, in fact, used to make the value-added tax payments to sellers, and that SUNAT owes Panexim approximately U.S. $11.4 million. However, SUNAT is suing Panexim for fines and interest relating to the tax.

HHRG also believes that during the period September 1996 to February 2000, in excess of 800,000 ounces of gold and 9,000,000 ounces of silver were exported by Panexim and processed by HHRG. HHRG further believes that an amount slightly less than 5% of the metal delivered into the Impressa Hermes vault for subsequent export to HHRG was either misappropriated, or the equivalent amount of monies paid to Panexim were never used to purchase gold but were instead fraudulently misappropriated.

HHRG has further learned that from 1996 to at least mid-1998, an employee of HHRG regularly issued directions to Impressa Hermes to release gold -- which had already been paid for by HHRG -- to Panexim for "repacking." This provided Panexim with the opportunity to re-present the gold as new material for resale to HHRG. From approximately mid-1998 through February 2000, Panexim also issued instructions to Impressa Hermes for release of boxes of gold from the vault to be delivered to the airport, and at the airport the gold was delivered to a Panexim representative accompanied by an ASA representative. At that time, the Panexim lot numbers were changed and one of the boxes would be sent to the premises of Panexim while the remainder of the boxes were properly exported. The box of gold returned to Panexim was then available for re-melt, re-assay by Alex Stewart and re-deposit in Impressa Hermes' vault for resale to HHRG.

A 5 May 2000 investigation report for HHRG further reports the following:

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
57361.1

UL-02140

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 7

1.  It has been established that Panexim was formed in September 1996. Instrumental in the establishment of Panexim were Barry Wayne, Michel Verleysen and possibly Richard Searle of HHRG (Verleysen is a contractor to HHRG), with Roberto Passaro of Panexim. Wayne initiated for HHRG an unauthorized wire transfer to Panexim of U.S. $74,000 as "start-up" capital. However, it appears that the HHRG personnel do not have any individual direct equity investment in Panexim. The Company's purpose appears to have been to purchase doré and/or semi refined gold in Peru and, after additional processing, export the material to HHRG. The additional processing into an approved form, allowed Panexim to claim "drawback" from the Government. This drawback was essentially an export incentive grant of 5% of the value of the exported goods. The plan was to split the 5% between Panexim (profit), HHRG (legitimate refining fee) and an entity owned by some (or all) of the HHRG personnel involved in the scheme (this is still subject to investigation). In about May 1998, the Government of Peru ended the drawback scheme and additional processing by Panexim ceased. HHRG receivd the exported gold at its Attleboro refinery and, following standard receipting, melting, sampling and assaying procedures, introduced the material into its refining circuit. The first transaction took place in mid September 1996.

2.  Consistently throughout the period between September 1996 and February 2000, collusion between executives of HHRG and Panexim created conditions that allowed the unauthorized release of a portion of HHRG's gold to Panexim. This was done to raise cash by the resale of that gold. The cash was used to fund Panexim's working capital requirements including payment of the 18% value added tax on the gold.

3.  The GWRC request to HHRG, in September 1999, for an independent check to be carried out on the material in the vault, was not fulfilled in the way intended due to the following actions:

    •   Luis Posada addressed the request to Panexim;

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02141

- Panexim/Posada commissioned ASA to carry out the inspection (in this context ASA could not be regarded as independent as they carried out the routine checks); and
- Posada defined the seal numbers and weights of the boxes containing silver as the items to be checked.

With respect to the third bullet point, the HHRG records were such that Posada would not have been able to define the details of the boxes containing silver without knowledge of their contents and their purpose in the vault. The boxes of silver were placed in the vault in May 1999, four months earlier. HHRG records showed that Posada would not have routinely known either the seal numbers or the weights of boxes in the vault at any particular time. It appears likely that much of the activity could not have been carried out without the knowledge and connivance of the ASA representative. This particularly applies to the preparation of the ASA 17th September report of the vault contents. Posada consistently, and with the knowledge of Wayne, regularly prepared and issued false reports with respect to the quantity of gold being held in the vault. Even after the September 1999 inspection, circumstances were created by Wayne, Posada and Panexim executives, to facilitate additional theft of HHRG gold to create an impression that some of the "undelivered balance of gold" and funds to pay outstanding fees, were being released to HHRG.

