UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| Plaintiff, | : | |
| V. | : | FEBRUARY 22, 2005 |
| PRICEWATERHOUSECOOPERS LLP and | : | |
| COOPERS & LYBRAND LLP, | : | (ALL CASES) |
| Defendants. | : | |
| _____ | : | |

**DEFENDANT PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN OPPOSITION TO UNDERWRITERS' MOTION TO COMPEL**

Defendant PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum of law in opposition to the Motion to Compel discovery dated February 11, 2005 ("Motion to Compel") filed by plaintiffs, Certain Underwriters at Lloyd's and Insurance Companies Subscribing to Policy No. 834/FB9700166 ("Underwriters" or "plaintiffs").

**PRELIMINARY STATEMENT**

It is important to emphasize that discovery in these actions is proceeding apace and that plaintiffs, far from being impeded in their efforts, are gathering all the information they need about PwC's performance of its engagements for Handy & Harman Refining Group, Inc. ("HHRG"):

● PwC has produced its audit workpapers.

● PwC has provided narrative descriptions of its audit work. For example, in a 4-page single-spaced letter dated July 2, 2004 (a copy of which is submitted as Exhibit A), PwC's

counsel summarized the audit and other engagements that PwC performed for HHRG, and provided a road-map for review of the audit workpapers. In addition, PwC's responses to Underwriters' First Request For Admissions included narrative descriptions of work performed on certain aspects of the audits, such as work related to the Panexim receivables that are at the heart of plaintiffs' case. (*See* Underwriters Ex. 4, Response to Request to Admit Nos. 1-3, 10-11)

- PwC is making available for deposition eight current and former PwC employees who worked on the HHRG engagements. As of this filing, plaintiffs have deposed three witnesses (including George Ingram, the engagement partner on the 1997 and 1998 audits), and the parties have scheduled five additional depositions between February 23 and March 12.

## ARGUMENT

### A.   INTERROGATORIES

#### 1.   First Set, Nos. 2-7:   Description of Work

Plaintiffs' motion to compel responses to Interrogatory Nos. 2-7, which seek detailed narrative descriptions of PwC's work on the HHRG audits, should be denied for several reasons.

First, PwC properly objected to these interrogatories on the general grounds that they were overly broad and unduly burdensome. For example, Interrogatory No. 3 asked PwC to "[i]dentify and describe all efforts PWC made and every action PWC took to verify the financial statements and/or records provided by HHRG." This interrogatory would appear to require PwC to construct a narrative of all audit work performed by PwC professionals on the HHRG engagements (whether

or not relevant to the issues in this case) for a period of three years, a burdensome and inefficient narrative that could be nearly as extensive as the workpapers.[1]  Moreover, PwC's responses referred to its audit workpapers, from which the information that plaintiffs request can be derived. *See* Fed. R. Civ. P. 33(d).

Second, PwC also properly objected to the form of the interrogatories on the ground that they mischaracterize the fundamental nature of an auditor's work.  For example, an auditor does not "verify" financial statements; "ensure" that an audit client does not extend credit; or "ascertain" the creditworthiness of the customers of audit clients, as these Interrogatories assume. Rather, an auditor conducts an audit on financial statements in accordance with generally accepted auditing standards ("GAAS"), and then issues a report expressing an opinion whether the financial statements fairly present the financial condition of the company in all material respects in accordance with generally accepted accounting principles ("GAAP").

Third, and most importantly, the issue for all practical purposes is moot, because Underwriters have received and are continuing to receive the information that they requested

---

[1] Plaintiffs' expansive requests calling for narrative responses are dramatically different from the focused inquiries in *New Colt Holding Corp. v. RJG Holdings of Fla, Inc*., 2003 U.S. Dist LEXIS 18039 (D. Conn. June 16, 2003), the case on which plaintiffs rely.  In that case, plaintiffs sought tangible, concrete information – gross and net revenues from sale of two models of revolvers that were the subject of Lanham Act claims in the case.  The Court ordered specific responses to these interrogatories, explaining: "It would be curious indeed if any business, specifically one selling firearms, would be unable to identify both the number of a particular model sold and the applicable unit cost and compute gross and net revenues therefrom." *Id.* at *8.

through other, more appropriate forms of discovery. Indeed, it is hard to see what purpose would be served by PwC's providing further answers to interrogatories (or responses to requests to admit, *see* Part C *infra*) at this point, other than to distract PwC and its counsel from meeting a tight discovery schedule and preparing for the upcoming mediation before Magistrate Judge Garfinkel. The simple fact is that plaintiffs – like the plaintiffs in the other consolidated cases who properly have sought to obtain discoverable information through document production and depositions – are getting the discovery they need in order to prosecute their claims.

