Exhibit A

# Day, Berry & Howard LLP

COUNSELLORS AT LAW

David J. Elliott
Direct Dial: (860) 275-0196
Email: djelliott@dbh.com

July 2, 2004

**VIA FACSIMILE**

Stefan Dandelles, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
120 N. LaSalle Street
Chicago, IL 60602

Re:    Golden West Refining Corp., Limited v. PricewaterhouseCoopers
Civil Action No. 3:02CV1379 (MRK)

Alec Sharp, et al. v. PricewaterhouseCoopers LLP
Civil Action No. 3:02CV1572 (MRK)

Handy & Harman Refining Group, Inc. v. PricewaterhouseCoopers LLP
Civil Action No. 3:02CV1803 (MRK)

In Re: Handy & Harman Refining Group, Debtor;
Handy & Harman Refining Group, Inc. v. Chubb Corporation, et al.
Civil Action No. 3:03 CV 1243 (MRK)

Dear Stefan:

As I reported to you in my letter dated June 25, 2004, I am writing this letter to provide additional information responsive to certain of the interrogatories and document requests propounded by Underwriters. This additional information is being provided to you in a good faith effort pursuant to our obligations under the discovery rules to resolve the existing dispute. Of course, we are not waiving the previous objections set forth by PricewaterhouseCoopers LLP ("PwC") in its objections to Underwriters' First Set of Interrogatories dated October 8, 2003 and in its Objections and Responses to Underwriters' Document Requests dated October 8, 2003.

1.    PwC's Responses to Interrogatories numbers 2-7.

In interrogatories 2-7, Underwriters seeks the following information:

Day, Berry & Howard LLP

Stefan Dandelles, Esq.
July 2, 2004
Page 2

- "every effort PWC made and every action PWC took to ensure that HHRG did not extend credit to a South American company during the relevant time period . . ." (Interrogatory 2);

- "All efforts PWC made and every action PWC took to verify the financial statements and/or records provided by HHRG." (Interrogatory 3);

- "every method of investigation used by PWC to ascertain the credit-worthiness of Panexim." (Interrogatory 4);

- "every effort or action taken by PWC to verify the purported security relating to Panexim's outstanding receivable owed to HHRG." (Interrogatory 5);

- "every effort or action taken by PWC to confirm the existence of inventory purportedly held for HHRG in a vault in Peru." (Interrogatory 6); and

- "every effort or action taken by PWC to ensure that HHRG did not make any unsecured advances of funds to Panexim." (Interrogatory 7.)

As we have previously stated, each of these interrogatories mischaracterizes the audit work PwC performed for HHRG. Each of these interrogatories has as a premise a responsibility that PwC did not have under Generally Accepted Auditing Standards. For example, GAAS does not require that auditors "verify" financial statements, (whatever "verify" means); that the credit-worthiness of Panexim be "ascertained"; or that the "security" relating to accounts receivable be "verified." However, in an effort to help resolve the objections to these questions, we provide the following additional information which we believe is generally responsive to these interrogatories.

As set forth in the various engagement letters sent to HHRG by PwC, PwC agreed to audit HHRG's financial statements for certain specified periods. For instance, in its March 1, 1999 engagement letter, PwC agreed to "audit [HHRG's] consolidated financial statements at and for the year ending March 31, 1999." (PWC Z 03022-26.) PwC agreed to perform such audit "in accordance with generally accepted auditing standards" in effect at that time. (PWC Z 03022.) Such standards required that PwC "plan and perform the audit to obtain reasonable assurances about whether the financial statements are free of material misstatement." (PWC Z 03022.) Such audit included "examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation." (PWC Z 03022.) As part of such audit, PwC considered HHRG's "internal control over financial reporting." (PWC Z 03022.) As PwC stated in such engagement letter, however, the financial statements which PwC audited are the responsibility of the management of HHRG and management "is responsible for properly recording transactions in the accounting records and for

Day, Berry & Howard LLP

Stefan Dandelles, Esq.
July 2, 2004
Page 3

establishing and maintaining internal control sufficient to permit the preparation of financial
statements in conformity with generally accepted accounting principles." (PWC Z 03022-26.)
The engagement letters associated with the other audit work performed by PwC for HHRG
contain similar language regarding the scope of such work.

