UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2005 MAR -2 P 3: 54
U.S. DISTRICT COURT
NEW HAVEN, CT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION : <br> Plaintiff : <br> : <br> VS. : <br> : <br> PRICEWATERHOUSECOOPERS, LLP and : <br> COOPERS & LYBRAND, LLP : <br> Defendants : | CIVIL ACTION NO. <br> 3:02 CV 1379 (MRK) |
| ALEC SHARP, et al. : <br> Plaintiffs : <br> : <br> VS. : <br> : <br> PRICEWATERHOUSECOOPERS, LLP d/b/a : <br> PRICE WATERHOUSE, LLP : <br> Defendant. : | CIVIL ACTION NO. <br> 3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC., : <br> Plaintiff : <br> : <br> VS. : <br> : <br> PRICEWATERHOUSECOOPERS, LLP, : <br> Defendant : | CIVIL ACTION NO. <br> 3:02 CV 1803 (MRK) <br><br> JANUARY 7, 2005 |

**UNDERWRITERS' MEMORANDUM OF LAW REGARDING APPLICATION OF THE ATTORNEY CLIENT PRIVILEGE AND WORK PRODUCT DOCTRINE**

Plaintiffs, Alec Sharp, et al. ("Underwriters") hereby submit their brief regarding application of the attorney client privilege and/or work product doctrine to certain documents withheld from production by Underwriters.

I.   **INTRODUCTION**

This action involves, *inter alia*, causes of action by Underwriters as assignees and subrogees of their insured, Handy & Harman Refining Group, Inc. ("HHRG"), against

241418.1

PricewaterhouseCoopers ("PWC") for professional malpractice and breach of contract occurring during the course of PWC's engagement as outside auditor of HHRG between 1996 and 2000. Specifically, Underwriters allege PWC was negligent and in breach of expressed contractual obligations in failing to uncover several unauthorized business transactions between certain HHRG employees and consultants and Panexim, S.A., a Peruvian entity. Such transactions resulted in the unauthorized transfer of over $300 million in unsecured cash advances to Panexim, over $12 million of which was never recovered. HHRG submitted a claim to Underwriters seeking coverage for a claimed $18 million loss under Underwriters' Bankers Blanket Bond (the "Bond Claim").[1] Underwriters agreed to settle the Bond Claim for a payment of $12.5 million, in exchange for a full assignment of rights to pursue recovery of the losses making up the Bond Claim.

This is a fairly simple accountants' liability matter where at issue is: 1) whether PWC deviated from the applicable standard of care in auditing HHRG, and thereby caused damages; and 2) whether PWC breached its contractual undertaking to assure unsecured advances would not be made to "third-world countries." Despite the simplicity of the issues, the damages are significant. Nonetheless, PWC's attempt to conduct a fishing expedition must fail as an inappropriate deviation from the scope of relevant, discoverable materials to which it is entitled under the Federal Rules of Civil Procedure and applicable case law.

This matter is presently before the Court in response to PWC's claim that Underwriters have improperly withheld documents during the course of discovery. PWC has generally challenged Underwriters' production of documents and privilege log on the theoretical basis that documents were purportedly created in the ordinary course of insurance business and are

---

[1] In addition to the loss relating directly to the unsecured Panexim advances, the Bond Claim included approximately $4 million attributed to payments to unauthorized consultants, excess remuneration to certain

therefore not subject to protection by either the attorney client privilege or the work product doctrine. PWC generally argues that "classic claims coverage documents" are not subject to either privilege. PWC only expresses specific interest in five (5) documents.

The documents withheld by Underwriters were not prepared in the ordinary course of insurance business, are clearly attorney-client communications, and given the factual context, also constitute attorney work product. PWC has received all fact-based, investigative materials, yet PWC now apparently seeks production of documents reflecting the mental impressions of Underwriters' counsel. Not only are the documents protected by the work-product doctrine and/or the attorney-client privilege, but they are also irrelevant to any issue in this case.

