# EXHIBIT NO. 5

# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

120 North LaSalle Street, Chicago, Illinois 60602   Tel: (312) 704-0550   Fax: (312) 704-1522

*New York • Los Angeles • San Francisco • Washington, DC • Newark • Philadelphia • Baltimore • Miami • Chicago • White Plains, NY*
*Dallas • Albany, NY • San Diego • Houston • Garden City, NY • Boston • McLean, VA • Stamford • London*
*Affiliate Offices: Paris • Berlin • Cologne • Frankfurt • Munich*

www.wemed.com

December 13, 2004

**VIA FEDERAL EXPRESS**

William Erickson, Esq.
Day Berry & Howard
City Place I
Hartford, CT  06103

> RE:   Sharp, et al. v. PricewaterhouseCoopers, LLP (Case: 3:02CV1572 (MRK))
>       Our File No.: 06118.00003

Dear Billy:

We are in receipt of your correspondence dated November 4, 2004. We respond below in the same order your inquiries were made.

1.   Explain when Underwriter[s] made the decision to provide coverage to HHRG under the Underwriters' policy. As you know, this date is significant because it is a factor to be considered in evaluating whether a document concerning an insurer's analysis of whether a claim is covered under an insurance policy is a document prepared in the ordinary course of an insurer's business or whether the document is protected by the attorney-client privilege or work product doctrine. Here, we note that although notice was given of a potential claim on February 22, 2000, it was not until December 31, 2001, that Underwriters and HHRG entered into the settlement agreement (the "Settlement Agreement") through which Underwriters agreed to pay $[1]2.5 million to HHRG to settle such claims.

**RESPONSE: Your request for a date certain as to when Underwriters "made the decision to provide coverage to HHRG" calls for a response that contains privileged information. However, we can advise that such decision was made long before December 31, 2001, the date of the Settlement Agreement. Indeed, per our letter dated April 23, 2001, to Charles Lee of the Paul Hastings law firm (HHRG's counsel at the time its claim was submitted), we ackowledge on behalf of Underwriters that "a covered claim exists." (We attach the letter for your convenience.) In addition, we have produced to you, or you have otherwise obtained, all documents relevant to the investigation of coverage which are contained in the HSNO and Dempsey Myers & Co. files. Other documents between Underwriters and their counsel relate to settlement strategy, negotiations, and subrogation, and are therefore subject to both the attorney-client and work product privileges.**

238554.1

William Erickson, Esq.
Day Berry & Howard
Page 2 of 5

As I advised Dave Elliott in a teleconference on December 8, 2004, WEMED was retained as legal counsel, not claims administrators or adjusters. WEMED did not conduct an independent investigation of the facts giving rise to the claim – HSNO, Dempsey Myers, and perhaps others did that. WEMED did not interview witnesses. WEMED did not inspect the Hermes vault or Panexim's refinery, or even HHRG's operations in Connecticut. WEMED conducted a legal analysis of coverage issues and immediately began to explore and opine on subrogation issues. Accordingly, we believe any WEMED generated documents are subject to the work product doctrine. Further, any correspondence between WEMED and Underwriters or the other law firm engaged by Underwriters (discussed further below) is subject to the attorney-client privilege.

2. Please indicate the company, law firm, or entity with which each person listed on the log is affiliated so that we can determine if the various listed reasons for not producing particular documents are valid.

**RESPONSE**: We believe Underwriters' privilege log has properly identified the entity with which each person listed on the log is affiliated. If there is anyone in particular that you believe has not been properly identified, please so advise.

3. With respect to each person listed on the log who is an attorney, please indicate the law firm with which such attorney was affiliated and what entity such attorney represented. This information is essential in order for us to determine if your claims of attorney-client privilege are valid. For example, document UL-1704 which you claim is protected by the attorney-client privilege, is an e-mail correspondence between an attorney at Wilson Elser ("WEMED") and Lisa Wright at AIG. AIG is, of course, an insurance company. Was AIG a Wilson, Elser client at this point in time such that the attorney-client privilege applies?

