# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendants | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION NO.<br>3:02 CV 1379 (MRK) |
| ALEC SHARP, et al.<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | : <br> : <br> : <br> : <br> : <br> : <br> : | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK)<br><br>AUGUST 12, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE THE EXPERT TESTIMONY OF R. GENE BROWN

### PRELIMINARY STATEMENT

Plaintiffs, Handy & Harman Refining Group ("HHRG") and Golden West Refining Corp. ("GWRC"),[1] move to preclude the testimony of defendant

---

[1]     HHRG and GWRC are referred to collectively as "Plaintiffs" and are moving jointly to preclude this testimony.

PricewaterhouseCoopers, LLP's ("PwC") disclosed expert, R. Gene Brown ("Brown"). PwC has proffered Brown as an expert in corporate governance who will testify that GWRC's board of directors and HHRG's board of directors and management "failed to exercise reasonable care" and that those failures "were a substantial contributing factor to HHRG business losses."[2]

Brown's opinion is clearly inadmissible under that line of federal court decisions beginning with <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S. Ct. 2786 (1993), and <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 119 S. Ct. 1167 (1999), for three separate reasons. First, his opinion lacks the minimum threshold of reliability necessary for admission under Federal Rule of Evidence 702. Second, he is not qualified under Rule 702 to deliver his opinion to the jury. Finally, his opinion will not "assist the trier of fact to understand the evidence or to determine a fact at issue." <u>See</u> Rule 702. Each of these requirements is a prerequisite to admissibility under Rule 702 of the Federal Rules of Evidence. <u>Nimely v. City of New York</u>, -- F.3d --, 2005 WL 1620481 **11-12 (2d Cir., June 27, 2005).[3]

A.    **The Nature of the Case and Defense.**

Plaintiffs seek to recover the damages they each sustained as a result of the PwC's failure to perform a proper audit of HHRG's financial statements. In conducting its audits in 1997 and 1998, PwC became aware that an HHRG employee

---

[2]    Brown's opinion is contained in his July 7, 2005 Expert Report. (the "Report") A full copy of his Report is attached hereto at Tab 1. He was deposed on July 21, 2005. Relevant excerpts from his deposition transcript are attached hereto at Tab 2.

[3]    A copy of this decision is attached hereto at Tab 3.

was making unsecured advance payments to South American precious metals vendors. (Panexim in Peru and Orion in Chile). PwC knew that such unsecured advances were against HHRG policy. PwC expressly recognized that prevention of unsecured advances was a "critical matter" and represented to HHRG that, as part of its audit, it would assure that unsecured advances would not be made. Unsecured advances by HHRG also violated GWRC's credit policy and HHRG's financial covenants with Fleet Bank, one of its principal lenders.

Despite knowing the significance of unsecured advances, despite its awareness of the existence of such advances, and despite it assurance to HHRG about them, PwC failed to report to HHRG's and GWRC's boards that HHRG had made unsecured advances to South American companies to finance the payment of value-added tax. PwC also failed to advise the boards that internal controls at HHRG were insufficient to prevent unsecured advances of funds for use by foreign companies. As a result of PwC's failure to bring these advances and the inadequacies of the internal controls to the attention of HHRG's and GWRC's boards, by the time the boards discovered these unsecured advances in 2000, the amount of unsecured advances had grown to over $12 million. HHRG was forced to file bankruptcy in March, 2000 and, shortly thereafter, GWRC was de-listed on the Australian Stock Exchange and was forced into the Australian equivalent of bankruptcy protection. Both companies have been forced to liquidate their assets, and have suffered the complete destruction of their going concern value.

3

In response to Plaintiffs' claims, PwC has alleged affirmative defenses contending that the negligence of GWRC and HHRG, their agents and representatives in very specific actions and failures to act concerning the advances made to Orion and Panexim, caused their respective losses.[4]  It proffers Brown's testimony in support of these narrow affirmative defenses.

**B.    Brown's Report and Opinion.**

Brown's opinion consists of four separate legal conclusions.  He states:

> The GWRC Board of Directors <u>failed to exercise reasonable care</u> in its oversight of HHRG's business.

> The management and Board of Directors of HHRG <u>failed to exercise reasonable care</u> in performance of their responsibilities.

> <u>These failures</u> permitted imprudent HHRG management practices to continue, <u>resulting in business losses</u> from HHRG's transactions with Panexim

> Taken individually and together, the failures of both GWRC and HHRG Boards of Directors and by HHRG management to exercise reasonable care in the conduct of their duties were <u>a substantial factor contributing to HHRG's business losses.</u>

---

[4]    PWC asserts as its Fourteenth Affirmative Defense to HHRG's Complaint that HHRG's losses were caused by HHRG's own negligence in that HHRG, "and/or it agents representatives failed to review, to obtain, or properly to analyze or construe information available to Plaintiff concerning the advances made to such entities as Orion, Darwill, Ladison and Panexim." <u>See</u> PWC Answer and Affirmative Defenses dated May 24, 2004.

In its Ninth Affirmative Defense to GWRC's Second Amended Complaint, PWC asserts that GWRC's losses were caused by its own negligence in that GWRC "and/or its agents or representatives failed to review, to obtain, or properly to analyze or construe information available to GWRC concerning HHRG's business transactions with South American entities such as Casa Diana and Panexim and with other businesses and enterprises." <u>See</u> PWC Answer and Affirmative Defenses dated November 24, 2004.

