## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1379 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP and | : | |
| COOPERS & LYBRAND, LLP | : | |
| Defendants | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al. | : | |
| Plaintiffs | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1572 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a | : | |
| PRICE WATERHOUSE, LLP | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1803 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP, | : | |
| Defendant | : | AUGUST 12, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE THE EXPERT TESTIMONY OF WILLIAM PINNEY

### I.    PRELIMINARY STATEMENT

Plaintiffs, Handy & Harman Refining Group ("HHRG") and Golden West Refining Company ("GWRC"), move to preclude defendant, Pricewaterhouse Coopers' ("PWC"), designated expert William Pinney ("Pinney") from offering expert testimony at trial. Pinney should be precluded from testifying because he does not have experience in the precious metals refining industry and he intends to testify

about how certain general conditions that could have affected the precious metals refining industry in 1999 and 2000 "could" have affected HHRG.  Mr. Pinney, however, performed no analysis with respect to whether such conditions did affect HHRG.  Pinney's opinions are unreliable, speculative, and will not assist the trier of fact.  Accordingly, the opinions should be precluded under Rule 702 of the Federal Rules of Evidence.

## II.    FACTS

### A.    PWC's Conduct Caused HHRG and GWRC's Losses

Plaintiffs seek to recover the damages they each sustained, inter alia, as a result of PwC's failure to perform a proper audit of HHRG's.  In conducting its audits in 1997 and 1998, PwC became aware that an HHRG employee was making unsecured advance payments to South American precious metals vendors.  (Panexim in Peru and Orion in Chile).  PWC knew that such unsecured advances were against HHRG policy.  PwC expressly recognized that prevention of unsecured advances was a "critical matter" and represented to HHRG that, as part of its audit, it would assure that unsecured advances would not be made.  Unsecured advances by HHRG also violated GWRC's credit policy and HHRG's financial covenants with Fleet Bank, one of its principal lenders.

Despite its knowledge of the significance of unsecured advances, despite its awareness of the existence of such advances, and despite its assurance to HHRG about them, PWC failed in its audit work or services to report to the board of directors of HHRG and GWRC, the existence of unsecured advances by HHRG in South America.  PWC failed further to advise the boards of directors of HHRG and

GWRC that internal controls at HHRG were insufficient to prevent unauthorized advances of funds. As a result of PWC's failures to bring these matters and other information to the attention of the HHRG and GWRC boards, HHRG never learned of the amount of unsecured advances and the fact that such advances were not collectable until after it was too late. HHRG was forced to file bankruptcy in March 2000 and GWRC was de-listed on the Australian stock exchange and placed in liquidation under Australian law in 2000.

PWC's negligence and breach of contract caused HHRG's and GWRC's businesses to be destroyed. HHRG's valuation expert, Craig Elson, opined that the discounted cash flow fair market value of HHRG was between $28.9 million and $30.7 million as of June 30, 1998 - the date on which PWC issued its 1998 audit opinion without notifying HHRG of the fact that it learned that unsecured advances were made to Panexim and Orion, for the payment of VAT and that internal controls were inadequate to prevent such unsecured advances. Additionally, GWRC has disclosed a valuation expert, Garry John Trevor, who opines that the market capitalization value of GWRC as of June 30, 1998 was $35.3 million and that GWRC also suffered additional creditor deficiency losses of approximately $6.634 million, for total separate damages of $41.1 million.

### B.    Introduction and Summary of Opinions at Issue in This Motion

PWC disclosed William Pinney as an expert witness offered to testify to the following opinions:[1] (1) during calendar years 1998, 1999 and 2000, HHRG's gross

---

[1] A copy of Pinney's report dated July 7, 2005 is attached as Exhibit A.

revenue was concentrated in refining "Old Scrap";[2] (2) HHRG had a leading share of silver refined in the United States; (3) reduction in Old Scrap supply in calendar year 1999 would cause lower demand for HHRG's primary refining services relative to calendar year 1998; (4) increasing worldwide unused precious metal refining capacity in calendar year 1999 would negatively impact margins as refiners competed for available supply; (5) HHRG suffered from materially increased financing costs in calendar year 1998 and 1999 as metal leasing rates for silver were significantly higher than prior periods; (6) during HHRG's fiscal year ended March 31, 2000, industry conditions deteriorated as compared to fiscal year ended March 31, 1999; and, (7) the fair market value of HHRG in fiscal year ended March 31, 2000 would have diminished relative to fiscal years ended March 31, 1998 and March 31, 1999.

