# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1572 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1803 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP, | : | August 12, 2005 |
| Defendant. | : | |

## PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST HANDY & HARMAN REFINING GROUP, INC.

David J. Elliott
Thomas D. Goldberg
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
Tel: (203) 977-7300
Fax: (203) 977-7301

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS.........................................................................................5

     A.    HHRG's Purchase of a Division of Handy & Harman, Inc ...................................5

     B.    HHRG's Declining Financial Performance After Mid-1998 ...............................6

     C.    HHRG's Inadequate Financial Reporting ........................................................10

     D.    HHRG's Relationship With Panexim ...............................................................12

     E.    The Discovery of the Missing Gold and the Federal Fraud Indictment of Messrs. Wayne and Searle ................................................................................15

     F.    HHRG's Settlement of its Insurance Claim for the Panexim Exposure ..............16

     G.    HHRG's Claims Against PwC .........................................................................18

ARGUMENT ...........................................................................................................20

I.     PwC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE HHRG HAS FAILED TO OFFER EXPERT TESTIMONY THAT PwC'S CONDUCT WAS THE PROXIMATE CAUSE OF HHRG'S CLAIMED LOSSES.................................21

     A.    Plaintiff Must Prove That The Alleged Conduct Of PWC Proximately Caused HHRG's Claimed Losses.......................................................................21

     B.    HHRG Must Establish Proximate Causation Through Expert Testimony ..........23

     C.    The Elson Report Does Not Opine That PwC Proximately Caused Plaintiff's Claimed Losses .........................................................................27

     D.    The Dempsey Report Does Not Address PwC's Conduct Or HHRG's Claimed Losses.............................................................................................29

II.    EVEN IF EXPERT TESTIMONY WERE NOT REQUIRED, HHRG HAS FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE THAT ITS CLAIMED LOSSES WERE PROXIMATELY CAUSED BY PwC............................29

     A.    HHRG Has Failed To Introduce Sufficient Evidence That PwC Proximately Caused The Claimed Losses.......................................................29

     B.    Because Of That Failure PwC Is Entitled To Summary Judgment ....................33

     C.    PwC Also Is Entitled To Summary Judgment Because HHRG Has Not Introduced Sufficient Evidence Of Any Damages Attributable To PwC With Reasonable Certainty.............................................................................37

CONCLUSION ........................................................................................................39

-i-

# TABLE OF AUTHORITIES

## CASES

*Abrahams v. Young & Rubicam*, 240 Conn. 300 (1997) ............................................... 34

*Advest Group, Inc. v. Arthur Andersen, LLP, No. CV 970571417*, 1998 Conn. Super. LEXIS 2137 (Conn. Super. Ct. July 20, 1998)............................................................. 25

*Ahern v. Fuss & O'Neill, Inc.*, 78 Conn. App. 202 (2003)............................................. 24

*Allstate Ins. Co. v. Mazzola*, 175 F.3d 255 (2d Cir. 1999)............................................. 31

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......................................... 21, 22

*Beverly Hills Concepts, Inc. v. Schatz & Schatz*, 247 Conn. 48 (1998) ................. 38, 39

*Boone v. William W. Backus Hosp.*, 272 Conn. 551 (2005) ........................... 22, 23, 24, 27, 34

*CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068 (W.D. Ky. 1995) .......................... 35

*Calig v. Schrank*, 179 Conn. 283 (1979)....................................................................... 23

*Campbell v. Pommier*, 5 Conn. App. 29 (1985).......................................................... 25

*Celotex v. Catrett*, 477 U.S. 317 (1986)....................................................................... 22

*Charter Marine Transp. v. Mallory, Jones, Lynch & Assocs.*, No. 88 Civ. 5687, 1990 U.S. Dist. LEXIS 6990 (S.D.N.Y. June 5, 1990) ........................................................ 36

*Cheryl Terry Enters. v. City of Hartford*, 270 Conn. 619 (2004)................................. 38

*Claar v. Burlington N. R.R.*, 29 F.3d 499 (9th Cir. 1994)............................................ 28

*Copeland Oaks v. Haupt*, 209 F.3d 811 (6th Cir. 2000) ............................................. 31

*Coughlin v. Anderson*, 270 Conn. 487 (2004)............................................................ 39

*Davis v. Rodriguez*, 364 F.3d 424 (2d Cir. 2004)....................................................... 26

*Doe v. Manheimer*, 212 Conn. 748 (1989) ........................................................... 22, 23

*Dura Pharms. Inc. v. Broudo*, 125 S. Ct. 1627 (U.S. 2005) ........................... 27, 37, 38

**Page**

*Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003) ................................................................................................. 38

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235 (S.D.N.Y. 1999) ....................................................................................................... 35

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002)............... 35

*Faulise v. Eisenstein, No. CV980490341S*, 2000 Conn. Super. LEXIS 3017 (Conn. Super. Ct. Oct. 30, 2000)............................................................................... 25, 34

*Fecht v. Northern Telecom Ltd. (In re Northern Telecom Ltd. Sec. Litig.)*, 116 F. Supp. 2d 446 (S.D.N.Y. 2000) ................................................................................ 27, 28

*First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, *overruled in part and sustained in part on other grounds,* 196 F.R.D. 608 ............................................... 3, 36

*Gold v. Greenwich Hosp. Ass'n*, 262 Conn. 248 (2002) ................................................ 23

*Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168 (1994) .................................. 23

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995)........................................ 23

*Intimate Bookshop, Inc. v. Barnes & Noble*, No. 98 Civ 5564, 2003 U.S. Dist. LEXIS 17231 (S.D.N.Y. Sept. 30, 2003)............................................................... 28, 37

*Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543 (D. Conn. 1996)........................... 23

*KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289 (M.D. Ala. 2001)........................ 36

*Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.*, 28 F. Supp. 2d 126 (S.D.N.Y. 1998)........................................................................................ 38

*Latham & Assocs., Inc. v. William Raveis Real Estate, Inc.*, 218 Conn. 297 (1991) ................. 24

*Law v. Camp*, 116 F. Supp. 2d 295 (D. Conn. 2000), *aff'd in relevant part,* 15 Fed. Appx. 24 (2d Cir. 2001)................................................................. 24, 25, 26

*Lawson v. Whitey's Frame Shop*, 241 Conn. 678 (1997) ................................................ 39

*Estate of Lepage v. Horne*, 262 Conn. 116 (2002) .................................................... 24

*MCI Commuc's Corp. v. ATT*, 708 F.2d 1081 (7th Cir. 1982) ........................................... 36

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520 (2d Cir. 2004) ................. 23

Page

*Nikkal Indus. Ltd. v. Salton, Inc.*, 735 F. Supp. 1227 (S.D.N.Y. 1990)......................................... 36

*Omega Eng'g, Inc.*, 30 F. Supp. 2d, 226 (D. Conn. 1998) ............................................................ 39

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) .................................................... 22

*Purzycki v. Town of Fairfield*, 244 Conn. 101 (1998) .......................................................... 22, 23

*Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994) .............................................................. 23

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992) ................................. 35

*Scotto v. Almenas*, 143 F.3d 105 (2d Cir. 1998)....................................................................... 22

*Sherman v. Bristol Hosp. Inc.*, 79 Conn. App. at 78 (2003) ...................................................... 34

*Solomon v. Levett*, 30 Conn. App. 125 (1993) ........................................................................ 24

*Somma v. Gracey, *, 15 Conn. App. 371 (1988)....................................................................... 24

*Stewart v. Federated Dep't Stores, Inc.*, 234 Conn. 597 (1995)............................................ 22, 34

*Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137 (4th Cir. 1994)................................... 35

*United States Football League v. Nat'l Football League*, 842 F.2d 1335 (2d Cir. 1988) ...... 36, 37

*Vanczak v. Romani*, No. 990080053, 2002 Conn. Super. LEXIS 3397 (Conn. Super. Ct. Oct. 18, 2002) ......................................................................................................................... 25

*Vona v. Lerner*, 72 Conn. App. 179 (2002)................................................................. 23, 24, 26, 27, 34

*Wal-Mart Stores v. Visa USA Inc. (In re Visa Check/Mastermoney Antitrust Litg.)*, 280 F.3d 124 (2d Cir. 2001)................................................................................................................. 27

*Ward v. Allied Van Lines, Inc.*, 231 F.3d 135 (4th Cir. 2000) .................................................... 31

*Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004) .................................................... 24, 28

## STATUTES

Fed. R. Civ. P. 56(c) ................................................................................................................... 21

**Page**

## MISCELLANEOUS

16 *Couch on Insurance* 2d § 61:18 ............................................................................... 31

PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum of law in support of its motion for summary judgment on all claims asserted by the plaintiff, Handy & Harman Refining Group, Inc. ("HHRG" or "plaintiff"), in *Handy & Harman Refining Group, Inc. v. PricewaterhouseCoopers LLP,* Civil Action No. 3:02 CV 1803 (MRK).

## PRELIMINARY STATEMENT

PwC is entitled to summary judgment in this accountant's liability action because plaintiff has failed to produce any evidence, including expert testimony as required by Connecticut law, that PwC proximately caused the decline in value of HHRG's business over the nearly two-year period before HHRG filed for bankruptcy on March 28, 2000. The bankruptcy filing followed (a) almost two years of steadily deteriorating financial performance caused by poor industry conditions and poor management; and (b) the discovery that approximately $12 million of gold believed to be held for HHRG's benefit in a warehouse in Lima, Peru was in fact silver, worth only a fraction of the $12 million. The missing gold related to HHRG's relationship with a Peruvian company called Panexim, S.A. ("Panexim"). As alleged in HHRG's and the other consolidated complaints, HHRG senior management, including its chief executive officer Barry Wayne, colluded with Panexim officials to defraud HHRG and others by diverting profits from a scheme for the importation of gold from Peru.

HHRG filed a claim against its insurance carriers ("Underwriters") for its "loss" relating to HHRG's advances to Panexim. After extensive negotiations, HHRG and Underwriters entered into a settlement agreement pursuant to which Underwriters paid HHRG $12.5 million. In return, HHRG assigned to Underwriters all of its right, title and interest in any and all claims which HHRG had that were asserted in its proof of loss to Underwriters, specifically including

claims against PwC. Underwriters has pursued that claim against PwC in *Sharp et al. v.*

*PricewaterhouseCoopers LLP* (*"Underwriters"*), one of the above consolidated cases.

