## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : |
|           Plaintiff, | :  CIVIL ACTION NO. |
| | :  3:02 CV 1379 (MRK) |
| VS. | : |
| | : |
| PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP, | : |
|           Defendants. | : |
| | |
| ALEC SHARP, et al., | : |
|           Plaintiff, | :  CIVIL ACTION NO. |
| | :  3:02 CV 1572 (MRK) |
| VS. | : |
| | : |
| PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP, | : |
|           Defendant. | : |
| | |
| HANDY & HARMAN REFINING GROUP, INC., | : |
|           Plaintiff, | : |
| | :  CIVIL ACTION NO. |
| VS. | :  3:02 CV 1803 (MRK) |
| | : |
| PRICEWATERHOUSECOOPERS LLP, | : |
|           Defendant. | :  August 12, 2005 |
| | : |

## <u>CONSOLIDATED LOCAL RULE 56(A)(1) STATEMENT OF DEFENDANT PRICEWATERHOUSECOOPERS LLP</u>

Pursuant to Local Rule of Civil Procedure 56(a)1, the defendant, PricewaterhouseCoopers LLP ("PwC"), in support of its motions for summary judgment on all claims asserted by Handy & Harman Refining Group, Inc. ("HHRG") and Golden West Refining Corporation Limited ("GWRC"), respectfully submits the following statement of material facts as to which there is no genuine issue to be tried.

**The Parties**

1.  HHRG was a Connecticut corporation in the business of refining precious metals with headquarters and a principal place of business in Connecticut.  (Handy & Harman Refining Group, Inc. Complaint, dated August 9, 2002, at ¶¶ 10, 12 ("HHRG Compl.").)

2.  Golden West Refining Corporation Limited ("GWRC") was an Australian metals refining company, traded on the Australian Stock Exchange until 2001 and majority owned by N.M. Rothschild & Sons (Australia) Pty. Ltd.  (HHRG Compl. at ¶ 13; Handy & Harman Refining Group, Inc. Consolidated Financial Statements dated March 31, 1998 and March 31, 1997 ("1997-1998 HHRG Consolidated Financials") at PWC Z 02595, 02605 (Ex. 2); A Chronology of Handy & Harman Refining Group, Inc. 1995-2002 ("HHRG Chronology") at GWRC-PWC0068110 (Ex. 10).)

3.  PwC, and its predecessor in interest Coopers & Lybrand LLP, provided professional accounting and auditing services for HHRG from 1996-1999.  Those services included audits of HHRG's financial statements for the period ended March 31, 1997; the fiscal year ended March 31, 1998; and the fiscal year ended March 31, 1999.  (*See* HHRG Compl. at ¶¶ 11, 24, 25, 39, 56, 59, 94, 133.)

**HHRG's Purchase of the Precious Metals Refining Division of Handy & Harman, Inc.**

4.  In 1996, GWRC formed HHRG as a wholly-owned subsidiary of GWRC in order to acquire the assets of the Precious Metals Refining Division of Handy & Harman, Inc., then one of the largest precious metals refiners in the world.  (*See* HHRG Compl. at ¶¶ 13, 14.)

5.  The acquisition was completed in August 1996 at a price of $9 million, funded with a cash contribution of $8.645 million from GWRC.  (*See* 1997-1998 HHRG Consolidated Financials, at PWC Z 02595 (Ex. 2).)

6.   To manage the new subsidiary, GWRC hired the pre-existing senior management of the Precious Metals Refining Division, including Barry Wayne, who was appointed President and Chief Executive Officer, Richard Searle, who was appointed Vice President of Sales and Marketing, and Luis Posada, who became the Smelter Administrator.  (*See* Letter to M. Ryan from Dempsey, Meyers & Co., dated October 9, 2000 ("Dempsey Rep."), at 1. (Ex. 19).)

**Factors Affecting HHRG's Financial Performance After Mid-1998**

7.   For the period ended March 31, 1997, which included the first seven months of HHRG's operations, HHRG reported operating income of $2,649,156 and net income of $1,519,877.  (*See* 1997-1998 HHRG Consolidated Financials, at PWC Z 02593 (Ex. 2).)

8.   For the full year ended March 31, 1998, HHRG reported operating income of $4,601,522 and net income of $2,556,489.  (*Id.*)

9.   A significant source of HHRG's metal supply came from precious metals recovered from electronic scrap.  In late 1998, GWRC issued a press release announcing reduced profits, particularly from its U.S. operations, due in part to the effect "felt in the electronic scrap sector" as a result of a slowdown in computer manufacturing and the Asian financial crisis.  (*See* Golden West Announces Half Year Result, dated November 30, 1998, at GWRC-PWC-E0003114 (Ex. 3).)

