## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP and | : | |
| COOPERS & LYBRAND LLP, | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1572 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP d/b/a | : | |
| PRICE WATERHOUSE LLP, | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1803 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP, | : | August 12, 2005 |
| Defendant. | : | |

## PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST GOLDEN WEST REFINING CORP. LIMITED

David J. Elliott
Thomas D. Goldberg
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut
06901-2047
Tel:  (203) 977-7300
Its Attorneys

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................5

STATEMENT OF FACTS ..........................................................................................6

    A.   Events Leading To This Litigation ...............................................................6

    B.   GWRC's Claims Against PwC...................................................................10

ARGUMENT ...........................................................................................................12

I.     PwC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE GWRC HAS FAILED TO DISCLOSE EXPERT TESTIMONY THAT PwC'S CONDUCT WAS THE PROXIMATE CAUSE OF GWRC'S CLAIMED LOSSES............................12

II.    EVEN IF EXPERT TESTIMONY WERE NOT REQUIRED, GWRC HAS FAILED TO OFFER EVIDENCE TO PROVE THAT ITS CLAIMED LOSSES WERE PROXIMATELY CAUSED BY PwC............................................................15

III.   PwC IS ENTITLED TO SUMMARY JUDGMENT ON COUNT FOUR BECAUSE GWRC HAS NOT PRODUCED EVIDENCE SUFFICIENT TO SHOW A FIDUCIARY DUTY OWED BY PwC TO GWRC...................................................18

CONCLUSION ........................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Abrahams v. Young & Rubicam*, 240 Conn. 300 (1997) ............................................. 13

*Acebey v. Shearson Lehman Bros., Inc. No. CV 92-5926-WMB*, 1993 U.S. Dist. LEXIS 19659 (C.D. Cal. June 4, 1993) ......................................................................... 19, 20

*Advest Group, Inc. v. Arthur Andersen, LLP, No. CV 970571417*, 1998 Conn. Super. LEXIS 2137 (Conn. Super. Ct. July 20, 1998) ............................................................ 10

*Ahern v. Fuss & O'Neill, Inc.*, 78 Conn. App. 202 (2003) ........................................... 10

*Biller Assocs. v. Peterken*, 269 Conn. 716 (2004) ..................................................... 15

*Block v. Razorfish, Inc.*, 121 F. Supp. 2d 401 (S.D.N.Y. 2000) .................................. 19

*Boone v. William W. Backus Hosp.*, 272 Conn. 551 (2005) .......................... 9, 10, 13

*Doe v. Manheimer*, 212 Conn. 748 (1989) ................................................................... 9

*Dudrow v. Ernst & Young LLP, No. CV 980144211S*, 1999 Conn. Super. LEXIS 104 (Conn. Super. Ct. Jan. 14, 1999) ................................................................................. 16

*Dunham v. Dunham*, 204 Conn. 303 (1987) ............................................................... 16

*FDIC v. Schoenberger*, 781 F. Supp. 1155 (E.D. La. 1992) ....................................... 19

*Facchini v. Miller, No. CV 990587686S*, 2000 Conn. Super. LEXIS 245 (Conn. Super. Ct. Jan. 28, 2000) ......................................................................................................... 19

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48 (2d Cir. 2002), *aff'd 75 F. Supp. 2d 235, 238-39 (S.D.N.Y. 1999)* ..................................................... 14

*Faulise v. Eisenstein, No. CV980490341S*, 2000 Conn. Super. LEXIS 3017 (Conn. Super. Ct. Oct. 30, 2000) ............................................................................................. 13

*Fleet Nat'l Bank v. H & D Entertainment, Inc.*, 926 F. Supp. 226 (D. Mass.) *aff'd* 96 F.3d 532 (1st Cir. 1996) ...................................................................................................... 19

*Franklin Supply Co. v. Tolman*, 454 F.2d 1059 (9th Cir. 1971) ................................. 19

*Fund of Funds Ltd. v. Arthur Anderson & Co.*, 545 F. Supp. 1314, 1356 (S.D.N.Y. 1982) .. 15, 19

**ORAL ARGUMENT REQUESTED**

*Gengras v. Coopers & Lybrand*, No. CV-92 0517836S, 1994 Conn. Super. LEXIS 888 (Conn. Super. Ct. Mar. 31, 1994) ............................................................................................ 15

*Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168 (1994) .................................. 9

*Greenblatt v. Richard Potasky Jewelers*, No. 93 Civ. 3652, 1994 U.S. Dist. LEXIS 258 (quoting *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1356 (S.D.N.Y. 1982)) ................................................................................................................ 15, 19

*Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20 (2000) .................................... 16, 17, 18, 20

*Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995)................................................... 10

*Hutchinson v. Farm Family Cas. Ins. Co.*, 273 Conn. 33 (2005)................................................. 20

*Konover Dev. Corp. v. Zeller*, 228 Conn. 206 (1994) ........................................................... 16, 19

*Law v. Camp*, 116 F. Supp. 2d 295 (D. Conn. 2000), aff'd in relevant part, 15 Fed. Appx. 24 (2d Cir. 2001) ........................................................................................................................ 10

*Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146 (3d Cir. 1989)................................................................................................................... 19

*Purzycki v. Town of Fairfield*, 244 Conn. 101 (1998) ................................................................... 9

*Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992) ................................. 14

*Sherman v. Bristol Hosp. Inc.*, 79 Conn. App. 78 (2003) ........................................................... 13

*Silva v. New York Life Ins. Co.*, No. CV970342973S, 2001 Conn. Super. LEXIS 202 (Conn. Super. Ct. Jan. 12, 2001) ................................................................................................ 16

*Silveri v. Mirsky*, No. 95 Civ. 10234, 2000 U.S. Dist. LEXIS 16709 (S.D.N.Y. Nov. 13, 2000) ........................................................................................................................................ 19

