## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED,<br>　　　　　Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP,<br>　　　　　Defendants. | CIVIL ACTION NO.<br>3:02 CV 1379 (MRK) |
| ALEC SHARP, et al.,<br>　　　　　Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP,<br>　　　　　Defendant. | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>　　　　　Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP,<br>　　　　　Defendant. | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK)<br><br>August 12, 2005 |

**PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO EXCLUDE IAN R. HOBSON AS AN EXPERT**

PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum of law in support of its motion in limine to exclude the testimony and report of Ian R. Hobson, an expert designated on behalf of plaintiff Golden West Refining Corporation Limited ("GWRC" or "Plaintiff") in *Golden West Refining Corp. Limited v. PricewaterhouseCoopers LLP,* Civil Action No. 3:02 CV 1379 (MRK), on the issue of damages.

**PRELIMINARY STATEMENT**

GWRC has asserted claims against PwC alleging that PwC proximately caused, and may be held liable for, the lost market value of GWRC's publicly traded stock from and after June 30, 1998, an amount that GWRC claims is over $35 million. In alleged support of this damages claim, GWRC has designated Ian R. Hobson as an expert witness. Mr. Hobson seeks to offer an opinion of the fair market value of GWRC, as measured by the total market capitalization of GWRC stock as listed on the Australian stock exchange as of June 30, 1998. GWRC stock was later suspended from trading on February 23, 2000, and GWRC was placed into insolvency proceedings in Australia in August 2001.

The gravamen of GWRC's damages theory is that the measure of its damages is simply the difference between the market capitalization value of GWRC as of June 30, 1998 and *zero* – which, according to Mr. Hobson, was the valuation as a result of the insolvency proceeding.[1] Contemporaneously with this motion, PwC is filing a motion for summary judgment, on the ground that GWRC has failed to offer the requisite expert testimony or any other evidence that would establish a causal connection between the decline in market capitalization value of GWRC from June 30, 1998 to its zero value at the time of its insolvency proceeding. Because GWRC has failed, as a matter of law, causally to connect PwC's conduct with any diminution in the value of GWRC, Mr. Hobson's opinion on GWRC's alleged June 30, 1998 valuation is not relevant to any issue in dispute. As a result, Mr. Hobson's proposed testimony and report must be excluded.

---

[1] Hobson also claims additional damages necessary to satisfy the "creditor deficiency" of the GWRC insolvency estate – that is, a deficit of assets to cover creditor claims. See *infra*.

**FACTUAL BACKGROUND[2]**

GWRC is an Australian company that was publicly traded on the Australian Stock Exchange until 2001.[3] In or about August 1996, it formed a wholly-owned subsidiary, HHRG, to purchase the Precious Metals Refining Division of Handy & Harman, Inc.[4] HHRG was GWRC's largest asset. By 1999, GWRC's sole assets were HHRG and a 50% interest in a joint venture known as the AGR Joint Venture.[5]

HHRG filed for bankruptcy on March 28, 2000.[6] HHRG's assets ultimately were liquidated.[7] GWRC had taken on considerable debt to finance its interest in the AGR Joint Venture. To service that debt, it needed HHRG to earn profits and distribute the profits to GWRC in the form of dividends. Once HHRG stopped earning profits and then filed for

---

[2] Contemporaneous with this Motion In Limine, PwC has filed Motions for Summary Judgment Against Handy & Harman Refining Group, Inc. and Golden West Refining Corporation Limited. Pursuant to Local Rule 56(a)(1), PwC has also filed a Consolidated Local Rule 56(a)(1) Statement and Compendium of Exhibits in Support. The exhibits referenced in this Motion have been provided to the Court in PwC's Compendium of Exhibits.

[3] HHRG Compl. at ¶ 13; Handy & Harman Refining Group, Inc. Consolidated Financial Statements dated March 31, 1998 and March 31, 1997 ("1997-1998 HHRG Consolidated Financials") at PWC Z 02595, 02605 (Ex. 2); A Chronology of Handy & Harman Refining Group, Inc. 1995-2002 ("HHRG Chronology") at GWRC-PWC0068110 (Ex . 10).)

