UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION, LTD., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:02 CV 1379 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP and COOPERS & LYBRAND, LLP, | ) ) ) | |
| Defendants. | ) ) ) | |
| ALEC SHARP, et al., | ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 3:02 CV 1572 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a PRICE WATERHOUSE, LLP, | ) ) ) | |
| Defendant. | ) ) ) | |
| HANDY & HARMAN REFINING GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:02 CV 1803 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) | |

## **LOCAL RULE 56(a)1 STATEMENT**

COMES NOW Plaintiffs Alex Sharp, et al. and for their Local Rule 56(a)1 Statement in support of their motion for partial summary judgment, state as follows:

1

275890.2

**A.    PwC performs a due diligence investigation prior to the formation of HHRG**

1. PricewaterhouseCoopers, LLP ("PwC")[1] performed a due diligence investigation for Golden West Refining Corporation ("GWRC") in conjunction with the purchase of the Precious Metals Refining Division of Handy & Harman, the predecessor to GWRC's wholly-owned subsidiary, Handy & Harman Refining Group, Inc. ("HHRG").  Transcript of the deposition of George Ingram taken February 18, 2005, p. 9, at Appendix Tab 7 ("App. 7").[2]

2. The due diligence report was prepared by PwC on or about May 1, 1996, and provided to GWRC.  App. 7, p. 9.

3. The due diligence report issued by PwC states as follows:

> Based upon our previous experience with overseas activities, we believe that there is [sic] serious risks associated with the Company's budgeted earnings and credit exposure with South American businesses in Venezuela, Chile, Uruguay and Bolivia.  Management has stated that cash will not be given to its customers in these countries until an armored car company has verified that deposit of the customer's metals into designated vaults, as opposed to extending advances and obtaining security insurance, bonds as was the previous practice.

Appendix Tab 1.

**B.    Panexim is created to transact business with HHRG**

4. Roberto Passaro is the President of Panexim.  Affidavit of Roberto Passaro, para. 1, at Appendix Tab 14 ("App. 14").

5. Panexim was formed in 1996 for the purpose of exporting value added precious metals to HHRG.  App. 14, para. 2.

---

[1] For ease of reference, "PwC" refers to PricewaterhouseCoopers and its predecessor Coopers & Lybrand, both of which provided audit services to HHRG during the relevant time period.

[2] Underwriters are filing contemporaneously herewith an appendix of exhibits, testimony, other discovery responses and unreported case law in support of their motion for partial summary judgment.

275890.2

6. The purpose of Panexim's business dealings with HHRG was to take advantage of a Peruvian government export incentive program. App. 14, para. 2.

7. Throughout the business relationship with Panexim and HHRG, from 1996-1999, the Peruvian government levied a value-added tax ("VAT") of 18% on all domestic purchases of precious metals. App. 14, para. 3.

8. However, an exporter of precious metals was entitled to a rebate of the VAT payment upon export of those metals out of Peru. App. 14, para. 3.

9. Until November 1998, those rebates were routinely granted by the Peruvian government. App. 14, para. 3.

**C.    The 1997 Audit**

10. PwC's initial engagement to audit HHRG's financial statements was for the period ending March 31, 1997 (the "1997 Audit"). App. 7, p. 6.

11. Joseph Tiroletto was the audit manager on the HHRG account in the 1997 Audit. App. 7, p. 12.

12. George Ingram was the engagement partner on the HHRG account for the 1997 Audit. App. 7, p. 6.

13. In conjunction with their preparation of the 1997 Audit, the PwC audit team reviewed the due diligence report that was prepared by PwC prior to GWRC's purchase of the assets that formed HHRG. Transcript of the deposition of Joseph Tiroletto taken on March 15, 2005 ("Tiroletto"), pp. 35-6, at Appendix Tab 8 ("App. 8"); App. 7, p. 10.

