**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION, LTD., Plaintiff, vs. PRICEWATERHOUSECOOPERS, LLP and COOPERS & LYBRAND, LLP, Defendants. | ) | CIVIL ACTION NO. 3:02 CV 1379 (MRK) |
| ALEC SHARP, et al., Plaintiffs, vs. PRICEWATERHOUSECOOPERS, LLP d/b/a PRICE WATERHOUSE, LLP, Defendant. | ) | CIVIL ACTION NO. 3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC., Plaintiff, vs. PRICEWATERHOUSECOOPERS, LLP, Defendant. | ) | CIVIL ACTION NO. 3:02 CV 1803 (MRK) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS UNDERWRITERS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

## TABLE OF CONTENTS


I. **INTRODUCTION** 3

II. **ARGUMENT** 5

A. **Plaintiffs Have Established Each Element Needed In Order To Establish As A Matter Of Law That PwC Breached Its Contract With HHRG** 6

1. **There is undisputed evidence of the existence of a contract** 6

2. **There is undisputed evidence that PwC breached its various promises and agreements with HHRG** 8

3. **The undisputed evidence establishes that PwC's breach of contract caused HHRG damages in the amount of $12,076,000** 12

(a) ***The loss was caused by PwC's failure to perform*** 12

(b) ***The loss was foreseeable by PwC*** 14

(c) ***Underwriters are entitled to more than $12 million in Damages*** 15

B. **PWC Has No Viable Affirmative Defense To The Breach Of Contract Count** 16

1. **Failure to state a claim** 17

2. **Standing** 17

3. **Risk of double or multiple obligations** 19

4. **GAAS** 19

5. **Not the "legal cause"** 20

6. **Unclean Hands** 21

7. ***In pari delicto*** 22

8. **Statute of Limitations** 23

9. **Mitigation** 23

**10. The engagement letter**……………………………………………... 24

**11. Expressed indemnity**………………………………………………. 24

**12. Contributory negligence**…………………………………………... 25

**III. CONCLUSION**………………………………………………………………. 25

## I. INTRODUCTION

Handy & Harman Refining Group, Inc. ("HHRG"), a wholly owned subsidiary of Golden West Refining Corporation ("GWRC"), was a precious metals refiner that had a policy prohibiting any advance of funds to a customer prior to metal of equal value being in the possession of or in transit to HHRG. PricewaterhouseCoopers, LLP ("PwC")[1] was HHRG's outside auditor and was aware of this policy and the reasons why this policy was significant. In fact, PwC, having performed due diligence services for GWRC prior to GWRC's purchase of the business that became HHRG, incorporated this policy into its audit program as a "Critical Matter" relating to the collectibility of foreign accounts receivable. Given the potential for significant losses if unsecured advances are made, PwC undertook to "assure advances to third world countries are not made unless material is in the possession of Handy & Harman." If no unsecured advances are made, collectibility of foreign accounts receivable will never be an issue. Unfortunately, PwC failed to make good on its promise, millions of dollars of unsecured funds were sent from HHRG to a Peruvian company, and HHRG's unsecured receivable ultimately became uncollectible.

During its audit for the period ending March 31, 1997 (the "1997 Audit"), PwC became aware that HHRG had advanced funds to four South American entities -- Darwill, Ladison,

[1] For ease of reference, throughout this brief "PwC" shall refer to PricewaterhouseCoopers LLP as well as one of its predecessors, Coopers & Lybrand LLP, which initiated the relationship with HHRG.

Orion and Panexim -- in excess of the value of precious metals in its possession by over $600,000. HHRG carried this amount on its books as a receivable. During its audit for the fiscal year ending March 31, 1998 (the "1998 Audit"), PwC knew that HHRG's unsecured receivable had grown to $2.8 million to these same South American companies. Further, during the 1998 Audit, PwC became aware that HHRG monies were advanced to Panexim and Orion on an unsecured basis in order to finance the value-added tax ("VAT") liability these companies owed to their respective governments for the domestic purchase of precious metals.

Despite PwC's assurances and with full knowledge of the facts and circumstances putting HHRG in breach of its corporate policy and a major lending facility with Fleet Bank, PwC did nothing to put a stop to the situation and failed to advise the HHRG board of directors that violations of corporate policy were ongoing, and getting worse. The impact of PwC's breach of contract was a series of unsecured advances to Panexim totaling $12,076,000, which became uncollectible (the "Panexim Loss").

Plaintiffs Alec Sharp, et al. ("Underwriters") are the assignees and subrogees of HHRG with respect to the Panexim Loss. In this motion, Underwriters seek summary judgment as to each element of their claim in Count I of their complaint for breach of contract as to the Panexim Loss.[2] No genuine issue of material fact exists. *See* Underwriters' Rule 56(a)1 Statement of Facts ("Facts"), and Underwriters' Appendix of Exhibits in Support of their Motion for Partial Summary Judgment ("Appendix"). Underwriters are entitled to partial summary judgment on each element of Count I for the Panexim Loss in the amount of $12,076,000, plus interest.

