## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiffs | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1379(MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendant | : | |
| | : | |
| | : | |
| _____ | | |
| | | |
| ALEC SHARP, et al.<br>Plaintiffs | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1572 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant | : | |
| | : | |
| | : | |
| _____ | | |
| | | |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff | : | |
| | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1803 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | : | |
| | : | SEPTEMBER 2, 2005 |
| _____ | | |

### SUPPLEMENTAL LOCAL RULE 56(a)(2) STATEMENT
### OF GOLDEN WEST REFINING CORPORATION LIMITED

Pursuant to Local Rule of Civil Procedure 56(a)(2), plaintiff Golden West Refining

Corporation Limited ("GWRC"), in opposition to the motion for summary judgment filed by the

defendant PricewaterhouseCoopers LLP, and in further support of the Local Rule 56(a)(2)

statement of plaintiffs Handy & Harman Refining Group, Inc. ("HHRG") and GWRC, dated

September 2, 2005, respectfully submits the following statement.

HART1-1279410-4

**GWRC's Response to Defendants' Local Rule 56(a)(1) Statement**

GWRC hereby adopts and incorporates the responses set forth in the Local Rule 56(a)(2) of plaintiffs HHRG and GWRC, dated September 2, 2005.

**GWRC's STATEMENT OF DISPUTED ISSUES OF MATERIAL FACT**

GWRC hereby adopts and incorporates the Statement of Disputed Issues of Material Fact set forth in the Local Rule 56(a)(2) of plaintiffs HHRG and GWRC, dated September 2, 2005. In addition, GWRC asserts this Supplemental Statement of Disputed Issues of Material Fact, as follows:

1.     GWRC was incorporated under the laws of Australia and was a public company listed and traded on the Australian stock exchange. Richard Gordon Hayes ("Hayes") was employed by GWRC as its Chief Financial Officer in September 1997, and he served in that capacity until November 30, 1998. (Supplemental Affidavit of Richard Gordon Hayes, To Be Submitted ("Supp. Hayes Aff.") at ¶ 4).

2.     At all times relevant to this lawsuit, Handy & Harman Refining Group ("HHRG") was a wholly owned subsidiary of GWRC. (Supp. Hayes Aff., at ¶ 5).

3.     HHRG engaged the services of PwC (US) to provide professional auditing services for the Fiscal years 1997 and 1998. GWRC engaged the services of PwC (Australia) to provide professional auditing services for Fiscal years 1997 and 1998. (Supp. Hayes Aff., at ¶ 6).

4.     As part of its work in auditing the financial statements of HHRG, PwC (US) was charged with the task of providing its factual findings and audit opinions to its affiliate, PwC (Australia), for the purpose of allowing PwC (Australia) to incorporate and consolidate such factual findings and opinions in the audit PwC (Australia) provided to GWRC. An audit opinion

was necessary because GWRC was a publicly traded company and had financial reporting

obligations, pursuant to Australian law.  (Supp. Hayes Aff., at ¶ 7).

     5.     PwC understood the nature and extent of GWRC's reliance upon its audits of

HHRG's financial statements, and agreed to the terms of the engagement and the reliance which

GWRC would have on its work.  This is evidenced, *inter alia*, by the fact that PwC repeatedly,

and willingly, reported its HHRG audit opinions to PwC (Australia) for the purpose of

incorporating those findings into the financial reports of GWRC.  (See Deposition Transcript of

Alex Corl ("Corl Dep."), March 14, 2005 (**Tab B** of GWRC's Appendix of Exhibits in

Opposition to Summary Judgment ("GWRC's Appendix")), at 17-18, 179-80, 209-15;

Deposition Transcript of George Ingram ("Ingram Dep."), February 18, 2005, **Tab C** of

GWRC's Appendix, at 204-05; Deposition Transcript of Joseph Tiroletto ("Tiroletto Dep."),

March 19, 2005, **Tab D** of GWRC's Appendix, at 48).

     6.     GWRC's Audit Committee served as the audit committee for HHRG.

     7.     The members of the Audit Committee consulted with PwC (US) with regard to

the timetable and conduct of the HHRG audits.  (*See* Tiroletto Dep., **Tab D** of GWRC's

Appendix, at 48).

     8.     GWRC imposed time deadlines upon PwC (US) by which PwC (US) was

required to submit its auditing opinions regarding HHRG's financial statements to GWRC's

auditor, PwC (Australia), which was affiliated with PwC (US).  (See Ingram Dep., **Tab C** of

GWRC Appendix, at 204-05).

