# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1572 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1803 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP, | : | September 2, 2005 |
| Defendant. | : | |

## PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF PLAINTIFFS ALEC SHARP ET AL. FOR PARTIAL SUMMARY JUDGMENT

David J. Elliott
Thomas D. Goldberg
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT  06901
Tel: (203) 977-7301
Fax: (203) 977-7301

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................................2

COUNTER-STATEMENT OF FACTS .....................................................................................3

    A.    The 1997 Engagement ...............................................................................3

    B.    The 1998 Engagement ...............................................................................4

    C.    HHRG's Alleged Reliance on PwC to Monitor HHRG's Compliance With Its Policies .....................................................................................................5

    D.    Plaintiffs' Damages Claims........................................................................7

ARGUMENT .............................................................................................................................8

I.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT WHETHER PWC BREACHED ANY AGREEMENT WITH HHRG ........................................................9

    A.    The 1997 Engagement .............................................................................10

    B.    The 1998 Engagement .............................................................................10

II.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT WHETHER THE ALLEGED BREACH OF CONTRACT CAUSED ANY LOSS TO HHRG.................15

III.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO THE AMOUNT OF HHRG'S LOSS RESULTING FROM THE PANEXIM ADVANCES ..............................................................................................................16

IV.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO PWC'S DEFENSES...............................................................................................................17

    A.    Unclean Hands and In Pari Delicto .........................................................18

    B.    Failure to Mitigate Damages ....................................................................19

    C.    HHRG's Indemnification Obligations Under the Engagement Letters ..............20

    D.    Comparative Negligence...........................................................................21

CONCLUSION .......................................................................................................................22

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................8

*Bank of China v. NBM LLC*, 359 F.3d 171 (2d Cir. 2004) ........................................................ 19

*Boone v. William W. Backus Hosp.*, 272 Conn. 551 (2005) ...................................................... 22

*Calig v. Schrank*, 179 Conn. 283 (1979).....................................................................................9

*Curtis Packaging Corp. v. KPMG LLP*, No. X06CV990156558S, 2002 Conn. Super. LEXIS 2663 (Conn. Super. Ct. July 31, 2002)........................................................................... 22

*Cusano v. Grudberg, No. CV010276769*, 2003 Conn. Super. LEXIS 2057 (Conn. Super. Ct. July 21, 2003)........................................................................................................................ 21

*Easterling v. Connecticut*, 356 F. Supp. 2d 103 (D. Conn. 2005)............................................8, 9

*Gold v. Greenwich Hosp. Ass'n*, 262 Conn. 248 (2002) ........................................................... 22

*Lynch v. McNamara*, 342 F. Supp. 2d 59 (D. Conn. 2004) ........................................................8

*Martin v. DuPont Flooring Sys.*, No. 3:01CV2189(SRU), 2004 U.S. Dist. LEXIS 5486 (D. Conn. Mar. 31, 2004), *aff'd 125 Fed Appx. 369 (2005)*.........................................................9

*Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69 (D. Conn. 2004) .....................8

*Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520 (2d Cir. 2004) ..........................9

*Neiditz v. Morton S. Fine & Assocs.*, 199 Conn. 683 (1986) ..................................................... 21

*Orange Improvements P'ship. v. Cardo, Inc.*, 984 F. Supp. 85 (D. Conn. 1997), *aff'd, 175 F.3d 1008 (2d Cir. 1999)* ...................................................................................... 10, 11, 12

*Orselet v. DeMatteo*, 206 Conn. 542 (1988) ....................................................................... 19, 21

*Pokorne v. Gary*, 281 F. Supp. 2d 416 (D. Conn. 2003) .......................................................... 12

*Preston v. Keith*, 217 Conn. 12 (Conn. App. 1991).................................................................. 19

*Rosato v. Mascardo*, 82 Conn. App. 396 (2004)........................................................................9

*Royal Ins. Co. of Am. v. Zygo Corp.*, , No. 3:01CV1317, 2003 U.S. Dist. LEXIS 14172 (D. Conn. Aug. 15, 2003)........................................................................................................ 12

*Samander v. Flemmig*, 20 F. Supp. 2d 343 (D. Conn. 1998) ........................................................ 8

*Schering Corp. v. Home Ins. Co.*, 712 F.2d 4 (2d Cir. 1983) ...................................................... 13

*Sevigny v. Dibble Hollow Condo. Ass'n*, 76 Conn. App. 306 (2003) .......................................... 21

*Somma v. Gracey*, 15 Conn. App. 371 (1988) ............................................................................ 21

*Vona v. Lerner*, 72 Conn. App. 179 (2002) ................................................................................. 22

*Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559 (1995) ......................................... 21

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP, | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1572 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP, | : | |
| | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1803 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP, | : | September 2, 2005 |
| Defendant. | : | |

## PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF PLAINTIFFS ALEC SHARP ET AL. FOR PARTIAL SUMMARY JUDGMENT

Defendant PricewaterhouseCoopers LLP ("PwC")[1] respectfully submits this

memorandum of law in opposition to the motion of plaintiffs Alec Sharp, *et al.* ("Underwriters"

or "plaintiffs") for partial summary judgment on Count I of their Complaint.

---

[1] For purposes of this memorandum, "PwC" includes PricewaterhouseCoopers LLP and one of its predecessor firms, Coopers & Lybrand L.L.P.

