UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - -x

GOLDEN WEST REFINING CORPORATION :
Plaintiff :
v. : CIVIL ACTION NO.
: 3:02CV 1379 (MRK)
PRICEWATERHOUSECOOPERS, LLP and :
COOPERS & LYBRAND, LLP :
Defendants. :

- - - - - - - - - - - - - - - - - -x

ALEC SHARP, et al. :
Plaintiffs :
v. : CIVIL ACTION NO.
: 3:02CV 1572 (MRK)
PRICEWATERHOUSECOOPERS, LLP d/b/a :
PRICE WATERHOUSE, LLP :
Defendants. :

- - - - - - - - - - - - - - - - - -x

HANDY & HARMAN REFINING GROUP, :
INC. :
Plaintiff :
v. : CIVIL ACTION NO.
: 3:02CV 1803 (MRK)
PRICEWATERHOUSECOOPERS, LLP :
Defendants. :

- - - - - - - - - - - - - - - - - -x

Deposition of ALEX M. CORL, taken pursuant to the Federal Rules of Civil Procedure, before Melissa J. Kelly, RMR, CRR, Licensed Shorthand Reporter #00307, and Notary Public within and for the State of Connecticut, held at the offices of Tyler, Cooper & Alcorn, LLP, 185 Asylum Street, CityPlace, 35th Floor, Hartford, Connecticut, on March 14, 2005, at 9:45 a.m.

conversation about it; and I can't recall whether the three of us talked at the same time but that David and George and I thought that it had made sense for me to go on.
Q. Had you served as the engagement partner on any audits prior to the time you were asked to come on as the partner in connection with Handy & Harman?
A. Yes.
Q. How many?
A. I'm guessing. I would say --
Q. Don't guess; but if you can approximate, that's fine.
A. Okay. Ten.
Q. Were any of those entities that were involved in any way in the refining industry?
A. Not specifically refining.
Q. What was the nature of the business of the other entities in which you had served as engagement partner prior to the fall of 1998?
A. I had a variety of clients that were generally concentrated in the manufacturing, distribution service industries.
Q. When you say "manufacturing," manufacturing what kinds of products?

A. Generally consumer industrial-type products.
Q. Such as?
A. I had a client that was involved with recycling metal content, in particular titanium. That was one. I had -- I served a lot of clients. I'm trying to think back to 1998 who my clients were.
I had quite a large distribution company, several of those. I had --
Q. When you say "a large distribution company," what do you mean?
A. Distributor of copy -- business machine products. Another, a distributor of tableware.
I had grown up spending a lot of time on a company called Coleco Industries, which was a toy manufacturer.
I had previously had a client called JM Ney, which was a manufacturer of dental alloys.
I had a variety of clients, as I said, manufacture and distribution service industries.
Q. Now, you indicated that you had this conversation with Mr. Ingram and/or Mr. DeVore in/or about the fall of 1998.
When for the first time did you actually

begin to become familiar with Handy & Harman as an entity?
A. My recollection is that in the fall of 1998 it was a transition period. So I was involved, but I wasn't fully involved and responsible for the engagement until March 31 of 1999.
But there were activities going on in the fall of 1998, in particular the six-month review, that our team had done as of September 30, 1998 that I was being kept apprised of.
Q. You were being kept apprised of in what way?
A. Joe Tiroletto, who was the director who worked on the engagement, knew that I was going to be coming onto the account as the partner; so he was keeping me apprised.
Q. Had you worked with Mr. Tiroletto before that?
A. I had, yes.
Q. When you say he was keeping you "apprised," what would he do; how would he keep you apprised?
A. We would talk periodically about how it was going. He provided me with a -- as I recall, a draft of our report to PWC Australia.
Q. That's the six-month review report?

