```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF CONNECTICUT
 2
 3   - - - - - - - - - - - - - - - -x
     GOLDEN WEST REFINING CORPORATION  :
 4            Plaintiff                :
          v.                           :
                                       : CIVIL ACTION NO.
 5                                     : 3:02CV 1379(MRK)
     PRICEWATERHOUSECOOPERS, LLP and   :
 6   COOPERS & LYBRAND, LLP            :
              Defendants.              :
 7   - - - - - - - - - - - - - - - -x
     ALEC SHARP, et al.                :
 8            Plaintiffs               :
          v.                           :
                                       : CIVIL ACTION NO.
 9                                     : 3:02CV 1572(MRK)
     PRICEWATERHOUSECOOPERS, LLP d/b/a :
10   PRICE WATERHOUSE, LLP             :
              Defendant                :
11   - - - - - - - - - - - - - - - -x
     HANDY & HARMAN REFINING GROUP,    :
12   INC.,                             :
              Plaintiff                :
13        v.                           :
                                       : CIVIL ACTION NO.
                                       : 3:02CV 1803(MRK)
14   PRICEWATERHOUSECOOPERS, LLP       :
              Defendants.              :
15   - - - - - - - - - - - - - - - -x
16
17
18       Deposition of GEORGE A. INGRAM, taken
     pursuant to the Federal Rules of Civil Procedure,
19   before Melissa J. Kelly, RMR, CRR, Licensed
     Shorthand Reporter #00307, and Notary Public within
20   and for the State of Connecticut, held at the
     offices of Tyler, Cooper & Alcorn, LLP, 185 Asylum
21   Street, CityPlace, 35th Floor, Hartford,
     Connecticut, on February 18, 2005, at 10:00 a.m.
22
23
24
25
```

Page 202

```
 1      the collectibility of foreign accounts
 2      receivable.
 3          MR. ELLIOTT: You're suggesting that
 4      that continued as a critical matter in the
 5      work papers?
 6          MR. CHAMPLIN: Yes.
 7          THE WITNESS: '97, and I think it
 8      was '98.
 9  BY MR. CHAMPLIN:
10   Q.  Well, this is '98 we're looking at.
11      You knew it was in the service plan in '98,
12  correct?
13   A.  I'm not sure -- it was there in '97. This
14  said that '98 would include it. But the way the
15  prior year items automatic -- or as a matter of
16  policy get included is that the first critical
17  matter in -- let's say in 1998, is entitled
18  "Disposition of prior year critical matters."
19      So there's not a reexamination or a
20  readdressing automatically. There's just a
21  determination as to whether or not the matter is
22  still applicable or not applicable.
23   Q.  And in '99, the matter of the
24  collectibility of foreign accounts receivable was
25  still considered a critical matter?
```

Page 203

```
 1   A.  I don't recall.
 2   Q.  If you'll look at Exhibit 5.
 3   A.  This was a service plan so it was planned
 4  to be a critical matter.
 5   Q.  Right. And if you look at page 0062 of
 6  Exhibit 5, it was still on the critical matters
 7  list, correct?
 8   A.  Yes, because it had been in the prior year.
 9   Q.  Right. And in this instance, you continued
10  the reference to assuring that advances to third
11  world countries are not made unless material is in
12  the possession of Handy & Harman, correct?
13   A.  I'm trying to find it on here. I'm sorry.
14   Q.  It's the third one from the bottom on page
15  0062.
16   A.  Yes, correct.
17   Q.  And in this particular instance, the status
18  of this item as of the service plan in '99 was in
19  process, correct?
20   A.  Yes.
21   Q.  What does that mean?
22   A.  It means that when -- at the outset of the
23  engagement when this plan was put together, there
24  was no completion of the audit plan, or it's we've
25  identified the matter, we have a plan to deal with
```

Page 204

```
 1  the matter but we haven't executed the plan yet.
 2   Q.  Why hadn't you executed the plan yet in
 3  1999?
 4   A.  Because we hadn't started the field work.
 5   Q.  One last couple of questions.
 6      Did you feel pressured by the Australian
 7  C&L to get this audit done more quickly than in
 8  1998 and 1999?
 9          MR. ELLIOTT: You're referring to the
10      1997 audit?
11          MR. CHAMPLIN: No. 1998 and 1999.
12          MR. ELLIOTT: I just lost your
13      question.
14  BY MR. CHAMPLIN:
15   Q.  Did you feel pressured in 1998 and 1999 by
16  the Australians to get this audit done faster?
17          MR. ELLIOTT: He wasn't an engagement
18      partner in 1999.
19          MR. CHAMPLIN: He was a concurring
20      partner, so he might have felt the pressure
21      while he was sitting there waiting to concur.
22          THE WITNESS: The pressure was not to
23      get our audit report out the door but rather
24      to sign off on the reporting package that
25      HHRG would send to Golden West for inclusion
```

Page 205

```
 1      of their numbers in the Australian financial
 2      statements --
 3  BY MR. CHAMPLIN:
 4   Q.  Right. But you couldn't do --
 5   A.  -- because of the statutory deadlines.
 6   Q.  You couldn't do that unless you had
 7  finished your audit, correct?
 8   A.  No, that's not correct. In fact, each
 9  year -- and when I say "each year," I'm referring
10  to 1997 and 1998, but in each of those years we
11  signed off on the reporting package and provided
12  them with a -- I shouldn't say signed off -- we
13  sent a status report of items that were still open
14  but let them know what was complete as far as the
15  reporting package was concerned.
16   Q.  If you look at the '99 plan, Exhibit 5.
17   A.  Yes.
18   Q.  And look at the page 6, which is 0059.
19   A.  Got it.
20   Q.  One of the needs and expectations, in fact,
21  the first one was meet and prescribe deadlines
22  indicated by PWC per Golden West and financial
23  institutions.
24   A.  Right.
25   Q.  And my question again is: With respect to
```

52 (Pages 202 to 205)