# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP, | : | |
| | : | |
| Defendants. | : | |
| | | |
| ALEC SHARP, et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1572 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP, | : | |
| | : | |
| Defendant. | : | |
| | | |
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1803 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS LLP, | : | |
| Defendant. | : | September 2, 2005 |

## DEFENDANT PRICEWATERHOUSECOOPERS LLP'S LOCAL RULE 56(a)2 STATEMENT

Pursuant to Rule 56(a)2 of the Local Civil Rules of the United States District Court for the District of Connecticut, Defendant PricewaterhouseCoopers LLP ("PwC") respectfully submits this statement in response to the Local Rule 56(a)1 Statement filed by Plaintiffs Alex Sharp, et al. ("Underwriters") in support of their motion for summary judgment:

## RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS

1.      PricewaterhouseCoopers, LLP ("PwC") performed a due diligence investigation

for Golden West Refining Corporation ("GWRC") in conjunction with the purchase of the

Precious Metals Refining Division of Handy & Harman, the predecessor to GWRC's wholly-

owned subsidiary, Handy & Harman Refining Group, Inc. ("HHRG").  Transcript of the

deposition of George Ingram taken February 18, 2005, p. 9, (Pl. Ex.. 7).

**RESPONSE:**      Denied.  At the request of Rothschild Australia Limited, PwC performed
                   specific procedures to assist in the evaluation of the proposed acquisition of
                   the Precious Metals Refining  Division.  (Pl. Ex. 1 submitted with
                   Underwriters' Rule 56(a)(1) Statement.)[1]

2.      The due diligence report was prepared by PwC on or about May 1, 1996, and

provided to GWRC. Pl. Ex. 7, p. 9.

**RESPONSE:**      Denied in part.  The due diligence report was provided to Rothschild Australia
                   Limited.  (Pl. Ex 1.)

3.      The due diligence report issued by PwC states as follows:

> Based upon our previous experience with overseas activities, we believe that
> there is [sic] serious risks associated with the Company's budgeted earnings
> and credit exposure with South American businesses in Venezuela, Chile,
> Uruguay and Bolivia.  Management has stated that cash will not be given to
> its customers in these countries until an armored car company has verified that
> deposit of the customer's metals into designated vaults, as opposed to
> extending advances and obtaining security insurance, bonds as was the
> previous practice.

(Pl. Ex. 1.)

---

[1] Exhibits submitted with Underwriters motion and Rule 56(A)(1) Statement are referred
to as "Pl. Ex. __."  Exhibits submitted with PwC's Local Rule 56(a)(2) Statement are referred
to as "Def. Ex. __."

**RESPONSE:**     Denied.  Underwriters' has misquoted, although slightly, the language contained in the due diligence report.  PwC admits that at page I.9, the due diligence report states:

Based upon our previous experience with overseas activities, we believe that there is [sic] serious risks associated with the Company's budgeted earnings and credit exposure with South American business in Venezuela, Chile, Uruguay and Bolivia.  Management has stated that cash will not be given to its customers in these countries until an outside armored car company has verified the deposit of a customer's metal to designated vaults, as opposed to extending advances and obtaining security insurance bonds as was the previous practice.  (Pl. Ex. 2.)

4.     Roberto Passaro is the President of Panexim.  Affidavit of Roberto Passaro, para. 1.  (Pl. Ex. 14.)

**RESPONSE:**     Admitted.[2]

5.     Panexim was formed in 1996 for the purpose of exporting value added precious metals to HHRG.  (Pl. Ex. 14, para. 2.)

**RESPONSE:**     Admitted.

6.     The purpose of Panexim's business dealings with HHRG was to take advantage of a Peruvian government export incentive program.  (Pl. Ex. 14, para. 2.)

**RESPONSE:**     Admitted.

7.     Throughout the business relationship with Panexim and HHRG, from 1996-1999, the Peruvian government levied a value-added tax ("VAT") of 18% on all domestic purchases of precious metals.  (Pl. Ex. 14, para. 3.)

**RESPONSE:**      Admitted.

8.      However, an exporter of precious metals was entitled to a rebate of the VAT payment upon export of those metals out of Peru.  (Pl. Ex. 14, para. 3.)

**RESPONSE:**      Admitted.

9.      Until November 1998, those rebates were routinely granted by the Peruvian government.  (Pl. Ex.14, para. 3.)

**RESPONSE:**      Admitted.

10.      PwC's initial engagement to audit HHRG's financial statements was for the period ending March 31, 1997 (the "1997 Audit").  (Pl. Ex.  7, p. 6.)

**RESPONSE:**      Admitted.

11.      Joseph Tiroletto was the audit manager on the HHRG account in the 1997 Audit. (Pl. Ex. 7, p. 12.)

**RESPONSE:**      Admitted.

12.      George Ingram was the engagement partner on the HHRG account for the 1997 Audit.  (Pl. Ex. 7, p. 6.)

**RESPONSE:**      Admitted.

---

[2] PwC's admissions are solely for purposes of responding to Underwriters' motion for summary judgment.  PwC reserves the right to challenge these assertions at trial and to object to the admission of the evidence relied upon by Underwriters.

