**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| Plaintiff, | : | |
| VS. | : | CIVIL ACTION NO. |
| PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP, | : | 3:02 CV 1379 (MRK) |
| Defendants. | : | |
| | : | |
| ALEC SHARP, et al., | : | |
| Plaintiffs, | : | |
| VS. | : | CIVIL ACTION NO. |
| PRICEWATERHOUSE COOPERS LLP d/b/a PRICE WATERHOUSE LLP | : | 3:02 CV1572 (MRK) |
| Defendant. | : | |
| | : | |
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| V. | : | 3:02 CV 1803(MRK) |
| PRICEWATERHOUSECOOPERS LLP, | : | |
| Defendant. | : | |
| | : | SEPTEMBER 2, 2005 |

**PRICEWATERHOUSECOOPERS LLP'S MEMORANDUM OF
LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO
<u>PRECLUDE THE EXPERT TESTIMONY OF WILLIAM F. PINNEY</u>**

Defendant PricewaterhouseCoopers LLP ("PwC") respectfully submits this memorandum of law in opposition to Plaintiffs' Motion to Preclude the Expert Testimony of William F. Pinney.

**PRELIMINARY STATEMENT**

Plaintiffs GWRC and HHRG contend that PwC's alleged negligence caused, in addition to any losses relating directly to HHRG's advances to Panexim, the entire decline in value of HHRG (which was GWRC's most valuable asset) from June 30, 1998 through March 2000. As

PwC has demonstrated in its recent summary judgment motion, plaintiffs have the burden of proof to show that the decline in value was proximately caused by the alleged conduct of PwC rather than by independent industry or company-specific factors.

William Pinney's testimony goes directly to this point. Pinney will testify, based upon his extensive experience in the precious metals industry, that two specific adverse market conditions (diminished supply of scrap precious metal and increased metal leasing rates) decreased the fair market value of HHRG during the relevant time period irrespective of the Panexim transactions. While it is true that Pinney cannot quantify any specific decline in monetary value, he need not do so because it is plaintiffs' burden to prove, rather than defendant's to disprove, that any PwC negligence in this case proximately caused the entire loss of value in an amount claimed in excess of $31,000,000.

Plaintiffs cannot have it both ways. On the one hand, they have proffered no expert witness on proximate causation, much less an expert who has considered, or rejected, any other causes of the decline in value of HHRG; rather, they ask the Court and jury blindly to assume that the Panexim losses caused the entire loss of HHRG's value from the artificial starting point of June 30, 1998. On the other, they seek to exclude the testimony of a qualified expert who can address two of these other factors. If plaintiffs' claims survive summary judgment on the issue of proximate causation – and they should not – the jury should be able to consider Pinney's testimony regarding market conditions that negatively impacted the value of HHRG long before the Panexim losses were suffered, along with significant other evidence regarding other causes of HHRG's demise.

**FACTUAL BACKGROUND**

HHRG was in the business of refining precious metals from August 1996 until shortly after March 28, 2000, when it filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. HHRG has asserted claims against PwC for breach of contract, professional malpractice and negligent misrepresentation, each of which is grounded on the theory that PwC, as HHRG's outside auditor, knew or should have known that several of HHRG's officers and employees engaged in a fraudulent scheme with Panexim that involved the purchase of precious metals and the advancement of unsecured funds to finance those purchases. HHRG and GWRC allege that, as a result of PwC's alleged deficiencies, HHRG was damaged in the approximate amount of at least $31 million for the full loss in value of its failed business; and that GWRC suffered further, additional losses.

For reasons more fully set forth in PwC's motion for summary judgment dated August 12, 2005, plaintiffs must offer expert witness testimony to demonstrate proximate causation for their professional malpractice claims. Pinney's testimony is designed to enlighten the jury as to relevant industry related factors that, in his judgment, more probably than not, decreased the value of HHRG during the relevant time period. Plaintiffs seek to preclude Pinney's testimony for two reasons. First, they assert that he has no experience in the precious metal <u>refining</u> industry, but rather possesses experience only in the field of precious metals <u>mining</u>. Second, they wrongly assert that Pinney is offered to testify only to general market conditions in the refining industry, without any analysis of whether these conditions actually impacted HHRG operations.

Pinney's testimony amply meets the standards of Federal Rule of Evidence 702 and should be admitted. He is competent to testify regarding market conditions in the refining industry not only by virtue of his direct involvement in the mining business, of which refining is an important downstream component, but also because (contrary to the papers submitted by plaintiffs) he has had personal experience in the refining segment of the precious metals industry. Any attack on his alleged lack of experience in the refining field should be reserved for cross-examination. Second, while it is true that Pinney plans to testify only to market conditions, he does confirm that these conditions specifically affected HHRG, and there is significant evidence in the record that those two market conditions did negatively impact the value of HHRG.

