**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1379 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP and | : | |
| COOPERS & LYBRAND, LLP | : | |
| Defendants | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al. | : | |
| Plaintiffs | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1572 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a | : | |
| PRICE WATERHOUSE, LLP | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff | : | |
| | : | CIVIL ACTION NO. |
| VS. | : | 3:02 CV 1803 (MRK) |
| | : | |
| PRICEWATERHOUSECOOPERS, LLP, | : | |
| Defendant | : | SEPTEMBER 2, 2005 |

**PLAINTIFF HANDY AND HARMAN REFINING GROUP AND GOLDEN
WEST REFINING CORPORATION'S JOINT MEMORANDUM OF LAW IN
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

The plaintiffs Handy & Harman Refining Group, Inc. ("HHRG") and Golden

West Refining Corporation ("GWRC") submit this memorandum of law, and the

affidavits of Michael Ryan, Sean Russo, Richard Hayes, Craig Elson, Jed Horwitt,

John Bullock, Didier Siffer, Kenneth Wightman, Ian Hobson, and Eric Henzy, in

opposition to the motion for summary judgment dated August 12, 2005 filed by

PricewaterhouseCoopers LLP ("PwC").  PwC's motion should be denied because

HHRG and GWRC have produced ample admissible evidence to demonstrate that

issues of fact exist regarding whether PwC's negligence and breach of contract was a

proximate cause of the destruction of HHRG and GWRC's businesses.  Expert

testimony is not required.  PwC's failure and negligence led to and caused the

destruction of the plaintiffs' businesses.

## I.    PRELIMINARY STATEMENT

This case is grounded in simple and dramatic facts.  PwC's negligence and

breach of contract caused the complete destruction of a business that had successfully

and profitably operated in the precious metals refining industry for over 125 years.

The evidence of causation linking the failures and inadequacies of PwC to the

destruction of HHRG and GWRC as going concerns is clear, uncomplicated, and

overwhelming.

Significantly, this case is <u>not</u> about the "deterioration" in value of HHRG's

business.  Although the first substantive sentence of PwC's brief attempts to

characterize the case that way, PwC is wrong.  This case is about the complete

destruction of HHRG's business as a going concern and the concomitant destruction

of GWRC.

The Connecticut Supreme Court clearly has explained how damages may be proven when a plaintiff claims the total destruction of its business. West Haven Sound Development Corp. v. West Haven, 201 Conn, 305, 325 n.5 (1986); Beverly Hills Concepts, Inc. v. Schatz and Schatz, Ribicoff and Kotkin, 247 Conn. 48, 64 (1998).

Based upon that precedent, the plaintiffs will show at trial that:

1.    PwC's breach caused the complete destruction of HHRG's business as a going concern.

2.    The value of HHRG based upon the capitalized value of the profits that it would have earned if not for PwC's breach was approximately $30 million.

3.    As a direct and proximate result of PwC's breach, HHRG was not able to continue operating as a going concern and was instead forced to liquidate all of its assets in bankruptcy.

4.    The destruction of HHRG directly caused the destruction of GWRC as a going concern in Australia.

These issues involve numerous disputed issues of fact and simply are not susceptible to summary judgment.

PwC's brief on summary judgment responds to these claims by asserting without citing any authority on point in Connecticut, or in any other jurisdiction, that an independent expert witness is necessary to establish causation of damage. Not

only is there <u>no legal requirement</u> that causation be shown through independent

expert testimony, as the following factual summary makes clear, the plaintiffs'

evidence of causation in this case is based upon the testimony of the actual people

involved at the time, most of whom have very extensive expertise and knowledge of

the precious metals refining business.  These witnesses were involved during the

relevant time period and have compelling, detailed <u>factual</u> evidence that is far more

reliable than paid expert opinion testimony.

1.    In June, 1998, in connection with its audit of the June, 1998 financial statements of HHRG, PwC knew that HHRG was making large unsecured advances to customers, including Panexim, in South America in violation of a strict company policy prohibiting such advances.

2.    PwC failed to disclose this fact to the boards of HHRG or its Australian parent company GWRC notwithstanding its actual knowledge of this fact and an obligation to disclose it.[1]

---

[1]  HHRG has disclosed John Salomon and Vincent Love as expert witnesses who opine that PwC breached the standard of care of an auditor and was negligent.  A copy of Salomon's report is attached as Exhibit 28 to PwC's motion.  A copy of Love's report is filed as Exhibit 12.  Salomon and Love opine that PwC breached its duty as an auditor by, among other reasons, failing to disclose the existence of unsecured advances to companies in South America, including Panexim in June 1998 and also failing to disclose deficiencies in internal controls at HHRG.  This evidence is sufficient to raise an issue of fact on the standard of care for negligence and breach of contract claims.  In fact, PwC assumes for purposes of its Motion that it "failed to perform its reviews for HHRG in accordance with applicable professional standards."  <u>See</u> PwC Memo at p. 3, n. 4.

3.  PwC knew that this was a "critical matter," having identified it as such on multiple occasions.

4.  Unsecured advances to Panexim began to increase dramatically after June, 1998, ultimately to an amount in excess of $10 million.[2]

5.  Had PwC disclosed these unsecured advances to the HHRG and GWRC boards in June, 1998, the boards would have acted swiftly to prevent the dramatic increase in unsecured advances that occurred thereafter.

6.  Once the extent of the unsecured advances after June, 1998 became known, HHRG lost its financing and its credibility with customers, which forced it to stop operating as a going concern.

7.  Because it was unable to continue operating as a going concern, HHRG was forced to liquidate its assets in bankruptcy.

8.  None of the other facts and circumstances cited by PwC caused HHRG to stop operating as a going concern, and no witness identified by PwC in its exhibits will testify to the contrary. (In most instances, the PwC experts have no opinion of the actual effect of any of these events on HHRG.)

9.  The destruction of HHRG directly caused the destruction of GWRC as a going concern in Australia.

---

[2] PwC concedes that beginning in June 1998, the unsecured advances to Panexim increased "dramatically." See PwC Memorandum at 13.

The affidavits of Messrs. Russo, Ryan, Bullock, and Hayes represent the testimony of witnesses with a combined experience of approximately 100 years in the precious metals refining industry. These affidavits, together with the affidavits of Henzy, Wightman, Siffer, and Horwitt, each of whom was directly involved with HHRG at the time of its bankruptcy, establish strong, unequivocal, uncomplicated, factual, and most importantly for present purposes, disputed evidence that PwC caused the destruction of the plaintiffs' businesses. See Section C, infra.

