UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1379(MRK) |
| ALEC SHARP, et al.<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK)<br><br>SEPTEMBER 2, 2005 |

**CONSOLIDATED LOCAL RULE 56(a)(2) STATEMENT
OF HANDY & HARMAN REFINING GROUP, INC. AND
GOLDEN WEST REFINING CORPORATION LIMITED**

Pursuant to Local Rule of Civil Procedure 56(a)(2), the plaintiffs Handy & Harman Refining Group, Inc. (HHRG) and Golden West Refining Corporation Limited (GWRC), in opposition to motions for summary judgment filed by the defendant PricewaterhouseCoopers LLP, respectfully submit the following statement.

## THE PARTIES

1. Admitted

2. Admitted.

3. Admitted.

4. Admitted.

5. Plaintiffs admit that the acquisition of the Precious Metals Refining Division of Handy & Harman was completed in August 1996. It is further admitted that the acquisition was funded with a cash contribution of $8.645 million from GWRC. The plaintiff denies that the "price" of the acquisition was "$9 million." The acquisition was accounted for as a purchase transaction of assets and assumed liabilities. The acquisition also included the assumption of liabilities of approximately $6 million for a total transaction value of over $15,000,000. (See 1997-1998 HHRG Consolidated Financials, Def. Ex. 2 to Defendants' Exhibit on Summary Judgment, Affidavit of Sean Russo, ¶ 26.

6. Admitted.

### Factors Affecting HHRG's Financial Performance After Mid-1998

7. Admitted

8. Admitted

9. The plaintiffs deny that a "significant source" of HHRG's metal supply came from precious metals recovered from electronic scrap. The plaintiffs admit that in late 1998, GWRC issued a press release, but plaintiffs deny that the press release announced reduced profits "particularly from its U.S. operations." The plaintiffs admit that the press release indicated that "The Northern Hemisphere summer is

2

traditionally a quiet period in our industry, however an additional effect was felt in the electronic scrap sector as a result of the slow down in computer manufacture and replacement due to the South East Asian financial crisis." (Def. Ex. 3)

10. The plaintiffs deny that the June 1999 GWRC press release concerned its "first half earnings." The release deals with the year end results as of March 1999. The portion of the June 1999 press release quoted in Paragraph 10 is an accurate quotation of the third paragraph of the press release but does not include the remaining portion of the press release which is necessary for a complete understanding of the statement. The press release reference to Handy & Harman Refining Group, Inc. concludes "these successes should combine with the strong and diverse core businesses and the range of other initiatives under consideration to insure long term growth and profitability of HHRG." (GWRC Press Release Second Half Performance Boasts Profit for Golden West, June 1999 (Def. Ex. 35).)

11. The plaintiffs admit that in its July 1999 Operations Report, HHRG noted that less electronic scrap was being generated by OEM manufacturers. As to the remaining portion of Paragraph 11, the plaintiffs deny that the paragraph accurately states the content of the Operations Report. (Def. Ex. 18)

12. Admitted.

13. The plaintiffs admit the first, second and third sentences of Paragraph 13. With regard to the fourth sentence, the plaintiffs admit that the report also stated that competition, primarily from Switzerland, had caused a continued decline in "high grade gold refining" margins. With regard to the remaining statement that gold refining charges had been driven down by one third, the report referenced in

3

Paragraph 13 does not make such a statement but rather states that the average treatment charge for refining gold has been 45¢ per ounce and competition primarily from Switzerland has driven the price into the 30¢ per ounce range. (Def. Ex. 6)

The statement set forth in the final sentence of Paragraph 13 is admitted.

