Windsor, Connecticut. (A. ¶12)

20. HHRG engaged in business transactions in North and South America and in certain other parts of the world. (RFA 10)

21. Golden West Refining Corporation, Ltd. ("Golden West"), an Australian corporation, formed HHRG to acquire the assets of the Precious Metals Refining Division of Handy & Harman, Inc. (the "PMRD"). (RFA 11) Between August, 1996 and March, 2002, Golden West owned 100% of HHRG. (A. ¶13)

22. In August, 1996, HHRG acquired the business and related assets of PMRD. (A. ¶14) Handy & Harman operated the Division prior to August, 1996. (RFA 12)

23. From August, 1996 until March 28, 2000, HHRG was a leading refiner of precious metals. (RFA 13)

24. Orion SA ("Orion") was a company doing business in South America (A ¶16), with an address in Chile. (RFA 14). Orion was an entity that engaged in business transactions with HHRG at various times. (RFA 14)

25. Orion exported precious metals to HHRG. (RFA 16)

26. Darwill Bol SA ("Darwill") was a company doing business in South America (A. ¶18), with an address in Bolivia. (RFA 17) Darwill was an entity that engaged in business transactions with HHRG at various times. (RFA 17)

27. Darwill exported precious metals to HHRG. (RFA 19)

28. Panexim SA ("Panexim") was an entity which engaged in business transactions with HHRG at various times from 1996 through 1999. Panexim was doing business in Peru during that time period. (RFA 20)

29. In and after 1996, Panexim engaged in the business of purchasing and exporting precious metals, primarily gold and silver, from Peru. (RFA 21)

30. In connection with HHRG purchases of gold and other precious metals from Panexim from April 1997 and to March 31, 1998. HHRG made advances to Panexim for Value Added Tax and transportation charges. (RFA 199)

31. Ladison SA ("Ladison") was a company doing business in South America. (Compl. ¶22). Ladison was an entity that engaged in business transactions with HHRG at various times. (RFA 23)

### PwC Audit Engagements and Services for HHRG

32. In 1997, 1998 and 1999 the Defendant provided audit services to HHRG. (RFA 26).

33. PWC conducted an audit for HHRG for the periods ending March 31, 1997, 1998 and 1999. (A ¶26)

34. The services PwC provided to HHRG for the year 1996 are set forth in the Draft Due Diligence Report (RFA 28 and Pl. Ex.3).

35. The services PwC offered to provide to HHRG and provided for the years 1997, 1998, and 1999 are set forth in its engagement letters and Service Plans relevant to those years. (RFA 28)

36. The Defendant "reviewed" the semi-annual financial statements of HHRG for the six-month periods ending September 30, 1997, 1998, and 1999. (RFA 29)

37. "Review," as used in this context, is a term of art in the accounting profession and a defined service under the standards published by the American

19

Institute of Certified Public Accountants (the "AICPA"). See RFA 29.

38. Following the Acquisition in 1996, PwC was informed by HHRG that it had a policy that advances to companies in third world countries "are not made unless the material to be assayed is in the possession of or in transit to" HHRG. (RFA 45)

39. From 1997, PwC was aware that Golden West owned all of HHRG's common stock (A ¶27) and PwC was aware that Golden West representatives served on the Board of Directors of HHRG. (RFA 30)

40. The terms of PwC's engagement for the fiscal year ending March 31, 1997, and representations PwC made to HHRG are contained in the engagement letter dated April 10, 1997, executed by PwC and William Myles, as controller of HHRG. (RFA 48)

41. PwC identified certain matters that impacted on its audit strategy, including Critical Matter #5, potential third-world country receivable collectability issues. (RFA 47)

42. PwC's workpapers for the period ending March 31, 1997 contain the following statement: "several of the accounts receivable at 3/31/97 represent balances owed from advances to third world countries . . ." (RFA 51)

43. Advances to Darwill, Orion and Panexim totaling more than $500,000 were shown on HHRG's price not booked schedule for the period ended March 31, 1997. (RFA 52)

