advances that related to VAT or the other components of the unsecured advances, and made no effort to determine the nature of unsecured advances made or how long they had been outstanding. Salomon Report pp. 14 and 15, Def. Ex. 28.

129. PwC staff members considered the amount of the unsecured advances as an audit difference—differences between what the auditors conclude should be recorded and what its client had actually recorded. Salomon Report pp. 14, 15, Def. Ex. 28.

130. The PwC staff member, Raj Dansinghani, proposed an adjustment to the Fiscal 1998 financial statements for its audit difference, increasing accounts receivable and accounts payable equally by approximately $2.8 million to account for the transactions. This proposal was not accepted. Salomon Report p. 15, Def. Ex. 28.

131. During its Fiscal 1998 audit, the engagement manager told the engagement partner that HHRG had $3 million in unsecured advances. Dep. transcript of George Ingram, February 18, 2005, Ingram Dep. Tr. pp. 190, 191. Pl. Ex. 8.

132. The audit engagement partner Ingram failed to notify anyone about what he learned or supplement or otherwise increase the level of audit procedures. Salomon Report p. 15, Def. Ex. 28.

133. In 1998, PwC did not perform any procedures to assess whether the $2.8 million of unsecured advances in South America for VAT tax was collectible. Salomon Report p. 16, Def. Ex. 28.

134. During its audit of 1998, PwC never informed anyone about the unsecured advances for Value Added Tax. Salomon Report p. 17, Def. Ex. 28.

135. In 1998's audit process, PwC never included the matter of unsecured advances in South America as an internal control weakness or reportable condition in its Management Letter; and, PwC never evaluated the unsecured advances for VAT as an act that violated, or could have potentially violated any of HHRG's covenants with its Banks. The unsecured advances should have caused PwC to question HHRG's policies, procedures and internal controls. Salomon Report p. 17 Def. Ex. 28.

136. PwC failed to identify that providing unsecured advances constituted a violation of the Fleet Agreement. Had PwC identified the breach and reported the practice of providing unsecured advances, the Board of Directors, the Audit Committee, or Golden West would have had the opportunity to take immediate corrective action. Salomon Report p. 20, Def. Ex. 28.

137. There are ten standards that form the underlying framework of GAAS. Auditors are required to comply with the Statements on Auditing Standards that are codified within the framework of the ten standards. Auditing procedures are the acts the auditor performs during the course of an audit to comply with those standards. Salomon Report p. 21, Def. Ex. 28.

138. GAAS requires the communication of reportable conditions, matters representing in the design or operation of internal control, which could adversely affect the organizations ability to record, process, summarize and report financial data consistent with the assertions of management in the financial statements. Salomon Report p. 22, Def. Ex. 28.

139. GAAS requires the auditor to report these matter to the audit

36

committee or to individuals with a level of authority and responsibility equivalent to an audit committee in organizations that do not have one, such as the board of directors, or an owner, such as Golden West. Salomon Report p. 22, Def. Ex. 28.

140. Mr. Salomon has stated that in his opinion, the issuance of unsecured advances was a reportable condition because the unsecured advances were made in contradiction to HHRG's policy; HHRG's internal control systems did not detect that the unsecured advances were made; and the magnitude of the amounts were material to the financial statements taken as a whole. Salomon Report p. 22, Def. Ex. 28.

141. PwC did not assure that the internal controls were functioning as designed and did not raise the matter with the Board of Directors or the Audit Committee to determine if they were aware of the matter. Salomon Report p. 22, Def. Ex. 28.

142. Mr. Salomon has stated in his opinion that in its Fiscal 1998 audit, PwC failed to bring to the Boards of HHRG and Golden West Refining Corporation or to the Audit Committee's attention that advances had been made to customers in South America to cover their VAT or for other purposes that PwC had not identified. HHRG was exposed to significant financial loss in violation of and deviation with HHRG's policy on providing advances to customers. Salomon Report p. 23, Def. Ex. 28.

