214. Beginning in 1996, many of HHRG's customers left precious metal "on deposit" with HHRG in pool accounts. HHRG pool accounts functioned much like bank accounts or brokerage accounts in that customers could withdraw metal from a pool account on demand and would receive monthly pool account statements. HHRG pool accounts were measured in ounces not dollars so that the customer, not HHRG, had the risk and benefit of price fluctuations, as long as HHRG held the precious metal. Aff. of S. Russo, ¶41; Aff. of M. Ryan, ¶44.

215. The unique nature of the refining business – the fact that it handles hundreds of millions of dollars of precious metal to generate refining fee income – has resulted in well-established policies adopted industry wide. One of these policies is to advance funds to a customer for precious metal only after that precious metal has been physically delivered to the refiner or an authorized agent of the refiner. Aff. of S. Russo, ¶42; Aff. of M. Ryan, ¶45.

216. GWRC and HHRG, at the time of the acquisition of the PMRD, recognized a policy against unsecured advances was critically important to the financial soundness of any refiner such as HHRG because a violation of this policy for even a relatively small amount of precious metal could put millions of dollars at risk and subject the company to large financial losses or even failure. Aff. of S. Russo, ¶43; Aff. of M. Ryan, ¶46.

217. Consistent with the foregoing, GWRC adopted a company wide policy that prohibited advances to customers unless precious metal was in the possession of GWRC or an authorized agent. Upon the acquisition of the PMRD, HHRG put the identical policy in place prohibiting unsecured advances. Aff. of S. Russo, ¶¶44, 45.

218. In its physical bullion trading activities, Rothschild's had a similar policy. Aff. of S. Russo, ¶46.

219. A variation of the policy to avoid risks concerning advances to customers was also embodied in the loan covenants of the HHRG financing facilities, which prohibited loans and advances and required precious metals to be held in certain approved and identified secure locations. Aff. of S. Russo, ¶47.

220. PwC did not advise the Boards of HHRG or GWRC or the audit committee of violations of company policy against unsecured advances in its 1998 management letter or audit opinion or in communications to GWRC's accountants at PwC Australia or to the finance or audit committees of GWRC. Aff. of S. Russo, ¶49; Aff. of M. Ryan, ¶50.

221. Sean Russo and Michael Ryan were unaware in 1997, 1998, and the first four months of 1999 of any unsecured advances for VAT to Panexim or Orion by HHRG. Aff. of S. Russo, ¶50; Aff. of M. Ryan, ¶51.

### Michael Ryan, Director of HHRG, GWRC, and Chairman of the Board of GWRC

222. Michael Ryan is an Australian citizen with significant experience and expertise in the precious metal industry on a world wide basis, including precious metal refining and precious metal trading. Aff. of M. Ryan, ¶3.

223. Mr. Ryan joined Engelhard Industries Limited (UK) in 1961, initially in the silver refining and silver products manufacturing section. In 1964, he was responsible for the management of the precious metals chemical products manufacturing section. Aff. of M. Ryan, ¶¶4 and 5.

224. Mr. Ryan developed a number of new bulk manufacturing processes,

53

among which were the following: very high purity potassium gold cyanide, ruthenium chloride, silver peroxide, and free flowing silver chloride for the automating of the manufacture of marine batteries. Aff. of M. Ryan, ¶5.

225. In 1968 Ryan emigrated to Australia. Engelhard Industries Pty. Ltd. ("EIPL"), the Australian operation, created a position for him in charge of all its precious metals and refining operations. Aff. of M. Ryan, ¶7.

226. Mr. Ryan, after 1968, developed a number of manufacturing processes, including a special high density silver powder to be used in the manufacture of sintered electrical contacts. He also improved the gold refining process to enable 99.99% (4 nines) gold to be manufactured as a one-step process. Aff. of M. Ryan, ¶6.

227. In the mid to late 1970s, Ryan had extensive meetings in Singapore and elsewhere with manufacturers supplying the then fledgling electronics industry with a view to creating an electronics scrap refining section. Aff. of M. Ryan, ¶7.

228. Between 1983 and 1985, Ryan developed and controlled the scrap silver battery collection and refining business in the States of Victoria and South Australia as well as 50% of the business in New South Wales for a turnover in excess of $1.2 million per year. During this period, he also undertook a number of consultations, including an evaluation of a gold extraction process developed by the Commonwealth Scientific and Research Organization and a feasibility study for the Elders group. Aff. of M. Ryan, ¶9.