4. The review carried out by the internal auditor, revealed that the procedures employed to allow the release of funds were inconsistent with claims made by Posada and Ollett (former Chief Financial Officer of HHRG). As late as January 2000, Posada insisted that he had never authorised a wire transfer until after notification by Hermes of safe receipt of the gold. The records show that this did not happen until November 1999 (when the internal auditor commenced to scrutinise the Panexim transactions).

5. The explanation given by the ASA representative for the method of reallocating Lot numbers at the time of export was that the record of export requires consecutive numbers to be used. This would also serve to conceal missing Lots

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02142

as a falsification of the records by ASA. ASA are mandated to check the material from melt, assay through Hermes to export, via their seal numbers and the various cross-references. By changing the Lot numbers they have broken the chain.

6. As both Brinks and Via Mat were contracted for door-to-door service, if some of the gold released from the Hermes vault and destined for export to HHRG was rerouted to a different destination, it suggests that the carriers have a potential liability. In addition, due to the contradictory information supplied by Felipe De Osma Berchmeyer, a Hermes employee, there is suspicion about his possible involvement.

7. On 23rd June 1999, under instruction by Barry Wayne, Richard Hart (HHRG Transport Manager) arranged additional deprivation insurance cover through Via Mat. It is not clear why this was done, as the existing GWRC/HHRG Deprivation cover was adequate. War Risk and Confiscation cover was added to the Via Mat cover for HHRG coincident with a question raised by GWRC to Fredrick Ollett regarding the existing insurance cover provided by Via Mat. Ollett stated that both the new Deprivation and the War Risk cover already existed under the existing policies. It also appears that an attempt was made to alter the date of commencement of Deprivation cover on the Via Mat invoice.

8. The procedure that was used by HHRG for settling each Lot ensured that the gold was priced on the basis of the previously booked values on a First In, First Out ("FIFO") basis. This method ensured that others at HHRG could not properly track the individual transactions through cross-referencing. This appears to be designed to conceal the consistent non-delivery of a portion of all purchases. It was later revealed that Barry Wayne had instructed Carol McLaughlin of HHRG not to cooperate with the internal auditor's investigation.

9. From Lot 6053, received at Attleboro on 29 October 1997, to Lot number 9851, received at Attleboro on 15 July 1998, cash advances were paid on the basis of a Banco De Lima

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 10

"Liquidation of Disbursements Commissions and Expenses by the Agencentiento of Local Sales by Assignment of Panexim" being submitted. In most cases during this period, the supporting assay certificates were dated after the advance was issued, all being received after the payment had been made to Panexim. There is no record of the Hermes receipt ever having been received by HHRG during this period, although they were later obtained from Hermes. The wire transfers during this period, as all other periods, were authorised by Posada.

10. It has been stated by Possaro and Seoane that under instructions from Wayne and Posada in May 1999, sixteen boxes of silver with a gross weight of 40,000 ounces were removed from a Doe Run Silver shipment lot No 13944 and placed in the Hermes vault (it is likely that Panexim purchased the silver as no record has been identified that indicates that HHRG purchased the 40,000 ounces of silver).

11. The presentation and format of the certificate provided by ASA in September 1999 indicates ASA intended to deceive GWRC into accepting the information provided by Wayne that in excess of 38,000 ounces gold was being held in the Hermes vault.

### HHRG Bankruptcy And Other Developments

On 8 March 2000, the FBI arrested Michael Verleysen and Richard Searle (former HHRG Vice-President-Marketing). The FBI was also seeking the whereabouts of Barry Wayne, who apparently surrendered himself to the authorities recently. HHRG had been advised that this FBI investigation relates to activities in Argentina, unrelated to the present claim, which took place prior to GWRC's involvement with HHRG.

On 24 March 2000, the GWRC Board announced that HHRG was filing a voluntary reorganization under Chapter 11 of the U.S. bankruptcy court. That bankruptcy petition was filed on 28 March 2000 in Connecticut bankruptcy court.

On 3 April 2000, certain unsecured creditors filed in the bankruptcy court a challenge to the title to metal claimed by secured creditors of the Attleboro facility. The court entered an order restricting the movement of the material until the issue could be resolved. GWRC determined to reopen the Attleboro facility subject to negotiated funding lines during pendency

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02144

of the Chapter 11 petition. At the same time, GWRC closed HHRG's South Windsor low-grade material processing facility with the intent of selling the assets at that facility.