### B. DOCUMENT REQUESTS

#### 1. First Request for Production, No. 5: Personnel Files

Underwriters' First Request for Production No. 5 seeks "[e]mployment records, personnel files, compliance files and related documents" for all individuals who worked on the HHRG engagements. PwC has <u>agreed</u> to produce, upon entry of an appropriate court order, any responsive documents related to the performance of each individual on the HHRG engagements whom plaintiffs have sought to depose.[2] Those are the only personnel-related documents that may be relevant to the subject matter of this action, and the only documents to which plaintiffs may be entitled under Connecticut law.

---

[2] Although as many as twenty-seven employees recorded time on one or the other of the engagements (including on tax and pension issues), the vast majority of time, including time on matters at issue in this case, was incurred by these individuals. Retrieval of personnel records for each of these other present and former employees would be extremely burdensome, especially during the tight deposition schedule.

Under Conn. Gen. Stat. § 31-128f, an employer may not disclose an employee's personnel file to a third party without the written authorization of the employee or pursuant to a court order. "The disclosure of such information [contained in a personnel file] must be carefully tailored to a <u>legitimate and demonstrated need</u> for such information in any given case." *Donaldson v. Sheffield, Jr.*, 2002 Conn. Super. LEXIS 2534, at *3-4 (July 26, 2002) (citations omitted; internal quotation marks omitted; emphasis added) (a copy of which is submitted as Exhibit B). The court explained:

> Where disclosure of the personnel file would place in the hands of a [party] irrelevant or personal and sensitive information concerning . . . [another], the entire file should not be disclosed. No [party] has the right to conduct a general "fishing expedition" into the personnel records of another.

*Id.*

The threshold issue in this case is whether PwC and its personnel performed the engagements for HHRG in accordance with professional standards. To the extent the personnel files are relevant, they are relevant only to the extent they reflect <u>specifically</u> on work performed on the HHRG engagements. Plaintiffs have no legitimate, demonstrated need for the wholesale production of the personnel files.

Indeed, the cases on which plaintiffs rely permitted production of portions of personnel files solely to the extent that such a need was demonstrated. In *O'Bar v. Borough of Naugatuck*, 2002 U.S. Dist. LEXIS 26800 (D. Conn. Nov. 27, 2002), an action alleging unfair discrimination and negligent training and supervision, the court <u>denied</u> the request for production of the entire personnel files, and instead ordered production only of information and documents regarding "any

grievance/complaints filed against the individual defendants" and information (but <u>not</u> the personnel files themselves) regarding the dates of employment and similar data directly relevant to plaintiff's claims. (*Id*. at *4-5). The court noted that this information was "relevant to plaintiff's claims [of negligent supervision]" and the order was "sufficiently narrow in scope so as to avoid unnecessary disclosure of confidential information." *Id*. at *5-6. Similarly, in *Slovak v. Fusco*, 1994 Conn. Super. LEXIS 3108, at *4 (Dec. 5, 1994), plaintiff sought the personnel records of defendant Fusco to support his claim that Fusco was terminated for poor performance. The court ordered production, but limited the production "to those documents that relate to Fusco's performance."

Plaintiffs here have not alleged negligent supervision or deficient performance by the auditors generally, but have only attacked the performance of PwC's audit staff on these particular audits. Accordingly, production should be limited to any portions of the personnel files of the employees noticed for deposition that relate directly to performance on the HHRG audits.

### 2. First Request for Production, Nos. 6 and 9: Internal Auditing and Accounting Manuals

These requests seek production of all documents "used as guidelines and/or references by PWC . . . providing instruction or guidance in the management and supervision of PWC's employees for the relevant time period" (Request No. 6) and all documents "used as a guideline and/or professional reference by PWC concerning the method and manner of preparing, reviewing,

or auditing of the records or financial statements of HHRG and/or GWRC" (Request No. 9).  The "relevant period" is defined as January 1, 1996 through October 8, 2003.  (Definition 5)

Taken literally, plaintiffs' requests would impose an enormous and undue burden on PwC. Plaintiffs seek production of all versions of PwC's proprietary manuals and guidebooks over a seven-year period – the vast majority of which have nothing whatever to do with any issues related to the HHRG engagements.  They also seek production of any other publication, internal document, newsletter, industry publication or reference document that provided guidance in the management and supervision of PwC employees or was used as a "professional reference" in preparing, reviewing or auditing HHRG's financial statements.  Attempting to identify and locate such materials would be a massive undertaking.