The specific work performed by PwC in connection with its audits, as described in its
engagement letters, is described in the working papers associated with each particular audit. As
you may recall, in producing responsive documents to you, we used different bates label prefixes
to indicate which working papers were associated with which audit. For instance, the bates
labels on the working papers associated with the 1999 audit begin with the prefix "PWC 99." In
this way, it is fairly easy to determine which working papers are associated with which audit.
By examining the working papers associated with each audit, we believe you will be able to
obtain the information you seek through these interrogatories. For example, with respect to
Interrogatories 5 and 6, as you know, and as the working papers indicate, because HHRG treated
Panexim's obligation secured by metal in the Hermes vault as an accounts receivable, PwC sent
a confirmation of that receivable to Panexim which Panexim executed and returned.

In addition to annual audits, PwC also performed certain agreed-upon procedures at
various times. For instance, at the request of Barry Wayne, President and CEO of Attleboro
Refining Company, Inc.("ARC"), PwC applied certain agreed-upon procedures to the physical
inventory records of ARC as of December 31, 1997. The specific agreed-upon procedures
followed by PwC were set forth in a letter dated March 31, 1998. (PWC Z 00677-678.) Similar
agreed-upon procedures with respect to a physical inventory performed at ARC as of June 30,
1998, are set forth in a separate letter from PwC. (PWC 99 WP 0006-7.)

PwC also performed certain reviews of the consolidated balance sheets of HHRG at
certain points in time. For instance, PwC reviewed the consolidated balance sheet of HHRG as
of September 30, 1998 and the related consolidated statement of income and retained earnings
for the period from April 1, 1998 through September 30, 1998. (PWC 99 WP 0475.) This
review was performed in accordance with Statements on Standards for Accounting and Review
Services issued by the American Institute of Certified Public Accountants. The scope of that
review is set forth in PwC's letter to HHRG dated November 10, 1998. (PWC 99 WP 0475).
The working papers which we previously made available to you regarding this review also
disclose information about how such review was conducted. (See generally the working papers
produced at PWC 99 WP 0471-602.)

2.    Document request numbers 6 and 9.

As I stated in my June 25 letter, we agreed to provide to you the bates numbers of
documents which were "used as guidelines and/or references by PWC . . . in providing
instruction or guidance in the management and supervision of PWC's employees" and which
were "used as a guideline and/or professional reference by PWC concerning the method and

Day, Berry & Howard LLP

Stefan Dandelles, Esq.
July 2, 2004
Page 4

manner of preparing, reviewing or auditing of the records or financial statements of HHRG
and/or GWRC." As we previously indicated, these documents are set forth in the working
papers previously made available to you. For instance, the 1997 electronic work papers (PWC
97 EW 0001-00797), the 1998 electronic work papers (PWC 98 EW 0001-01075) and the 1999
electronic work papers (PWC 99 EW 0001-02361) set forth in detail the numerous steps to be
followed by PwC's audit team in performing its audit work. Additionally, the working papers
related to a particular audit contain various checklists and procedures employed by PwC
personnel in performing their audit work.  See, for example, the following working papers
concerning the following topics: PWC 98 WP 0007-15 (physical inventory observation
checklist); PWC 98 WP 01570-01580 (physical inventory observation checklist); PWC 99 WP
00538-39 (inventory); PWC 99 WP 00540-541 (accounts and notes receivable); PWC99 WP
00542 (current and deferred income taxes); PWC 99 WP 00543 (derivative financial
instruments); PWC 99 WP 00547 (confirming matters with external lawyers); PWC 99 WP
00548-52 (trial balance and financial statements); PWC 99 WP 00553-55 (developing strategy
and workplan);  PWC 99 WP 00559-00573 (review inquiries); and PWC 99 WP 00574-00602
(financial statement disclosure requirements).  We believe by producing these documents, we
have adequately responded to each of these document requests.

     I trust you will find this information helpful and responsive to your requests.  Please
contact us if you feel additional information is warranted.

     Very truly yours,

David J. Elliott

DJE:dlw

Exhibit B

LEXSEE 2002 CONN. SUPER. LEXIS 2534

**Kimberly Donaldson v. Roscoe Sheffield, Jr.**

**CV990433074S**

**SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW HAVEN, AT NEW HAVEN**

**2002 Conn. Super. LEXIS 2534**

**July 26, 2002, Decided**
**July 30, 2002, Filed**

**NOTICE:** [*1]  THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**DISPOSITION:** The Motion for Protective Order is denied as to the issue of the hours worked by the defendant each day for the time period from October 1, 1997 to March 31, 1998.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant employee moved for a protective order protecting him from having his employer produce his employee personnel file, claiming that plaintiff injured party's subpoena duces tecum was an invasion of his privacy and sought information that was not relevant to the case and was confidential.