## II.   SUMMARY OF FACTS

As noted above, HHRG submitted the Bond Claim to Underwriters seeking to recover over $18 million in losses purportedly covered under a Bankers Blanket Bond issued by Underwriters to Rothschild Continuation Ltd. ("Rothschild"), the ultimate parent company of HHRG. HHRG retained a forensic accountant, Dempsey, Myers & Co. ("Dempsey"), which submitted a Proof of Loss on or about October 9, 2000. *PWC has received all of Dempsey's investigative reports and the raw data relied on in calculating HHRG's loss.* Underwriters also retained a forensic accounting firm, Hagen Streiff Newton & Oshiro ("HSNO"), to investigate the Bond Claim and calculate the extent of any covered loss, as well as to advise on potential sources of recovery in subrogation. *PWC has received all of HSNO's investigative reports, including damage schedules and the raw data on which HSNO relied in conducting its analysis.*

Underwriters retained the law firm of Wilson Elser Moskowitz Edelman & Dicker ("WEMED") to protect their interests with respect to the Bond Claim, including specifically drafting, negotiating, and providing legal advice on the enforceability of a settlement agreement,

---

executives, and claims investigation costs incurred by HHRG.

3

241418.1

appropriate releases, and an agreement regarding subrogation and assignment of claims. WEMED was also specifically retained to pursue various recovery actions on behalf of Underwriters, including the instant action. WEMED *did not* investigate the facts underlying the Bond Claim or the quantum of loss claimed by the insured. Instead this analysis was performed by Dempsey and HSNO. WEMED relied on the facts developed by these two investigators in providing legal analysis and advice to Underwriters.

A determination that the Bond Claim presented a covered loss occurred much earlier than the ultimate settlement of the Bond Claim executed on December 31, 2001. Indeed, by correspondence dated April 23, 2001, WEMED issued a letter to HHRG's counsel indicating that Underwriters considered the Bond Claim to be a "covered claim." (Attached hereto as Exhibit 1). (See also at Exhibit 2 a copy of WEMED Report No. 1, dated December 1, 2000, indicating it appears this matter constitutes a covered claim, and that PWC had already been identified as a subrogation target.) The only matters to be resolved thereafter were the precise quantum of loss, the nature and extent of the assignment of claims, and the drafting of appropriate releases based on applicable law in the United States, England and Australia. These matters were inextricably intertwined with preserving Underwriters' subrogation and assignment rights and the provision of legal advice in obvious anticipation of litigation against PWC and others.

### III. DOCUMENTS PURPORTEDLY AT ISSUE

PWC's only challenge to specific items on Underwriters' privilege log was received on November 4, 2004. (Attached hereto as Exhibit 3 is a copy of Underwriters' privilege log; attached as Exhibit 4 is PWC's November 4 letter.) In response thereto, Underwriters produced certain documents previously withheld, and provided further explanations to PWC's inquiries by correspondence dated December 13, 2004. (Attached as Exhibit 5.) Underwriters have not

received any response to this correspondence and therefore do not know precisely what challenges PWC maintains. Nonetheless, PWC appears to focus on several communications between WEMED and Mr. Richard Cook of Alleghany Underwriters, and queries why such communications are protected by the attorney client privilege. As we advised PWC, Alleghany was the Lead Underwriter on the Policy and Mr. Cook was the claims handler responsible for the Bond Claim. Mr. Cook was WEMED's primary client contact with respect to the provision of legal services relating to the Bond Claim and the recovery actions arising therefrom.

PWC specifically challenges only five (5) documents amongst the Richard Cook communications asserting that they appear to be "classic claims coverage documents."[2] PWC further asserts it "would have expected to see in your production documents concerning [Alleghany's] analysis of whether there was coverage under the Underwriters policy for the claims presented by HHRG." PWC appears to be challenging a failure to produce hypothetical documents. (See Weber v. Paduano, 2003 U.S. Dist. LEXIS 858 at 32-33 (S.D.N.Y. 2003) (denying a motion to compel where the challenging party failed to establish the existence of challenged "hypothetical documents").) Such a fishing expedition for ultimately irrelevant documents should not be allowed here either.