**RESPONSE**: As noted above, we believe each individual is properly identified, and to the extent any attorney is listed as an author or recipient of privileged information on Underwriters' privilege log, such attorney represents Underwriters. As we are sure you are aware, "Underwriters" is not an entity, per se, but rather, as referred to in the context of this matter, a group of London market underwriting syndicates and insurance companies that subscribe to the Policy issued to Rothschild Continuation Ltd. Accordingly, AIG is one such company subscribing to the Policy and therefore is a client of WEMED at all relevant times.

With respect to specific documents, we again address your inquiries in the order they are made.

1. UL-01294; [. . .]: Explain the relationship between WEMED, "Kennedys," and P. Spibey and why that relationship leads you to the conclusion that these documents are protected by the attorney-client privilege.

**RESPONSE**: Paul Spibey is a solicitor with the London law firm Kennedys. Kennedys was retained by Underwriters to work together with WEMED to address issues

of English law implicated by HHRG's claim and potential subrogation. (As you may be aware, the Policy is subject to English law.) Accordingly, the documents in question are protected by the attorney-client privilege.

2. UL-01339-01341; UL 01342-01343; UL 01344-01345: Explain the relationship between WEMED and Ebsworth & Ebsworth (and Patrick Monahan of that entity) and why you believe communications with this person and entity are protected by the attorney-client privilege.

**RESPONSE**: Ebsworth & Ebsworth (and Patrick Monahan of that entity) is an Australian law firm engaged by Underwriters (via WEMED) to consider and advise on aspects of Australian law implicated by this matter, and therefore the subject communications are protected by the attorney-client privilege. (As you know, HHRG's parent company, Golden West Refining Corp., is an Australian entity.

3. UL-01339-01341; [. . .] Explain the relationship between WEMED and R. Cook and why you believe communications with this persona re protected by the attorney-client privilege. It appears that R. Cook was affiliated with Alleghany Underwriters (see UL 01273). Even if this entity was a WEMED client, we would have expected to see in your production documents concerning this entity's analysis of whether there was coverage under the Underwriters policy for the claims presented by HHRG. We are especially interested in your justification for withholding UL 01536, UL 01537, UL 01540, UL 01541-48, and UL 01551-553 because these appear to be classic claims coverage documents created at least one year before Underwriters entered into the Settlement Agreement. We believe these documents are not protected by the attorney-client privilege or work product doctrine.

**RESPONSE**: Richard Cook was the individual at Alleghany Underwriting, the managing agent for the Lead Underwriter on the Policy (at the time), who was responsible for the HHRG claim and with whom WEMED most frequently communicated. Accordingly, the subject documents are subject to the attorney-client privilege.

With respect to those in which you are "especially interested", we cannot respond to what you term "classic claims coverage documents" as we do not know how you define such term. However, the fact that certain documents were created one year before the settlement agreement does not remove such documents from the scope of attorney-client privilege or work-product doctrine. For example, Underwriters' analysis of coverage under the Chubb and Hiscox Policies is directly in relation to any contemplation of potential litigation against those entities, and as you know, Underwriters did pursue litigation against Chubb arising from this matter. Further, as noted above, the decision that the Policy afforded coverage for HHRG's claim was made long before the settlement agreement was executed. Accordingly, such documents are protected by both attorney-client privilege and the work-product doctrine.

4. UL 01385-01391: Explain the relationship between WEMED and Aon that leads you to the conclusion that this document is protected by the attorney-client privilege. We note

William Erickson, Esq.
Day Berry & Howard
Page 4 of 5

that numerous documents to and from Aon were already produced by Underwriters, and, even if the privilege applied, it has probably been waived.