Report p. 3 (emphasis added). In his Report Brown identifies ways in which he believes that Plaintiffs' boards and HHRG's management violated their respective duties of "reasonable care." His support for each purported violation is a summary of selected evidence culled from his review of depositions and documents. He also claims to rely on fifty years of experience as a board member of various companies;[5] however, he has <u>no</u> experience whatsoever with the business that is the subject matter of this action – the precious metals refining business – nor does he have any knowledge of or experience with the law that governs the actions of the HHRG and GWRC boards – the laws of Connecticut and Australia.

## ARGUMENT

### I.    THE COURT'S CRITICAL ROLE IS AS A GATEKEEPER FOR EXPERT OPINION.

As the Supreme Court made clear in <u>Kumho Tire</u>, the District Court judge acts as a "gatekeeper" ensuring that expert testimony is both relevant and reliable. This function applies to all expert testimony that relies on specialized knowledge or experience, not just to scientific testimony. <u>See</u> <u>Brooks v. Outboard Motor Marine Corp.</u>, 234 F.3d 89, 91 (2d Cir. 2000). As the Supreme Court explained, "where such testimony's methods . . . or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the

---

[5]    While Brown was a Certified Public Accountant, he has not practiced in over thirty years and he does not maintain a CPA license in any jurisdiction. Brown Tr. 31: 12-18. His Ph.D. in accounting is similarly outdated, have been granted in 1961, 44 years ago. Brown Tr. 133: 12.

knowledge and experience of [the relevant] discipline." <u>Kumho Tire</u>, 526 U.S. at 175

(internal citation omitted).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert

testimony in federal courts.[6]  The Court's evaluation of proffered expert testimony

under Rule 702 is especially important because of the threat expert testimony poses to

accurate factfinding.

> [E]xpert opinion can undermine the ability of the trier of fact to decide those issues correctly if the trier of fact is incapable of critically evaluating the reliability of that opinion. In addition, experts present themselves as people with special qualifications.  As a consequence, there is an "aura of infallibility." Thus, even where the trier of fact has some basis for questioning the expert's reliability, it may be disinclined to do so.  In an era when professional opinions of professional witnesses are available for purchase in virtually every field of science and technology, a jury's unquestioning deference to expert opinion may seriously jeopardize accurate factfinding.

29 <u>Federal Prac. & Proc.</u>, C.A. Wright & V.J. Gold, §6262, p. 182-83 (1997).

The Second Circuit has recently restated the District Court's role as

gatekeeper for the admissibility of expert testimony. <u>See</u> <u>Nimely</u>, 2005 WL 1620481

(2d. Cir. 2005).

---

[6]     Rule 702 provides that : "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact at issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts or the case.

> [A]s <u>Daubert</u> explained, Rule 702 governs the district
> court's responsibility to "ensure that any and all
> scientific testimony or evidence admitted is not only
> relevant, but reliable."

<u>Id.</u> at *12.  The Court also emphasized the significance of Rule 403 in the scrutiny of

expert testimony.

> [T]he Supreme Court, echoed by members of our own
> court, has noted the uniquely important role that Rule
> 403 has to play in a district court's scrutiny of expert
> testimony, given the unique weight such evidence may
> have in a jury's deliberations.

<u>Id.</u>   Therefore, expert evidence "may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

misleading the jury."  <u>Id.</u> (quoting Fed. R. Evid. 403).[7]  As Wright and Gold have

pointed out, expert testimony may be prejudicial merely by virtue of the fact that the

witness testifies as an "expert."

In <u>Nimely</u>, the court identified three separate requirements that proffered

expert testimony must meet in order to be ruled as admissible:  (1) the reliability of

the opinion; (2) the qualification of the expert to give the proffered opinion; and (3)

---

[7]        Indeed, at least one authority on Federal Court practice reasons that Rule 702 gives the Court
even greater authority to exclude testimony than does Rule 403:  "Rule 702 seems to require exclusion
of expert testimony unless, after weighing the costs and benefits, the court concludes that expert
testimony on balance will help the trier or fact to accurately 'determine a fact at issue.'  Thus, where the
balance appears even, there is no power to exclude under Rule 403 but the evidence may still be
inadmissible under Rule 702. Even where expert testimony will assist, Rule 702 merely states that it
"may" be admitted, suggesting there yet may be power to exclude.  Thus Rule 702 provides more
power than Rule 403 to exclude evidence where its dangers are balanced against benefits."  29 <u>Federal
Prac. & Proc.</u>, §6263, p. 195-96.

the opinion's ability to assist the trier of fact in understanding the evidence or determining a fact at issue. Brown's opinion fails each one of these requirements.

The required analysis under Rules 702 and 403 lead to the conclusion that Brown's testimony must be precluded.

## II.    BROWN'S OPINIONS ARE ENTIRELY UNRELIABLE.

Brown's proposed testimony fails the reliability test required by Daubert and Kumho Tire.

> In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that "the witness has applied the principles and methods reliably to the facts of the case."