Pinney has no relevant experience, however, with the precious metals refining industry. His experience is limited to investment banking and within that field he has no experience in companies whose business is precious metals refining. He has no experience with the financial operation of companies in the business of refining precious metals. Pinney Tr. 27:2-30:25. Pinney has never testified as an expert witness in regard to any aspect of the precious metals industry, or as an expert witness in any other industry, at anytime, before the assignment in this case. Pinney Tr. 54:4-55:4. Notwithstanding this lack of general experience as an expert witness, and lack of specific experience in the precious metals refining industry, Pinney offers to testify at trial that the fair market value of HHRG would have declined from 1998 to 2000.

---

[2] Pinney testified that his definition of "old scrap" means the "recycling of above ground metals after they've been used for other purposes." Pinney Tr. 57: 11-16. Copies of relevant portions of the deposition transcript of William Pinney are attached as Exhibit B. Specific portions are quoted in detail, infra.

Pinney, however, did not perform any work or analysis with respect to determining the value of HHRG at any time, whether 1998, 1999 or 2000.  He does not know or have an opinion of the value of HHRG at anytime in 1998, 1999, or 2000.  Pinney Tr. 56:18-57:4, 98:18-102:11.

Moreover, Pinney is offered to opine that a reduction in the overall supply of old scrap silver in 1999 could have caused a lower demand for HHRG's primary refining services in 1999 as compared to 1998.  Pinney did not perform any analysis of the facts, however, to support this conclusion.  He did not know whether the claimed reduction in supply of old scrap silver in 1999 affected HHRG financials in any way.  Pinney testified at his deposition:

> Q  (By Mr. Champlin) Are you able to tell from any analysis you made what impact actually occurred to HHRG's financials because of this drop of nine percent that you've analyzed in the available old scrap silver in North and South America?
>
> A  No I did not do that analysis.

Pinney Tr. 77:23-78:3.  See also Pinney Tr. 90:20-92:10.

Similarly, Pinney concludes without supporting evidence or analysis that excess capacity in the worldwide precious metals industry in 1999 would adversely affect HHRG's business.  Unfortunately, Pinney did not know what the precious metals refining capacity was worldwide in 1999.  Pinney Tr. 82:8-83:8.  He also did not know how the conditions in the industry in general affected HHRG.  Pinney Tr. 83:16-88:1.

Finally, Pinney offers testimony without foundation that in 1998 and 1999, HHRG's value would suffer from increased financing costs that were evident in the

5

precious metals refining industry. Pinney, however, does not know what HHRG's financing costs were during those years and he does not know how conditions that may have existed in the general industry affected HHRG, if at all. Pinney Tr. at 88:2-88:17. Mr. Pinney did not analyze detailed financial information and credit facility data available concerning HHRG for the periods 1998, 1999 and 2000.

In sum, William Pinney intends to testify at trial that the market conditions that he believes existed in 1999, could have adversely affected HHRG's value in 2002 without having reviewed any data or performed any analysis to determine whether HHRG was in fact affected by such conditions. Pinney's opinions are purely speculative and are not supported by any reliable data or analysis. Pinney should not be permitted to testify as an expert witness at trial.

## III.    LEGAL DISCUSSION

### A.    Rule 702 Guides the Court's Critical Role as a Gatekeeper for Expert Opinion

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion. The rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. To be admissible under Rule 702, expert testimony must be both relevant and reliable. "[T]o be reliable, expert testimony must be based on sufficient facts or data and it must be the product of reliable principles and methods properly applied." Lippe v. Bairnco Corporation, 288 B.R. 678, 686 (S.D.N.Y. 2003)(granting

6

motion to preclude expert who did not analyze in detail information that was available to him). To be relevant, the expert's opinion must assist the trier of fact in understanding the evidence or determining a fact in issue. Fed. R. Evid. 702; Lippe, 288 B.R. at 687. Even if expert evidence is relevant, however, expert evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Nimely v. City of New York, -- F.3d --, 2005 WL 1620481 **11-12 (quoting Fed. R. Evid. 403)(copy attached as Exhibit C).