Notwithstanding that HHRG sold and assigned its claim related to the Panexim loss to

Underwriters, HHRG itself has asserted a claim against PwC. By definition, HHRG must prove

that PwC proximately caused losses separate and apart from HHRG's losses related to Panexim.

Lacking any evidence that would tie PwC's alleged deficiencies to HHRG's deteriorating

performance in late 1998, 1999, and early 2000, plaintiff summarily asserts that PwC's conduct

caused the entire decline in value of HHRG's business after June 30, 1998 and seeks more than

$30 million in damages.

HHRG's theory is:

- According to an expert report of Craig Elson submitted on HHRG's behalf ("Elson Report"), HHRG's business had a fair market value of $30.7 million as of June 30, 1998.[1] Elson selected that date because, he was advised, "by that date HHRG was being operated in a manner substantially inconsistent with its policy regarding foreign advances."[2]
- Following discovery of the Panexim losses, HHRG filed for bankruptcy and was liquidated. HHRG claims that in liquidation HHRG's fair market value was zero.
- HHRG claims that PwC is liable for $30.7 million, the difference between HHRG's alleged value as of June 30, 1998 and its alleged value of $0 after liquidation.

While seemingly simple, HHRG's theory is unavailing. Having been compensated for its

direct losses from the Panexim relationship, HHRG seeks to hold PwC responsible for all of its

---

[1] If this case goes to trial, PwC will dispute the Elson Report as well as HHRG's other allegations. PwC has disclosed the expert report of Anil Shivdasani, which opines that the equity value of HHRG at June 30, 1998 was $8.7 million. *See* n. 89 *infra*.

[2] (Rep. of Craig T. Elson, dated March 18, 2005 ("Elson Rep.") at 1-2 (Ex. 25); Dep. Tr. of Craig T. Elson, dated May 26, 2005 ("Elson Tr.") at 4-5, 26-28 (Ex. 26). *See also* PricewaterhouseCoopers LLP's Consolidated Local Rule 56(a)(1) Statement ("56(a)(1)") at ¶ 59.)

adverse fortunes after June 30, 1998 – not coincidentally, the apex of HHRG's profitability –

whether or not related to Panexim, and without any expert testimony that PwC caused any losses

whatsoever.  Plaintiff's effort to augment its insurance recovery with an additional windfall from

PwC ignores the many unrelated factors that caused HHRG's performance to decline

dramatically, which are described in detail below.  As one example, plaintiff must ignore the

words of the Chairman of the Board of Directors of HHRG, Robert Guy, who months before the

bankruptcy stated:

> "[HHRG] is operating at break-even and will likely deteriorate further in the
> short-term because of rising metal interest rates. . . .  [L]ike nearly all companies
> involved in the international precious metal industry, HHRG is operating in a very
> difficult environment.  Mining companies are squeezing refinery margins and low
> precious metal prices are undermining severely the economics of recycling."[3]

Plaintiff cannot survive summary judgment simply by tendering evidence that the fair

market value of HHRG's assets declined after June 30, 1998 or that HHRG went into bankruptcy

after discovery of the Panexim losses.  Rather, HHRG must produce evidence – including expert

testimony – from which a jury reasonably could find that plaintiff's claimed losses were

**_proximately caused_** by the conduct of PwC.[4]  HHRG cannot do so as a matter of law.

---

[3] (Memorandum from R. Guy to R. Lee, C. Wiggins, S. Russo, R. Warren and M. Ryan,
dated September 20, 1999 ("September 1999 Guy Memorandum") at GWRC-PWC0066089-
0066090 (Ex. 4)  _See also_ 56(a)(1) ¶ 12).

[4] We assume, solely for purposes of this motion, that PwC proximately caused the losses
associated with the Panexim advances which are asserted in the _Underwriters_ complaint.  That
is, we assume that (1) PwC failed to perform its services for HHRG in accordance with
applicable professional standards, (2) these failures related directly to the examination of the
Panexim account and similar South American accounts, (3) if PwC had performed its services
properly HHRG's board would have acted to prevent or limit HHRG's advances to Panexim, and
(4) if the board had taken these actions, such losses would have been avoided.  Of course, PwC
vigorously contests all these allegations.

-3-

*First*, Connecticut law requires that, in a professional services case such as this, HHRG must present expert testimony that PwC's conduct was the proximate cause of the deterioration of the value of HHRG's business. Proper expert testimony, among other things, would analyze HHRG's performance after June 30, 1998, distinguish industry and other factors from those related to PwC's conduct, set forth an analysis of HHRG's enterprise value after the bankruptcy to determine the difference from the June 30, 1998 value, and opine that PwC's conduct proximately caused a loss in value. Plaintiff has failed to disclose any such evidence. Elson's report is nothing more than a valuation report, opining on the value of HHRG as of a particular date nearly two years before the bankruptcy. It does not even purport to address causation. Nor has plaintiff proffered expert testimony regarding the fair market value of HHRG's assets after the bankruptcy, so that a factfinder could measure the decline in value, much less attribute the decline to particular causal factors. This lack of expert testimony is fatal to HHRG's claims. *See* Point I *infra*.

*Second*, even if HHRG were not required to present expert testimony of proximate cause, HHRG has failed to produce any evidence from which a trier of fact could determine that its deterioration in value after June 30, 1998 was proximately caused by PwC's actions. HHRG's business and prospects declined after June 30, 1998 due to a host of factors having nothing to do with Panexim or any conduct of PwC, including poor industry conditions, internal operating problems at HHRG, and the indictment and arrest of Barry Wayne and another senior HHRG officer in February 2000 for activities that predated HHRG's acquisition of the precious metals refining division of Handy & Harman, Inc. Particularly since HHRG already has recovered its direct losses from insurance proceeds, a jury would have to resort to impermissible speculation to conclude that PwC's conduct proximately caused the claimed consequential losses, a problem

exacerbated because HHRG's financial reporting systems did not even permit the parties accurately to assess its performance. In short, plaintiff has come forward with no evidence that would permit a jury to find any decline in value proximately caused by PwC, much less to support its claim that PwC is legally responsible for the *entire* decline. *See* Point II *infra*.

### STATEMENT OF FACTS[5]

**A.    HHRG's Purchase of a Division of Handy & Harman, Inc.**

In 1996, Golden West Refining Corporation Limited ("GWRC"), an Australian metals refining company traded on the Australian Stock Exchange, sought to acquire the Precious Metals Refining Division of Handy & Harman, Inc. ("Handy & Harman"), then one of the largest precious metals refiners in the world. To effect the acquisition, GWRC formed HHRG as a wholly-owned subsidiary. The acquisition was completed in August 1996 for $9 million.[6]

To manage its new subsidiary, GWRC recruited the pre-existing senior management of Handy & Harman, including Barry Wayne, who was appointed president and chief executive officer of HHRG. In addition to Wayne, HHRG retained Richard Searle (later implicated in the Panexim transactions and indicted for activities he undertook at Handy & Harman) as Vice

---

[5] The statement of material facts as to which there is no genuine dispute is set forth in PricewaterhouseCoopers LLP's Consolidated Local Rule 56(a)(1) Statement, filed herewith in support of this motion and PwC's separate motion for summary judgment against GWRC. Exhibits to the Local Rule 56(a)(1) statement are cited as "Ex. __."

[6] (*See* HHRG Compl. ¶¶ 13, 14; Handy & Harman Refining Group, Inc. Consolidated Financial Statements dated March 31, 1998 and March 31, 1997 ("1997-1998 HHRG Consolidated Financials") at PWC Z 02595, 02605 (Ex. 2); A Chronology of Handy & Harman Refining Group, Inc. 1995-2002 ("HHRG Chronology") at GWRC-PWC0068110 (Ex. 10). *See also* 56(a)(1) ¶¶ 2, 4, 5.)

President of Sales and Marketing, and Luis Posada (also implicated in the Panexim transactions) as Smelter Administrator.[7]

### B.    HHRG's Declining Financial Performance After Mid-1998

HHRG reported profits for about the first two years after the acquisition.  For the period ended March 31, 1997, which included the first seven months of HHRG's operations, HHRG reported operating income of $2,649,156 and net income of $1,519,877.[8]  For the fiscal year ended March 31, 1998, HHRG reported operating income of $4,601,522 and net income of $2,556,489.[9]

Beginning in mid-1998, however, the financial performance and prospects of HHRG began to suffer as a result both of industry conditions and operational problems and investment decisions at HHRG.  In late 1998, GWRC announced reduced profits, particularly from its U.S. operations (*i.e.*, HHRG), including from the effect "felt in the electronic scrap sector" as a result of a slowdown in computer manufacturing and the Asian financial crisis.[10]  In mid-1999, an HHRG operating report noted that less electronic scrap was being generated and that collection of electronic scrap from end users was more difficult.  This changed environment resulted in erosion of HHRG's traditional electronic scrap customer base and declining profits.[11]

---

[7] (*See* Letter to M. Ryan from Dempsey, Meyers & Co., dated October 9, 2000 ("Dempsey Rep.") (Ex. 19).  *See also* 56(a)(1) ¶ 6.)

[8] (*See* 1997-1998 HHRG Consolidated Financials, at PWC Z 02593 (Ex. 2).  *See also* 56(a)(1) ¶ 7.)

[9] (*See id.  See also* 56(a)(1) ¶ 8.)

[10] (*See* Golden West Announces Half Year Result, dated November 30, 1998, at GWRC-PWC-E0003114 (Ex. 3).  *See also* 56(a)(1) ¶ 9.)

[11] (*See* Handy & Harman Operations Report July 1999 at HHRG-PWC78035 (Ex. 18). *See also* 56(a)(1) ¶ 11.)