10. In June 1999, GWRC issued a press release on first half earnings, which stated:

"As reported in November 1998, the Asian financial crisis had a negative impact on the traditionally slow first half.  Particularly affected was Golden West Refining's United States subsidiary, [HHRG], due to a slowdown in the computer manufacturing sector in the United States which is a significant source of business."

(GWRC Press Release, "Second Half Performance Boosts Profit for Golden West," issued June 1999 at GWRC-PWC-E0014718 (Ex. 35).)

-3-

11. In its July 1999 Operations Report, HHRG noted that less electronic scrap was being generated and that collection of electronic scrap from end users was more difficult, resulting in the erosion of HHRG's traditional electronic scrap customer base and declining profits.  (*See* Handy & Harman Operations Report July 1999 at HHRG-PWC78035 (Ex. 18).)

12. In a memorandum dated September 20, 1999 to the Australian directors on HHRG's Board, the Chairman of HHRG's Board of Directors, Robert Guy, commented on HHRG's financial performance:

> "Described by [HHRG CEO] Barry [Wayne] as 'miserable.' [HHRG CFO] Rick [Ollett] noted HHRG had just suffered its worst August in four years.  The company is operating at break-even and will likely deteriorate further in the short-term because of rising metal interest rates… [.]"

> "[L]ike nearly all companies involved in the international precious metal industry, HHRG is operating in a very difficult environment.  Mining companies are squeezing refinery margins and low precious metal prices are undermining severely the economics of recycling."

(Memorandum from R. Guy to R. Lee, C. Wiggins, S. Russo, R. Warren and M. Ryan, dated September 20, 1999 ("September 1999 Guy Memorandum") at GWRC-PWC0066089-0066090 (Ex. 4); *see also* Dep. Tr. of Michael Ryan, dated March 24, 2005 ("Ryan Tr.") at 251-52 (Ex. 5).)

13. HHRG's October 1999 operating report reported a pre-tax loss for the month of $472,000 and year-to-date pre-tax losses of $756,000, versus HHRG's budget that it would earn profits of over $2.2 million for the same period.  The report stated:  "Many of our business segments are facing unprecedented adverse conditions.  These stem from competitive forces, changes in the market place, our position in the market and variability's [sic] inherent in dealing with financial commodities (gold, silver, etc.)." The report also stated that competition, primarily from Swiss refiners, had caused a continued decline in margins and that HHRG's average

treatment charge for gold refining had been driven down by one-third, from $.45 per ounce to the $.30 per ounce range.  Similarly, the report noted that, with respect to high grade silver refining, "[a]s with gold refining, margins are under pressure."  (HHRG Operations Report dated October 1999, at HHRG-PWC 78999-79000 (Ex. 6).)

14. HHRG did not "own" the metal at its refining facilities.  Upon receiving metal, it immediately "sold" the metal to one of its financing sources.  HHRG then repurchased and sold the metal once the refining process was complete.  (*See* 1997-1998 HHRG Consolidated Financials, at PWC Z 02595, 02597, 02601 (Ex. 2); *see also* Expert Report of William F. Pinney ("Pinney Rep.") at 5 (Ex. 9).)

15. HHRG did not pay its financing sources interest, but rather paid fees corresponding to the metal lease rate in effect. (*See, e.g.,* Master Precious Metals Purchase and Refining Agreement by and between Attleboro Refining Company, Inc. and Credit Suisse, dated August 20, 1996, § 2.4 (Ex. 1).)  Thus, the "lease rate" was effectively HHRG's financing cost; the higher the lease rate, the more it must pay to its financing sources.

16. In 1998, metal lease rates for silver went up "five-fold."  HHRG had massive silver borrowing costs that obliterated the profit HHRG expected to make and had a negative impact on HHRG's broader business.  (*See* Dep. Tr. of Sean Russo, dated June 24, 2005 ("Russo Tr.") at 77 (Ex. 7).)

17. The increase in HHRG metal lease rates was consistent with the market trend.  The three-month average annual lease rates for silver, which had remained at or under 1.7% from 1991 through 1997, rose significantly from these low historical levels to 5% in 1998 and 3.9% in 1999.  The three-month average annual gold lease rates also rose from 1998 to 1999.  (*See*

September 1999 Guy Memorandum, at GWRC-PWC 0066090 (Ex. 4); *see also* Expert Report of

William F. Pinney ("Pinney Rep.") at 3 and Ex. 5 (Ex. 9).)