*Solomon v. Levett*, 30 Conn. App. 125 (1993) ........................................................................... 10

*Stewart v. Federated Dep't Stores, Inc.*, 234 Conn. 597 (1995)............................................. 9, 13

*Tsg Water Res., Inc. v. D'Alba & Donovan Certified Public Accountants, P.C.*, 366 F. Supp. 2d 1212 (S.D. Ga. 2004) ................................................................................................ 19

*Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137 (4th Cir. 1994)................................. 14

*Vanczak v. Romani*, No. 990080053, 2002 Conn. Super. LEXIS 3397 (Conn. Super. Ct. Oct. 18, 2002) ................................................................................................................. 10, 12

*Vona v. Lerner*, 72 Conn. App. 179 (2002) ........................................................................ 10, 13

PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum of law in support of its motion for summary judgment on all claims asserted by the plaintiff, Golden West Refining Corporation Limited ("GWRC" or "plaintiff") in *Golden West Refining Corp. Limited v. PricewaterhouseCoopers LLP*.

## PRELIMINARY STATEMENT

GWRC became the subject of insolvency proceedings in Australia in August 2001, following the bankruptcy and liquidation the preceding year of its largest subsidiary, Handy & Harman Refining Group, Inc. ("HHRG"). GWRC alleges that PwC, which audited the financial statements of HHRG, should have detected and disclosed to GWRC unauthorized advances that HHRG management made to a Peruvian company called Panexim, S.A. ("Panexim"). GWRC alleges that the unauthorized advances caused HHRG to file for bankruptcy, which in turn caused GWRC's insolvency. GWRC has asserted claims against PwC for negligence (Count One), negligent misrepresentation (Count Two), breach of third-party beneficiary contract (Count Three), and breach of fiduciary duty (Count Four).[1]

GWRC alleges that PwC may be held liable for the lost value of GWRC's business from and after June 30, 1998, an amount that GWRC claims is over $35 million. These allegations ignore the fact, recognized in GWRC's own public disclosures to the Australian Stock Exchange, that the financial performance of GWRC and HHRG declined after June 30, 1998 for reasons wholly unrelated to the Panexim losses or any conduct of PwC. As we show below, PwC is entitled to summary judgment, even assuming that PwC was negligent in failing to detect and report on the unauthorized advances to Panexim, that the Panexim losses were a factor that

---

[1] GWRC's Second Amended Complaint, Counts One through Four.

precipitated HHRG's bankruptcy filing, and that the HHRG bankruptcy in turn precipitated

GWRC's insolvency.[2]  First, plaintiff has failed to produce any expert testimony, as required by

Connecticut law, that any conduct of PwC proximately caused the decline in value of GWRC.

Second, even apart from that failure, GWRC has failed to produce evidence from which a jury

reasonably could find that the decline in value of GWRC's business was proximately caused by

conduct of PwC, as opposed to many industry and other factors that negatively affected GWRC

and the business of its largest subsidiary, Handy & Harman Refining Group, Inc. ("HHRG").

PwC also is entitled to summary judgment on GWRC's claim for breach of fiduciary duty

because there is no evidence sufficient to create a genuine issue of fact whether PwC owed a

fiduciary duty to GWRC.[3]

## STATEMENT OF FACTS[4]

### A.    Events Leading To This Litigation

GWRC is an Australian company that was publicly traded on the Australian Stock

Exchange.[5]  In or about August 1996, it formed a wholly-owned subsidiary, HHRG, to purchase

---

[2] Of course, PwC would contest all these allegations at trial.

[3] PwC has filed today a motion for summary judgment on all claims asserted by HHRG in another of these consolidated cases, on similar grounds.  HHRG likewise asserts that PwC caused the deterioration in the value of HHRG from June 30, 1998 through HHRG's bankruptcy, which was filed on March 28, 2000.  HHRG also has failed to disclose expert testimony on proximate causation and ignores the many factors negatively affecting HHRG's performance that were wholly unrelated to the challenged conduct of PwC.  *See* PwC's Memorandum of Law in Support of its Motion For Summary Judgment Against HHRG (""HHRG Summary Judgment Mem.").

[4] The relevant facts related to HHRG's bankruptcy are set forth in the Consolidated Local Rule 56(a)1 Statement submitted in support of PwC's motion for summary judgment on all claims asserted by HHRG and GWRC.  Likewise, PwC has filed a two-volume compendium of exhibits in support of its Rule 56(a)1 Statement.

the Precious Metals Refining Division of Handy & Harman, Inc. for $9 million.[6] By 1999, GWRC's sole assets were HHRG and a 50% interest in a joint venture known as the AGR Joint Venture.[7]

For its fiscal year ended March 31, 1998, HHRG reported operating income of over $4.6 million and net income of over $2.5 million.[8] Beginning in mid-1998, however, and continuing into early 2000, HHRG's performance deteriorated. This deterioration reflected adverse industry conditions, such as a poor scrap metal market and rising metal lease rates, operational problems and poor investment decisions. By late 1999, HHRG was losing money.[9]

GWRC's public statements disclosed some of these adverse factors. For example, a June 1999 release stated:

> "As reported in November 1998, the Asian financial crisis had a negative impact on the traditionally slow first half. Particularly affected was Golden West Refining's United States subsidiary, [HHRG], due to a slowdown in the computer manufacturing sector in the United States which is a significant source of business."[10]

---

[5] (HHRG Compl. at ¶ 13; Handy & Harman Refining Group, Inc. Consolidated Financial Statements dated March 31, 1998 and March 31, 1997 ("1997-1998 HHRG Consolidated Financials") at PWC Z 02595, 02605 (Ex. 2); A Chronology of Handy & Harman Refining Group, Inc. 1995-2002 ("HHRG Chronology") at GWRC-PWC0068110 (Ex. 10). *See also* 56(a)1 at ¶ 2.)