[4] HHRG Compl. at ¶¶ 13, 14.

[5] *See* Rep. of Ian Hobson of Ferrier Hodgson (WA), dated March 24, 2005 ("Hobson Rep.") at § 4.1(b) and (c) (Ex. 31).

[6] Managing Director's Report of Michael Ryan ("Director's Rep.") at 1-2 (Ex. 20).)

[7] *See* Third Interim Status Report of Liquidating Custodian of Handy & Harman Refining Group, Inc. (Re: Fifth Distribution), dated March 11, 2005, at 8 (Ex. 40).

bankruptcy, it no longer could pay dividends to GWRC. This allegedly led to GWRC's insolvency.[8]

Even before HHRG's bankruptcy filing, the stock price of GWRC had declined considerably. Always a thinly-traded, low-priced (under $1) stock, GWRC's reported stock price on the Australian Stock Exchange as of June 30, 1998 was A$.66. It reached a high of A$.70 in July 1999, and declined to A$.47 in January 2000 and to A$.36 per share on February 23, 2000.[9] That same day, because of revelations about missing gold in Peru, which created an exposure to HHRG of about $12 million, trading in GWRC stock was suspended.[10]

According to GWRC, without the expected cash flow from HHRG, GWRC defaulted on its debt. In August 2001, GWRC was placed into insolvency proceedings in Australia and an administrator was appointed. GWRC shortly thereafter sold its interest in the AGR Joint Venture, and has no operating assets.[11]

GWRC has designated several experts in support of its claims, including Mr. Hobson.[12] GWRC has tendered the putative expert report of Mr. Hobson ("Hobson Report"), which opines

---

[8] *See* GWRC Press Release, "Golden West Announces Half-Year Result," issued November 3, 1998 at GWRC-PWC-E0003114 (Ex. 3); Golden West Refining Corporation Limited Financial Summary – Quarter to 31 December 1998 at GWRC-PWC0056525 (Ex. 39); Hobson Report §§ 4.1, 10.1, 12.1

[9] *See* Hobson Report, § 7.2 & Annexure B.

[10] *See* Golden West Refining Corporation Limited Annual Report 2000 at HHRG-PWC356750 (Ex. 41).

[11] *See* Hobson Report, §§ 4.1, 7.1, 10.1.

[12] While PwC contests numerous aspects of the opinions of each of the experts designated by GWRC, it addresses herein only those aspects of Mr. Hobson's testimony and report relevant to this motion.

on "the loss incurred by GWRC as a result of the insolvency of [HHRG]."[13] According to Mr. Hobson, the GWRC loss includes two components. First, he opines on the loss of GWRC's equity value after June 30, 1998, which is the same date used by GWRC's expert witness, Craig Elson. According to Mr. Hobson, that date was chosen because it "was prior to the substantial change and increase in unsecured advances by HHRG to South American companies. We understand that subsequent to 30 June 1998, HHRG's business as being operated in a manner inconsistent with its policy regarding foreign advances. HHRG's results were therefore infected with transactions that were not in accordance with corporate policy."[14] He calculates GWRC's equity value as of that date by multiplying GWRC's quoted price on the Australian Stock Exchange at June 30, 1998, which was A$.66 per share, by the total number of outstanding shares of GWRC. That calculates to a market capitalization of A$37.0 million.[15] Mr. Hobson then applies a "control premium" of 25%, and opines that the value of GWRC's equity as of June 30, 1998 was A$46.3 million.[16] Because GWRC's shares lost all their value once the corporation was liquidated, Mr. Hobson opines that GWRC's loss was A$46.3 million.[17] Second, Mr. Hobson calculates that the GWRC estate has a creditor deficiency – that is, a deficit

---

[13] Hobson Report § 1.1.