14. Part of the audit plan for the 1997 Audit was a document which referred to "Critical Matter # 5". Appendix Tab 2 ("App. 2"); App. 7, pp. 13-15.

3

15. Critical Matter # 5 states that "as several of the accounts receivable at 3/31/97 represent balances owed from advances to third world countries in South America, [PwC] will ensure that there are no collectibility issues with regards to such accounts." App. 2; App. 8, p. 60.

16. PwC understood Critical Matter # 5, which was prepared in April 1997, to mean that PwC would adopt audit procedures sufficient to assure itself that collectibility from South America would not be an issue. App. 7, p. 16.

17. PwC identified and prepared Critical Matter # 5 between August 1996 and December 1996, in connection with the 1997 Audit. App. 8, p. 49.

18. The critical matter relating to the collectability of foreign accounts receivable was identified in the 1997 Audit. App. 7, p. 169.

19. For PwC, a critical matter is a term that brings to the forefront for the audit team matters that must be resolved to the satisfaction of the PwC partner before PwC will issue a report. App. 8, p. 48.

20. It was the understanding of the PwC audit team that HHRG would advance money to customers in countries outside of the United States only as long as HHRG was sure that it had precious metals securing those advances in its possession. App. 8, p. 44.

21. PwC understood that if HHRG made unsecured advances[3] that this would be a violation of HHRG's operating policy. App. 7, p. 130.

22. PwC was aware that unsecured advances were therefore not supposed to be made at all. App. 7, pp. 130-1.

---

[3] Money advanced to customers in excess of the precious metals which were reported to be in the company's possession or in transit to the company, have been referred to in depositions and will be referred to herein as "unsecured advances."

23.     PwC did not take any steps during the 1997 Audit to ascertain how much of HHRG's accounts receivable was due from companies in South America.  App. 8, p. 61.

24.     During the 1997 Audit, PwC was aware that HHRG had unsecured advances to Panexim, Darwill, Ladison and Orion, all South American companies, which totalled more than $600,000.  App. 7, pp. 71-3, 131.

25.     PwC admits that the policy of not making advances to third world countries unless the metal was in the possession of or in transit to HHRG was not being adhered to in 1997.  App. 7, p. 177.

26.     PwC did nothing to confirm the existence of precious metal in 1997 that was scheduled to be delivered to HHRG from Panexim (or any of the other South American companies) despite the fact that the collectibility of these receivables was premised in part on the existence of such metal.  App. 8, pp. 64-5.

27.     PwC found out while performing the 1997 Audit that the policy of always having possession of metal equal to any advance was not being adhered to and it did not tell anyone on the HHRG board of directors or the audit committee of GWRC.  App. 7, pp. 197-8.

28.     PwC did nothing to advise the board of directors of HHRG that unsecured advances were being made in violation of their policy in 1997.  App. 7, pp. 179-80.

**D.     HHRG finances South American customer's VAT liability**

29.     Beginning in mid-1997 and continuing into early 1999, HHRG began to finance Panexim's monthly VAT obligations.  App. 14, para. 4.

30.     HHRG did so ostensibly because Panexim had insufficient assets to finance the VAT obligations itself.  App. 14, para. 4.

31. Panexim was entitled to a rebate of the VAT payments upon export of the precious metals to HHRG. App. 14, para. 3.

32. Pursuant to the financing arrangement, HHRG would advance money to Panexim, Panexim would pay the money to the Peruvian government, then Panexim would repay the advance to HHRG in cash or precious metals of equivalent value once the Peruvian government paid Panexim the rebate. App. 14, para. 4.

**E.    The 1998 Audit**

33. The critical matter relating to the collectibility of foreign accounts receivable was also identified in PwC's audit of HHRG for the fiscal year ending March 31, 1998 (the "1998 Audit"). App. 7, p. 169.

34. The 1998 client service plan ("1998 Service Plan") included a critical matter concerning the collectibility of foreign accounts receivable. Appendix Tab 3 ("App. 3"), p. 5; App. 7, p. 167.