---

[2] Underwriters also seek in this case additional consequential damages in excess of $3.7 million in Count I and their other causes of action against PWC. Those damages however are not being sought in this motion and Underwriters intend to pursue those damages at trial in addition to the damages associated with the Panexim Loss.

## II. ARGUMENT

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact…." *Miner v. Glen Falls*, 999 F.2d 655, 661 (2nd Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Central School District*, 963 F.2d 520, 523 (2nd Cir. 1992); *see also, Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585, 106 S.Ct. 1348 (1986) (a "metaphysical doubt as to the material facts" is not enough to create a genuine issue of fact for trial).

In this case, no reasonable jury could find that PwC did not enter into a contract with HHRG, that PwC did not breach that contract, or that this breach did not cause a loss in excess of $12 million. PwC's affirmative defenses to the breach of contract claim are all legally and factually baseless. The Court should, therefore, enter summary judgment in favor of Underwriters in the amount of $12,076,000, plus interest.

The undisputed facts establish that there was a contract, PwC breached that contract, and that this breach of the contract caused the substantial losses suffered by HHRG. As such, Underwriters, as assignees and subrogees of HHRG, are entitled to summary judgment on Count I of their Complaint. Alternatively, should this Court determine that less than all of these elements are established, but that one or more of these elements are not subject to a fact dispute, Underwriters respectfully seek an order of partial summary judgment with regard to any

established element, as such a finding will help to limit the issues for trial, shorten the trial, and avoid repetitive and unnecessary testimony regarding facts and elements that have already been established.

**A. Plaintiffs Have Established Each Element Needed In Order To Establish As A Matter Of Law That PwC Breached Its Contract With HHRG.**

In Connecticut, plaintiffs claiming breach of contract must prove the following elements: the existence of a contractual agreement; breach of such agreement; and the plaintiff suffered resulting damages. *Chem-Tek, Inc. v. General Motors Corp.*, 816 F.Supp. 123, 131 (D. Conn. 1993). If there is no material issue of fact regarding the establishment of any of the elements for a breach of contract claim, summary judgment may be entered in favor of the plaintiff. *See Sartor v. Town of Manchester*, 312 F.Supp. 2d 238 (D. Conn. 2004); *see also*, *Velarde v. Pace Membership Warehouse, Inc.*, 105 F.3d 1313 (9th Cir. 1997) (granting summary judgment upon finding that there was a valid contract and a breach of the express terms of that contract); *Intermed Associates v. Maldonado*, 351 F.Supp. 2d 821 (N.D.Ill. 2004) (granting partial summary judgment to plaintiff on breach of contract claim).

**1. There is undisputed evidence of the existence of a contract.**

Under Connecticut law the exchange of promises is sufficient consideration to support a finding of the existence of a contract. *Christopherson v. Blount*, 216 Conn. 509 (1990). A contract may take the form of an engagement letter which sets forth the terms of the promises including the services that will be offered and the fee that will be paid. *See e.g. Oscar Gruss & Sons v. Hollander*, 337 F.3d 186 (2nd Cir. 2003); *Venture Partners v. Synapse Technologies, Inc.*, 42 Conn.App. 109 (1996).

The 1998 engagement letter submitted by PwC to HHRG is just this sort of contract. *See* Facts 33-68; *see also* App. 4. This letter states that it sets forth the "nature and scope of the

services" PwC will provide and, "the other terms and conditions designed to assure that our professional services are performed to achieve the mutually agreed upon objectives of the Company." *Id*. The letter also sets forth the promises of HHRG regarding its own representations, a promise of indemnity, and the payment of the audit fee. *Id*. On the last page of this document, it identifies the offeror of this contract, through PwC's engagement partner, George Ingram, and the acceptance by HHRG through its controller, William Myles. *Id*. There can be no dispute that the 1998 engagement letter constitutes a contract between HHRG and PwC.

"Under Connecticut law, where the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties." *Orange Improvements Partnership v. Cardo, Inc.*, 984 F.Supp. 85 (D. Conn. 1997). A "service plan" is referred to in the engagement letter as the "benchmark against which you will be able to measure our performance." Facts 52; App. 4. This promise is echoed in the cover letter to the 1998 client service plan itself which states in pertinent part:

> As part of our audit planning process we prepare a service plan which includes a summary of the expectations you and others with your organization have of [PwC], key issues related to the audit, timetable and other matters to ensure our [PwC] service team members understand your needs and exceed your expectations. This service plan will be updated periodically to track our progress on meeting your expectations and document any new expectations. This service plan will become the baseline against which you will be able to measure our performance.

Facts 46; App. 3.

Within this service plan, PwC listed certain "critical matters and other issues" which it "highlighted as requiring particular attention during the course of the audit." Facts 37; App. 3. Indeed, PwC declared that, "our audit scope and procedures have been tailored to address these

specific matters." *Id*. One of these critical matters, so-called "Critical Matter # 5," referred to the collectibility of foreign accounts receivable and was incorporated into the 1997 Audit and the 1998 Service Plan. Facts 33-35; App. 3. The PwC audit plan with respect to this critical matter was as follows:

> ***We will assure advances to third world countries are not made unless material is in the possession of Handy & Harman.***

Facts 35; App. 3, p. 5 (emphasis added).