     9.     For example, on or about March 25, 1997, the PwC (US) manager on the HHRG

account, Joseph Tiroletto, met via teleconference with certain HHRG employees and with

members of GWRC's Audit Committee to discuss the timetable and procedure for the FY 1997

HHRG audit.  According to Tiroletto, "[t]he primary content of the conversation centered around [PwC (US)] meeting the timing that [GWRC] laid out in [Deposition Exhibit No. 164]."[1]  (See Tiroletto Dep., **Tab D** of GWRC's Appendix, at 48).

10.     As further evidence of GWRC's reliance upon PwC (US), in August or September 1998, the CFO of GWRC requested that the PwC (US) "Engagement Partner" on the HHRG audit be replaced due to the fact that the HHRG audits for FY 1997 and FY 1998 had not been submitted by PwC (US) to PwC (Australia) within the time deadline prescribed by GWRC. (Supp. Hayes Aff., at ¶ 7).

11.     In response, PwC (US) removed George Ingram as its Engagement Partner in charge of the HHRG account, and replaced him with Alex Corl.  (Supp. Hayes Aff., at ¶ 8).

12.     Within weeks after Corl was appointed Engagement Partner for the HHRG account, he personally met with the CFO of GWRC in New York City and assured him that HHRG's Fiscal 1999 audit work would be completed within the time prescribed by GWRC so that it could be incorporated into the GWRC public financial reports for FY 1999.  (Supp. Hayes Aff., at ¶ 9; Corl Dep., **Tab B** of GWRC's Appendix, at 209-15).

13.     Therefore, there is no question that PwC (US) performed its audits of HHRG's financial statements with the full knowledge and expectation that they would be used by GWRC to satisfy its reporting obligations as a publicly traded company.  (*See* Corl Dep., **Tab B** of GWRC's Appendix, at 17-18, 179-80; 209-15; Ingram Dep., **Tab C** of GWRC's Appendix, at 204-05; Tiroletto Dep., **Tab D** of GWRC's Appendix, at 48; Supp. Hayes Aff., at ¶¶ 7-9).

---

[1] A copy of Deposition Exhibit No. 164 is attached as **Tab E** of GWRC's Appendix.  At Bates No. PWC Z 02302, Exhibit No. 164 contains a facsimile, dated March 19, 1997, from GWRC to HHRG in which GWRC sets forth the timetable by which it would require each of its subsidiaries to complete certain tasks for the purpose of ensuring that GWRC timely issued its semiannual audited financial reports for FY 1997.

14.     As the CFO of GWRC, Hayes relied upon the judgment and oversight of PwC (US) which fact PwC (US) was aware of in the performance of its auditing services with regard to HHRG's financial statements for Fiscal 1998.  GWRC's reliance upon PwC (US) was especially significant due to the fact that Hayes and the other officers and directors of GWRC were resident in Australia and HHRG's principal office was in Connecticut.  GWRC was dependent upon and relied upon PwC (US) performing its audit responsibilities in accordance with GAAP and GAAS.  PwC (US) performed its auditing services with full knowledge that they would be used and relied upon by GWRC to satisfy GWRC's statutory obligations as a publicly traded company.  (Supp. Hayes Aff., at ¶ 8).

15.     Ian Hobson ("Hobson") is a chartered accountant and registered liquidator with 20 years experience, 17 years of which has been gained in the areas of restructuring and corporate recovery.  He is employed as a director of Ferrier Hodgson.  Garry Trevor, a partner at Ferrier Hodgson was appointed as the Deed Administrator of GWRC on August 17, 2001, pursuant to the terms of a Deed of Company Arrangement, dated November 29, 2001 and subsequently liquidator of GWRC on November 24, 2003.  (Affidavit of Ian Hobson, September 2, 2005 ("Hobson Aff."), at ¶ 3).

16.     Hobson drafted an expert report on behalf of GWRC with regard to the captioned litigation, dated March 24, 2005.  (Hobson Aff., at ¶ 4, Exhibit A thereto).

17.     As stated in paragraph 4.1 of Hobson's report, HHRG's filing of Chapter 11 Bankruptcy on March 28, 2000 left GWRC in a position where its only income producing asset was the 50% investment by its subsidiary, Golden West Australasia Pty. Ltd. ("GWA"), in a joint venture between GWA and the Western Australian Mint.  The joint venture was known as the AGR Joint Venture.  (Hobson Aff., at ¶ 5).