## PRELIMINARY STATEMENT

This is a professional malpractice case in which plaintiffs contend that PwC negligently perform audits of the financial statements of Handy & Harman Refining Group, Inc. ("HHRG") for the fiscal years ended March 31, 1997, 1998 and 1999. The parties vigorously dispute whether PwC performed the audits in accordance with professional standards, known as generally accepted auditing standards, or "GAAS." Each side has offered expert testimony to support its position, and plaintiffs do not dispute that this is an issue for the jury.

Nonetheless, plaintiffs have moved for summary judgment on their claim that PwC breached the terms of the engagement letters in connection with the 1997 and 1998 audits.[2] Plaintiffs' theory apparently is that in each year PwC, beyond agreeing to conduct an audit in accordance with GAAS, further contracted to assure that HHRG would not suffer any losses as a result of advances to companies in third world countries. In order to win summary judgment, plaintiffs must show that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Yet virtually every aspect of plaintiffs' breach of contract claim is disputed. Indeed, it is telling that plaintiffs fail even to cite or attach the 1997 engagement letter, and for good reason – the letter does not include the provision that plaintiffs say was breached.

Plaintiffs' argument that it is entitled to summary judgment because PwC breached the 1998 engagement letter fares no better. The argument rests on a contorted, disputed construction of the engagement letter and a separate service plan that PwC sent to HHRG's controller. Even if the Court were to allow plaintiffs' proffered construction of the documents, there would

---

[2] Count One also alleges that PwC breached a contract with respect to the 1999 audit engagement. Because plaintiffs have not included that portion of the claim in their motion, it is not addressed in this opposition.

remain genuine issues of material fact about (a) whether the contract required PwC specifically to notify HHRG's Board of Directors of the Panexim advances, (b) whether HHRG's Board would have acted differently if PwC had notified them of the advances, (c) whether the alleged breach caused the damages asserted by plaintiffs, and (d) whether PwC nonetheless would be entitled to prevail on certain of its affirmative defenses.  Simply put, Underwriters' request for summary judgment has no colorable basis.

## COUNTER-STATEMENT OF FACTS

### A.     The 1997 Engagement

Pursuant to an engagement letter with HHRG dated April 10, 1997, PwC agreed to perform an audit of HHRG's financial statements for the period ended March 31, 1997.[3]  The engagement letter was addressed to and was countersigned by HHRG's controller, William Myles.  The engagement letter provides, under the heading, "Summary of Services":  "We will audit the financial statements of the Company as of and for the year ended March 31, 1997, in accordance with generally accepted auditing standards."  (*Id.* at 1.)  The parties dispute whether PwC conducted its audit in accordance with generally accepted auditing standards ("GAAS"), as provided in the engagement letter.  Plaintiffs' expert, Vincent Love, opines that PwC's audit failed to comply with GAAS.  (Pl. Ex. 5, at 7.)  PwC's expert, Robert Temkin, opines that PwC's audit complied with GAAS. (Expert Report of Robert H. Temkin dated July 6, 2005 (the "Temkin Report") submitted as Def. Ex. 15, at 12.)

---

[3] A copy of the engagement letter is submitted as Exhibit 19 to PwC's Local Rule 56(a)2 Statement.  Exhibits submitted with plaintiffs' motion are referred to as "Pl. Ex. __."  Exhibits submitted with PwC's Local Rule 56(a)(2) Statement are referred to as "Def. Ex. __."

Plaintiffs cite a "promise" that "was incorporated into the audit" that PwC would ensure that there were no collectability issues with respect to foreign receivables.  (Pl. Mem. at 8)  The document on which plaintiffs rely, however, was an internal audit work paper that comprised part of PwC's documentation of its audit work, intended to identify issues for the consideration and clearance of the engagement partner before the audit report is released.  (Affidavit of Alex Corl (the "Corl Aff.") submitted herewith as Def. Ex. 1 at ¶ 4.)  It is not a contractual "promise" from PwC to HHRG.

### B.     The 1998 Engagement

Pursuant to an engagement letter with HHRG dated March 30, 1998, PwC agreed to perform an audit of HHRG's financial statements for the period ended March 31, 1998.  (Pl. Ex. 4.)  The 1998 engagement letter also was addressed to and was countersigned by HHRG's controller, Myles.  The engagement letter provides, under the heading "Summary of Services": "We will audit the financial statements of the Company as of and for the year ended March 31, 1997, in accordance with generally accepted auditing standards."  (*Id.* at 1.)  It further provides: "Any additional services that you may request, and that we agree to provide, will be the subject of separate written arrangements."  (*Id.*)

The engagement letter includes a separate section entitled "Your Expectations," which provides:

> As part of our planning process, we have met with you to discuss your expectations of Coopers & Lybrand L.L.P., your concerns about your business, changes in your business and industry, your views on risks facing you, any relationship issues with Coopers & Lybrand L.L.P., and specific engagement arrangements and timing.  Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the engagement objectives and meet, and/or exceed, your expectations.  Our service plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance.

(*Id.* at 2.)