A. Yes.
Q. Did you have any understanding as to why a -- withdrawn.
The draft report that he provided to you, was that sent to PWC Australia as a draft report; do you know?
A. I don't know.
Q. Was it sent to PWC Australia as a final report?
A. I believe there was a final report sent, yes.
Q. Did you have any understanding as to the reason as to why a report was being sent to PWC Australia?
A. Yes.
Q. And what was your understanding?
A. My understanding was that PWC Australia were the auditors for Golden West Refining Corporation which had certain financial reporting requirements in Australia, and in connection therewith they had to report certain information semiannually.
And so in support of the PWC Australia opinion on that semiannual information, they asked PWC Hartford to perform certain procedures and

report back to them on those procedures.
Q. Now, when PWC Australia would ask Hartford to perform certain procedures, would they do that in some type of written communication?
A. Generally speaking, it was done through e-mail.
Q. Now, when you became the partner in charge, would these instructions be addressed to you?
MR. ELLIOTT: You mean as of March of 1999?
MR. BOYLE: Yeah.
THE WITNESS: I don't recall whether they were specifically addressed to me or just generically, or they may have even been addressed to Joe Tiroletto since he continued on the account. I don't remember.
BY MR. BOYLE:
Q. To the extent that these were instructions regarding what they wanted done, would those instructions be printed in the e-mail and incorporated into the work papers?
A. They may be printed and put in hard copy. They may only be in there electronically, or they may be in there in both forms.
Q. In the context of e-mails being sent to

you, did you have any particular practice that you followed in terms of printing and incorporating the e-mails into the work papers?
A. E-mails generally?
Q. E-mails from PWC Australia.
A. As I recall with regard to e-mails we received from them, if it was something that related to a specific matter involved in the engagement that we were doing, then we would just make sure that it got into the file one way or the other. I might put it in there. A manager might put it in there.
Q. Do you know: When someone in Australia would send a letter to you, do you know whether or not their e-mail, the first two numbers on the e-mail, would be the date as opposed to the month?
In other words, if an e-mail came from Australia and it was sent on August 6th, would that e-mail appear as 06 08 or 08 06?
A. I don't remember.
Q. Now, turn, if you would, to the volume. Take a look at Exhibit 5.
A. Okay.
Q. Have you had an opportunity to review it?
A. I have flipped it, yes.

Q. Did you present this document to Mr. William Myles?
A. No.
Q. Were you present at any meeting at which Mr. Tiroletto presented this document to Mr. Myles?
A. No.
Q. Did you review this document at any point in time prior to March 31, 1999?
A. I don't recall doing that.
Q. Have you seen a signed copy of this document signed by Mr. Tiroletto?
A. Yes.
Q. So you know this document was at some point signed and presumably presented to Mr. Myles, correct?
MR. ELLIOTT: Objection to the form.
THE WITNESS: Do I answer?
MR. ELLIOTT: Yeah, if you understand the question.
THE WITNESS: I understand -- I've seen a signed document.
BY MR. BOYLE:
Q. Signed by Mr. Tiroletto?
A. Yes.
Q. And do you have any understanding as to

whether or not the -- a signed copy was in fact provided to Mr. Myles?
A. I don't know.
Q. You don't know. Okay.
Is it practice to deliver a service plan to a client at the beginning of an engagement?
A. It is practice to discuss the service plan with the client, and sometimes that discussion was followed up in writing. Our practice over the years evolved.
Q. Were you present at any meetings where this service plan was discussed with Mr. Myles?
A. No.
Q. Did Mr. Tiroletto to your knowledge have such a meeting with Mr. Myles to discuss the service plan?
A. I don't know.
Q. When for the first time did you see this document?
A. My recollection was that I saw this for the first time during the preparation for this deposition.
Q. Not in 1999?
A. I don't recall reviewing it in 1999.
Q. Would there be any records that you would

receivable situation with Panexim had not improved between March 31, 1999 and the date that the report was going to be released?

A. I don't recall having a discussion like that with Laura Wheeler.

Q. Now, did you ever have a discussion with anybody within PWC as to what the write off would be in connection with the Panexim receivable if funds were not received?

A. You asked me I think if I ever had a discussion with anyone within PWC?

Q. Yeah.

A. Well, I'm sure Joe and I probably talked about it in the context of the six-month review; and then I know that Joe and I also talked about et in planning for the 2000 audit that we were going to undertake.

Q. As of 9/30/99, did the two of you have a discussion as to whether or not a write off or reserve was appropriate as of 9/30/99?

A. At that point, as I think this indicates, our reporting --

MR. ELLIOTT: "This" is Exhibit 155?

THE WITNESS: Yes. I'm referring to Exhibit 155.