13.    In conjunction with their preparation of the 1997 Audit, the PwC audit team reviewed the due diligence report that was prepared by PwC prior to GWRC's purchase of the assets that formed HHRG.  Transcript of the deposition of Joseph Tiroletto taken on March 15, 2005 (Pl. Ex. 8), pp. 35-6.  (Pl. Ex. 7, p. 10.)

**RESPONSE:**    Denied.  The cited testimony does not support the assertion that the "PwC audit team" reviewed the due diligence report prior to March 1997.  PwC admits that Mr. Tiroletto reviewed the due diligence report prior to March 1997.  (Pl. Ex. 8 at 35-36.)

14.    Part of the audit plan for the 1997 Audit was a document which referred to "Critical Matter # 5".  (Pl. Ex.. 2; Pl. Ex. 7, pp. 13-15.)

**RESPONSE:**    Denied.  The document referred to as "Critical Matter # 5" (Pl. Ex. 2) is an internal PwC working paper and not part of any audit "plan" for the audit of HHRG's financial statements for year-end March 31, 1997.  (Affidavit of Alex Corl (the "Corl Aff.") at ¶ 3, submitted as Def. Ex. 1.)

15.    Critical Matter # 5 states that "as several of the accounts receivable at 3/31/97 represent balances owed from advances to third world countries in South America, [PwC] will ensure that there are no collectibility issues with regards to such accounts."  (Pl. Ex 2; Pl. Ex. 8, p. 60.)

**RESPONSE:**    Admitted.

16.    PwC understood Critical Matter # 5, which was prepared in April 1997, to mean that PwC would adopt audit procedures sufficient to assure itself that collectibility from South America would not be an issue.  (Pl. Ex. 7, p. 16.)

**RESPONSE:**    Denied.  PwC, in connection with Critical Matter # 5, adopted audit procedures to address collectibility of accounts receivable, including

collectibility of accounts receivable owing from customers located in South America.  (Transcripts of deposition testimony of George Ingram ("Ingram Tr.") at 15-16 (Pl. Ex. 7); transcript of deposition testimony of Joseph Tiroletto given on May 5, 2005 ("May Tiroletto Tr.") the cited portions of which are submitted as Def. Ex. 2, at  238-240.)  (The March Tiroletto Tr. was provided as Pl. Ex. 8.))

17.    PwC identified and prepared Critical Matter # 5 between August 1996 and December 1996, in connection with the 1997 Audit.  (Pl. Ex 8, p. 49.)

**RESPONSE:**    Denied.  (Pl. Ex. 7 (Ingram Tr.) at 14-15.)

18.    The critical matter relating to the collectibility of foreign accounts receivable was identified in the 1997 Audit.  (Pl. Ex. 7, p. 169.)

**RESPONSE:**    Admitted.

19.    For PwC, a critical matter is a term that brings to the forefront for the audit team matters that must be resolved to the satisfaction of the PwC partner before PwC will issue a report.  (Pl. Ex. 8, p. 48.)

**RESPONSE:**    Admitted.

20.    It was the understanding of the PwC audit team that HHRG would advance money to customers in countries outside of the United States only as long as HHRG was sure that it had precious metals securing those advances in its possession.  (Pl. Ex. 8, p. 44.)

**RESPONSE:**    Denied.  Consistent with the language set forth in Critical Matter # 5, Mr. Tiroletto testified that it was his understanding that Handy & Harman, the company from which GWRC purchased the Precious Metals Refining Division, would advance money to customers in countries other than the United States so long as it was sure it "had the metals in their possession," and that this would be HHRG's policy on a going-forward basis.  (Pl. Ex. 8 (March Tiroletto Tr.) at 48.)  Moreover, the only contemporaneous document

-6-

memorializing PwC's understanding of HHRG's policy regarding advances is Critical Matter # 5, which states that advances to third world countries "ARE NOT MADE unless the material to be assayed is in the possession of or in transit to Handy & Harman" (emphasis in original).  This document makes no mention of "securing" each and every advance by metal of a value equal to or greater than the advance.  (Pl. Ex. 2 (Critical Matter # 5).)

21.     PwC understood that if HHRG made unsecured advances that this would be a violation of HHRG's operating policy.  (Pl. Ex. 7, p. 130.)

**RESPONSE:**     Denied.  PwC had no knowledge of whether "unsecured" advances would violate HHRG's unwritten policy regarding advances, given PwC's understanding of HHRG's policy as discussed in response to paragraph 20.

22.     PwC was aware that unsecured advances were therefore not supposed to be made at all.  (Pl. Ex 7, pp. 130-1.)

**RESPONSE:**     Denied.  PwC had no knowledge of whether "unsecured" advances were or were not supposed to be made, given PwC's understanding of HHRG's policy regarding advances, as discussed in response to paragraph 20.

23.     PwC did not take any steps during the 1997 Audit to ascertain how much of HHRG's accounts receivable was due from companies in South America.  (Pl. Ex. 8, p. 61.)