**ARGUMENT**

**I.   STANDARD FOR ADMISSION OF EXPERT TESTIMONY**

Under Rule 702 of the Federal Rules of Evidence, an expert may testify as to any scientific, technical, or other specified knowledge that "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Rule 702 embodies a standard of admissibility of expert opinions that is liberal, representing a departure from the previously widely followed more restrictive standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923). *See, e.g., Nimely v. City of New York,* No. 04-3240-CV, 2005 U.S. Dist. LEXIS 12712, at *11-12 (2nd Cir. June 27, 2005)(attached as Ex. 1)(citing *Daubert v. Merrell Pharmaceuticals, Inc.,* 509 U.S. at 579, 588 (1993)).

Under *Daubert* and its progeny, the court's function here is to ensure that Pinney's expert testimony will be helpful to the jury, that the testimony will be reliable, and that Pinney possesses necessary qualifications. *Nimely*, 2005 U.S. Dist. LEXIS 12712 at *11-12. In performing its screening function, a court ought not replace the traditional adversary system,

which provides the necessary tools for challenging reliable expert testimony. *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir. 2002). The court must adapt the inquiry to the facts of each case. *Id.* at 266. Experts may testify to matters that "would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror." *Eze v. Senkowski*, 321 F.3d 110, 131 (2d Cir. 2003); *LinkCo, Inc. v. Fujitsu Ltd.,* No. 00 CIV 7242 (SAS), 2002 U.S. Dist. LEXIS 12975, *3 (S.D.N.Y. July 16, 2002)(Exhibit 2)(an expert witness should be used to help the jury with issues that go beyond common understanding).

## II.    DR. PINNEY HAS SUFFICIENT EXPERIENCE UNDER RULE 702

Plaintiffs attack Pinney's testimony as inadmissible under Rule 702 because, they assert, he has no relevant experience with the precious metals refining industry and thus his opinion is unreliable. Contrary to plaintiffs' assertion, Pinney has specific experience in the silver refining industry in connection with his engagement with respect to a company known as Sunshine Mining. As set forth in his Affidavit attached hereto, Pinney gained specific direct experience in the silver refining industry in connection with PaineWebber's engagement as underwriter of common stock of Sunshine Mining, listed on the New York Stock Exchange. (Affidavit of William F. Pinney, dated September 2, 2005 ("Pinney Aff.")¶¶ 3, 4)(Exhibit 3). In the due diligence process undertaken in the normal course of underwriting the securities offering, Pinney (then a PaineWebber employee) became familiar with all financial and operational aspects of the company which included a significant silver refining business. (*Id.*) This involved site visits to the mining and refining operations in Idaho, a review of the financial statements of the company including its component businesses, and discussions with senior and divisional management including the mining and refining operations. (*Id.*)

Pinney's experience with Sunshine Mining supplemented his education and background in the fields of mining and natural resources. Pinney has a Bachelor of Science Degree in Mining Engineering, which was followed by four years of operating experience in an integrated mining production business, which included all aspects of production necessary to refine metal. (Pinney Aff., ¶ 4) The refining process is the next downstream operation after the metal is mined, and Pinney's work experience and education in mining required him to become intimately familiar with metal refining operations. Pinney, an investment baker, specialized for ten years in mining companies, primarily focused on precious metals. (*Id.*) He also spent a good portion of his professional career advising companies on financial matters of all kinds, including senior debt facilities that included off balance sheet mineral financings. (*Id.*) The bailment and consignment facilities of HHRG are just another example of a senior debt facility used to finance valuable minerals as they go through the work process. Pinney is qualified to render the opinion about HHRG's business that he proposes to render.

Moreover, many courts have refused to require specific industry experience as pre-requisite for admission of expert testimony. *In re Voluntary Purchasing Groups, Inc. Litig.*, No. 3194-Civ-2477-H, 2000 U.S. Dist. LEXIS 18561 (N.D. Tex. Dec. 14, 2000) (Exhibit 4)(expert's testimony on standard of care admitted despite lack of narrow industry experience); *Voilas v. GMC*, 73 F. Supp. 2d 452, 454 (D.N.J. 1999) (expert's lack of "specific experience in the automotive industry or in creating or evaluating business plans does not impact upon his qualifications to review such plans and to summarize in a concise, easy to understand fashion GM's own analyses of the business options available to it"); *accord Beverly Hills Concepts v. Schatz & Schatz*, 247 Conn. 48, 63 717 A.2d 724 (1998) (refusing to impose a bright line rule

that experts must possess prior industry-specific experience since industries may be segmented infinitesimally and professionals often transfer between industries).