By failing to recognize that this case is not about the "deterioration" of HHRG's business over time, and by ignoring clear Connecticut Supreme Court precedent concerning how damages may be proven for the destruction of a business, PwC attempts to impose on HHRG an obligation, under the guise of causation, to disprove that other factors contributed to a decline in value of HHRG after PwC's breach. There is no basis for such a proposition. If PwC disagrees with the projections of HHRG's expert as to what profits HHRG would have earned if the unsecured advances had stopped in June, 1998 (as they would have if PwC had acted properly), it is free to cross-examine HHRG's expert on that point, but as the Supreme Court has clearly stated, these issues are not a basis to disallow the testimony in the first instance. West Haven Sound, 201 Conn. at 318 ("We do not believe, however, that [plaintiff's expert] should have been precluded from using econometric projections to predict future profits merely because those projections were contradicted by the restaurant's actual profit performance after the breach.").

6

Finally, PwC's focus on HHRG's insurance recovery is a red herring. Neither HHRG nor GWRC is suing PwC for the recovery of approximately $12.5 million lost in Peru because of the actual unsecured advances to Panexim. The plaintiffs are suing for the destruction of their businesses, a wholly different loss. In fact, if HHRG had not recovered the insurance settlement, its claims against PwC in this case would have been both for the destruction of its business and the money lost in Peru. The fact that HHRG received an insurance settlement for the latter has nothing to do with the former and more importantly, provides no compensation to either HHRG or GWRC for the destruction of their businesses.

## II.     FACTUAL BACKGROUND

GWRC was a precious metals refining company based in Perth, Australia. See Affidavit of Sean Russo ("Russo Aff.") ¶13. See also, Handy & Harman Refining Group, Inc. and HHRG/Golden West Refining Corporation Joint Consolidated Local Rule 56(a)(2) Statement ("56(a)(2)"), ¶196. In 1995, GWRC became aware of an opportunity to acquire the assets of the Precious Metals Refining Division of Handy & Harman, Inc. (the "PMRD"). Russo Aff. ¶16; 56(a)(2) ¶199. In 1996, GWRC formed HHRG to acquire the PMRD. See PwC Response to Request for Admission ("RFA") No. 11[3];. 56(a)(2) ¶204. In August, 1996, HHRG acquired the business and related assets of the PMRD. Russo Aff. ¶38; Ryan Aff., ¶38; 56(a)(2) ¶21, 22. For over 125 years before, the PMRD was one of the oldest, largest

---

[3] A copy of PwC's responses to HHRG's Requests for Admissions of Fact dated June 12, 2005 is filed as Exhibit 1 to this Memorandum of Law.

and most well known refiners of precious metals in North America. Russo Aff. ¶19; 56(a)(2) ¶200. The PMRD's bullion bars bearing the "H&H" logo or hallmark were accepted by the world's leading gold and silver exchanges. Russo Aff. ¶19; Ryan Aff. ¶21; 56(a)(2) ¶200. From August 20, 1996 to March 28, 2000, HHRG, together with its wholly owned subsidiary Attleboro Refining Company ("ARC"), continued as a refiner of precious metals (including gold and silver) and was headquartered in South Windsor, Connecticut. RFA No. 9; 56(a)(2) ¶19.

In connection with its efforts relating to the acquisition of the PMRD, GWRC engaged PwC[4] in April 1996 to conduct certain due diligence. PwC Answer and Special Defenses dated May 24, 2004 ("PwC Answer") ¶28; (Ex. 2). Recognizing the risks associated with unsecured advances in third world countries, PwC stated in its report to GWRC: "Management has stated that cash will not be given to its customers in these countries until an outside armored car company has verified the deposit of a customer's metal to designated vaults, as opposed to extending advances and obtaining security insurance bonds as was the previous practice." RFA 37; 56(a)(2) ¶13. PwC had previous experience with providing professional services to clients regarding advice concerning overseas business activities. RFA 35; 56(a)(2) ¶12.

---

[4] In 1996, Coopers & Lybrand ("C&L") assisted GWRC with due diligence efforts. C&L subsequently merged with PricewaterhouseCoopers. See RFA 25. Both entities are collectively referred to in this memorandum and this action as PwC.

8

Following the Acquisition in 1996, PwC was retained to provide audit and business services to HHRG. PwC audited HHRG's financial statements for the fiscal years ending March 31, 1997, 1998 and 1999. RFA 26, 46; 56(a)(2) ¶33. In connection with these audit services, PwC was informed that HHRG had a policy that advances to companies in third world countries "are not made unless the material to be assayed is in the possession of or in transit to" HHRG. RFA 45, 56(a)(2) ¶71; see also PwC Electronic Audit Workpapers Bates No. PwC 97 EW000906 ) (Ex. 4).

PwC prepared a Service Plan related to its audit of HHRG's financial statements for the year ending March 31, 1998. RFA 83; 56(a)(2) ¶57, 60. In a letter dated March 24, 1998 to HHRG's Comptroller, Mr. William Myles, signed by Joseph J. Tiroletto on behalf of PwC, PwC stated: "As part of our audit planning process we prepare a service plan which includes a summary of the expectations you and others within your organization have of C&L, key issues related to the audit, timetable and other matters to ensure our C&L service team members understand your needs and exceed your expectations." RFA 87; Ex. 5; Rule 56(a)(2) ¶60. PwC further represented: "This service plan will become the baseline against which you will be able to measure our performance." RFA 86; Ex. 5; Rule 56(a)(2) ¶61

PwC identified certain areas requiring attention during the course of its audits, one of which was the collectability of foreign accounts. PwC Answer ¶¶66, 67 (Ex. 2). In its 1998 Service Plan, under the heading "Critical Matters and Other Issues", the defendant stated to HHRG that:

9

"We will assure advances to Third World Countries are not made unless
material is in the possession of Handy & Harman [sic]."

RFA 179; see also Ex. 5 p. 5; 56(a)(2) ¶72.