14. Admitted.

15. The plaintiffs admit that with respect to the Master Precious Metals Purchase and Refining Agreement by and between Attleboro Refining Company, Inc., a subsidiary of HHRG, and Credit Suisse, dated August 20, 1996, Attleboro Refining Company paid a metal lease rate in effect from time to time. The plaintiffs deny that the "lease rate" was effectively HHRG's financing cost. The lease rate affected only a portion of HHRG's financing. The plaintiffs admit that the higher the lease rate that more would be paid to Credit Suisse. The remainder of Paragraph 15 is denied. Russo Aff. ¶32; Report of Craig Elson dated March 18, 2005 at p. 7 n. 15 (Def. Ex. 25).

16. The plaintiffs admit that HHRG had silver borrowing costs that exceeded the profit HHRG expected to make on one specific contact or transaction for refining services that were to take place over a period of months. The plaintiffs further admit that higher metal lease rates for silver in 1998 had a negative impact on HHRG's broader business. The plaintiffs deny that in 1998, metal lease rates for silver went up "five fold." Russo Aff. ¶78a; Affidavit of Michael Ryan (Ryan Aff.) ¶78a; Def. Expert Report of William F. Pinney ("Pinney Report") at 3 and Def. Ex. 5 (Def. Ex. 9).

4

17. Denied. Russo Aff. ¶78a, Ryan Aff. ¶78a).

18. The plaintiffs admit that HHRG's Board Chairman, Mr. Guy, in September 1999, wrote that "HHRG has not reacted as well as it should to the deteriorating market. In part this is due to what, in retrospect, were appalling budgetary procedures. It is also due as colleagues have persistently pointed out over the last twelve months, to an inability to cost properly the various activities of the company."

The plaintiffs admit that the memorandum of Mr. Guy stated that for budget year 1999/2000, "The latest forecast is 3.5 plus with no prospect, in the short term of turning round the core refining businesses and therefore much rests on one-offs such as technology sales."

19. Admitted.

20. Admitted.

21. The plaintiffs admit the first two sentences of Paragraph 21. With regard to the third sentence, the plaintiffs admit that HHRG exercised the option to purchase Environment on September 30, 1998 and purchased Environment for $2.3 million in cash.

The plaintiffs further admit that after the bankruptcy of HHRG, the plaintiffs discovered the information contained in the last three sentences of Paragraph 21 and, accordingly, admit that the information contained in those sentences is true but this information was not known to GWRC's directors until after the bankruptcy of HHRG in late March 2000.

22. Admitted.

23. The plaintiffs admit that GWR Canada, owned by GWRC, had performed poorly and essentially had ceased to operate by November 1998, months before HHRG acquired GWR Canada. The remaining portions of Paragraph 23 are admitted.

24. Denied. The minutes of February 17, 1999 referenced in Paragraph 24 (Def. Ex. 13) state that Mr. Wayne "also noted that GWRC Canada was negatively impacting on the performance of HHRG (page 2) and at page 5 that GW Canada was currently negatively impacting the HHRG bottom line." (Def. Ex. 13)

### HHRG's Inadequate Financial Reporting

25. Denied. The plaintiffs admit that Mr. Christopher Wiggens, a member of the GWRC Board of Directors, recommended that GWRC develop a more sophisticated "profit centre reporting" system that would provide better quality information to management and directors on the performance of individual operating units. See Minutes of GWRC Audit Comm. Meeting; dated March 18, 1997 (Def. Ex. 14).

26. The plaintiffs admit that in mid-1998, a member of the GWRC Audit Committee commented "that he was disappointed that HHRG had not yet managed to produce profit centre management reports which were to have been provided as agreed last year." The remaining portion of Paragraph 26 is denied. The Audit Committee of GWRC "resolved that the board of GWRC should be asked to insist that profit centre reporting be prepared and this should form a topic for discussion at board level." The statements in Paragraph 26 mischaracterize the Audit Committee's action. (Minutes of GWRC Audit Comm. Meeting dated May 1, 1998. Def. Ex. 15,

at HHRG-PwC 11142-11143.)