44. PwC did not notify or have any discussion with HHRG's Board of Directors, GWRC's Board of Directors or the GWRC Audit Committee regarding the

fact that as of March 31, 1997, there were unsecured advances totaling more than $500,000 by HHRG to Darwill, Orion, and Panexim. (RFA 53)

45.  PwC did not "ensure" for the period ending March, 31, 1997 that precious metals covering advances to companies in South America were in the possession of or in transit to HHRG. (RFA 56)

46.  PwC did not discuss with "HHRG's Board of Directors the proper accounting treatment of 'over advancements' in third world companies." (RFA 57)

47.  In connection with its audit for the period ended March 31, 1997, PwC did not contact Banco de Lima. (RFA 60)

48.  In connection with its audit work for the period ending March 31, 1997, PwC did not review or obtain evidential matter from HHRG's business files to consider the monthly or quarterly amounts of advances by HHRG to companies in third world countries. (RFA 70)

49.  PwC noted in its 1997 audit work papers of that certain advances made by HHRG were accounted for as accounts receivable. Salomon Report p. 11, Def. Ex. 28.

50.  PwC is not aware of any specific discussion it had with HHRG's Board of Directors, GWRC directors or the GWRC Audit Committee regarding whether, as of March 31, 1997, metal was in the possession of, or in transit to, HHRG for all advances to companies in third world countries. (RFA 73)

51.  PwC provided services to HHRG in connection with a "review" of financial statements of HHRG for the six-month period ending September 30, 1997. (RFA 74)

21

52. PwC is not aware of any specific discussion it had with HHRG's Board of Directors regarding whether as of September 30, 1997, HHRG had advanced money to Orion, Darwill, Panexim and Ladison without having precious metal in the possession of HHRG.

53. Advances to Darwill, Orion, Panexim and Ladison were reflected on HHRG's books and records, including on HHRG price not booked schedule as negative balances, for the period ended September 30, 1997 indicating more money had been advanced than metal received from such companies. (RFA 76)

54. PwC opined that the financial statements of HHRG presented fairly, in all material respects, the consolidated financial position of HHRG as of March 31, 1997, 1998, and 1999, and that the consolidated results of its operations and cash flows for the period ended March 31, 1997, and the years ended March 31, 1998 and 1999 were in conformity with GAAP. (RFA 80)

55. Prior to conducting its audit work for the fiscal year ending March 31, 1998, PwC discussed with HHRG management issues regarding auditing and business services. (RFA 82)

56. HHRG engaged PwC to audit HHRG's 1998 financial statements. PwC Engagement Letter, Pl. Ex. 6.

57. For the HHRG fiscal year ending March 31, 1998, PwC prepared a Service Plan. (RFA 83)

58. The document attached to HHRG's Request to Admit as Exhibit A is a true and correct copy of the Service Plan prepared by PwC for HHRG in 1998. (RFA 84)

22

59. The Service Plan signed by Joseph Tiroletto on behalf of PwC was provided by PwC to William Myles, the controller of HHRG. (RFA 85)

60. A PwC letter dated March 24, 1998 to Mr. William Myles and signed by Joseph J. Tiroletto contains the following statement: "As part of our audit planning process we prepare a service plan which includes a summary of the expectations you and others within your organization have of C&L, key issues related to the audit, timetable and other matters to insure our C&L service team members understand your needs and exceed your expectations." (RFA 87) The reference to the Service Plan in this letter is to the Service Plan, Ex. A, to the HHRG Request to Admit.

61. In the March 24 Letter to HHRG, PwC stated: "This service plan will become the baseline against which you will be able to measure our performance." (RFA 86)

62. For HHRG fiscal year ending March 31, 1998, PwC knew from its prior audit work and 1997 six month review that HHRG continued to have receivables from Orion, Darwill and Panexim. (RFA 88)

63. With respect to fiscal year ending March 31, 1998, PwC understood that HHRG continued to have a policy that advances to companies in third world countries "are not made unless the material to be assayed is in the possession of or in transit to" HHRG. (RFA 89)

64. In connection with its audit of HHRG for the period ended March 31, 1998, PwC identified certain areas requiring attention during the course of its audit. (A ¶66).