143. Mr. Salomon has stated his opinion that PwC failed to make the required communications under GAAS that unsecured advances had been made to customers in South America in violation of HHRG policy to the Board of Directors, the Audit Committee, or Golden West. Had PwC complied with GAAS and its Fiscal

1998 Service Plan, it would have notified the Board of Directors, the Audit Committee, or Golden West about the policy deviations in or about April 1998 through the release of PwC's report in June 1998, allowing the Board of Directors, the Audit committee, or Golden West the opportunity to take appropriate action. Salomon Report p. 28, Def. Ex. 28.

144. HHRG engaged PwC to conduct a review of HHRG's financial statements for the six months ended September 30, 1998. (A ¶ 109) The defendant performed services for HHRG in connection with a "review" of financial statements for the period ending September 30, 1998. (RFA 137)

145. PwC did not inquire in its review in September 1998 whether HHRG was advancing money to companies in third world countries for VAT when HHRG did not have possession or control of metal equal to the amount of the advances to secure the advances, as then HHRG employee Posada had advised PwC in April 1998. (RFA 150)

146. The Defendant's audit report dated June 19, 1998 represented that the Defendant had conducted its audit and review in accordance with GAAS. (RFA 162)

147. In its 1998 Audit Report, the defendant provided its opinion to the Board of Directors of HHRG that the financial statements of HHRG presented fairly in all material respects the consolidated financial position of HHRG and its subsidiaries as of March 31, 1998 and 1997 in conformity GAAP. (RFA 165)

### Unsecured Advances to Panexim after June 98

148. Panexim continued to export precious metals to HHRG after July 1998. (RFA 213)

149. Between November 1, 1998 and January 31, 1999, HHRG made unsecured advances of more than $10 million to Panexim for payment of VAT by Panexim and these advances were not repaid to HHRG. Aff. of M. Ryan, ¶ 65; Aff. of S. Russo, ¶ 65.

### The Bankruptcy and Liquidation of HHRG

150. On February 19, 2000, the GWRC board and finance committee learned that HHRG did not have gold in the Peruvian vault covering the Panexim receivable and that the metal in the vault was actually silver, worth a small fraction of the value represented to be present. Aff. of M. Ryan, ¶61.

151. In the latter months of 1998, the Peruvian government stopped refunding VAT payments to Panexim, and Panexim stopped repaying the unsecured advances made to it by HHRG. Aff. of S. Russo, ¶64.

152. The GWRC board also learned in 2000 that during the period November, 1998 through January, 1999, the unsecured advances to Panexim for VAT grew to an outstanding balance in excess of $(US)10 million. This balance was never reduced below $(US)10 million thereafter. Aff. of S. Russo, ¶65.

153. The amount of unsecured advances to Panexim that accumulated during the latter months of 1998 and January 1999 was so large that HHRG could not continue as a going concern with these unsecured advances outstanding. Aff. of S. Russo, ¶66. Aff. of M. Ryan ¶ 70.

154. Upon the discovery in 2000 that there was no substantial quantity of gold in the vault in Peru covering the unsecured advances to Panexim, the GWRC and HHRG boards reported the situation to Credit Suisse and Fleet, both of whom

39

terminated financing facilities with HHRG within days. This caused HHRG to shut down all refining operations within days and to file a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut on March 28, 2000. Aff. of S. Russo, ¶67.

155. Once the financial exposure of more than $(US)10 million to HHRG because of Panexim became known to the market, HHRG customers demanded return of precious metals "on deposit" with HHRG. HHRG was not able to comply with these requests and ultimately these customers became unsecured creditors of HHRG. Aff. of S. Russo, ¶68.

156. Mr. Russo and Mr. Ryan were present in Connecticut during March 2000, working at HHRG, and Mr. Russo affirms the loss of confidence in HHRG by the financial institutions and refining customers could not be overcome by actions he took or those of Michael Ryan, who was also in Connecticut at that time. Aff. of S. Russo, ¶68; Aff. of M. Ryan, ¶69.

157. As a result of the unsecured advances to Panexim that were contrary to company policy, HHRG was forced to stop operating as a going concern and had no alternative but to liquidate its assets. Aff. of M. Ryan, ¶70.

158. In early March 2000, Jed Horwitt, a Connecticut attorney, was appointed to represent the Official Committee of Unsecured Creditors (the "Committee") in the Chapter 11 bankruptcy case of Handy & Harman Refining Group, Inc. ("HHRG"). Aff. of Jed Horwitt, ¶6.