229. In early 1987, Mr. Ryan was recruited by Fine Metals Corporation Limited, the major shareholder of a new company Golden West Refining Corporation

Limited ("GWRC"), to design, build, and manage a new gold refining operation in Perth, Western Australia. Refining operations commenced in 1988. Mr. Ryan recruited and trained the staff in all aspects of refining and control and designed the computerized stock control system and the customer reporting interface. Aff. of M. Ryan, ¶11.

230.  Ryan led the team that obtained accreditation to the Tokyo Commodity Exchange and the London Bullion Market Association that provided worldwide acceptance of the GWRC mark on bullion bars. He also led the team that developed the process to produce 99.999% (5 nines) gold, which gained accreditation for GWRC as the sole supplier of gold to one of the world's largest fine wire manufacturers and suppliers to the electronic industry. Aff. of M. Ryan, ¶12.

231.  Ryan was the managing director of GWRC and a member of the board of directors. He became the chief executive of GWRC in 1990. Aff. of M. Ryan, ¶14.

232.  In November, 1989, NM Rothschild & Sons acquired a controlling interest in GWRC. Aff. of M. Ryan, ¶16.

233.  In addition to being on the board of GWRC, starting in February, 1999 Ryan was on the finance committee of the board of GWRC. The responsibilities of the finance committee included oversight of the management of the assets and liabilities of GWRC and its subsidiaries with respect to financing matters and financial covenants. Aff. of M. Ryan, ¶17.

234.  In Ryan's position as managing director of GWRC, he worked closely with and was familiar with the auditing practice of PricewaterhouseCoopers Australia

("PwC Australia"), with respect to their audit of GWRC. Among its auditing duties it was PwC Australia's practice as part of its audit to review GWRC documents that recorded transactions with customers, stock control activities and trading activities to ensure that policies and limits had not been breached, and to report on any variations and violations to the audit committee and the board of GWRC. Aff. of M. Ryan, ¶18.

235. After leaving GWRC in 2001, Ryan was engaged in 2003 by a Melbourne firm of attorneys to investigate and report on the evidence and quantum of damages that had been asserted by a major international refiner of precious metals in connection with a multi million dollar fire insurance claim. He was engaged in that matter to appear as an expert witness should that prove necessary. Aff. of M. Ryan, ¶ 15.

### John Bullock – General Counsel of HHRG and Director of HHRG

236. John Bullock is an attorney licensed to practice in the State of Connecticut. Aff. of J. Bullock, ¶4.

237. In 1986, after ten years in private practice, Bullock joined Handy & Harman ("HH"), a long standing, internationally famous precious metals company, as its environmental counsel. Aff. of J. Bullock, ¶5.

238. In 1996 John Bullock became the General Counsel to Handy & Harman Refining Group, Inc. ("HHRG") when it purchased the assets of the precious metals refining division of HH and was General Counsel to HHRG until August, 1999. Aff. of J. Bullock, ¶6.

239. Since Mr. Bullock left HHRG in August, 1999, he has been in private

practice providing legal services to refiners and users of precious metals. Aff. of J. Bullock, ¶7.

240. As part of his responsibilities as General Counsel of HHRG, Mr. Bullock was on the board of HHRG and had broad responsibilities consistent with the traditional role of a general counsel. Aff. of J. Bullock, ¶8.

241. During his tenure at HHRG, Bullock regularly attended board meetings of HHRG. Board members of Golden West Refining Corporation ("GWRC"), the parent company to HHRG, were also on the board of HHRG and regularly attended those board meetings. Aff. of J. Bullock, ¶9.

242. It is a well-established policy in the precious metals refining industry that a refiner does not make advances to a refining customer unless the precious metal of that customer to fully back the advance is in the possession of the refiner or an authorized agent. Aff. of J. Bullock, ¶10.

243. This policy not to make unsecured advances is critical in the precious metals refining industry because of the extremely high price of precious metal, especially as contrasted to the margins earned by refiners when metal is refined. Aff. of J. Bullock, ¶11.