In April 2000 Tony Pearce, who replaced Wayne, resigned as President and CEO of HHRG and management responsibility for the company was assumed by directors Shawn Russo and Mike Ryan. GWRC proposed to engage Seneca Financial Group, Inc. of Greenwich, Connecticut to provide management support with respect to a plan of reorganization under Chapter 11.

On 5 May 2000, GWRC announced that HHRG would cease refining under its current arrangements, minimize costs by laying off staff and completing the refining of all "end process" material, and completely cease operations at the South Windsor, Phoenix, and Villa Park facilities.

On 19 June 2000, a notice to HHRG's creditors stated, in part:

> We have been actively pursuing our claim against insurers for the loss of gold in Peru and associated costs. The total claimed is $14,000,000. The issues are complex and the company must first prove the loss resulted from fraud or theft in order to determine which of its insurers is ultimately liable. The Directors are advised that this loss should be an insurable event. It has taken several months to collate over 20,000 pieces of information relating to transactions and events involving the relationship between HHRG and the South American Company, to develop our case with insurers. We have two groups of investigators working on the claim at present and with our work largely complete, we are hopeful of an outcome within a reasonable time frame.

On 11 July 2000, the Assured advised Aon Group, Ltd. that it had retained the accounting firm of Dempsey, Myers & Company on behalf of HHRG "to assist in the preparation of employee dishonesty and all-risks insurance claims arising from various acts of fraud alleged to involve certain former employees, customers, and contractors of HHRG."

## ANALYSIS

Under the Bond section of the Policy issued by Underwriters, based upon the information currently available, there may be a possibility that coverage exists under Insuring Clause 1 for the $14,000,000 in loss sought by the Assured, plus additional costs incurred by the Assured in investigating that loss and developing information in support of a proof of loss. We need to develop additional information as to whether the Assured has timely submitted notice of loss and affirmative proof of loss "with full particulars." The Bond is subject to the Other Insurance Provision of the Policy, which is a provision similar to that contained in the other policies issued

by other insurers which may be at issue in this claim. The impact of that provision, and the corresponding provisions in the other policies, is discussed in more detail below.

**THE BOND**

1. **Assured Entities**

The Assured identified in the Policy Schedule, Item 1, is

> ROTHSCHILD CONTINUATION LIMITED and/or ROTHSCHILD CONTINUATION HOLDINGS A.G., and/or NM ROTHSCHILD & SONS, LTD. and/or ROTHSCHILD ASSET MANAGEMENT INTERNATIONAL HOLDINGS BV GROUP and/or their majority owned and/or management controlled entities at inception, or companies hereinafter constituted subject to policy conditions.

We believe that in addition to the Assured entities specifically named in the schedule, GWRC (an entity majority owned by the Assured) and HHRG (an entity wholly-owned by GWRC and indirectly controlled by the Assured) are covered entities under the Policy.

2. **Fidelity Clause**

Insuring Clause 1 of the Bond provides coverage for

> Loss resulting directly from dishonest, fraudulent or malicious acts by Employees of the Assured, wherever committed and whether committed alone or in collusion with others, including the loss of property through any such acts by Employees.

"Employee" is defined as "one or more of the Assured's officers, clerks, servants and other employees while employed at the Assured." As such, to the extent the allegations against Wayne, Ollett, and Posada are substantiated, coverage would exist under this provision under the Bond.[3]

3. **Determination Expenses**

Endorsement No. 1 applicable to the Bond provides

> It is agreed that this Policy shall indemnify the Assured for fees and expenses incurred and paid by the Assured, with the prior

---

[3] If Wayne, or other employees of the Assureds, are not involved in the loss, the Assureds may argue there is coverage under one or more other Insuring Clauses.

approval of Underwriters, for independent outside accountants, solicitors or other specialists or professional person(s) to determine the amount and/or extent of loss or claim covered under this Section of the policy, such indemnity shall be part of and not in addition to the Limit of Indemnity specified in the Schedule, and in any event the total indemnity provided during each annual period of the Policy shall not exceed GBP 100,000 in excess of a deductible of nil.