Moreover, the requested materials are not relevant.  An accountant malpractice case requires an examination of the standard of care applicable to the entire profession (*i.e.*, compliance with GAAS), "not an examination of standards imposed by the accounting firm itself." *In re Conticommodity Serv. Inc. Secs. Litig.*, MDL No. 644, 1998 U.S. Dist. LEXIS 4812,  (N.D. Ill. May 23, 1988) (a copy of this decision is submitted as Exhibit C) (denying motion to compel).  A number of courts thus have refused to compel production of internal accounting manuals on the grounds that GAAS, not the manuals, sets forth the applicable standard of care; that it is unfair to use professionals' self-imposed standards against them; and that the internal guidance constitutes

proprietary trade secrets. *E.g.*, *Tonnemacher v. Sasak*, 155 F.R.D. 193, 195 (D. Ariz. 1994); *In re Worlds of Wonder Secs. Litig.*, 147 F.R.D. 214, 215-16 (N.D. Cal. 1992).

Plaintiffs here make no effort to articulate why PwC's internal guidance is relevant. The audit workpapers, audit programs and deposition testimony document the work performed by the PwC audit team, and thus the basis for whether PwC complied with GAAS in conducting its audits of HHRG. Plaintiffs have not identified any workpaper that they and their experts have been unable to understand without reference to PwC's internal guidance.[3] Accordingly, the motion to compel production of these documents should be denied.[4]

### 3.  First Request for Production, No. 16:  Time Records

Plaintiffs incorrectly assume that PwC is withholding documents that include "a description of the services provided by each employee for each time entry." (Motion to Compel at 6) As the deposition testimony to date has made clear, PwC's audit staff recorded its time spent on the HHRG engagement on a given day, but did not include specific work descriptions. This practice is consistent with the practice followed by other large accounting firms (though it differs from the practice followed by law firms). At PwC, reports are issued on a semi-monthly basis for

---

[3] In the three depositions conducted to date, no member of PwC's audit staff has indicated that any such documents were used as a "professional reference" in performing the HHRG audit.

[4] In *Tonnemacher*, the court granted plaintiffs leave to renew their motion in the event that future discovery determined that the auditors relied on standards contained in internal manuals rather than GAAS. 155 F.R.D. at 195. We suggest that this approach would be appropriate here.

each professional showing, for each day, how many hours were spent on which client engagements. PwC has produced copies[5] of these semi-monthly summaries to plaintiffs for all but three of the individuals whom plaintiffs have noticed for deposition and the time records for those remaining three will be produced shortly.[6]

### 4. First Request for Production, No. 36: "Internal Investigation" Materials

Each PwC staff auditor deposed to date has been asked specifically whether, to his or her knowledge, PwC conducted an "internal investigation" of its work on the HHRG engagement. Each has responded "no." Notwithstanding this, plaintiffs assert "on information and belief" that sometime in or after February 2000, PwC conducted "internal investigations" relating to the HHRG engagements. (Motion to Compel at 7) An "internal investigation" is an investigation conducted by or at the direction of management where a principal purpose is a business purpose, rather than a purpose to prepare for possible litigation. *See, e.g., In re Grand Jury Subpoena*, 599 F.2d 504, 506, 510 (2d Cir. 1979). As addressed in Part D below, PwC has withheld certain documents on work product grounds, including documents prepared by Alex Corl, PwC's

---

[5] For example, Exhibit 8 to the Motion to Compel shows the daily entries for Barrett Brown, a senior accountant on the 1998 HHRG engagement, for the periods March 16-31, 1998 and April 1-15, 1998.