**OVERVIEW:** After an automobile accident, the injured party specifically sought the employee's employment records indicating the number of hours the employee had worked each day for a specific time period. The court held that the information sought by the injured party was very specific and narrowly tailored. The issue as to whether the employee undertook activities before the accident or conducted such activities in such a manner that he could not maintain the control of his vehicle was within the scope of Conn. Gen. Stat. § 13-2. Therefore, the injured party was entitled to discovery of the records.

**OUTCOME:** The motion for a protective order was denied.

**LexisNexis(R) Headnotes**

**JUDGES:** Richard A. Robinson, J.

**OPINIONBY:** Richard A. Robinson

**OPINION:** MEMORANDUM OF DECISION RE MOTION # 122 FOR PROTECTIVE ORDER

The plaintiff in the instant action seeks a Protective Order protecting him from having his employer produce documents requested by the defendant in a subpoena duces tecum dated June 14, 2002.

On July 3, 2002, the defendant filed its objection to the Motion for Protective Order. Attached to the motion is a copy of the subject subpoena. Said document orders the defendant's employer to produce:

A copy of Roscoe Sheffield's employment records specifically indicating the number of hours Mr. Sheffield worked each day for the time period from October 1, 1997 to March 31, 1998.

The defendant asserts that:

1) The subpoena duces tecum is an invasion of the defendant's privacy and any benefits gained by production of the subject [*2] material will be greatly overshadowed by the loss of personal information by the defendant; and

2) The subpoena duces tecum seeks information that is not relevant to the case in question; and

3) The subpoena seeks information that is confidential and cannot be released by his employer without Mr. Sheffield's consent, or a judicial order.

Section 31-128f of the Connecticut General Statutes concerns the disclosure of information in an employee's personnel file. This statute provides in pertinent part that:

No individually identifiable information contained in the personnel file or medical records of any employee shall be disclosed by an employer to any person or entity not employed by or affiliated with the employer without the written authorization of such employee except where the information is limited to the verification of dates of employment and the employee's title or position and wage or salary or where the disclosure is made: (1) To a third party that maintains or prepares employment records or performs other employment-related services for the employer; (2) pursuant to a lawfully issued administrative summons or judicial order, [*3] including a search warrant or subpoena, or in response to a government audit or the investigation or defense of personnel-related complaints against the employer; (3) pursuant to a request by a law enforcement agency for an employee's home address and dates of his attendance at work; (4) in response to an apparent medical emergency or to apprise the employee's physician of a medical condition of which the employee may not be aware; (5) to comply with federal, state or local laws or regulations; or (6) where the information is disseminated pursuant to the terms of a collective bargaining agreement.

In the current situation, the defendant specifically seeks employment records "indicating the number of hours Mr. Sheffield worked each day for the time period from October 1, 1997 to March 31, 1998." The information sought by the defendant is very specific and narrowly tailored:

The disclosure of such information [contained in a personnel file] must be carefully tailored to a legitimate and demonstrated need for such information in any given case. Where disclosure of the personnel file would place in the hands of a [party] irrelevant or personal and sensitive information concerning [*4] . . . [another], the entire file should not be disclosed. No [party] has the right to conduct a general "fishing expedition" into the personnel records of [another] . . . Because discovery of matters contained in a . . . personnel file involves careful discrimination between material that relates to the issues involved and that which is irrelevant to those issues, the

judicial authority should exercise its discretion in determining what matters should be disclosed . . . Because the law furnishes no precise or universal test of relevancy, the question must be determined on a case by case basis according to the teachings of reason and judicial experience . . . (Citations omitted; internal quotation marks omitted.)

*Rosado v. Bridgeport Roman Catholic Diocesan Corp.*, *supra*, Superior Court, Docket No. 300272, quoting *State v. Januszewski*, 182 Conn. 142, 172-73, 438 A.2d 679 (1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L. Ed. 2d 1005 (1981), cited in *Zito v. Sports Authority, Inc.*, No. CV99-0495291S (Aug. 28, 2000) (28 Conn. L. Rptr. 51, 2000 Ct. Sup. 10697) (Kocay, J.).