## IV.   ARGUMENT

### A.   Applicable Law

Underwriters' claims against PWC are brought pursuant to state law and therefore state law – *i.e.*, Connecticut law – will govern application of the attorney client privilege. Fed.R.Evid. 501; see also EDO Corp. v. Newark Ins. Co., U.S. Dist. LEXIS 21253 at 4 (D.Conn. 1992). However, federal law governs application of the work production doctrine in cases pending in

---

[2] These five documents are: UL 01536, 01537, 01540, 01541-48, 01551-53.

241418.1

federal court regardless of whether state law provides the rule of decision. Id. Accordingly, the two privileges are discussed separately below.

1. Attorney Client Privilege

The Connecticut Supreme Court in Met. Life Ins. Co. v. Aetna, 249 Conn. 36, 52 (1999), stated that "the attorney-client privilege protects both the confidential giving of professional advice by an attorney acting in the capacity of a legal advisor to those who can act on it, as well as the giving of information to the lawyer to enable counsel to give sound and informed advice." The Court also noted that "[e]xceptions to the attorney-client privilege should be made only when the reason for disclosure outweighs the potential chilling of essential communications." Id. Finally, because PWC has alleged in correspondence that an implied or "at issue" waiver is present in this matter, we note the applicable Connecticut standard for same:

> the 'at issue', or implied waiver, exception is invoked only when the contents of the legal advice is integral to the outcome of the legal claims of the action. (citation omitted). Such is the case when a party specifically pleads reliance on an attorney's advice as an element of a claim or defense, voluntarily testifies regarding portions of the attorney-client communication, or specifically places at issue, in same or other manner, the attorney-client relationship.

Id. at 52-53. Merely because certain communications are relevant does not place them "at issue." Id. at 54.

2. Work Product Doctrine

Application of the work product doctrine in cases pending in federal court is governed by Rule 26(b)(3) of the Federal Rules of Civil Procedure and the case law interpreting same. Go Medical Industries v. C.R. Band, Inc., 1998 U.S. Dist. LEXIS 22919 at 13 (D.Conn. 1998). "The work product doctrine shields from disclosure documents and other materials prepared in anticipation of litigation or trial by a party or a party's representative, absent a showing of

241418.1

6

substantial need." Loftis v. America Mutual Ins. Co., 1997 U.S. Dist. LEXIS 11788 at 16 (D.Conn. 1997). Opinion work product, which reflects the mental impressions, conclusions or opinions of an attorney, receives greater protection than "ordinary work product materials." Id. at 17. The Second Circuit, in U.S. v. Adlman, 134 F.3d 1194 (1998), interpreted the work product doctrine to extend to documents created "because of the prospect of litigation." Adlman, 134 F. 3d at 1202-03.

In the context of a dispute over purported insurance claim files, we note Travelers Cas. & Sur. Co. v. J.D. Elliott & Co., 2004 U.S. Dist. LEXIS 20712 (S.D.N.Y. 2004), which stated "[t]here is not 'bright line' test for when an insurance company's investigative work passes from work in the ordinary course of the insurance company's business to work performed in anticipation of litigation." The J.D. Elliott court did indicate however that despite the difficulty in determining when a shift in the work occurred, where there was a dual purpose (i.e., "performing ordinary claim processing work and trial preparation work simultaneously") such work would be protected by the work product doctrine. Id. at 7; see also Adlman, 134 F.3d at 1194, 1199, 1201 n.5.

B. Analysis

Based on the applicable law for each asserted privilege, Underwriters have properly withheld the documents at issue. First, there is no dispute that the documents reflect communications between a client (Richard Cook) and his counsel (WEMED). The next inquiry to determine application of the attorney-client privilege must be whether the communications reflect confidential legal advice given to Mr. Cook or confidential information given by the client. Based on the factual context gleaned from the voluminous documents that have been produced, as well as the several representations made in respect of this matter, it is clear that the

communications do indeed reflect confidential legal advice and other confidential information on which such advice is based. It appears PWC believes the communications relate to discussions over whether or not the Bond Claim is a covered claim or the factual elements of such claim. This is not the case. As noted above and as the documents establish, HSNO and Dempsey performed the bulk of the factual investigation. This is what PWC is entitled to discover and this is precisely what PWC has obtained discovery of.