**RESPONSE: Enclosed find documents UL01385-01391.**

5. UL 01404-01405; UL 01719-01745: Explain the relationship between R. Cook and Phil Kalban and Charles Lee that leads you to the conclusion that these documents are protected by the attorney-client privilege. As we understand it, Charles Lee of Paul, Hastings was counsel to Underwriters' assured, HHRG, and Phil Kalban of Fischbein, Badillo was counsel to Underwriters concerning all matters relating to claims against Chubb or Hiscox (see Settlement Agreement, page 11.) Are you claiming that an attorney-client relationship existed between R. Cook and Attorney Kalban? If so, explain how the attorney-client privilege applicable to these documents, if any, was not waived when these documents were transmitted to HHRG's counsel

**RESPONSE: Enclosed find documents UL01404-01405. With respect to documents UL01719-01745, as indicated, the document contains handwritten notes of Dan McMahon of WEMED which constitute privileged work product and/or contain privileged attorney-client communications.**

6. UL01425; UL 01454: Explain why you believe these documents are not classic claims coverage document created before Underwriters entered into the Settlement Agreement.

**RESPONSE: Again, your term "classic claims coverage document" is undefined and therefore we cannot respond specifically to that. However, with respect to the documents noted, Underwriters' privilege log with respect to document UL01425 clearly indicates it is correspondence "regarding analysis of potential recovery claims" and therefore, is in contemplation of Underwriters' subrogation claims; second, UL01454 is correspondence between client and counsel and therefore, subject to the attorney-client privilege. Simply because it occurs prior to execution of the settlement agreement does not mean it is not protected by the privilege.**

7. UL 01455-01456; UL 01457-01459: Explain the relationship between WEMED and Paul Willmott of ERC Group and why you believe these documents are protected by the attorney-client privilege.

**RESPONSE: The ERC Group was a client of WEMED at all relevant times and therefore communications with Paul Wilmott of ERC Group are subject to the attorney-client privilege.**

8. UL 01526; UL 01560-01562: Explain the relationship between WEMED, R. Cook and K. Chaplin which leads you to believe that these documents are protected by the attorney-client privilege. In particular, UL 01526, described as an e-mail correspondence "regarding coverage analysis," appears to be documents concerning Underwriters' analysis of

whether there is insurance coverage for HHRG's claims. We see no basis for your decision not to produce this document.

**RESPONSE: The subject documents are enclosed herewith.**

9.  UL 01529-01530: Provide further information regarding K. Rowley and Lydia Laboy (i.e., the entities for whom they work and the relationship between these persons and such entities.) You have not provided us with enough information to make a determination of whether your decision to withhold this document from production is proper.

**RESPONSE: Kathie Rowley and Lydia Laboy are non-attorney employees of WEMED. Ms. Rowley forwarded correspondence containing attorney-client communications to Ms. Laboy to be forwarded to Richard Cook, at the request of Dan McMahon.**

10.  UL 01554-01559; [. . .] As with the documents noted in paragraph 5 above, explain the relationship between, on the one hand, WEMED and the other persons and entities listed as having sent or received these documents and, on the other hand, Phil Kalban that leads you to the conclusion that these documents are protected by the attorney-client privilege.

**RESPONSE: As you know, Phil Kalban was retained by Underwriters to pursue the subrogation action against Federal Insurance Company (a Chubb Company). As there is significant overlap in the facts and circumstances giving rise to the matter prosecuted by Mr. Kalban and those actions pursued by WEMED, frequent privileged communications were exchanged between Underwriters, this firm and Mr. Kalban's firm.**

We also enclose additional documents from our clients' claim file, including Bates range UL 01999 – UL 02172. We trust this correspondence with its enclosures eliminates or at least significantly narrows your concerns on the privilege issues. If you have any additional questions regarding this matter, please feel free to contact us.

Very truly yours,

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**

Stefan R. Dandelles

SRD/ll
Enclosures
cc:   Edward Boyle – WEMED NY (*via interoffice—without enclosures*)
      Daniel McMahon – WEMED CH (*via interoffice—without enclosures*)