Amorgianos v. Nat'l Railroad Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002). Daubert and Kumho Tire, while charging the district court with responsibility as the gatekeeper, also give the district court discretion in reaching its decision concerning reliability. The inquiry extends to all expert testimony, and is flexible. The Court must adapt the inquiry to the specific facts of each case. Amorgianos, at 266.

Rule 702 requires the Court to "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts to the case at hand." Amorgianos, at 267 (expert testimony properly precluded at trial because unreliable). The Court must

8

exclude expert testimony where the flaw in the expert's reasoning is large enough to determine that he lacks good grounds for his conclusion. Id. at 267-68.

### A.    Brown's Testimony Is Subjective and Personal, Rather than Objective and Verifiable.

Brown's testimony is not based on "reliable principles and methods." In large part, his opinion consists of general conclusions about the standard of care that he claims should apply to both HHRG and GWRC and general rules he contends govern all directors and officers anywhere in the world of any type of public or private company. His opinions are not grounded in any reliable legal, statutory or court established standard of director conduct.

Brown proposes to testify that the plaintiffs' boards violated the standard of reasonable care. His testimony however is unreliable and in most instances unrelated to and irrelevant as to the specific claims in the 6th and 14th Special Defenses. During his deposition, he was questioned about the source of his opinion. His explanation of the genesis of his opinion was both candid and remarkable.

> Let me tell you that the description of the roles and duties of boards of directors and management came right off the top of my head based on almost fifty years of studying, teaching and serving on the boards of private and public corporations. And it's as intuitive to me as a pediatrician taking the temperature of a sick child. I mean, it's just intuitive.[8]

Brown Tr. 115:1-9. He was vague about the source of his knowledge.

---

[8] The last teaching by Mr. Brown was in 1968, almost 40 years ago. His last formal education was the PhD in 1961.

9

> And there are on a – for those who serve as directors there are a multitude of documents which they are bombarded with, such as monthly subscription report[s] that lays out directors responsibilities and changes in compensation and audit committee responsibilities and blah, blah, blah, the professional literature that you read, and this all gets put into your head somewhere, but it doesn't – and you practice it, but you don't have a checklist that's codified anywhere that you read about directors responsibilities and duties.
>
> * * *
>
> I told you that I read as a matter of course on a monthly basis, management and board literature, and that all gets churned up and put somewhere in your data bank.

Brown Tr. 115: 10-21; 116:12-15.

In sum, he testified that the standards in his opinion are his own, intuitive conclusions off the top of his head from various unidentified sources. The manner in which he developed his view of Board responsibility, was unique to him. It was the product of the specific materials he received, which were then "churned up" and put in [his] head somewhere. The casual nature of his testimony aside, he was, in fact, stating that his view was personal, not verifiable or based on any common understanding of an industry standard. Even though, he believes that his opinion of corporate governance is the right one, regardless of where the board or company is located, his opinion is not grounded in any objective or industry specific standard. As such, it is not subject to peer review, is not testable and is not based on facts that can be analyzed, tested or cross examined. See U.S. v. Mitchell, 365 F.3d 215, 245 (3rd

Cir. 2004) (testability ensures the basic possibility of cross-examination). There is no basis for a trier of fact or this Court to evaluate his opinion for reliability. In effect, Mr. Brown states "the Board's duty is what I say it is because that's what I say." Fortunately, the Federal Rules of Evidence require a more rigorous analytical connection between the methodology and the expert's conclusion.

**B.    Brown's Testimony Should Be Precluded Because It Is Speculative and Unreliable.**

Brown concludes in a sweeping fashion that the combined impact of Plaintiffs' conduct over the course of a number of years became a "substantial factor contributing to HHRG's business losses." Report, p. 3.

> Reliability requires a sufficiently rigorous analytical connection between the methodology and the expert's conclusions. Nothing in Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert.

Nimely, at *12. When asked whether the individual violations of reasonable care he identifies caused HHRG's losses, he refused to give an opinion. When pressed, he could not testify that any of these alleged failures caused the Plaintiffs' losses. For example, one of the board responsibilities Brown cites in his Report is the need to set goals and objectives for the company. About that, he was asked:

> Q: That wasn't something that caused the loss we're all dealing with here, as far as you're concerned?
> A: Well, I'm not going to be able to point to individual factors, you know, on a broad basis the Board of HHRG

11

> and GWRC failed to exercise reasonable care. And if
> you want to go through these one by one, we can.
> Q: I do. I'm still trying to get an answer to my
> question that you feel the board did not set a long range
> goal for HHRG and as a result of that caused some loss.
> Is that your testimony, that not having some long range
> goal caused a loss here?
> A: No, and you're not going to get that answer from
> me on any of these individually because it was a matter
> of all of these taken together.

Brown Tr. 119:23-120:16. Further, Mr. Brown made no effort to link

his views on deficiencies in goal setting by the Board to the claims of

the special defenses as to the Panexim unsecured advances.

Later he was asked about HHRG's lack of "profit center reporting." He gave

a similarly inconclusive answer about causation.

> Q: Is your opinion that if [Plaintiffs] had profit center
> record keeping at HHRG that such profit center
> reporting would have avoided unsecured advances?
> A: It possibly could have.
> Q: Possibly could have; possibly couldn't have, right?
> A: Possibly, yes.
>
> * * *
>
> Q: So the losses in this case suffered by HHRG,
> because of unsecured advances to Panexim which were
> never repaid, now those losses are not the result of
> profit center accounting deficiencies; is that correct?
> A: I can't conclude that.
> Q: You can't conclude one way or the other?
> A: Neither can the Board.