The decision whether to admit expert testimony under Rule 702 rests within the sound discretion of the trial court. General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512 (1998). In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 593-94, 113 S.Ct. 2786 (1993), the United States Supreme Court held that trial court should consider the reliability of expert opinion under Rule 702 before allowing the testimony of an expert. See also Nimely, 2005 WL 1620481 at 12.

As the Supreme Court made clear in Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-149, 199 S. Ct. 1167 (1999), the District Court judge acts as a "gatekeeper" ensuring that expert testimony is both relevant and reliable. This function applies to all expert testimony, not just scientific testimony. See also Brooks v. Outboard Motor Marine Corp., 234 F.3d 89, 91 (2d Cir. 2000). The factors identified in Daubert are not a definitive checklist and they may or may not be pertinent in assessing the reliability of an expert's opinion in a particular case. Kumho Tire Company v. Carmichael, 526 U.S. at 150.

The analysis to be applied when determining the reliability of an opinion under Rule 702 depends on the particular circumstances of the particular case at issue. Id. at 151. As the Kumho Court explained, "where such testimony's factual basis, data, principles, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline." Kumho, 526 U.S. at 149 (internal citation omitted). The trial court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same

7

level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152.

"Both Daubert, and Kumho, make clear that the day of the expert who merely opines and does so on the basis of vague notions of experience is over. Experts are now held to a level of accountability, that requires factual predicates, in historical fact, or in competent evidence, which allows a factfinder to independently verify the accuracy of the expert's results." Kemp v. Tyson Seafood Group, Inc., 2000 WL 1062105 at *7 (D. Minn. 2000) (copy attached as Exhibit D) (granting motion to preclude expert opinion on plaintiff corporation's future market value when the opinion was not predicated upon plaintiff's historical data).

The Second Circuit has recently restated the District Court's role as gatekeeper for the admissibility of expert testimony.

> [A]s Daubert explained, Rule 702 governs the district court's responsibility to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."
>                    *  *  *
> Rule 702 requires the district court to fulfill the "gatekeeping" function of mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.
>                    *  *  *
> Nothing in either Daubert or the Federal Rules of evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

Nimely, 2005 WL 1620481 at **11-12 (2d Cir., June 27, 2005) (citations omitted). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of unreliable opinion testimony." Amorgianos v. National Railroad Passenger Corporation, 303 F.3d 256, 266 (2d Cir. 2002).

The analysis that this Court must conduct under Rule 702, <u>Daubert</u>, and <u>Kumho</u>, clearly leads to the conclusion that Pinney's testimony should be precluded because his opinions are speculative and unreliable.

**B.    Pinney's Opinions Are Entirely Unreliable.**

**1.    Pinney's Opinion that Reduction in Old Scrap Supply in Calendar Year 1999 Would Cause Lower Demand for HHRG's Primary Refining Services Relative to Calendar Year 1998 is not Supported by Any Reliable Data Considered by Pinney**

In his report, Pinney states that "North and South American regional supply Old Scrap Silver increased steadily from 1994 through 1998, declined in 1999, and recovered somewhat in 2000." Pinney Report at p. 4. He further states that "[o]n a worldwide basis calendar 1999 supply to refiners of both Silver and Gold Scrap declined from 1998 levels, falling 10% and 44% respectively." <u>Id.</u> He adds:"[i]n HHRG's primary markets, North and South America, Old Scrap Silver supply dropped 9%." <u>Id.</u> at p. 2. Old scrap gold supply, in North and South America, increased in 1999. From this, Pinney opines that the reduction in old scrap supply worldwide in calendar 1999 would cause lower demand for HHRG's primary refining services relative to calendar 1998, which would adversely affect HHRG's financial condition. <u>Id.</u> Pinney's opinion, however, is unreliable and without foundation because he does not know what impact, if any, the reduction in worldwide old scrap supply had on HHRG. Absent data or facts to support the opinion, the opinion is unreliable and, therefore, inadmissible. <u>Amorgianos v. National Railroad Passenger Corporation</u>, 303 F.3d at 266; <u>Lippe v. Bairnco Corporation</u>, 288 B.R. at 686.