The poor trends continued through late 1999.  In a September 20, 1999 memo from the Chairman of HHRG's Board of Directors, Robert Guy, to the Australian directors on HHRG's board,[12] Guy commented on HHRG's financial performance:  "Described by [HHRG CEO] Barry [Wayne] as 'miserable.'  [HHRG CFO] Rick [Ollett] noted HHRG had just suffered its worst August in four years.  The company is operating at break-even and will likely deteriorate further in the short-term because of rising metal interest rates."  Guy went on to comment:

*"[L]ike nearly all companies involved in the international precious metal industry, HHRG is operating in a very difficult environment.  Mining companies are squeezing refinery margins and low precious metal prices are undermining severely the economics of recycling."*[13]

HHRG's October 1999 operating report reflected a pre-tax loss for the month of $472,000 and year-to-date pre-tax *losses* of $756,000, even though HHRG had budgeted *profits* of over $2.2 million for the same period.  The report, under the heading "HHRG Business Conditions," stated: "Many of our business segments are facing unprecedented adverse conditions.  These stem from competitive forces, changes in the market place, our position in the market and variability's [sic] inherent in dealing with financial commodities (gold, silver, etc.)."  The report went on to state that competition, primarily from Swiss refiners, had caused a continued decline in margins.  HHRG's average treatment charge for gold refining had been driven down by one-third, from $.45 per ounce to the $.30 per ounce range.  Similarly, HHRG

---

[12] Several Australians on the GWRC Board of Directors also sat on HHRG's Board of Directors.

[13] (*See* September 1999 Guy Memorandum at GWRC-PWC 0066089-90 (emphasis added).  *See also* Dep. Tr. of Michael Ryan, dated March 24, 2005 ("Ryan Tr.") at 251-52 (Ex. 5).  *See also* 56(a)(1) ¶ 12).

noted that, with respect to high grade silver refining, "[a]s with gold refining, margins are under pressure."[14]

The reference to metal interest rates, also called metal "lease rates," is telling.  The "lease rate" is HHRG's financing rate; the higher the lease rate, the more it must pay to its financing sources.[15]  In 1998, silver lease rates went up "five-fold."  HHRG had massive silver borrowing costs that obliterated the profit it expected to make on silver transactions.[16]  Although in a less dramatic fashion, the annual gold lease rates also rose from 1998 to 1999.[17]

The September 20, 1999 Guy memorandum not only cited these external factors, but also criticized the performance of HHRG management:

> "That said[,] HHRG has not reacted as well as it should to the deteriorating market.  In part this is due to what, in retrospect, were appalling budgetary procedures.  It is also due, as colleagues have persistently pointed out over the last twelve months, to an inability to cost properly the various activities of the company."

Guy saw "no prospect, in the short term of turning around the core refining business . . . ."[18]

---

[14] (HHRG Operations Report dated October 1999, at HHRG-PWC 78999 (Ex. 6).  *See also* 56(a)(1) ¶¶ 13).

[15] HHRG did not "own" the metal at its refining facilities.  Instead, upon receiving metal, it immediately "sold" the metal to one of its financing sources, Fleet Precious Metals or Credit Suisse First Boston, and repurchased and sold the metal once the refining process was complete.  HHRG did not pay its financing sources interest, but rather paid fees corresponding to the metal lease rate in effect.  (*See, e.g.,* Master Precious Metals Purchase and Refining Agreement by and between Attleboro Refining Company, Inc. and Credit Suisse, dated August 20, 1996, § 2.4 (Ex. 1).  *See also* 56(a)(1) ¶ 15.)

[16] (*See* Dep. Tr. of Sean Russo, dated June 24, 2005 ("Russo Tr.") at 77 (Ex. 7).  *See also* 56(a)(1) ¶ 16.)

[17] (*See* Expert Report of William F. Pinney ("Pinney Rep.") at 3 and Ex. 5 (Ex. 9).  *See also* 56(a)(1) ¶ 16.)

[18] (September 1999 Guy Memorandum at GWRC-PWC 0066090 (Ex. 4).  *See also* 56(a)(1) ¶ 18.)

A December 10, 1999 press release reported that HHRG lost money for the quarter ended September 30, 1999 as a result of "extremely adverse business conditions." The release identified numerous contributing factors:

> "Low grade electronic scrap business continued to contract due to changing technology reducing contained precious metals content. This position was exacerbated by substantial increases in external costs and a sustained increase in gold and silver lease rates during the period. In the high grade mine doré business, competition increased from European refiners, which also had a knock on effect of squeezing margins in many other market sectors. In addition, initiatives . . . have not delivered the profitability expected due to lower than expected precious metals content and lower precious metals prices."[19]

HHRG also made poor investment decisions. In September 1998, HHRG spent over $2 million to acquire a refining operation called Enviromet. The profitability of Enviromet was dependent upon a personal relationship between an Enviromet principal and an individual representative of its largest customer, who promptly retired. Enviromet lost this customer and HHRG's investment proved "worthless." [20]

Yet another factor affecting HHRG's performance was its acquisition in March 1999 of its sister company, Golden West Refining (Canada) Ltd. ("GWR Canada").[21] Although the acquisition may have been neutral from the perspective of GWRC (moving one subsidiary to another),[22] it hurt HHRG because GWR Canada had performed poorly and essentially had ceased

---

[19] (GWRC Press Release, "Golden West Refining Corporation Limited Half-Year Result," issued December 10, 1999, at GWRC-PWC0025037 (Ex. 8). *See also* 56(a)(1) ¶ 19.)

[20] (*See* HHRG Chronology at GWRC-PWC 0068148-49 (Ex. 10); Ryan Tr. at 244-46, 250 (Ex. 5). *See also* 56(a)(1) ¶¶ 22.)

[21] *See* HHRG Op. Report dated May 1999 ("May 1999 Operations Report") at HHRG-PWC152544 (Ex. 11). *See also* 56(a)(1) ¶ 28.

[22] GWRC actually gave HHRG a promissory note to compensate for the negative value of GWR Canada – *i.e.,* the seller paid the purchaser to take the asset.

to operate. Not only did the Canadian business lose money, it also exposed HHRG to environmental contamination concerns.[23] Not surprisingly, the poor performance of GWR Canada "negatively impact[ed] the HHRG bottom line."[24]

In sum, the value of HHRG's business declined markedly after June 30, 1998 for numerous reasons wholly unrelated to the losses that resulted from the Panexim relationship.

### C.     HHRG's Inadequate Financial Reporting

Although it is clear that HHRG's business was performing poorly in 1998 and 1999 irrespective of its South American operations, no one knows now and no one knew then whether or not the company's core refining business was making or losing money, for the simple reason that HHRG had not implemented internal financial reporting systems that would provide this information. This problem was raised at the Board of Directors level as early as March 1997, when the GWRC Board of Directors recommended that the company implement "profit center reporting" in order to provide better information as to how different sectors of HHRG's business were performing.[25] Over a full year later, in mid-1998, a member of the GWRC Audit Committee expressed disappointment "that HHRG had not yet managed to produce profit centre management reports which were to have been provided as agreed last year." The Audit

---

[23] (See Memorandum from B. Wayne to R. Guy, dated February 4, 1999, at HHRG-PWC10099 (Ex. 12). See also 56(a)(1) ¶ 23.)

[24] (See Minutes of GWRC Board of Directors Meeting dated February 17, 1999, at HHRG-PWC08349 (Ex. 13). See also 56(a)(1) ¶ 24.)

[25] (Minutes of GWRC Audit Comm. Meeting, dated March 18, 1997, at HHRG-PWC0069278 (Ex. 14); see also Dep. Tr. of Sean Russo, dated June 24, 2005 ("Russo Tr.") at 98 (Ex. 7). See also 56(a)(1) ¶ 25.

Committee insisted without success that this "critical" financial management tool be used by HHRG.[26]

In October 1998, a member of the GWRC Audit Committee complained to Barry Wayne and others about HHRG's still "unsatisfactory" profit center reporting.  The Audit Committee member explained that "[t]he necessity for better reporting, which has been requested of HHRG for the last year, is highlighted by worse than budgeted performance over the last six months, *for which there is no quantitative explanation*." He attached an earlier memorandum on the inadequacies of HHRG's systems, which in turn had explained that HHRG's financial reporting provided little information on where profits and losses were made, that it "would almost certainly camouflage a loss making activity," and that "income and expenditure is accounted for in such a way as to make detailed analysis of various parts of the business impossible."[27]

In November 1998, Sean Russo, who sat on the Boards of Directors of HHRG and GWRC, wrote to the Chairman of GWRC that HHRG could not explain why it was losing money in most of its operations, because Wayne "ha[d] refused to adopt a more focus[]ed approach to profit centre reporting despite it being requested by the Board." Instead, Russo explained, HHRG went out of its way "to conceal the real picture."  Among other problems, Russo noted that Wayne had claimed that HHRG's business in Peru (*i.e.*, the Panexim business) was making money at a rate that would have represented nearly all of the company's profit, such

---

[26] (Minutes of GWRC Audit Comm. Meeting dated May 1, 1998, at HHRG-PWC11142-43 (Ex. 15); *see also* Russo Tr. at 106-108 (Ex. 7).  *See also* 56(a)(1) ¶ 26.)

[27] (*See* Memorandum from C. Wiggins to M. Ryan, R. Hayes and B. Wayne, dated October 28, 1998, at HHRG-PWC54200, 54204, 54206 (Ex. 16).  *See also* 56(a)(1) ¶ 27.)

that "[e]ither a large part of [the] business is losing money or Peru is misrepresented."[28]
Notwithstanding these serious problems, the Board of Directors did not succeed in establishing
profit center reporting at HHRG[29] and was unable to determine which if any components of
HHRG's business were profitable.

### D.     HHRG's Relationship With Panexim

As a subsequent investigation has shown, Wayne and other senior managers of HHRG,
from the inception of HHRG, established a close relationship with Panexim for the purchase of
gold in Peru for exportation.  The Panexim relationship was described at length in the report of
the forensic firm Dempsey Myers & Co. (the "Dempsey Report"), authored by John Dempsey.
Dempsey and his firm were retained by HHRG, and the Dempsey Report was relied upon by
HHRG as its proof of loss for its insurance claim against Underwriters.  Plaintiff has designated
Dempsey as an expert witness in this action.[30]

According to the Dempsey Report, Mr. Wayne authorized an advance of $74,000 in
working capital to Panexim to begin operations in late 1996.  Panexim was to purchase gold, ship
gold products abroad and recover an export subsidy from the Peruvian government.  Panexim
was required to pay a refundable 18% value added tax, or "VAT," on its gold purchases to the
Peruvian tax authority, SUNAT, which SUNAT would refund to Panexim after the product was

---

[28] (Memorandum from S. Russo to R. Lee, dated November 2, 1998, at GWRC-PWC0045791, 45793 (Ex. 17).  *See also* 56(a)(1) ¶ 17.)