18. According to the Chairman of HHRG's Board of Directors, in September 1999:

"HHRG has not reacted as well as it should to the deteriorating market.  In part this is due to

what, in retrospect, were appalling budgetary procedures.  It is also due, as colleagues have

persistently pointed out over the last twelve months, to an inability to cost properly the various

activities of the company."  He further stated there was "no prospect, in the short term of turning

around the core refining business . . . ." (September 1999 Guy Memorandum at GWRC-PWC

0066090 (Ex. 4).)

19. On December 10, 1999, GWRC reported in a press release that HHRG lost money for

the quarter ended September 30, 1999 as a result of "extremely adverse business conditions."

The release identified numerous contributing factors:

> "Low grade electronic scrap business continued to contract due to changing technology
> reducing contained precious metals content.  This position was exacerbated by substantial
> increases in external costs and a sustained increase in gold and silver lease rates during
> the period.  In the high grade mine dore business, competition increased from European
> refiners, which also had a knock on effect of squeezing margins in many other market
> sectors.  In addition, initiatives…have not delivered the profitability expected due to
> lower than expected precious metals content and lower precious metals prices."

(GWRC Press Release, "Golden West Refining Corporation Limited Half-Year Result," issued

December 10, 1999, at GWRC-PWC0025037 (Ex. 8).)

20. On February 3, 2000, GWRC announced that "the performance of its United States

subsidiary continued to decline in the third quarter, and it is now anticipated that HHRG will

report a loss for the year ending March 31, 2000.  Although "cost-cutting measures have been

introduced," "reduced revenue from United States based marketing sectors, and a delay in

returning its foreign business to previous contribution levels, has caused HHRG to modify its

earlier forecast.  A re-evaluation of all aspects of HHRG's business to determine the viability and profit dynamics of each business segment and plant is being undertaken."  (GWRC Press Release, "Golden West Refining Corporation Limited," issued February 3, 2000 at GWRC-PWC-E0014661 (Ex. 36).)

21. According to a chronology prepared by GWRC's managing director, Michael Ryan, in March 1998, HHRG executed a 6-month option to acquire a refining operation called Enviromet.  Although Enviromet appeared extremely profitable, GWRC was concerned that 75% of Enviromet's business was with one customer, Motorola, and that the business relied upon the personal relationship between Enviromet's principal, Peter Dryden, and the Motorola representative.  HHRG exercised the option on September 30, 1998 and purchased Enviromet for $2.3 million in cash.  Before the option was exercised, the Motorola representative responsible for the placement of refining contracts, and with whom Mr. Dryden had a relationship, had retired.  His replacement moved most of the business that had previously gone to Enviromet to other refiners.  HHRG's investment in Enviromet became worthless.  (*See* HHRG Chronology at GWRC-PWC 0068148-49 (Ex. 10); Dep. Tr. of Michael Ryan, dated March 24, 2005, ("Ryan Tr." at 244-46, 250 (Ex. 5).)

22. As of March 1999, Golden West Refining (Canada) Ltd. ("GWR Canada"), a subsidiary of GWRC, was acquired by and consolidated with HHRG.  *See* HHRG Op. Report dated May 1999 ("May 1999 Operations Report") at HHRG-PWC152544 (Ex. 11).

23. GWR Canada had performed poorly and essentially had ceased to operate.  By early 1999, HHRG was subsidizing GWR Canada in part through its operations at HHRG's facility in Attleboro, Massachusetts and was financing additional GWR Canada operating losses in the form of receivables.  GWR Canada generated annual carrying costs from cost items such as

salary and maintenance and its property was exposed to environmental contamination concerns. (*See* Memorandum from B. Wayne to R. Guy dated February 4, 1999, at HHRG-PWC10099 (Ex. 12).)

24. The poor performance of GWR Canada "negatively impact[ed] the HHRG bottom line." Minutes of GWRC Board of Directors Meeting dated February 17, 1999, at HHRG-PWC08349 (Ex. 13).

## HHRG's Inadequate Financial Reporting

25. In March 1997, the GWRC Board of Directors recommended that the company develop a more sophisticated "profit center reporting" system in order to provide better information as to how different sectors of HHRG's business were performing.  (Minutes of GWRC Audit Comm. Meeting, dated March 18, 1997, at HHRG-PWC0069278 (Ex. 14); *see also* Dep. Tr. of Sean Russo, dated June 24, 2005 ("Russo Tr.") at 98 (Ex. 7).)