[6] (*See* HHRG Compl. at ¶¶ 13, 14. *See also* 56(a)1 at ¶ 2.)

[7] (Rep. of Ian Hobson of Ferrier Hodgson (WA), dated March 24, 2005 ("Hobson Rep.") at § 4.1(b) and (c) (Ex. 31). *See also* 56(a)1 at ¶ 55.)

[8] (*See* 1997-1998 HHRG Consolidated Financials, at PWC Z 02593 (Ex. 2). *See also* 56(a)1 at ¶ 8.)

[9] HHRG's performance is addressed at length in the HHRG Summary Judgment Mem., at pp. 6-10.

[10] (GWRC Press Release, "Second Half Performance Boosts Profit for Golden West," issued June 1999 at GWRC-PWC-E0014718 (Ex. 35). *See also* 56(a)1 at ¶ 10.)

In a December 10, 1999 press release, GWRC reported that HHRG lost money for the

quarter ended September 30, 1999 as a result of "extremely adverse business conditions." The

release identified numerous contributing factors:

> "Low grade electronic scrap business continued to contract due to changing
> technology reducing contained precious metals content. This position was
> exacerbated by substantial increases in external costs and a sustained increase in
> gold and silver lease rates during the period. In the high grade mine dore
> business, competition increased from European refiners, which also had a knock
> on effect of squeezing margins in many other market sectors. In addition,
> initiatives . . . have not delivered the profitability expected due to lower than
> expected precious metals content and lower precious metals prices."[11]

On February 3, 2000, GWRC announced that "the performance of its United States

subsidiary continued to decline in the third quarter, and it is now anticipated that HHRG will

report a loss for the year ending March 31, 2000. Although "cost-cutting measures have been

introduced," "reduced revenue from United States based marketing sectors, and a delay in

returning its foreign business to previous contribution levels, has caused HHRG to modify its

earlier forecast. A re-evaluation of all aspects of HHRG's business to determine the viability and

profit dynamics of each business segment and plant is being undertaken."[12]

In late 1999 and early 2000, GWRC's quoted price on the Australian Stock Exchange

declined precipitously. Always a thinly-traded, low-priced (under $1) stock, GWRC's reported

quoted price on the Australian Stock Exchange was at A$.66 on June 30, 1998, and declined

---

[11] (GWRC Press Release, "Golden West Refining Corporation Limited Half-Year
Result," issued December 10, 1999, at GWRC-PWC0025037 (Ex. 8). *See also* 56(a)(1) ¶ 19.)

[12] (GWRC Press Release, "Golden West Refining Corporation Limited," issued February
3, 2000 at GWRC-PWC-E0014661 (Ex. 36). *See also* 56(a)(1) ¶ 20.)

from a high of A$.70 in July 1999 to A$.47 in January 2000, and to A$.36 per share on February 23, 2000.[13]

On or about February 23, 2000, GWRC discovered that what it believed was gold held in the vault in Peru for HHRG's benefit was in fact silver, and that HHRG thus had an unsecured exposure of over $12 million.[14]  GWRC immediately halted trading in its shares.[15]  HHRG immediately filed an insurance claim, which ultimately was paid in the amount of $12.5 million.[16]  Negotiations with HHRG's lenders and creditors were ongoing when GWRC learned that two of HHRG's most senior managers, including CEO Barry Wayne, had been indicted on charges relating to their conduct at Handy & Harman, Inc. before the HHRG acquisition.[17]  The indictments undermined HHRG's negotiations with its creditors and lenders.[18]  On March 28, 2000, HHRG filed for bankruptcy.[19]

HHRG's assets ultimately were liquidated.  Its liquidating custodian has paid creditors approximately 70% of the value of their claims, but does not expect to make a distribution to

---

[13] (*See* Hobson Rep. § 7.2 & Annexure B (Ex. 31).  *See also* 56(a)(1) ¶ 54.)

[14] (*See* Letter to M. Ryan from Dempsey, Meyers & Co., dated October 9, 2000 ("Dempsey Rep.") at 17 (Ex. 19); Managing Director's Report of Michael Ryan ("Director's Rep.") at 2 (Ex. 20).  *See also* 56(a)(1) ¶ 43.)

[15] (*See* Golden West Refining Corporation Limited Annual Report 2000 at HHRG-PWC356750 (Ex. 41).  *See also* 56(a)(1) ¶ 44.)

[16] (*See* Settlement Agr., dated December 31, 2001, at UL00302, UL00303, UL00307 (Ex. 24).  *See also* 56(a)(1) ¶ 54.)

[17] (Director's Rep. at 3 (Ex. 20).  *See also* 56(a)(1) ¶ 47.)

[18] (Director's Rep. at 3 (Ex. 20).  *See also* 56(a)(1) ¶ 48.)

[19] (Director's Rep. at 1-2 (Ex. 20).  *See also* 56(a)(1) ¶ 49.)

HHRG's sole shareholder, GWRC, unless the estate prevails in various pending litigations including its litigation against PwC.[20]

GWRC had only two assets, HHRG and a 50% interest in a collaborative refining operation called the AGR Joint Venture.[21]  To acquire its interest in the AGR Joint Venture, GWRC made an equalization payment of $7 million to other venture participants, funded by a loan from N.M. Rothschild & Sons (Australia) Pty. Ltd.[22]  To service GWRC's debt to N.M. Rothschild & Sons (Australia), GWRC relied on cash generated by HHRG.  According to GWRC, without the expected cash flow from HHRG, GWRC defaulted on its debt.  In August 2001, GWRC was placed into insolvency proceedings in Australia and an administrator was appointed.  GWRC shortly thereafter sold its interest in the AGR Joint Venture, and has no operating assets.[23]

## B.    GWRC's Claims Against PwC

GWRC contends that PwC's conduct proximately caused the entire loss of GWRC's business value from June 30, 1998.  To support that contention, GWRC has tendered the putative

---

[20] (*See* Third Interim Status Report of Liquidating Custodian of Handy & Harman Refining Group, Inc. (Re: Fifth Distribution), dated March 11, 2005, at 8 (Ex. 40). *See also* 56(a)(1) ¶ 50.)