[14] Hobson Report § 5.2; Deposition of Ian R. Hobson, June 27, 2005 ("Hobson Tr.") at 20-21, 74 (Ex. 34).

[15] Hobson Report § 8.4.

[16] *Id.;* Hobson Tr. at 18.

[17] Of course, if HHRG recovers on its claims any amounts distributed to GWRC will reduce the separate damages that GWRC claims in its case. Hobson Tr. at 32.

of assets to cover creditor claims – of A$10.7 million.[18]  Thus, Mr. Hobson opines, GWRC's total loss is A$57.0 million – or $35.3 million US dollars.[19]

The Hobson Report does not opine that any conduct of PwC caused any specific decline in the market price of GWRC stock.[20]  Together with this motion, PwC also has filed a separate motion for summary judgment against GWRC, on the ground that GWRC has failed to discharge its burden of offering competent evidence from which a jury could lawfully infer that PwC proximately caused an injury to GWRC as measured by the total decline in market capitalization from June 30, 1998 to February 2000.  *See* PwC's Memorandum of Law in Support of its Motion for Summary Judgment Against GWRC.  In particular, PwC has shown in its motion for summary judgment that GWRC's claims should be dismissed because (i) GWRC has failed to offer the necessary expert testimony to demonstrate that the total destruction of GWRC's business was proximately caused by PwC and, moreover, (ii) GWRC has failed to come forward with ***any*** evidence that would permit a jury to find any decline in market value after June 30, 1998 proximately caused by PwC, much less that PwC is legally responsible for the ***entire*** decline in market capitalization that GWRC claims is attributable to PwC.

## ARGUMENT

Under Rule 702 of the Federal Rules of Evidence, an expert may testify as to any scientific, technical, or other specified knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  While this creates a liberal

---

[18] Mr. Hobson testified that he measured the creditor deficiency as of March 24, 2005. Hobson Tr. at 15-16;  Hobson Report §§ 6.2, 16.3.

[19] Mr. Hobson uses an exchange rate of 0.62, which he claims was the rate as of June 30, 1998.  *See id.*

[20] See "Conclusion" in Hobson Report, at §§ 16.1-16.3.

standard for the admissibility of expert opinions, it does not relieve the court of its gatekeeping responsibility to ensure that all expert testimony is both relevant and reliable. *E.g., Nimely v. City of N. Y.*, No. 04-3240-CV, 2005 U.S. App. LEXIS 12712, at *35-39 (2d Cir. June 27, 2005).

**I.    THE COURT SHOULD EXCLUDE MR. HOBSON'S TESTIMONY AND REPORT BECAUSE GWRC HAS FAILED TO SHOW THAT PwC'S ALLEGED PROFESSIONAL NEGLIGENCE PROXIMATELY CAUSED GWRC'S DEMISE.**

**A.    Expert Testimony Must Be Relevant.**

It is clear that, in order to be admissible, expert testimony must be relevant and not unduly prejudicial.[21] *Nimely v. City of N. Y.*, at *35-39; *United States v. Taylor*, 18 F.3d 55, 59 (2d Cir. 1994). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591 (1993)(internal citation and quotation omitted). The Second Circuit similarly has recognized that expert testimony should be excluded if it is speculative or conjectural in nature. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996); *accord BIC Corp. v. Far E. Source Corp.*, 23 Fed. Appx. 36, 38 (2d Cir. 2001).

**B.    Absent Proof of Causation, Expert Testimony as to Damages is Speculative and Not Relevant, and Therefore Inadmissible.**

The Second Circuit recently has upheld the exclusion of expert testimony on the value of a failed business where a plaintiff has failed to establish causation. In *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, Fashion Boutique attempted to introduce expert testimony estimating the value of its lost business, which the district court excluded "on the basis that there

---

[21] According to Rule 401, relevant evidence is that which "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Under Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403.

was insufficient evidence to support a reasonable inference that Fendi's actions caused plaintiff to go out of business." 314 F.3d 48, 55 (2d Cir. 2002).  The Second Circuit agreed and affirmed, stating that to allow an expert opinion on the value of plaintiff's business, without any evidence supporting the assumption that Fendi caused those damages, "would invite the jury to award damages based on speculation." *Id.* at 60.  Accordingly, the Court agreed that the expert's testimony as to damages was not relevant and not admissible. *See id.* at 59-60.