35. PwC's audit plan for this "critical matter", as identified in the 1998 Service Plan, was to "assure advances to third world countries are not made unless material is in the possession of Handy & Harman." App. 3, p. 5.

36. It was the intent of PwC to use the terms "third world countries" and "South American countries" interchangeably. App. 7, p. 172.

37. According to the 1998 Service Plan, this matter was "highlighted as requiring particular attention during the course of the audit." App. 3, p. 5.

38. According to the 1998 Service Plan, PwC's "audit scope and procedures" were "tailored to address" the critical matters listed therein, including the collectibility of foreign accounts receiveable. App. 3, p. 5.

39. As part of the 1998 Service Plan, PwC promised that it would make certain that HHRG would not make unsecured advances of money to businesses located in third world countries, such as those in South America. App. 3, p. 5; App. 7, pp. 179-80.

40. Joseph Tiroletto was the audit manager for the 1998 Audit. App. 7, p. 12.

41. George Ingram was the engagement partner at the inception of the 1998 Audit. App. 7, p. 6.

42. PwC had a requirement that the terms of its client service plans had to be discussed with its clients. App. 8, p. 127.

43. PwC is supposed to communicate in writing to the client elements of the client service plan. App. 7, p. 157.

44. PwC delivered its 1998 Service Plan to HHRG. PwC's Answer to GWRC Request to Admit No. 1, at Appendix Tab 16.

45. Tiroletto discussed with HHRG collectibility of receivables, including foreign receivables, as part of the 1998 Service Plan. App. 8, p. 131.

46. The cover letter to the 1998 Service Plan, dated March 24, 1998, and directed to William Myles, Controller of HHRG, from Joe Tiroletto, states:

> We enjoyed our recent meetings with you and others, and appreciate the opportunity to discuss Handy & Harman's business issues and your expectations of [PwC] as your independent auditors and business advisors. As part of our audit planning process we prepare a service plan which includes a summary of the expectations you and others within your organization have of [PwC], key issues related to the audit, timetable and other matters to ensure our [PwC] service team members understand your needs and exceed your expectations. This service plan will be updated periodically to track our progress on meeting your expectations and document any new needs and expectations that arise. *__This service plan will become the baseline against which you will be able to measure our performance__*. We will have frequent communication with you regarding our service plan. This copy is for your review.

App. 3 (emphasis added).

7

275890.2

47. The 1998 Service Plan was shown to HHRG during a meeting in which the plan was discussed. App. 8, p. 130.

48. The 1998 Service Plan was discussed with the PwC audit teams during organizational meetings as part of the planning process for the 1998 Audit. App. 8, p. 143.

49. A letter of arrangement dated March 30, 1998 was signed by Ingram and directed to Mr. Myles, the controller of HHRG (the "1998 Engagement Letter"). App. 7, p. 198.

50. The 1998 Service Plan was referenced in the 1998 Engagement Letter. App. 4.

51. The 1998 Engagement Letter is a contract between HHRG and PwC. App. 4.

52. In the section referred to as "Your Expectations," PwC wrote the following to HHRG:

> As part of our planning process, we have met with you to discuss your expectations of [PwC], your concerns about your business, changes in your business and industry, your views on risks facing you, any relationship issues with [PwC], and specific engagements and timing. Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality focused approach to accomplish the engagement objectives and meet, and/or exceed, your expectations. ***Our service plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance***.

App. 4. (emphasis added).

53. By its own terms, the 1998 Engagement Letter sets forth the nature and scope of PwC's obligations as well as the fees that will be paid by HHRG. App. 4, p. 1.

54. The 1998 Engagement Letter sets forth the promises of HHRG regarding its own representations, a promise of indemnity, and the payment of an audit fee. *Id*.

55. On the last page of the 1998 Engagement Letter, the PwC engagement partner, George Ingram, is identified as the PwC offeror of the promises in this contract, and acceptance is indicated by the signature of the HHRG controller, William Myles. *Id*.