The 1997 Audit also included a similar promise, which was incorporated into the audit as Critical Matter # 5. Facts 14-19; App. 7, pp. 13-15. This critical matter stated that, "[PwC] will ensure that there are no collectibility issues" with regard to accounts with companies in South America. Facts 14-15; App. 2; App. 8, p. 60. PwC understood this critical matter to mean that it would adopt audit procedures sufficient to assure themselves that collectibility from South American companies would not be an issue. Facts 16; App. 7, p. 16.

The 1997 and 1998 engagement letters, and the audit plans, incorporated by reference in those documents, memorialize the contract between PwC and HHRG. Accordingly, Underwriters have established the first element of their breach of contract claim: the existence of a contract.

**2. There is undisputed evidence that PwC breached its various promises and agreements with HHRG.**

Breach occurs when one party to a contract fails to carry out a term, promise or condition of the contract. *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2nd Cir. 1997). There is undisputed evidence that PwC knew about unsecured advances to third world countries prior to the substantial losses suffered by HHRG, but did nothing to assure that these unsecured advances

would not take place or advise the HHRG Board of Directors of this violation of its policy. As a result, PwC breached its contract with HHRG.

These breaches are most clearly contained in the deposition testimony of George Ingram, PwC's engagement partner for the 1997 Audit and at the inception of the 1998 Audit, who testified as follows:

> Q: Well, advances weren't supposed to be made in the first place; is that correct?
>
> A: That was their operating policy.
>
> Q: So the very fact that there was an advance was a violation of policy?
>
> A: Violation of their operating policy.

App. 7, p. 130.

> Q: Unsecured advances weren't supposed to have been made in the first place, correct?
>
> A: Right.
>
> Q: And in connection with these companies – Darwill, Panexim and Orion – were you shown that there were unsecured advances as of March 1997?
>
> A: Yes

App. 7, pp. 130-31.

> Q: And to the extent that these advances were in violation of company policy to Darwill, Panexim and Orion in 1997, company policy had been breached by a more significant number with respect to these three same entities by March of 1998; is that correct?
>
> A: The dollar amounts were larger, yes.

App. 7, pp. 131-32. Finally, Ingram admitted later in his deposition the following facts:

> Q: I'm back to the audit plan to ensure that advances are not made unless material was in the possession of [HHRG], and I'm going to ask you: what did you do, if anything, to advise the board of directors of [HHRG] in 1997 that unsecured advances were being made in violation of their policy?

A: Nothing because it wasn't an audit issue.

Q: It was a critical matter and part of the audit plan to assure that that wouldn't happen; that's correct?

A: That is correct.

Q: And it was happening, correct?

A: Correct.

Q: And you didn't tell anybody on the board that unsecured advances were being made in South America in violation of the policy, correct?

A. Correct.

App. 7, pp. 179-80. It is clear based upon Ingram's testimony that PwC breached its promise to assure that HHRG would not advance funds to South American companies without first having possession of metal to secure these advances.

PwC was aware that such advances were taking place as early as 1997. Facts 24; App. 7, pp. 71-73. PwC's 1997 work papers showed unsecured advances to various South American companies totaling more than $600,000. *Id.* At this same time, PwC had as a critical matter the responsibility of ensuring that there would be no collectability issues with regard to South American accounts. Facts 10-28; App. 8, p. 60; App. 2. It was the understanding of the PwC audit team that this meant that HHRG would not advance funds unless it had in its possession metal of equal value to secure these advances. Facts 20; App. 8, p. 44. Despite this knowledge regarding the 1997 advances, PwC never informed the HHRG board of directors that unsecured advances were being made in violation of this policy. Facts 28; App. 7, p. 179.

PwC's breach is even more stark in 1998. As part of the 1998 Audit, PwC delivered to HHRG and discussed with HHRG its client service plan which expressly assured that advances to South American companies would not be made unless secured by materials in the possession

of HHRG. Facts 44-47; App. 3, p. 5. Again, this was a "critical matter."[3] *Id*. Indeed, the contract terms contained in this service plan were to be the benchmark against which HHRG was to measure PwC's performance. Facts 46, 52; App. 3; App. 4.

Nevertheless, in its 1998 work papers, PwC uncovered the fact that not only were unsecured advances being made to South American companies, but that these advances were being made to finance the payment of such companies' VAT liability – payments which were not secured by metals. Facts 56-58; App. 9, pp. 37-39; App. 8, p. 138. Despite its knowledge that money was flowing from HHRG to South American companies for purposes of financing the VAT required in those countries, PwC made no efforts to even determine whether or not these advances for the VAT were being repaid to HHRG. Facts 62; App. 8, p. 150. Most significantly, despite the fact that it was aware of these advances, which were clearly in violation of HHRG policy, PwC failed to inform the HHRG Board of Directors that advances were being made to finance the VAT. Facts 66; App. 7, p. 189.