5

18.     As related in Sections 9 through 15 of Hobson's report, following the bankruptcy of HHRG, the above-mentioned 50% interest in the AGR Joint Venture generated insufficient profits and cashflow for GWRC's to meet its continuing obligations.  As a result, GWRC, like HHRG, was caused to collapse in that it was unable to meet its loan obligations to NM Rothschild & Sons (Australia) Ltd. ("NMRA"), nor was it able to pay the guarantee creditor claims of HHRG's debtors, Credit Suisse First Boston International ("CSFB") and Pension Benefit Guaranty Corporation.  (Hobson Aff., at ¶ 6).

19.     When CSFB notified GWRC in August 2001 of the quantum of the guarantor claim against GWRC, this necessitated action by GWRC's directors, which action was the appointment of an Administrator.  The appointment of an Administrator resulted in the collapse of GWRC all of which was caused by HHRG's collapse.  (Hobson Aff., at ¶ 7).

20.     The inability of GWRC to meet its continuing obligations to its secured creditor NMRA, the guarantor claims and the costs associated with maintaining a public company required GWRC to sell its 50% interest (through GWA) in the AGR Joint Venture to repay NMRA's secured debt.  (Hobson Aff., at ¶ 8).

21.     In Section 7 of Hobson's report, he calculated the monetary loss suffered by GWRC caused by the collapse of HHRG, using the "market capitalization" methodology.  The methodology is explained in the text of Section 7, and the calculations are provided in Annexure C to the report.  Hobson's calculations estimates the damages in excess of A$50 million. Hobson made reference to reasonableness cross-check at paragraphs 8.5, 13.1, 13.2 and 13.3 of his report using the multiple of future maintainable earnings method.  This methodology is also a generally accepted valuation methodology for valuing shares in a public company and confirmed

the results of the market capitalization methodology adopted by me.  (Hobson Aff., at ¶ 9;

Hobson Report, Exhibit A to Hobson Aff., at § 7, 8, 13 and 16).

22.     It has been brought to Hobson's attention that in challenging the calculations that

appear in Annexure C to his report, an expert on behalf of PwC, Anil Shivdasani, has alleged that

the market prices employed in such calculations, for shares of GWRC, might not provide an

adequate basis upon which the loss to GWRC may be calculated.  In so arguing, however, PwC's

expert admits that he did not have any knowledge of or evidence to support a position that the

Australian Stock Exchange was inefficient so that its pricing could not be relied upon.  (Hobson

Aff., at ¶ 10). Mr. Shivdasani, PwC's expert, also testified that he has no quarrel with the

practice of using a market capitalization method to value a business. (See Deposition of Anil

Shivdasani, **Tab F** of GWRC's Appendix, at 205).

23.     The Australian Stock Exchange has listed securities for over 100 years, and is

generally recognized by shareholders and traders of Australian securities in the same way as the

New York Stock Exchange is recognized.  Hobson is aware of no evidence or reason why a

reasonable investor would not treat the market for stocks traded through the Australian Stock

Exchange, including the shares of GWRC, as anything other than efficient.  Following the

acquisition of HHRG in August 1996, GWRC's shares traded freely, efficiently and in an open

market until suspended in February 2000.  As stated above, the multiple of future maintainable

earnings confirmed the market capitalization method.  (Hobson Aff., at ¶ 11).

24.     There are, of course, other methods of valuing a company but, in Hobson's

opinion, under the circumstances of this case, the market capitalization methodology is the most

appropriate.  (Hobson Aff., at ¶ 12).

25.     Hobson's report addresses the decline in GWRC's stock price preceding the disclosure of the Panexim loss in Section 7 of his expert report.  In Sections 7.1 through 7.4 of his report, Hobson acknowledges the decline of GWRC's share price from A$0.70 to A$0.36 between July 1, 1999 and February 23, 2000, the day before trading on the shares of GWRC was halted.  He then states:

> We have considered GWRC's ASX announcements in the period leading up to the shares being suspended to assess if negative announcements occurred during this time, contributing to the share price decline.  GWRC issued two profit warnings on 10 December 1999 and 3 February 2000 notifying the market firstly that HHRG had incurred a loss in the six months to 30 September 1999 and later stating further HHRG losses would result in an overall loss for the year ended 31 March 2000.
>
> Given these announcements may not be indicative of historical earnings or projections and the resultant material range of market capitalization values, we consider it appropriate to calculate a weighted average market capitalization over a three month period prior to suspension of the shares.

(Hobson Report, Exhibit A to Hobson Aff, at §§ 7.3 – 7.4).