Pursuant to this provision, and as part of its audit process, PwC forwarded a service plan to Myles.  (*See* Pl. Ex. 3, at PWC/H&H 016872.)  One portion of the service plan, captioned "Critical Matters and Other Issues," included a chart identifying areas "requiring particular attention during the course of the audit."  It goes on to say:  "Our audit scope and procedures have been tailored to address these specific matters."  (*Id.* at PWC/H&H 016878)  One of the specific matters was "Collectability of Foreign Accounts Receivable."  The adjacent box of the chart, which summarized C&L's audit plan with respect to that step, stated:  "We will assure advances to third world countries are not made unless material is in the possession of Handy & Harman."  (*Id.*)

The parties dispute whether PwC conducted its audit of HHRG's 1998 financial statements in accordance with GAAS, and specifically whether PwC performed adequate procedures with respect to the collectability of foreign accounts receivable.  *Compare* Pl. Ex. 5 (expert report of Vincent Love, at 7 *with* Def. Ex. 15 (Temkin Report) at 12.  As discussed below (*see* pages 10-12 *infra*), the parties also dispute the meaning and effect of the quoted provisions from the service plan, and whether the audit steps that PwC performed with respect to the collectability of foreign accounts receivable satisfied its obligations.

## C.    HHRG's Alleged Reliance on PwC to Monitor HHRG's Compliance With Its Policies

Plaintiffs assert that "[t]he HHRG Board of Directors relied upon the oversight of HHRG's auditors to make certain that HHRG and GWRC [*i.e.*, Golden West Refining Corp., HHRG's parent] policy was being followed, such that no funds would be advanced against metals until such metals were in the possession of or in transit to HHRG."  (Local Rule 56(a)(1)

Stmt. ¶ 74.)  Plaintiffs further assert that, if PwC had told the HHRG Board about advances to Panexim, the Board would have commenced an investigation of all transactions with Panexim and would have changed the terms of all future business "in a manner which would have assured that material was in the possession of HHRG before advances were made." (*Id.* ¶¶ 75-76.)  In support of these assertions, plaintiffs rely upon the testimony of Michael Ryan, the former chief executive officer of GWRC and a member of the Board of Directors of HHRG.

Although Ryan asserts that the HHRG Board relied upon the "oversight" of PwC's auditors, that assertion is contradicted by Ryan's further testimony that he had no involvement in HHRG's engagement of PwC, never saw the engagement letters between PwC and HHRG, and was not aware that PwC had provided Myles with a service plan until after HHRG's bankruptcy. (Pl. Ex. 11 (deposition testimony of Michael Ryan (the "Ryan Tr."), at 37-38.)  Indeed, Ryan did not even meet any of the PwC auditors until March 2000. (*Id.* at 58)  Plaintiffs cite no evidence that any non-management member of the HHRG Board ever saw the 1998 engagement letter or the service plan, or otherwise understood that PwC had undertaken to provide any particular assurances with respect to advances to companies in third world countries.

Plaintiffs' motion also fails to establish that HHRG had a corporate policy not to make any unsecured advances to customers, and that the Panexim advances were "clearly in violation of HHRG policy." (Pl. Mem. at 11.)  Plaintiffs have failed to cite any HHRG document setting forth such a policy, and we are not aware of any such document.  To the contrary, a draft report dated July 20, 1999 and prepared after the HHRG and GWRC Boards knew of an unsecured exposure to Panexim states that the HHRG credit policy "is apparently not written" and "leaves room for interpretation." (GWRC Finance Committee Report marked as Ryan Ex. 21 submitted herewith as Def. Ex.26, at HHRG-PWC153691).)  Moreover, HHRG's management was aware

that unsecured advances had been made to some of its customers yet they did not consider them

improper. (December 14, 1998 memorandum, marked as Ex. 31 at the deposition of John King

and submitted herewith as Def. Ex. 24.)

     **D.**    **Plaintiffs' Damages Claims**

     Plaintiffs point out that as of March 31, 1997 HHRG had a receivables balance from

South American companies which totaled about $600,000, and that as of March 31, 1998, HHRG

had a receivables balance from those same companies of about $2.8 million. (Plaintiffs' Rule

56(a)(1) Stmt., ¶¶ 24, 63.) But plaintiffs do not allege that any of those receivables was not

collected. To the contrary, all receivables that were included in HHRG's financial statements as

of the March 31, 1998 audit date were fully repaid in the ordinary course of transactions between

the companies, through the receipt of metal and cash.[4]

     1.    Plaintiffs' expert, Love, expresses his opinion that HHRG ultimately suffered

damages of $12,076,000 million resulting from losses on advances to Panexim (Pl. Ex. 5, at 52-

59), but those alleged losses resulted from millions of dollars of payments made from HHRG to

Panexim after November 1998, long after PwC had completed its audit work pursuant to the

1998 engagement letter. (*See* Pl. L. Rule 56(a)(1) Stmt., ¶¶ 69-72) Moreover, Love's

calculation of HHRG's losses on advances to Panexim is contradicted by other evidence,

including Underwriters' own position that it advanced in negotiating the insurance claim filed by

HHRG. Relying on an analysis performed by W. Marcus Johnson of Hagen Streiff Newton

Oshiro ("HSNO"), who reviewed the same materials reviewed by Love, Underwriters argued

---

     [4] This is supported by HHRG's aged accounts receivable report for 1999 which shows all
outstanding receivables as of March 31, 1999 with the oldest receivable dated January 22, 1999
and no outstanding receivables from 1998. (The 1999 aged accounts receivable detail report is
submitted as Def. Ex. 6 at PwC 99 WP 01193-94; *see also* Temkin Report, at 8.)

that the total loss was less than $7.7 million. (Deposition transcript of W. Marcus Johnson

("Johnson Tr." submitted as Def. Ex.17, at 29-34; June 8, 2001 letter from HSNO to John

Dempsey (marked as HSNO Ex. 6 at the Johnson deposition) submitted as Def. Ex. 18 at DMC

046883.)