Our reporting was to PWC Australia, and so our intent was to give them the information that we had so that they could discuss it as necessary up the chain and that's what we did. I don't recall Joe and I -- we were not -- I guess what I'm trying to say is that we were not making the determination at that point on the reserve because it was -- what we were doing was for the purpose of PWC Australia's report in Australia. So we tried to give them the information that we had and we told them that it was an issue and one that would have to continue to be monitored and that we would have to address it during the audit.

BY MR. BOYLE:

Q. Now, you described this twice in your answer as a report to PWC Australia.

Why do you say that?

A. Well, this --

Q. Referencing Exhibit 155.

A. Okay. 155 is -- let me back up.

The six-month review that we did at 9/30 of each year was done for the purpose of rendering an inner office report to PWC Australia in support of

their opinion on the consolidated financial statements of Golden West Refining Corporation. So we obtained instructions from them as to what they wanted us to do in the context of a review, and then we did that. In some cases it was specific instruction. In some cases it was general instruction and we applied judgment. And then when we were done doing the things that we did, we reported in an inner office report to PWC Perth, including a summary memorandum which described the key areas of the review and the things that we felt we needed to report to them.

Q. Do you have a recollection that in the summary memorandum prepared as of September 30, 1999 you discussed the need at some point in time to establish either a reserve or to write off the balance of Panexim?

A. I know Panexim was discussed. I think it was discussed fairly consistently with the way it's described here, but I don't recall exactly what we said in that report.

Q. Who prepared the summary report for September 1999?

A. It probably --

MR. ELLIOTT: Don't guess. If you need

to see it, don't guess.

THE WITNESS: Okay. What I was going to say was there's probably a couple versions, a couple of drafts, and the final report would have been prepared I think by Joe with my input.

BY MR. BOYLE:

Q. Take a look at Exhibit 49.

A. Okay.

Q. Can you tell me, first of all, if this is the final version of the summary report?

A. I can't tell you for certain. I think it is.

Q. Is there any way that you can tell me with certainty that this document was forwarded to PWC Australia?

A. Well, I would have expected there to be a step -- a program step that this would have been attached to that would have said whether we forwarded it.

Q. Just help me out.

What's a program step?

A. An audit program step. Sorry. A review program step in the electronic work papers that would have had this as an attachment.

APPEARANCES:

FOR THE PLAINTIFF, ALEC SHARP, et al:

EDWARD J. BOYLE, ESQUIRE
WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER, LLP
150 East 42nd Street
New York, New York 10017
Tel: (212) 490-3000 Fax: (212) 490-3038

FOR THE PLAINTIFF, HANDY & HARMAN REFINING GROUP, INC.:

MICHAEL T. McCORMACK, ESQUIRE
TYLER, COOPER & ALCORN, LLP
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103
Tel: (860) 725-6279 Fax: (860) 278-3802
e-mail: mmccormack@tylercooper.com

FOR THE DEFENDANTS, PRICEWATERHOUSECOOPERS, LLP and COOPERS & LYBRAND, LLP:

WILLIAM H. ERICKSON, ESQUIRE
DAY, BERRY & HOWARD, LLP
CityPlace I
185 Asylum Street
Hartford, CT 06103
Tel: (860) 275-0100 Fax: (860) 275-0343
e-mail: wherickson@dbh.com

ALEXANDER M. CORL, Resumed
DIRECT EXAMINATION, Continued
BY MR. BOYLE:
Q. Mr. Corl, good afternoon. Just to remind you -- I'm sure your attorney has pointed this out to you -- you're still under oath.
First of all, have you had an opportunity -- withdrawn.
Have you reviewed the transcript of your first day of testimony?
A. I did.
Q. Is there anything that you would like to change, modify, or clarify at this point in time based upon that review?
A. I noticed some typographical errors, but they didn't appear to be substantive.
Q. Are there any substantive points that you would like to expand upon in any way?
A. No.
Q. And again, for the record, we have a new reporter. Let me finish the questions even if you can anticipate what it is, and I'll try and let you finish the answer as well. Okay?
A. Okay.
Q. Now, you indicated that Mr. Ingram approached