**RESPONSE:**     Admitted.  PwC did, however, perform various procedures to test the existence and collectibility of such accounts receivables.  (Pl. Ex. 8 (March Tiroletto Tr.) at 61.)  Such procedures included sending and receiving confirmation letters and performing certain analytical procedures. (PwC work papers PwC 97 WP 0343 and 0344 and PwC 97 EW 0241-0244, collectively submitted as Def. Ex. 3.)

24.     During the 1997 Audit, PwC was aware that HHRG had unsecured advances to Panexim, Darwill, Ladison and Orion, all South American companies, which totaled more than $600,000.  (Pl. Ex. 7, pp. 71-3, 131.)

**RESPONSE:**    Denied.  (PwC's June 10, 2005 Supplemental Responses to Underwriters' First Set of Interrogatories (the "Supplemental Interrogatory Responses") submitted herewith as Def. Ex. 4, response to interrogatory 5; transcript of deposition testimony of William Myles, former controller of HHRG ("Myles Tr.") the cited portions of which are submitted herewith as Def. Ex. 5, at 76-104 (discussing the "price-not-booked" schedules and the fact that the negative numbers on them do NOT represent situations where HHRG has advanced money to a particular customer greater in value than the value of precious metals in HHRG's possession).)

25.    PwC admits that the policy of not making advances to third world countries unless the metal was in the possession of or in transit to HHRG was not being adhered to in 1997.  (Pl. Ex. 7, p. 177.)

**RESPONSE:**    Denied.  (Def. Ex. 5 (Myles Tr.) at 76-104.)

26.    PwC did nothing to confirm the existence of precious metal in 1997 that was scheduled to be delivered to HHRG from Panexim (or any of the other South American companies) despite the fact that the collectibility of these receivables was premised in part on the existence of such metal.  (Pl. Ex. 8, pp. 64-5.)

**RESPONSE:**    Admitted.  PwC did perform audit procedures, however, with respect to the Panexim and other receivables.  HHRG's internal records, which PwC relied upon in connection with its audit work, indicate that all such receivables outstanding as of March 31, 1997 were fully collected.  (The 1999 aged accounts receivable detail report submitted as Def. Ex.6, at PwC 99 WP 01193-94.)

27.    PwC found out while performing the 1997 Audit that the policy of always having possession of metal equal to any advance was not being adhered to and it did not tell anyone on the HHRG board of directors or the audit committee of GWRC.  (Pl. Ex. 7, pp. 197-8.)

**RESPONSE:**      Denied.  (Def. Ex. 4 (Supplemental Interrogatory Responses), response to interrogatory 5; Pl. Ex. 2 (Critical Matter # 5) (which sets forth PwC's understanding of HHRG's unwritten policy).)

28.    PwC did nothing to advise the board of directors of HHRG that unsecured advances were being made in violation of their policy in 1997.  (Pl. Ex. 7, pp. 179-80.)

**RESPONSE:**      PwC objects to this statement because it assumes a disputed fact, namely, that unsecured advances were being made in violation of HHRG policy.  (Def. Ex. 4 (Supplemental Interrogatory Responses), response to interrogatory 5; Pl. Ex. 2 (Critical Matter # 5) (which accurately sets forth PwC's understanding of HHRG's unwritten policy).)

29.    Beginning in mid-1997 and continuing into early 1999, HHRG began to finance Panexim's monthly VAT obligations.  (Pl. Ex. 14, para. 4.)

**RESPONSE:**      Admitted in part.  It appears that HHRG made advances to Panexim that facilitated payment of VAT obligations, but Panexim also had other sources of funds including a line of credit at Banco de Lima.  (Report of the forensic firm Dempsey Myers & Co. (the "Dempsey Report"), authored by John Dempsey, at 9.)  (Cited portions of the Dempsey Report are submitted herewith as Def. Ex. 7.)

30.    HHRG did so ostensibly because Panexim had insufficient assets to finance the VAT obligations itself.  (Pl. Ex. 14, para. 4.)

**RESPONSE:**      Denied.  The cited affidavit lacks foundation to establish the mindset of any HHRG personnel.

31.    Panexim was entitled to a rebate of the VAT payments upon export of the precious metals to HHRG.  (Pl. Ex. 14, para. 3.)

**RESPONSE:**      Admitted.

32.     Pursuant to the financing arrangement, HHRG would advance money to Panexim, Panexim would pay the money to the Peruvian government, then Panexim would repay the advance to HHRG in cash or precious metals of equivalent value once the Peruvian government paid Panexim the rebate.  (Pl. Ex. 14, para. 4.)

**RESPONSE:**     Admitted in part.  The cited affidavit supports only the assertion that, "prior to November 1998, upon Panexim's receipt of the VAT rebate, Panexim would repay HHRG  for the advance either in cash or in precious metals of an equal value to the amount over-advanced."

33.     The critical matter relating to the collectibility of foreign accounts receivable was also identified in PwC's audit of HHRG for the fiscal year ending March 31, 1998 (the "1998 Audit").  (Pl. Ex. 7, p. 169.)

**RESPONSE:**     Admitted.

34.     The 1998 client service plan ("1998 Service Plan") included a critical matter concerning the collectibility of foreign accounts receivable.  (Pl. Ex. 3, p. 5; Pl. Ex. 7, p. 167.)