Plaintiffs' objection to Pinney is that his experience is focused on mining, rather than refining, of precious metals. While these disciplines are sufficiently connected to satisfy Rule 702 standards, Pinney's has applied his financial and educational experience to a broad array of industries. Pinney has prepared numerous fairness opinions on companies in different industries in which he had no prior experience. Preparation of a fairness opinion requires an in depth evaluation and understanding of the operations of a company, its financial structure and its financial statements. In sum, Pinney's experience is sufficient to satisfy Rule 702 and *Daubert*.

### III.     PINNEY'S OPINION IS BASED ON RELIABLE DATA AND IS NOT SPECULATIVE

Plaintiffs next seek to exclude Pinney's testimony because, they claim, it is speculative and not based on reliable data. In order to respond to this argument, it is vital to understand the scope of Pinney's anticipated testimony. Pinney's testimony will take into account the following basic facts: (1) HHRG's financial performance between 1998 and 2000 was significantly dependent on worldwide supply of scrap metal, because 86% of its supply of metal for refining came from scrap sources of supply, with only the remaining 14% from underground mining; (2) worldwide scrap silver volumes significantly declined regionally and globally in 1999 after several years of increase; (3) HHRG borrowed (*i.e.* leased) nearly all gold and silver necessary in its operations; (4) metal leasing rates fluctuate depending on market conditions (like prime rate); and (5) worldwide metal leasing rates were significantly higher in 1999 and early 2000, as compared to 1998.

This testimony is not simply, as plaintiffs contend, a recitation of general industry data without application to HHRG, but rather is focused on two special aspects of HHRG's business that make these two negative market conditions directly relevant to HHRG: the limited source of its metal supply and its dependence on leased metal. As a result of these two negative market conditions, Pinney opines that that decreased supply of metal and the increased cost of leasing had a negative impact on the value of HHRG from June 1998 through February 2000.

The connection between these industry factors and HHRG's performance is not speculative. A significant body of evidence confirms that these adverse market conditions negatively impacted HHRG after June 1998. As early as February 5, 1998, a memorandum to the HHRG Board states that "the rapid escalation of silver lease rates has necessitated a restructuring of how HHRG and our competitors do business. . . . Silver lease rates have been rising for the past six months from 1.5% in June to 3.8% in November." (Exhibit 5.) This sentiment was echoed in the GWRC Board minutes dated February 10, 1998, which state that "the low gold price coupled with high precious metal lease costs had affected [HHRG's] earnings for the quarter." Significantly, the minutes also proclaim that the "single most important factor" in affecting HHRG profitability are metal lease rates. (Exhibit 6.)

HHRG's business records throughout 1998 and 1999 corroborate the adverse impact of rising metal lease rates. The minutes of a Board of Directors' meeting dated March 15, 1999 state that "metal finance costs were high." (Exhibit 7.) The July 13, 1999 Board minutes state that "low metal prices, historically high metal lease rates, competitive pressure and basic changes in the low grade electronic scrap market all conspire to put substantial downward pressure on profitability." (Exhibit 8.) An August 4, 1999 memorandum indicates further negative impact on HHRG's earnings because "lease rates are creeping up. Our most recent rate from Fleet on

500,000 ounces of silver for six months was 5.5%. Our average rate for silver was approximately 3%." (Exhibit 9.)

A September 20, 1999 memorandum from GWRC states that "HHRG had just suffered its worst August in four years. The company is operating at break-even and will likely deteriorate further in the short term because of rising metal interest rates." (Exhibit 10.) An October 1999 HHRG operations report states that "interest is unfavorable to budget for the month while year-to-date is favorable. This reflects higher lease rates over the last few months even as ounces decline." The same memorandum concludes: "There is no quick fix. With volatile and high interest rates for metal leasing, we must make sure that our fixed charge, low grade business generates enough income to cover higher metal interest costs." (Exhibit 11.) A November 29, 1999 press release by GWRC advised the Australian public market that "HHRG experienced extremely adverse business conditions in the second quarter [of FY 1999], leading it to report a loss for the first half of A$445,000. This position exacerbated by substantial increases in external costs and a sustained increase in gold and silver lease rates during the period." (Exhibit 12.) A December 7, 1999 mid-year review of operations stated that "low gold price, volatile and high lease rates, increased competition, falling margins and reduced intrinsic value of low grade scrap, individually and collectively, influenced the first half fall in profit" of GWRC. (Exhibit 13.)