In its March 30, 1998 audit engagement letter PwC commented that "[a]t the
conclusion of the engagement, [PwC] will provide management, in a mutually
agreeable format, [PwC's] recommendations designed to help [HHRG] make
improvements in its internal control and operations and other matters that may come
to [PwC's] attention.  RFA 96; Ex. 6; 56(a)(2) ¶76

As with its 1997 audit, when PwC conducted its audit of HHRG's records for
the fiscal year ending March 31, 1998, PwC understood that HHRG had a policy that
advances to companies in third world countries "are not made unless the material to
be assayed is in the possession of or in transit to" HHRG.  See RFA 45, 89; 56(a)(2)
¶71.  During its audit in 1998, PwC reviewed a Price Not Settled Schedule, see Ex. 6;
56(a)(2) ¶79, which showed that as of March 31, 1998, HHRG had made unsecured
advances to Panexim and Orion totaling more than $2.5 million.  RFA 97; 102; Ex. 6;
56(a)(2) ¶79.

In April 1998, Luis Posada, an HHRG employee, told Raj Dansinghani, a
PwC employee, who was a member of the PwC audit team for HHRG, that he had
made advances to Panexim and Orion that were not secured by metal in the
possession of HHRG.  Specifically, Posada told the PwC auditor that HHRG included
in advances to "Panexim an amount for value added tax that Panexim has to pay.

10

Once Panexim pays this, Panexim reimburses HHRG the amount that was over advanced." RFA 99; Ex. 6; 56(a)(2) ¶81. PwC knew that such advances were unsecured advances because HHRG did not have precious metal in its possession to secure payment of such VAT advances. Deposition Testimony of George Ingram, PwC Partner, ("Ingram Dep."); (Ex. 8); and Deposition Testimony of Barrett Brown at pp. 176, 197, and 202, (Ex. 9); 56(a)(2) ¶95.

Before PwC issued its June 1998 management letter and its opinion on HHRG's financial statements, PwC team members discussed the existence and treatment of the Orion and Panexim unsecured advances. Salomon Report, Def. Ex. 28, p. 15; 56(a)(2) ¶130. Nevertheless, PwC did not inform the HHRG board, the GWRC board or the audit committee that it had learned from an HHRG employee that HHRG had made unsecured advances to Panexim for the payment of VAT.

From June 1998 to January 1999, the unsecured advances to Panexim increased significantly. On January 31, 1999, the amount of unsecured advances to Panexim exceeded $10 million dollars. Russo Aff. ¶¶63, 65; Ryan Aff. ¶¶63, 65; 56(a)(2) ¶149.

Upon learning in May 1999 of an apparently secured receivable from Panexim of over $10 million, the GWRC finance committee promptly investigated the situation. Russo Aff. ¶¶53-60; Ryan Aff. ¶¶57-60; 56(a)(2) ¶254, 256. The Board of GWRC instituted stricter controls over metals business with Panexim. Specifically, Robert Guy, a GWRC director, instructed Barry Wayne that there should be "no

11

additional exposure to Panexim . . . until such time as board approval is given." Russo Aff. ¶¶54-56; (Ex. 10); 56(a)(2) ¶258. Sean Russo, a GWRC and HHRG board member and chairman of the finance committee, also instructed Rick Ollett, the Chief Financial Officer of HHRG, that interim approval of the GWRC Board was required before any further advances were made to Panexim. Russo Aff. ¶56; Ryan Aff. ¶56; (Ex. 11); 56(a)(2) ¶259. Additionally, Russo raised certain issues to be investigated by Ollett and the other members of the HHRG finance committee. Russo Aff. ¶57; (Ex. 11); 56(a)(2) ¶260.

In response to the investigation by the GWRC board and finance committee, Barry Wayne, HHRG's president, stated that sufficient gold to cover the receivable was located in a secured vault in Peru. Wayne further indicated that the delay in obtaining the gold from the vault was due to the Peruvian government's curtailment of large gold exports and not to any financial issue with Panexim. Russo Aff. ¶58; 56(a)(2) ¶261.

In July 1999, the GWRC board censured Barry Wayne, withheld his bonus for 1999, and initiated changes to the negotiation of his contract providing for a terminal one-year contract. Russo Aff. ¶59; Ryan Aff. ¶59; 56(a)(2) ¶262. The GWRC board and finance committee requested an independent assay of the gold in the Peruvian vault. Ryan Aff. ¶60; Russo Aff. ¶60; 56(a)(2) ¶263. The assay appeared to confirm the quantity of gold in the vault. The Board of GWRC later learned on February 21, 2000 that the assay report had been prepared to obscure the reality that silver rather

than gold was stored in the vault at a small fraction of the value previously represented. Id.

Upon discovering that there actually was no gold in the Peruvian vault, the GWRC and HHRG boards immediately reported the situation to Credit Suisse and Fleet. Russo Aff. ¶67; Ryan Aff. ¶67; Affidavit of Eric Henzy ("Henzy Aff.) ¶9; Affidavit of Diddier Siffer ("Siffer Aff."); ¶11, 56(a)(2) ¶154. Within days, the lenders terminated their financing facilities with HHRG. Id. The termination of HHRG's financing facilities caused HHRG to stop accepting precious metal from refining customers, shut down its operations and file for bankruptcy protection on March 28, 2000. Russo Aff. ¶¶67-68; Ryan Aff. ¶¶67-68; Henzy Aff. ¶10; Affidavit of Jed Horwitt ("Horwitt Aff."). ¶¶10-11; Siffer Aff. ¶9; 56(a)(2) ¶154.

Upon learning of its cessation of business and exposure from Panexim, many HHRG customers who placed their precious metals on deposit at HHRG demanded immediate return of their precious metals. Russo Aff. ¶68; Ryan Aff. ¶68; Henzy Aff. ¶12; Horwitt Aff. ¶11; 56(a)(2) ¶155. HHRG was not legally or practically able to comply with these demands. In the bankruptcy proceedings, HHRG's major customers were not interested in continuing to do business with HHRG, but only interested in obtaining their metal on deposit. Affidavit of Kenneth Wightman ("Wightman Aff.") ¶11; Horwitt Aff. ¶11; Henzy Aff. ¶12. As a result, HHRG was forced to liquidate its assets. Russo Aff. ¶70; Henzy Aff. ¶13; Horwitt Aff. ¶12; Ryan Aff. ¶70. The liquidation value of HHRG's income producing assets realized through

13

the bankruptcy was less than the costs associated with holding and selling those assets. Horwitt Aff. ¶16; 56(a)(2) ¶168. The liquidation of HHRG's assets also caused the demise of GWRC and the liquidation of GWRC's assets. Ryan Aff. ¶77. As a result of HHRG's liquidation, GWRC was unable to meet its obligations to Credit Suisse and Rothschild. GWRC was forced to liquidate its assets under Australian law. Russo Aff. ¶77; 56(a)(2) ¶268

## III.    ARGUMENT

### A.    Causation Of Damage Is An Issue Of Fact For The Jury And Is Rarely Amenable To Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Summary judgment may be granted under Rule 56 only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Media Group, Inc. v. Tuppatsch, 298 F.Supp.2d 235, 240 (D.Conn. 2003).