27. The plaintiffs admit that in October 1998, Christopher Wiggens, a member of the GWRC Audit Committee raised the issue of HHRG's "unsatisfactory" profit centre reporting with Mr. Wayne and Mr. Ryan and Mr. Hayes. No other HHRG management was involved in this discussion. The plaintiffs admit Mr. Wiggens, in the memorandum to Mr. Wayne, Mr. Ryan and Mr. Hayes stated "the necessity for better reporting, which has been requested of HHRG for the last year, is highlighted by the worst than budgeted performance over the last six months for which there is no quantitative explanation." The remaining portion of Paragraph 27 is admitted.

28. The plaintiffs admit that in November 1998, Sean Russo, who sat on both the HHRG and GWRC Boards of Directors wrote that Wayne could not explain why HHRG was losing money in most of its operations because Mr. Wayne "ha[d] refused to adopt a more focus[ ]ed approach to profit centre reporting despite it being requested by the board." The remaining sentences of Paragraph 28 are denied as they mischaracterize the memorandum and the information set forth therein. Memorandum of Sean Russo to Richard Lee dated November 2, 1998 (Def. Ex. 17)

29. Admitted.

30. Admitted.

31. Admitted.

32. Plaintiffs admit that the Dempsey Report contains references to the matters set out in this paragraph.

33. Plaintiffs admit that the Dempsey Report contains references to the

7

matters set out in this paragraph.

34. The plaintiffs admit that on or about May 18, 1999, the HHRG and GWRC Boards of Directors became aware that a substantial receivable was owed from Panexim to HHRG. The plaintiffs further admit that when the Board of Directors confronted HHRG's CEO about this receivable, Mr. Wayne responded that gold had accumulated on behalf of HHRG in a secure vault in Lima, Peru because the Peruvian government had been controlling the amount of gold it permitted for export. The remaining portions of Paragraph 34 are admitted.

35. The plaintiffs admit the statement in Paragraph 35 except the plaintiffs state the assurances were provided by Barry Wayne and not "HHRG management."

36. Admitted.

37. The plaintiffs admit the statements of Paragraph 37 that the GWRC Board of Directors considered terminating Mr. Wayne and reached a decision to do so but deferred the actual termination. An additional sanction of the Board of Directors of GWRC towards Mr. Wayne included a deferral of any 1999 profit share distribution which would have been due to him. Russo Aff. ¶59.

38. The plaintiffs admit Paragraph 38 except that the Panexim audited financial statement provided to the Board of Directors was a purported financial report of 31 December 1999 and the purported management accounts to May 31, 1999. Dempsey Report at 28, 29 (Def. Ex. 19).

39. Denied. See July 26 GWRC Board Meeting minute (Def. Ex. 21).

40. Admitted.

41. Admitted.

8

42. Admitted.

43. Admitted.

44. Admitted.

45. The plaintiffs admit that in March 2000, a federal criminal indictment against Mr. Wayne, Mr. Searle and others was unsealed that alleged that, in the early 1990s, when they were employed by Handy & Harman, Mr. Wayne and Mr. Searle had participated in a scheme to defraud the government of Argentina through a scheme for the export of gold from that country.

46. Admitted.

47. The plaintiffs admit that the Managing Director's Report of Mr. Ryan on behalf of Golden West Refining Corporation, Ltd. and controlled entities, Def. Ex. 20, states at page 3 in part "During late February and through March 2000, despite being in breach of a number of key banking covenants as a result of the bullion loss, HHRG continued to have the support of its bankers, who had provided interim facilities. Negotiations with the bankers, Fleet National Bank and Credit Suisse First Boston International appeared to be likely to lead to a new agreement that would allow HHRG to continue to operate."

48. The plaintiffs admit that the Managing Directors Report of Mr. Ryan on behalf of Golden West Refining Corporation, Ltd. and controlled entities (Def. Ex. 20) states: "The news of the indictments complicated the negotiations with the banks and severely undermined the confidence of major customers and unsecured creditors."