65.   PwC identified collectability of foreign accounts receivable as a matter requiring particular attention during the course of the 1998 audit. (A ¶ 67)

66.   PwC referred to the collectability of foreign accounts in its 1998 Service Plan. (A ¶ 70)

67.   PwC services to be provided for the fiscal period ending March 31, 1998 were set forth in PwC's March 30, 1998 audit engagement letter and Service Plan. (RFA 90)

68.   Critical matters to be addressed in the audit for the period ending March 31, 1998 are set forth in PwC's audit workpapers. (RFA 91)

69.   Mr. Tiroletto, a PwC auditor on the 1998 HHRG audit, stated critical matters "have to be resolved to the satisfaction of the partner before sign off on the audit." Deposition Testimony of Joseph Tiroletto ("Tiroletto Dep. Tr., p. 48. Pl. Ex. 16.

70.   The Defendant's 1998 engagement letter with HHRG referred specifically to the 1998 Service Plan. (RFA 95)

71.   PwC understood HHRG's policy that advances "are not made unless the material to be assayed is in the possession of or in transit to" HHRG. (RFA 89)

72.   In its 1998 Service Plan, under the heading "Critical Matters and Other Issues", the defendant stated to HHRG that:

> "We will assure advances to Third World Countries are not made unless material is in the possession of Handy & Harman [sic]." (RFA 179)

74.   Barrett Brown, a PwC audit team member on the HHRG audit in 1998 knew of this assurance. Brown Dep. Tr., p. 25. Pl. Ex. 9.

24

75. Raj Dansinghani, a PwC audit team member on the HHRG audit in 1998 never read the Service Plan. Dansinghani Tr. p. 32. Pl. Ex. 17.

76. In its March 30, 1998 audit engagement letter, PwC agreed that "[a]t the conclusion of the engagement, [PwC] will provide management, in a mutually agreeable format, [PwC's] recommendations designed to help [HHRG] make improvements in its internal controls and operations and other matters that may come to [PwC's] attention. (RFA 96)

77. The policy of PwC was to communicate with the client regarding issues identified in the Service Plan at the end of the audit. Brown Dep. Tr. p. 29. Pl. Ex. 9.

78. HHRG paid PwC for its professional services rendered for the fiscal year end periods ending March 31, 1997 and 1998. (A ¶ 75)

79. In connection with its audit work for fiscal year end March 31, 1998, PwC reviewed the books and records of HHRG which showed that as of March 31, 1998, HHRG had made advances to Panexim and Orion totaling more than $2.5 million. (RFA 97)

80. A HHRG Priced not Settled Schedule for 3/31/98 marked as Pl. Ex. 7 at Depositions of PwC witnesses has the writing of Raj Dansinghani and was reviewed by Barrett Brown and Joseph Tiroletto. B. Brown Dep. Tr. p. 159, Pl. Ex. 9 Tiroletto Dep. Tr. p. 139, Pl. Ex. 16, R. Dansinghani Dep. Tr. p. 77. Pl. Ex. 17.

81. In April 1998, Luis Posada, an HHRG employee, told Raj Dansinghani, an employee of PwC who was a member of the defendant's audit team for HHRG, that HHRG included in advances to "Panexim an amount for value added

tax that Panexim has to pay. Once Panexim pays this, Panexim reimburses HHRG the amount that was over advanced." (RFA 99) See Pl. Ex. 7 for handwritten notation.

82. The Priced not Settled Schedule Pl. Ex. 7 memorializes the discussion that took place between Raj Dansinghani and Luis Posada referenced in the preceding paragraph. (RFA 100)

83. Pl. Ex. 7 to this 56a2 Statement was reviewed by other PwC employees and the audit senior manager prior to PwC completing its audit and service plan work of HHRG for the fiscal year ending March 31, 1998. (RFA 102)

84. Pl. Ex. 7 includes in the lower right corner the letter "T". (RFA 103) The letter "T" refers to Joseph Tiroletto, a PwC employee who was to perform audit services for HHRG for the period ending March 31, 1998. (RFA 104)

85. Joseph Tiroletto reviewed Pl. Ex. 7 with all the handwriting and notations on it before PwC completed its audit of HHRG in June 1998 for the fiscal period ending March 31, 1998. (RFA 105)