159. Mr. Horwitt thereafter became familiar with the financing facilities that HHRG had with Fleet Precious Metals and Credit Suisse. Aff. of Jed Horwitt,

¶7.

160. At the time of HHRG's bankruptcy filing in March, 2000, many of HHRG's largest refining customers, some of whom were members of the Committee, were interested only in recovering the precious metal that they believed HHRG was holding for them and were not interested in continuing to do business with HHRG. Aff. of Jed Horwitt, ¶11, Aff. of Eric Henzy, ¶12.

161. Given the inability to obtain unrefined precious metal, and therefore the inability to operate, in consultation with HHRG and its counsel, Mr. Horwitt and the Committee determined that HHRG would not be able to reorganize as a going concern and generate profits. It therefore had no alternative but to liquidate its assets. Aff. of Jed Horwitt, ¶15.

162. In March of 2000, Eric Henzy, an attorney licensed to practice in Connecticut and New York, began to represent Handy & Harman Refining Group, Inc. ("HHRG"), and its wholly owned subsidiary Attleboro Refining Company, Inc. ("ARC"), in connection with serious financial difficulties that they were confronting. Aff. of E. Henzy ¶ 6.

163. As part of his representation of HHRG, Mr. Henzy became familiar with its refining business and operations and with the financing facilities that HHRG had with Fleet Precious Metals and Credit Suisse. Pursuant to the facility with Credit Suisse, Credit Suisse agreed to purchase from ARC, and ARC agreed to sell to and refine for Credit Suisse, certain precious metals. ARC used the funding obtained by it under the Credit Suisse facility to purchase from HHRG unrefined precious metals (or material containing precious metals) that HHRG had acquired from its refining

customers. The funding from Credit Suisse through purchases under the facility was a principal source of liquidity for the business operations of HHRG. All of the precious metal refined at the Attleboro refinery was owned by Credit Suisse while in the refining process, and without purchases of precious metal by Credit Suisse, HHRG had no ability to continue its business or to operate. Aff. of E. Henzy, ¶ 7.

164. In early March, 2000, Credit Suisse and Fleet Precious Metals terminated the financing facilities, leaving HHRG with no ability to acquire unrefined precious metal to put into its refining operations. Mr. Henzy was lead counsel to HHRG in that case. Aff. of E. Henzy, ¶10.

165. In consultation with HHRG, its counsel Eric Henzy, and various major customers of HHRG and their counsel, Mr. Horwitt and the Committee determined that HHRG was not able to reorganize as a going concern and that it had no alternative but to liquidate its assets. The plan of reorganization that HHRG proposed and that the Bankruptcy Court confirmed in July, 2001 was a liquidating plan that provided for the liquidation of all of HHRG's remaining assets. Aff. of Jed Horwitt, ¶12; Aff. of Eric Henzy, ¶13.

166. Pursuant to the bankruptcy, HHRG undertook the liquidation of all of its assets. A limited liability company of which Mr. Horwitt is the sole member was appointed as Liquidating Custodian to continue this process under the liquidating plan confirmed by the Bankruptcy Court. The Liquidating Custodian is responsible for all aspects of the liquidation of HHRG's assets. Aff. of Jed Horwitt, ¶13.

167. The Liquidating Custodian has liquidated all of the remaining income producing assets of HHRG including the refining plants that HHRG owned in South

Windsor, Connecticut and Attleboro, Massachusetts, both of which had significant environmental issues. All of these liquidating sales, both before and after the confirmation of HHRG's plan, were undertaken in accordance with the provisions of the United States Bankruptcy Code and under the supervision and approval of the United States Bankruptcy Court. Aff. of Jed Horwitt, ¶14.

168.  The going concern value of HHRG in March 28, 2000 was zero because HHRG was not capable of operating and producing profits. The liquidation value of HHRG's income producing assets realized through the bankruptcy was less than the costs associated with holding and selling those assets. Aff. of Jed Horwitt, ¶16.

### The Experience, Background, and Knowledge of GWRC and HHRG Board Members in the Precious Metals Refining Business

#### Mr. Hayes, CFO of GWRC

169.  Richard Hayes is a certified practicing accountant and has a Masters of Business Administration. He is also a chartered secretary. Aff. of R. Hayes, ¶4.