244. It also is well known in the industry that a violation of this policy against unsecured advances could cause substantial financial losses or the destruction of the refiner's business, if the customer defaults upon its obligation to deliver metal depending on the size of the loss. Aff. of J. Bullock, ¶12.

245. HHRG had a well-established policy prohibiting unsecured advances to customers unless precious metal was in the possession of HHRG or an authorized

agent. Aff. of J. Bullock, ¶13.

246.  At no time prior to May, 1999, was Bullock aware of any advance by HHRG to Panexim in violation of this policy. Aff. of J. Bullock, ¶ 14.

247.  During his tenure as General Counsel of HHRG, Mr. Bullock worked with PricewaterhouseCoopers, LLP ("PwC") in connection with the annual financial audits and six month financial reviews of HHRG. Aff. of J. Bullock, ¶ 15.

248.  At no time during his tenure as General Counsel of HHRG did PwC ever inform me of any unsecured advance to Panexim for value added tax payments ("VAT") by Panexim or unsecured advances to any other customer in violation of HHRG's policy against unsecured advances. Aff. of J. Bullock, ¶16.

249.  As the General Counsel of HHRG, Mr. Bullock expected to receive and relied upon PwC to report violations of company policy discovered by PwC at HHRG. Aff. of J. Bullock, ¶17.

250.  Mr. Bullock understands now that during its audit of the HHRG financial statements dated June 30, 1998, PwC became aware of a violation of the HHRG policy against unsecured advances to customers. He absolutely would have expected and relied upon PwC to report to the Audit Committee of GWRC. Aff. of J. Bullock, ¶18.

251.  If PwC had informed Mr. Bullock of violations of HHRG's policy against unsecured advances to customers in South America for VAT payments in any amount, he immediately would have informed the boards of both HHRG and GWRC or the Audit Committee of GWRC or the Chairman of GWRC he would have informed John King, the treasurer of HHRG. Aff. of J. Bullock, ¶¶19 and 20.

252. If Mr. Bullock had been told by PwC that an unsecured advance had been made that exceeded $(US)1 million for VAT in South America, he would have considered that to be an extremely serious matter and one that required immediate responsive action by the Boards of HHRG and GWRC and he also would have closely investigated and monitored this situation to be certain that corrective action was immediately taken. Aff. of J. Bullock, ¶¶21 and 22.

### The GWRC Board Responed to Issues in May 1999 Concerning Panexim and a Receivable Allegedly Secured by Gold

253. Based on his experience as General Counsel and as a member of the board of HHRG, Mr. Bullock firmly believes the HHRG board would have taken prompt action to prevent additional unsecured advances to Panexim for VAT or any other purpose if advised of such advances by PwC. Aff. of J. Bullock, ¶23.

254. In May 1999, Sean Russo and Michael Ryan, and other GWRC board members, first became aware of a large apparently partially secured receivable in excess of $(US) 12 million owed to HHRG by Panexim. Aff. of S. Russo, ¶51; Aff. of M. Ryan, ¶52.

255. John King, a board member of HHRG, raised concerns with the audit committee in May 1999 with the receivable balance due from Panexim and issues concerning security for the receivable. Aff. of S. Russo, ¶51.

256. The finance committee of GWRC promptly in May 1999 investigated this situation on the referral from the audit committee. When questioned, Barry Wayne initially reported that approximately $(US)11 million of this Panexim receivable was covered by gold in a secure vault in Peru on consignment to HHRG. In addition, the GWRC board discovered that a portion of this receivable related to an

59

unsecured advance to Panexim to pay VAT owed by it to the Peruvian government with respect to certain silver transactions. After an investigation into this matter, Rick Ollett, HHRG's chief financial officer at the time, reported this amount to be $(US) 1 million. Any advance to a customer for VAT was a violation of the GWRC and HHRG policy against such unsecured advances. Aff. of S. Russo, ¶52, 53.

257.   The Board of GWRC immediately instituted stricter controls over the metals business with Panexim. Aff. of S. Russo, ¶54.

258.   On May 24, 1999, director Robert Guy notified Barry Wayne by fax that there should be "no additional exposure to Panexim...until such time as board approval is given." Mr. Russo and Mr. Ryan agreed with this directive. Aff. of S. Russo, ¶55; Aff. of M. Ryan, ¶56.