The Assured has advised Underwriters that it has retained KPMG to perform a forensic audit, and Dempsey, Myers & Company to assist in preparation of the other information necessary to perfect a claim. The Assured's expenses incurred in these endeavors may be added to any covered claim pursuant to this provision of the Bond.

4. **Discovery**

The discovery section of the Bond provides as follows:

> This Section of the Policy applies to loss discovered by or actually advised to the Company Secretary's Department or Compliance Officer of NM Rothschild & Sons Ltd., London during the Policy period. Discovery occurs when the Company Secretary's Department or Compliance Officer of NM Rothschild & Sons, Ltd., London becomes aware of facts which would cause a reasonable person to assume that a loss that has the potential to exceed GBP 500,000 or any lower excess as stated in the Schedule, which is covered by the Policy has been or will be incurred, even though the exact amount or details of loss might not then be known fully.

5. **Notice/Proof of Loss**

The Bond provides as follows concerning notification and proof of loss:

> The Assured shall, as soon as possible and in any event within 30 days after discovery by the Assured of any loss hereunder that exceeds or in the view of the Company Secretary's Department or Compliance Officer of NM Rothschild & Sons Ltd., London has the potential to exceed GBP 500,000 or any lower excess as stated in the Schedule give written notice thereof to the Underwriters.

> The Assured shall also, within six months after such discovery, furnish to the Underwriters affirmative proof of loss in writing together with full particulars.

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 14

At this stage, it is not clear when the Company's Secretary's Department or Compliance Officer of NM Rothschild & Sons Ltd. first learned of the loss which is the subject of the present claim. We will need to develop additional information, therefore, to determine whether notice of the loss was provided within the time limitation under the Bond.

As to the Assured's compliance with the proof of loss provision, the materials submitted to date most likely satisfy the requirements of a written proof of loss, although we believe the Assured must still provide "full particulars." We will follow-up with the Assured concerning the specific details, with "full particulars", after the Assured has completed its internal investigation.

6. <u>Other Insurance</u>

The Other Insurance or Indemnity provision of the Bond provides, as follows:

> This Insurance does not cover any loss which at the time when such loss is discovered is insured by or would but for the existence of this Section of Policy, be insured by any other existing policy or policies except in respect of any excess (not exceeding the Limits of this Section of the Policy) beyond the amount which would have been payable under such other policy or policies including any deductible applicable thereunder had this Insurance not been affected.

At this time, at least two other insurance policies have been identified which may invoke this provision of the Bond.

### Chubb Policy

Chubb, through Federal Insurance Company, issued an Executive Protection Policy to HHRG ("the Chubb Policy"), originally effective 20 August 1996 and renewed through the policy period 20 August 1999 through 20 August 2000. The Chubb Policy has a Crime Coverage Section with a limit of liability of US $10,000,000 and a $250,000 deductible.

The Employee Theft Coverage Insuring Clause 1 of the Chubb Policy provides

> [Chubb] shall be liable for direct losses of Money, Securities or other property caused by Theft or Forgery by any Employee of any Insured acting alone or in collusion with others.

"Money" is defined as "currency, coin, bank notes and bullion." "Theft" is defined as "the unlawful taking of Money, Securities or other property to the deprivation of the Insured."

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02148

If it can be shown that Wayne's acquiescence in the Panexim transaction was a "unlawful taking of money ... or other property", then it appears there would be coverage under this provision of the Chubb Policy.[4]

The Chubb Policy Other Insurance Clause provides

> If the Insured or any other party at interest in any loss covered by this coverage section has any bond, indemnity or insurance which would cover such loss in whole or in part in the absence of this coverage section, then this coverage section shall be null and void to the extent of the amount recoverable or received under such other bond, indemnity, or insurance; but this coverage section shall cover such loss, subject to its exclusions, conditions and other terms, only to the extent of the amount of such loss in excess of the amounts recoverable or received under such other bond, indemnity or insurance.

### Hiscox Policy

For the period 1 July 1997 through 1 July 2000, an all risks policy led by Hiscox was issued to GWRC and HHRG ("the Hiscox Policy"). Section 1 of this policy has a US $200 million limit applicable to HHRG, which provides

> This Policy covers the insured's interest and/or property against physical loss or damage from any cause whatsoever for claims first made during the period of this insurance only while such interests and/or property is at any of the assured's premises or any Bank wherever situated, and/or Depositories and/or Safe Deposit and/or Processors and/or Refineries and/or Fabricators and/or whilst at Exhibitions and/or Shows and/or Auctions and/or at Customs and/or any other location as may be required.