[6] We understand that one PwC auditor on the HHRG engagements periodically described meetings or work related to the HHRG engagements in his personal calendars. Relevant calendar entries for that auditor are being reviewed and will be produced.

engagement partner on the 1999 HHRG audit. Those documents were prepared at the direction of and under guidance of PwC's Office of the General Counsel and outside counsel, and in anticipation of the litigation that materialized. They were not prepared as part of any sort of "internal investigation" along the lines of investigations in the cases relied upon by plaintiffs.[7]

### 5. Second Request for Production, Nos. 2 and 6: Document Retention Policies

The motion to compel ignores the fact that Underwriters' counsel and PwC's counsel have had ongoing discussions about the <u>mutual</u> scope of production of document retention policies by their respective clients. In those discussion, Underwriters first refused to produce <u>any</u> document retention policies. It later agreed to produce the <u>lead</u> Underwriter's policy only, and only the policy in effect for the last relevant year, *i.e.*, 2000. In view of Underwriters' position, PwC agreed that it also would produce only the policy in effect during 2000.

Although plaintiffs have yet to produce that or any retention policy, PwC is providing Underwriters with copies of Coopers & Lybrand's document retention policies dated January 1990

---

[7] Plaintiffs include in this argument an inflammatory, yet completely erroneous and irrelevant, assertion that one of the documents that PwC produced pre-litigation was produced in a different form in this litigation. The "pre-litigation" document that plaintiffs attach as the first page of Exhibit 9 is a workpaper from the 1998 audit known as a "price not booked" schedule for accounts receivable; that <u>very</u> document in the <u>same</u> form was produced in the litigation as PWC 98 WP 01019. (A copy of the produced workpaper is submitted as Exhibit D) The second page of Exhibit 9 (PWC 98 WP 01473) is not the same schedule in different form but rather a different workpaper, the separate price not booked schedule for inventory.

and January 1998. The prior policy remained in effect until January 1998. The latter policy (which is substantially similar to the 1990 policy) remained in effect for Coopers & Lybrand's legacy clients through the firm's merger with Price Waterhouse in September 1998 until April 2001, when PwC for the first time instituted a document retention policy applicable to all clients of the post-merger firm.[8] Thus, PwC has fairly complied with Underwriters' request.

### C.   UNDERWRITERS' FIRST REQUESTS TO ADMIT, NOS. 1-16

Underwriters essentially seek to compel PwC to admit to facts that it disputes, and to adopt mischaracterizations of its audit work and responsibilities that are embedded in the requests to admit. PwC has fairly objected and responded to Underwriters' requests to admit, and thus the motion to compel should be denied. Moreover, the very questions posed in the requests to admit are now being asked by plaintiffs' counsel in their depositions of PwC's audit staff.

Plaintiffs quote from Request Nos. 14 and 15, which are typical of the requests to admit. Request No. 14 asked PwC to admit that, "during 1999, PwC made no effort to confirm or deny the existence of precious metals in a vault in Peru, which was purportedly held for HHRG's benefit." This request mischaracterizes PwC's professional obligations by suggesting that audit

---

[8] Underwriters gratuitously refers to the magistrate judge's Report and Recommendation in *In Re Telxon Corp. Securities Litigation*, Case No. 5:98 CV 2876, Docket No. 288, Report and Recommendation (N. D. Ohio July 2, 2004), objections to which are currently pending before the district court. PwC has vigorously contested the magistrate judge's decision in that case, which relates to a protracted discovery dispute and allegations that PwC failed to comply with outstanding discovery orders.

procedures should include independent verification of the contents of the boxes held in a vault in Peru. That mischaracterization is underscored in the Motion to Compel, where plaintiffs construe this request – which asks whether "efforts" were made to confirm or deny the existence of metal – to ask whether "PwC either *did* or *did not* verify the existence of precious metal in the Peruvian vault." (Motion to Compel at 11 (emphasis in original)).[9] PwC did not stand simply on the objection, but went on to deny the request to admit. The denial was appropriate because PwC did make extensive efforts to consider the validity and collectibility of the Panexim receivable, including through inquiries of management and Panexim (*See* Response to Request to Admit No. 1, which provided a narrative description of these steps).

Request No. 15 asked PwC to admit that "PwC did not review the transactions between HHRG and Panexim during 1997." PwC again objected to the form of this request, and again, notwithstanding its objection, denied the request. Plaintiffs' motion to compel redacts PwC's explanation for the denial:

> PwC performed certain procedures in connection with each of the engagements at issue in this litigation that involved a review or consideration of information regarding Panexim including the historical information regarding HHRG's relationship with Panexim and information regarding the Panexim accounts

---

[9] Even the term "verify" is vague in the context of this case. As Underwriters know, in September 1999 HHRG engaged an independent assayer, who issued a report purporting to confirm the existence of the gold to the satisfaction of both HHRG and Golden West. Later events showed that the independent assay was either deliberately misleading or fraudulent. Did HHRG or Golden West "verify" the existence of the gold when it engaged the assayer and relied on its report?

receivable and the aging of such accounts receivable.  Such activities are set forth in the PwC working papers already made available to Underwriters' counsel.  See also PwC's responses to requests to admit numbers 1 and 8 [which describe many of the audit steps related to Panexim].