Section 13-2 of the Connecticut Practice Book 2002, [*5] concerns the scope of discovery in general. This section provides that:

In any civil action, in any probate appeal, or in any administrative appeal where the judicial authority finds it reasonably probable that evidence outside the record will be required, a party may obtain in accordance with the provisions of this chapter discovery of information or disclosure, production and inspection of papers, books or documents material to the subject matter involved in the pending action, which are not privileged, whether the discovery or disclosure relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, and which are within the knowledge, possession or power of the party or person to whom the discovery is addressed. Discovery shall be permitted if the disclosure sought would be of assistance in the prosecution or defense of the action and if it can be provided by the disclosing party or person with substantially greater facility than it could otherwise be obtained by the party seeking disclosure. It shall not be ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably [*6] calculated to lead to the discovery of admissible evidence. Written opinions of health care providers concerning evidence of medical negligence, as provided by General Statutes § 52-190a shall not be subject to discovery except as provided in that section.

The Complaint in this matter asserts that the defendant lost control of his vehicle. The issue as to whether the defendant undertook activities before the accident in question or conducted such activities in such a manner that he could not maintain the control of his vehicle is within the scope of § 13-2.

2002 Conn. Super. LEXIS 2534, *

The Motion for Protective Order is denied as to the issue of the hours worked by the defendant each day for the time period from October 1, 1997 to March 31, 1998.

Richard A. Robinson, J

July 26, 2002

Exhibit C

116 of 194 DOCUMENTS

**In re: Conticommodity Services, Inc. Securities Litigation**

**MDL No. 644**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

**1988 U.S. Dist. LEXIS 4812**

**May 23, 1988, Decided**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff customers alleged that defendant accounting firm's negligence in auditing a corporation caused them to sustain financial losses. The customers filed a motion to compel the accounting firm to produce its internal procedure manuals to help the customers to determine whether the procedures used in the accounting firm's audit complied with the standards set forth in those manuals.

**OVERVIEW:** The customers alleged that the accounting firm's negligence in auditing a commodities corporation caused them to sustain substantial financial losses. The court denied the customers' motion to compel the accounting firm to produce its internal procedure manuals to help the customers to determine whether the accounting firm acted negligently. The standard of care applicable to the conduct of accountants was whether they rendered skillful performance according to local standards. Such standards were set forth by the American Institute of Certified Public Accountants. Thus, the accounting firm could be found liable for negligence if it breached an objective standard of conduct existing in the accounting profession, not if it only breached a standard established by the accounting firm's own internal policies. As such, the manuals were not relevant or discoverable.

**OUTCOME:** The court denied the customers' motion to compel the accounting firm to produce its internal procedure manuals to help the customers to determine

whether the accounting firm was negligent or whether the procedures used in the accounting firm's audit of the corporation complied with the standards set forth in the manuals.

**LexisNexis(R) Headnotes**

**OPINIONBY:** [*1]

HART

**OPINION:**

MEMORANDUM AND OPINION

WILLIAM T. HART, UNITED STATES DISTRICT JUDGE

Plaintiffs, former customers of ContiCommodity Services, Inc. ("Conti"), allegedly sustained significant financial losses through the ContiArbitrage-Houston and Pearl River arbitrage programs managed by Conti. Defendant, Arthur Andersen & Co. ("Andersen"), conducted internal accounting control audits for Conti in which Andersen reviewed the internal controls of the ContiArbitrage-Houston and Pearl River programs. Among other things, plaintiffs brought a claim of negligence against Andersen, claiming that Andersen failed to adhere to proper standards for reviewing and reporting the activities of the ContiArbitrage-Houston and Pearl River programs.

Plaintiffs have filed a motion to compel Andersen to produce its internal procedure manuals to help determine

whether Andersen's auditing procedures as regards Conti were in accordance with the standards set forth in those manuals. Plaintiffs have also requested the manuals for the additional purpose of discovering any relevant documents that may have been produced in Andersen's review of the arbitrage programs n1

n1 All other issues raised in the motion to compel were resolved by the parties. Andersen is granted leave to file its surreply in opposition to plaintiffs' motion to compel production of internal procedure manuals. [*2]

Andersen has refused to produce the internal manuals, asserting that the manuals are irrelevant to the negligence claim. Andersen contends that it can be held only to external standards of accounting practice and therefore the only relevant standards are those defined by professional accounting organizations and reasonable standards of practice in the accounting field. Any higher standards contained in its internal procedure manuals are claimed to be irrelevant. Andersen further contends that the material in its procedure manuals is proprietary material containing trade secrets. Additionally, it contends that plaintiffs' request is excessive and burdensome.