The cases PWC cites in the context of insurance claims documents relate almost exclusively to application of the work product doctrine. For example, in J.D. Elliott, the documents at issue were documents relating to the investigation of a forensic accountant. In this case such documents have been produced. In Weber v. Paduano, the documents at issue were investigative reports and claim file documents compiled during the course of an insurance investigation into the facts giving rise to the claimed loss. In this case, the documents at issue are not investigative reports on factual findings, but rather confidential communications between attorney and client reflecting legal advice. Again, the investigative reports and other factual materials PWC apparently seeks are already in its possession.

PWC relies on additional case law that has no application here. For example, PWC cites Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co., 1994 U.S. Dist. LEXIS 13216, (S.D.N.Y.), for the proposition that "if the claim has not yet been rejected, the documents are part of the claim investigation file and are not work product." Following such a rule would render all documents prepared in anticipation of litigation in subrogation matters discoverable, because by definition, there has not been a rejection of the claim. This would also render the J.D. Elliott holding meaningless, because any shift towards work in anticipation of litigation would be irrelevant in such cases. In the instant matter, the shift towards anticipation of

litigation occurred no later than April 2001 as there was by that time a clear recognition of a covered claim, as opposed to a denial. It is all too ironic that PWC challenges documents produced prior to this time given it has withheld documents on the basis of work product/anticipation of litigation dating back to *March 2000*.

Under Met. Life, *supra*, WEMED's communications with Underwriters are protected attorney client communications as they constitute the confidential giving of legal advice to Richard Cook who was authorized to act on such advice. PWC has not raised a valid challenge to application of the attorney client privilege. PWC does briefly assert that the elements of an "at issue" waiver are present here. We disagree. WEMED's legal advice is not integral to any legal claims asserted against PWC. PWC attempts to inject such advice into its defenses but fails to substantiate how WEMED's confidential communications with its client will bear on whether it properly performed its professional obligations in auditing HHRG.

It is clear that WEMED's function was not as factual claims investigator but as legal advisor, and from its earliest involvement sought to protect Underwriters' interests vis-à-vis their subrogation rights. The types of communications at issue here fall well within the expected range of protected attorney-client communications, such that to force disclosure of these communications would *discourage* "full and frank communication between attorneys and their clients." See Upjohn Co. v. U.S., 449 U.S. 383 (1981).

## V.   **CONCLUSION**

Based on the foregoing analysis, we believe it is clear that Underwriters have not improperly withheld any documents challenged by PWC, as the attorney client privilege and/or work product doctrine shields such documents from production. Alternatively, should this Court not find the matter clear on the briefs, we request that PWC be ordered to expressly set forth its

challenge as to each document it believes has been improperly withheld and the specific basis for such challenge, allowing Underwriters an opportunity to respond in writing prior to any *in camera* inspection or order to produce subject documents.

        Respectfully submitted,

        PLAINTIFFS
        ALEC SHARP, ET AL.

        By: _____

Edward J. Boyle
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639
(212) 490-3000
(212) 490-3038
boylee@wemed.com

Daniel J. McMahon
Stefan R. Dandelles
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
120 N. LaSalle Street
Chicago, IL 60602
(312) 704-0550
(312) 704-1522
mcmahond@wemed.com
dandelless@wemed.com

Fred Knopf
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604
(914) 323-7000
(914) 323-7001
knopff@wemed.com

## CERTIFICATION

    I hereby certify that a copy of the foregoing was transmitted via facsimile on January 7, 2005 to all counsel of record as follows:

Thomas D. Goldberg, Esq.
David J. Elliott, Esq.
William H. Erickson, Esq.
Kathleen D. Warner, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103-3597

William H. Champlin III, Esq.
William S. Fish, Jr., Esq.
Michael T. McCormack, Esq.
Tyler Cooper & Alcorn, LLP
CityPlace, 35th Floor
185 Asylum Street
Hartford, CT 06103

_____
Stefan R. Dandelles

241418.1