Brown Tr. 189:16-190:13. This testimony can hardly assist the jury in considering the claims of the two special defenses relating to contributory negligence.

It became clear over the course of his deposition that Brown had not undertaken any analysis of the relationship of Board inadequacies he identified to discovery of the Panexim unsecured advances or the resulting of HHRG's losses. Experts must testify to probabilities, not possibilities. <u>Schultze v. Celotex Corp.</u>, 942 F.2d 204 (3rd Cir. 1991). On the issue of contributory negligence, Brown could not testify with any degree of certainty about the impact of the Boards' conduct on discovery of the Panexim unsecured advances or the resulting GWRC and HHRG damages. In fact, he admitted that he could not connect the negligence he identified to the actual losses. As such, his opinion is entirely unreliable and should be precluded.

**III.   BROWN IS NOT QUALIFIED TO RENDER AN OPINION ON THE STANDARD OF CARE APPLICABLE TO THE HHRG AND GWRC BOARDS' CONDUCT AND ITS IMPACT ON THE OPPORTUNITY TO DISCOVER THE PANEXIM UNSECURED ADVANCES TO PREVENT HHRG'S AND GWRC'S LOSSES.**

Rule 702 requires that a witness be qualified to render the particular opinion proffered by reason of "knowledge, skill, experience, education or training." Brown did not possess, nor can he provide any expert testimony useful to the jury on the

particular issue of the duties of a member of the Board of Directors of a Connecticut

or an Australian corporation operating in the precious metals refining industry.

Brown admitted a fundamental lack of familiarity or experience with the

precious metals refining industry in general, and HHRG's business in particular.  He

testified as follows:

> Q:  You were an auditor.  Did you ever have occasion
> to audit a company that was involved in precious metals
> refining?
> A:  No, sir.
> Q:   In your business school program, your MBA
> program, did you have occasion to do any study in any
> subject that would relate to precious metals refining?
> A:  No, sir.
> Q:   How about your Ph.D work, any experience in
> precious metals refining businesses?
> A:  None.
> Q:   I looked through your resume, and I didn't see
> anything that looked to me like it was related in any
> way to precious metals refining.  Am I correct?
> A:  You're correct.
> Q:  Am I correct that you have never served on a board
> of a company that was involved in precious metals
> refining?
> A:  Correct.
> Q:  Have you ever had anything to do as an officer with
> any company that was involved in precious metals
> refining?
> A:  No, sir.
> Q:   How about any company that had a … division
> involved in precious metals refining?
> A:  No, sir.

Brown Tr. 134:4-135:7.

> Q:  [Your qualifications state that] you served as a
> business executive in private and public corporations.

14

So in those capacities as a business executive, have you been involved in any company that had anything to do with precious metals refining?

A: No, sir.

Q: How about the importation of precious metals?

A: No, sir.

Q:  Any role at all, in a board or management or executive or consultant with any company or entity that ever did, as far as you can tell, any...amount of importation of precious metals?

A: No, sir.

Brown Tr. 137:8-22.

Brown has never testified as an expert in a matter involving claims in any way related to precious metals refining or the importation of precious metals, including payment for precious metals obtained from third world countries. Brown Tr. 137:23-138:16. His only knowledge of the industry comes from the depositions and exhibits he has reviewed in this particular case. This evidence may not be funneled through an "expert" and then repeated to the jury as expert testimony. PwC can present the testimony of fact witnesses and exhibits as evidence directly to the jury and ask it to reach its own determination.  The testimony of a knowledge-less expert is of no assistance to the trier of fact.

Moreover, Brown readily admitted during his deposition that he has no experience and no knowledge of Connecticut or Australian law relating to the role or duties of a director.

> Q: ...[Y]ou are not familiar with Connecticut law with
> respect to the duties of a member of a board of directors
> of a Connecticut corporation, correct?
> A: No, sir, I haven't looked at that.
> Q: Besides not looking at it, you don't have any
> personal knowledge from any source of what
> Connecticut law requires with respect to the duties of a
> board of directors?
> A: No, sir, I don't.

Brown Tr. 144:25-145:11.

> Q: Do you know what the standard of performance of
> board of director members under Australian law?
> A: No, sir.
> Q: In analyzing the duties of the board of Golden West
> Refining Company, what law were you applying?
> A: I wasn't applying any law.
> * * *
> Q: ...You're telling me that the testimony you'd give
> about the duty of a member of [a] board of directors
> applies with equal force to a corporation which is
> located in and governed by the laws of Australia?
> A: Yes.
> Q: And you don't have any idea what those laws of
> Australia are with respect to the duties of a member of
> the board of directors?
> A: I'm not familiar with Australian law.
> Q: And you made no attempt to become familiar before
> you entered your opinion; is that correct?
> A: That's correct.

Brown Tr. 179:15-181:5; see also 245:20-246:4.