When asked at his deposition about his analysis of the reduction in old scrap silver supply and the impact that actually occurred to HHRG, Pinney testified as follows:

> Q  (By Mr. Champlin)  Are you able to tell from any analysis you made what impact actually occurred to HHRG's financials because of this drop of nine percent that you've analyzed in the available old scrap <u>silver</u> in North and South America?
>
> A  No I did not do that analysis.

Pinney Tr. 77:23-78:3 (emphasis added).  When asked at his deposition whether he analyzed the affect of the increase in old scrap <u>gold</u> supply in 1999 on HHRG, Pinney admitted that he had not.  Specifically, he testified:

> Q  Did you make any analysis of the affect of the increase in old scrap gold supply in 1999 on the financial results of HHRG?
>
> A  No.
>
> Q  Did you make any analysis of the financial results for HHRG of the situation with the change in gold availability between 1998 and '99?
>
> A  No.

Pinney Tr. 78:14-21.  Pinney further admitted that he did not know any specifics concerning whether supply conditions even in 1999 affected HHRG and more importantly that his judgment was not based on analysis or any financial information.  Pinney testified:

> Q  Okay.  Now, I take from the answers you've given me previously that <u>you do not know any specifics with respect to HHRG in terms of how if at all supply conditions affected HHRG in the period ending March 31, 1999</u>?

    A  <u>I didn't quantify that</u>.

    Q  And <u>you also don't know how supply conditions if any changes affected HHRG through its fiscal year ending March 31, 2000</u>?

    A  <u>I didn't quantify that</u>.

    Q  And therefore you don't know them.  You don't know the answer to that?

    A  <u>My judgment is that it would have affected their financial condition</u>.

    Q  <u>But it [sic] your judgement based on analysis of any financial information</u>?

    A  <u>That's not available</u>.

    Q  And so is it fair to say that there's no financial information that you reviewed?

    A  I did not quantify it.

    Q  <u>You did not quantify it</u>?

    A  <u>That's correct</u>.

<u>Id</u>. at 90-92 (emphasis added).

Pinney's opinion that the reduction in Old Scrap silver supply in calendar year 1999 would cause lower demand for HHRG's refining services is not supported by any data specific to HHRG or any other company.  Even if the market conditions that Pinney believes existed in 1999 actually did exist, Pinney does not know whether HHRG was affected by these general conditions because he did not analyze any HHRG data or financial information that qualifies him to opine regarding this point. To allow Pinney to testify to this issue is to allow him to tell the jury "a fact exists because I say it exists, without quantitative analysis financial information or data."

The presentation of this ipse dixit direct testimony was disfavored just this year by the Second Circuit in Nimley v. City of New York, 2005 WL 1620481 (2d. Cir. June 27, 2005). Speculative opinions as to conditions in the worldwide refining industry do not establish facts as to HHRG's financial condition. Pinney's opinion is not reliable because it is not based upon sufficient facts or data which permit the opinion to be tested. Accordingly, the testimony of Pinney should be excluded. Fed. R. Evid. 702; Daubert; Amorgianos, 303 F.3d 256, 266. See also Crawford v. SAP America, Inc., 2004 WL 7643930 *5 (E.D. Pa. 2004)(barring expert testimony on damages to corporation when expert failed to consider the actual performance of the corporation or the general market conditions affecting the corporation); Kemp v. Tyson Seafood, Group, Inc., 200 WL 1062105 *5 (D. Minn. 2000)(precluding expert opinion on plaintiff corporation's future net worth because testimony not predicated upon historical data from the plaintiff). The testimony is also not relevant because Pinney does not connect the general industry conditions to HHRG. Abrams v. Van Kampen Funds, Inc., 2005 WL 88973 *1, 10 (N.D.Ill. 2005)(precluding expert testimony as to general economic conditions that may have affected stock's value because expert failed to connect change in economic conditions to changes in stock's value and failed to show effect on stock's value).