[29] (*See* Russo Tr. at 106-108 (Ex. 7).  *See also* 56(a)(1) Statement ¶ 29.)

[30] (*See generally,* Dempsey Rep. (Ex. 19).  *See also* 56(a)(1) ¶ 31.)  For purposes of this motion, we assume the truth of the statements in the Dempsey Report, without prejudice to PwC's ability to challenge the admissibility of the Dempsey Report or any supporting documentation, or the truthfulness of any statements contained therein.

exported from Peru.  Separately, the Peruvian government would pay Panexim a 5% export subsidy following export of the product.  Initially, Panexim utilized a line of credit, secured by HHRG gold with Wayne's agreement, to pay for its VAT obligation.[31]

In June 1998, HHRG's gold purchases from Panexim began to expand dramatically.  This caused an expansion in Panexim's VAT obligations and, as a result, Wayne agreed to finance Panexim's VAT directly.  When Panexim was prepared to buy gold, the amount of gold in the transaction was inflated by 18% so that HHRG's cash advance would cover the market value of gold and applicable VAT taxes.  Plaintiff claims that these advances violated HHRG corporate policy and that PwC should have brought to the attention of HHRG's non-management directors that HHRG was making advances to Panexim to cover VAT payments.  In November 1998, SUNAT suspended payment on refunds of VAT.  HHRG nevertheless continued to advance money to Panexim to fund its purchases of gold and VAT obligations and Panexim continued to ship gold to HHRG.[32]

On or about May 18, 1999, the HHRG and GWRC Boards of Directors became aware that a substantial receivable was owed from Panexim to HHRG.  When the Board confronted Wayne about this receivable, Wayne responded that gold had accumulated on behalf of HHRG in a secure vault called Hermes in Lima, Peru because the Peruvian government had been controlling the amount of gold it permitted for export; that the gold was to be released to HHRG on a gradual basis; and that HHRG had only advanced money to Panexim upon the delivery of

---

[31] (*See id.* at 4, 8-9.  *See also* 56(a)(1) ¶ 32.)

[32] (*See id.* at 10-12.  *See also* 56(a)(1) ¶ 33.)

metals to the vault.  As it subsequently became clear, these and later assurances by Wayne

regarding the Panexim receivable were not true.[33]

By late July 1999, the GWRC Board of Directors had concluded that Wayne had failed to

fulfill his contractual and fiduciary duties to HHRG because he had "without proper authority

and contrary to policy, authorized and allowed unsecured credit to be extended to Panexim" and

had "misled" the Board "by previous statements that HHRG does not extend unsecured credit"

and "by understating the value of the total exposure to Panexim."[34]  At a special meeting held on

July 26, 1999, the GWRC Board of Directors considered terminating Wayne, but elected not to

do so.  Instead, the Board gave Wayne a "censure" and renewed his employment contract

through mid-2000.[35]

Over the remainder of 1999, the HHRG and GWRC Boards continued to monitor the

Panexim receivable and continued to receive, as later events demonstrated, misleading

information from Wayne.  First, in the summer of 1999, the GWRC Board requested copies of

Panexim's financial statements and, in response, Wayne provided the Board with fabricated

audited Panexim statements, which the Board relied on in deciding not to disclose the Panexim

exposure to the Australian stock exchange or HHRG's lenders.[36]  Second, in September 1999,

the HHRG and GWRC Finance Committees asked for an independent inspection of the precious

---

[33] (*See id.* at 12-13; Managing Director's Report of Michael Ryan ("Director's Rep.") at 1-2 (Ex. 20); Russo Tr. at 135 (Ex. 7).  *See also* 56(a)(1) ¶¶ 34-35.)

[34] (*See* Minutes of GWRC Board Meeting, dated July 26, 1999 ("July 26 GWRC Board Meeting") at GWRC-PWC0068486 (Ex. 21).  *See also* 56(a)(1) ¶ 36.)

[35] (*Id.* at GWRC-PWC0068486-0068487; Wayne Employment Agreement, dated August 16, 1999 (Ex. 22).  *See also* 56(a)(1) ¶ 37.)

[36] (*See* July 26 GWRC Board Meeting at GWRC-PWC 0068485-86 (Ex. 21); Dempsey Rep. at 28-29 (Ex. 19).  *See also* 56(a)(1) ¶¶ 38-39.)

metals held in the Hermes vault in Peru, and received an assay report that appeared to confirm the existence of sixteen boxes of gold worth approximately $11.8 million held on behalf of HHRG. That assay later was determined to be a "sham" approved by Wayne.[37] Third, in the fall of 1999, the Boards sought information on the status of VAT refunds from SUNAT, and Mr. Wayne and others falsely represented that Panexim had begun to receive VAT refunds and repay them to HHRG.[38]

### E.     The Discovery of the Missing Gold and the Federal Fraud Indictment of Messrs. Wayne and Searle

On February 18, 2000, Wayne, who had been suspended from all executive duties the month before, resigned from HHRG.[39] A few days later, on February 21, 2000, a new, independent inspection of the contents of the Hermes vault revealed that the sixteen boxes of gold on consignment to HHRG did not contain gold at all. A report from the assayer issued the next day "indicated that the material said to be gold in the September 1999 inspection was, in fact, silver."[40] HHRG's insurers were immediately put on notice of a potential claim as a result of the missing gold.[41]

---

[37] (*See* Dempsey Rep. at 13, 14 (Ex. 19); Director's Rep. at 1 (Ex. 20). *See also* 56(a)(1) ¶¶ 40.) GWRC had required an independent verification of the gold held in the Hermes vault by an internationally recognized inspectorate group.

[38] (*See* Dempsey Rep. at 29-30 (Ex. 19). *See also* 56(a)(1) ¶ 41.) Wayne advised the Directors in late 1999 that portions of the gold in the Hermes vault had been released.

[39] (*See* Dempsey Rep. at 17 (Ex. 19). *See also* 56(a)(1) ¶ 42.)

[40] (*See* Dempsey Rep. at 17 (Ex. 19); Director's Rep. at 2 (Ex. 20). *See also* 56(a)(1) ¶ 43.)

[41] (Director's Rep. at 3 (Ex. 20). *See also* 56(a)(1) ¶ 44.)

Also in late February 2000, a federal criminal indictment against Wayne, Searle and others was unsealed that alleged that, in the early 1990's, Wayne had participated in a scheme to defraud the government of Argentina through a scheme for the export of gold from that country.[42]  In his Managing Director's report sent to GWRC shareholders after HHRG's bankruptcy filing, Michael Ryan wrote that the Board of Directors of GWRC became aware of Wayne's federal indictment in early March 2000.[43]

Notably, Ryan explained that, prior to the news of the criminal indictments, "HHRG continued to have the support of its bankers" notwithstanding the missing gold in Peru, and that negotiations with its bankers "appeared likely to lead to a new agreement that would allow HHRG to continue to operate."[44]  But, he explained, "[t]he news of the indictments complicated the negotiations with the banks and severely undermined the confidence of major customers and unsecured creditors."[45]  HHRG proved unable to work out satisfactory arrangements with the lenders and filed for bankruptcy protection on March 28, 2000.[46]

F.     **HHRG's Settlement of its Insurance Claim for the Panexim Exposure**

HHRG and Underwriters each engaged experts to investigate the events giving rise to the missing gold.  After more than a year of investigation and negotiations, a tentative settlement of

---

[42] (*See* Dempsey Rep. at 6 (Ex. 19); *see also* Superseding Federal Indictment Against Barry Wayne (Ex. 23.)  *See also* 56(a)(1) ¶ 45.)

[43] (Director's Rep. at 3 (Ex. 20).  *See also* 56(a)(1) ¶ 46.)

[44] (Director's Rep. at 3 (Ex. 20).  *See also* 56(a)(1) ¶ 47.)

[45] (*Id.* at 2.  *See also* 56(a)(1) ¶ 48.)

[46] (*See id.* at 1, 2 (a key incident leading to HHRG's filing for bankruptcy protection was "the impact on bankers and creditors of the revelation that former senior executives of HHRG had been indicted by US Federal Authorities on criminal charges related to various issues between 1992 and 1996 while employed by Handy & Harman").  *See also* 56(a)(1) ¶ 49.)

-16-

the insurance claim was reached in July 2001 and formal documentation was completed and

submitted to the bankruptcy court a few months later.  In a settlement agreement dated December

31, 2001, Underwriters acknowledged that a covered loss existed on HHRG's claim for "losses

arising from acts, errors, or omissions on the part of former employees/consultants of HHRG

Barry Wayne, Richard L. Searle, Luis Posada . . . and others" as more fully explained in the

Dempsey Report.  Pursuant to the Settlement Agreement, Underwriters paid $12.5 million to

HHRG on account of the claimed loss.[47]

Also pursuant to the settlement, Underwriters became subrogated to all claims that

HHRG may have had against third parties -- expressly including PwC -- relating to the covered

losses.  To remove any doubt on this score, the Settlement Agreement provided:

> "The Assured acknowledges Underwriters as subrogee pursuant to the Policy as to
> all losses asserted by the Assured in the Claim.  In addition, the Assured assigns to
> Underwriters all rights, title and interest in any and all claims which the Assured
> has, had, or may ever have as to all losses asserted by the Assured in the Claim,
> plus interest, costs, and punitive damages arising from such losses, ***including but
> not limited to, any and all such claims against*** . . . (e) ***PricewaterhouseCoopers***
> and its predecessors, successors, agents and assigns . . . ."[48]

HHRG also executed a separate Acknowledgement of Assignment and Subrogation.[49]  These

documents make clear that the assignment and subrogation encompasses the entire claim asserted

by HHRG under the Underwriters policy, including the alleged loss associated with the Panexim

exposure and related losses totaling over $18 million.