26.  In mid-1998, a member of the GWRC Audit Committee stated "that HHRG had not yet managed to produce profit centre management reports which were to have been provided as agreed last year."  The GWRC Audit Committee insisted without success that this "critical" financial management tool be used by HHRG.  (Minutes of GWRC Audit Comm. Meeting dated May 1, 1998, at HHRG-PWC11142-43 (Ex. 15); *see also* Russo Tr. at 106-108 (Ex. 7).)

27. In October 1998, Christopher Wiggins, a member of the GWRC Audit Committee, raised the issue of HHRG's still "unsatisfactory" profit center reporting with Mr. Wayne and other HHRG management.  Mr. Wiggins stated: "The necessity for better reporting, which has been requested of HHRG for the last year, is highlighted by the worse than budgeted performance over the last six months, for which there is no quantitative explanation."  He attached an earlier memorandum on the inadequacies of HHRG's systems, that had explained

that HHRG's financial reporting provided little information on where profits and losses were made, that it "would almost certainly camouflage a loss making activity," and that "income and expenditure is accounted for in such a way as to make detailed analysis of various parts of the business impossible." (*See* Memorandum from C. Wiggins to M. Ryan, R. Hayes and B. Wayne dated October 28, 1998, at HHRG-PWC54200, 54204, 54206 (Ex. 16).)

28. In November 1998, Sean Russo, who sat on both the HHRG and GWRC Boards of Directors, wrote that HHRG could not explain why it was losing money in most of its operations, because Mr. Wayne "ha[d] refused to adopt a more focus[]ed approach to profit centre reporting despite it being requested by the Board." Mr. Russo stated that HHRG went out of its way "to conceal the real picture." Mr. Russo also stated that Mr. Wayne had claimed that HHRG's business in Peru [*i.e.*, the Panexim business] was making money at a rate that would have represented nearly all of the company's profit, such that "[e]ither a large part of [the] business is losing money or Peru is misrepresented." (Memorandum from S. Russo to R. Lee, dated November 2, 1998 at GWRC-PWC0045791, 45793 (Ex. 17).)

29. The GWRC Board of Directors did not succeed in establishing profit center reporting at HHRG. (*See* Russo Tr. at 106-108 (Ex. 7).)

### HHRG's Relationship With Panexim

30. Panexim S.A. ("Panexim") was a Peruvian company in the business of purchasing and exporting gold. (*See* HHRG Compl. ¶¶ 20, 21.)

31. In or about June 2000, HHRG engaged the forensic firm of Dempsey Myers & Co., and its principal John Dempsey, to investigate HHRG's relationship with Panexim for purposes of pursuing claims under various insurance policies. Mr. Dempsey prepared, among other things, a report dated October 9, 2000 for GWRC concerning HHRG's relationship with

Panexim ("Dempsey Report").   HHRG has designated Mr. Dempsey as an expert with respect to the matters set forth in the Dempsey Report.   (*See generally,* Dempsey Rep. (Ex. 19).)

32. According to the Dempsey Report, Mr. Wayne authorized an advance of $74,000 in working capital to Panexim to begin operations in late 1996.  Panexim was to purchase gold, ship gold products abroad and recover an export subsidy from the Peruvian government.  Panexim was required to pay a refundable 18% value-added tax ("VAT") on its gold purchases to the Peruvian tax authority, the National Superintendency of Tax Administrationon ("SUNAT"), which SUNAT would later refund to Panexim.  Separately, the Peruvian government would pay Panexim a 5% export subsidy following export of the product.  Initially, Panexim utilized a line of credit from Banco de Lima Sudameris, secured with HHRG gold with Mr. Wayne's agreement, to pay for its VAT tax obligation.  (*See id.* at 4, 8-9.)

33. According to the Dempsey Report, in June 1998 HHRG's gold purchases from Panexim began to increase.  As a result, Mr. Wayne "agreed to finance Panexim's VAT directly."  When Panexim was prepared to buy gold, the amount of gold in the transaction "was inflated by 18% so that HHRG's cash advance would cover the market value of gold and applicable VAT taxes."  In November 1998, SUNAT suspended payment on refunds of VAT. HHRG continued to advance money to Panexim to fund its purchases of gold and VAT obligations and Panexim continued to ship gold to HHRG.  (*See id.* at 10-12.)