[21] (Hobson Rep. at § 4.1(b) and (c) (Ex. 31).  *See also* 56(a)(1) ¶ 55.)

[22] (*See* GWRC Press Release,"Golden West Announces Half-Year Result," issued November 3, 1998 at GWRC-PWC-E0003114 (Ex. 3); Golden West Refining Corporation Limited Financial Summary – Quarter to 31 December 1998 at GWRC-PWC0056525 (Ex. 39). *See also* 56(a)(1) ¶ 55.)

[23] (Hobson Rep. §§ 4.1, 10.1, 12.1 (Ex. 31).  *See also* 56(a)(1) ¶ 56.)

expert report of Mr. Hobson ("Hobson Report"), which opines on "the loss incurred by GWRC as a result of the insolvency of [HHRG]."[24]

Mr. Hobson opines on the loss of GWRC's equity value after June 30, 1998, which is the same date used by HHRG's expert witness, Craig Elson.[25]  That date was chosen because it

> "was prior to the substantial change and increase in unsecured advances by HHRG to South American companies.  We understand that subsequent to 30 June 1998, HHRG's business as being operated in a manner inconsistent with its policy regarding foreign advances.  HHRG's results were therefore infected with transactions that were not in accordance with corporate policy."[26]

He calculates GWRC's equity value as of that date by multiplying GWRC's quoted price on the Australian Stock Exchange at June 30, 1998, which was A\$.66 per share, by the total number of outstanding shares of GWRC.  That calculates to a market capitalization of A\$37.0 million.  Mr. Hobson then applies a "control premium" of 25%, and opines that the value of GWRC's equity as of June 30, 1998 was A\$46.3 million. Since GWRC's shares lost all their value once the corporation was liquidated, Mr. Hobson opines that GWRC's loss was A\$46.3 million.  Mr. Hobson also calculates that the GWRC estate has a creditor deficiency – that is, a deficit of assets to cover creditor claims – of A\$10.7 million, and adds that to his damages calculation.  Thus, Mr. Hobson opines, GWRC's total loss is A\$57.0 million.[27]

---

[24] (*See* Hobson Report § 1.1 (Ex. 31).  *See also* 56(a)(1) ¶ 68.)

[25] (Rep. of Craig T. Elson, dated March 18, 2005 ("Elson Rep.") at 1-2 (Ex. 25); Dep. Tr. of Craig T. Elson, dated May 26, 2005 ("Elson Tr.") at 4-5, 26-28 (Ex. 26).  *See also* 56(a)(1) ¶ 59.)

[26] (*See* Hobson Report § 5.2 (Ex. 31).  *See also* 56(a)(1) ¶ 69.)

[27] (*See* Hobson Rep. at §§ 1.1, 5.2, 8.4, 8.5, 16.3 (Ex. 31).  *See also* 56(a)(1) ¶ 70.) According to Mr. Hobson, this equates in U.S. dollars to \$35.3 million, using an exchange rate of 0.62, which was the rate as of June 30, 1998.

The Hobson Report does not opine that any conduct of PwC caused the collapse of

HHRG or any losses of GWRC.[28]  Nor does he address the impact of other business factors

affecting HHRG and GWRC after June 30, 1998 or the fact that GWRC's stock price had decline

precipitously even before announcement of the Panexim losses.[29]

## ARGUMENT

**I.    PwC IS ENTITLED TO SUMMARY JUDGMENT BECAUSE GWRC HAS
FAILED TO DISCLOSE EXPERT TESTIMONY THAT PwC'S CONDUCT WAS
THE PROXIMATE CAUSE OF GWRC'S CLAIMED LOSSES.**

In a professional malpractice case, the plaintiff must establish "that the defendant's

negligent conduct was a cause in fact and the proximate cause of" plaintiff's claimed injury.  *See,*

*e.g., Boone v. William W. Backus Hosp.*, 272 Conn. 551, 571 (2005).  "Cause in fact," also called

actual cause, means that the injury would not have occurred but for the defendant's negligent

conduct.  *See Stewart v. Federated Dep't Stores, Inc.*, 234 Conn. 597, 605 (1995); *accord*

*Boone,* 272 Conn. at 571; *Purzycki v. Town of Fairfield*, 244 Conn. 101, 113 (1998).  Proximate

cause is defined as "[a]n actual cause that is a substantial factor in the resulting harm," and

reflects the question of "whether the harm which occurred was of the same general nature as the

foreseeable risk created by the defendant's negligence."  *E.g., Purzycki*, 244 Conn. at 113

(quoting *Stewart*, 234 Conn. at 606 and *Doe v. Manheimer*, 212 Conn. 748, 758 (1989); *accord*

*Boone,* 272 Conn. at 571.  In other words, "[t]he existence of the proximate cause of an injury is

determined by looking from the injury to the negligent act complained of for the necessary

causal connection.'"  *Grayson v. Wofsey, Rosen, Kweskin & Kuriansky*, 231 Conn. 168, 182

---

[28] (*See* Hobson Report, "Conclusion," at §§ 16.1-16.3 (Ex. 31).  *See also* 56(a)(1) ¶ 71.)

[29] (*See* Hobson Report, "Conclusion," at §§ 16.1-16.3 (Ex. 31).  *See also* 56(a)(1) ¶ 72.)