Similarly, the Fourth Circuit has held that expert testimony as to damages is inadmissible absent proof of causation. *See Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142-43 (4th Cir. 1994). In that case, Pensacola proffered expert testimony on increased costs it had incurred from delays in completing a construction contract, without having shown that that the delays had been caused by Tyger. *See id.* The court stated that an expert's opinion should be excluded when it is based upon assumptions which are speculative and not supported by the record, and that an expert's opinion on damages should be causally related to the alleged harm. *See id.* The court held that it had been an abuse of discretion to admit the expert's calculation of increased costs based on the faulty assumption of a causal connection between those costs and Tyger's conduct, and vacated the corresponding portion of the jury's damages award. *See id.* at 143.

The conclusion reached by the Second and Fourth Circuits, not surprisingly, has also been reached in other courts. For example, in a case involving unfair competition, a plaintiff sought to introduce expert testimony as to damages from lost contracts. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1072, 1078 (W.D. Ky. 1995). The court found that there was no basis in the case to conclude that CMI's financial results were causally related to defendants' conduct. *See id.* at 1078-79. It held that "[u]nder no circumstances could this Court

allow a jury to consider [expert] opinions that, due to the absence of foundation or reasonable causal connection, amount to no more than sheer speculation." *Id.* at 1079. *See also El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 620, 626 (S.D. Tex. 2003) (expert testimony as to damages inadmissible where expert relied upon flawed and inadmissible testimony on causation), *aff'd*, 131 Fed. Appx. 450 (5th Cir. 2005); *KW Plastics v. U. S. Can Co.*, 131 F. Supp. 2d 1289, 1294-95 (M.D. Ala. 2001) (expert testimony as to damages inadmissible where expert offered no opinion as to whether defendant's use of trade secrets caused defendant to be unjustly enriched); *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084-85 (D. Kan. 2000) (expert testimony as to lost profits inadmissible where expert assumed causation and improperly attributed all losses to the defendant's acts), *overruled in part and sustained in part on other grounds,* 196 F.R.D. 608 (D. Kan. 2000).

As the courts consistently have held, an expert's testimony as to damages is speculative and inadmissible where there is no proof of causation on which it may be based.  Here, Mr. Hobson renders an "opinion" on GWRC damages simply by multiplying the number of shares outstanding on June 30, 1998 by the then-quoted market share price, and adding the "creditor deficiency" allegedly caused by the insolvency proceeding.  The fatal flaw here is that there is no proof in the record to support an inference that the decline in value in GWRC's business from June 30, 1998 to March 2000 was caused completely, or even in any identifiable part, by the Panexim losses or PwC's conduct.  Neither Mr. Hobson nor any other expert witness has opined on that connection.  The evidence unequivocally shows that many other factors, singly or in combination, could have caused GWRC to decline in value.  Yet GWRC's damage theory assumes, without any expert testimony or other factual basis, that the entire decline in value during that 22-month period was caused by the Panexim losses.  Mr. Hobson readily admitted in

his deposition that he conducted no analysis to evaluate whether there were any industry factors that affected the value of GWRC or HHRG between June 1998 and February 2000.[22] If his theory were correct, then even if GWRC had significantly declined in value from June 1998 through February 2000, **which it undeniably did**,[23] for business or marketplace reasons wholly unrelated to Panexim, PwC would still be responsible for the entire decline in value.