8

275890.2

56. Appearing on one of the PwC work papers for the 1998 Audit is a note in the writing of Raj Dansinghani, a member of the PwC audit team, which states, "per discussion with Luis Posada, HHRG includes in Panexim advances an amount for a value-added tax that Panexim has to pay. Once Panexim pays this, Panexim reimburses HHRG the amount that was over advanced." Transcript of the deposition of Raj Dansinghani taken on February 23, 2005, pp. 37-8, at Appendix Tab 9 ("App. 9"); App. 8, p. 138.

57. PwC noted a similar situation involving Orion and received a confirmation from Orion for the entire amount of the monies advanced to it for the VAT. App. 9, 39.

58. PwC was aware that, in or about April of 1998, as a result of a discussion with Luis Posada, HHRG was including in its Panexim advances an unsecured amount to finance Panexim's VAT liability. App. 8, p. 200.

59. PwC was aware that the money being advanced to Panexim for purposes of the VAT was coming from HHRG's bank accounts. App. 8, p. 166.

60. PwC could not identify what portion of the advances to Panexim were used for purposes of the VAT, versus for the purchase of precious metals. App. 8, p. 146; Transcript of the deposition of Dansinghani taken on March 29, 2005, p. 350, at Appendix Tab 10.

61. PwC never saw any documentation from HHRG which recorded the amounts of the VAT advances made to Panexim, nor did PwC inquire whether any such documentation existed. App. 8, pp. 148, 151.

62. Despite being made aware of these advances during the 1998 Audit, PwC did not consider it relevant to determine whether or not Panexim had reimbursed HHRG for the VAT advances during its mid-year review in September 1998. App. 8, p. 150.

63. During the 1998 Audit, PwC knew that HHRG had unsecured advances to Panexim, Orion and Darwill, three South American entities, which totaled more than $2.8 million. App. 7, pp. 100-1.

64. PwC was, in fact, tracking the increase in unsecured advances over the period between the 1997 Audit and the 1998 Audit. App. 7, p. 101.

65. PwC admits that it was aware that the HHRG policy against the provision of unsecured advances to South American countries was being breached by a more significant amount as of March 31, 1998. App. 7, pp. 131-2.

66. PwC never told anyone on the Board of Directors of HHRG in 1998 that unsecured advances were being made to pay customers' VAT liability in South America. App. 7, p. 189.

67. PwC never told anyone on the Board of Directors in 1998 that HHRG had an unsecured receivable of almost $3 million due to unsecured advances made to companies in South America. App. 7, pp. 190-1.

68. PwC knew that in 1998 the policy of always having possession of metal equal to any advance was not being adhered to and it did not tell anyone on the HHRG Board of Directors or the audit committee of GWRC of this fact. App. 7, pp. 197-8.

**G.  HHRG suffers loss in excess of $12 million no later than March 1999**

69. In November 1998, the Peruvian government stopped all VAT rebates. App. 14, para. 5.

70. Despite this event, HHRG continued to advance monies to Panexim to finance its VAT obligations and Panexim continued to pay to the Peruvian government the VAT associated with its precious metals purchases. App. 14, para 5.

275890.2

71. From November 1998 through February 1999, HHRG sent millions of dollars to Panexim for the payment of VAT. App. 14, para. 6.

72. By no later than March 1999, HHRG's unsecured account receivable relating to advances made to Panexim for the financing of Panexim's VAT obligations was no less than $12,076,000. App. 14, para. 6.

73. The VAT payments made by Panexim with HHRG funds have not been reimbursed to date, and the Peruvian government refuses to release these funds to Panexim. App. 14, paras. 8-10.