Moreover, the overall amount of unsecured advances made by HHRG to South American companies (including Panexim) grew from 1997 to 1998. Facts 63-64, 67; App. 7, p. 131. Indeed, PwC tracked the growth of this unsecured account receivable over this time period. *Id.* Nevertheless, PwC never told anyone on the Board of Directors in 1998 that unsecured advances of almost $3 million (up from $600,000) had been made to South American companies. Facts 67; App. 7, pp. 190-91.

---

[3] The fact that this is a critical matter means that the performance of this task took on special significance for PwC. Indeed, Tiroletto testified that it was a matter at the forefront of the audit and had to be resolved to the satisfaction of the PwC partner (Ingram) before PwC would issue a report. App. 8, p. 48. PwC issued reports for all three years it audited HHRG's financial statements.

Finally, despite the fact that PwC was supposed to be assuring HHRG's receipt of metal as security for advances to South American companies, PwC admitted that it did nothing to independently confirm the existence of metal that was scheduled to be delivered to HHRG from Panexim. App. 8, pp. 64-5. PwC knew in both 1997 and 1998 that the policy of always having metal equal to advances was not being adhered to by HHRG management, but failed to inform the HHRG Board of Ddirectors of this violation of corporate policy. *Id*.

As no fact question exists on this issue, summary judgment should be entered in favor of Underwriters on the element of breach relative to the contractual terms as set forth in the 1998 engagement letter, the 1998 service plan, and in Critical Matter # 5. *See e.g.*, *S&D Petroleum Co., Inc. v. Tamsett*, 144 A.D.2d 849 (1988) (court granted summary judgment on issues of breach and causation in favor of plaintiff in professional malpractice case because defendant failed to perfect security interest).

**3. The undisputed evidence establishes that PwC's breach of contract caused HHRG damages in excess of $12,076,000.**

***(a) The loss was caused by PwC's failure to perform.***

Causation is an element of breach of contract claims. *National Market Share, Inc. v. Sterling National Bank*, 392 F.3d 520 (2nd Cir. 2004). It is undisputed that PwC's failure to assure that no unsecured advances were made to South American companies was a natural and proximate cause of the losses associated with the financing of Panexim's VAT obligations. Indeed, had PwC successfully carried out its contractual obligations, or at the very least warned the HHRG Board that unsecured advances were being made to Panexim, there would not have been any unsecured advances to Panexim at the time the Peruvian government began freezing the VAT rebates. Because there were unsecured advances and based on Panexim's inabililty to

recover the VAT payments, HHRG's foreign account receivable became uncollectible, causing a significant loss.

A $12,076,000 loss to HHRG occurred through the advance of unsecured funds to Panexim by HHRG in order to finance Panexim's VAT obligation. Facts 69-73; App. 14. Prior to November 1998, the Peruvian government would reimburse the VAT payments to Panexim upon export of the gold to HHRG, and Panexim would in turn reimburse HHRG for its advances with either cash or metal of equal value. Facts 7; App. 14, para. 3. The Peruvian government terminated the rebates in November 1998. Facts 9; App. 14, para. 5. As a result, all monies HHRG advanced to Panexim for the VAT after November 1998 have been retained by the Peruvian government. Efforts to challenge the Peruvian government's seizure of these funds have failed. Facts 74; App. 14, paras. 8-10.

Had PwC properly assured that no unsecured advances would be made as of either the 1997 Audit or the 1998 Audit, HHRG would not have had exposure to the Peruvian government's seizure of VAT payments and HHRG would not have suffered a loss.

Alternatively, had PwC merely informed the HHRG Board of Directors of its knowledge that these unsecured advances to South American companies were being made and were growing during 1997 into 1998, the HHRG Board would have been in a position to terminate this breach of corporate policy. Indeed, once the Board eventually did learn of the unsecured advances, it launched a thorough investigation and immediately took steps to make certain that no further unsecured advances would be made to Panexim. Facts 75-77; App. 11, pp. 218-27; App. 12, pp. 131-33.

Accordingly, either by taking steps itself to assure that these advances would not take place as promised, or by warning the only group with authority to control management –

HHRG's Board of Directors – PwC could have prevented the loss suffered by HHRG. The undisputed facts demonstrate that PwC's failure to act or to warn was a proximate and natural cause of the loss.

***(b) The loss was foreseeable by PwC.***

Causation in a breach of contract claim is also governed by the reasonable foreseeability of damages arising out of the breach by the defendant. *See Dunnigan v. First Bank*, 217 Conn. 205, 217, 585 A.2d 659 (1991). The undisputed facts in this case demonstrate that PwC could easily foresee that its failure to assure that advances were secure would lead to collectability problems on the accounts of South American companies. In fact, in its original due diligence report to GWRC, it was <u>PwC</u> that identified the issue of collectability of foreign accounts receivable due to the negative experience of HHRG's predecessor company. It identified "serious risks" associated with "credit exposure" with South American businesses. Facts 3; App. 1. The solution was to make certain that the customer's metal was in the possession of HHRG. *Id*. PwC was therefore in a unique position to understand and foresee the risks associated with not assuring that advances were secured by metal in the possession of HHRG. Indeed, PwC did foresee these risks and expressly agreed to assure that no unsecured advances would be made, and PwC considered the issue of collectibility of foreign accounts receivable a "critical matter."