26.     The collapse of HHRG was caused by the malfeasance of PwC in the performance of its audit work with regard to the financial statements of HHRG for FY 1997 and 1998.  Had PwC advised the GWRC Board or the HHRG Board of the unsecured advances that it knew HHRG had given to Panexim in the Fiscal Year ending March 31, 1998, in June 1998, Michael Ryan and/or Sean Russo would have taken steps to stop future unsecured advances to Panexim and to recover any outstanding advances by HHRG.  (Michael Ryan Affidavit, at ¶ 79; Sean Russo Affidavit, September 2, 2005, at ¶ 81).

27.     The collapse of HHRG caused the collapse of GWRC's business as a going concern.  (Hobson Report, Exhibit A to Hobson Aff., at § 7; Deposition of Anil Shivdasani, **Tab A** of GWRC's Appendix, at 217).

28.    It was the negligence of PwC in not advising the GWRC Board, the HHRG Board, or the Audit Committee of the unsecured advances that it knew HHRG had given to Panexim in the Fiscal Year ending March 31, 1998, in June 1998, that caused the collapse of HHRG's business as a going concern, and the subsequent demise of GWRC as a going concern. (Michael Ryan Affidavit, at ¶ 79; Sean Russo Affidavit, September 2, 2005, at ¶ 81; Hobson Report, Exhibit A to Hobson Aff., at § 7; Deposition of Anil Shivdasani, **Tab A** of GWRC's Appendix, at 217).

29.    It was the negligent misrepresentation on the part of PwC to the GWRC Board, the HHRG Board, and the Audit Committee, that its audits of HHRG's financial statements met the requirements of GAAP and GAAS that caused the collapse of HHRG's business as a going concern, and the subsequent demise of GWRC as a going concern.  (Michael Ryan Affidavit,  at ¶ 79; Sean Russo Affidavit, September 2, 2005, at ¶ 81; Hobson Report, Exhibit A to Hobson Aff., at § 7; Deposition of Anil Shivdasani, **Tab A** of GWRC's Appendix, at 217).

30.    It was the breach of PwC's third party beneficiary contract with GWRC to ensure the accuracy and completeness of the HHRG financial statements that caused the collapse of HHRG's business as a going concern, and the subsequent demise of GWRC as a going concern. (Michael Ryan Affidavit, at ¶ 79; Sean Russo Affidavit, September 2, 2005, at ¶ 81; Hobson Report, Exhibit A to Hobson Aff., at § 7; Deposition of Anil Shivdasani, **Tab A** of GWRC's Appendix, at 217).

31.    And it was PwC's breach of its fiduciary duty to GWRC to protect GWRC's interests in ensuring the accuracy and completeness of the HHRG financial statements that caused the collapse of HHRG's business as a going concern, and the subsequent demise of GWRC as a going concern. (Michael Ryan Affidavit,  at ¶ 79; Sean Russo Affidavit, September

2, 2005, at ¶ 81; Hobson Report, Exhibit A to Hobson Aff., at § 7; Deposition of Anil

Shivdasani, **Tab A** of GWRC's Appendix, at 217).

**PLAINTIFF**
**GOLDEN WEST REFINING**
**CORPORATION LIMITED**


By  /s/ Steven R. Humphrey
    Steven R. Humphrey (ct06053)
    shumphrey@rc.com
    Dina S. Fisher (ct14896)
    dfisher@rc.com
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT 06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2005, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept filing]. Parties may access this filing through the Court's system.

David J. Elliott, Esq.
William H. Erickson, Esq.
Steven D. Goldberg, Esq.
Steven M. Greenspan, Esq.
Day, Berry & Howard LLP
CityPlace
185 Asylum Street
Hartford, CT  06103-3499

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman &
   Dicker LLPs
150 East 42nd St.
New York, NY 10017-5639

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Daniel E. Tranen, Esq.
Wilson, Elser, Moskowitz, Edelman &
   Dicker LLP
120 N. LaSalle Street
Chicago, IL 60602

Kathleen DiGennaro Warner, Esq.
Thomas D. Goldberg, Esq.
Day, Berry & Howard
One Canterbury Green
Stamford, CT  06901-2047

William H. Champlin, III, Esq.
Michael T. McCormack, Esq.
William S. Fish, Jr., Esq.
Tyler Cooper & Alcorn, LLP
William S. Fish, Jr., Esq.
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman &
   Dicker LLP
3 Gannett Drive
White Plains, NY 10604-3407

Jed Horwitt, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Ave.
P.O. Box 3186
Bridgeport, CT  06605-0186

Kevin J. O'Connor, Esq.
U.S. Attorney's Office-NH
157 Church Street, 23rd Floor
P.O. Box 1824
New Haven, CT  06510

    /S StevenR. Humphrey_____
    Steven R. Humphrey