## ARGUMENT

On a motion for summary judgment, the moving party has the burden to establish that

there are no genuine issues of material fact to be tried and that the facts as to which there is no

such issue warrant judgment as a matter of law. *Easterling v. Connecticut*, 356 F. Supp. 2d 103,

106 (D. Conn. 2005) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); Fed. R.

Civ. P. 56(c)).  If, as to any issue on which summary judgment is sought, "there is any evidence

in the record from which a reasonable inference could be drawn in favor of the opposing party,

summary judgment is improper." *Samander v. Flemmig*, 20 F. Supp. 2d 343, 344 (D. Conn.

1998) (citation omitted).  In determining whether a genuine issue has been raised, all ambiguities

and reasonable inferences to be drawn from the underlying facts revealed in the affidavits,

exhibits, interrogatory answers, and depositions must be resolved in favor of the non-moving

party. *Easterling*, 356 F. Supp. 2d at 106; *Merry Charters, LLC v. Town of Stonington*, 342 F.

Supp. 2d 69, 73 (D. Conn. 2004) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.

1995)).  The district court must resolve any factual issues of controversy in favor of the

nonmoving party, "mindful that its ultimate concern is to ascertain whether there is a need for a

trial -- whether, in other words, there are any genuine factual issues that properly can be resolved

only by a finder of fact because they may reasonably be resolved in favor of either party." *Lynch

v. McNamara*, 342 F. Supp. 2d 59, 65 (D. Conn. 2004) (internal citations and quotations

omitted).  Determinations as to the weight to accord evidence or credibility assessments of

witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Easterling*, 356 F. Supp. 2d at 106 (citing *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996)).

In order to establish their claim for breach of contract, plaintiff must establish: (1) the formation of an agreement; (2) performance by HHRG; (3) that PwC breached the agreement; and (4) damages. *See Rosato v. Mascardo*, 82 Conn. App. 396, 411 (2004); *Martin v. DuPont Flooring Sys.*, No. 3:01CV2189(SRU) 2004 U.S. Dist. LEXIS 5486 (D. Conn. Mar. 31, 2004), aff'd 125 Fed Appx. 369 (2005).[5] Causation is an essential element of damages in a breach of contract action, and requires that plaintiffs establish that PwC's breach directly and proximately caused their damages. *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, Inc.*, 392 F.3d 520, 525 (2d Cir. 2004); *Calig v. Schrank*, 179 Conn. 283, 286 (1979).

As we show below, plaintiffs have failed to show that there are no genuine issues of material fact on each element of their breach of contract claim and on PwC's affirmative defenses. Accordingly, their motion must fail.

## I.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT WHETHER PWC BREACHED ANY AGREEMENT WITH HHRG.

The 1997 and 1998 engagement letters explicitly provided that PwC would conduct an audit of HHRG's financial statements in accordance with generally accepted auditing standards. Whether PwC conducted its audits in accordance with GAAS is a disputed issue, on which the parties have submitted competing expert reports. Plaintiffs' motion thus depends on their showing that PwC agreed to perform services in addition to its audits of HHRG's financial

---

[5] A copy of this unreported case is submitted as Def. Ex. 31.

statements, and that PwC breached such agreement as a matter of law.  Plaintiffs cannot make such a showing.

### A.    The 1997 Engagement

Plaintiffs' claim for breach of the 1997 contract is based on a document which they refer to as "Critical Matter # 5" (Pl. Ex. 2), which is an internal PwC audit work paper that was produced to plaintiffs in this litigation.  It was created by a PwC staff auditor, Chad Albano, and was reviewed by the engagement partner, George Ingram, in the course of PwC's work on the 1997 engagement.  Plaintiffs do not and cannot contend that the document was shown to, reviewed by, or approved by PwC's client, HHRG.

There is no basis to argue that this internal work paper constitutes a contract between PwC and HHRG.  Nor is there any basis for plaintiffs' argument (Pl. Mem. at 8) that the 1997 engagement letter "incorporated by reference" this or any other work paper.  The engagement letter does not refer to the work paper, much less refer to it "in such a manner as to establish that [the parties] intended to make the terms and conditions of [the work paper] a part of their understanding."  *Orange Improvements P'ship. v. Cardo, Inc.*, 984 F. Supp. 85, 92 (D. Conn. 1997), aff'd, 175 F.3d 1008 (2d Cir. 1999).

### B.    The 1998 Engagement

Plaintiffs' claim for breach of the 1998 contract is based on its contention that PwC failed to complete a step set forth in the service plan that PwC provided to HHRG's controller, that PwC "will assure advances to third world countries are not made unless material is in the possession of Handy & Harman."  Plaintiffs contend that the provision in the service plan constituted a contractual commitment over and above PwC's agreement to perform an audit in accordance with GAAS, and that PwC breached that commitment.

Plaintiffs' argument that it is entitled to summary judgment faces a steep hurdle. Putting aside the important, disputed issue of whether PwC contracted to do anything other than to perform a GAAS audit, the parties sharply debate the interpretation of what was meant by the language in the service plan. "Generally, contract interpretation involves issues of the parties' intent and thus presents a question of fact." *Orange Improvements P'ship.*, 984 F. Supp. at 90 (citing *Bead Chain Mfg. Co. v. Saxton Prods., Inc.*, 183 Conn. 266, 274-75 (1981)). Thus, "the moving party must prove that the contractual language is not susceptible to at least two fairly reasonable meanings. If the moving party cannot establish unambiguous contract language, 'a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term.'" *Id.* at 89 (citations omitted).