you about being the replacement partner on the account.
My question to you is whether, aside from the conversation with Mr. Ingram, you made any inquiries within PWC as to whether there was any reason -- was there an exchange as to why Mr. Ingram was coming off the account?
A. Within PWC, George is the one who asked me, and then I recall discussions also with Joe Tiroletto, but there wasn't really anyone else who would have been in a position to give me information on that.
Q. At that time, did you have an understanding of the role of the relationship of the PWC Perth office to the Handy & Harman account?
A. Yeah, I did. As part of the initial discussion, it was explained to me what we were engaged to do.
Q. Did you have an understanding or was someone identified to you as the partner in Perth who was in charge insofar as the Perth relationship with Golden West was concerned?
A. Yes.
Q. Who was identified as that person?
A. Alan Goode.
Q. Did you contact Alan Goode to find out whether there were any problems, from his perception,

in connection with Mr. Ingram's performance on the account?
A. I can't recall. I know Alan and I exchanged a number of e-mails as I was coming on board, but I don't recall a specific exchange on that topic.
Q. Did anybody ever indicate to you that the client had requested that Mr. Ingram be replaced as the partner in charge of the account?
A. Yeah, I think Joe told me that.
Q. Joe Tiroletto?
A. I think so, yeah.
Q. When?
A. As I was coming on board.
Q. Did you make any inquiries of anyone to determine what it was about Mr. Ingram's performance that caused the client to want him to be removed from the account?
MR. ERICKSON: Object to the form.
Answer the question if you can.
A. I talked with Joe about it.
Q. What did Joe tell you?
A. Joe told me that there was, as I explained earlier, there was some tension that was created, because in the prior two audits there were substantial difficulties, and that the timing associated with those

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430

was -- it took longer than had been hoped or had been initially planned, and there was some dissatisfaction as a result of that.

Q. When you say tension, can you identify the parties that were involved in this tension?

A. I really can't. I don't remember.

Q. Well, did you have an understanding that the tension was between Golden West and the audit team?

A. Yeah, I think it was driven from Golden West, yes.

Q. And so when you came on board, you had a knowledge of the existence of Golden West, is that correct?

A. As I transitioned on, yeah.

Q. And what was your knowledge of Golden West?

A. I knew that they were the owner of Handy & Harman Refining Group.

Q. Did you contact anyone at Golden West to find out what was causing this tension between them and Mr. Ingram?

A. I don't recall who initiated the contact, but at some point fairly early on, I think I was contacted by Richard Hayes, who, at that time, I think, was the relatively new Chief Financial Officer. He was new on board. I was new on board, and that's the initial

contact I recall.

Q. Was that a telephonic communication?

A. No. My recollection is that it was a meeting that was held around whose primary purpose or the primary purpose of which was to discuss hedging-related activities, and Richard was involved in that, so he was over here for that meeting, and my recollection is that either before or after that meeting, he and Joe and I spent a little time together and talked about my transition onto the account.

Q. Did you participate in the hedging-related activities discussion that related to Handy & Harman?

A. Yes.

Q. Did you participate in the meeting that discussed the hedging-related activities?

A. My recollection is that it was a lunch meeting, a working lunch meeting, and I don't recall whether it just started with lunch or not. I don't know that I was there for the whole meeting, but I was there for some portion of that meeting.

Q. Do you recall -- who do you recall participating in the meeting?

A. I recall Joe being there. I recall Richard Hayes being there. I recall Greg Kozak, who was a Coopers & Lybrand partner specializing in hedging

transactions, was there, and I recall another Coopers & Lybrand partner named Bob Bhave.

Q. Could you spell that?

A. I think it's -- Bob is short for a long Indian name, so I can't spell the first one, but Bhave is B H A V E.

Q. And is he another hedging specialist?

A. Yes, and there may have been somebody else there. Oh, John King was there, I think. That's what I remember.

Q. This is the first time you met John King as well, is that correct?

A. I'm not sure about that. I may have met John before. I don't know.

Q. At the time can you approximate this meeting for me, sometime in late 1998?

A. Yeah. I would say -- yeah, late fall, early winter is my best estimate.

Q. Now, do you have a recollection of having met Mr. King prior to that meeting?

A. I think I did. I can't place a date for it, but I think I did.

Q. Can you tell me the circumstances -- first of all, was it a casual meeting or a business meeting?

A. I believe that Joe and I went out to the

company and met Barry Wayne, John King. I think I also met Bill Myles at that time.