**RESPONSE:**     Denied.  This statement mischaracterizes the language in the 1998 Service Plan.  (Pl. Ex. 3.)

35.     PwC's audit plan for this "critical matter", as identified in the 1998 Service Plan, was to "assure advances to third world countries are not made unless material is in the possession of Handy & Harman."  (Pl. Ex. 3, p. 5.)

**RESPONSE:**     Denied.  By its very terms the Service Plan does not set forth the "audit plan" which is documented in the entire set of PwC work papers for that audit.  (Pl. Ex. 3.)

36.     It was the intent of PwC to use the terms "third world countries" and "South American countries" interchangeably.  (Pl. Ex. 7, p. 172.)

**RESPONSE:**    Denied.  The cited deposition testimony refers to a 1997 audit work paper, which references "balances owed from advances to third world countries in South America."

37.    According to the 1998 Service Plan, this matter was "highlighted as requiring particular attention during the course of the audit."  (Pl. Ex. 3, p. 5.)

**RESPONSE:**    PwC can neither admit nor deny this "fact" because the "matter" to which this "fact" relates is not identified in this paragraph.

38.    According to the 1998 Service Plan, PwC's "audit scope and procedures" were "tailored to address" the critical matters listed therein, including the collectibility of foreign accounts receivable.  (Pl. Ex. 3, p. 5.)

**RESPONSE:**    Admitted.

39.    As part of the 1998 Service Plan, PwC promised that it would make certain that HHRG would not make unsecured advances of money to businesses located in third world countries, such as those in South America.  (Pl. Ex. 3, p. 5; Pl. Ex. 7, pp. 179-80.)

**RESPONSE:**    Denied.  This statement is a legal conclusion and therefore not properly part of Underwriters' Rule 56(a)(1) Statement.  The 1998 Service Plan does not contain the language stated in this paragraph.  In any event, this allegation is not supported by testimony of the PwC audit team.  *E.g.,* Pl. Ex. 8 (March Tiroletto Tr., at 132-133.)

40.    Joseph Tiroletto was the audit manager for the 1998 Audit.  (Pl. Ex. 7, p. 12.)

**RESPONSE:**    Admitted.

41.    George Ingram was the engagement partner at the inception of the 1998 Audit. (Pl. Ex. 7, p. 6.)

**RESPONSE:**        Admitted.

42.     PwC had a requirement that the terms of its client service plans had to be discussed with its clients.  (Pl. Ex. 8, p. 127.)

**RESPONSE:**        Admitted.

43.     PwC is supposed to communicate in writing to the client elements of the client service plan.  (Pl. Ex. 7, p. 157.)

**RESPONSE:**        Admitted.

44.     PwC delivered its 1998 Service Plan to HHRG.  Pl. Ex. 16 (PwC's Answer to GWRC Request to Admit No. 1)

**RESPONSE:**        Admitted.

45.     Tiroletto discussed with HHRG collectibility of receivables, including foreign receivables, as part of the 1998 Service Plan.  (Pl. Ex. 8, p. 131.)

**RESPONSE:**        Admitted.

46.     The cover letter to the 1998 Service Plan, dated March 24, 1998, and directed to William Myles, Controller of HHRG, from Joe Tiroletto, states:

> We enjoyed our recent meetings with you and others, and appreciate the opportunity to discuss Handy & Harman's business issues and your expectations of [PwC] as your independent auditors and business advisors.  As part of our audit planning process we prepare a service plan which includes a summary of the expectations you and others within your organization have of [PwC], key issues related to the audit, timetable and other matters to ensure our [PwC] service team members understand your needs and exceed your expectations.  This service plan will be updated periodically to track our progress on meeting your expectations and document any new needs and expectations

that arise. *This service plan will become the baseline against which you will be able to measure our performance.* We will have frequent communication with you regarding our service plan. This copy is for your review.

((Pl. Ex. 3) (emphasis added).)

**RESPONSE:**       Admitted.


47.     The 1998 Service Plan was shown to HHRG during a meeting in which the plan was discussed. (Pl. Ex. 8, p. 130.)

**RESPONSE:**       Admitted. The cited testimony indicates that the plan was shown only to William Myles.


48.     The 1998 Service Plan was discussed with the PwC audit teams during organizational meetings as part of the planning process for the 1998 Audit. (Pl. Ex. 8, p. 143.)

**RESPONSE:**       Admitted.


49.     A letter of arrangement dated March 30, 1998 was signed by Ingram and directed to Mr. Myles, the controller of HHRG (the "1998 Engagement Letter"). (Pl. Ex. 7, p. 198.)

**RESPONSE:**       Admitted.


50.     The 1998 Service Plan was referenced in the 1998 Engagement Letter. (Pl. Ex. 4.)

**RESPONSE:**       Admitted.


51.     The 1998 Engagement Letter is a contract between HHRG and PwC. (Pl. Ex. 4.)

**RESPONSE:**       Admitted.

52.     In the section referred to as "Your Expectations," PwC wrote the following to HHRG:

> As part of our planning process, we have met with you to discuss your expectations of [PwC], your concerns about your business, changes in your business and industry, your views on risks facing you, any relationship issues with [PwC], and specific engagements and timing.  Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality focused approach to accomplish the engagement objectives and meet, and/or exceed, your expectations.  ***Our service plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance.***

((Pl. Ex. 4.)  (emphasis added).)