Numerous documents also reflect that the financial performance of HHRG deteriorated significantly between June 30, 1998 and February 2000, having nothing to do with the Panexim related losses. The minutes of the July 13, 1999 Board of Directors' meeting report that "margins continue to be tight especially on large volume mining and jewelry business." (Exhibit 8.) The September 20, 1999 GWRC memorandum indicates that HHRG, like "nearly all

companies involved in the international precious metal industry, . . .is operating in a very difficult environment. Mining companies are squeezing refining margins and low precious metal prices are undermining severely the economics of recycling." (Exhibit 10.)  The October 1999 HHRG operations report provides that margins "continue to decline" for gold and silver. (Exhibit 11.)  While plaintiffs may want to ignore these other admitted causes for the decline in HHRG value, Pinney is being offered to give further support and guidance on issues not familiar to lay jurors, namely, the deteriorating market conditions, having nothing to do with Panexim, that caused loss in value.

Plaintiffs also argue that Pinney's testimony should be excluded because he cannot quantify the decline in fair market value attributable to the two negative factors he identifies. Plaintiffs again miss the mark.  Pinney is not offered as a valuation expert, but he can testify, without speculation, that the value of HHRG fell, in an undetermined amount, because of the two conditions.  This testimony is not offered to reduce or attack plaintiffs' damage claims, like Mr. Shivdasani's testimony, but rather only to rebut plaintiffs' remarkable claim that all the decline in value was caused by Panexim related losses.  There is no legal requirement that Pinney quantify such decline, other than to say that there are factors that negatively impacted the value. Pinney points to significant market conditions, which tie directly to the operating conditions of HHRG, that plaintiffs fail to exclude or even to consider in developing their theoretical proof of proximate causation of $31 million in damages.  These are sophisticated, technical issues on which PwC is entitled to proffer expert testimony to assist lay jurors in reaching their determinations.

## CONCLUSION

For the foregoing reasons, the motion to exclude William F. Pinney should be denied. Alternatively, the Court should conduct an evidentiary hearing pursuant to Federal Rule of Evidence 104 to determine the admissibility of Pinney's testimony.

|  | DEFENDANT,<br>PRICEWATERHOUSECOOPERS LLP<br><br>By   /s/   Thomas D. Goldberg<br>    David J. Elliott (ct 04301)<br>    E-mail: djelliott@dbh.com<br>    Thomas D. Goldberg (ct 04386)<br>    E-mail: tdgoldberg@dbh.com<br>    Day, Berry & Howard LLP<br>    One Canterbury Green<br>    Stamford, CT 06901-2047<br>    Tel: (203) 977-7300<br>    Fax: (203) 977-7301<br><br>Its Attorneys |
|---|---|

## **CERTIFICATION**

      I hereby certify that on September 2, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System..

                                          DEFENDANT,
                                          PRICEWATERHOUSECOOPERS LLP

                                          By  /s/  Thomas D. Goldberg
                                              David J. Elliott (ct 04301)
                                              E-mail:  djelliott@dbh.com
                                              Thomas D. Goldberg (ct 04386)
                                              E-mail:  tdgoldberg@dbh.com
                                              Day, Berry & Howard LLP
                                              One Canterbury Green
                                              Stamford, CT 06901-2047
                                              Tel:  (860) 275-0100
                                              Fax:  (860) 275-0343
                                              Its Attorneys

| | |
|---|---|
| Edward J. Boyle, Esq.<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>150 East 42nd St.<br>New York, NY  10017-5639 | William H. Champlin, III, Esq.<br>Michael T. McCormack, Esq.<br>William S. Fish, Jr., Esq.<br>Tyler Cooper & Alcorn, LLP<br>CityPlace - 35th Floor<br>185 Asylum Street<br>Hartford, CT 06103 |
| Daniel McMahon, Esq.<br>Stefan Dandelles, Esq.<br>Daniel E. Tranen, Esq.<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>120 N. LaSalle Street<br>Chicago, IL  60602 | Fred N. Knopf, Esq.<br>Wilson, Elser, Moskowitz, Edelman & Dicker LLP<br>3 Gannett Drive<br>White Plains, NY 10604-3407 |
| Steven R. Humphrey (ct06053)<br>Dina S. Fisher (ct14896)<br>James M. Ruel (ct21222)<br>Robinson & Cole LLP<br>280 Trumbull Street<br>Hartford, CT 06103-3597 | Jed Horwitt, Esq.<br>Zeisler & Zeisler, P.C.<br>558 Clinton Ave.<br>P.O. Box 3186<br>Bridgeport, CT 06605-0186 |