To be entitled to summary judgment, the moving party must establish that there is no genuine material dispute of fact. Carlton v. Mystic Transportation, Inc. 202 F.3d.129, 133 (2d Cir. 2000); Tuppatsch, 298 F.Supp. 2d at 240. This burden is only established when the moving party can point to the absence of evidence to support an essential element of the non-moving party's claim. See Celotex Corp., 477

14

U.S. at 322-23. Any inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing a motion for summary judgment. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986).

The existence or absence of proximate cause is generally a question of fact that must be resolved by the trier of fact. <u>West Haven Sound</u>, 201 Conn. at 317. "It only becomes a question of law when the mind of a fair and reasonable person could reach only one conclusion: if there is room for reasonable disagreement the question is one to be determined by the trier as a matter of fact." <u>Driscoll v. Gen. Nutrition Corp.</u>, 34 F.Supp.2d 789, 794 (D.Conn. 1999), citing <u>Stewart v. Federated Dep't. Stores, Inc.</u>, 234 Conn. 507, 611 (1995). <u>Slepski v. Williams Ford, Inc.</u>, 170 Conn. 18, 22 (1975)("Where the plaintiff has introduced evidence which removes the issue of proximate cause from the realm of mere speculation, that issue presents a question of fact for the trier . . . The plaintiff is not required to show only one possible theory of causation, negating all others."(internal citations omitted).

**B.**    **Expert Testimony Is Not Required To Establish Proximate Cause In This Case**

PwC claims that it is entitled to judgment as a matter of law because the plaintiffs have not designated an expert witness to testify that PwC's breach of contract or negligence was the proximate cause of the destruction of HHRG and

15

GWRC's businesses.  PwC simply is wrong that independent expert testimony is required as the method of proof on this issue in this case.

There is no Connecticut case holding that in an accounting malpractice or breach of contract case an expert is required to testify as to causation of damage (as contrasted with the standard of care).  Nor does PwC provide this Court with any controlling or other authority from any American or foreign jurisdiction that so holds.[5]  PwC's argument is based upon cases that are clearly distinguishable and more importantly, its argument ignores the fundamental principles upon which causation issues are based.

In order to recover damages in a professional malpractice action, the plaintiff must prove that (1) the defendant was obligated to conform to a recognized standard of care, (2) the defendant deviated from that standard, (3) the plaintiff suffered some injury and (4) the defendant's act in departing from the standard of care caused the plaintiff's injury.  Pisel v. Stamford Hospital, 180 Conn. 314, 334-42 (1980); LaBienic v. Baker, 11 Conn. App. 199, 202-203 (1987).  Plaintiffs have expert and non-expert evidence to establish the first three elements above and they are not in issue for PwC's motion.  See Salomon and Love Reports; Affidavits submitted herewith.

As to the fourth element concerning the cause of the plaintiffs' losses, causation under Connecticut law consists of two elements: (1) actual cause and (2)

_____

[5] One would assume that PwC and its general counsel's office would be well aware of any such authority if it existed given PwC's experience as a defendant in accounting malpractice cases.

proximate cause. <u>Coste v. Riverside Motors, Inc.</u>, 24 Conn.App. 109, 113 (1991).

Actual cause requires evidence that the loss would not have occurred in the way that

it did without the defendant's conduct. <u>Id.</u> Proximate cause is an actual cause that is

a substantial factor in the resulting harm. <u>Doe v. Manheimer</u>, 212 Conn. 748, 757

(1989). "The test of proximate cause is whether the defendant's conduct is a

substantial factor in bringing about the plaintiff's injuries." <u>Barry v. Quality Steel</u>

<u>Products, Inc.</u>, 263 Conn. 424, 433 (2003); <u>Paige v. St. Andrew's Roman Catholic</u>

<u>Church Corp.</u>, 250 Conn. 14, 25 (1999). <u>See also</u> <u>Doe v. Manheimer</u>, 212 Conn. at

758.

 The defendant's conduct is a substantial factor if it materially contributes to

the plaintiff's loss. <u>Lewandoski v. Finkel</u>, 129 Conn. 526, 529 (1942). <u>See also</u>

<u>Lupatin v. Shine</u>, 117 Conn. 698, 699 (1934)("negligence could not materially

contribute to the accident without being a substantial factor in its productions). The

substantial factor test is "whether the harm which occurred was of the same general

nature as the foreseeable risk created by the defendant's negligence." <u>Doe v.</u>

<u>Manheimer</u>, 212 Conn. at 758. Proximate cause is determined by looking from the

loss to the negligent act complained of for the necessary causal connection. <u>Paige</u>,

250 Conn. at 26.

 Like proximate cause in tort theory, causation is also an element of a breach

of contract claim. "It is hornbook law that to be entitled to damages in contract a

17

plaintiff must establish a causal relationship between the breach and the damages flowing from that breach." Calig v. Schrank, 179 Conn. 283, 286 (1979).

In this case, the issue of whether PwC's negligence and breach of contract caused the destruction of the plaintiffs' businesses does not require scientific, technical, or other specialized testimony from an independent expert witness. See Fed. R. Evid. 702. Instead, the plaintiffs have the specialized knowledge and deep experience of executives with approximately 100 years experience in all aspects of the precious metals industry. Competent evidence contained in the affidavits of Sean Russo, Michael Ryan, Richard Hayes, and John Bullock is not rebutted by any evidence from PwC. The testimony of John King and other affidavits and materials submitted in opposition to PwC's motion sets forth sufficient facts from which a jury can conclude without the assistance of a paid expert that there is a clear, simple, and ineluctable causal link between PwC's breach of contract and negligence and the plaintiffs' damages. See Section C, infra.