49. The plaintiffs admit that HHRG was unable to work out satisfactory

arrangements with the lenders and other creditors and filed for bankruptcy protection on March 28, 2000. The plaintiffs further admit that HHRG no longer was a going concern or operating company after it ceased to do business in early March 2000 and then had no expectation of future earnings as a going concern. The plaintiffs admit that HHRG did have cash and used cash and the sale of assets, to pay its secured debt in full during the bankruptcy. Affidavit of Jed Horwitt ("Horwitt Aff.") ¶¶14 and 15.

50. Admitted.

51. The plaintiffs admit that in a settlement agreement dated December 31, 2001, Underwriters acknowledge that a covered loss exists for the Claim (a defined term under the settlement agreement) under the policy. The plaintiffs' further admit that HHRG submitted a Claim for losses arising from acts, errors or omissions on the part of former employees/consultants of HHRG, as named in the first Whereas clause of the settlement agreement, and others as more fully explained in a memorandum submitted on 9 March 2000 and more fully documented in a proof of loss dated 9 October 2000, both of which were incorporated into the settlement agreement by reference. The plaintiffs admit that pursuant to the settlement agreement, Underwriters paid $12.5 million to HHRG which HHRG agreed to accept to resolve the Claim.

52. The plaintiffs admit that pursuant to the settlement agreement, Underwriters was acknowledged by HHRG as "subrogee pursuant to the policy as to all losses asserted by the Assured in the Claim." In addition, the settlement agreement provided an assignment to Underwriters by HHRG of all rights, title and interest in any and all claims which the Assured has, had, or may ever have as to all

losses "asserted by the Assured in the Claim." The plaintiffs admit that the settlement agreement provided the quoted language set forth in Paragraph 52 in part. The plaintiffs admit that HHRG executed an Acknowledgement of Assignment and Subrogation. The Acknowledgement of Assignment and Subrogation contains the entire assignment of any and all claims to "all losses asserted by HHRG in the written Claim of 22 February 2000 submitted by HHRG to Underwriters under the Policy and which were more fully explained in a memorandum submitted to Underwriters on 9 March 2000 and more fully documented in a proof of loss submitted to Underwriters 9 October 2000...."

53. The plaintiffs admit that HHRG executed a separate Acknowledgement of Assignment and Subrogation which encompasses the "claim" as defined and asserted by HHRG under the Underwriters Policy.

### GWRC's Insolvency Proceeding

54. The plaintiffs deny that in late 1999 and early 2000 GWRC's quoted price on the Australian Stock Market declined precipitously. The per share closing price as of August 2, 1999 was 60¢ per share and the per share price on January 20, 2000 was 61¢ per share. The share price on February 22, 2000 was 48¢ per share. The plaintiffs admit that as of June 30, 1998, GWRC's reported price quote on the Australian Stock Exchange was 66¢ Australian. The plaintiffs further admit that the price per share fluctuated from 66¢ in June of 1998 to 70¢ in July of 1999 and to 47¢ as of January 23, 2000. The final share price on February 23, 2000, the day before the closing of trading was 36¢ reflecting a 12¢ decline between February 22, 2000 and February 23, 2000. See Report of Ian Hobson dated March 24, 2005, Sec. 7.2

11

and Annexure B (Def. Ex. 31).

55. The plaintiffs admit that on December 1, 1998, GWRC made an equalization payment of $7 million Australian dollars to establish a refining and manufacturing joint venture with the Gold Corporation called AGR Joint Venture on a 50/50 basis between the parties. GWRC funded this equalization payment with a loan from N. M. Rothschild and Sons (Australia) Pty. Ltd. The remaining portion of Paragraph 55 is denied because GWRC held additional assets. (Hobson Rep. at Sec. 4.1(b) and (c) (Def. Ex. 31)).