86. Although during the course of the 1998 audit, Luis Posada, HHRG's smelter administrator, informed a member of the PwC audit team that "HHRG includes in Panexim advances an amount for a 'value-added' tax that Panexim has to pay." PwC did not inform HHRG's Board of Directors, the Directors of GWRC or the Audit Committee of GWRC that it had learned from an HHRG employee that HHRG had made advances to Panexim for the payment of VAT. (RFA 108)

87. In April 1998, Luis Posada, HHRG's smelter administrator, informed Raj Dansinghani, a member of the PwC team that there was a similar situation

26

concerning Orion, similar to the situation noted for Panexim regarding VAT advances by HHRG. PwC did not inform HHRG's Board of Directors, the Directors of GWRC or the Audit Committee of GWRC that it had learned from an employee of HHRG that advances to Orion for the payment of VAT had been made by HHRG. (RFA 109)

88.     In connection with its audit work for the period ending March 31, 1998, PwC did not determine the amount due from Panexim to HHRG for payment of advances for VAT. Tiroletto Dep. Tr. 143-144, Dansinghani Dep. Tr. 78, 89. Pl. Ex. 16, Pl. Pl. Ex. 17.

89.     Mr. Dansinghani was not curious and did not attempt in 1998 to figure out the amount owed by Panexim to HHRG for VAT advances. Dansinghani Dep. Tr. p. 80, 89. Pl. Ex. 17.

90.     In connection with its audit work for the period ending March 31, 1998, PwC did not determine the amounts due, if any, from Orion for payment of advances for VAT or the amount due, if any, from Panexim, Orion, or Darwill for over advancements for operating expenses as of March 31, 1998. (RFA 124)

91.     PwC evaluated the HHRG's price not booked schedules of September 30, 1997 and March 31, 1998 with regard to advances to Orion. The schedules showed the balance due from Orion to HHRG was the exact same amount on September 30, 1997 and on March 31, 1998. In the 1998 audit work, PwC did not review the timing of the repayment of advances, the aging of advances for VAT and performed no subsequent events testing for VAT advances to Orion. (RFA 115-117, 119)

92. PwC performed audit procedures with respect to the existence of and collectability of foreign accounts receivable for the period ending March 31, 1998. (RFA 118)

93. In connection with its audit work for the period ending March 31, 1998, PwC did not determine: (1) the specific amounts due from Panexim or Orion to HHRG for payment of advances for VAT; (2) the amounts due, if any, from Darwill for payment of advances for VAT; or (3) the amounts due, if any, from Panexim, Orion or Darwill for over-advancements for operating expenses as of March 31, 1998. (RFA 124)

94. PwC's Audit Report concerning HHRG's financial statements for the period ended March 31, 1998 is dated June 19, 1998 and the report was issued after June 19, 1998 and before June 30, 1998. (RFA 126)

95. During the course of the audit, PwC was aware that the Priced Not Settled Schedule Pl. Ex. 7 showed $2,818,000 advances not backed by metal. Brown Dep. Tr., pp. 210, 211, 216. Pl. Ex. 9.

96. In connection with its audit for the period ending March 31, 1998, PwC did not obtain copies of written agreements between HHRG and Panexim, if any. (RFA 129)

97. In connection with its audit for the period ending March 31, 1998, PwC did not obtain copies of written agreements between HHRG and Orion, if any. (RFA 129)

98. PwC issued an unqualified audit opinion on the 1998 financial statements of HHRG. (A ¶ 94)

99. John Salomon, the plaintiffs' expert, stated in his opinion that:

> PwC's audits as of and for the periods ended March 31, 1997, 1998, and 1999 were not performed in conformity with GAAS because PwC:
>
> 1. Failed to communicate to the Board of Directors, the Audit Committee, or Golden West that a material amount of unsecured advances had been made in violation of HHRG's policy and not detected by HHRG's internal control system, a reportable condition under GAAS.
>
> 2. Failed to exercise due professional care and apply professional skepticism in planning and performing its audits, and preparing its reports.
>
> 3. Failed to adequately plan its audit work and supervise accordingly.
>
> 4. Failed to obtain sufficient competent evidential matter to support its opinion.
>
> 5. Failed to identify in its audit report or otherwise require HHRG to adjust its financial statements for the misstatements it knew about and for the disclosures that it knew should have been included therein in accordance with GAAP.