170.  Mr. Hayes became the chief financial officer of Golden West Refining Corporation ("GWRC") in November 1997. He held that position until November 1998, when he became the chief financial officer of the AGR Joint Venture of which GWRC controlled 50%. Aff. of R. Hayes, ¶4.

171.  As part of his responsibilities as chief financial officer of GWRC, Mr. Hayes was responsible for the corporate financial management of GWRC and its subsidiaries. Aff. of R. Hayes, ¶7.

172.  During his tenure at GWRC, Mr. Hayes regularly attended board

meetings of Golden West, occasionally attended board meetings of HHRG, and was a member of the finance committee of the board of directors of GWRC. Non-executive GWRC board members, Sean Russo, Chris Wiggins, and latterly Robert Guy, were the other members of the finance committee. Michael Ryan was appointed to the finance committee at the February 1999 GWRC board meeting. Aff. of R. Hayes, ¶9.

173. One of the GWRC subsidiary corporations whose financial management Mr. Hayes oversaw was Handy & Harman Refining Group, Inc. ("HHRG"). Aff. of R. Hayes, ¶10.

174. It is a well established policy in the precious metals refining industry that a refiner does not make advances or extend credit to a refining customer unless the precious metal of that customer to properly back the advance is in the possession of the refiner or an authorized agent. This policy is critical in the precious metals refining industry because of the extremely high price of precious metal, especially as contrasted to the margins earned by refiners when metal is refined. Aff. of R. Hayes, ¶¶11 and 12.

175. A violation of this policy against unsecured advances could cause substantial financial losses or the destruction of the refiner's business, depending on the size of the loss caused by the violation of the policy. Aff. of R. Hayes, ¶13.

176. GWRC and HHRG had well-established policies prohibiting unsecured advances or extensions of credit to customers unless precious metal was in the possession of GWRC or HHRG or an authorized agent. Aff. of R. Hayes, ¶14.

177. At no time during his tenure as chief financial officer of GWRC was Mr. Hayes aware of any advance to Panexim in violation of this policy. Aff. of R.

44

Hayes, ¶15.

178. During his tenure as chief financial officer of GWRC, Mr. Hayes worked with PricewaterhouseCoopers, LLP ("PwC") in connection with the annual financial audits and six-month financial reviews of HHRG. Aff. of R. Hayes, ¶16.

179. In connection with its audits of HHRG, PwC made detailed recommendations each year concerning the internal control structure at HHRG, which HHRG typically responded to with remedial action. For example, in connection with its audit of the 1997 financial statements, PwC made a recommendation and HHRG replaced a software system and instituted a new computer program or system to respond to an issue on accounts receivable segregation and recording raised by PwC. Aff. of R. Hayes, ¶17.

180. Notwithstanding its practice of making recommendations on the internal control structure at HHRG, and notwithstanding the fact that it regularly did so, at no time during Mr. Hayes' tenure as chief financial officer did PwC ever inform him of any unsecured advance to Panexim for value added tax payments ("VAT") by Panexim or unsecured advances to any other customer in violation of HHRG's policy against unsecured advances. Aff. of R. Hayes, ¶18.

181. As the chief financial officer responsible for the financial reporting of GWRC and its subsidiaries, including HHRG, Mr. Hayes expected to receive and relied upon PwC to make recommendations concerning the internal control structure and deficiencies or violations of company policy discovered by PwC at HHRG. The prevention of unsecured advances was one of the specific deliverables included in the audit scope for the 1997 and 1998 year-end audits. Aff. of R. Hayes, ¶19.

182. Mr. Hayes would have expected and relied upon PwC to report to him immediately any violation of HHRG policy against unsecured advances. Aff. of R. Hayes, ¶20.

183. If PwC had informed Mr. Hayes of violations of HHRG's policy against unsecured advances to customers in South America for VAT payments in an amount that exceeded $(US) 1 million, he immediately would have informed Michael Ryan, his immediate superior and Sean Russo, the chairman of the finance committee of GWRC and he would have considered any such violation to be an extremely serious matter and one that required immediate responsive action. Aff. of R. Hayes, ¶¶22, 23, and 24.