259.   Mr. Russo specifically referenced Mr. Guy's fax in a fax concerning the GWRC finance committee meeting to Mr. Ollett, Mr. Wayne, Mr. Guy, Mr. Ryan, and Mr. Wiggins on June 1, 1999, which stated that we required an interim approval by the finance committee before any further advances could be made to Panexim. After May 1999, no unsecured advances of any additional amounts were made to Panexim. Aff. of S. Russo, ¶56.

260.   In Russo's memo of June 1, 1999 to Rick Ollett Russo posed specific issues raised by the finance committee on June 1, 1999 including specifically VAT related advances to be addressed by HHRG. Aff. of S. Russo, ¶57.

261.   In response to the investigation of the GWRC board and finance committee, Barry Wayne continued to maintain that sufficient gold to cover the receivable for gold was on consignment to HHRG in a secure vault in Peru and that

the delay in obtaining it was due to the Peruvian government's curtailment of large gold exports and not to any financial issue with Panexim. Aff. of S. Russo, ¶58.

262. In July 1999, the GWRC board censured Mr. Wayne, withheld his bonus for 1999, and initiated changes to the negotiation of his contract providing for a terminal one-year contract. The board also notified Barry Wayne that his CEO position would be terminated at the end of the terminal contract term of one year. The board officially suspended Barry Wayne on January 24, 2000. Aff. of S. Russo, ¶59.

263. The GWRC board and finance committee in 1999 requested an independent assay on the gold in the Peruvian vault in connection with the interim financial statements that had to be publicly reported in Australia in September 1999. This assay appeared to confirm a quantity of gold on deposit in Peru, but it was later learned in February 2000 that the assay report had been constructed in such a manner as to hide the true situation and that no significant gold was available to cover the advances to Panexim. Aff. of S. Russo, ¶60.

### The Board of GWRC would have Prevented the More than $10 Million of Unsecured Advances to Panexim by HHRG if Notified by PwC in June 98 of Unsecured Advances to Panexim and Orion and HHRG would not have been Destroyed

264. If the unsecured advances to Panexim had been disclosed by PwC in June 1998 to Mr. Russo, the audit committee, or the GWRC board, the GWRC board would have prevented any future unsecured advances to Panexim. If GWRC had been able to take this action, HHRG would have continued as a going concern and its value as of June 1998, before the significant increase in unsecured advances to Panexim, would not have been destroyed. Aff. of M. Ryan, ¶71.

264. If the GWRC board had known of the unsecured advances to Panexim in June 1998, Mr. Russo, Mr. Ryan, and the board would have taken immediate action to stop all such future unsecured advances, just as they did in May 1999 and thereafter. Aff. of S. Russo, ¶72; Aff. of M. Ryan, ¶72.

265. Because the board of GWRC and board members of HHRG were not advised by PwC of unsecured advances in June 1998, Mr. Russo, Mr. Ryan, and the boards were not able to take steps and institute actions to prevent unsecured advances from accumulating after June 1998. Aff. of S. Russo, ¶73; Aff. of M. Ryan, ¶73.

266. Mr. Russo and Mr. Ryan have reviewed the expert report of Craig Elson. They affirm the valuation based on their knowledge at that time concerning the reasonable long term prospects for precious metals prices and lease rates and the consequent benefits to the precious metals refining business globally. Mr. Russo and Mr. Ryan, from personal knowledge on the board of GWRC and its finance committee, affirm that there were no circumstances or matters that materially affected the long term business prospects or valuation of HHRG in a negative way, as a going concern during the latter half of 1998 and to January 31, 1999, other than the unsecured advances and payments to or on behalf of Panexim that were contrary to company policy. Aff. of S. Russo, ¶74; Aff. of M. Ryan, ¶74.

267. Mr. Russo and Mr. Ryan have reviewed the expert reports of Mr. Pinney and Mr. Shivdasani concerning matters they contend could have affected the business prospects of HHRG in 1999 and 2000. Mr. Russo and Mr. Ryan disagree that these matters materially affected the long term business prospects or valuation of HHRG as a going concern. Aff. of S. Russo, ¶75; Aff. of M. Ryan, ¶75.

268. Based on Mr. Russo's and Mr. Ryan's personal and direct knowledge of HHRG, these matters did not have anything to do with the complete destruction of the going concern value of HHRG and the liquidation of its assets. Aff. of S. Russo, ¶76; Aff. of M. Ryan, ¶76.