The Hiscox Policy further provides

**COUNTERFEIT BULLION**

> This Policy shall pay any loss sustained by the assured as a result of accepting 'Counterfeit Bullion', subject to immediate advice to Underwriters upon the Assured becoming aware of such a loss,

---

[4] Like the Bond, there may arguably be coverage under other insuring clauses of the Chubb policy if there was no employee dishonesty.

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 16

where such discovery occurs within 12 months of the Assured taking delivery.

In respect of the above it is agreed:

a) the term 'single bullion' shall be deemed to refer to Precious Metals of all kind whatsoever form and articles made therefrom.

b) the term 'counterfeit' shall be deemed to refer to material which is represented to the Assured as, and is accepted by them as being Bullion of a specific metal type and finesse but which subsequently proves to differ in terms of its actual Precious Metal content by more than 5% of the stated Precious Metal content.

To the extent Panexim or others passed off silver as gold, then there may be coverage under the counterfeit bullion provision of this policy.

The Hiscox Policy contains a "non-contribution" clause which provides

It is agreed that this policy does not cover any loss which at the time of the happening of such losses insured or would, but for the existence of this Policy, be insured by any other Policy or Policies, except in respect of any excess beyond the amount which would have been payable under such other Policy or Policies had they been affected.

## PROOF OF LOSS

We received documents from Dempsey, Myers & Company ("DMC") purporting to be the Assured's proof of loss. We are still reviewing that material; and will provide Underwriters with our analysis in our next report. We do note the total claimed is U.S. $18,330,477, which breaks down as follows:

### U.S. $14,547,054.10 – Missing Precious Metal

| | |
|---|---|
| Gold | $ 12,595,958.58 |
| Silver | 1,810,131.62 |
| Comarsa Gold | 140,963.90 |

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02150

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 17

<u>**TOTAL:**</u>          <u>**$14,547,054.10**</u>

**II.   U.S. $3,118,039 – Consultant Fees**

According to DMC, consultants were retained by the Precious Metals Refining Division of H & H in South America prior to the asset purchase. Barry Wayne was instructed to terminate all consulting agreements effective August 16, 1996 with the exception of Verleysen's contract. Wayne did not terminate the consultants as instructed.

The U.S. $3,118,039 claimed as a loss is the total of payments paid to the South American consultants from September 1996 through March 2000. According to the DMC report, it is unclear what role these "consultants" played in the scheme. The breakdown of consulting payments is as follows:

| Name | Amount |
|---|---:|
| Michael Verleysen | $ 1,029,872 |
| Carlos Augspach | 281,073 |
| Frank Philips | 594,176 |
| Jorge Washington | 301,957 |
| Erick Claudet | 308,369 |
| Linneo Klocker | 250,690 |
| Fernando Limo | 302,201 |
| Mario Seaone | 43,702 |
| Jorge Passaro | 6,000 |
| **TOTAL:** | **$ 3,118,039** |

The above consultants were retained specifically to work on HHRG's South American venture. As of September 1996, Wayne was allowed only to retain Verleysen as a consultant. Although he worked out of an office in the United States, Verleysen worked solely in Central and South America as a sales associate.

The consulting contracts pertaining to the above individuals were seized from Verleysen. Although Barry Wayne signed a number of the contracts, no copies have been found in HHRG's files.

Note that the claim prepared by DMC does not break down the amounts paid to each consultant. It appears that most of the consultants were paid a set monthly fee plus expenses. Verleysen and Claudet also received 3% commission on their sales. It is unclear if the remaining consultants received commissions.

### III. Excessive Remuneration – U.S. $505,384

Included in the claim submitted by the Assured is a claim for excessive compensation paid to HHRG employees. The figure arrived at by the DMC includes bonuses paid to Wayne, Searle, and Posada in 1996, 1997, and 1998. Specifically:

|      | Wayne    | Searle   | Posada   |
|------|----------|----------|----------|
| 1996 | $0       | $5,000   | $5,000   |
| 1997 | $132,692 | $5,000   | $3,000   |
| 1998 | $302,692 | $30,000  | $22,000  |

**TOTAL: U.S. $505,384**

From the information provided to us, it appears that the above amounts were bonuses paid for an entire fiscal year for work done for HHRG. The bonuses do not appear to relate specifically to the South American scheme.