This response complies fully with Fed. R. Civ. P. 36(a).

### D. PRIVILEGE LOG

In Exhibits 11, 12, and 13 to their Motion to Compel, Underwriters take issue with over 500 documents listed on PwC's privilege log.  PwC, at this Court's suggestion, is conducting a detailed review of each of these documents to determine whether any of the documents has been mistakenly withheld or whether, notwithstanding the asserted privilege, any such documents may be produced without communicating sensitive information.  These documents will be produced shortly, the latter category subject to counsel's agreement that production will not be construed as a subject matter waiver.  This review will moot a portion of the dispute.

There is no basis, however, to grant plaintiffs' motion to compel.  PwC's privilege log fully complies with Local Rule 37(a)(1).  For each document listed on the log, PwC provided the type of the document (memo, facsimile, outline, email, etc.); the general subject matter of the document (communication regarding litigation, notes prepare in anticipation of litigation, memorandum of meeting with counsel, etc.); the date of the document; the author of the document; and each recipient of the document.  PwC is not required to provide a more detailed description of the subject matter, because doing so might communicate privileged material.

PwC's claim of work product for certain documents created on and after February 28, 2000 is well founded. On that date, after discovery of the missing gold in Peru, PwC's engagement partner, Mr. Corl, was notified that HHRG and/or its parent company, Golden West, might pursue a claim against PwC. He immediately notified PwC's Office of General Counsel, and he thereafter created certain documents at the direction of counsel and in anticipation of such threatened litigation. Such documents are protected from disclosure because they were prepared "in anticipation of litigation . . . by or for [PwC] or by or for [PwC's] representative." Fed. R. Civ. P. 26(b)(3). Similarly, PwC's claim of attorney-client protection is well founded with respect to communications between Mr. Corl or other PwC employees and PwC's attorneys through which the employees furnished information to counsel, or counsel provided professional advice, regarding the threatened litigation.

Finally, PwC's communications regarding these potential claims with PwC Australia, a separate legal entity that also had been threatened with possible litigation, are protected by the common interest privilege (also known as the joint defense privilege). Such communications were undertaken to share information designed to further both entities' common legal interest – *viz.*, defense of any claim regarding the audit work each entity had performed. The privilege applies to these documents because: (1) PwC shares "a common legal interest with the party with whom the information was shared" and (2) "the statements for which protection is sought were designed to

further that interest." *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,* 215 F.R.D. 466, 471-72 (S.D.N.Y. 2003).

## CONCLUSION

The motion to compel should be denied. As required by Conn. Gen. Stat. § 31-128f, PwC requests that the Court issue an order authorizing it to produce any portions of the personnel files of PwC employees whom plaintiffs have sought to depose who worked on the HHRG audits solely to the extent those files specifically discuss the employee's work on any HHRG engagement.

**DEFENDANT,**
**PRICEWATERHOUSECOOPERS LLP**

By _____
David J. Elliott (ct 04301)
E-mail: djelliott@dbh.com
Thomas D. Goldberg (ct 04386)
E-mail: tdgoldberg@dbh.com
Kathleen D. Warner (ct 23973)
E-mail: kdwarner@dbh.com
William H. Erickson (ct18117)
E-mail: wherickson@dbh.com
Day, Berry & Howard LLP
CityPlace I
Hartford, CT 06103
(860) 275-0100 – telephone
(860) 275-0343 – facsimile

Its Attorneys

## CERTIFICATION

THIS IS TO CERTIFY that on this day, a copy of the foregoing was sent via first class U.S. Mail, postage prepaid, and via e-mail to:

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, NY 10017-5639

Steven R. Humphrey, Esq.
Dina S. Fisher, Esq.
James M. Ruel, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
120 N. LaSalle Street
Chicago, IL 60602

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
3 Gannett Drive
White Plains, NY 10604-3407

William H. Champlin III, Esq.
Michael T. McCormack, Esq.
Tyler, Cooper & Alcorn
CityPlace – 35th Floor
Hartford, CT 06103

_____
William H. Erickson