Plaintiffs contend that Andersen's internal procedure manuals are relevant to the negligence claims against Andersen because the manuals outline Andersen's own standards for conducting an internal accounting control audit of a futures commission merchant such as Conti. Plaintiffs contend that any deviation from such standards in connection with the failure to discover or disclose misconduct within the ContiArbitrage program is probative, though concededly not determinative, of the negligence claims against Andersen. Plaintiffs [*3] assert that any concern relating to proprietary information would be alleviated by a protective order keeping the documents confidential.

Whether Andersen must produce its internal procedure manuals for discovery purposes first turns on whether the information contained in the manuals is relevant to the negligence claim. This requires a determination of the standard of care applicable to accountants in conducting auditing services. n2

n2 This is a diversity claim filed in the Southern District of Texas. Texas law would control as to choice of law. The parties, however, have not discussed which state's substantive law should apply. Like the parties, the court looks to all states and applies general principles.

Accountants are subject generally to the same rules of liability for negligence in the practice of their profession as are members of other skilled professions. Bancroft v. Indemnity Insurance Co. of North America, 203 F. Supp. 49, 53 (W.D. La.), aff'd, 309 F.2d 959 (5th Cir. 1962). The standard of reasonable care which applies to the conduct of accountants is the same as the standard applied to lawyers, doctors, architects, engineers, and other professionals who furnish [*4] skilled services for compensation. Id. This standard requires that an accountant exercise that degree of skill and competence reasonably expected of persons in the accounting field in the community. Id. Accordingly, accountants should not be held to a standard higher than that recognized in their profession. Escott v. Barchris Construction Corp., 283 F. Supp. 643, 703 (S.D.N.Y. 1968). Rather, the duty placed upon the accounting firm in providing professional services to its clients is to render skillful performance according to local professional standards. Bancroft, 203 F. Supp. at 53. Specifically, the American Institute of Certified Public Accountants sets forth standards and procedures for performing internal accounting control audits such as Andersen performed for the Conti arbitrage programs. These standards, approved and adopted by the membership of the Institute, were recognized as establishing the relevant standard of care for an accounting firm conducting an internal accounting control audit in Hochfelder v. Ernst & Ernst, 503 F.2d 1100 (7th Cir. 1974), rev'd on other grounds, 425 U.S. 185 (1976).

In In re Boise Cascade Securities Litigation, MDL [*5] 128, slip op. (W.D. Wash. June 1, 1976) (unpublished order), the court addressed the question of whether the duty imposed on an accounting firm was determined by external or internal standards. That court held that the accountants could be found liable for negligence if they breached an objective standard of conduct existing in the accounting profession, not if they only breached a standard established by the accounting firm's own internal policies. Id. at 4. The court therefore affirmed the Special Master's dismissal of a motion to compel production of the defendant accounting firm's internal manual. Id. at 5.

The determination of whether Arthur Andersen was negligent in performing the internal audit controls for the Conti arbitrage programs requires an examination of prevailing professional standards, not an examination of standards imposed by the accounting firm itself. Therefore, since any higher standards outlined in the internal manuals would be irrelevant to the negligence inquiry, the manuals need not be produced for discovery.

Plaintiffs already have received all audit workpapers specifically related to the ContiArbitrage-Houston and

1988 U.S. Dist. LEXIS 4812, *

Pearl River arbitrage programs. [*6] Consequently, production of the internal manuals would not serve plaintiffs' secondary purpose of using the manuals to discover additional documents related to Andersen's audit of the arbitrage programs. Since the manuals are not otherwise discoverable, it is unnecessary to decide if they should be protected as proprietary trade secrets.

IT IS THEREFORE ORDERED that:

(1) Arthur Andersen & Co.'s motion for leave to file its surreply in opposition to motion to compel production of internal procedure manuals is granted.

(2) Customer parties' motion to compel discovery from Arthur Andersen & Co. is denied as to Andersen's internal procedure manuals and otherwise denied as moot.

Dated: MAY 23, 1988