Mr. Brown's lack of knowledge of the industry and of Connecticut law

disqualifies him from testifying about claimed deviation or failure of a board member

to meet the standard of care for a director of a Connecticut corporation, such as

HHRG. Moreover, he has offered no support for any opinion about how any specific

16

director's conduct related to Panexim situation and HHRG's losses.    Brown's experience as a board member of Advanced Micro Devices, a technology company in an unrelated industry, simply does not suffice to overcome his deficiencies in preparation, knowledge and analysis.    Ultimately, the expert "must do more than aver conclusorily that his experience led to his opinion."    <u>Roniger v. McCall</u>, 2000 WL 1191078, at *4.    Because he is not qualified and has not demonstrated the reliability of his opinion, Brown's testimony should be precluded.

## IV.    BROWN'S TESTIMONY WILL NOT ASSIST THE TRIER OF FACT.

The Second Circuit has repeatedly used the reliability analysis under Rule 702 to preclude expert testimony that threatens to usurp the role of either the judge or the jury.

> Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will "assist the trier of fact."    We have consistently held that,...<u>the expert that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it</u>," by definition does not "aid the jury in making a decision"; rather it "undertakes to tell the jury what decision to reach," and thus "attempts to substitute the expert's judgment for the jury's.

<u>Nimely.</u> at *12 (citations omitted) (emphasis added).[9]

Brown's opinion that HHRG and GWRC directors and management "failed to exercise reasonable care" and that they were required to exercise their "best business

---

[9]       A copy this decision is attached hereto at Tab 3.

judgment" is an impermissible statement of the legal standard of care. Admitting that he does not know the law in Connecticut or Australia with respect to the standard of care of a director of a corporation established under those jurisdictions. Brown bases his testimony "off the top of his head." For the following reasons, both his proposed testimony about the legal standard, and his misstatement of the law are separate and independently sufficient reasons for barring his testimony.

**A.    Expert Testimony Concerning Legal Standards Is Impermissible.**

"[E]very circuit has explicitly held that experts may not invade the court's province by testifying on issues of law." In re Initial Public Offering Securities Litigation, 174 F. Supp.2d 61, 64 (S.D.N.Y. 2001). The Second Circuit "require[es] the exclusion of expert testimony that expresses a legal conclusion." Hygh v. Jacobs, 961 F.2d 359, 363 (2d Cir. 1992) (expert's trial testimony objectionable because it communicated legal standard to jury); see also Marx & Co., Inc. v. Diners' Club. Inc., 550 F.2d 505, 508, 509-10 (2d Cir. 1977) (holding expert opinion inadmissible as it invaded court's duty to "instruct the jury as to the applicable principles of law"); AUSA Life Ins. Co. v. Dwyer, 899 F. Supp. 1200, 1203, (S.D.N.Y. 1995) (expert's assertion that defendant was not a corporation's "controlling person" within meaning of securities laws excluded because it infringed judge's role of instructing jury on the law).

The Connecticut Superior Court has described succinctly the danger of allowing experts to testify to legal standards.

18

> If jurors were exposed to a battle of experts about the proper interpretation of governing law, they might confuse the experts' testimony with the Court's instructions or worse, reject or modify the rules set forth in those instructions based on its own reaction to the more persuasive expert testimony.  It is not the jury's job to find the law; instead it must find the facts by applying the law, as the Court has instructed on it, to the credible evidence presented at trial.  Excluding expert testimony on points of law significantly reduces the risk that the jurors will step outside their own role as fact finders by finding the law as well.

Pepe & Hazard v. Jones, 2002 WL 31255522 (Conn. Super. Ct., Sept. 11, 2002, Sheldon, J.).[10] "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." Marx & Co., 550 F.2d at 509-10. See also In re Initial Public Offering Securities Litigation, 174 F.Supp.2d at 69 ("[I]t remains this Court's exclusive duty and province to "say what the law is")(citing Marbury v. Madison, 5 U.S. (I. Cranch) 137, 177, 2 L.Ed 60 (1803).

Brown's opinion rests entirely on his idiosyncratic view of directors' and officers' "duties" of "reasonable care" and "best business judgment." See e.g. Report, p.4. In his report, he identifies ways in which he believes the boards of GWRC and HHRG and HHRG management violated their duty of reasonable care.  Each violation has a duty or duties associated with it.  Brown's duties are per se rules of director and officer conduct.[11]

---

[10]    A copy of this decision is attached hereto at Tab 4.
[11]    For example, some of Brown's rules are (1) requirement for the Board's receipt of written rather than oral reports; and (2) attendance at Board meetings in person rather than by telephone. Brown Report, pp. 7, 25-26.

A violation of each such duty, according to Brown, constitutes a failure to exercise reasonable care. So presented, each duty becomes a standard or requirement that Brown will suggest should guide the jury in this case. If the jury finds Brown's individually defined standard has been violated, it may find that the Plaintiffs have not acted reasonably.

Brown has clearly stepped over the line of acceptable expert witness testimony. The standard of care for directors and officers under Connecticut law is mandated by statute, and articulated in case law. See Conn. Gen. Stat. 33-756, and Rosenfield v. Metals Selling Corporation, 229 Conn. 771 (1994) (discussing the business judgment rule as applied to the duties of directors and officers). The issue raised by PwC's sixth and fourteenth affirmative defenses is whether HHRG's and GWRC's boards and HHRG's management were negligent in not learning about unsecured advances to Panexim..