**B.     Pinney's Opinion that Increasing Unused Precious Metal Refining Capacity in Calendar 1999 Would Negatively Impact Margins as Refiners Competed for Available Supply is not Supported by Any Reliable Data**

In an attempt to expand upon his opinion that a decrease in old scrap silver supply in calendar 1999 would adversely affect HHRG, Pinney states:

> [s]hrinking supply leads to excess capacity and in high fixed cost
> businesses with little differentiation between competitors like metal
> refining, competitors tend to lower prices to customers, putting
> pressure on margins.

Pinney Report, at p. 2. As a general statement, this proposition like a principle from

an Economics 101 Course may sometimes be true. Excess supply or capacity may

lead to lower prices or it may lead to modification of the use of manufacturing

facilities or even the shifting of capacity. A careful expert would consider the actual

events which occurred in fact, including total capacity, a detailed study of changes in

amounts of capacity in the relevant market, actual compression in pricing by HHRG's

competitors and HHRG. Pinney made no attempt to perform the detailed work

necessary to provide a testable foundation for his opinion.

Pinney testified that he did not know what the precious metals refining

capacity was in 1998 (the starting point). Pinney Tr. 81:10-22. He also did not know

what the precious metals refining capacity was at the end of 1999 (the ending point).

Id. at 82:14-83:23. This leads to the obvious conclusion that since he did not know

the beginning capacity or the ending capacity he could not calculate any increase in or

decrease in capacity. Moreover, when asked about his opinion about excess capacity,

Pinney testified to his opinion that worldwide refining capacity probably would not

change much 1998 to 1999, although he did not know the capacity in 1999 and did

not qualify the amount of "excess capacity."

> Q  Stick with me because I want to get through this if I
> can. What I understand you're telling me now you do
> not know what the precious metals refining capacity
> was worldwide at the end of 1999; am I correct?
>
> A  Correct.

> Q   You do not know what the precious metals capacity
>      was worldwide at the end of the calendar year of '99?
>
> A   Yeah except it probably wouldn't change very much.
>
> Q   It wouldn't change much from 1998 to 1999?
>
> A.  Correct.

Pinney Tr. at 83:3-15.

In offering testimony regarding the effect of the actual change in HHRG

capacity utilization on pricing, Pinney could not tie his conclusions to any reliable

data as to pricing for refining services.  Pinney's lack of fundamental data to underpin

his opinions is breathtaking.

Pinney testified that he did not know whether HHRG's capacity utilization

changed between 1998 and 1999.  Id. at 84:10-22.  With respect to whether HHRG's

prices were affected by HHRG's competitors pricing, Pinney testified to conclusions

unsupported by factual analysis.

> Q.  Okay.  Good.  And you say that the fact that there is
>      excess capacity leads competitors to lower prices.
>
> A.  Yes.
>
> Q   Do you know what refining prices were for silver at the
>      end of 1998?
>
> A   No.
>
> Q   Do you know what refining prices were at the end of
>      1999 for silver?
>
> A   No.
>                           * * *

Q  Well, I think we went through this but let me try it
again.  You don't know what the prices of what HHRG
was charging at the end of 1998 for refining were?

A  No.

Q  And you don't know what the prices they were charging
at the end of '99 were?

A  No.

Q  So you can't tell me that HHRG was forced to lower its
prices by any competitive factor; correct?

A  That is – I can't tell you based on that that they did
reduce it.  But my opinion is that the margin suffered in
2000 because of this factor.

       . . .

Q  Now, what competitors lowered prices for refining in
the year 1999?

A  Nobody publishes that data.

Q  So the answer is you don't know whether any
competitor lowered prices for precious metals refining
in 1999; correct?

A  That's correct.

Pinney Tr.. 85:3-88:1 (emphasis added).

  Pinney has no factual basis for his opinion that excess precious metal capacity

in 1999 put pressure on HHRG's pricing and adversely affected HHRG's margins.

The absence of sufficient facts or data renders his opinion unreliable and

inadmissible.  Pinney's opinion that conditions that he believes may have existed in

the precious metals industry in 1999 affected HHRG margins is pure speculation.  A

calculation of the effect that the claimed general industry conditions actually had on

HHRG is utterly missing from Pinney's report.  The principles and methods by which

Pinney reached such an unsupported opinion cannot be tested. See <u>Amorgianos v.</u>

<u>National Railroad Passengers Corporation</u>, 303 F.3d at 266 (2d. Cir. 2002). Mr.