---

[47]  (*See* Settlement Agr., dated December 31, 2001, at UL00302, UL00303, UL00307
(Ex. 24). *See also* 56(a)(1) ¶ 51.)

[48]  (*Id.* at UL00307.  *See also* 56(a)(1) ¶ 52**.**)

[49]  (*See id.* at UL00393.  *See also* 56(a)(1) ¶ 53.)

G.    HHRG's Claims Against PwC

Notwithstanding that HHRG received payment under the insurance policy and that Underwriters have pursued a subrogation claim against PwC, HHRG has filed this action against PwC seeking additional, consequential damages.  The Complaint, remarkably, omits any reference to the insurance settlement or assignment of claims to Underwriters, while at the same time HHRG makes factual allegations that are substantially identical to those in the *Underwriters* complaint, as well as to the additional complaint filed by HHRG's parent company, GWRC.  The gravamen of each complaint is that PwC was aware of a GWRC corporate policy not to extend unsecured advances to companies in "third world countries"; that PwC was or should have been aware that HHRG was making such advances to Panexim and other South American companies; and that PwC should have notified HHRG's Board of Directors of the scheme so that the Board would have had the opportunity to take action to prevent the losses.  Based on these allegations, the *HHRG* complaint, like the *Underwriters* and *GWRC* complaints, asserts claims for breach of contract (Count 1) , malpractice-negligence (Count 2) and negligent misrepresentation (Count 3).

In support of this theory regarding the loss of its business, HHRG has proffered as an expert Craig T. Elson.[50]  In Elson's report of March 18, 2005, he concludes: "[I]t is my opinion that the fair market value of HHRG as of June 30, 1998, ranged from $28.9 to $30.7 million."[51]

_____

[50] While PwC contests numerous aspects of the opinions of each of the experts designated by HHRG, it addresses herein only those aspects of their reports and testimony relevant to this motion.

[51] (Rep. of Craig T. Elson, dated March 18, 2005 ("Elson Rep.") at 2 (Ex. 25); Dep. Tr. of Craig T. Elson, dated May 26, 2005 ("Elson Tr.") at 4-5 (Ex. 26).  *See also* 56(a)(1) ¶ 59.)  Mr. Elson's valuation of HHRG has been challenged by Anil Shivdasani, a business school Professor of Finance and Chairman of the Finance Area who has provided an expert opinion on behalf of PwC. (*See, e.g.,* Report of Anil Shivdasani, dated July 7, 2005 ("Shivdasani Report") at 1 (Ex. 33).)  Professor Shivdasani states that Mr. Elson has overstated the value of HHRG and estimates that the equity value of HHRG as of June 30, 1998 was only $8.7 million.  (*See id.* at 2.)

Elson does not value the equity of HHRG but rather its "enterprise value." Essentially, this represented the gross going concern value of HHRG's assets, without deducting secured debt of about $8 million.[52] Elson adopted June 30, 1998 as the valuation date based on the assumption that by then "HHRG's business was being operated in a manner substantially inconsistent with its policy regarding foreign advances."[53] As set out at page 6 *supra*, the June 1998 time frame marks the high point of HHRG's reportedly profitable performance and precedes the existence of numerous internal and industry factors negatively impacting HHRG's performance, which Elson ignores. Elson provides no opinion as to the value of HHRG on the day on which it filed for bankruptcy protection in March 2000, or indeed at any point between June 30, 1998 and March 2000.[54]

HHRG's damages theory was explained in its recent responses to PwC's contention interrogatories:

> "As a result of the professional negligence of [PwC], the going concern value of [HHRG] was destroyed entirely and HHRG suffered damages in the amount of Thirty Million Seven Hundred Thousand Dollars ($30.7 Million), representing the fair market value of HHRG as a going concern. <u>See</u> Report and testimony of Craig T. Elson."[55]

---

Further, Professor Shivdasani opines that this value would have been made lower yet by the time of HHRG's bankruptcy filing as a result of other industry and firm-specific factors. (*See id.*, at 2.)

[52] (Elson Rep. at 12, 14, 26.)

[53] (Elson Rep. at 1; Elson Tr. at 26-28 (Ex. 26). *See also* 56(a)(1) ¶ 59.)

[54] (*See generally* Elson Rep.; *see also* Elson Tr. at 50 (Ex. 26). *See also* 56(a)(1) ¶ 60.)

[55] (HHRG's Responses to PWC Interrogs., dated July 15, 2005 at Resp. to Interrog. No. 1 (Ex. 27). *See also* 56(a)(1) ¶ 57.)

Neither Elson nor any other expert opines, however, that PwC *caused* the decline in value of HHRG over the following two years.[56]  Nor does plaintiff take into account HHRG's poor performance after June 1998, the external industry factors that adversely affected the performance of all refiners, the poor operational and investment decisions by HHRG's Board of Directors and management that were unrelated to Panexim, or HHRG's remaining "enterprise value" after the bankruptcy.

## ARGUMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Once a properly supported motion for summary judgment has been made, the non-moving party has the burden of presenting "specific facts showing that there is a genuine issue for trial."  *Id.* at 250 (citation omitted).  On issues where the party opposing summary judgment has the burden of proof (such as proximate cause), the moving party may point out the absence of evidence on the issue, and the motion should be granted if the opposing party does not adduce evidence sufficient to permit a reasonable jury to decide the issue in its favor.  *See*

---

[56] (*See* Elson Rep. at 1 (Ex. 25); Elson Tr. at 50 (Ex. 26); Dep. Tr. of John Dempsey, dated June 30, 2005 ("Dempsey Tr.") at 61-62 (Ex. 33); Rep. of John Salomon, dated April 2, 2005 ("Salomon Rep.") at 28 (Ex. 28).  *See also* 56(a)(1) ¶¶ 61, 64, 67.)

-20-

*Celotex v. Catrett*, 477 U.S. 317, 325 (1986); *PepsiCo, Inc. v. Coca-Cola Co.,* 315 F.3d 101, 105 (2d Cir. 2002).

The party opposing summary judgment "may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). The applicable standard is similar to the standard for a motion for directed verdict after trial, *i.e.,* whether a reasonable jury could fail to return a verdict for the moving party. *Anderson,* 477 U.S. at 250-251. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## I.    PwC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE HHRG HAS FAILED TO DISCLOSE EXPERT TESTIMONY THAT PwC'S CONDUCT WAS THE PROXIMATE CAUSE OF HHRG'S CLAIMED LOSSES.

### A.    Plaintiff Must Prove That The Alleged Conduct Of PwC Proximately Caused HHRG's Claimed Losses.

In a professional malpractice case, the plaintiff must establish "that the defendant's negligent conduct was a cause in fact and the proximate cause of" plaintiff's claimed injury. *See, e.g., Boone v. William W. Backus Hosp.*, 272 Conn. 551, 571 (2005) (physician malpractice case). "Cause in fact," also called actual cause, means that the injury would not have occurred but for the defendant's negligent conduct. *See Stewart v. Federated Dep't Stores, Inc.*, 234 Conn. 597, 605 (1995); *accord Boone,* 272 Conn. at 571; *Purzycki v. Town of Fairfield*, 244 Conn. 101, 113 (1998). The concept of proximate causation "serves to '[temper] the expansive view of causation [in fact] . . . .'" *Stewart,* 234 Conn. at 606 (quoting *Doe v. Manheimer*, 212 Conn. 748, 757-58 (1989)). Proximate cause is thus defined as "[a]n actual cause that is a substantial factor in the resulting harm," and reflects the question of "whether the harm which

occurred was of the same general nature as the foreseeable risk created by the defendant's negligence." *Purzycki*, 244 Conn. at 113 (quoting *Stewart*, 234 Conn. at 606 and *Doe*, 212 Conn. at 758); *accord Boone,* 272 Conn. at 571.  In other words, "[t]he existence of the proximate cause of an injury is determined by looking from the injury to the negligent act complained of for the necessary causal connection.'" *Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 182 (1994) (citation omitted); *accord Vona v. Lerner*, 72 Conn. App. 179, 190 (2002).

The requirement to establish causation applies not only to negligence claims, but also to claims denominated as breach of contract and negligent misrepresentation.  *See, e.g., Johnson v. Chesebrough-Pond's USA Co.*, 918 F. Supp. 543, 549 (D. Conn. 1996) (citing *Revak v. SEC Realty Corp.*, 18 F.3d 81, 90 (2d Cir. 1994)) ("Like any cause of action sounding in negligence, negligent misrepresentation requires a showing of proximate cause."); *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.,* 392 F.3d 520, 525 (2d Cir. 2004) ("Causation is an essential element of damages in a breach of contract action; and, as in tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her damages."), aff'd mem. 104 F.3d 355 (2d. Cir. (1996); *Calig v. Schrank*, 179 Conn. 283, 286 (1979) (plaintiff must establish the causal relation between a breach of contract and damages flowing therefrom).[57]  Thus, in order to prevail,

---

[57] HHRG's claims all sound in deficient professional services or professional malpractice, since PwC is sued in its capacity as an accounting professional, its alleged breaches arise out of its accountant-client relationship with HHRG, and they are inextricably tied to its accounting services for its client.  *See, e.g., Boone v. William W. Backus Hosp.,* 272 Conn. 551, 562-66 (2005) (citing *Gold v. Greenwich Hosp. Ass'n*, 262 Conn. 248, 254 (2002)) (claims pleaded as ordinary negligence and recklessness against medical professionals were properly characterized as sounding in professional malpractice); *Vona v. Lerner*, 72 Conn. App. 179, 185-88 (2002) (claims alleging negligence, breach of contract and breach of fiduciary duty against attorneys all analyzed as sounding in professional malpractice); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (claims against accounting and law firms for *inter alia*

plaintiff must show both that HHRG's value would not have declined after June 30, 1998 but for the alleged conduct of PwC, and that PwC's conduct proximately caused the decline in value.