34. On or about May 18, 1999, the HHRG and GWRC Boards of Directors became aware that a substantial receivable was owed from Panexim to HHRG.  When the Boards of Directors confronted HHRG management about this receivable, management responded that gold had accumulated on behalf of HHRG in a secure vault in Lima, Peru because the Peruvian government had been controlling the amount of gold it permitted for export; that the gold was to

be released to HHRG on a gradual basis; and that HHRG had only advanced money to Panexim upon the delivery of precious metals to the vault in an amount sufficient to collateralize the advance.  (*See id.* at 12-13; Managing Director's Report of Michael Ryan ("Director's Rep.") at 1-2 (Ex. 20).)

35. These and later assurances by HHRG management regarding the Panexim receivable were false.  (*See id.* at 1; *see also* Russo Tr. at 135 (Ex. 7).)

36. At a special meeting on July 26, 1999, the GWRC Board of Directors concluded that Mr. Wayne had failed to fulfill his contractual and fiduciary duties because he had "without proper authority and contrary to policy, authorized and allowed unsecured credit to be extended to Panexim" and had "misled" the Board of Directors "by previous statements that HHRG does not extend unsecured credit" and "by understating the value of the total exposure to Panexim." (*See* Minutes of GWRC Board of Directors Meeting, dated July 26, 1999 ("July 26 GWRC Board Meeting"), at GWRC-PWC0068486 (Ex. 21).)

37. At that meeting, the GWRC Board of Directors considered terminating Mr. Wayne, but elected not to do so.  Instead, the Board of Directors gave Mr. Wayne a "censure" and renewed his employment contract through mid-2000.  (*Id.* at GWRC-PWC0068486-0068487; *see also* Wayne Employment Agreement, dated August 16, 1999 (Ex. 22).)

38. In the summer of 1999, the GWRC Board of Directors requested copies of Panexim's financial statements.  In response, Mr. Wayne provided the Board of Directors with fabricated audited Panexim statements.  (*See* July 26 GWRC Board Meeting at GWRC-PWC 0068486 (Ex. 21); Dempsey Rep. at 28-29 (Ex. 19).)

39. The GWRC Board of Directors relied on these fabricated audited statements in deciding not to disclose the Panexim exposure to the Australian stock exchange or to HHRG's

lenders.  (*See* July 26 GWRC Board Meeting at GWRC-PWC 0068485 (Ex. 21); Dempsey Rep. at 28-29 (Ex. 19).)

40. In September 1999, the HHRG and GWRC Finance Committees asked for an independent inspection of the precious metals held in the vault in Peru.  Alex Stewart Assayers conducted the independent inspection and assay at the direction of HHRG, and on September 21, 1999, issued a report that appeared to confirm the existence of sixteen boxes of gold worth approximately $11.8 million held in the vault on behalf of HHRG.  That assay later was determined to be a "sham" orchestrated by Luis Posada and approved by Mr. Wayne.  (*See* Dempsey Rep. at 13-14 (Ex. 19); *see also* Director's Rep. at 1 (Ex. 20).)

41. In the fall of 1999, the HHRG and GWRC Boards of Directors sought information on the status of VAT refunds from SUNAT.  In response, Mr. Wayne and others falsely represented that Panexim had begun to receive VAT refunds and repay them to HHRG.   (Dempsey Rep. at 29-30 (Ex. 19).)

### The Discovery of the Missing Gold and the Federal Fraud Indictment of Messrs. Wayne and Searle

42. On February 18, 2000, Mr. Wayne, who had been suspended from all executive duties the month before, resigned from HHRG.  (*Id.* at 17.)

43. On February 21, 2000, a new, independent inspection of the contents of the vault in Peru revealed "that the material said to be gold in the September 1999 inspection was, in fact, silver."  (*Id.*; Director's Report at 2 (Ex. 20).)

44. HHRG's insurers were put on notice of a potential claim as a result of the missing gold.  (Director's Rep. at 3 (Ex. 20).)  On February 23, 2000, trading in GWRC shares was

halted and subsequently suspended. (*See* Golden West Refining Corporation Limited Annual Report 2000 at HHRG-PWC356750 (Ex. 41).)

45. In late February 2000, a federal criminal indictment against Mr. Wayne, Mr. Searle and others was unsealed that alleged that, in the early 1990's, when they were employed by Handy & Harman, Inc., Mr. Wayne and Mr. Searle had participated in a scheme to defraud the government of Argentina through a scheme for the export of gold from that country. (*See* Dempsey Rep. at 6 (Ex. 19); *see also* Superseding Federal Indictment Against Barry Wayne (Ex. 23.)

46. GWRC's Board of Directors became aware of Mr. Wayne's federal indictment in early March 2000. (Director's Rep. at 3 (Ex. 20).)