(1994) (citation omitted); *accord Vona v. Lerner*, 72 Conn. App. 179, 190 (2002).[30]  This rule

applies regardless whether the claims are denominated as negligence, negligent

misrepresentation, breach of contract or breach of fiduciary duty.[31]

Under Connecticut law, a plaintiff must present expert testimony to establish proximate

causation in support of a professional malpractice case.  *See, e.g.*, *Law v. Camp*, 116 F. Supp. 2d

295, 305 (D. Conn. 2000) ("It is axiomatic that the plaintiff in a medical malpractice action has

the burden of proving legal causation by expert testimony."), *aff'd in relevant part,* 15 Fed.

Appx. 24 (2d Cir. 2001); *Boone*, 272 Conn. at 567, 573-75; *Ahern v. Fuss & O'Neill, Inc.*, 78

Conn. App. 202, 208 (2003) (engineering malpractice case); *Vona*, 72 Conn. App. at 180

(medical malpractice case); *Solomon v. Levett*, 30 Conn. App. 125, 128 (1993) (attorney

malpractice action).[32]

---

[30] *See generally* HHRG Summary Judgment Mem. at pp. 23-27, addressing in more detail the legal requirement of expert testimony in a malpractice case such as this.

[31] *See, e.g., Boone,* 272 Conn. 551,  562-66 (citing *Gold v. Greenwich Hosp. Ass'n*, 262 Conn. 248, 254 (2002)) (claims pleaded as ordinary negligence and recklessness against medical professionals were properly characterized as sounding in professional malpractice); *Vona v. Lerner*, 72 Conn. App. 179, 185-88 (2002)(claims alleging negligence, breach of contract and breach of fiduciary duty against attorneys all analyzed as sounding in professional malpractice); *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (claims against accounting and law firms for *inter alia* negligence, professional malpractice and breach of contract all traceable to "the provision of deficient professional services").

[32] There is no reason to distinguish accountants from other professionals.  In other contexts, the Connecticut courts have recognized that professional accountants are part of a skilled, professional class, akin to legal or medical professionals.  *See Advest Group, Inc. v. Arthur Andersen, LLP*, No. CV 970571417, 1998 Conn. Super. LEXIS 2137, at *20 (Conn. Super. Ct. July 20, 1998) (applying CUTPA professional negligence exemption to accountants because: "Accounting, like law and medicine, is a learned profession that is not interchangeable with other commercial endeavors."); *accord Vanczak v. Romani,* No. 990080053, 2002 Conn. Super. LEXIS 3397 (Conn. Super. Ct. Oct. 18, 2002).

GWRC has failed to disclose any expert report or testimony that demonstrates that PwC proximately caused the losses claimed by GWRC.  Construed most favorably to plaintiff, the Hobson Report opines only that HHRG's failure caused the subsequent failure of GWRC.  The report, however, does not tie the substantial decline in value of HHRG and GWRC *between* June 30, 1998 and February 2000 to any conduct of PwC, or even to HHRG's transactions with Panexim and other South American companies.  Mr. Hobson admitted at his deposition:

"Q     . . . You agree that this report sets forth all the opinions to which you expect to testify at trial?

"A     On the loss of Golden West, yes.

"Q     Do you intend to testify as to any opinions at trial other than those set forth in this report?

"A     No.

"Q     And you agree that this report does not set forth any opinion whether the Panexim losses caused HHRG to fail?

"A     Correct.

"Q     And so, as you sit here today, you do not have an expectation that you will be asked at trial to opine whether the Panexim losses caused HHRG to fail?

"A     Correct."[33]

Mr. Hobson's report makes no effort to segregate other independent factors that affected GWRC's value and that of its subsidiary – including the factors that GWRC publicly disclosed to its shareholders – from the impact (if any) of HHRG's advances to Panexim.  At deposition, Mr. Hobson reiterated that he attributed the *entire* decline in GWRC's market capitalization after June 30, 1998 to PwC:

---

[33] (Dep. Tr. of Ian R. Hobson, dated June 27, 2005 ("Hobson Tr.") at 37-38 (Ex. 34).)

-14-

"Q:     Is it your opinion that the entire market capitalization of GWRC as of June 30, 1998 was lost due to the conduct of [PwC]"?

"A:     Yes.

"Q:     And that includes the entire decline in market capitalization between June 30, 1998 and February of 2000?

"A:     Yes."[34]

But he admitted that the market capitalization had declined substantially **before** the Panexim exposure was disclosed:

"Q:     Would you agree that, between July 1, 1999 and February 23, 2000, the market capitalization of [GWRC] declined by nearly 50 percent?

"A:     From 70 cents to 36 cents, yes.

"Q:     And at no time before February 23, 2000 was the market aware of any losses attributable to Panexim?

"A:     Yes, that's right."[35]

Mr. Hobson makes no effort to explain the nearly 50% drop in market capitalization that preceded any disclosure of the Panexim loss.

In sum, the Hobson Report is insufficient to meet GWRC's burden to introduce expert testimony to establish that PwC proximately caused the decline in value of GWRC after June 30, 1998.

## II.     EVEN IF EXPERT TESTIMONY WERE NOT REQUIRED, GWRC HAS FAILED TO OFFER EVIDENCE TO PROVE THAT ITS CLAIMED LOSSES WERE PROXIMATELY CAUSED BY PwC.

While the issue of causation generally is for the trier of fact, it "becomes one of law when the mind of a fair and reasonable person could reach only one conclusion, and summary

---

[34] (*Id.* at 22 (Ex. 34).)