Mr. Hobson's deposition testimony reveals the flaw in his damage opinion and, in turn, the fatal defect in GWRC's entire damage theory. When asked about his damages opinion, Mr. Hobson's testified:

> "Q: Is it your opinion that the entire market capitalization of GWRC as of June 30, 1998 was lost due to the conduct of [PwC]"?
>
> "A: Yes.
>
> "Q: And that includes the entire decline in market capitalization between June 30, 1998 and February of 2000?
>
> "A: Yes."[24]

This testimony was followed later in the deposition by the following:

> "Q: Would you agree that, between July 1, 1999 and February 23, 2000, the market capitalization of [GWRC] declined by nearly 50 percent?
>
> "A: From 70 cents to 36 cents, yes.

---

[22] Hobson Tr. at 22.

[23] Hobson's Report at §7.2 and Annexure C reveals that the Closing stock price at February 23, 2000, before the public announcement on February 24 of the missing Gold in Peru which led to suspension of all trading in GWRC stock, was A$.36/share. Accordingly, as Mr. Hobson himself calculates, the market capitalization as of February 23, 2000, already had fallen, for reasons wholly unrelated to Panexim, to A$20,578, 643 (57,162,898 shares outstanding x A$.36 cents). Thus, the market capitalization value of GWRC declined from roughly A$46.3 million on June 30, 1998 to A$20.6 million as of February 23, 2000, a decline of 43%, equating to $12.2 million US – losses that could not possibly be attributed to PwC.

[24] Hobson Tr. at 22.

"Q: And at no time before February 23, 2000 was the market aware of any losses attributable to Panexim?

"A: Yes, that's right."[25]

The juxtaposition of these two sets of inquiries demonstrates that even if the jury finds that PwC committed malpractice, that caused the Panexim losses, that caused HHRG to fail, that then caused GWRC to fail, neither Mr. Hobson nor any other expert offered by GWRC can testify that the decline in market value from June 30, 1998 through February 23, 2000 -- when the market became aware of the Panexim losses and trading in GWRC stock was suspended -- was proximately caused by PwC's conduct.

Mr. Hobson cannot properly testify as to the June 30, 1998 valuation unless and until there is evidence that lawfully supports a finding that the dramatic diminution in market value after that date was proximately caused by PwC. *See* PwC's Memorandum of Law in Support of its Motion for Summary Judgment Against GWRC. As a result, Mr. Hobson's conclusion is speculative and is not relevant to any issue in dispute in the case. Under the well-established principles described above, Mr. Hobson's opinion must be excluded.

---

[25] *Id.* at 57. In response to a later question, Hobson candidly admits that he cannot explain why the market stock price fell at various points after June 30, 1998:

"Q: Do you know why the price declined from 70 cents per share to 65 cents per share between July 8 and July 9, 1999?

"A: No." Hobson Tr. at 55.

## CONCLUSION

For the foregoing reasons, the Court should grant PwC's motion to exclude Mr. Hobson's testimony and report.

DEFENDANT,
PRICEWATERHOUSECOOPERS LLP


By: ____/s/ Thomas D. Goldberg_____
    David J. Elliott (ct 04301)
    Thomas D. Goldberg (ct 04386)
    Day, Berry & Howard LLP
    One Canterbury Green
    Stamford, Connecticut 06901-2047
    Tel: (203) 977-7300
    Fax: (203) 977-7301
    Its Attorneys

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on August 12, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

                /s/ Thomas D. Goldberg
David J. Elliott (ct 04301)
Thomas D. Goldberg (ct 04386)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901-2047
Tel: (203) 977-7300
Fax: (203) 977-7301
Its Attorneys

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

William H. Champlin, III, Esq.
Michael T. McCormack, Esq.
William S. Fish, Jr., Esq.
Tyler Cooper & Alcorn, LLP
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Daniel E. Tranen, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
120 N. LaSalle Street
Chicago, IL 60602

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604-3407

Steven R. Humphrey (ct06053)
Dina S. Fisher (ct14896)
James M. Ruel (ct21222)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Jed Horwitt, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Ave.
P.O. Box 3186
Bridgeport, CT 06605-0186

41618997.1