**H. The reaction of the HHRG Board of Directors.**

74. The HHRG Board of Directors relied upon the oversight of HHRG's auditors to make certain that HHRG and GWRC policy was being followed, such that no funds would be advanced against metals until such metals were in the possession of or in transit to HHRG. Transcript of the deposition of Michael Ryan taken on March 24, 2005, pp. 36-7, 57-8, 108, at Appendix Tab 11 ("App. 11").

75. The HHRG Board of Directors would have engaged in a substantial investigation of all transactions with Panexim had they been made aware of the over-advances to Panexim at the time that PwC was aware of them. App. 11, pp. 218-19.

76. The HHRG Board of Directors would have changed the terms of all future business with Panexim in a manner which would have assured that material was in the possession of HHRG before advances were made. App. 11, pp. 226-27.

77. Upon learning about the violations of the corporate policy relating to advancements to South American companies in or about May 1999, the finance committee immediately looked into terminating the entire relationship with Panexim and avoiding further

advancements. Transcript of the deposition of Sean Russo taken on June 24, 2005, pp. 127-29, 136-38, at Appendix Tab 12 ("App. 12").

## I.    Damages and other facts.

78.    Despite continuing efforts to try to recover this money from the Peruvian government, such efforts have been unsuccessful. App. 14, paras. 8 and 10.

79.    Panexim has no assets with which it can satisfy the massive debt owed to HHRG. App. 12, para. 10.

80.    After reviewing the calculations of PwC and HHRG's forensic auditors, and performing his own calculations based upon all available and relevant data, Underwriters' expert determined that the total loss to HHRG representing the unsecured advances of funds to Panexim was $12,076,000.00. Transcript of deposition of Vincent Love taken on May 16, 2005, p. 16 (authenticating Expert Report) at Appendix Tab 13; and Expert Report of Vincent Love dated April 5, 2005, pp. 51-62, at Appendix Tab 5.

81.    PwC has not challenged this calculation or offered any alternative calculation from any of its experts.

82.    HHRG assigned its claims against PwC relating to the loss described in Paragraph 82 to Underwriters, and Underwriters are subrogated to those claims. Exhibit to Affidavit of Daniel J. McMahon, at Appendix Tab 15 ("App. 15").

83.    As part of its assignment, HHRG did not assign any of its liabilities to Underwriters. App. 15.

84.    Counsel for PwC and HHRG executed a tolling agreement, which tolled any claims against PwC as of May 3, 2001. Tolling Agreement at Appendix Tab 6.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP,


By: /s/ Fred Knopf
    Fred Knopf, Esq. (ct 09427)
    E-mail: knopff@wemed.com
    Edward Boyle, Esq.
    E-mail: boylee@wemed.com
    WILSON, ELSER, MOSKOWITZ,
    EDELMAN & DICKER LLP
    150 E. 42nd Street
    New York, NY 10017
    Phone: 212-490-3000
    Fax: 212-490-3038


    Daniel J. McMahon, Esq. (Ill. Bar 0162590)
    E-mail: mcmahond@wemed.com
    Stefan R. Dandelles, Esq. (Ill. Bar 6244438)
    E-mail: dandelless@wemed.com
    WILSON, ELSER, MOSKOWITZ,
    EDELMAN & DICKER LLP
    120 N. LaSalle Street
    Chicago, IL 60602
    Phone: 312-704-0550
    Fax: 312-704-1522

## **CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on August 12, 2005, a copy of the foregoing was filed electronically (and served by mail on anyone unable to accept electronic filing) on each of the following counsel of record in each of the consolidated cases. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system (or by mail to anyone unable to accept electronic filing). Parties may access this filing through the Court's system.

Thomas D. Goldberg, Esq.
Steven Greenspan, Esq.
David J. Elliott, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
City Place I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103-3597

William H. Champlin III, Esq.
Michael T. McCormack, Esq.
Tyler Cooper & Alcorn, LLP
City Place, 35th Floor
185 Asylum Street
Hartford, CT 06103

                                               /s/ Fred Knopf
                                               Fred Knopf

275890.2