Moreover, PwC was observing first hand how the amount of the unsecured receivable with these South American companies was growing during the course of its audits of HHRG's financial statements. Facts 64; App. 7, p. 101. Just during the period between the 1997 Audit and the 1998 Audit, more than a half a year before the Peruvian government stopped reimbursing the VAT, PwC observed the unsecured receivable more than quadruple in size from an amount in excess of $600,000 in March of 1997 to almost $3 million by March 1998. Under those

circumstances, it must have been foreseeable that unchecked as it was, this unsecured receivable could quadruple again by March 1999 (which it did) and grow to an amount in excess of $12 million. As such, no reasonable jury could conclude that PwC was unaware or could not foresee the possibility that HHRG might suffer a loss based upon the uncollectibility of unsecured advances made to South American companies, as it was tracking the growth of this unsecured receivable during the months prior to the time that the loss began to occur.

***(c) Underwriters are entitled to at least $12,076,000 in damages.***

Damages for breach of contact should put the plaintiff in the same economic position that it would have been had the defendant fulfilled the contract. *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1183 (2nd Cir. 1995); *Ambrogio v. Beaver Road Associates*, 267 Conn. 148 (2003); *West Haven Sound Development Corp. v. City of West Haven*, 201 Conn. 305 (1986) ("It has traditionally been held that a party may recover "general" contract damages for any loss that may fairly and reasonably be considered [as] arising naturally, i.e., according to the usual course of things, from such breach of contract itself.").

The evidence is undisputed that had PwC succeeded in assuring that no unsecured advances were made to Panexim, then HHRG would not have suffered a loss of funds. If there is no exposure, there can be no loss. App. 11; App. 12. The losses to HHRG as a result of the unsecured advances paid to Panexim totaled $12,076,000. Facts 80-81; App. 5. This amount is undisputed by any evidence or expert testimony offered by PwC. Underwriters are therefore entitled to payment of this loss pursuant to their assignment from HHRG. *See* App. 15; *see also* footnote 5, *infra*.

Accordingly, as no reasonable jury could deny the existence of a contract, PwC's breach of that contract, and the loss caused by PwC's breach, summary judgment should be entered in

favor of Underwriters on their breach of contract claim. *Deb-Jo Construction, Inc. v. Westphal*, 210 A.D.2d 951, 620 N.Y.S.2d 678 (1994) (when breach of contract to preserve security interest was manifest, and damages undisputed, damages in the amount of the loss may be awarded on summary judgment in favor of plaintiff).

**B. PwC has No Viable Affirmative Defense To The Breach Of Contract Count.**

PwC lists eighteen affirmative defenses to the Complaint. Not one of these defenses finds support in the record, and indeed, most are completely unsupportable based upon affirmative facts developed by Underwriters.[4] The burden of proving facts in support of its affirmative defenses rests on PwC. *See e.g. Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2nd Cir. 1995) (statute of limitations); *Miller v. AT&T Corp.*, 280 F.3d 820, 838 (4th Cir. 2001) (mitigation); *Sony Electronics, Inc. v. Soundview Technologies, Inc.*, 157 F.Supp. 2d 172 (D.Conn. 2001); *Gidatex v. Campaneillo*, 82 F.Supp. 2d 126 (S.D.N.Y. 1999) (unclean hands); *Ruscito v. F-Dyne Electronics, Co.*, 177 Conn. 149 (1979).

Since there is no factual basis whatsoever for these defenses, particularly in relation to the breach of contract count, these affirmative defenses do not provide a basis to deny summary judgment in favor of Underwriters under this claim for relief. *Accord Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986) (After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate.); *FDIC v. Giammettei*, 34 F.3d 51, 54 (2nd Cir. 1994) ("Where a plaintiff uses a summary judgment motion, in part, to challenge the legal sufficiency of an affirmative defense -- on which the defendant bears the burden of proof at

[4] PwC has decided not to pursue four of these defenses: waiver, estoppel, laches and common law indemnity. It indicated that its responses to interrogatories 6, 7, 8 and 15 propounded by GWRC apply to Underwriters as well. In addition, the twelfth affirmative defense is not directed to Count I.

trial -- a plaintiff may satisfy its Rule 56 burden by showing that there is an absence of evidence to support [an essential element of] the [non-moving party's] case.”). A motion for summary judgment is an appropriate mechanism to challenge an affirmative defense. *FDIC v. Haines*, 3 F. Supp. 2d 155, 159 (D. Conn. 1997).

Not one of PwC’s remaining pleaded affirmative defenses precludes summary judgment in favor of Underwriters on their breach of contract claim.