Plaintiffs here fall far short of surmounting this hurdle. ***First***, contrary to supporting plaintiffs' assertion, the plain language of the documents makes clear that the parties did <u>not</u> intend the cited provision in the service plan to constitute an independent contractual obligation, separate and apart from PwC's obligation to conduct an audit in accordance with GAAS. The engagement letter makes clear the scope of the services that PwC agreed to provide: "We will audit the consolidated financial statements of the Company as of and for the period ending March 31, 1998, in accordance with generally accepted auditing standards. . . . Any additional services that you may request, and that we agree to provide, will be the subject of separate written arrangements." (Pl. Ex. 4, at 1) The engagement letter did refer to a service plan, but only in the context of addressing HHRG's client satisfaction ("Your Expectations"). The purpose of the service plan, which included the audit plan, was "to provide a foundation for an

effective, efficient and quality-focused approach <u>to accomplish the engagement objectives</u> [*i.e.*, to conduct an audit] and meet, and/or exceed, your expectations." (*Id.* at 2 (emphasis added.)

The relevant portion of the service plan reinforces that the purpose of the plan was to describe activities within the scope of the audit. Thus, PwC prepared a chart identifying areas "as requiring particular attention <u>during the course of the audit</u>. Our <u>audit scope and procedures</u> have been tailored to address these specific matters. The table below outlines the status of each item and our <u>planned audit procedures</u>." (Pl. Ex. 5, at PWC/H&H016878 (emphasis added.) The left column of the chart identified a matter ("Collectability of foreign receivables") and the next column identified the application portion of the "Audit Plan" ("We will assure advances to third world countries are not made unless material is in the possession of Handy & Harman"). (*Id.*) In other words, the language on which plaintiffs rely was a means to accomplish a particular audit objective – assessing the collectability of foreign accounts receivable.

***Second***, even if the engagement letter was ambiguous, the parties' intent would present a genuine issue of material fact. *See Pokorne v. Gary*, 281 F. Supp. 2d 416, 420 (D. Conn. 2003) (when the contractual language is ambiguous and subject to varying reasonable interpretations, the issue of the parties' intent is a question of fact, thereby rendering summary judgment inappropriate) (citing *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)). In that event, the parties have a right to present extrinsic evidence to aid in the interpretation of the contract. *Id.*; *see also Orange Improvements P'ship.*, 984 F. Supp. at 89; *Royal Ins. Co. of Am. v. Zygo Corp.*, No. 3:01CV1317, 2003 U.S. Dist. LEXIS 14172, at *1-2 (D. Conn. Aug. 15, 2003)[6]; *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir. 1983).

---

[6] A copy of this unreported case is submitted as Def. Ex. 32.

Plaintiffs have offered no evidence that anyone at HHRG construed the service plan as setting forth contractual commitments separate and apart from the commitment to conduct a GAAS audit.  The deposition testimony in this case is all to the contrary.  Myles, the person to whom the engagement letter and service plan were addressed, could not recall whether he even received a copy of the 1998 service plan.  (Deposition transcript of William Myles (the "Myles Tr.") the cited portions of which are submitted as Def. Ex. 5, at 385-87.)  HHRG's treasurer, John King, testified that he had never seen the service plan before his deposition, did not recall discussing it with anyone at PwC, and did not recall discussing it with anyone at HHRG. (Deposition transcript of John King (the "King Tr.") the cited portions of which are submitted as Def. Ex. 33,  at 136-37.)  Nor was it PwC's intent to undertake additional contractual obligations pursuant to the service plan.  Raj Dansinghani, a PwC senior auditor who worked on all the HHRG audits, characterized the service plan as a "talking document," the purpose of which was to "outline the timetable, who would be on the engagement, things of that nature."  (Pl. Ex. 9 (February Dansinghani Tr.) at 288-90)  In his experience, "usually just the engagement letter would outline all the terms and conditions that an auditor is performing for a client."  (*Id.* at 290)

***Third***, and contrary to plaintiffs' assertions, PwC <u>did</u> comply with the service plan by taking steps properly to assess the collectability of foreign receivables.  PwC's audit strategy with respect to accounts receivable and allowance for doubtful accounts appears on the very next page of the service plan.  (Pl. Ex. 5, at PWC/H&H016878)  As the service plan indicates, the audit risks for receivables are "Existence" and "Collectability" and, during the course of the audit, the PwC audit team performed various audit steps to evaluate the existence and collectability of the receivables from Panexim and other South American customers.  For example, the audit team traced and agreed information on the 1998 "price not booked" schedule

regarding advances made to HHRG's customers in South America to wire transfer information. The PwC audit team tested the information concerning the value of the precious metals listed on the price not booked schedule to trading logs and invoices maintained by HHRG. (*See* Supplemental Responses to Underwriters' First Set of Interrogatories submitted as Def. Ex. 4, response to interrogatory 3).) The audit team sent confirmation letters to numerous of HHRG's foreign customers, including Panexim, Darwill S.A., and Orion, S.A., requesting that each of them confirm the balance of the accounts receivable owed to HHRG. Each of these customers returned these confirmation letters to the PwC audit team noting no exceptions to the balances each of them owed to HHRG. (PwC work papers bates labeled PwC 98 WP 01030, 01041, and 01044 submitted as Def. Exs. 20, 21, and 22 respectively.) The audit team also performed a "subsequent cash review" to determine, of the approximate $1.25 million receivable owed by Panexim as of March 31, 1998, how much was paid during the first week subsequent to the audit cut-off date. The audit team determined that $415,000 had been received from Panexim during the first nine days of April 1998. (PwC work paper bates labeled PwC 98 EW 0361-0362 and submitted as Def. Ex. 23.) In sum, there is ample evidence from which a jury could find that PwC performed what was intended by the service plan.[7]

Underwriters have fallen woefully short of establishing as a matter of law that PwC breached a contractual obligation to HHRG during either the 1997 or 1998 audits.