Q. Was that during the same time frame as this Hedging meeting?

A. Yes, same general time frame. I think it was before.

Q. And what was your understanding of Mr. King's position?

A. I guess the understanding that I obtained from Joe was that -- Joe Tiroletto -- was that John was the Treasurer who dealt primarily with the banking related matters, but was also somewhat of a de facto CFO since the company didn't have an official CFO.

Q. Now, in the meeting that you had with Mr. Hayes after the hedging activities were discussed, was there any discussion regarding the operations of Handy & Harman?

A. I don't recall specific discussion. I don't think we got in a lot of depth. I remember most of the discussion being around the hedging-related issues, and Richard Hayes making the point that the hedging program that they were working on was important to their business, and they needed to come up with something that was going to comply with what was then to be the new accounting standard governing those kinds of

was -- it took longer than had been hoped or had been initially planned, and there was some dissatisfaction as a result of that.

Q. When you say tension, can you identify the parties that were involved in this tension?

A. I really can't. I don't remember.

Q. Well, did you have an understanding that the tension was between Golden West and the audit team?

A. Yeah, I think it was driven from Golden West, yes.

Q. And so when you came on board, you had a knowledge of the existence of Golden West, is that correct?

A. As I transitioned on, yeah.

Q. And what was your knowledge of Golden West?

A. I knew that they were the owner of Handy & Harman Refining Group.

Q. Did you contact anyone at Golden West to find out what was causing this tension between them and Mr. Ingram?

A. I don't recall who initiated the contact, but at some point fairly early on, I think I was contacted by Richard Hayes, who, at that time, I think, was the relatively new Chief Financial Officer. He was new on board. I was new on board, and that's the initial

contact I recall.

Q. Was that a telephonic communication?

A. No. My recollection is that it was a meeting that was held around whose primary purpose or the primary purpose of which was to discuss hedging-related activities, and Richard was involved in that, so he was over here for that meeting, and my recollection is that either before or after that meeting, he and Joe and I spent a little time together and talked about my transition onto the account.

Q. Did you participate in the hedging-related activities discussion that related to Handy & Harman?

A. Yes.

Q. Did you participate in the meeting that discussed the hedging-related activities?

A. My recollection is that it was a lunch meeting, a working lunch meeting, and I don't recall whether it just started with lunch or not. I don't know that I was there for the whole meeting, but I was there for some portion of that meeting.

Q. Do you recall -- who do you recall participating in the meeting?

A. I recall Joe being there. I recall Richard Hayes being there. I recall Greg Kozak, who was a Coopers & Lybrand partner specializing in hedging

transactions, was there, and I recall another Coopers & Lybrand partner named Bob Bhave.

Q. Could you spell that?

A. I think it's -- Bob is short for a long Indian name, so I can't spell the first one, but Bhave is B H A V E.

Q. And is he another hedging specialist?

A. Yes, and there may have been somebody else there. Oh, John King was there, I think. That's what I remember.

Q. This is the first time you met John King as well, is that correct?

A. I'm not sure about that. I may have met John before. I don't know.

Q. At the time can you approximate this meeting for me, sometime in late 1998?

A. Yeah. I would say -- yeah, late fall, early winter is my best estimate.

Q. Now, do you have a recollection of having met Mr. King prior to that meeting?

A. I think I did. I can't place a date for it, but I think I did.

Q. Can you tell me the circumstances -- first of all, was it a casual meeting or a business meeting?

A. I believe that Joe and I went out to the

company and met Barry Wayne, John King. I think I also met Bill Myles at that time.

Q. Was that during the same time frame as this Hedging meeting?

A. Yes, same general time frame. I think it was before.

Q. And what was your understanding of Mr. King's position?

A. I guess the understanding that I obtained from Joe was that -- Joe Tiroletto -- was that John was the Treasurer who dealt primarily with the banking related matters, but was also somewhat of a de facto CFO since the company didn't have an official CFO.

Q. Now, in the meeting that you had with Mr. Hayes after the hedging activities were discussed, was there any discussion regarding the operations of Handy & Harman?

A. I don't recall specific discussion. I don't think we got in a lot of depth. I remember most of the discussion being around the hedging-related issues, and Richard Hayes making the point that the hedging program that they were working on was important to their business, and they needed to come up with something that was going to comply with what was then to be the new accounting standard governing those kinds of