**RESPONSE:**     Admitted.

53.     By its own terms, the 1998 Engagement Letter sets forth the nature and scope of PwC's obligations as well as the fees that will be paid by HHRG.  (Pl. Ex. 4, p. 1.)

**RESPONSE:**     Admitted.

54.     The 1998 Engagement Letter sets forth the promises of HHRG regarding its own representations, a promise of indemnity, and the payment of an audit fee.  *Id.*

**RESPONSE:**     Admitted.

55.     On the last page of the 1998 Engagement Letter, the PwC engagement partner, George Ingram, is identified as the PwC offeror of the promises in this contract, and acceptance is indicated by the signature of the HHRG controller, William Myles.  *Id.*

**RESPONSE:**     Admitted.

56.     Appearing on one of the PwC work papers for the 1998 Audit is a note in the writing of Raj Dansinghani, a member of the PwC audit team, which states, "per discussion with

-14-

Luis Posada, HHRG includes in Panexim advances an amount for a value-added tax that Panexim has to pay.  Once Panexim pays this, Panexim reimburses HHRG the amount that was over advanced."  Transcript of the deposition of Raj Dansinghani taken on February 23, 2005 (Pl. Ex. 9, pp. 37-8; Pl. Ex. 8, p. 138.)

**RESPONSE:**         Admitted.

57.    PwC noted a similar situation involving Orion and received a confirmation from Orion for the entire amount of the monies advanced to it for the VAT.  (Pl. Ex. 9, 39.)

**RESPONSE:**         Admitted.

58.    PwC was aware that, in or about April of 1998, as a result of a discussion with Luis Posada, HHRG was including in its Panexim advances an unsecured amount to finance Panexim's VAT liability.  (Pl. Ex. 8, p. 200.)

**RESPONSE:**         Denied.  The cited testimony does not support this statement.  PwC admits that in April 1998, PwC became aware that HHRG had made advances to Panexim for VAT, and that the amount of the advances were less than the estimated value of the material in HHRG's possession.  (Pl. Ex. 9 (Deposition Transcript of Raj Dansinghani, dated February 23, 2005 ("February Dansighani Tr.")) at 131-133.)

59.    PwC was aware that the money being advanced to Panexim for purposes of the VAT was coming from HHRG's bank accounts.  (Pl. Ex. 8, p. 166.)

**RESPONSE:**         Admitted.

60.    PwC could not identify what portion of the advances to Panexim were used for purposes of the VAT, versus for the purchase of precious metals.  (Pl. Ex. 8, p. 146; Transcript of

the deposition of Dansinghani taken on March 29, 2005 ("March Dansinghani Tr.") (Pl. Ex. 10),

p. 350.))

**RESPONSE:**      Admitted.

61.    PwC never saw any documentation from HHRG which recorded the amounts of

the VAT advances made to Panexim, nor did PwC inquire whether any such documentation

existed.  (Pl. Ex. 8, pp. 148, 151.)

**RESPONSE:**      Admitted.

62.    Despite being made aware of these advances during the 1998 Audit, PwC did not

consider it relevant to determine whether or not Panexim had reimbursed HHRG for the VAT

advances during its mid-year review in September 1998.  (Pl. Ex. 8, p. 150.)

**RESPONSE:**      Admitted.  PwC did consider it relevant, however, to determine whether the
                   advances in total (as opposed to any VAT component) had been reimbursed.
                   (*Id*.)

63.    During the 1998 Audit, PwC knew that HHRG had unsecured advances to

Panexim, Orion and Darwill, three South American entities, which totaled more than $2.8

million.  (Pl. Ex. 7, pp. 100-1.)

**RESPONSE:**      Denied.  PwC had no knowledge of any unsecured advances made by HHRG
                   to any of HHRG's customers during 1998 audit and the documentation
                   reviewed by PwC does not reveal any such unsecured advances.  (Pl. Ex. 9
                   (February Dansinghani Tr.) at 131-33; Def. Ex. 5 (Myles Tr.) at 99-100.)

64.    PwC was, in fact, tracking the increase in unsecured advances over the period

between the 1997 Audit and the 1998 Audit.  (Pl. Ex. 7, p. 101.)

-16-

**RESPONSE:**     PwC objects to this statement because it is unclear what plaintiffs mean by the phrase "tracking the increase in unsecured advances."  The cited testimony does not support the statement.

65.     PwC admits that it was aware that the HHRG policy against the provision of unsecured advances to South American countries was being breached by a more significant amount as of March 31, 1998.  (Pl. Ex. 7, pp. 131-2.)

**RESPONSE:**     Denied.  PwC had no knowledge of any "unsecured" advances made by HHRG to any of HHRG's customers during 1998 audit and the documentation reviewed by PwC does not reveal any such unsecured advances nor have plaintiffs documented the alleged policy that was violated.  (Pl. Ex. 9 (February Dansinghani Tr., at 131-33; Def. Ex. 5 (Myles Tr.) at 99-100.)