These affidavits establish the sequence of events that took place after PwC failed to disclose the existence of unsecured advances in June 1998. These affidavits also demonstrate that the board members of HHRG and GWRC would have taken decisive action had PwC disclosed what it knew in 1998. These actions by the board members would have prevented the dramatic increase in unsecured advances after June 1998 that destroyed HHRG. Based on this evidence, a jury may properly find

18

without resorting to conjecture or surmise that PwC's conduct was the proximate cause of HHRG and GWRC's losses.  See Section C, infra.

Other courts have held that a jury is capable of determining that an accountant's breach of duty was the proximate cause of a client's losses without the aid of expert testimony.  Seafirst Corp. v. Jenkins, 644 F.Supp. 1152, 1155 (W.D.Wash. 1986).

In Seafirst, the court denied a motion for summary judgment filed by the defendant auditor that claimed that the auditor's negligence was not the proximate cause of the plaintiff's losses.  Seafirst Corp., 644 F.Supp. at 1155.  The plaintiff alleged that it suffered financial losses arising from loans that were made by certain employees without proper approval and without sufficient supporting documentation. The plaintiff further claimed that its losses were caused by the defendant auditor's negligent failure to advise the plaintiff's board of directors of material weaknesses in the plaintiff's internal controls.  Id. at 1154.  The defendant contended that any negligence on its part could not have been the cause of the plaintiff's losses because members of management and a board member were aware of the improper loans.  Id. at 1155.  In response to the defendant's motion for summary judgment, two members of the plaintiff's board of directors attested to the fact that had the auditor disclosed the inadequacy of the plaintiff's internal controls over disbursement of the loans, "they are sure that the Audit and Examining Committee and Board would have taken

immediate steps to correct these significant shortfallings." Id. at 1155 (emphasis added).

Based on the evidence set forth above, the court agreed that "the causal link, if any, between [the defendant's] alleged failure to report, the existence of material weaknesses in internal controls and loan losses suffered by Seafirst is an issue of fact that the trier of fact must decide." Seafirst Corp., 644 F.Supp. at 1155 (emphasis added).

Similarly, in Board of Trustees of Community College District No. 508, County of Cook v. Coopers & Lybrand, LLP, 775 N.E.2d 55 (Ill.App. 2002), the Illinois Appellate Court affirmed the trial court's entry of judgment in favor of the plaintiff on the jury's verdict that the defendant auditor's professional negligence and breach of contract proximately caused the plaintiff's losses. The plaintiff claimed that the defendant's professional negligence and breach of contract in failing to detect and notify the board of directors of the treasurer's violation of the plaintiff's investment policy and illegal and inappropriate investments was the proximate cause of its financial losses. Id. at 61. Specifically, the plaintiff contended that had the defendant disclosed the illegal and inappropriate investments, the board of directors would have taken necessary steps to bring the investments into compliance with the plaintiff's investment policy and avoid the losses. Id.

The trial court and appellate court found the trial testimony of several board members and former trustees of the plaintiff sufficient to establish proximate cause.

20

The board members testified to the actions they would have taken had the defendant notified the board of the violations of company policy. Id. Based on this evidence, the court concluded that the auditor's failure to detect the treasurer's violation of the plaintiff's investment policy and the plaintiff's inability to correct the problem could lead to the financial losses alleged by the plaintiff. Board of Trustees of Community College District No. 508, 775 N.E.2d at 63.[6] The court focused on the testimony of these lay witnesses in concluding that there was sufficient evidence of causation for the jury. While an expert testified on what a board would have done had it been informed of the policy violation, the court made no reference to that testimony in its consideration of the adequacy of the causation proof.

C.    **There Is Ample Evidence From Which The Jury Can Conclude That PwC's Negligence and Breach of Contract Caused the Destruction of The Plaintiffs' Businesses**

As set forth above, HHRG proffers affidavits of various members of the boards of directors of HHRG and GWRC that show that had PwC notified the HHRG or GWRC boards, or the audit committee, in June 1998 that PwC knew that an employee of HHRG was making unsecured advances of millions of dollars to

---

[6]    Just as PwC assured HHRG that it would pay particular attention to assure that unsecured advances would not be made, the defendant in Board of Trustees specifically proposed that "it would identify business risks and ensure that management acted upon such risks." Board of Trustees of Community College District No. 508, 775 N.E.2d at 63. The defendant's proposal to provide professional services included an audit approach that "provides assurance not only that your financial statements are accurate and provide a fair representation of your financial position, but that any business risks are quickly identified and acted upon by management." Id.

companies in South America, they would have taken swift action to prevent this blatant violation of HHRG policy from occurring in the future.

There is no dispute that HHRG maintained a strict policy against unsecured advances and there is overwhelming evidence that PwC was aware of the policy. Russo Aff. ¶¶33-34, 39-46; Ryan Aff. ¶¶42-48; Hayes Aff. ¶¶11-14; Bullock Aff. ¶¶10-13. The affidavits submitted by the plaintiffs explain the importance of this policy in the refining industry given the high price of precious metals. Id. This evidence is buttressed by the industry experience and expertise of the witnesses. Russo Aff. ¶¶3-12; Ryan Aff. ¶¶3-15; Hayes Aff. ¶¶4-7; Bullock Aff. ¶¶4-8. It can fairly be said they know the industry to a depth unmatched by any PwC witness.

The affidavits of GWRC board members confirm that a violation of the policy on unsecured advances could and did lead to catastrophic damage for a refiner such as HHRG. Russo Aff. ¶43; Ryan Aff. ¶46; Hayes Aff. ¶¶12-13. PwC's failure to disclose the material information it held in June 1998 allowed the unsecured advances to increase dramatically between June 1998 and January 1999 to a level of over $10 million. Ultimately HHRG could not continue to operate as a going concern once unsecured advances by HHRG of more than $10 million were discovered. Henzy Aff. ¶¶10-13; Horwitt Aff. ¶¶9-12; Russo Aff. ¶¶61-70; Ryan Aff. ¶¶61-70; Siffer Aff. ¶¶7-9; Wightman Aff. ¶¶7-12.

In this case, the plaintiffs also have actual evidence of how the GWRC board and others reacted in 1999 to questions about unsecured advances to Panexim. Ryan

22

Aff. ¶¶52-60; Russo Aff. ¶¶51-60. The jury will be able to evaluate this evidence in considering what the same individuals would have done in 1998 if PwC advised them of unsecured advances in 1998.