56. The plaintiffs admit that to service GWRC's debt to N. M. Rothschild and Sons (Australia), GWRC relied in part on cash generated by HHRG. The plaintiffs further admit that it is the position of GWRC that without the expected cash flow from HHRG, GWRC was left in a position where it's only income producing asset, AGR generated insufficient profit and cash flow to meet interest and principal reduction commitments. The plaintiffs admit that in August 2001, GWRC was placed into insolvency proceedings in Australia and that an administrator was appointed. The plaintiffs further admit that the date of the appointment of the administrator was August 17, 2001. The plaintiffs further admit that GWRC sold its interest in the AGR Joint Venture and has no operating assets or operations.

57. Plaintiffs admit that the damage theory of HHRG for negligence by PwC is set forth in part in Paragraph 57 but the statement is not complete and does not include reference to damages claimed for breach of contract and as set forth in HHRG's response to interrogatories. (Def. Ex. 27.)

58. The plaintiffs admit that HHRG has disclosed the following experts:

Craig T. Elson, John Dempsey, and John Saloman. HHRG has further cross designated as an expert Vincent Love. HHRG also expects to offer testimony of board members Russo and Ryan who are experts in the precious metals industry and have provided affidavits and will testify that had they known about unsecured advances to Panexim in June 1998 they would have taken action to atop such advances. They will further testify that HHRG could not continue as a going concern after March 2000. (Russo Aff. ¶ 70, 71, 72 and 80, Ryan Aff. ¶ 70, 71, 72 and 80.)

59.   Plaintiffs admit that the quotation of Mr. Elson's opinion in the first sentence is accurate. The remainder of Paragraph 59 sets forth testimony of Mr. Elson in a deposition based on statements to him by counsel regarding the date of breach of contract and negligence by PwC and the operation of HHRG thereafter. The testimony is accurately set forth.

60.   It is admitted that Mr. Elson provides no opinion as to the value of HHRG on the day on which it filed for bankruptcy protection in March 2000. The portion of Paragraph 60 as follows "or at any point between June 1998 and March 2000" is denied as the report sets forth the going concern fair market value of HHRG as of June 30, 1998. (Elson Rept., Def. Ex. 25.)

61.   Admitted

62.   The plaintiffs admit that Mr. Elson does not opine on any aspect of HHRG's performance after June 30, 1998 except to the extent his analysis is based on cash flow and profits he believes HHRG would have been expected to earn as set forth in his report and later affidavit of September 2, 1995, and does not consider any external industry factors that could have affected the performance of all refiners. The

13

plaintiffs deny that Mr. Elson should have taken into account in preparing his report as to the value of HHRG as a going concern on June 30, 1998, any industry factors that could have affected performance of <u>all refiners</u> or the operational or investment decisions by the HHRG Board of Directors after June 1998 and decisions of management after 1998 that were unrelated to Panexim or unknown on June 30, 1998. Russo Aff. ¶78, Ryan Aff. ¶78, Elson Aff. ¶4, 6, 10 and 11.

63. Admitted.

64. Admitted.

65. Admitted.

66. The plaintiffs admit that Mr. Saloman opines in part that PwC did not conduct its audits of HHRG financial statements for fiscal 1997, 1998 and 1999 in accordance with GAAS. The plaintiffs further admit that Mr. Saloman opines in part that the financial statements of HHRG at year-end 1997, 1998 and 1999 do not fairly present, in all material respects, the consolidated financial position of HHRG and subsidiaries.

67. Admitted.

68. Admitted.

69. Admitted.

70. Admitted.

71. Admitted.

72. Admitted.

73. Admitted.

74. The plaintiffs admit that Michael Ryan did not meet with PwC prior to

February 2000. The remainder of Paragraph 74 is denied.