Salomon Report p. 4, Def. Ex. 28.

100. Mr. Salomon stated in his opinion,

> PwC's failures center around (a) its knowledge of HHRG's policy prohibiting cash advances to customers until after it received precious metal; (b) its explicit commitment in its Fiscal 1998 and 1999 Engagement Letters and/or related Service Plans to "assure" that HHRG did not provide any advances of an unsecured nature; (c) its knowledge that unsecured advances had been made and that the magnitude of the unsecured advances were material and had been made in violation of company policy and its obligation under GAAS to report the policy violation to the Audit Committee; and, (d) its knowledge that because HHRG's internal control system did not detect the unsecured advances there was a significant deficiency in the design and operation of HHRG's internal control system, a matter PwC was required to communicate to the Board of Directors, Audit Committee or Golden West as a reportable condition.

Salomon Report p. 5, Def. Ex. 28.

101. VAT is a consumption tax applied by certain foreign tax jurisdictions

29

on commercial activities that involve the production and distribution of goods and services. Salomon Report p. 7, Def. Ex. 28.

102. Panexim, doing business in Peru, was subject to an 18% VAT. Generally, VAT is a refundable tax on transactions by and among businesses and when products are exported. Salomon Report p. 7, Def. Ex. 28.

103. In Peru, the National Superintendence of Tributary Administration ("SUNAT") administers VAT. In sum, the reimbursement of VAT is subject to government process and not guaranteed to be paid. Salomon Report p. 7, Def. Ex. 28.

104. In 1997 and fiscal year end March 31, 1998, Louis Posada, an HHRG employee, made advances in excess of the value of the precious metal delivered to the Company to cover VAT payments. Salomon Report p. 8, Def. Ex. 28.

105. The result of providing advances to certain customers in excess of the amount of precious metal or for VAT caused HHRG to be "over-advanced" or "unsecured," meaning that HHRG was exposed to substantial credit risk and financial loss for the over-advanced portion since there was nothing to secure the over-advance. Salomon Report p. 8, Def. Ex. 28.

106. The over-advances were unsecured and, in substance, were unsecured loans to customers. Salomon Report p. 8, Def. Ex. 28.

107. Statement of Financial Accounting Standards (SFAS) No. 91 states that, "lending, committing to lend, refinancing or restructuring loans, arranging standby letters of credit, syndicating loans, and leasing activities are 'lending activities.'" Salomon Report p. 8, Def. Ex. 28.

108. PwC was engaged for Fiscal 1997, 1998 and 1999 to "audit the

financial statements of the Company" with the objective being the "expression of our [an] opinion concerning whether the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the Company in conformity with generally accepted accounting principles." Salomon Report pp. 8 and 9, Def. Ex. 28.

109.  During its audits, PwC communicated to HHRG its Service Plan for services to be performed. For each engagement it provided an annual engagement letter. Engagement letters are significant because they establish a mutual understanding of the terms of the engagement between the auditor and the client. The terms of the engagement are written to minimize any misunderstandings between the auditor and the client. AU 310.05-07. Salomon Report p. 9, Def. Ex. 28.

110.  The Fiscal 1998 Engagement Letter states, "our audit will include procedures designed to obtain reasonable assurance of detecting misstatements due to errors or fraud that are material to the financial statements." Salomon Report p. 9, Def. Ex. 28.

111.  It further states, "we will inform you with respect to material errors and fraud, or illegal acts that come to our attention during the course of our audit." Similar statements are made in the Fiscal 1997 and 1999 Engagement Letters. Salomon Report p. 9, Def. Ex. 28.

112.  The Engagement Letter for the Fiscal 1998 audit incorporated, by reference, PwC's Service Plan as follows:

"[The] Service Plan, which includes our audit plan, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the

engagement objectives and meet, and/or exceed, your expectations. Our [PwC's] Service Plan will be reviewed with you periodically and will serve as a benchmark against which you will be able to measure our performance."
Salomon Report p. 9, Def. Ex. 28.