184. Mr. Hayes also would have closely investigated and monitored the situation to be certain that corrective action was immediately taken and that no additional advances in violation of policy were occurring. Aff. of R. Hayes, ¶25.

185. Mr. Hayes would have taken immediate action to advise Mr. King, the treasurer of HHRG, who reported to him on a dotted line relationship to take direct action to require his and Mr. Hayes' approval of any transaction with Panexim and to further act to collect any amounts due from Panexim. Aff. of R. Hayes, ¶26.

186. The GWRC board would have taken prompt action to prevent additional unsecured advances to Panexim for VAT or any other purpose if advised of such advances by PwC. Aff. of R. Hayes, ¶27.

### Mr. Sean Russo, Director of HHRG and GWRC

187. Mr. Sean Russo is an Australian citizen who has significant experience and expertise in the precious metal industry on a world wide basis, including precious

metal refining and precious metal trading. Aff. of S. Russo, ¶3.

188.  Mr. Russo worked for NM Rothschild & Sons ("Rothschild") in a variety of positions from April 1984 to 2004. All of these positions were related to the precious metal industry. Aff. of S. Russo, ¶4.

189.  In 1989, Rothschild was one of the largest traders of gold bullion in the world and was the chairman of the London Bullion Market, a group that established daily gold prices that were used and accepted on a world wide basis. Aff. of S. Russo, ¶9.

190.  At Rothschild, Mr. Russo coordinated and managed Rothschild's bullion banking and physical gold businesses with gold producers, refiners, and end-users and also was the managing director of the treasury division and a member of the executive committee. Aff. of S. Russo, ¶4.

191.  At Rothschild, in his capacity as managing director of the treasury division Mr. Russo's duties included the management and oversight of the bank's funding and trading activities across precious and base metals, currency, and interest rate markets. Aff. of S. Russo, ¶7.

192.  At Rothschild, Mr. Russo had previously headed its physical bullion and trading operations in Australia and in Asia and spent significant time in Singapore, London, and other countries as part of his tenure at Rothschild. Aff. of S. Russo, ¶8.

193.  At Rothschild, Mr. Russo gained significant experience and knowledge in the hedging strategies available and utilized in the precious metals industry for metal price and interest rate risk hedging. Aff. of S. Russo, ¶9.

47

194.    Currently, Mr. Russo is a principal of a consulting firm located in Sydney, Australia that specializes in matters related to the measurement and management of market risk in a variety of industries including the precious metals industry. He consults on a wide variety of matters for clients who are active in the precious metals industry in Australia and other countries in the region. Aff. of S. Russo, ¶11.

195.    In addition to his broad based experience and expertise related to the precious metals industry and precious metal refining, Mr. Russo employs his specific expertise and experience in matters related to bullion trading and hedging strategies. Aff. of S. Russo, ¶12.

196.    In November, 1989, Rothschild acquired a controlling interest in a publicly traded Australian company known as Golden West Refining Corporation ("GWRC"). Based in Perth, Australia, GWRC was a precious metals refining company, which later acquired operations in Melbourne, Australia, Auckland, New Zealand, Port Moresby, Papua New Guinea, and Vancouver, Canada. Aff. of S. Russo, ¶13.

197.    Mr. Russo was closely involved in the acquisition of the controlling interest in GWRC by Rothschild and became a member of the board of directors of GWRC after Rothschild completed the acquisition. Aff. of S. Russo, ¶14.

198.    In addition to being on the board of GWRC, for a time, Mr. Russo was chair of the finance committee of the board of GWRC. The responsibilities of the finance committee included oversight of the management of the assets and liabilities of GWRC and its subsidiaries with respect to financing matters and financial

covenants. Aff. of S. Russo, ¶15.

199. In early 1996, GWRC commenced due diligence and negotiations to acquire the PMRD. Mike Ryan (another GWRC director) and Sean Russo were the persons at GWRC responsible for the due diligence and the negotiations. Aff. of S. Russo, ¶18; Aff. of M. Ryan, ¶20.