269. Since HHRG represented a significant source of income for GWRC, HHRG was critical to the continued viability of GWRC as a going concern. When HHRG ceased operating as a going concern, this caused GWRC's financial collapse as it was not able to meet its loan and other obligations. This forced GWRC into liquidation and caused the complete destruction of GWRC as a going concern. Aff. of M. Ryan, ¶77.

270. Mr. Russo and Mr. Ryan affirm from personal involvement with HHRG and GWRC that:

   (a) The increase in silver metal lease rates in 1999 did not materially affect HHRG's overall financial condition and certainly did not affect the long term value of HHRG. The effect of higher lease rates relating to Warren Buffet's reported silver purchases affected one HHRG term contract for silver refining which was not hedged as effectively as it might have been and turned a profitable refining contract into a loss on that one contract. Subsequently, metal lease rates have been very benign and often at or near historical lows and would have been highly favorable to HHRG had it stayed in business.

   (b) Although HHRG initially had budget and reporting procedures that

63

the GWRC board believed should be updated, these procedures were changed on an ongoing basis from the time of the acquisition and HHRG made substantial improvement. In any event, these reporting issues did not materially affect the overall business prospects and valuation of HHRG as a going concern.

(c) The Enviromet acquisition in October 1998 and the acquisition of the GWRC owned business in Canada by HHRG similarly did not materially affect the long term valuation and overall business of HHRG. Moreover, it is extremely unlikely that the acquisition of Enviromet would have occurred had the GWRC board learned of the unsecured advances to Panexim in June of 1998.

(d) With respect to the electronic scrap refining business, this was not a significant factor in the long term valuation of HHRG as a going concern, just as it had not been a significant factor in GWRC's decision to acquire the assets of the PMRD. The revenue from this business also fluctuated as the price of precious metals fluctuated. Thus, any temporary reduction in revenue from this business based on a reduction in the price of precious metals would be reversed when the price of precious metals increased.

(e) The low prices and high lease rates that affected precious metal refiners in 1999 were short term temporary issues that were substantially reversed by 2000-2001 when the price of precious metals increased and lease rates declined. These issues also had

nothing to do with the failure of HHRG as a going concern, If HHRG had not made the unsecured advances to Panexim and had instead continued as a going concern, today HHRG would be experiencing very high prices on precious metal recoveries and very low metal lease rates, conditions that would be extremely favorable to HHRG's business. HHRG also would have been able to take advantage of these favorable market conditions without quantity limitations on throughput due to the unique financial arrangements that were in place with Credit Suisse and Fleet.

Aff. of S. Russo, ¶78; Aff. of M. Ryan, ¶78.

271. If Mr. Russo and Mr. Ryan had been advised as members of the HHRG board or the GWRC board of the unsecured advances to Panexim in June 1998, they immediately would have taken action to stop future unsecured advances to Panexim and to recover any outstanding advances by HHRG. Aff. of S. Russo, ¶79; Aff. of M. Ryan, ¶79.

HANDY & HARMAN REFINING GROUP, INC.

By: _____
William H. Champlin III
(ct04202), Champlin@tylercooper.com
Michael T. McCormack
(ct13799), mmcormack@tylercooper.com
TYLER COOPER & ALCORN, LLP
CityPlace, 35th Floor
185 Asylum Street
Hartford, CT  06103
Tel.: (860) 725-6200
Fax: (860) 278-3802

GOLDEN WEST REFINING CORPORATION

By: _____
Steven Humphrey, Esq. (ct06053)
shumphrey@rc.com
ROBINSON & COLE LLP
280 Trumbull Street
Hartford, CT 06103
Tel.: (860) 275-8221
Fax: (860) 275-8299

## CERTIFICATION

I hereby certify that on September 2, 2004, a copy of the foregoing was filed electronically [and served by mail on anyone unable to accept electronic filing]. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system [or by mail to anyone unable to accept filing]. Parties may access this filing through the Court's system.

Steven Greenspan, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
CityPlace I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
James M. Ruel, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman
 & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

Stefan Dandelles, Esq.
Daniel McMahon, Esq.
Wilson, Elson, Moskowitz Edelman
 & Dicker LLP
120 North LaSalle Street
Suite 2600
Chicago, IL 60602

_____
William H. Champlin III