### IV. Claim Preparation Costs – U.S. $160,000

From the information provided to us, the insured is claiming U.S. $160,000 in claim preparation costs. It appears this figure is arrived at solely because the Bond provides for coverage of up to GBP 100,000 for claim preparation costs. Therefore, the Assured appears to be claiming the policy limits for preparing the claim. There is no documentation of the exact cost to prepare this claim submitted by DMC. While we know that DMC undertook an extensive investigation complete with interviews of the people involved, and prepared a detailed report, there is not documentation as to the cost of its services. Therefore, documentation as to the costs of preparing the claim will be necessary.

## POTENTIAL THIRD-PARTY RECOVERY

To the extent there is coverage under the Bond for part or all of the loss, Underwriters would be subrogated to the rights of the Assured under the Bond, at least to the extent of any amounts paid in indemnity. There appears, at this time, to be several potential third-party tortfeasors from whom a potential subrogation recovery could be sought.

Although the likelihood of collectibility of any judgment may be remote, certainly a claim against Wayne, Ollett, Posada, and other former employees of HHRG should be pursued.

Similarly, any claim against Panexim, or employees of that company (including Passaro) should also be pursued.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02152

We will need to develop additional information concerning whether there is any potential claim against PWC or ASA for the audits they performed as to whether there was any negligence in failing to discover the scheme. Moreover, and in particular as to ASA, further investigation is necessary to determine whether there was any potential involvement in the scheme.

Similarly, additional information will need to be developed concerning Impressa Hermes' involvement, and whether it has any liability exposure under either a negligence or intentional tort theory.

## RECOMMENDATIONS FOR FURTHER HANDLING

We will coordinate with the representatives of the other insurers, in order to eliminate duplication of effort and pool our information. Once we have received the full particulars of the claim contained in the recently received proof of loss, and discussed these issues with the other insurers, we will be in a better position to recommend how to proceed with the pending claim, and to the extent coverage is determined, how to proceed with any subrogation actions.

## PROPOSED MEETING

There has been a suggestion that representatives of all interested parties assemble in New York City in the coming weeks.

In our view such a meeting would be in Underwriters' interests. To date Chubb has not taken a position on coverage. Hiscox has apparently denied coverage on the grounds that (i) there has been no counterfeit bullion and (ii) Wayne (and perhaps the other employees implicated) is the alter ego of HHRG. A meeting may be productive in fleshing the respective positions of the insurers.

## RESERVE RECOMMENDATIONS

The "other insurance" provisions of the various policies are obviously in conflict. If coverage exists for this claim under the Bond, and under the other policies, we would argue the other policies are primary because they are more specific in their coverage of an HHRG loss. It is possible, however, that a pro rata apportionment of the loss based on loss limits would ultimately resolve a dispute among the coverages. Because of its US $200 million limit, a determination of coverage under the Hiscox policy would be very favorable vis-à-vis the Bond under either scenario.

While it cannot be said with any certainty that coverage exists under the Policy, that possibility cannot be dismissed at this time either. We recommend Underwriters mark a U.S. $5 million indemnity reserve on the basis that Chubb may well pay its $10 million limit and the balance of the loss fall to Underwriters. The fact that Hiscox perhaps wrongfully denied coverage does not afford Underwriters a basis to reject claim payment under its Policy.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02153

To The Underwriters At Interest
c/o Aon Group Limited
Financial Institutions & Professional Risks
Page 20

We further recommend a U.S. $100,000 reserve respecting our fees and costs.

### WEMED INVOICE

Enclosed is our invoice dated 13 November 2000 in the amount of U.S. $8,343.34 for services rendered hereon. Should Underwriters find our invoice in order we request that Aon Group Limited be authorized to timely collect and remit payment thereof.

We look forward to receiving Underwriters' thoughts after they have had an opportunity to review this report.

Very truly yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Raymond J. Jast

Daniel J. McMahon

RJJ:DJM:kjr

Enclosure

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
87361.1

UL-02154