> Connecticut treats negligence as a breach of a duty. The existence and nature of the duty is a question of law to be determined by the court. It is only after the court has prescribed the applicable standard of care, that the trier of fact can determine whether the defendant has violated the standard and the duty.

Andrews v. Metro North Commuter Railroad Co., 882 F.2d 705, 709 (2d Cir. 1989) (holding that expert's trial testimony concerning the negligence standard of care was inadmissible). Because Brown's opinion relies so heavily on his general statements

about the Plaintiffs' duty of care, his entire opinion infringes on the role of the Court and must be precluded.

**B.     The Legal Standard Brown Applies is Incorrect, and Is, Therefore, Inadmissible.**

      **1.     A Director Of A Connecticut Corporation Must Be Judged By Standards Established Under Connecticut Law.[12]**

Connecticut statutes and case law provide that a director must act with that degree of care expected from an ordinarily prudent director within the same industry. Section 33-756 of the General Statutes sets the legal standard for Board conduct.

> A director shall discharge his duties as a director, including his duties as a member of a committee: (1) in good faith; (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and (3) in a manner he reasonably believes to be in the best interests of the corporation.

§33-756(a). The statute expressly authorizes a director to rely on information, reports and statements from board committees, officers and employees, and public accountants under certain circumstances. §33-756(b). The statute also expressly limits directors' liability by stating that "[a] director is not liable for any action taken as a director, or any failure to take action, if he performed the duties of his office in compliance with this section." §33-756(e).

---

[12] Similarly, a director of an Australian corporation must be judged by the standards established under Australian law. Brown admitted he had no knowledge as to what those standards were nor did he know whether they were the same or different from those standards that governed directors of Connecticut corporation.

In <u>Rosenfield v. Metals Selling Corporation</u>, 229 Conn. 771 (1994), the Connecticut Supreme Court discussed what has become commonly known as the "business judgment rule." It cited favorably to the formulation of the rule in the American Law Institute's <u>Principles of Corporate Governance</u>. That formulation adds the following to the standard contained in Conn. Gen. Stat. §33-756(a):

> A director or officer who makes a business judgment in good faith fulfills the duty [of care] if the director or officer: (1) is not interested in the subject of the business judgment; (2) is informed with respect to the subject of the business judgment to the extent the director or officer reasonably believes to be appropriate under the circumstances; and (3) rationally believes that the business judgment is in the best interests of the corporation.

<u>Rosenfield</u>, 229 Conn. at 785-86 n. 17 (quoting 1 A.L.I. <u>Principles of Corporate Governance</u>, §4.01(1994)). It is worth noting that Brown makes no reference to and was apparently unaware of the ALI <u>Principles of Corporate Governance</u>.

Nearly 100 years ago, in <u>Lippett v. Ashley</u>, 89 Conn. 451 (1915), the Connecticut Supreme Court of Errors emphasized the need for the trier of fact in determining whether directors had complied with their duty of care to consider the industry within which the directors were operating. In that case, the court held that the appropriate standard of care for a savings bank director was that level of care expected of a reasonably prudent savings bank director.

> [T]he reasonable care which the law requires of savings bank directors is that degree of care which might be expected of reasonably prudent directors, having regard

22

> to the reasonable usages of the business, as well as to
> the statutes, and to the charter and the by-laws of the
> corporation.

Id. at 475.

The Court identified three sources for guidelines to consider when evaluating a director's standard of care: (1) usage of the business; (2) statutes; and (3) the corporations bylaws and charter. It is significant that Brown does not have any experience and did not research or consider, any of these guidelines for either HHRG or GWRC directors: (1) he has no experience in the precious metals refining industry; (2) he did not review either Connecticut or Australian law in preparation of his Report; and (3) neither HHRG's or GWRC's charter or bylaws are included in the list of documents reviewed in Appendix B of his report. Thus, Brown is not qualified under Rule 703 to opine of the relevant standard of care, even if such testimony were admissible on another basis.

The relevant business which must be considered in this case is the precious metals refining industry. The statutes governing the directors and officers are those of Connecticut, where HHRG is incorporated and had its principle place of business. As to GWRC, an Australian Corporation, Australian law must govern. The relevant corporate documents (bylaws and charters) are those of both GWRC and HHRG. Brown testified at his deposition, however, that he has no experience with the precious metals business. Brown Tr. 134:4-135:7; 137:8-138:16. He further testified he did not know where HHRG was incorporated, Brown Tr. 142:24-25; and admitted

23

that he has no knowledge of the law in Connecticut or Australia.  Brown Tr. 142:24-143:9; 144:25-145:11 (Connecticut law); and 179:15-181:5; 245:20-246:4 (Australian law).  Thus, he cannot testify regarding the duty of care established by the statutes of either jurisdiction, let alone testify to whether or not Plaintiffs violated the established duty of care.

### 2.     Brown's Approach Conflicts Sharply With Connecticut Law.

Brown's opinion is extraordinarily prejudicial because Brown ignores the Connecticut standard for board members and claims the duties and responsibilities of a board member are not driven by any state or federal law.  Brown Tr. 143:10-144:4. Connecticut's standard requires the trier of fact to consider all of the circumstances surrounding a board's decision, including the circumstances of the particular industry involved, and the standards of that industry.   In other words, Connecticut law contemplates that directors' duties will require different decisions under different circumstances.   Thus, each decision or action of a Connecticut board must be evaluated independently under the Connecticut legal standard.