Pinney's <u>ipse dixit</u> opinion is not admissible because it is unreliable and will not aid

the jury of fact in deciding any of the issues in the case. <u>Abrams</u>, 2005 WL 88973 at

*1. Accordingly, this Court must preclude Pinney's opinions from being presented to

the jury. <u>Amorgianos</u>, 303 F.3d at 266. <u>See also</u>; <u>Abrams</u>, 2005 WL 88973 at *10;

<u>Crawford</u>, 2004 WL 764393 at *5; <u>Kemp</u>, 2000 WL 1062105 at *5.

    **C.**    **Pinney's Opinion that HHRG Suffered from Materially Increased Financing Costs in Calendar Year 1998 and 1999 As Metal Leasing Rates for Silver Were Significantly Higher Than Prior Periods, Is Not Supported by Any Reliable Data**

Pinney states in his report (6e) that the average three month silver lease rates

increased 1.7% in 1997, 5% in 1998 and 3.9% in 1999. Pinney Report at p. 3.

Leaving aside for the moment that the change in the rate of increase from 1998 to

1999 was reduced by 20%, average lease rates do not demonstrate or determine the

actual effect of any level of interest costs on HHRG. Based on this reported increase

in silver lease rates, Pinney opines that HHRG's financial condition "<u>suffered from</u>

<u>materially increased financing costs.</u>" <u>Id.</u> One would expect to see detailed

calculations in the report comparing interest rates incurred and financing costs paid

by HHRG. Pinney, however, did not analyze the amount or rate that any specific

financing had on HHRG as a business. He did not know even the most basic

information such as the financing costs actually experienced by HHRG. He testified

as follows:

> Q  All right. Lets turn to the next page. In 6e you're
> talking about increased financing costs in calendar '98
> and '99. Are you saying here that financing costs in

calendar '98 were greater than financing costs in 1998 [sic] for HHRG?

A  Yes.

Q  What were the financing costs in 1997?

A  Those are hidden from the world by the financial structure of the business.

Q  In other words, saying that is you don't know what the financing cost of HHRG was in 1997; correct?

A  Correct.

Q  What was the financing cost for HHRG in 1998?

A  I don't know.

Q  What was the financing cost for HHRG in 1999?

A  I can't quantify that.

Pinney Tr. 88:2-17 (emphasis added). Pinney does not know, therefore, what HHRG's financing costs were in 1997, 1998 or 1999. As a result, it should be obvious that he has no reliable data from which he can offer an opinion that HHRG suffered a material increase in financing costs in 1998 and 1999. Although it is possible that increased finance costs could affect HHRG's business, and in fact financial information on HHRG's borrowing arrangements with its creditors was available to its auditors PWC or could have been explored in discovery, Pinney did not develop any reliable qualification for his opinion that financing costs increased for HHRG. Pinney's opinion is pure speculation that must not be presented to the jury.

Answering "I don't know" and "I can't qualify that", Mr. Pinney dramatically demonstrated the lack of any reliable basis for his opinion. Accordingly, HHRG's

motion to preclude PWC from offering expert evidence on this issue should be granted.  Amorgianos, 303 F.3d at 266; Abrams, 2005 WL 88973 at *10; Crawford, 2004 WL 764393 at *5; Kemp, 2000 WL 1062105 at *5.

> **D.**   **Pinney Did not Analyze HHRG's Value in 1998, 1999 or 2000 and, Therefore, His Opinion that the Fair Market Value of HHRG in Fiscal Year Ended March 31, 2000 Would Have Diminished From the Fair Market Value of HHRG in Fiscal Years 1998 and 1999 Is Unreliable**

The Defendant has disclosed as an expert, finance professor, Anil Shivdsani. He will testify among other things that HHRG had an enterprise or going concern value of 19.1 million dollars as of June 1998.  While plaintiffs do not believe this opinion is reflective of all of the value of HHRG as a going concern, it has the benefit of at least being based on HHRG's financial data.  Despite having the opinion of Professor Shivdsani, PWC seeks to present in addition the unscientific and unsupported opinion of Mr. Pinney that HHRG's fair market value would have diminished from the period ending March 31, 1998 to March 31, 2000.  See Pinney Report at p. 3.  It does not appear that Pinney is making reference to the bankruptcy filing of HHRG in late March 2000.  On that fact alone it is apparent that the fair market value of HHRG was greater in 1998 as a going concern then as a bankrupt company on March 31, 2000.