### B.    HHRG Must Establish Proximate Causation Through Expert Testimony.

As a rule, "expert testimony is required when the question involved goes beyond the field of the ordinary knowledge and experience of judges or jurors." *Latham & Assocs., Inc. v. William Raveis Real Estate, Inc.*, 218 Conn. 297, 301 (1991) (internal quotation marks and citations omitted); *accord Estate of Lepage v. Horne*, 262 Conn. 116, 125 (2002).  In diverse contexts, where the requisite causal connection between the defendant and the ultimate injury is not obvious to the lay juror, expert evidence is required to establish it.  *See, e.g., Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (causal link between toxins and carcinoma beyond the knowledge of the lay juror).

In accordance with these principles, a plaintiff must present expert testimony to establish proximate causation in support of a professional malpractice case.  *See, e.g.*, *Law v. Camp*, 116 F. Supp. 2d 295, 305 (D. Conn. 2000) ("It is axiomatic that the plaintiff in a medical malpractice action has the burden of proving legal causation by expert testimony."), *aff'd in relevant part,* 15 Fed. Appx. 24 (2d Cir. 2001); *Boone*, 272 Conn. at 567, 573-75 (similar); *Ahern v. Fuss & O'Neill, Inc.*, 78 Conn. App. 202, 208 (2003) (expert testimony required in engineering malpractice case); *Vona*, 72 Conn. App. at 180 (legal malpractice case); *Solomon v. Levett*, 30 Conn. App. 125, 128 (1993) (in an attorney malpractice action, "the plaintiff must produce expert testimony (1) that a breach of the professional standard of care has occurred, and (2) that the breach was the proximate cause of the injuries suffered by the plaintiff."); *Somma v. Gracey,*

---

negligence, professional malpractice and breach of contract all traceable to "the provision of deficient professional services").

15 Conn. App. 371, 374-75 (1988) (same); *Campbell v. Pommier*, 5 Conn. App. 29, 32 (1985)
("In Connecticut, both breach of the standard of care and proximate cause must be proved by
expert testimony."); *Faulise v. Eisenstein*, No. CV980490341S, 2000 Conn. Super. LEXIS 3017,
at *15 (Conn. Super. Ct. Oct. 30, 2000) ("[E]ven if the court were to find that the defendant's
representation was below the requisite standard of care, in the absence of expert testimony, the
plaintiff cannot establish that the defendants breach was the proximate cause of the injuries
suffered by the plaintiff.").[58]

The failure to introduce expert testimony on causation is grounds for summary judgment
or a directed verdict.  In *Law v. Camp*, the plaintiff sued several physicians and a hospital for
professional malpractice in connection with the removal of a patient's life support.  116 F. Supp.
2d 295, 300-301 (D. Conn. 2000).  Plaintiff moved for summary judgment, and argued that the
removal of life support had been the undisputed cause of the patient's death.  *See id.* at 302.  The
defendants also moved for summary judgment, including because plaintiff had failed to establish
proximate cause through expert testimony.  *See id.* at 306-10.  The court denied plaintiff's
motion because the plaintiff, Law, "has not established proximate cause – the nexus between the
negligence and Mrs. Law's death – by expert testimony.  His failure to do so is dispositive."  *Id.*
at 304 (citation omitted).   The court reasoned:

> "Here, Law offers no expert opinion to establish that the defendants' alleged
> negligence was a proximate cause of Mrs. Law's death.  He merely asserts that

---

[58] There is no reason to distinguish accountants from other professionals.  In other
contexts, the Connecticut courts have recognized that professional accountants are part of a
skilled, professional class, akin to legal or medical professionals.  *See Advest Group, Inc. v.
Arthur Andersen, LLP*, No. CV 970571417, 1998 Conn. Super. LEXIS 2137, at *20 (Conn.
Super. Ct. July 20, 1998) (applying CUTPA professional negligence exemption to accountants
because: "Accounting, like law and medicine, is a learned profession that is not interchangeable
with other commercial endeavors."); *accord Vanczak v. Romani,* No. 990080053, 2002 Conn.
Super. LEXIS 3397 (Conn. Super. Ct. Oct. 18, 2002).

> causation is not an issue because it is undisputed that Mrs. Law was not brain dead before the life support was removed and that she died as a result of its removal. Law's failure to adduce the required expert opinion as to causation is fatal to his claim."

*Id.* at 306. Likewise, the court granted defendants' motions for summary judgment on plaintiff's malpractice claims, holding that Law "does not have any expert testimony to support his malpractice claims against [defendant]. This lack of evidence is fatal to his claims." *Id.* at 307; *see also id.* at 307, 309, 310 (granting summary judgment to other defendants on similar grounds). Relying upon *Law v. Camp*, the Second Circuit recently agreed that, under Connecticut law, a medical malpractice plaintiff carries the burden of establishing, through expert testimony, that "the defendant's deviation from the standard of care proximately caused the plaintiff's injuries." *Davis v. Rodriguez*, 364 F.3d 424, 430 (2d Cir. 2004).

In *Vona v. Lerner*, the plaintiffs sued an attorney and his law firm *inter alia* for malpractice in connection with their purchase of real estate. *Vona*, 72 Conn. App. at 182-85. The plaintiffs alleged that, as a result of the attorney's negligent conduct, they had suffered financial losses. *See id.* at 186. The attorney sought and obtained a directed verdict on the basis that plaintiffs' expert witness had failed to offer testimony to establish proximate cause and, in particular, "had provided no responses that connected a breach of the standard of care with the damages the plaintiffs claimed." *Id.* at 189. The Appellate Court agreed:

> "In this case, there was no expert testimony that Lerner's [the attorney's] alleged negligence was the proximate cause of the plaintiffs' claimed damages. Hawkins [plaintiffs' expert] did not connect the services Lerner rendered with respect to the transfer of property to any of the financial losses the plaintiffs alleged they sustained after they took title to the property, regardless of their reasons for doing so. The jury therefore could have reached no other conclusion than to find in favor of the defendants."

*Id.* at 191-92.[59]

The type of expert testimony that plaintiff is required to produce here is the same kind of testimony typically seen in federal securities law cases which, as the Supreme Court recently noted, have their roots in common law principles.[60]   In a securities case, a plaintiff is required to show the extent to which a decline in value of a company's stock was proximately caused by the alleged misconduct rather than independent factors. In such cases, an expert witness typically will perform an analysis to separate out factors that were unrelated to the plaintiff's claims.  *See, e.g.*, *Wal-Mart Stores v. Visa USA Inc.* (*In re Visa Check/Mastermoney Antitrust Litg.*), 280 F.3d 124, 134-35 (2d Cir. 2001) (describing expert evidence from both plaintiff and defendant regarding the effect of other consequences on plaintiff's damages model).  In *Fecht v. Northern Telecom Ltd.* (*In re Northern Telecom Ltd. Sec. Litig.*), 116 F. Supp. 2d 446 (S.D.N.Y. 2000), the court granted summary judgment for defendants in part because plaintiffs failed to prove that the claimed misrepresentations proximately caused the alleged losses.  The court pointed out that the defendants' expert had conducted an "event study," which uses "regression analysis and other statistical techniques to model the effect that public statements have on a particular company's trading experience and normalizing that experience to factor out performance of the stock market generally or of stocks in relevant related indices."  *Id.* at 456-57.  Plaintiff's expert report was

_____

[59] While limited exceptions exist to the requirement of expert testimony in a professional malpractice case, they occur in cases involving obvious and gross circumstances.  Indeed, in *Boone*, the Connecticut Supreme Court, held that the "high threshold of egregiousness" necessary had not been met, and noted that the exceptions in medical malpractice cases have been limited to circumstances involving foreign objects left in patients after surgery and other abnormal injuries in surgery.  *Boone*, 272 Conn. at 567-68.

[60] In securities law cases, this is called "loss causation."  As explained more fully below, *see* pp. 37-38, the Supreme Court has noted the common law roots of securities fraud actions and the relationship between loss causation and the general tort law concept of proximate cause.  *See Dura Pharms. Inc. v. Broudo*, 125 S. Ct. 1627, 1632-33 (U.S. 2005).

"fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information" or address defendant's approach. *Id.* at 460.[61]  In this case, such expert testimony would have to remove the effects of independent industry and company factors in order to determine whether any conduct of PwC proximately caused HHRG's losses.

### C.    The Elson Report Does Not Opine That PwC Proximately Caused Plaintiff's Claimed Losses.

HHRG has not disclosed any expert report or testimony that, if credited, would meet these standards.  HHRG relies on the report of Craig Elson, who opines that the "enterprise value" of HHRG as of June 30, 1998 was between $29.8 and $30.7 million.  As plaintiff explains in its response to PwC's contention interrogatories:  "For specific details on how HHRG's damages were calculated, see expert report of Craig Elson and testimony at deposition of this expert."[62]  Elson did not opine on HHRG's enterprise value at the time of the bankruptcy or at any intermediate date,[63] and did not even purport to address the issue of causation:

"Q    Do you have any opinion as to any causation issue in this case?

"A    None."[64]

---

[61] *See also, e.g., Wills v. Amerada Hess Corp.*, 379 F.3d at 46 (where "an injury has multiple potential etiologies" expert testimony is necessary to establish causation) (citing *Claar v. Burlington N. R.R.*, 29 F.3d 499, 503-04 (9th Cir. 1994)); *Intimate Bookshop, Inc. v. Barnes & Noble*, 2003 U.S. Dist. LEXIS 17231, at *14 (S.D.N.Y. Sep. 30, 2003) (in antitrust case, "[o]nly expert testimony can demonstrate that any injury to plaintiffs was caused by defendants' unlawful conduct, and not because of lawful competition or other factors").

[62] (HHRG's Responses to PWC Interrogs., dated July 15, 2005 at Resp. to Interrog. No. 1 Resp. to Interrog. No. 2, at 6 (Ex. 27).)

[63] (*See generally* Elson Rep. (Ex. 25); *see also* Elson Tr. at 50-51 (Ex. 26).  *See also* 56(a)(1) ¶ 60.)

[64] (Elson Tr. at 50 (Ex. 26). *See also* 56(a)(1) ¶ 61.)