47. Before news of the criminal indictments, "HHRG continued to have the support of its bankers" and negotiations with its bankers "appeared likely to lead to a new agreement that would allow HHRG to continue to operate." (*Id.* at 3 (Ex. 20).)

48. "The news of the indictments complicated the negotiations with the banks and severely undermined the confidence of major customers and unsecured creditors." (*Id.* at 2.)

49. HHRG was unable to work out satisfactory arrangements with the lenders and filed for bankruptcy protection on March 28, 2000. (*Id.* at 1, 2.) Though HHRG no longer had an expectation of future earnings, HHRG did have cash and long-term debt, which was paid in full in the bankruptcy. (*See* Deposition Tr. of Jed Horwitt, dated August 4, 2005 (*"*Horwitt Tr."*) at 28-32 (Ex. 39).)

50. HHRG's assets were liquidated. Its liquidating custodian had paid unsecured creditors approximately 70% of the value of their claims, but does not expect to made a distribution to GWRC unless the HHRG estate prevails in litigation against PwC. (*See* Third

Interim Status Report of Liquidating Custodian of Handy & Harman Refining Group, Inc. (Re: Fifth Distribution), dated March 11, 2005, at 8 (Ex. 40).)

### HHRG's Settlement of its Insurance Claim for the Panexim Exposure

51. In a settlement agreement dated December 31, 2001, Underwriters acknowledged that a covered loss existed on HHRG's claim for "losses arising from acts, errors, or omissions on the part of former employees/consultants of HHRG Barry Wayne, Richard L. Searle, Luis Posada . . . ('the Former Employees') and others as more fully explained in a memorandum submitted on 9 March 2000 and more fully documented in a proof of loss dated 9 October 2000, both of which are incorporated herein by reference ('the Claim')." Pursuant to the Settlement Agreement, Underwriters paid $12.5 million to HHRG on account of the claimed loss. (*See* Settlement Agr., dated December 31, 2001, at UL00302, UL00303, UL00307 (Ex. 24).)

52. Also pursuant to the Settlement Agreement, Underwriters became subrogated to all claims that HHRG may have had against third parties -- expressly including PwC -- relating to the covered losses. The Settlement Agreement provided:

> "The Assured acknowledges Underwriters as subrogee pursuant to the Policy as to all losses asserted by the Assured in the Claim. In addition, the Assured assigns to Underwriters all rights, title and interest in any and all claims which the Assured has, had, or may ever have as to all losses asserted by the Assured in the Claim, plus interest, costs, and punitive damages arising from such losses, including but not limited to, any and all such claims against . . . (e) PricewaterhouseCoopers and its predecessors, successors, agents and assigns . . . ."

(*Id.* at UL00307**.**)

53. HHRG also executed a separate Acknowledgement of Assignment and Subrogation. The assignment and subrogation encompasses the entire claim asserted by HHRG under the Underwriters policy, including the alleged loss associated with the Panexim exposure, the alleged losses for payments to consultants in South America, excess compensation to Mr.

-14-

Wayne, and the costs of pursuing the insurance claim, totaling over $18 million. (*See id.* at UL00393.)

## GWRC's Insolvency Proceeding

54. In late 1999 and early 2000, GWRC's quoted price on the Australian Stock Exchange declined precipitously. As of June 30, 1998, GWRC's reported quote price on the Australian Stock Exchange was A$.66. This price fluctuated throughout the following two years, from a high of A$.70 in July 1999 to a low of A$.47 in January 2000, and to A$.36 per share on February 23, 2000. (*See* Rep. of Ian Hobson of Ferrier Hodgson (WA), dated March 24, 2005 ("Hobson Rep.") § 7.2 & Annexure B (Ex. 31).)

55. On December 1, 1998, GWRC made an equalization payment of $7 million to the Gold Corporation to establish a collective refining and manufacturing operation called the AGR Joint Venture, on a 50:50 basis between the parties. (*See* GWRC Press Release, "Golden West Announces Half-Year Result," issued November 3, 1998 at GWRC-PWC-E0003114 (Ex. 3).) GWRC funded this equalization payment with a loan from N.M. Rothschild & Sons (Australia) Pty. Ltd. (*See* Golden West Refining Corporation Limited Financial Summary – Quarter to 31 December 1998 at GWRC-PWC0056525 (Ex. 39).) HHRG and the AGR Joint Venture were GWRC's only assets. (Hobson Rep. at § 4.1(b) and (c) (Ex. 31).)