[35] (*Id.* at 57 (Ex. 34).)

judgment may be granted based on a failure to establish causation." *Abrahams v. Young &*

*Rubicam,* 240 Conn. 300, 307 (1997)(internal quotation marks and citations omitted); *see also*

*Stewart v. Federated Dep't Stores*, 234 Conn. at 611.  Accordingly, Connecticut courts regularly

have found that a failure to offer proof of proximate causation results in judgment in favor of

defendants as a matter of law.  *See, e.g., Abrahams,* 240 Conn. at 306-311 (denying summary

judgment to plaintiff and granting summary judgment in favor of defendants in the absence of

proof of proximate cause); *Boone*, 272 Conn. at 575 (affirming trial court's grant of summary

judgment in favor of defendant in the absence of proof of proximate cause); *Sherman v. Bristol*

*Hosp. Inc.*, 79 Conn. App. 78, 91 (2003) (affirming trial court's grant of summary judgment in

favor of defendants in the absence of proof of proximate causation); *Vona*, 72 Conn. App. at 190

(upholding directed verdict to defendant in the absence of proof of proximate cause); *Faulise v.*

*Eisenstein,* No. CV980490341S, 2000 Conn. Super. LEXIS 3017 at *15 (Conn. Super. Ct. Oct.

30, 2000) (granting motion for summary judgment in favor of defendants in the absence of proof

of proximate cause).

  For the same reasons that HHRG is unable to prove that the decline in the value of its

business after June 30, 1998 was proximately caused by PwC, GWRC also is unable to prove

that PwC proximately caused the decline in value of GWRC after that same date.[36]   GWRC

admitted in its public statements that HHRG's business was adversely affected after June 30,

1998 by a host of factors that had nothing to do with the Panexim transactions or any conduct of

PwC, including contraction of the market for HHRG's low grade electronic scrap practice,

substantial increases in external costs and a sustained increase in gold and silver lease rates, and

---

[36] *See* HHRG Summary Judgment Mem., at pp. 22-37.

-16-

increased competition from European refiners.[37]  Not only did these factors drive down the value

of HHRG (GWRC's largest asset) after June 30, 1998, but other factors did as well.  These

included poor management and investment decisions and, in February 2000, unsealing of the

indictments of Mr. Wayne and Mr. Searle, which – though related to conduct that pre-dated

HHRG's acquisition of the Handy & Harman business – undermined the confidence of lenders

and creditors.[38]

     A jury is not free to assume that the loss of value of GWRC was proximately caused by

PwC.  Under any circumstance, a jury must be given competent evidence from which to measure

the alleged deterioration in value and determine the deterioration was caused by PwC.  In the

absence of such evidence, the jury is left to impermissible speculation.  *See, e.g., Fashion*

*Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 60 (2d Cir. 2002), *aff'd* 75 F. Supp.

2d 235, 238-39 (S.D.N.Y. 1999); *Tyger Constr. Co. v. Pensacola Constr. Co*., 29 F.3d 137, 142-

43 (4th Cir. 1994); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir.

1992).[39]

     GWRC's claims, like those of HHRG, fail because it has not produced any evidence that

would permit the jury to determine that the decline in value after June 30, 1998 of GWRC's

largest asset, its interest in HHRG, was proximately caused by PwC.  But GWRC's claims are

even more attenuated because they attribute to PwC not only the decline in value of HHRG, but

also the decline in value of GWRC.  Prior to the sale its Canadian subsidiary to HHRG, GWRC

operated that entity as well as operations in Australia.  On December 1, 1998, GWRC borrowed

---

[37] (*See* HHRG Summary Judgment Mem., at pp. 6-9.)

[38] (*See* HHRG Summary Judgment Mem., at pp. 9-12, 16.)

[39] (*See* HHRG Summary Judgment Mem. at 30.)

approximately $7 million to purchase a 50% interest in a refining operation called the AGR Joint

Venture. GWRC has disclosed no evidence that would permit the jury to determine the value of

these other assets at any point between June 30, 1998 and February 2000.

Accordingly, PwC is entitled to summary judgment on all counts.

### III.    PwC IS ENTITLED TO SUMMARY JUDGMENT ON COUNT FOUR BECAUSE GWRC HAS NOT PRODUCED EVIDENCE SUFFICIENT TO SHOW A FIDUCIARY DUTY OWED BY PwC TO GWRC.

In Count Four, GWRC summarily alleges that PwC "had a fiduciary duty to GWRC."[40]

GWRC contends that this duty arose because PwC was the auditor for GWRC's wholly-owned

subsidiary, HHRG.[41]  It "is axiomatic that a party cannot breach a fiduciary duty to another party

unless a fiduciary relationship exists between them." *Biller Assocs. v. Peterken*, 269 Conn. 716,

723 (2004). In this case, there is simply no evidence that PwC had a fiduciary relationship with

GWRC.[42]  Indeed, GWRC cannot even establish that it had a client-accountant relationship with

PwC. Even if GWRC could establish such a relationship, courts have consistently held that the

mere existence of a client-accountant relationship does not create fiduciary obligations. *See, e.g.*,

*Greenblatt v. Richard Potasky Jewelers*, No. 93 Civ. 3652, 1994 U.S. Dist. LEXIS 258, at *11-

12 (quoting *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F. Supp. 1314, 1356 (S.D.N.Y.

1982)).[43]

---

[40] (Second Amended Complaint, Count 4, ¶ 70 (Ex. 29).)

[41] (Second Amended Complaint, Count 3, ¶¶ 71-72 (Ex. 29).)

[42] PwC's Australian affiliate served as the auditors for GWRC, but the two entities are legally distinct.