**1. Failure to state a claim**

PwC alleges that Underwriters have failed to state a claim upon which relief can be granted. This assertion does not constitute an affirmative defense. As set forth above, not only have Underwriters stated a claim, but they are entitled to summary judgment on their claim. As such, this defense should be stricken.

**2. Standing**

Although pleaded as such, standing is technically not an affirmative defense, but a jurisdictional requirement for Underwriters. It is easily satisfied with evidence of the agreement whereby HHRG assigned its rights to the damages relating to the Panexim Loss to Underwriters, and acknowledge that Underwriters are HHRG’s subrogee on the Panexim Loss. *See* settlement agreement attached as an exhibit to the Affidavit of Daniel McMahon, which was also an exhibit to Underwriters’ complaint.[5]

---

[5] The assignment states in pertinent part:

> HHRG assigns to Underwriters all rights, title and interest in any and all claims which HHRG has, had, or may ever have as to all losses asserted by HHRG in the written claim of 22 February 2000 submitted by HHRG to Underwriters under the Policy, and which were more fully explained in a memorandum submitted to Underwriters on 9 March 2000 and more fully documented in a proof of loss submitted to Underwriters dated 9 October 2000, and which were the subject of claims submitted to Chubb and/or Federal Insurance Company and to Hiscox (“the Losses”), plus interest, costs, and punitive damages arising from the Losses, including but not limited to, any and all such claims against (a) Barry Wayne, Richard L. Searle, Louis Posado,

(continued . . . )

Underwriters, as assignees and subrogees of HHRG, obtained the claims of HHRG, and may be awarded damages for any claims that could have been brought by HHRG. Underwriters have pleaded, and now proven, that HHRG suffered damages as a result of PwC's breaches of its contracts with HHRG.

PwC's second affirmative defense referencing "standing" (number fifteen) seems to be an attempt to impute the wrong to HHRG to the extent that it was caused by HHRG. The argument makes little sense in the context of the breach of contract count. PwC knew about the violations of HHRG policy and failed to inform the board of directors. This is hardly a wrong that can be imputed to HHRG. Even if it could, this would not affect Underwriters' standing to bring this lawsuit against PwC. *See* discussion *infra* relative to unclean hands and *in pari delicto*.

In addition, when asked for specific facts to support this claim, PwC responded to GWRC's interrogatory by generally pointing to the engagement of fraud by board members of HHRG and GWRC. As noted *infra*, to the extent that this may have occurred, which Underwriters deny can be done with any factual or evidentiary support, the adverse interests doctrine precludes the imputation of the misdeeds of those individuals in HHRG management that were not acting in the interest of HHRG, but instead were engaged in a frolic in support of their own selfish interests.

---

( . . . continued)

Michael Verleysen, Manuel Seaone, Carlos Augspach, Frank Phillips, Jorge Washington, Erick Claudet, Linneo Klocker, Fernando Limo, Mario Seaone, and Jorge Passaro and their relatives, corporations, affiliates, and assigns; (b) Panexim and any and all employees or agents of Panexim or related entities; (c) SUNAT; (d) The Peruvian Government; (e) PriceWaterhouseCoopers and its predecessors, successors, agents and assigns; (f) Hermes; (g) Alex Stewart Assayers; (h) The Chubb Corporation or Federal Insurance Company and Hiscox.

**3. Risk of double or multiple obligations**

The third affirmative defense of PwC is also not an affirmative defense listed in Rule 12 of the F.R.Civ.P. It is not clear how any such defense would nullify or preclude Underwriters' entitlement to damages under its breach of contract claim. Even to the extent that this Court considers this a "defense," it should satisfy itself that all relevant parties are before it. Thus, there is no risk of double or multiple obligations of PwC arising out of its misconduct in this case. There certainly is not any such risk arising out of the breach of contract claim wherein the only parties to such a claim are (or were) HHRG and GWRC, and these entities are presently before this Court.

**4. GAAS**

PwC's alleged compliance with GAAS is not an affirmative defense either. PwC's purported compliance with GAAS, which Underwriters deny, is not dispositive of whether or not PwC breached its contract with HHRG. In particular, to the extent that the assurances provided in the 1998 client service plan and Critical Matter # 5, while part of the audit or audit services supplied by PwC, were not among the general auditing standards, PwC's compliance with GAAS would be irrelevant. Alternatively, to the extent that there is a general accounting standard which controls the assurances made by PwC, it is clear based upon the foregoing that this standard was not met by PwC. In any case, PwC's purported compliance with GAAS does not provide a defense to its failure to meet its obligations under the 1998 client service plan or Critical Matter # 5.

When asked by GWRC for the factual support for this affirmative defense, PwC pointed to the report of its expert, Robert Temkin. However, Mr. Temkin does not opine outside the scope of GAAS and had no opinion relative to the issues raised in Underwriters' motion for

partial summary judgment. Accordingly, this affirmative defense is clearly inapplicable to the breach of contract claim.