---

[7] Plaintiffs' motion is not advanced by its assertion that PwC was aware of advances that "were clearly in violation of HHRG policy" and failed to inform the HHRG board of directors of those advances. (*See* Pl. Mem. at 11) There are genuine issues of material fact regarding what if any policy HHRG had in effect regarding advances to Panexim and similar customers, whether HHRG management violated any such policy, and whether PwC had a duty to inform HHRG's Board of Directors of the advances. (*See* Def.. Ex. 15 (Temkin Report) at 22-23.)

## II.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT WHETHER THE ALLEGED BREACH OF CONTRACT CAUSED ANY LOSS TO HHRG.

Plaintiffs baldly assert: "[H]ad PwC successfully carried out its contractual obligations, or at the very least warned the HHRG board that unsecured advances were being made to Panexim, there would not have been any unsecured advances to Panexim at the time the Peruvian government began freezing the VAT rebates [in November 1998]. Because there were unsecured advances and based on Panexim's inability to recover the VAT payments, HHRG's foreign account receivable became uncollectible, causing a significant loss." (Pl. Mem. at 12-13)

This is pure conjecture, based on the self-serving testimony of Michael Ryan, the former CEO of GWRC. The jury is free to reject that testimony, and likely will do so based on evidence that the non-management Board members of HHRG were aware before mid-1998 that HHRG was making unsecured advances to companies in South American countries, and did nothing about it. For example, at a November 1996 meeting, Barry Wayne made a presentation to the HHRG Board of Directors in which he described opportunities in South America with "high yields and high risks." (Notes of November 25, 1996 HHRG board of directors meeting marked as Ryan Ex. 5 and submitted herewith as Def. Ex. 28, at HHRG-PWC62598) He discussed in particular a situation in Chile, where there is a "tax incentive for export of products" and where HHRG "participate[s] in finance of local source," with about $350,000 at risk. (*Id.*) There is no evidence that any Board member considered this business inappropriate (even though it is very similar to the Panexim relationship), much less characterized it as an impermissible breach of corporate policy. At a meeting of the GWRC Board of Directors in May 1998, Wayne described the "Peruvian business," which meant Panexim, as very profitable. Shortly thereafter, some of the directors learned that the Panexim business depended on an export incentive program that

-15-

was likely to require advances, yet there is no evidence anywhere that any director had concern, followed up, or took action to limit transactions with Panexim.  (May 22, 1998 memo marked as Ryan Ex. 7 and submitted herewith as Def. Ex. 29; deposition testimony of Sean Russo (the "Russo Tr.") submitted as Pl. Ex. 12, at  42, 112-13.)

The jury also may choose not to credit plaintiffs' assertion that in May 1999 the HHRG Board of Directors, after learning of HHRG's exposure to Panexim, "launched a thorough investigation and immediately took steps to make certain that no further unsecured advances to Panexim would be made."  (Pl. Mem. at 13)  Even after May 1999, HHRG continued to make advances to Panexim, the exposure increased, and the Board continued to rely on misrepresentations by Wayne and others that concealed the nature of the Panexim transactions and the amount of HHRG's exposure.  (*See, e.g.* Def. Exs.8-14; Def. Ex. 15 (Temkin Report) at 32-35.)

In sum, a jury readily could conclude that, even if PwC had specifically informed the Board of the unsecured advances during the 1998 audit, either (1) the Board of Directors would have deferred to Wayne, as they did many times even after learning of his improper conduct, and permitted unsecured advances or (2) Wayne would have taken steps to conceal the extent and magnitude of his fraud from the Board and would have continued making advances to Panexim. In either event, HHRG would have suffered losses once the VAT reimbursements to Panexim were suspended.

## III.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO THE AMOUNT OF HHRG'S LOSS RESULTING FROM THE PANEXIM ADVANCES.

PwC disputes whether the losses from the Panexim advances cited in the Love Report constitute damages flowing from the alleged breach by PwC.  Plaintiffs concede that the losses

apparently were suffered beginning in November 1998 – months after PwC completed its audit of the March 31, 1998 financial statements – when the Peruvian government suspended the VAT reimbursement payments to Panexim that Panexim had used to pay HHRG.  (*See* Pl. Mem. at 13; Pl. Ex. 14.)  By contrast, the advances to Panexim that were outstanding as of March 31, 1997 and March 31, 1998 – the relevant dates for purposes of the 1997 and 1998 audits – were fully paid.  (*See* p.7 and f.n. 4 *supra*.)  Even if plaintiffs convinced a jury that PwC failed to assure the collectability of the foreign receivables, plaintiffs suffered no damages because those receivables were collected.