66.     PwC never told anyone on the Board of Directors of HHRG in 1998 that unsecured advances were being made to pay customers' VAT liability in South America.  (Pl. Ex. 7, p. 189.)

**RESPONSE:**     Admitted.

67.     PwC never told anyone on the Board of Directors in 1998 that HHRG had an unsecured receivable of almost $3 million due to unsecured advances made to companies in South America.  (Pl. Ex. 7, pp. 190-1.)

**RESPONSE:**     Admitted.

68.     PwC knew that in 1998 the policy of always having possession of metal equal to any advance was not being adhered to and it did not tell anyone on the HHRG Board of Directors or the audit committee of GWRC of this fact.  (Pl. Ex. 7, pp. 197-8.)

**RESPONSE:**     Denied.  This statement mischaracterizes the HHRG policy as it was communicated to PwC.  (Pl. Ex. 2) (Critical Matter # 5).

69.    In November 1998, the Peruvian government stopped all VAT rebates.  (Pl. Ex. 14, para. 5.)

**RESPONSE:**    Admitted.

70.    Despite this event, HHRG continued to advance monies to Panexim to finance its VAT obligations and Panexim continued to pay to the Peruvian government the VAT associated with its precious metals purchases.  (Pl. Ex. 14, para 5.)

**RESPONSE:**    Admitted.

71.    From November 1998 through February 1999, HHRG sent millions of dollars to Panexim for the payment of VAT.  (Pl. Ex. 14, para. 6.)

**RESPONSE:**    Denied.  This statement mischaracterizes the statement in the Passaro Aff. upon which it is based which simply states, "HHRG sent several millions of dollars in funds to Panexim on an unsecured basis. . . ."  (Pl. Ex. 14) (Passaro Aff., ¶ 6).

72.    By no later than March 1999, HHRG's unsecured account receivable relating to advances made to Panexim for the financing of Panexim's VAT obligations was no less than $12,076,000.  (Pl. Ex. 14, para. 6.)

**RESPONSE:**    Denied.  This statement mischaracterizes the statement in the Passaro Aff. upon which it is based which makes no reference to whether the accounts receivable from Panexim were secured or not secured.  That statement reads simply, "By March 1999, a sum of not less than $12,076,000 used to satisfy Panexim's value-added tax obligations was owed to HHRG and not reimbursed by Panexim."  (Pl. Ex. 14) (Passaro Aff., ¶ 6).

73.     The VAT payments made by Panexim with HHRG funds have not been reimbursed to date, and the Peruvian government refuses to release these funds to Panexim.  (Pl. Ex. 14, paras. 8-10.)

**RESPONSE:**     Denied.  This statement mischaracterizes the statements in the Passaro Aff., which do not establish that the VAT payments were made "with HHRG funds."

74.     The HHRG Board of Directors relied upon the oversight of HHRG's auditors to make certain that HHRG and GWRC policy was being followed, such that no funds would be advanced against metals until such metals were in the possession of or in transit to HHRG. Transcript of the deposition of Michael Ryan taken on March 24, 2005, pp. 36-7, 57-8, 108 (Pl. Ex. 11).

**RESPONSE:**     Denied.  Mr. Ryan was not aware of PwC's service plan with HHRG, which purportedly contained the provision requiring PwC to "assure" unsecured advances were not made, until after HHRG filed for bankruptcy.  Mr. Ryan did not rely on any oral or written representations by PwC "in conducting [his] business as a director of Handy & Harman" and never reviewed PwC's "report on HHRG's 1998 financial statement at any time before the bankruptcy."  (Deposition Transcript of Michael Ryan, dated March 24, 2005 ("Ryan Tr.") provided as Pl. Ex 11,  at 58-59, 119, 218.)

75.     The HHRG Board of Directors would have engaged in a substantial investigation of all transactions with Panexim had they been made aware of the over-advances to Panexim at the time that PwC was aware of them.  (Pl. Ex. 11, pp. 218-19.)

**RESPONSE:**     Denied.  First, this is not a "concise statement of material fact" but rather unsupported speculation concerning what HHRG's Board of Directors "would have" done under certain circumstances.  Second, this statement is contradicted by numerous HHRG and GWRC documents and testimony of various HHRG and GWRC representatives.  When the HHRG Board became aware that unsecured advances were made by HHRG to Panexim, the Board monitored the receivable for the remainder of the year but did not instruct HHRG to stop business with Panexim.  There is evidence that even after May

1999, HHRG continued to make advances to Panexim, that the exposure increased, and that the Board continued to rely on misrepresentations by Wayne and others that concealed the nature of the Panexim transactions and the amount of HHRG's exposure. (June 16, 1999 GWRC memo, June 17, 1999 Russo e-mail, June 23, 1999 Russo e-mail, minutes of the July 26, 1999 GWRC special meeting of directors, October 1, 1999 Russo e-mail, October 11, 1999 GWRC memo, and December 9, 1999 Christopher Wiggins e-mail, each marked, respectively, as Exs. 12-14, 17, 19-21 at the deposition of Mr. Russo, and submitted herewith as Def. Exs. 8, 9, 10, 11, 12, 13, and 14; Expert Report of Robert H. Temkin dated July 6, 2005 (the "Temkin Report") submitted as Def. Ex. 15, at 32-35.) In fact, it was not until February 2000 that the true nature of the situation with Panexim was uncovered – that is, that the precious metal held in a secured vault in Peru was actually silver, not gold as Mr. Wayne had reported. (Deposition transcript of Frederick Ollett (the "Ollett Tr.") at 64- 109.) The portions of the Ollett Tr. cited to herein are attached hereto as Def. Ex. 16.