When HHRG finally learned in February, 2000 that $10 million or more of unsecured advances existed, HHRG immediately disclosed this situation to its lenders who immediately terminated financing of HHRG. Siffer Aff. ¶7; Russo Aff. ¶61; Ryan Aff. ¶61. This forced HHRG to stop accepting metal for refining and within days, file for bankruptcy. Id. The affidavits further show that GWRC, which derived a substantial amount of its income from HHRG, was forced to halt trading in its stock on the Australian Exchange and later compelled to liquidate its assets. Russo Aff. ¶ 77.

The risk that HHRG's business could be adversely affected by extending unsecured credit to companies in South America was foreseeable and foreseen by PwC as early as 1996. Russo Aff. ¶ 33; Ryan Aff. ¶ 35. In connection with its due diligence work relating to the acquisition of the precious metals refining division, PwC stated: "Based on our previous experience with overseas activities, we believe that there is serious risks associated with the Company's ... credit exposure with South American business ...." RFA 33 (Ex. 1); see also Ex. 3 at I.9. Based on this risk, PwC, as part of its audit plan in 1998, prepared a Service Plan in which PwC recognized the collectability of foreign accounts receivable as a critical matter to the audit. PwC stated it would assure that advances to third world countries are not made

unless material is in the possession of HHRG. PwC referred to this service plan as the baseline against which HHRG could measure PwC's performance.[7]

Sean Russo, Michael Ryan, Richard Hayes, John Bullock, and John King all attest to the fact that if they were advised in June 1998 of the unsecured advances to Panexim, they would have taken steps to stop unsecured advances to Panexim after June 1998. Russo Aff. ¶¶71-72; Ryan Aff. ¶¶71-72; Hayes Aff. ¶¶22-27; Bullock Aff. ¶¶19-22; Deposition of John King, p. 336-337 (Ex. 13). PwC has offered no expert or lay witness to dispute this evidence. For purposes of summary judgment, it is undisputed.

The testimony of John King, treasurer of HHRG who first raised issues concerning Panexim in May of 1999, is compelling on this point.

Q.    ...If in March of 1998, PricewaterhouseCoopers knew that money was being sent from HHRG to a customer for the payment of VAT, that's something you would have liked to have known as the treasurer of HHRG; correct?

A.    Yes.

Q.    If PwC knew that money was being sent to a customer when metal was not in the possession of HHRG to secure that money, that's something you would have liked to have known as the treasurer of HHRG; is that correct?

A.    Yes.

---

[7]  PwC specifically referenced its Service Plan in its audit engagement letter to HHRG concerning the audit of HHRG's records for the fiscal year ending March 31,1998. PwC stated: "Our service plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the engagement objectives and meet, and/or exceed your expectations." See Ex. 6

> Q.    If PwC knew that HHRG sent money to a customer for the payment of
>        VAT in March of 1998, is that something that you would also have
>        liked to have known for purposes of verifying compliance with the
>        banks' loan agreements?
>
> A.    Yes.

See King Deposition (Ex. 13), pp. 363-364.  Mr. King further testified that he learned

of a large, although apparently secured, receivable from Panexim in May 1999.  Upon

learning of this situation, King notified the audit committee of GWRC.  See King

Deposition, p. 337, 338.  King further testified that had he been informed of the

unsecured advances to Panexim in 1998, he would have taken action.  Specifically, he

testified:

> Q.    If someone had brought that information to you, would you have acted
>        upon that information?
>
> A.    I -- I would have tried, but, I mean, it's more likely I would have
>        referred it to, you know, more senior management, you know, more
>        Golden West for alternatives.

King Deposition, pp. 336-337.

      John Bullock also attests to the fact that he would have taken action.  See

Bullock Aff. ¶¶19-22.

      The evidence contained in the affidavits of Messrs. Ryan, Russo, Hayes,

Bullock, Warren, Horwitt, Henzy, and Siffer is sufficient competent evidence from

which a jury could conclude, without independent expert testimony, that PwC's

breach of contract and negligence caused the destruction of HHRG and GWRC.  Put

most starkly, within weeks after it became known by the HHRG and the GWRC

boards that unsecured advances to Panexim in excess of $10 million existed, HHRG

was forced to shutter its refinery and file for bankruptcy. There could scarcely be a

more compelling argument that proximate cause in this case is an issue for the jury.

### D.    The Medical Malpractice And Other Cases Upon Which PwC Relies Are Not Applicable

PwC vainly tries to analogize this case to medical malpractice cases in which

expert testimony many times must be offered on the issue of causation. However,

even in medical malpractice cases, expert causation testimony is not required in the

following circumstances: (1) when the medical condition is obvious or common in

everyday life; (2) when the plaintiff's evidence creates a probability so strong that a

lay jury can form a reasonable belief; or (3) when the professional negligence is so

gross to be clear even to a lay person. Shegog v. Zabrecky, 36 Conn.App., 737, 746-

747 (1995).

Connecticut courts also have held that it is proper to allow a jury to determine

the issue of proximate cause in other professional and general negligence cases

without the need for expert testimony. See Aspiazu v. Orgera, 205 Conn. 623, 631

(1987)("expert testimony is not always mandatory if the medical condition is obvious

or common in everyday life."); State v. Orsini, 155 Conn. 367, 372 (1967)(witness

permitted to testify to the fact that she was pregnant without expert testimony);

Gannon v. S.S. Kresge Co., 114 Conn. 36, 38 (1931) (holding that jury could properly

conclude that plaintiff's ingestion of glass caused miscarriage six months later

without testimony of expert witness); <u>Parker v. Supermarkets General Corp.</u>, 36 Conn. App. 647, 652 (1995)(jury could infer that defendant's negligence caused plaintiff a permanent injury without expert testimony based on plaintiff's testimony, nature and duration of injury, likelihood of continuance in the future, and lack of total recovery); <u>Doe v. Advisors Healthcare, Inc.</u>, No. X01-CV-020173300S, 2005 WL 1089176 at *5, (Conn. Super. Ct. March 24, 2005)(denying motion for summary judgment in negligence action against nursing home because jury, using common knowledge, could conclude that sexual assault caused plaintiff harm).