## DISPUTED ISSUES OF MATERIAL FACT AND FACTS RELEVANT TO THE MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule of Civil Procedure 56(a)(2), the plaintiffs HHRG and GWRC hereby set forth their statement of disputed issues of material fact and facts relevant to the Memorandum of Law in Opposition to Motion for Summary Judgment.[1]

### The Bankruptcy of HHRG

1. On March 28, 2000 (the "Petition Date"), HHRG filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code. (RFA 1)

2. In accordance with Bankruptcy Code §§ 1107 and 1098, HHRG was authorized to continue in possession of its property and operate and manage its business as debtor in possession. (RFA 2)

3. On August 20, 2001, the bankruptcy court entered its Order Confirming Modified Second Amended Plan (the "Plan"). (RFA 3)

4. The Plan became effective on August 30, 2001 (the "Effective Date"). (RFA 4)

5. Under the Plan, as of the Effective Date, the Liquidating Custodian, as defined in the Plan, was authorized and empowered to exercise all of the powers of the Debtor HHRG in place and to the exclusion of HHRG's board of directors and officers. (RFA 5)

---

[1] Certain facts have been established by requests to admit answered in this case. These facts are noted as RFA with number referenced to plaintiffs request. They are filed as Ex. 1 with the Plaintiffs' Joint Memorandum of Law in Opposition to PwC's Motion for Summary Judgment

6. The Plan authorizes the Liquidating Custodian to examine all rights of action and file, litigate to final judgment, settle or withdraw such rights of action (see Plan, § V (A)(3)), and that any proceeds of litigation shall be distributed in accordance with the Plan. (RFA 6)

### PwC Services and Knowledge pre-August 1996

7. PwC is a limited liability partnership registered in Delaware and is one of the largest certified public accounting firms in the United States. (RFA 7)

8. Prior to March 2000, PwC offered consulting and business advisory services to its clients. (RFA 8)

9. Between mid-1996 and early 2000, PwC and its predecessor, Coopers & Lybrand L.L.P. (collectively "PwC"), performed various professional engagements at the request of GWRC. See PwC's Answer and Special dated May 24, 2004 ("PwC Answer") Pl. Ex. 2 hereafter "A". (A. ¶11))

10. PwC was engaged to conduct certain due diligence in connection with the Acquisition of PMRD by Golden West and reviewed certain information as part of that due diligence. (A ¶28) PwC rendered certain services at the request of Rothschild Australia Ltd. in connection with the proposed Acquisition. (RFA 31, 32).

11. In its Draft Due Diligence Report, PwC states: "We believe that there is serious risks associated with the company's budgeted earnings and credit exposure with South America business in Venezuela, Chile, Uruguay and Bolivia." (RFA 33, 36)

12. PwC had previous experience with providing professional services to clients regarding advice concerning overseas business activities. (RFA 35)

13. In its Draft Due Diligence Report, PwC states: "Management has stated that cash will not be given to its customers in these countries until an outside armored car company has verified the deposit of a customer's metal to designated vaults, as opposed to extending advances and obtaining security insurance bonds as was the previous practice." (RFA 37)

14. PwC's knowledge, prior to the Acquisition, of transactions with South American Companies is reflected in the Draft Due Diligence Report. (RFA 38)

15. PwC's Draft Due Diligence Report contains an analysis of revenue, expense, bad debt expense, income reported and allowance for doubtful accounts in South America, including Argentina, for the years ended December 31, 1994 and 1995. The Draft Due Diligence Report contains a report from management regarding total outstanding accounts receivable from Argentine customers. (RFA 40)

16. The services PwC provided in connection with the Acquisition are set forth in the Draft Due Diligence Report. Pl. Ex. 3.

17. PwC did not determine whether PMRD management was engaged in improper business transactions and unauthorized advances to companies in South America. (RFA 43)

18. PwC elicited information from PMRD management as to the PMRD's policies and management's intention to comply with them.

### The Parties

19. From August 20, 1996 to March 28, 2000, HHRG, together with its wholly owned subsidiary Attleboro Refining Company ("ARC"), was a refiner of precious metals including gold and silver, (RFA 9), and was headquartered in South