113. In its Service Plans, PwC identified certain matters as "critical." Critical matters are those that the Service Plan states will be given particular attention. Salomon Report pg. Def. Ex. 28.

114. PwC partner, Alexander Corl, stated that critical matters have "enough significance that it needs to be brought to the attention of the partner and reviewed by the partner." Salomon Report p. 9, Def. Ex. 28.

115. Critical matters, according to the manager of the audits, was "a term that was used…that brings to the forefront for the audit team items, matters, issues that have to be resolved to the satisfaction of the partner before he's going to sign off on the engagement and before we can issue the report." Salomon Report p. 9, Def. Ex. 28.

116. Compliance with debt covenants and collectibility of foreign accounts receivable are examples of matters identified as "critical" by PwC in the 1998 audit. Salomon Report p. 10, Def. Ex. 28.

117. The Service Plan formed part of PwC's commitment to HHRG. The Service Plan is considered part of the planning materials in a GAAS audit, especially since it was included in the work papers for the Fiscal 1998 and 1999 audits. AU 311.04. Salomon Report p. 10, Def. Ex. 28.

118. The PwC audit team had a responsibility and duty under the standards

of due professional care to understand each Service Plan's content since it was a key planning document, it was part of the Engagement Letter (for the Fiscal 1998 Audit), and it was included in PwC's work papers. AU 230. Salomon Report p. 7, Def. Ex. 28.

119. During PwC's planning process for the Fiscal 1997 audit, PwC identified "Third World country receivable collectibility issues" and *"over-advancements on positioned lots"* as matters that impacted its audit strategy. Salomon Report p. 10, Def. Ex. 28.

120. On a PwC Fiscal 1997 audit work paper it states that, "advances ARE NOT MADE unless the material to be assayed is in the possession of or in transit to Handy & Harmon [HHRG]," reconfirming HHRG's policy and PwC's knowledge thereof. Salomon Report p. 11, Def. Ex. 28.

121. During PwC's Fiscal 1998 audit, PwC provided its Service Plans to HHRG. In its Service Plan, PwC identified Third World country receivable collectibility issues as a matter "requiring particular attention during the course of the audit." Salomon Report p. 11, Def. Ex. 28.

122. PwC further identified that, "its audit scope and procedures have been tailored to address...the collectibility of foreign accounts receivable." Salomon Report p. 11, Def. Ex. 28.

123. PwC also identified that it planned to "assure advances to Third World countries are not made unless material is in the possession of Handy & Harmon [HHRG]." Salomon Report p. 11, Def. Ex. 28.

124. The PwC engagement team members understood HHRG's policy

33

regarding advances. PwC's audit partner during the audits knew that sums advanced by HHRG in excess of what was delivered to them was an unsecured advance and that the provision of such was a violation of Company policy. Salomon Report p. 11, Def. Ex. 28.

125. PwC's engagement manager understood that "the Company would advance moneys to customers in countries other than in the United States as long as they were sure that they had the metals in their possession." Salomon Report p. 11, Def. Ex. 28.

126. A key document PwC obtained from HHRG when applying audit procedures to accounts receivable and accounts payable was the schedule referred to as either the Accounts Receivable Priced Not Settled Schedule, Pl. Ex 7. This schedule summarized HHRG's precious metal liability. It listed, by customer, the amount of cash advances provided to each customer by HHRG and the total value of precious metal estimated to have been received from each customer. A customer that had provided precious metal valued in excess of HHRG advanced funds was shown on the PNB Schedule as a positive amount; an unsecured advance was shown on the PNB Schedule as a negative amount. Salomon Report p. 13, Def. Ex. 28.

127. The unsecured advances as of March 31, 1998 primarily related to three customers located in South America: Panexim (approximately $1.252 million at March 31, 1998), Orion (approximately $1.322 million at March 31, 1998), and Darwill (approximately $223,000 at March 31, 1998). Salomon Report p. 14, Def. Ex. 28.

128. PwC made no effort to identify the magnitude of the unsecured