200. In 1996, the PMRD of Handy & Harman was one of the oldest and largest refiners of precious metals in North America, having been in operation for over 125 years. Its bullion bars bearing the "H&H" logo or hallmark were accepted by the world's leading gold and silver exchanges including the London Bullion Marketing Association, the Commodities Exchange, Inc., and The New York Mercantile Exchange. Its daily silver quotation was the pricing basis for settling many of the world's silver contracts. Aff. of S. Russo, ¶19.

201. In 1996, the PMRD serviced most of the industries and markets that used precious metals to manufacture commercial products. It provided refining services to a broad industrial base and secondary refiners. The division provided services to parties involved in merchant banking, central banking, mining, and metal hedging. Aff. of S. Russo, ¶21.

202. GWRC expected that the international combination of strengths and relationships among Rothschild, GWRC, and the PMRD would lead to significant growth and profitability for GWRC and the PMRD. Aff. of S. Russo, ¶25.

203. In July, 1996, GWRC entered into an asset purchase agreement with HH to acquire the PMRD. Under the terms of that asset purchase agreement, GWRC agreed to purchase the assets of the PMRD for $(US)9 million and assumed liabilities

of approximately $(US)6 million. Aff. of S. Russo, ¶26.

204. GWRC created a wholly owned subsidiary, Handy & Harman Refining Group, Inc. ("HHRG"), a Connecticut corporation, to acquire the assets of the PMRD. GWRC assigned rights under the asset purchase agreement to HHRG prior to the closing. Aff. of S. Russo, ¶26.

205. At the time, the PMRD had precious metal inventory in excess of $(US) 170 million. Much of this inventory was owed to customers of the PMRD, who had delivered precious metal to the PMRD to be refined. Aff. of S. Russo, ¶28.

206. In order to fund and facilitate the acquisition of the PMRD and this inventory, GWRC negotiated complex financing arrangements with Fleet Precious Metals ("Fleet") and Credit Suisse that would be entered into contemporaneously with the closing of the acquisition. Sean Russo was responsible for the negotiations of these financing arrangements. Aff. of S. Russo, ¶29.

207. Although these financing arrangements were extremely complex, a very simplified description of a key component of the Credit Suisse facility was that Credit Suisse provided a $(US) 200 million financing facility, under which Credit Suisse initially purchased the precious metal inventory of the PMRD directly from the PMRD. This permitted the acquisition to take place without HHRG having to purchase the inventory of the PMRD. Aff. of S. Russo, ¶30; Aff. of M. Ryan, ¶32.

208. Under the Credit Suisse facility, Credit Suisse further agreed to buy unrefined high grade precious metal from HHRG (and its wholly owned subsidiary ARC) and to pay for it with fully refined high grade precious metal, all on an ongoing basis. This permitted HHRG to advance fully refined precious metal to its refining

50

customers prior to refining the customer's metal. It also allowed HHRG to operate without having to own large inventories of precious metal. Aff. of S. Russo, ¶31; Aff. of M. Ryan, ¶33.

209. Under the Fleet facility, which Mr. Russo negotiated, Fleet provided an additional $(US) 25 million working capital and precious metal consignment facility. Aff. of S. Russo, ¶32.

210. The PwC due diligence report agreed with Mr. Russo's view and that of GWRC that unsecured advances to customers were unacceptable risks that would not be taken. Aff. of S. Russo, ¶34; Aff. of M. Ryan, ¶36.

211. After the acquisition, Mr. Russo and Mr. Ryan became board members of HHRG. Initially the board of HHRG consisted of other Australian GWRC board members and Barry Wayne and John Bullock, the corporate counsel of HHRG. In November 1996, after joining HHRG, John King became a board member of HHRG. Aff. of S. Russo, ¶38; Aff. of M. Ryan, ¶41.

212. The major source of income for a refiner such as HHRG is refining fees. In order to generate refining fees, it is necessary for a refiner such as HHRG to receive and process precious metals from mines, secondary refiners, and other customers. It is therefore essential that customers have a high level of confidence in the financial soundness of the refiner. Aff. of S. Russo, ¶39; Aff. of M. Ryan, ¶42.

213. Customers will not deliver valuable quantities of precious metal or materials containing precious metal to a refiner such as HHRG to be refined if they believe the refiner is not financially stable. Aff. of S. Russo, ¶40; Aff. of M. Ryan, ¶43.