In stark contrast to Connecticut's standard, Brown uses two general standards: (1) a duty of "reasonable care"; and (2) a duty to use "best business judgment."  His "reasonable care" standard oversimplifies the duty of care analysis and, in so doing offers no grounding in the specific facts of this case. He misstates the appropriate standard of care described in the preceding section by arguing for a "best business judgment" requirement.

In his claim that directors must use their "best business judgment", Report, p. 4, Brown introduces a formulation which finds no support in Connecticut law. To the contrary, Connecticut courts have expressly recognized that directors must follow a business judgment rule as outlined in the Connecticut Statutes. Directors are protected by statute when they rationally believe that the business judgment is in the best interests of the corporation. See Rosenfield, supra. Brown states, however, that directors must use "best" business judgment which he does not define. A jury hearing Brown testify to this standard as an expert will clearly be confused when they hear the Court's instruction concerning directors' and officers' duties of care. At a minimum Brown's use of a "Best Business judgment rule" will not assist the jury.

Finally, Brown identifies a series of board duties he claims apply regardless of the circumstances. Two examples illustrate the problem with his approach and his failure to study the relevant law. First, by way of example, he testified that "board members cannot exercise reasonable care based on oral presentations" by management. Brown Tr. 174:24-25, 175:1-14, 177:10-178:16. According to his rule, oral presentations by management are insufficient regardless their content. This opinion is based on personal experience only. Brown Tr. 176:21-178:16.

The second example is his statement that a board member who attends 70% of board meetings in person or by phone is derelict in his duties. Report, p. 25; Brown Tr. 213:4-13.. Putting aside the impossibility of proving that attendance at seven out of ten board meetings somehow caused HHRG's Board not to realize unsecured

advances were being made to Panexim (Spec. Def. 6th and 14th), his opinion once again flatly contradicts Connecticut law.  Section 33-748 of the General Statutes authorizes directors to attend board meetings by telephone and treats such attendance as "present in person".[13]  Mr. Brown's glaring lack of knowledge of Connecticut law is not surprising given his failure to acquaint himself with the law of this state. Nevertheless, this lack of knowledge renders his testimony on this point unreliable and inadmissible.

These examples highlight the danger inherent in allowing someone completely unfamiliar with the relevant law to testify about the duties of care for corporate directors.   Brown's view of the requirements of a director differs dramatically from the correct legal standard Brown's opinion will likely confuse or mislead the jury, and threaten the integrity of the jury's conclusions.  Accordingly, he should be precluded from testifying.

**C.    Brown's Legal Conclusions Are Inadmissible.**

Brown's opinion that Plaintiffs did not "exercise reasonable care" is a legal conclusion tantamount to testifying that Plaintiffs were negligent. See Hoelter v. Mohawk Serv., Inc., 170 Conn. 495, 501 (1976) (common law negligence is the failure to use reasonable care under the circumstances).  His opinion that Plaintiffs' alleged failures were a "substantial factor contributing to HHRG's losses" is nothing

---

[13]    Under §33-748(b), a director is deemed to be "present in person" at board meetings through any means of communication that allows all directors to "simultaneously hear each other" throughout the meeting.

26

less than a statement that Plaintiffs' alleged conduct was a proximate cause of HHRG's damage. See Doe v. Mannheimer, 212 Conn. 748, 757-58 (1989). (the "test of proximate cause is whether the defendant's conduct is a 'substantial factor' in producing plaintiff's injury").

Although federal courts have abandoned the complete prohibition of experts testifying to the ultimate issue, Rule 704, they have not opened the floodgates to such opinion testimony.

> The closer the subject of the opinion gets to the critical issues, the likelier the judge is to require the witness to be more concrete because the jury is not helped by a witness that merely tells it what result to reach.

United States v. Allen, 10 F.3d 405 (7th Cir. 1993).  Thus, courts have precluded experts from testifying that a defendant has acted negligently, Andrews v. Metro-North Railroad, 882 F.2d 705 (2d Cir. 1989), and precluded testimony that a defendant has breached a fiduciary duty.  Montgomery v. Aetna Casualty & Surety Co., 898 F.2d 204 (11th Cir. 1990).  Brown's testimony suffers the very same flaw as the experts' testimony in Andrews and Montgomery.

An expert witness may not testify to factual conclusions that effectively tell the jury what result to reach.  See Ingber v. Enzor, 841 F.2d 450 (2d Cir. 1988), (expert testimony "clearly inadmissible" where witness sought to opine "regarding the ultimate question of whether [defendant's] conduct amounted to breach of fiduciary [duty]); Marx & Co., 550 F.2d at 510 (expert's conclusions that defendant

did not use its "best efforts promptly to file" registration statement and that it "had no

legal excuses for nonperformance" were inadmissible); Roninger v. McCall, 2000

WL 1191078, at *5 (S.D.N.Y. Aug. 22, 2000) (Sweet, J.) (granting in part motion in

limine to exclude expert testimony where expert opined as to whether party's job

search was "reasonable," "active and proper," "vigorous," "serious," etc.).[14]

For example, in Primavera Familienstifung v. Askun, 130 F. Supp.2d 450,

528-529 (S.D.N.Y 2001), the district court held that proposed expert testimony was

inadmissible because the expert "[sought] . . . to supplant . . . the role of the jury

interpreting the evidence." Id. at 529. In that case, plaintiffs asked their finance

expert to examine whether defendant securities brokers complied with their

contractual obligations, "adhered to the covenant of good faith and fair dealing," and

conducted their actions in a "commercially reasonable manner." Id. at 486. The

expert reported that the defendants breached their contractual responsibilities and

acted in a commercially unreasonable manner and in contravention of the implied

covenant of good faith and fair dealing. Id. The Court excluded the testimony

because it was saturated with "opinions and conclusions directed at telling the jury

what decision to reach." Id. at 529. Yet telling the jury what decision to reach is

precisely what Brown proposes to do.