Pinney, appears to be comparing March 31, 1998 values for HHRG with an unknown value at an unknown time in 2000 before the bankruptcy of HHRG strikingly, Pinney did not know what the fair market value of HHRG was in 1998, 1999 or 2000.  His deposition testimony clearly shows that his opinion is pure speculation and it is intended to confuse the jury into believing that HHRG's value

18

decreased from its value of June 30, 1998 without any basis for determining or testing

his conclusion.  In fact, <u>Mr. Pinney admitted he was not asked and did not do any</u>

<u>valuation work on the company</u>.  Pinney testified as follows:

> Q  I take it from a review of what you've written here as to
> your assignment that you were not asked to make a
> valuation of the fair market value of HHRG as of
> March 31, 1998?

> A  Correct.

> Q  And you were not asked for a fair market value analysis
> of HHRG as of June 30th 1998?

> A  <u>No I was not asked to do any valuation work on the</u>
> <u>company</u>.

> Q  And did you not do any valuation work on the
> <u>company</u>?

> A  <u>I did not</u>.

Pinney Tr. 56:18-57:4 (emphasis added).

* * *

> Q  Good.  Now, you then have a sentence that says the fair
> market value of HHRG in fiscal year ending March 31,
> 2000 would have diminished relative to fiscal years
> ending '98 and '99.  And I think you told me a moment
> ago that you made no analysis of the fair market values
> of HHRG in any time period; correct?

> A  Correct.

Pinney Tr. 98:18-25.  Finally, Pinney testified that he did not have an opinion about

any change in the fair market value of HHRG between 1998 to 1999:

> Q  So you're not saying that the company HHRG fair
> market value went down from March 31 '98 to March
> 31 '99; correct?

> A  That's not what that says.

19

Q  And that's not what you're saying, is it?

A  No.

Q  You don't have any opinion as to whether the fair
market value of HHRG went down from March 31,
1998 to March 31, 1999?

A  No.

Q  And you don't have an opinion with respect to that?

A  No.

Pinney Tr. 100:23-101:10.

Pinney never analyzed HHRG's fair market value at anytime in 1998, 1999 or

2000.  He was, candid in admitting he did not have an opinion as to what the fair

market value of HHRG was at any point in time during those particular years.  In the

absence of this information, and in the absence of any financial analysis of HHRG, it

is pure speculation for Pinney to state that the value of HHRG would have decreased

from 1998 to 2000.  This Court must keep such speculative and unreliable evidence

from the jury. Fed. R. Evid. 702; Daubert, 509 U.S. 579, 597 (1993); Amorgianos,

303 F.3d 256, 266 (2d. Cir. 2002).

## IV.    CONCLUSION

For the reasons stated above, the proposed testimony of plaintiffs' expert

William Pinney should be excluded.

THE PLAINTIFF
HANDY & HARMAN REFINING
GROUP, INC.

By: _____
William H. Champlin III
(ct04202), Champlin@tylercooper.com
Michael T. McCormack
(ct13799), mmcormack@tylercooper.com
TYLER COOPER & ALCORN, LLP
CityPlace, 35th Floor
185 Asylum Street
Hartford, CT  06103
Tel:  (860) 725-6200
Fax:  (860) 278-3802

21

PLAINTIFF,
GOLDEN WEST REFINING CORPORATION

By: _____
    Steven R. Humphrey
    (ct06053)
    shumphrey@rc.com
    Robinson & Cole
    280 Trumbull Street
    Hartford, CT 06103
    Tel:  (860) 275-8221
    Fax:  (860) 275-8299

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent via U.S. Mail on August 12, 2005 to:

Steven Greenspan, Esq.
Thomas Goldberg, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman
 & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Wilson, Elson, Moskowitz Edelman
 & Dicker LLP
120 North LaSalle Street
Suite 2600
Chicago, IL  60602

_____
William H. Champlin