His testimony thus is nothing more than a valuation opinion, as of an arbitrary date, and is plainly insufficient to meet HHRG's burden to introduce expert testimony on proximate causation.  Simply put, allegations that the enterprise value of HHRG declined from over $30 million on June 30, 1998 to $0 after March 2000, even if proved, do not establish that PwC caused that decline, because they do not take into account other factors that may have accounted for the decline.

As noted above, in the ordinary course, the value of a business may fluctuate dramatically over time for reasons wholly unrelated to any alleged tortious conduct by third parties, including, as in this instance, a company's auditor.  As plaintiff's own contemporaneous documents attest, HHRG's performance was negatively affected by, among other factors, difficult conditions in the industry, higher metal lease rates which increased HHRG's financing costs, HHRG's own management and investment decisions, and the federal criminal indictment of two senior officers.  *See* pp. 7-15, 19-21 *supra*.  Further, any assessment of the impact of these other factors is particularly difficult because HHRG's internal systems did not permit its board to determine whether segments of the business were making or losing money.  Plaintiff's failure to produce expert testimony to establish that PwC proximately caused the diminution in the value of HHRG's business is fatal to its case.[65]

---

[65] Because plaintiff's theory is based on the specialized concept of "enterprise value," *see* p. 18-19, *supra*, which is beyond the ordinary experience of lay jurors, plaintiff's claim also fails because it has not produced expert testimony of HHRG' "enterprise value" after the bankruptcy. A lay jury would have no basis to compare HHRG's terminal enterprise value to its "enterprise value" on June 30, 1998, the date on which Elson opines.

**D.    The Dempsey Report Does Not Address PwC's Conduct Or HHRG's Claimed Losses.**

HHRG also has disclosed as an expert John Dempsey, who authored the proof of loss on which HHRG relied in pursuing its claims against Underwriters and its other insurers.  Mr. Dempsey opines that as a result of the improper activities of HHRG management, including the Panexim advances, HHRG lost over $18 million.  But however instrumental the Dempsey Report may have been in persuading Underwriters to pay HHRG's insurance claim, it does not advance, let alone support, HHRG's claim against PwC for the destruction of its business.  First, Mr. Dempsey has expressed no opinion whether PwC caused any losses to HHRG.[66]  Second, Mr. Dempsey has no opinion whether the alleged misconduct of HHRG management with respect to Panexim and other South American businesses, much less PwC's alleged failure to detect such misconduct, caused any losses beyond the insured losses, including the destruction of HHRG's business.  The losses on which Dempsey does opine are the ***very losses for which HHRG has been compensated*** and which Underwriters are now pursuing against PwC.  The Dempsey Report does not establish that PwC caused losses other than the Panexim losses.

**II.    EVEN IF EXPERT TESTIMONY WERE NOT REQUIRED, HHRG HAS FAILED TO OFFER SUFFICIENT EVIDENCE TO PROVE THAT ITS CLAIMED LOSSES WERE PROXIMATELY CAUSED BY PwC.**

**A.    HHRG Has Failed To Introduce Sufficient Evidence That PwC Proximately Caused The Claimed Losses.**

Construed most favorably to HHRG, the evidence shows at most that HHRG had a fair market value of $30.7 million on June 30, 1998, and no value after March 2000.  There is no competent admissible evidence, however, that PwC proximately caused that decline.

---

[66] (*See generally*, *id.;* Dep. Tr. of John Dempsey, dated June 30, 2005 ("Dempsey Tr.") at 61-62 (Ex. 33). *See also* Rule 56(a)(1) ¶ 64.)

HHRG asserts, of course, that PwC failed adequately to conduct its audits relating to advances to Latin American companies, and that if HHRG's Board had been notified of the improper conduct by HHRG management, the losses to Panexim would have been avoided. But those are the same losses for which HHRG has been compensated and that are the subject of the subrogation claim filed by Underwriters. HHRG has recovered for these losses and cannot recover for them again. *See, e.g., Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 259 (2d Cir. 1999) ("Subrogation is the principle which exists to prevent double recovery by the insured and to force the wrongdoer to bear the ultimate costs."); *accord Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 140 (4th Cir. 2000); *Copeland Oaks v. Haupt*, 209 F.3d 811, 814 (6th Cir. 2000) (citing 16 *Couch on Insurance* 2d § 61:18).

Further, HHRG's claims regarding the actions that the non-management members of HHRG board would have taken had they known of the alleged improprieties do not remedy the lack of evidence of proximate causation. These claims, if true, would show only that one event followed another. They would not show that the diminution in value of HHRG's business was proximately caused by PwC.

A jury is not free to assume that the loss of the value of HHRG's business – separate and apart from any losses caused by the advances to Panexim – was proximately caused by PwC. Rather, a jury must be given competent evidence from which to conclude that this deterioration in value was caused by PwC, as opposed to other factors that might affect a company's performance over a period of nearly two years. Particularly in this case, there are compelling reasons to adhere strictly to the rule requiring expert testimony.

First, HHRG's internal accounting system was so primitive that the Boards of Directors of HHRG and GWRC could not determine which sectors of the business made and lost money.

-30-

The Boards had directed for nearly two years that HHRG implement what the Boards called "profit center reporting," but such reporting was never fully implemented. In October 1998, for example, a member of the GWRC Audit Committee explained that "[t]he necessity for better reporting, which has been requested of HHRG for the last year, is highlighted by worse than budgeted performance over the last six months, for which there is no quantitative explanation."[67] The following month, Sean Russo, who sat on the Boards of Directors of HHRG and GWRC, wrote that HHRG could not explain why it was losing money in most of its operations, because Wayne "ha[d] refused to adopt a more focus[]ed approach to profit centre reporting despite it being requested by the Board." Instead, Russo explained, HHRG went out of its way "to conceal the real picture." Among other problems, Russo noted that Wayne had claimed that HHRG's business in Peru (*i.e.*, the Panexim business) was making money at a rate that would have represented nearly all of the company's profit, such that "[e]ither a large part of [the] business is losing money or Peru is misrepresented."[68] This is a critical point. Plaintiff's valuation expert, Craig Elson, bases his value of the company on HHRG's reported earnings as of March 31, 1998 and expected earnings from assumptions regarding revenue growth, maintenance of operating margins and other factors, all using the March 31, 1998 financial statements as a baseline. But no HHRG witness can testify whether HHRG made or lost money (apart from the Panexim losses included in the insurance claim) after March 31, 1998.

---

[67] (*See* Memorandum from C. Wiggins to M. Ryan, R. Hayes and B. Wayne dated October 28, 1998, at HHRG-PWC54200, 54204, 54206 (Ex. 16). *See also* 56(a)(1) ¶ 27.)

[68] (Memorandum from S. Russo to R. Lee, dated November 2, 1998 at GWRC-PWC0045791, 45793 (Ex. 17). *See also* 56(a)(1) ¶ 28.)

Second, without expert testimony the jury has no basis to determine the effect of independent factors on HHRG's value apart from any losses it suffered with respect to Panexim. The factors which negatively impacted the value of HHRG include:

- HHRG was subject to a significant contraction in the electronic scrap refining business in the fall of 1998 and in 1999, which was a key component of HHRG's business.

- A sustained increase in metal lease rates in 1999 contributed to erosion of any profitability of HHRG.

- HHRG had "appalling budgetary procedures" that made it unable to cost its activities properly.

- In late 1998, HHRG expended substantial cash to acquire a company called Enviromet, an investment that proved imprudent because Enviromet had recently lost the customer that had accounted for the vast majority of its revenue.

- In early 1999, HHRG acquired and consolidated GWRC's money-losing refinery in Canada, which had ceased operations, requiring subsidizing from HHRG and generating additional carrying costs.[69]

HHRG may contest the extent to which these other factors influenced HHRG's performance. But the point remains. Plaintiff may not simply argue that PwC proximately caused its losses and leave the jury to speculate about it. Rather, plaintiff must produce expert evidence from which a jury reasonably may conclude that HHRG's claimed losses were

---

[69] *See* pages 9-13 *supra*.

-32-

proximately caused by the alleged conduct of PwC in light of the many other factors that affected the value of HHRG.

**B.      Because Of That Failure PwC Is Entitled To Summary Judgment .**

While the issue of causation generally is for the trier of fact, it "becomes one of law when the mind of a fair and reasonable person could reach only one conclusion, and summary judgment may be granted based on a failure to establish causation." *Abrahams v. Young & Rubicam,* 240 Conn. 300, 307 (1997); *see also Stewart v. Federated Dep't Stores*, 234 Conn. at 611.  Accordingly, Connecticut courts regularly have found that a failure to offer proof of proximate causation results in judgment in favor of defendants as a matter of law.  *See, e.g., Abrahams,* 240 Conn. at 306-11 (denying summary judgment to plaintiff and granting summary judgment in favor of defendants in the absence of proof of proximate cause); *Boone*, 272 Conn. at 575 (affirming trial court's grant of summary judgment in favor of defendant in the absence of proof of proximate cause); *Sherman v. Bristol Hosp. Inc.*, 79 Conn. App. at 78, 91 (affirming trial court's grant of summary judgment in favor of defendants in the absence of proof of proximate causation); *Vona*, 72 Conn. App. at 190 (upholding directed verdict to defendant in the absence of proof of proximate cause); *Faulise,* 2000 Conn. Super. LEXIS 3017 at *15 (granting motion for summary judgment in favor of defendants in the absence of proof of proximate cause).

Where a party claims that a defendant caused it to lose value or profits, it must prove that the defendant caused those losses, and not simply leave the jury to rely on speculation or assumption, as plaintiff has done here.  With characteristic bluntness, Judge Posner chastised a plaintiff who claimed that the defendant's misconduct, as opposed to other factors, was responsible for the severe decline in plaintiff's sales:

-33-

> "For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. . . . *Post hoc ergo propter hoc* will not do. . . . The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor . . . from the damages that resulted from particular forms of misconduct allegedly committed by that competitor . . . ."

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992).