56. To service GWRC's debt to N.M. Rothschild & Sons (Australia), GWRC relied on cash generated by HHRG. According to GWRC, without the expected cash flow from HHRG, GWRC defaulted on its debt. In August 2001, GWRC was placed into insolvency proceedings in Australia and an administrator was appointed. GWRC shortly thereafter sold its interest in the AGR Joint Venture, and has no operating assets. (Hobson Rep. §§ 4.1, 10.1, 12.1 (Ex. 31).)

**HHRG's Claims Against PwC**

57. HHRG has asserted a claim for damages against PwC seeking an award of at least

$30.7 million.  HHRG has explained its damages theory as follows:

> "As a result of the professional negligence of [PwC], the going concern value of [HHRG]
> was destroyed entirely and HHRG suffered damages in the amount of Thirty Million
> Seven Hundred Thousand Dollars ($30.7 Million), representing the fair market value of
> HHRG as a going concern.  See Report and testimony of Craig T. Elson."

(HHRG's Responses to PwC Interrogs., dated July 15, 2005 at Resp. to Interrog. No. 1 (Ex. 27).)

58. HHRG has disclosed the following experts:  Craig T. Elson, John Dempsey, and John

Salomon.

**Elson Report**

59. Mr. Elson, in a report dated March 18, 2005, concludes: "[I]t is my opinion that the

fair market value of HHRG as of June 30, 1998, ranged from $28.9 to $30.7 million."  Mr. Elson

stated that he had been asked to provide an opinion on the value of HHRG as of June 30, 1998,

on the stated basis that by then "HHRG's business was being operated in a manner substantially

inconsistent with its policy regarding foreign advances."  (Rep. of Craig T. Elson, dated March

18, 2005 ("Elson Rep.") at 1-2 (Ex. 25); Dep. Tr. of Craig T. Elson, dated May 26, 2005 ("Elson

Tr.") at 4-5, 26-28 (Ex. 26).)

60. Mr. Elson provides no opinion as to the value of HHRG on the day on which it filed

for bankruptcy protection in March 2000, or at any point between June 1998 and March 2000.

(See generally id.; see also Elson Tr. at 50-51 (Ex. 26).)

61. Elson does not opine that PwC caused any decline in value of HHRG after June 30,

1998 or offer any opinion as to causation.  (See Elson Rep. at 1 (Ex. 25); see also Elson Tr. at 50

(Ex. 26).)

62. Elson does not opine on the effect that HHRG's poor performance after June 1998, the external industry factors that adversely affected the performance of all refiners, or the poor operational and investment decisions by HHRG's Board of Directors and management that were unrelated to Panexim had on the value of HHRG.   (*See generally* Elson Report (Ex. 25).)

**Dempsey Report**

63. HHRG has also proffered as an expert John Dempsey, and tendered as his reports the Dempsey Report and other letters authored by Mr. Dempsey related to the insurance claim.  Mr. Dempsey opines "that a scheme to defraud HHRG was carried out by Barry Wayne, Richard Searle, Luis Posada, and potentially other employees and consultants of HHRG . . . ."  *See* Dempsey Rep. at 34 (Ex. 19).

64. The Dempsey Report does not mention PwC or opine that PwC's alleged conduct caused HHRG's claimed losses.  (*See generally*, *id.;* Dep. Tr. of John Dempsey, dated June 30, 2005 ("Dempsey Tr.") at 61-62 (Ex. 33).)

65. Mr. Dempsey does not offer an opinion as to whether the alleged misconduct of HHRG management with respect to Panexim and South American business caused any losses beyond the insured losses, including the destruction of HHRG's business.  (*See generally,* Dempsey Rep (Ex. 19).)

**Salomon Report**

66. Mr. Salomon opines that "PWC did not conduct its audits of the HHRG financial statements for Fiscal 1997, 1998 and 1999 in accordance with GAAS" and that HHRG's financial statements for those years did not fairly present the company's financial position and results.  (*See* Rep. of John Salomon, dated April 2, 2005 ("Salomon Rep.") at 28 (Ex. 28).)

67. Mr. Salomon was not asked to and has not provided an opinion as to the cause of HHRG's claimed losses.  (*See generally id.*)

### GWRC's Claims Against PwC

68. GWRC has asserted a claim for damages against PwC seeking an award of at least $35.3 million.  GWRC relies on the expert report of Ian Hobson ("Hobson Report"), which opines on "the loss incurred by GWRC as a result of the insolvency of [HHRG]." (*See* Hobson Report § 5.2. (Ex. 31).)

69. The Hobson Report values GWRC's equity as of June 30, 1998 because that date "was prior to the substantial change and increase in unsecured advances by HHRG to South American companies.  We understand that subsequent to 30 June 1998, HHRG's business as being operated in a manner inconsistent with its policy regarding foreign advances.  HHRG's results were therefore infected with transactions that were not in accordance with corporate policy." (*See id.* § 5.2).