[43] *But see Gengras v. Coopers & Lybrand*, No. CV-92 0517836S, 1994 Conn. Super. LEXIS 888, at *7-8 (Conn. Super. Ct. Mar. 31, 1994).  In *Gengras*, the court denied the defendant's motion to strike a breach of fiduciary duty claim, apparently assuming, without explaining its rationale, that allegations of an accountant-client relationship were sufficient to

Under Connecticut law, a "fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 38 (2000)(quoting *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 218 (1994)). In order to meet its burden of proving a fiduciary duty, GWRC must establish (1) that because of PwC's "dominant position" GWRC was "unable to fully protect its interests," (2) that GWRC had justifiably "placed [its] trust and confidence in" PwC, and (3) that PwC "undertook to act primarily for the benefit of the plaintiff." *Hi-Ho Tower*, 255 Conn. at 41, 43; *Dunham v. Dunham*, 204 Conn. 303, 320 (1987) (trust must be "justifiable"), *accord Silva v. New York Life Ins. Co.*, No. CV970342973S, 2001 Conn. Super. LEXIS 202, at *23 (Conn. Super. Ct. Jan. 12, 2001) ("The Connecticut Supreme Court has never recognized the existence of a fiduciary relationship without some facts indicating that the claimed fiduciary has in some manner agreed to protect that person's interests."); *Dudrow v. Ernst & Young LLP*, No. CV 980144211S, 1999 Conn. Super. LEXIS 104, at *12 (Conn. Super. Ct. Jan. 14, 1999).

The Connecticut Supreme Court's decision in *Hi-Ho Tower* is instructive. There, plaintiff sought damages for the defendants' alleged unlawful use of the plaintiff's radio and communications tower. *Hi-Ho Tower*, 255 Conn. at 22. The plaintiff asserted that defendants were the "sole technical advisors" to plaintiff with respect to the tower, that plaintiff relied exclusively on defendants for information regarding the persons using the tower, and that defendants seized plaintiff's business opportunity and profited from the trust and confidence placed in them by plaintiff. *Id.* at 40. The trial court entered a directed verdict for defendants on

---

create issues of fact regarding the existence of a fiduciary duty. *Id.* Even if this decision had been correctly decided, however, the *Gengras* court presumed the existence of an accountant-client relationship - an assumption which plainly does not apply here. *See id.*

-19-

this count, finding that the evidence was insufficient as a matter of law to support a fiduciary duty. *Id.* at 25.

The Supreme Court affirmed. The Court initially reviewed the seminal cases on fiduciary duty, and found that in each "the fiduciary was either in a dominant position, thereby creating a relationship of dependency, or was under a specific duty to act for the benefit of another." *Id.* at 38. None of those factors was present in *Hi-Ho Tower*. The Court held that it was not enough that plaintiff trusted and relied upon defendants; such reliance "did not confer upon the defendants the authority to exercise over the plaintiff the control, dominance or influence characteristic of fiduciary relationships. Thus, we conclude that the record, as a matter of law, is inadequate to support a finding of a fiduciary relationship." *Id.* at 41-42.

Similarly, GWRC has failed to produce any evidence suggesting that PwC owed it a fiduciary duty. First, GWRC has offered no evidence that PwC was in a dominant position that rendered GWRC "unable" fully to protect his interests. PwC served as the independent auditors for GWRC's subsidiary, HHRG.

Second, the evidence does not support a finding that GWRC justifiably reposed a "unique degree of trust and confidence" in PwC. To the contrary, the evidence shows that GWRC's senior management had very little contact with PwC. GWRC's managing director, Michael Ryan, testified that he has only ever met with two members of PwC, that he never spoke or met with either of them until after February 2000, and that he was not even *aware* of PwC's service plan with HHRG on which GWRC bases its claims until after HHRG filed for bankruptcy. Indeed, Mr. Ryan admitted that he did not rely on any oral or written representations by PwC "in

conducting [his] business as a director of Handy & Harman " and never reviewed PwC's "report on HHRG's 1998 financial statement at any time before the bankruptcy."[44]

Third, there is no evidence that PwC contracted with GWRC, as opposed to its client, HHRG, to audit HHRG's financial statements.  There is no engagement letter between PwC and GWRC; GWRC's complaint implicitly admits as much, instead relying on the allegation that it was the "intended beneficiary of HHRG's contract with PwC/US, including the Service Plan and Work Plan."[45]  However, neither documents named GWRC as an "intended" beneficiary of PwC's professional services to HHRG.  There is simply no evidence that would suggest that PwC undertook to represent the individual interests of GWRC, or that GWRC was the intended beneficiary of the alleged contractual relationship between HHRG and PwC (US).

To the extent plaintiff may contend that PwC had superior knowledge, skill or expertise, and even assuming the evidence would support such a finding, that is not sufficient to establish a fiduciary duty.  As the Supreme Court made clear in *Hi-Ho Tower*: "Superior skill and knowledge alone do not create a fiduciary duty among parties involved in a business transaction." *Hi-Ho Tower*, 255 Conn. at 42 (emphasis added). Rather, the record must demonstrate "that the defendants exercised dominance or influence over the plaintiff as a result of their superior knowledge and skill and, furthermore, . . . that they undertook to act primarily for the benefit of the plaintiff." *Id.* at 43.  Plaintiff here failed to make such a showing.

---

[44] (*See* Ryan Tr. at 58-59, 119, 218 (Ex. 5); *see also* Dep. Tr. of Rodney D. Warren, dated March 25, 2005 ("Warren Tr.") at 77 (Ex. 37).  *See also* 56(a)(1) ¶ 74.)

[45] (Second Amended Complaint, Count 3, ¶ 71 (Ex.29).)

Even if GWRC could establish that it engaged PwC as its independent accountants, courts have widely held that this alone is not sufficient to establish a fiduciary duty.[46] The rationale of these decisions has consistently been that an accountant is deemed "independent"; although an accountant renders services to a client, his duty, unlike that of a lawyer or trustee, is not to represent the interests of the company.[47] It is this independence that is at the heart of the accountant-client relationship; it is simply not a relationship where the accountant "is under a duty to represent the interests of the [company]." *Konover Dev. Corp. v. Zeller*, 228 Conn. 206, 219 (1994) (citation omitted).