**5. Not the "legal cause"**

While causation is an element of some of the claims raised by Underwriters, the absence of "cause" is not an affirmative defense to any of them. As such, this too is not a proper affirmative defense. Like the defenses identified earlier, this so-called affirmative defense is not identified in Rule 12 of the F.R.Civ.P. It is certainly not a defense to a breach of contract claim, where multiple causes do not preclude a successful claim. *LNC Investments, Inc. v. First Fidelity Bank, N.A.*, 173 F.3d 454, 465 (2nd Cir. 1999) *quoting* E. Allan Farnsworth, Contracts § 12.1, at 841 (2d ed. 1990) ("There is, of course, a fundamental requirement, similar to that imposed in tort cases, that the breach of contract be the cause in fact of the loss, although the presence of other contributing causes may not preclude recovery."). Since, as noted above, the loss suffered by HHRG was clearly caused, at least in part, by PwC's breach of contract with HHRG, PwC's breach was the "legal cause" of HHRG's damages.

PwC was asked in an Interrogatory by GWRC to state with particularity all facts to support this affirmative defense. PwC responded by stating that GWRC has "failed to produce sufficient evidence to supports its claim that PwC's conduct and actions were the legal cause of any damages." PwC's answers to GWRC's Interrogatories, number 5. Such a response demonstrates that this is not an affirmative defense at all, but simply a challenge to causation. PwC's further response that the weight of all discovery relative to HHRG and GWRC witnesses will set forth the factual basis for PwC's defense is no response at all. It is clear, based upon PwC's response to this Interrogatory, that it has no factual support for this "defense."

**6. Unclean Hands**

To invoke the defense of unclean hands, a defendant must show that its opponent engaged in willful misconduct with regard to the matter in litigation. *Fenn v. Yale Univ*., 283 F. Supp. 2d 615, 635 (D. Conn. 2003). Alleged "misconduct in the abstract, unrelated to the claim to which it is asserted as a defense, does not constitute unclean hands." *Chauvin Int'l v. Goldwitz*, 927 F. Supp. 40, 48 (D. Conn. 1996).

PwC has absolutely no basis to assert as a defense the unclean hands of HHRG with respect to the breach of contract count. There is no evidence whatsoever that HHRG "engaged in willful misconduct" relative to PwC's promise to assure that no unsecured advances were taking place, particularly when PwC was perfectly aware that such advances were taking place. In fact, the only persons who might fall within this category are HHRG's former management, who by their purported willful misconduct were clearly not acting in the scope of their duties for HHRG. *See Bank of China v. NBM, LLC*, 359 F.3d 171, 179 (2nd Cir 2004) (Management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation). As such, any example of unclean hands attributed to Barry Wayne, Richard Searle, or others is no defense to Underwriters' claims for breach of contract against PwC.

In response to GWRC's interrogatories, PwC identified several other directors who had knowledge of the fraud in June 1999. Of course, by this time, PwC's audits were complete and the loss had occurred. The loss had been suffered no later than March 1999. *See* Passaro Aff, para. 6. As such, the knowledge of the loss after the fact cannot constitute unclean hands which could bar Underwriters' breach of contract claim.

This defense is therefore not a basis to deny summary judgment in favor of Underwriters on Count I of their complaint against PwC.

**7. *In pari delicto***

To assert the defense of *in pari delicto*, a defendant must show that the fault of the parties is "clearly mutual, simultaneous, and relatively equal" and that the plaintiff was an active, essential, and knowing participant in the unlawful activity. *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 289 (D. Conn. 1979). The term "*in pari delicto*" means in equal fault, and the defense is usually allowed where the plaintiff has knowingly participated as an equal in the illegal act which caused the loss. *Herzfeld v. Laventhol, Krekstein, Horwath & Horwath*, 378 F. Supp. 112, 137 (S.D.N.Y. 1974); *Dowling v. Slotnik*, 244 Conn. 781 (1998) (relates to the enforceability of an illegal contract based upon public policy grounds).

There is no "unlawful activity" alleged relative to PwC or HHRG as to the issues in the breach of contract count. There is also no evidence that the Board of Directors of HHRG was aware of, and therefore, equally at fault with PwC for its breach of its agreement with HHRG to assure the absence of unsecured advances. Again, any illegal acts of Wayne, Searle, or others cannot be attributed to HHRG. *Accord Bank of China, supra*.

Moreover, this defense is inapplicable to Underwriters as they had no part in any fault that might be asserted against HHRG. Since Underwriters are assignees and subrogees of HHRG's claims, they are not subject to the *in pari delicto* defense. *See e.g. Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995) ("the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is [not the person seeking the recovery]"). *In pari delicto* is therefore no defense to this action, or Underwriters' motion.

**8. Statute of Limitations**

A cause of action for breach of contract is subject to the six year statute of limitations set forth in Conn. Gen. Stat. § 52-576(a), which provides in pertinent part that "no action . . . on any contract in writing shall be brought but within six years after the right of action accrues . . . ." Conn. Gen. Stat. § 52-576; *Halpern v. Bristol Bd. of Educ.*, 52 F. Supp. 2d 324, 333 (D. Conn. 1999). PwC's breaches of its engagement with HHRG took place in 1997 and 1998. The present lawsuit was filed in 2002, less than 6 years after PwC's breaches of contract. As a result, the statute of limitations is no defense to Underwriters' breach of contract count. Moreover, PwC executed a tolling agreement which extended any applicable statute of limitations in favor of Underwriters. This agreement tolls the statute from May 3, 2001. This agreement is attached to the appendix of exhibits at Tab 6.