Further, even if plaintiffs were able to persuade the jury that all of HHRG's subsequent losses on advances to Panexim were proximately caused by PwC's breach of contract, the calculation of those losses nonetheless would present a disputed issue of material fact.  Plaintiffs' current expert, Love, formed his opinion on losses by performing a "reconciliation" of competing analyses that were done in connection with HHRG's insurance claim.  (Love Report at 51-59.)  In doing so, Love rejected the analysis of Underwriters' previous expert, Marcus Johnson of HSNO.  (*See* p.7-8, *supra*.)  The jury, however, may disagree with Love and credit Johnson, or may discredit both of them.

## IV.    THERE ARE DISPUTED ISSUES OF MATERIAL FACT AS TO PwC'S DEFENSES.

Plaintiffs also have failed to meet their burden to show that there are no genuine issues of material fact with respect to PwC's affirmative defenses.[8]

---

[8] PwC addresses below those affirmative defenses that it intends to assert at trial with respect to plaintiffs' breach of contract count, and that are not otherwise subsumed within elements on which plaintiffs have the burden of proof (*e.g.*, compliance with GAAS, legal causation).

### A.    Unclean Hands and *In Pari Delicto*

PwC's defenses of unclean hands and *in pari delicto* are based upon the willful misconduct of HHRG's senior management, including its chief executive officer, Barry Wayne. Plaintiffs do not dispute that misconduct.  To the contrary, plaintiffs paid HHRG's insurance claim precisely because it concluded that the senior managers of HHRG engaged in misconduct. Plaintiffs argue instead that (1) the misconduct is unrelated to the claim against PwC and (2) HHRG's managers were not acting within the scope of their duties for HHRG.  (Pl. Mem. at 21).

Both arguments present triable issues of fact.  First, there is evidence that HHRG's managers, in addition to withholding information from the GWRC Board and non-management members of the HHRG Board, withheld from PwC material information related to HHRG's business dealings with Panexim.  This information included that HHRG had made an unsecured loan to Panexim to finance its start-up of operations (Report of the forensic firm Dempsey Myers & Co. (the "Dempsey Report") submitted as Def. Ex. 7, at 8), and that HHRG management and Panexim had agreed to share profits from export incentives payable from the Peruvian government to Panexim (*id.* at 18-19).  Second, the "adverse interest exception" to the *in pari delicto* defense applies only where the employee has "totally abandoned" the employers' interests."  *Bank of China v. NBM LLC,*  359 F.3d 171, 179 (2d Cir. 2004).  That, in turn, "raises an issue of fact for the jury to decide."  *Id.*  The jury readily could find the exception inapplicable because Wayne and other HHRG personnel entered into the transactions in the ordinary course of HHRG's business, and the transactions generated substantial revenues for HHRG until the Peruvian authorities stopped making VAT refunds in November 1998.  (*See, e.g.*, Def. Ex. 29 (marked as Ryan Ex. 7).

Finally, these defenses apply to Underwriters the same as if the claim were still owned by HHRG, because Underwriters stand in the shoes of HHRG with respect to these claims.  As the Connecticut Supreme Court has explained:  "The insurer's right of subrogation against third persons causing the loss paid by the insurer to the insured . . . is derived from the insured alone. Consequently, the insurer can take nothing by subrogation but the rights of the insured, and is subrogated to only such rights as the insured possesses. . . .  Therefore, any defense which a wrongdoer has against the insured is good against the insurer subrogated to the rights of the insured."  *Orselet v. DeMatteo*, 206 Conn. 542, 546-47 (1988).

### B.    Failure to Mitigate Damages

Plaintiffs admit that their claim for breach of contract will fail if the jury finds that the injured party, HHRG, failed to take reasonable actions to mitigate its damages, that the damages were in fact enhanced by such failure, and that the damages which could have been avoided can be measured with reasonable certainty.  *Preston v. Keith*, 217 Conn. 12, 22 (Conn. App. 1991). In response to a contentions interrogatory propounded by GWRC, PwC explained how the plaintiffs in these consolidated actions failed to mitigate damages, including by failing to act decisively after learning of the Panexim advances in May 1999 to terminate Wayne, and by instead repeatedly accepting Wayne's misrepresentations regarding the Panexim relationship. (*See* Pl. Ex. 17, at pp. 7-8; *see also, e.g.,* Russo Exs. 12-14, 17, 19-21.)[9]

Plaintiffs assert that the losses all were established by March 1999, before the nature of the credit exposure allegedly was disclosed to the non-management members of the HHRG Board.  Plaintiffs do not support that assertion, however, by reference to any HHRG documents

---

[9] Additional evidence supporting the mitigation defense is summarized in detail in the July 7, 2005 expert report of R. Gene Brown submitted as Def. Ex. 27 , at 16-27.

or even to its damages expert report.  Indeed, plaintiffs' expert calculated damages by analyzing

all advances to Panexim and receipts from Panexim for the period through March 2000, when

HHRG finally stopped transacting business with Panexim.  (*See, e.g.,* Pl .Ex. 5 (Love Report) at

53, 55-56)  Instead, to support their assertion that all losses were established by March 1999,

plaintiffs rely on a bare assertion in the "affidavit" of Roberto Passaro Ponce de Leon, the

president of Panexim, procured on the eve of the filing of plaintiffs' motion.[10]  Plaintiff's

reliance on Passaro is astonishing, since plaintiffs have sued Passaro and accused him of

committing fraud.  In any event, the bare assertion is insufficient to support plaintiffs' motion for

partial summary judgment.