76.     The HHRG Board of Directors would have changed the terms of all future business with Panexim in a manner which would have assured that material was in the possession of HHRG before advances were made. (Pl. Ex. 11, pp. 226-27.)

**RESPONSE:**     Denied. *See* response to paragraph 75 above.

77.     Upon learning about the violations of the corporate policy relating to advancements to South American companies in or about May 1999, the finance committee immediately looked into terminating the entire relationship with Panexim and avoiding further advancements. Transcript of the deposition of Sean Russo taken on June 24, 2005, pp. 127-29, 136-38. (Pl. Ex. 12.)

**RESPONSE:**     Denied. ((Def. Ex. 16 (Ollett Tr.) at 64-109); Def. Exs. 8-14 (documents marked as Russo Exs. 12-14, 17, 19-21 at the Russo deposition.)

78.     Despite continuing efforts to try to recover this money from the Peruvian government, such efforts have been unsuccessful. (Pl. Ex. 14, paras. 8 and 10.)

**RESPONSE:**       Admitted.

79.     Panexim has no assets with which it can satisfy the massive debt owed to HHRG.
(Pl. Ex. 12, para. 10.)

**RESPONSE:**       Admitted.

80.     After reviewing the calculations of PwC and HHRG's forensic auditors, and
performing his own calculations based upon all available and relevant data, Underwriters' expert
determined that the total loss to HHRG representing the unsecured advances of funds to Panexim
was $12,076,000.00.  Transcript of deposition of Vincent Love taken on May 16, 2005, p. 16
(authenticating Expert Report) (Pl. Ex. 13); and Expert Report of Vincent Love dated April 5,
2005, pp. 51-62, Pl. Ex. 5.)

**RESPONSE:**       Admits that plaintiffs' expert expressed the opinion that the total loss to
                    HHRG from advances to Panexim was $12,076,000.  PwC denies that the
                    losses are properly calculated or constitute the measure of damages for
                    plaintiffs' claim against PwC.  (Deposition transcript of W. Marcus Johnson
                    ("Johnson Tr."), cited portions of which are submitted as Def. Ex. 17, at 29-
                    34; June 8, 2001 letter from HSNO to John Dempsey (HSNO Ex. 6),
                    submitted as Def. Ex. 18, at DMC 046883.)

81.     PwC has not challenged this calculation or offered any alternative calculation
from any of its experts.

**RESPONSE:**       Denied.  Analysis performed by W. Marcus Johnson of Hagen Streiff Newton
                    Oshiro ("HSNO") for Underwriters, determining that the loss was less than
                    $7.7 million.  (*See* Def. Ex. 17 (Johnson Tr.) at 29-34, Def. Ex. 18 (June 6,
                    2001 HSNO letter), at DMC 046883.)

82.    HHRG assigned its claims against PwC relating to the loss described in Paragraph 82 to Underwriters, and Underwriters are subrogated to those claims.  Exhibit to Affidavit of Daniel J. McMahon.  (Pl. Ex. 15.)

**RESPONSE:**    Admitted.

83.    As part of its assignment, HHRG did not assign any of its liabilities to Underwriters.  (Pl. Ex. 15.)

**RESPONSE:**    Denied.  As a matter of law,  an insurer, as subrogee, stands in the place of the insured and succeeds to whatever rights or liabilities the insured may have in the matter.  *See Orselet v. DeMatteo*, 206 Conn. 542, 546-47 (1988).

84.    Counsel for PwC and HHRG executed a tolling agreement, which tolled any claims against PwC as of May 3, 2001.  (Tolling Agreement, Pl. Ex. 6.)

**RESPONSE:**    Admitted.  The tolling period expired on July 31, 2001.  (*Id.*)

## DISPUTED ISSUES OF MATERIAL FACT

PwC contends there is sufficient evidentiary support for the following material facts which Underwriters dispute:

1.    PwC performed an audit of the financial statements of HHRG as of and for the period ended March 31, 1997 in accordance with generally accepted auditing standards, as agreed in the April 10, 1997 engagement letter.  (Def. Ex. 19 (1997 Engagement Letter); Def. Ex. 15 (Temkin Report), at 12.)

2.    "Critical Matter #5" (Pl. Ex. 2) which provides, "As several of the accounts receivable at 3/31/97 represent balances owed from advances to third world countries in South America, C&L will ensure that there are no collectibility issues with regard to such accounts," is

a PwC internal work paper and was not provided to HHRG at anytime during the performance by PwC of audit work for HHRG. (Def. Ex. 1 (Corl Aff.) at ¶ 3.)

3.    PwC performed an audit of the financial statements of HHRG as of and for the period ended March 31, 1998 in accordance with generally accepted auditing standards, as agreed in the March 30, 1998 engagement letter. (Def. Ex. 15 (Temkin Report) at 12; Pl Ex. 4 (the 1998 Engagement Letter).)