Many of the defendant's cases involve complex medical issues where causation is not within the sphere of a lay person's common knowledge. <u>See</u> <u>e.g.</u> <u>Wills v. Amerada Hess Corp.</u>, 379 F.3d 32 (2d Cir. 2004)(whether exposures to toxins caused plaintiff's death); <u>Davis v. Rodriguez</u>, 364 F.3d 424 (2d Cir. 2004) (whether failure to remove bullet in plaintiff's leg caused plaintiff any injury); <u>Boone v. William W. Backus Hospital</u>, 272 Conn. 551 (2005)(whether release of plaintiff's child from emergency room without further treatment or whether medicine given to child in hospital caused child's death); <u>Sherman v. Bristol Hospital</u>, 79 Conn.App. 78 (2003)(whether negligent administration of morphine following surgery caused plaintiff to suffer heart attack); <u>Cambell v. Pommier</u>, 5 Conn.App. 29 (1985)(whether negligent operation of x-ray machine caused plaintiff's decedent to suffer excessive x-ray radiation); <u>Law v. Camp</u>, 116 F Supp. 2d 295 (D. Conn. 2001) (whether

respiratory arrest suffered before plaintiff was placed on life support caused the plaintiff's death was far from the sphere of a lay person's common knowledge).

Unlike the complex scientific causation issues in the cases upon which PwC relies, HHRG's causation case is grounded in simple, dramatic, and ineluctable facts that a jury can easily understand. Had PwC informed HHRG in 1998 that a certain employee of HHRG was making unsecured advances to companies in South America when HHRG did not have metal in its possession, the boards of HHRG and GWRC and the audit committee would have prevented future unsecured advances. Had the advances stopped in June 1998, HHRG would have not been exposed to the unsecured receivable that arose from the advances totaling more than $10 million that occurred between June 1998 and January 1999. The evidence also shows that the Panexim receivable was the primary basis of Credit Suisse's decision to terminate HHRG's financing. See Siffer Affidavit at ¶¶7-8. Once HHRG's financing was terminated, HHRG was forced to shut down its operations, file for bankruptcy and liquidate its assets. In sum, there is sufficient competent evidence from which a jury using their common knowledge can link PwC's conduct in June 1998 to the destruction of HHRG and the subsequent demise of GWRC. This issue is one of fact that must be resolved by a jury.

PwC's reliance on the need for expert testimony and an event study in order to prove causation in cases involving securities' fraud is also misplaced. See PwC Memo at 26-27 and cases cited therein. As discussed previously, HHRG does not

28

claim that it suffered a decline in the value of its business over time as a result of

HHRG's conduct.  Rather, HHRG contends that its business was totally destroyed as

a result of PwC's negligence and breach of contract.  Expert testimony is not needed

for a jury to conclude, without resorting to conjecture or surmise, that PwC's conduct

caused the destruction of HHRG's business.  Because there is more than sufficient

evidence from which the jury can decide the issue of causation, and because the issue

of proximate cause is a question of fact that must be resolved by the jury, PwC's

motion for summary judgment should be denied.[8]

### E.    There Is Ample Evidence In This Case From Which The Jury Can Determine Damages With Reasonable Certainty

As stated above, PwC's mistakenly interprets the issue of damages in this case

to be one of diminution in the value of HHRG over a period of time.  Based on this

misinterpretation, PwC believes that HHRG cannot prove to a jury that PwC's

negligence, rather than other unrelated factors, caused HHRG's business to decline.

PwC is wrong for a number of reasons and it has not established that it is entitled to

judgment as a matter of law.

---

[8]  Although for all of the reasons set forth above, the plaintiffs do not require expert testimony to prove causation, in an abundance of caution and to avoid any potential appellate issues in response to PwC's arguments in this regard, the plaintiffs have demonstrated the expertise and relevant experience of Messrs. Russo and Ryan as described in their affidavits. To the extent their testimony as set forth in the affidavits may be characterized as "expert opinion", the plaintiffs disclose herewith Messrs. Russo and Ryan as experts on all of the matters set forth in their affidavits.  Both Russo and Ryan are clearly experts in the precious metals refining business and in the business of HHRG and GWRC as their affidavits attest.  Moreover, by disclosing them as experts, the plaintiffs directly address the hyper-technical argument asserted by PwC. There is also no prejudice to PwC by this disclosure given that everything the witnesses will testify to has been in this case from the day it was filed and each witness has been deposed and will appear for trial.

The plaintiffs are not seeking damages for diminished profits or a decrease in the value of HHRG's business over a period of time. Rather, the evidence submitted in opposition to PwC's motion and that which will be presented at trial will permit a jury to conclude that the plaintiffs' businesses were <u>destroyed completely</u> as a result of PwC's negligence and breach of contract. The plaintiffs, therefore, seek to recover damages for the complete destruction of their businesses.

In support of its damage claim, HHRG has disclosed Craig Elson as its expert witness. Following the methodology approved by the Connecticut Supreme Court in <u>West Haven Sound</u> and other cases, Elson relied primarily upon the capitalization of projected profits method to determine the value of HHRG. Specifically, Elson determined the value of HHRG based upon the capitalized value of the profits HHRG would have earned after June 30, 1998 <u>had the unsecured advances to Panexim not taken place. See</u> Report of Craig Elson ("Elson Report"), (Ex. 25 to PwC's Motion) and Elson Aff. ¶¶4-5.

PwC challenges this methodology by claiming that it is nothing more than a valuation opinion as of an arbitrary date and by arguing that Elson ignores all sorts of factors that PwC claims affected HHRG after June 1998. The Supreme Court rejected this exact same argument in <u>West Haven Sound</u>, <u>supra</u>. In that case, the defendant argued that the plaintiff's expert failed to consider factors that occurred after the defendant's alleged breach including the fact that the plaintiff had "actually operated at a loss." As explained by the Supreme Court:

> The fact that the restaurant actually operated at a loss after the breach is certainly not fatal to [the expert's] prediction of what might have occurred had the contract been performed. We can agree with the defendant that the actual profit data was a relevant consideration against which [the expert] might have checked the accuracy of his projections. This was the proper subject of cross-examination, and the defendant in fact questioned [the expert] in detail as to whether he had evaluated the actual data. We do not believe, however, that [the expert] should have been precluded from using econometric projections to predict future profits merely because those projections were contradicted by the restaurant's actual profit performance after the breach.

West Haven Sound, 201 Conn. at 318 (1986).