---

[14]    A copy of this decision is attached hereto at Tab 5. See also Fed. R. Evid. 704 advisory
committee's note cautioning that "opinions which would merely tell the jury what result to reach" are
inadmissible.

As the Second Circuit recently stated in <u>Nimely</u>, expert testimony that usurps the role of the jury in applying the law to the facts "by definition does not 'aid the jury in making a decision.'" Nimely, at *12. Brown's opinions concerning the duty of care and proximate cause do not in any way assist the jury. Accordingly, Brown should not testify as to his conclusions on the evidence selects by defense counsel and provided to him.

**D.     Brown's Presentation of the Evidence Is Nothing More than Argument.**

An example symptomatic of the flaws found throughout the Brown opinion, is the conclusion that the GWRC board failed to exercise proper control over HHRG's CEO. <u>See</u> Report, pp. 15-16. In support of this statement, Brown selects excerpts from documents exchanged in discovery. He quotes GWRC board members who voiced frustration with the HHRG CEO's attitude toward GWRC board members and with the CEO's perceived determination to manage HHRG without input from GWRC. Yet the frustration, determination and obstinacy that Brown describes in detail are merely observations and conclusions of witnesses who will testify in this Court. Jurors simply do not need the assistance of an "expert" to filter this information for them. The Jury will be able to evaluate whether the GWRC board should have recognized a need to exercise additional control over the HHRG CEO.

Unfortunately, Brown does more than merely repeat the evidence he has been given by defense counsel, he acts as an advocate, selecting only the quotations and documents most favorable to the defendant.

A clear example of the danger of this process of selectivity concerns the argument by Brown that the Board of GWRC should have required HHRG management to establish profit center accounting management in its business. This is one of the sources of frustration for some GWRC board members expressed in memos used by Brown. Referring to memos on this topic, Brown suggests the GWRC Board's follow up was inadequate. When asked at his deposition whether profit center accounting would have avoided unsecured advances, the issue posed by the sixth and fourteenth special defenses, however, he testified "it could have," Brown Tr. 186, 187. Brown acknowledged he couldn't say if profit center accounting would have prevented or avoided the losses. Tr. 187-191.

In precluding expert testimony in a case involving the judgment of a board of directors for a telecommunications company and their counsel, Judge Milton Pollack issued a holding that could have been written for this case. Expressing his disapproval of the proffered expert testimony, he said:

> The standards of conduct espoused by the experts are not specialized knowledge; rather, in effect, the "experts" are called to express their legal conclusions on ethics and business oriented transactions. In a highly volatile industry with novel and unpredictable challenges, competitive conduct and timing factors such as those in the instant litigation, it would be inappropriate to consider the experts' personal assessments of the credibility of the situations involved, the sufficiency of the measures utilized in considering the business plans being pursued, the limits of unacceptable business risks, the evaluation of the means to deal with business choices presented to corporate officers and advisors, and the impact of self-interested conduct and the significance thereof.

> In short, the court should not shift to such witnesses the
> responsibility to give conclusory opinions and
> characterizations of the business conduct portrayed and
> to essentially decide the case.

GST Telecommunications, Inc. v. Irwin, 192 F.R.D. 109, 110-11 (S.D.N.Y. 2000) As

in Irwin, there is simply nothing that Brown offers that the jury cannot decide on its

own given the presentation of evidence and the charge from the Court on the law.

## CONCLUSION

For the reasons stated above, the proposed opinions and testimony of

defendant's corporate governance expert, R. Gene Brown, should be excluded.


THE PLAINTIFF,
HANDY & HARMAN REFINING
GROUP, INC.

By:

William H. Champlin III
(ct04202), Champlin@tylercooper.com
Michael T. McCormack
(ct13799), mmcormack@tylercooper.com
TYLER COOPER & ALCORN, LLP
CityPlace, 35th Floor
185 Asylum Street
Hartford, CT  06103
Tel:  (860) 725-6200
Fax:  (860) 278-3802

31

PLAINTIFF,
GOLDEN WEST REFINING CORPORATION

By: _____
Steven R. Humphrey
(ct06053)
shumphrey@rc.com
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103
Tel:  (860) 275-8221
Fax:  (860) 275-8299

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent via U.S. Mail on August 12, 2005 to:

Steven Greenspan, Esq.
Thomas Goldberg, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman
 & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Wilson, Elson, Moskowitz Edelman
 & Dicker LLP
120 North LaSalle Street
Suite 2600
Chicago, IL  60602

_____
William H. Champlin