Consistent with this approach, numerous decisions have found against plaintiffs who fail to introduce evidence that the defendant's conduct rather than independent factors caused a claimed diminution in value or lost profits. For example, in *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F.Supp.2d 235 (S.D.N.Y. 1999), Fashion Boutique claimed that defendant's disparagement had caused its business to fail and resulted in the full lost value of its business of over $15 million. The district court explained that "for evidence of the lost value of Fashion Boutique's entire business to be relevant, Fashion Boutique ***must show that Fendi's isolated defamatory statements caused it to lose its entire business,***" and held that, because there was no such proof of causation, the lost value of the business was "not the measure of damages . . . that plaintiff can prove." *Id.* at 238 (emphasis added). The Second Circuit agreed and affirmed: "To permit Fashion Boutique to present evidence of the value of the entire business in the absence of evidence of widespread dissemination [of the alleged defamatory statements] would invite the jury to award damages based on speculation." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002). *See also Tyger Construction Co. v. Pensacola Construction Co.*, 29 F.3d 137, 142-43 (4th Cir. 1994) (vacating part of the jury's damages award because there was no evidence establishing a causal connection between the alleged misconduct and damages); *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1078 (W.D. Ky. 1995) (granting summary judgment on plaintiff's common law claims, in part because

plaintiff's evidence on damages, in the absence of a causal relationship to defendants' conduct, amounted to speculation and could not be considered by jury).[70]

The courts have reached the same result in antitrust and securities fraud cases, which are analogous because they also require the plaintiff to show that financial losses were caused by the defendant's alleged misconduct, as opposed to other factors affecting the industry generally or the performance of the particular company at issue.  In the antitrust context, the Second Circuit has held that a "plaintiff's proof of amount of damages [] must provide the jury with a reasonable basis upon which to estimate the amount of its losses caused by other factors, such as management problems, a general recession or lawful factors." *United States Football League v. Nat'l Football League*, 842 F.2d 1335, 1378-79 (2d Cir. 1988).  This is because, "[w]hen a plaintiff *improperly attributes all losses* to a defendant's illegal acts, *despite the presence of significant other factors*, the evidence does not permit a jury to make a reasonable and principled estimate of the amount of damage." *Id.* at 1379 (emphasis added) (citing *MCI Commun's Corp. v. ATT*, 708 F.2d 1081, 1162-63 (7th Cir. 1982).  As a result, the Second Circuit upheld a damages award of $1.00, notwithstanding the finding that the NFL was liable

---

[70] *See also KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289, 1294-95 (M.D. Ala. 2001) (testimony on damages that did not take into account whether defendant had caused unjust enrichment would not be permitted); *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084-85, *overruled in part and sustained in part on other grounds*, 196 F.R.D. 608 (D. Kan. 2000) (plaintiff's damages expert "improperly attributed all losses to the defendants' allegedly illegal acts, despite the presence of other factors that could be significant to his analysis"); *Charter Marine Transp. v. Mallory, Jones, Lynch & Assocs.*, No. 88 Civ. 5687, 1990 U.S. Dist. LEXIS 6990 , at *8 (S.D.N.Y. June 5, 1990) (motion for summary judgment granted on the basis that plaintiff had not established causation, as "speculative possibility is not sufficient to cast a defendant in damages, either in contract or tort.")  *Nikkal Indus. Ltd. v. Salton, Inc.,* 735 F. Supp. 1227, 1237-38 (S.D.N.Y. 1990) (claim for lost sales rejected because plaintiff could not show that losses were caused by defendant rather than other factors).

-35-

for unlawful conduct in violation of federal antitrust laws.[71]  *Accord, Intimate Bookshop, Inc. v.*

*Barnes & Noble*, 2003 U.S. Dist. LEXIS 17231, at *21-22, 25-27 (granting summary judgment

for defendant; plaintiff's "unsupported assumption of causation and supposition that all of its

losses were caused by defendants' allegedly unlawful conduct, and failure to account for

defendants' lawful conduct and intervening market factors are fatal to its claim").

These principles were strongly brought home this year in *Dura Pharmaceuticals Inc. v.*

*Broudo.*  Although the opinion upholds the requirement of loss causation in a federal securities

law case, the Supreme Court made clear that the requirement derived from the concept of

proximate causation long required by the common law.  *Dura,* 125 S. Ct. at 1632-33.  In *Dura,*

the Court highlighted the importance of the causal connection from a defendant's conduct to the

alleged loss, particularly in light of other circumstances that may affect plaintiff's loss.  The

Supreme Court held that the purchase of securities at an inflated share price was insufficient to

establish loss causation because that approach was "inconsistent with the law's requirement that

a plaintiff prove that the defendant's misrepresentation (or other fraudulent conduct) proximately

caused the plaintiff's economic loss."  *Id.* at 1633-34.  The Supreme Court reasoned that an

inflated share price is not invariably linked to later economic loss:

> "When the purchaser subsequently resells such shares, even at a lower price, that
> lower price may reflect, not the earlier misrepresentation, but changed economic
> circumstances, changed investor expectations, new industry-specific or firm-

---

[71]  In that case, the Second Circuit rejected plaintiff's argument that the defendant "should
have borne the burden of separating out the amount of USFL losses caused by the NFL's
wrongful acts from the amount caused by other factors such as the USFL's unsuccessful merger
strategy."  United States Football League v. Nat'l Football League, 842 F.2d 1335, 1377-78 (2d
Cir. 1988).  While recognizing the latitude afforded plaintiffs in antitrust cases, the Second
Circuit reasoned that any latitude "is limited by the requirement that the damages awarded must
be traced to some degree to unlawful acts. . . . [and] is thus circumscribed by the need for proof
of causation."  *Id.* (internal citations omitted).

specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . .

"Given the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will *sometimes* play a role in bringing about a future loss. . . ."

*Id.* at 1632. The Supreme Court cited with approval the Second Circuit's decision in *Emergent Capital Investment Management, LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003), which also rejected the notion that an inflated share price could establish loss causation: "Plaintiff's allegation of a purchase-time value disparity, standing alone, cannot satisfy the loss causation pleading requirement. . . . it does not explain why [plaintiff] lost money on the purchase, the very question that the loss causation allegation must answer." *Id.* at 198. Like loss causation, common law proximate causation requires a causal connection between the defendant's conduct and a subsequent decline in the value of its worth, and "if the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation will not have been established." *Id.* at 197.

In sum, plaintiff has not produced evidence sufficient to create a genuine issue of fact whether PwC proximately caused HHRG's claimed losses, and thus PwC is entitled to summary judgment.

**C.    PwC Also Is Entitled To Summary Judgment Because HHRG Has Not Introduced Sufficient Evidence Of Any Damages Attributable To PwC With Reasonable Certainty.**

HHRG's failure to produce evidence that could establish that any losses were caused by PwC's alleged conduct further runs afoul of "the well established principle that such damages must be proved with reasonable certainty." *Beverly Hills Concepts, Inc. v. Schatz & Schatz*, 247 Conn. 48, 69 (1998); *accord Cheryl Terry Enters. v. City of Hartford*, 270 Conn. 619, 639 (2004); *see also Kidder, Peabody & Co. v. IAG Int'l Acceptance Group N.V.*, 28 F. Supp. 2d

-37-

126, 131, 137 (S.D.N.Y. 1998) (damages must be proven with reasonable certainty and plaintiff

had not met that requirement as a matter of law).  In particular, damages for lost profits "are

recoverable only to the extent that the evidence affords a sufficient basis for estimating their

amount with ***reasonable certainty***."  *Beverly Hills Concepts, Inc.*, 247 Conn. at 69 (emphasis in

original); *accord Omega Eng'g, Inc.*, 30 F. Supp. 2d, 226 263 (D. Conn. 1998).  In *Beverly Hills

Concepts*, for example, the Connecticut Supreme Court reversed the trial court's $15 million

damages award for lost profits in connection with alleged professional malpractice, noting:

> "In this case, the defendants argued that [plaintiff's expert's] testimony failed to
> remove the question of damages from the realm of speculation and, consequently,
> the plaintiff failed to satisfy its burden of proof on the issue of damages.  This is a
> case in which we reverse the judgment not for lack of 'mathematical exactitude' .
> . . but because the plaintiff failed to provide sufficient evidence."

*Beverly Hills,* 247 Conn.  at 78 (internal citations omitted).  *See also, e.g., Coughlin v. Anderson*,

270 Conn. 487, 512 (2004) (affirming directed verdict for defendants in light of the lack of

evidence of damages from partial encumbrance);  *Lawson v. Whitey's Frame Shop*, 241 Conn.

678, 689-90 (1997) (affirming damages of only $50 salvage value of vehicles).  In light of the

same additional factors that influenced the performance and value of HHRG and impaired the

parties' ability accurately to measure that value, the record does not permit any reasonably

reliable estimation of HHRG's claimed lost value attributable to PwC's alleged conduct.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for PwC on all counts of HHRG's complaint, and dismiss the complaint with prejudice.


                              DEFENDANT,
                              PRICEWATERHOUSECOOPERS LLP


                              By:  ____/s/ Thomas D. Goldberg_____
                                   David J. Elliott (ct 04301)
                                   Thomas D. Goldberg (ct 04386)
                                   Day, Berry & Howard LLP
                                   One Canterbury Green
                                   Stamford, Connecticut 06901-2047
                                   Tel:  (203) 977-7300
                                   Fax: (203) 977-7301
                                   Its Attorneys

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


_____/s/ Thomas D. Goldberg_____
David J. Elliott (ct 04301)
Thomas D. Goldberg (ct 04386)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901-2047
Tel:  (203) 977-7300
Fax: (203) 977-7301
Its Attorneys


Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman &
Dicker LLP
150 East 42nd St.
New York, NY  10017-5639

William H. Champlin, III, Esq.
Michael T. McCormack, Esq.
William S. Fish, Jr., Esq.
Tyler Cooper & Alcorn, LLP
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Daniel E. Tranen, Esq.
Wilson, Elser, Moskowitz, Edelman &
Dicker LLP
120 N. LaSalle Street
Chicago, IL  60602

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
LLP
3 Gannett Drive
White Plains, NY 10604-3407

Steven R. Humphrey (ct06053)
Dina S. Fisher (ct14896)
James M. Ruel (ct21222)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Jed Horwitt, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Ave.
P.O. Box 3186
Bridgeport, CT 06605-0186