70. According to the Hobson Report, GWRC's loss for which it seeks recovery consists of the decline in the market capitalization of GWRC measured using the price quoted on the Australian Stock Exchange as of June 30, 1998 plus the alleged deficiency of assets in GWRC's insolvency proceeding to pay all stated claims of creditors.  Mr. Hobson calculates GWRC's equity value by multiplying GWRC's quoted price on the Australian Stock Exchange at June 30, 1998 by the total number of outstanding shares of GWRC, resulting in a market capitalization of A$37.0 million.  Mr. Hobson then applies a "control premium" of 25%, and opines that since GWRC's shares lost all their value once the corporation was liquidated, GWRC's loss was A$46.3 million.  Mr. Hobson also calculates that the GWRC estate has a creditor deficiency – that is, a deficit of assets to cover creditor claims – of A$10.7 million, and adds that to his

damages calculation.  Thus, Mr. Hobson opines, GWRC's total loss is A$57.0 million.  (*See* Hobson Rep. at §§ 1.1, 5.2, 8.4, 8.5, 16.3 (Ex. 31).)

71.  The Hobson Report does not opine that any conduct of PwC caused the collapse of HHRG or any losses of GWRC.  (*See id.* at "Conclusion," at §§ 16.1-16.3).

72. The Hobson Report does not address the impact of other business factors affecting HHRG and GWRC after June 30, 1998 or the fact that GWRC's stock price had declined between June 30, 1998 and February 23, 2000 before announcement of the Panexim losses.  (*See id.* at "Conclusion," at §§ 16.1-16.3).

73. GWRC also alleges that PwC breached a fiduciary duty owed to GWRC, which arose due to the professional services PwC rendered to HHRG.  (*See* GWRC Second Amended Compl. at Count 3 ¶ 71-72 (Ex. 29).)

74. GWRC's Managing Director did not meet with PwC prior to February 2000 and did not review HHRG's 1998 financial statement before HHRG filed for bankruptcy.  The GWRC Board of Directors was not aware of PwC's Client Service Plans for HHRG prior to the bankruptcy and did not rely on oral or written representations from PwC in conducting HHRG's business.  (*See* Ryan Tr. at 21, 119 (Ex. 5); Dep. Tr. of Rodney D. Warren, dated March 25, 2005 ("Warren Tr.") at 77 (Ex. 37).)

DEFENDANT,
PRICEWATERHOUSECOOPERS LLP


By: _____/s/ Thomas D. Goldberg_____
       David J. Elliott (ct 04301)

Thomas D. Goldberg (ct 04386)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901-2047
Tel:  (203) 977-7300
Fax: (203) 977-7301
Its Attorneys

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                        _/s/ Thomas D. Goldberg_____
                                          David J. Elliott (ct 04301)
                                          Thomas D. Goldberg (ct 04386)
                                          Day, Berry & Howard LLP
                                          One Canterbury Green
                                        Stamford, Connecticut 06901-2047
                                          Tel:  (203) 977-7300
                                          Fax: (203) 977-7301
                                          Its Attorneys

| | |
|---|---|
| Edward J. Boyle, Esq.<br>Wilson, Elser, Moskowitz, Edelman &<br>Dicker LLP<br>150 East 42nd St.<br>New York, NY  10017-5639 | William H. Champlin, III, Esq.<br>Michael T. McCormack, Esq.<br>William S. Fish, Jr., Esq.<br>Tyler Cooper & Alcorn, LLP<br>CityPlace - 35th Floor<br>185 Asylum Street<br>Hartford, CT 06103 |
| Daniel McMahon, Esq.<br>Stefan Dandelles, Esq.<br>Daniel E. Tranen, Esq.<br>Wilson, Elser, Moskowitz, Edelman &<br>Dicker LLP<br>120 N. LaSalle Street<br>Chicago, IL  60602 | Fred N. Knopf, Esq.<br>Wilson, Elser, Moskowitz, Edelman & Dicker<br>LLP<br>3 Gannett Drive<br>White Plains, NY 10604-3407 |
| Steven R. Humphrey (ct06053)<br>Dina S. Fisher (ct14896)<br>James M. Ruel (ct21222)<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597 | Jed Horwitt, Esq.<br>Zeisler & Zeisler, P.C.<br>558 Clinton Ave.<br>P.O. Box 3186<br>Bridgeport, CT 06605-0186 |