The absence of fiduciary obligations is even more clear as between an accountant and non-clients, such as GWRC. *See Facchini v. Miller*, No. CV 990587686S, 2000 Conn. Super. LEXIS 245, at *9 (Conn. Super. Ct. Jan. 28, 2000).[48] In *Facchini*, the court granted the

---

[46] *See, e.g.*, *Greenblatt*, 1994 U.S. Dist. LEXIS 258, at *11-12 (quoting *Fund of Funds*, 545 F. Supp. at 1356 ( "Courts do not generally regard the accountant-client relationship as a fiduciary one"); *see also Franklin Supply Co. v. Tolman*, 454 F.2d 1059, 1065 (9th Cir. 1971); *Block v. Razorfish, Inc.*, 121 F. Supp. 2d. 401, 403-04 (S.D.N.Y. 2000) (under New York law accountant-client relationship does not give rise to fiduciary duty unless accountant engages in affirmative fraud against client); *Silveri v. Mirsky*, No. 95 Civ. 10234, 2000 U.S. Dist. LEXIS 16709, at *11 (S.D.N.Y. Nov. 13, 2000) ("Generally, the relationship between an accountant and his client does not give rise to a fiduciary duty"); *Fleet Nat'l Bank v. H & D Entertainment, Inc.*, 926 F. Supp. 226, 242 (D. Mass.) ("Where an accountant merely performs basic accounting functions, no fiduciary relationship is created") *aff'd* 96 F.3d 532 (1st Cir. 1996); *FDIC v. Schoenberger*, 781 F. Supp. 1155, 1157 (E.D. La. 1992) ("Federal circuit courts have held that accountants do not owe a fiduciary duty to their clients when providing services as auditor . . ."); *see also Painters of Phila. Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1150 (3d Cir. 1989) (accountant who audits pension fund does not owe fiduciary obligation to trustees of fund).

[47] *See* n. 46, supra. *See also Tsg Water Res., Inc. v. D'Alba & Donovan Certified Public Accountants, P.C.*, 366 F. Supp. 2d 1212, 1227 (S.D. Ga. 2004) ("Generally, an accountant hired to audit the financial statements of a client is not a fiduciary of the client, but rather is required to be independent of the client")

[48] *See also Acebey v. Shearson Lehman Bros., Inc. No. CV 92-5926-WMB,* 1993 U.S. Dist. LEXIS 19659, at *15 (C.D. Cal. June 4, 1993)(dismissing plaintiff's breach of fiduciary

plaintiff's motion to strike the breach of fiduciary claim because the plaintiff failed to allege that there was a "client-accountant relationship between plaintiff and defendant accountants." *Id.* Similarly here, GWRC has not alleged—nor can it—that there was a client-accountant relationship between GWRC and PwC. Moreover, even if GWRC had a right to expect that it would receive complete financial information from PwC (US), that expectation alone does not create the special obligations of a fiduciary duty. *See id.* (granting motion to strike even where plaintiff had alleged that "defendants were aware that the plaintiff relied upon them for financial information"); *see also Hutchinson v. Farm Family Cas. Ins. Co.*, 273 Conn. 33, 48 (2005) (quoting *Hi-Ho Tower*, 255 Conn. at 41) ("the fact that one…person trusts another [entity] and relies on [the entity] to perform [its obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty").

GWRC has not presented any evidence that PwC was ever hired by GWRC, nor that the PwC ever represented that they would occupy a position of trust with regard to GWRC. Accordingly, the Court should grant PwC's motion for summary judgment on GWRC's claim for breach of fiduciary duty.

---

duty claim because defendant accounting firm had "not undertaken to act on plaintiffs' behalf or for their benefit" and that as such it "never had any relationship with plaintiffs, let alone one from which a fiduciary duty can be inferred").

**CONCLUSION**

The Court should grant summary judgment for PwC on all counts of GWRC's complaint, and dismiss the complaint with prejudice.


DEFENDANT,
PRICEWATERHOUSECOOPERS LLP


By: _____/s/ Thomas D. Goldberg_____
        David J. Elliott (ct 04301)
        Thomas D. Goldberg (ct 04386)
        Day, Berry & Howard LLP
        One Canterbury Green
        Stamford, Connecticut 06901-2047
        Tel:  (203) 977-7300
        Fax: (203) 977-7301
        Its Attorneys

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                                    /s/ Thomas D. Goldberg
                                                David J. Elliott (ct 04301)
                                                Thomas D. Goldberg (ct 04386)
                                                Day, Berry & Howard LLP
                                                One Canterbury Green
                                                Stamford, Connecticut 06901-2047
                                                Tel:  (203) 977-7300
                                                Fax: (203) 977-7301
                                                Its Attorneys


Edward J. Boyle, Esq.                    William H. Champlin, III, Esq.
Wilson, Elser, Moskowitz, Edelman &      Michael T. McCormack, Esq.
Dicker LLP                               William S. Fish, Jr., Esq.
150 East 42nd St.                        Tyler Cooper & Alcorn, LLP
New York, NY  10017-5639                 CityPlace - 35th Floor
                                         185 Asylum Street
                                         Hartford, CT 06103


Daniel McMahon, Esq.                     Fred N. Knopf, Esq.
Stefan Dandelles, Esq.                   Wilson, Elser, Moskowitz, Edelman & Dicker
Daniel E. Tranen, Esq.                   LLP
Wilson, Elser, Moskowitz, Edelman &      3 Gannett Drive
Dicker LLP                               White Plains, NY 10604-3407
120 N. LaSalle Street
Chicago, IL  60602


Steven R. Humphrey (ct06053)             Jed Horwitt, Esq.
Dina S. Fisher (ct14896)                 Zeisler & Zeisler, P.C.
James M. Ruel (ct21222)                  558 Clinton Ave.
Robinson & Cole LLP                      P.O. Box 3186
280 Trumbull Street                      Bridgeport, CT 06605-0186
Hartford, CT 06103-3597