**9. Mitigation**

To invoke the defense of failure to mitigate damages, the defendant must show that the injured party failed to take reasonable action to lessen the damages, that the damages were in fact enhanced by such failure, and that the damages which could have been avoided can be measured with reasonable certainty. *Preston v. Keith*, 217 Conn. 12, 22 (Conn. App. 1991). In order to establish the defense of mitigation, PwC must demonstrate that the Board of Directors of HHRG failed to take steps to protect themselves or otherwise reduce or eliminate the loss, once it was discovered. There is no factual basis to support such a claim. On the contrary, once the Board learned about the unsecured advancements (through no help from PwC), it took immediate steps to investigate the transactions and to prevent further losses as a result of additional over-advances which might otherwise have taken place. *See* Facts 75-77; App. 11, pp. 218-19; App. 12, pp. 127-29, 136-38.

In response to GWRC's interrogatory seeking the factual support for PwC's mitigation defense, PwC points only to efforts made to contain future loss after May 1999. *See* PwC's answer to GWRC Interrogatory number 12, at Appendix Tab 17. Since the loss described herein was established by March 1999, no amount of mitigation could have prevented it. Indeed, the only party in a position to mitigate or prevent this loss was PwC, which knew that these unsecured advances were being made, and yet failed to warn the HHRG Board of Directors.

In addition, PwC has no basis upon which it could quantify its mitigation defense. It has no expert testimony in this regard and it has not identified any person with knowledge regarding the amounts that could or should have been mitigated. Accordingly, PwC cannot take this defense to trial.

**10. The engagement letters**

PwC also claims as an affirmative defense a limitation on the recovery of consequential damages pursuant to "the engagement letters." There is no such limitation among the terms of such letters. Moreover, Connecticut law clearly provides for the imputation of consequential damages flowing from breaches of contracts as long as they are foreseeable. *Boulevard Associates v. Sovereign Hotels*, 861 F.Supp. 1132, 1136 (D. Conn. 1994). Since the loss in question was clearly foreseeable by PwC, as set forth herein, Underwriters are entitled to their damages.

**11. Expressed indemnity**

The engagement letters for each of the audits performed by PwC contain an agreement by HHRG to indemnify PwC. For each of the engagement letters, the agreement states as follows:

> The Company hereby indemnifies [PwC] and its partners, principals and employees, and holds them harmless from all claims, liabilities, losses and costs arising in circumstances where there has been a knowing misrepresentation by a member of the Company's management, regardless of whether such person was

> acting in the Company's interest. This indemnification will survive termination of this letter of arrangement.

App. 4. This indemnification agreement by HHRG is not a defense to Underwriters' claims brought via subrogation and assignment.

**12. Contributory negligence**

This affirmative defense is applicable only to negligence and therefore is not a reason to deny Underwriters' breach of contract claim. *Curtis Packaging Corp. v. KPMG LLP*, 2002 Conn.Super. LEXIS 2663 (Waterbury 2002). Indeed, it does not appear PwC has set forth this defense in relation to Underwriters' Count I for breach of contract.

## III. CONCLUSION

For each of the foregoing reasons, Underwriters respectfully request that partial summary judgment be entered in their favor and against PwC on each and every element needed to establish liability for breach of contract under Count I of their complaint, and that judgment in the amount of $12,076,000, plus interest, be entered.

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP,

By: /s/ Fred Knopf

Fred Knopf, Esq. (ct 09427)
E-mail: knopff@wemed.com
Edward Boyle, Esq.
E-mail: boylee@wemed.com
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
150 E. 42nd Street
New York, NY 10017
Phone: 212-490-3000
Fax: 212-490-3038

Daniel J. McMahon, Esq. (Ill. Bar 0162590)
E-mail: mcmahond@wemed.com
Stefan R. Dandelles, Esq. (Ill. Bar 6244438)
E-mail: dandelless@wemed.com
WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP
120 N. LaSalle Street
Chicago, IL 60602
Phone: 312-704-0550
Fax: 312-704-1522

**CERTIFICATE OF SERVICE**

THIS IS TO CERTIFY that on August 12, 2005, a copy of the foregoing was filed electronically (and served by mail on anyone unable to accept electronic filing) on each of the following counsel of record in each of the consolidated cases. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system (or by mail to anyone unable to accept electronic filing). Parties may access this filing through the Court's system.

Thomas D. Goldberg, Esq.
Steven Greenspan, Esq.
David J. Elliott, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
City Place I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103-3597

William H. Champlin III, Esq.
Michael T. McCormack, Esq.
Tyler Cooper & Alcorn, LLP
City Place, 35th Floor
185 Asylum Street
Hartford, CT 06103

/s/ Fred Knopf
Fred Knopf