### C.     HHRG's Indemnification Obligations Under the Engagement Letters

Plaintiffs acknowledge that the engagement letter for each audit included a provision

requiring HHRG to indemnify PwC from all claims and liabilities "arising in circumstances

where there has been a knowing misrepresentation by a member of [HHRG's] management,

regardless of whether such person was acting in [HHRG's] interest."  (Def. Ex. 19, at PWC 97

WP 0008; Pl. Ex. 4, at 4)  Plaintiffs do not dispute that PwC has tendered evidence that HHRG

management made knowing misrepresentations to PwC during the course of its audits with

respect to the Panexim receivables, or that, based on this evidence, PwC is entitled to setoff and

recoupment with respect to any claims asserted by HHRG.

Plaintiffs instead repeat their unavailing argument – which the Court already has rejected

– that, as assignees and subrogees of HHRG's claim, plaintiffs are immune from these defenses.

*See* Order dated Nov. 5, 2004 (denying in part plaintiffs' motion to dismiss PwC's affirmative

---

[10] The statement is styled an "Affidavit," but it is not notarized and there is no indication
whether Passaro signed the affidavit in the United States or elsewhere.

defenses and counterclaims).[11]  It is black-letter law that an insurer, as subrogee, stands in the place of the insured and thus is subject to any and all defenses that the defendant may assert against the insured.  *See Orselet v. DeMatteo*, 206 Conn. at 546-47.

### D.    Comparative Negligence

The defense of comparative negligence is properly raised against all claims that sound in negligence which result in commercial losses, including claims for professional malpractice.  *See Somma v. Gracey*, 15 Conn. App. 371, 378 (1988); *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 586 (1995) ("the policy of the comparative negligence statute, [Conn. Gen. Stat.] § 52-572h, applies to negligence actions where only commercial losses are sustained.").  The existence of a duty of care that is essential for a successful claim of negligence may arise from a contractual obligation.  *See Neiditz v. Morton S. Fine & Assocs.*, 199 Conn. 683 (1986); *Sevigny v. Dibble Hollow Condo. Ass'n*, 76 Conn. App. 306, 318 (2003); *Cusano v. Grudberg*, No. CV010276769, 2003 Conn. Super. LEXIS 2057 (Conn. Super. Ct. July 21, 2003)[12].  Connecticut courts have routinely analyzed breach of contract claims based upon deficient professional services, such as those asserted by Underwriters, as claims sounding in professional negligence.  *See, e.g., Boone v. William W. Backus Hosp.*, 272 Conn. 551, 562-66 (2005) (citing *Gold v. Greenwich Hosp. Ass'n*, 262 Conn. 248, 254 (2002)); *Vona v. Lerner*, 72 Conn. App. 179, 185-

---

[11]  The Court granted plaintiffs' motion solely to the extent that PwC had captioned its setoff and recoupment defenses as both affirmative defenses and counterclaims.  The Court granted PwC leave to amend its Answer so that setoff and recoupment are captioned solely as affirmative defenses.

[12]  A copy of this unreported case is submitted as Def. Ex. 30.

88 (2002).[13]  Thus, plaintiffs cannot evade application of ordinary comparative negligence principles simply by characterizing their claims as one for breach of contract.  This defense, too, presents triable issues of material fact.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for partial summary judgment should be denied in its entirety.

DEFENDANT,
PRICEWATERHOUSECOOPERS LLP


By:  ____/s/ Thomas D. Goldberg_____
        David J. Elliott (ct 04301)
        Thomas D. Goldberg (ct 04386)
        Day, Berry & Howard LLP
        One Canterbury Green
        Stamford, Connecticut 06901-2047
        Tel:  (203) 977-7300
        Fax: (203) 977-7301
        Its Attorneys

---

[13] We respectfully submit that the language to the contrary in *Curtis Packaging Corp. v. KPMG LLP*, 2002 Conn. Super. LEXIS 2663 (Conn. Super. 2002), is unreasoned and incorrect.

-22-

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on August 12, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


                                        /s/ Thomas D. Goldberg
                                        David J. Elliott (ct 04301)
                                        Thomas D. Goldberg (ct 04386)
                                        Day, Berry & Howard LLP
                                        One Canterbury Green
                                        Stamford, Connecticut 06901-2047
                                        Tel:  (203) 977-7300
                                        Fax: (203) 977-7301
                                        Its Attorneys


Edward J. Boyle, Esq.                   William H. Champlin, III, Esq.
Wilson, Elser, Moskowitz, Edelman &     Michael T. McCormack, Esq.
Dicker LLP                              William S. Fish, Jr., Esq.
150 East 42nd St.                       Tyler Cooper & Alcorn, LLP
New York, NY  10017-5639                CityPlace - 35th Floor
                                        185 Asylum Street
                                        Hartford, CT 06103


Daniel McMahon, Esq.                    Fred N. Knopf, Esq.
Stefan Dandelles, Esq.                  Wilson, Elser, Moskowitz, Edelman & Dicker
Daniel E. Tranen, Esq.                  LLP
Wilson, Elser, Moskowitz, Edelman &     3 Gannett Drive
Dicker LLP                              White Plains, NY 10604-3407
120 N. LaSalle Street
Chicago, IL  60602


Steven R. Humphrey (ct06053)            Jed Horwitt, Esq.
Dina S. Fisher (ct14896)                Zeisler & Zeisler, P.C.
James M. Ruel (ct21222)                 558 Clinton Ave.
Robinson & Cole LLP                     P.O. Box 3186
280 Trumbull Street                     Bridgeport, CT 06605-0186
Hartford, CT 06103-3597