4.    The parties did not intend that the 1998 Service Plan (Pl. Ex. 3) would be incorporated by reference into the 1998 engagement letter such that each statement in the service plan would constitute a specific contractual obligation to HHRG. (Pl. Ex. 4 (1998 Engagement Letter); Pl. Ex. 9 (February Dansighani Tr.) at 288-290.)

5.    PwC performed all steps contemplated by the 1998 Service Plan with respect to evaluating the existence and collectibility of foreign accounts receivable including the Panexim receivable. (Pl. Ex. 9 (February Dansinghani Tr.) at 129; PwC work papers regarding various audit procedures performed by PwC addressing the existence and collectibility of accounts receivable and foreign accounts receivable - PwC 98 WP 01030, 01041, 01044, and PwC 98 EW 0361-0362 submitted as Def. Exs. 20, 21, 22, and 23 respectively.)

6.    HHRG did not have a binding corporate policy that precluded, under any circumstances, advances to its customers where the amount of the advance exceeded the value of metals in HHRG's possession or in transit to HHRG associated with such advance. (December 14, 1998 memorandum showing unsecured advances to, among others, Panexim and Orion marked as Ex. 31 at the deposition of John King and submitted as Def. Ex. 24; September 3, 1996 HHRG memo showing unsecured advances to MDO Chile marked as Ex. 100 at the

deposition of Martin Boehm and submitted as Def. Ex. 25; draft report dated July 20, 1999 marked as Ryan Ex. 21 submitted herewith as Def. Ex. 26, at HHRG-PWC153691.)

7.      HHRG's board of directors did not "rely upon the oversight of HHRG's auditors" to make sure that HHRG management was complying with HHRG corporate policy.  (Pl. Ex. 11 (Ryan Tr.) at 37-38, 58.)

8.      HHRG's managers knowingly withheld material information from PwC related to HHRG's transactions with Panexim.  (Def. Ex. 16 (Ollett Tr.) at 94-106.)

9.      HHRG did not take reasonable actions to mitigate its damages.  (Def. Ex. 16 (Ollett Tr.) at 94-106; Pl. Ex. 17 (PwC's responses to GWRC's interrogatories), at pp. 7-8; Def Exs.8-14 (Russo Exs. 12-14, 17, 19-21); July 7, 2005 expert report of R. Gene Brown submitted as Def. Ex. 27, at 16-27.)

10.      Even assuming that PwC was obligated pursuant to the 1997 engagement letter or related documents to assure the collectibility of all foreign accounts receivable, and that PwC breached such obligation (which are disputed), HHRG did not suffer any loss resulting from such breach, given that the Panexim receivables outstanding as of March 31, 1997 were fully collected.  (Def. Ex. 6 (1999 accounts receivable aged detail showing all outstanding receivables as of that date with the oldest receivable dated January 22, 1999 (PwC 99 WP 01193-94).)

11.      Even assuming that PwC was obligated pursuant to the 1998 engagement letter or service plan related documents to assure the collectibility of all foreign accounts receivable, and that PwC breached such obligation (which are disputed), HHRG did not suffer any loss resulting from such breach, given that the receivables outstanding as of March 31, 1998 were fully collected.  (Def. Ex. 6 (1999 accounts receivable aged detail showing all outstanding receivables as of that date with the oldest receivable dated January 22, 1999 (PwC 99 WP 01193-94).)

12.    HHRG's management made knowing misrepresentations to PwC during the course of the 1997 and 1998 audits.  (Def. Ex.15 (Temkin Report) at 31-32.)

13.    Underwriters' expert witness did not properly calculate the losses ultimately incurred by HHRG resulting from advances to Panexim.  (Def. Ex. 17 (Johnson Tr.), at 29-34; Def. Ex. 18 (June 8, 2001 letter from HSNO to John Dempsey (HSNO Ex. 6), at DMC 046883.

Respectfully submitted,

DEFENDANT,
PRICEWATERHOUSECOOPERS, LLP

By_____/s/ Thomas D. Goldberg
    Thomas D. Goldberg, ct 04386
    David J. Elliot, ct 04301
    Day, Berry & Howard LLP
    CityPlace I
    Hartford, CT  06103-3499
    Tel. (860) 275-0100
    Fax. (860) 275-0343

    Its Attorneys

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Thomas D. Goldberg
David J. Elliott (ct 04301)
Thomas D. Goldberg (ct 04386)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901-2047
Tel:  (203) 977-7300
Fax: (203) 977-7301
Its Attorneys

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd St.
New York, NY  10017-5639

William H. Champlin, III, Esq.
Michael T. McCormack, Esq.
William S. Fish, Jr., Esq.
Tyler Cooper & Alcorn, LLP
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Daniel E. Tranen, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
120 N. LaSalle Street
Chicago, IL  60602

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604-3407

Steven R. Humphrey (ct06053)
Dina S. Fisher (ct14896)
James M. Ruel (ct21222)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Jed Horwitt, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Ave.
P.O. Box 3186
Bridgeport, CT 06605-0186