In this case, the same is true. For example, if PwC believes that Elson's projections should be adjusted because they did not consider metal lease rates in 1999 or because they do not account for the Enviromet acquisition in late 1998, they are free to cross-examine Elson as much as they want on those issues. Similarly, the plaintiffs are free to offer their own evidence as to why these assertions by PwC are irrelevant to the valuation of HHRG. Indeed, as set forth in the Affidavits of Russo and Ryan, the plaintiffs vigorously dispute that the factors cited by PwC in fact had any effect on the valuation of HHRG at that time. See Russo Aff. ¶78; Ryan Aff. ¶ 78. (This disputed set of facts is another reason to deny summary judgment.)

In West Haven Sound, the Court also recognized that if "the breach had thrust the plaintiff into such abject financial condition as to be unable to profitably exploit the value of whatever goodwill survived the breach", then the loss is complete. West Haven Sound, at 325 n.5.

31

As stated in the affidavits of Russo, Ryan, Henzy, Siffer, Wightman, and Horwitt, that is exactly what occurred in this case. Russo Aff. ¶¶67-70; Ryan Aff. ¶¶67-70; Henzy Aff. ¶¶8-13; Siffer Aff. ¶¶8-11; Wightman Aff. ¶¶7-12; Horwitt Aff. ¶¶8-13. As a direct result of the Panexim unsecured advances, HHRG lost its financing without which it could not operate at all; and as a direct result of the Panexim unsecured advances, it lost the confidence of its customers, without which it could not operate at all. Id. When the unsecured advances to Panexim became known, HHRG was represented by sophisticated counsel, had sophisticated lenders, and had sophisticated board members. Id. All of these persons recognized at the time that HHRG could not continue to operate and that it had no option but to liquidate its assets under the auspices of the Bankruptcy Court. Id. Certainly, this is what the Supreme Court had in mind when they used the words "abject financial condition." At a minimum, this is a question for the trier of fact.

As explained by Craig Elson in his affidavit, to the extent the income producing assets of HHRG retained any net value in liquidation, that value should be credited against the going concern value of the business. Elson Aff. ¶¶10-11. In this case, and as will be explained at trial in great detail, the net value of those assets was zero. See Horwitt Aff. ¶¶13-16. For present purposes, these issues clearly involve disputed issues of fact that cannot be determined on a motion for summary judgment.

Elson's valuation methodology is also consistent with the law of damages caused by torts. Restatement (Second) of Torts §906, cmt. A. This measure also has

32

been applied by other courts.  See, e.g., Mattingly, Inc. v. Beatrice Foods Co., 835

F.2d 1547, 1560 (10th Cir. 1987), opinion vacated following settlement, 852 F.2d 516

(10th Cir. 1988) (damage for destruction of business caused by misrepresentation

measured as difference between value at commencement of misrepresentations in

1974 and value when it ceased operations in 1977).

In Mattingly, the plaintiff, a swimming pool installation and maintenance

company, sued the defendant Beatrice Foods for misrepresentation and breach of

warranty.  Mattingly used a spray-on coating manufactured by Beatrice.  The coating

stained and peeled severely.  Relying on Beatrice's misrepresentations about the

product and on additional defective products Beatrice supplied to remedy the

problems, Mattingly's business deteriorated.  Three years later, Mattingly went out of

business.

After a bench trial, the trial court calculated Mattingly's damages by valuing

the business as of December 31, 1977, the date the parties ceased doing business, and

shortly before Mattingly ceased its operations.  The Tenth Circuit found error in the

trial court's decision.

> Such an approach would be correct where the injury
> occurred instantly from one wrong, such as one act of
> arson.  Here, however, the damage resulted over a
> protracted period of time.  On December 31, 1977, the
> business had suffered the deleterious effects caused by
> Beatrice's products for more than three years.  As a
> consequence, any valuation on December 31, 1977
> would fail to account for the decline that ensued after
> the Mattinglys began using Beatrice's products.... On

> remand, therefore, in determining the proper measure of
> damages for the destruction of Mattinglys' businesses,
> the trial court should ... determine the companies' value
> before and after the continuing wrongs and make
> findings concerning the difference in market value of
> the companies from 1974 to 1977.

Id. at 1560. As articulated by the Tenth Circuit in Mattingly, the measure of tort damages for the destruction of business is a simple application of the well established rule that damages in tort for impairment to or destruction of property is the difference in value before and after the defendant's misconduct. See also B. F. Goodrich Co. v. Mesabi Tire Co., 430 N.W.2d 180, 183-184 (Mn. 1988); Lively v. Rufus, 533 S.E.2d 662, 669 (W.Va. 2000).

Finally, it is well-settled that an owner of a business is permitted to testify as to their opinion about the value of the business without having to resort to expert testimony. Westport Taxi Serv., Inc. v. Westport Transit Dist., 235 Conn. 1, 35 (1995); Somers v. LeVasseur, 230 Conn. 560, 566 (1994), Griffin v. Nationwide Moving & Storage Co., 187 Conn. 405, 422 (1982). The affidavits of Sean Russo and Michael Ryan thus contain competent evidence from which a jury can conclude that HHRG could not operate any longer and that it was forced to liquidate its assets.

## IV.    CONCLUSION

For the foregoing reasons, PwC's motion for summary judgment should be denied.

34

Respectfully submitted,

HANDY & HARMAN REFINING GROUP, INC.,

By: _____
    William H. Champlin III, (ct04202)
    William S. Fish (ct05349)
    Michael T. McCormack, (ct13799)
    Tyler Cooper & Alcorn, LLP
    CityPlace, 35th Floor
    185 Asylum Street
    Hartford, CT  06103
    Tel:  (860) 725-6200
    Fax:  (860) 278-3802


GOLDEN WEST REFINING CORPORATION


By: _____
    Steven Humphrey, Esq. (ct06053)
    shumphrey@rc.com
    ROBINSON & COLE, LLP
    280 Trumbull Street
    Hartford, CT  06103
    Tel: (860) 275-8221
    Fax: (860) 275-8299

35

## CERTIFICATION

I hereby certify that on September 2, 2005, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept filing]. Parties may access this filing through the Court's system.

Steven Greenspan, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
James M. Ruel, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman
 & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

Stefan Dandelles, Esq.
Daniel McMahon, Esq.
Wilson, Elson, Moskowitz Edelman
 & Dicker LLP
120 North LaSalle Street
Suite 2600
Chicago, IL  60602

Michael T. McCormack