## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendants | CIVIL ACTION NO.<br>3:02 CV 1379 (MRK) |
| ALEC SHARP, et al.<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant. | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK)<br><br>SEPTEMBER 2, 2005 |

## AFFIDAVIT OF MICHAEL RYAN

I, Michael Ryan, being duly sworn, hereby state as follows:

1. I am over the age of eighteen and believe in the obligations of the oath.

2. I have personal knowledge of the facts set forth herein, and the statements made herein are true to the best of my knowledge and belief.

3.  I am an Australian citizen. I have significant experience and expertise in the precious metal industry on a world wide basis, including precious metal refining and precious metal trading.

4.  I joined Engelhard Industries Limited (UK) in 1961, initially in the silver refining and silver products manufacturing section.

5.  In 1964, the company closed its London operations and moved all of its chemical operations to Cinderford, Gloucestershire, in the west of England. At the new location I was responsible for the management of the precious metals chemical products manufacturing section. I developed a number of new bulk manufacturing processes, among which were the following: very high purity potassium gold cyanide, ruthenium chloride, silver peroxide, and free flowing silver chloride for the automating of the manufacture of marine batteries.

6.  In 1968 I decided to emigrate to Austrailia. Engelhard Industries Pty. Ltd. ("EIPL"), the Australian operation, created a position for me and invited me to join the company in charge of all its precious metals and refining operations. I developed a number of manufacturing processes, including a process to manufacture silver oxide suitable for the manufacture of watch batteries, and a special high density silver powder to be used in the manufacture of sintered electrical contacts. I also improved the gold refining process to enable 99.99% (4 nines) gold to be manufactured as a one-step process. I introduced a new costing method for internal and external refining. I regularly visited other Engelhard operations worldwide.

7. In the mid to late 1970s, I had extensive meetings in Singapore and elsewhere with manufacturers supplying the then fledgling electronics industry with a view to creating an electronics scrap refining section.

8. In 1978, as many of its customers for precious metals products were based in South East Asia, EIPL decided to install a manufacturing facility in Singapore. I was selected to design and build that facility and to be responsible for all aspects of its management upon completion. Parallel to that project, I was to expand the refining and manufacturing sections of the Australian operation and to install an electronic scrap refining facility. Although a decision was made not to go ahead with the Singapore plan, the Australian expansion was completed in about 1982. I felt that not to have proceeded with the Singapore project was a mistake and a sign of stagnation of the company, so I resigned to become self employed.

9. Between 1983 and 1985, I developed and controlled the scrap silver battery collection and refining business in the States of Victoria and South Australia as well as 50% of the business in New South Wales for a turnover in excess of $1.2 million per year. During this period, I also undertook a number of consultations, including an evaluation of a gold extraction process developed by the Commonwealth Scientific and Research Organisation and a feasibility study for the Elders group.

10. In1985, I was again recruited by EIPL to design and build a new precious metals refinery and chemical manufacturing operation in Melbourne. On completion of that project, I was seconded as consultant to a small and incomplete gold refinery

in Port Moresby, Papua New Guinea to manage the completion of building the refinery and to train the staff in refining gold and silver.

11. In early 1987, I was recruited by Fine Metals Corporation Limited, the major shareholder of a new company Golden West Refining Corporation Limited ("GWRC"), to design, build, and manage a new gold refining operation in Perth, Western Australia. Refining operations commenced in 1988. I recruited and trained the staff in all aspects of refining and control. I designed the computerised stock control system and the customer reporting interface.

12. I led the team that obtained accreditation to the Tokyo Commodity Exchange and the London Bullion Market Association that provided worldwide acceptance of the GWRC mark on bullion bars. I also led the team that developed the process to produce 99.999% (5 nines) gold, which gained accreditation for GWRC as the sole supplier of gold to one of the world's largest fine wire manufacturers and suppliers to the electronic industry.

13. I negotiated a contract for GWRC to supply and install a gold refinery in Saudi Arabia. The contract also called for the training of the staff by the GWRC team.

14. At all times relevant to the statements set forth herein, I was the managing director of GWRC and a member of the board of directors. I became the chief executive of GWRC in 1990.

15. After leaving GWRC in 2001, I was engaged in 2003 by a Melbourne firm of attorneys to investigate and report on the evidence and quantum of damages that had been asserted by a major international refiner of precious metals in

connection with a multi million dollar fire insurance claim. I was engaged in that matter to appear as an expert witness should that prove necessary.

16. In November, 1989, NM Rothschild & Sons acquired a controlling interest in GWRC.

17. In addition to being on the board of GWRC, starting in February, 1999 I was on the finance committee of the board of GWRC. The responsibilities of the finance committee included oversight of the management of the assets and liabilities of GWRC and its subsidiaries with respect to financing matters and financial covenants.

18. In my position as managing director of GWRC, I worked closely with and was familiar with the auditing practice of PricewaterhouseCoopers Australia ("PwC Australia"), with respect to their audit of GWRC. It was PwC Australia's practice as part of its audit to review GWRC documents that recorded transactions with customers, stock control activities and trading activities to ensure that policies and limits had not been breached, and to report on any variations and violations to the audit committee and the board of GWRC.

19. In 1995, through the Italian office of Rothschild, GWRC became aware of the opportunity to acquire the Precious Metals Refining Division (the "PMRD") of Handy & Harman, Inc. ("HH"). From my experience in the precious metals industry I was familiar with the business and reputation of HH.

20. In early 1996, GWRC commenced due diligence and negotiations to acquire the PMRD. Sean Russo (another GWRC director) was the point persons at GWRC

responsible for the negotiations. Sean Russo and I were both responsible for the due diligence.

21. In 1996, the PMRD was one of the oldest and largest refiners of precious metals in North America, having been in operation for over 125 years. Its bullion bars bearing the "H&H" logo or hallmark were accepted by the world's leading gold and silver exchanges including the London Bullion Marketing Association, the Commodities Exchange, Inc., and The New York Mercantile Exchange. Its daily silver quotation was the pricing basis for settling many of the world's silver contracts.

22. The PMRD was headquartered in South Windsor, Connecticut, and it had refining operations in Attleboro, Massachusetts, South Windsor, Connecticut, Phoenix, Arizona, and Villa Park, Illinois.

23. At the time, the PMRD serviced most of the industries and markets that used precious metals to manufacture commercial products. It provided refining services to a broad industrial base and secondary refiners. The division provided services to parties involved in merchant banking, central banking, mining, and metal hedging.

24. In connection with negotiations to acquire the PMRD, I made trips from Australia to the United States over an eight month period, including visiting all four PMRD plants twice, to conduct due diligence and negotiations.

25. In April 1996, GWRC retained Coopers & Lybrand LLP, now PricewaterhouseCoopers, LLP ("PwC"), to assist GWRC with its due diligence efforts prior to entering into an asset purchase agreement to acquire the PMRD.

26. At the time, GWRC and Rothschild, as its major shareholder, were interested in acquiring the PMRD in order to broaden their world wide refining operations in the precious metals industry. As one of the oldest and largest refiners of precious metals in North America, the PMRD was an attractive acquisition for GWRC.

27. GWRC expected that the international combination of strengths and relationships among Rothschild, GWRC, and the PMRD would lead to significant growth and profitability for GWRC and the PMRD.

28. In July, 1996, GWRC entered into an asset purchase agreement with HH to acquire the PMRD. Under the terms of that asset purchase agreement, GWRC agreed to purchase the assets of the PMRD for $(US)9 million and assumed liabilities of approximately $(US)6 million.

29. GWRC created a wholly owned subsidiary, Handy & Harman Refining Group, Inc. ("HHRG"), a Connecticut corporation, to acquire the assets of the PMRD. GWRC assigned rights under the asset purchase agreement to HHRG prior to the closing.

30. At the time, the PMRD had precious metal inventory in excess of $(US)170 million. Much of this inventory was owed to customers of the PMRD, who had delivered precious metal to the PMRD to be refined.

31. In order to fund and facilitate the acquisition of the PMRD and this inventory, GWRC negotiated complex financing arrangements with Fleet Precious Metals ("Fleet") and Credit Suisse that would be entered into contemporaneously with the closing of the acquisition. Sean Russo was responsible for the negotiations of these financing arrangements.

32. Although these financing arrangements were extremely complex, a very simplified description of a key component of the Credit Suisse facility was that Credit Suisse provided a $(US)200 million financing facility, under which Credit Suisse initially purchased the precious metal inventory of the PMRD directly from the PMRD. This permitted the acquisition to take place without HHRG having to purchase the inventory of the PMRD.

33. Under the Credit Suisse facility, Credit Suisse further agreed to buy unrefined high grade precious metal from HHRG (and its wholly owned subsidiary ARC) and to pay for it with fully refined high grade precious metal, all on an ongoing basis. This permitted HHRG to advance fully refined precious metal to its refining customers prior to refining the customer's metal. It also allowed HHRG to operate without having to own large inventories of precious metal.

34. Under the Fleet facility, Fleet provided an additional $(US)25 million working capital and precious metal consignment facility.

35. In May, 1996, PwC issued a due diligence report on the PMRD. In this report, PwC identified certain South American business that the PMRD conducted. PwC stated:

> Based on our previous experience with overseas activities, we believe that there is serious risks associated with the Company's budgeted earnings and credit exposure with South American business in Venezuela, Chile, Uruguay and Bolivia. Management has stated that cash will not be given to its customers in these countries until an outside armored car company has verified the deposit of a customer's metal to designated vaults, as opposed to extending advances and obtaining security insurance bonds as was the previous practice.... As previously discussed with you, there are inherent political risks involved in the South American business which were demonstrated by the Company's last experience in Argentina. The Company has stated that it will no longer finance customers in Argentina

8

and has changed its business practice in other South American countries in order to reduce any bad debt exposure.

36. This due diligence report agreed with my view and that of GWRC that unsecured advances to customers were unacceptable risks that would not be taken.

37. As part of the acquisition of the PMRD, GWRC and HHRG intended to hire all of the employees of the PMRD including its officers, but excluding all but one of its permanent consultants. Among the officers retained was the president of the PMRD, Barry Wayne, and John Bullock, legal counsel.

38. On August 20, 1996, GWRC and HHRG completed the acquisition of the PMRD.

39. From the time of this acquisition through 1999, I traveled to the United States and visited HHRG at least once per quarter, with stays of up to two weeks. Commencing in 1999, these visits were more frequent and the stays longer in order to address the issues that were occurring at HHRG.

40. As part of the acquisition, HHRG entered into an employment agreement with Barry Wayne to become the president of HHRG reporting to the board of GWRC.

41. After the acquisition, I became a board member of HHRG. Initially the board of HHRG consisted of other Australian GWRC board members including Sean Russo plus Barry Wayne and John Bullock, the corporate counsel of HHRG. In November 1996, after joining HHRG, John King became a board member of HHRG.

42. The major source of income for a refiner such as HHRG is refining fees. In order to generate refining fees, it is necessary for a refiner such as HHRG to receive and process precious metals from mines, secondary refiners, and other customers. It

is therefore essential that customers have a high level of confidence in the financial soundness of the refiner.

43. Stated simply, it is my experience and knowledge that customers will not deliver valuable quantities of precious metal or materials containing precious metal to a refiner such as HHRG to be refined if they believe the refiner is not financially stable.

44. Beginning in 1996, many of HHRG's customers left precious metal "on deposit" with HHRG in pool accounts. HHRG pool accounts functioned much like bank accounts or brokerage accounts in that customers could withdraw metal from a pool account on demand and would receive monthly pool account statements. HHRG pool accounts were measured in ounces not dollars so that the customer, not HHRG, had the risk and benefit of price fluctuations, as long as HHRG held the precious metal.

45. The unique nature of the refining business – the fact that it handles hundreds of millions of dollars of precious metal to generate refining fee income – has resulted in well-established policies adopted industry wide. One of these policies is to advance funds to a customer for the purchase of precious metal only after that precious metal has been physically delivered to the refiner or an authorized agent of the refiner.

46. GWRC and HHRG, at the time of the acquisition of the PMRD, recognized a policy against unsecured advances was critically important to the financial soundness of any refiner such as HHRG because a violation of this policy for

even a relatively small amount of precious metal could put millions of dollars at risk and subject the company to large financial losses or even failure.

47. Consistent with the foregoing, GWRC adopted a company wide policy that prohibited advances to customers unless precious metal was in the possession of GWRC or an authorized agent.

48. Upon the acquisition of the PMRD, HHRG put the identical policy in place prohibiting unsecured advances.

49. Upon information and belief and based on PwC workpapers that are not in dispute, PwC knew that Luis Posada, an employee of HHRG, made unsecured advances on behalf of HHRG to Panexim in Peru and Orion in Chile for Value Added Tax ("VAT") prior to April 30, 1998.

50. PwC did not advise the Boards of HHRG or GWRC or the audit committee of these violations of company policy in its 1998 management letter or audit opinion or in communications to GWRC's accountants at PwC Australia or to the finance or audit committees of GWRC.

51. I was unaware in 1997, 1998, and the first four months of 1999 of any unsecured advances for VAT to Panexim or Orion by HHRG.

52. In May 1999, I and other GWRC board members first became aware of a large apparently partially secured receivable in excess of $(US)12 million owed to HHRG by Panexim.

53. John King, a board member of HHRG, raised concerns with the audit committee in May 1999 with the receivable balance due from Panexim and issues concerning security for the receivable.

54. The finance committee of GWRC promptly in May 1999 investigated this situation on the referral from the audit committee. When questioned, Barry Wayne initially reported that approximately $(US)11 million of this Panexim receivable was covered by gold in a secure vault in Peru on consignment to HHRG. In addition, the GWRC board discovered that a portion of this receivable related to an unsecured advance to Panexim to pay VAT owed by it to the Peruvian government with respect to certain silver transactions. After an investigation into this matter, Rick Ollett, HHRG's chief financial officer at the time, reported this amount to be $(US)1 million. Any advance to a customer for VAT was a violation of the GWRC and HHRG policy against such unsecured advances.

55. The Board of GWRC immediately instituted stricter controls over the metals business with Panexim.

56. On May 24, 1999, director Robert Guy notified Barry Wayne by fax that there should be "no additional exposure to Panexim...until such time as board approval is given." I agreed with this directive.

57. After May 1999, no unsecured advances of any additional amounts were made to Panexim.

58. In response to the investigation of the GWRC board and finance committee, Barry Wayne continued to maintain that sufficient gold to cover the receivable for gold was on consignment to HHRG in a secure vault in Peru and that the delay in obtaining it was due to the Peruvian government's curtailment of large gold exports and not to any financial issue with Panexim.

59. In July 1999, the GWRC board censured Mr. Wayne, withheld his bonus for 1999, and initiated changes to the negotiation of his contract providing for a terminal one year contract. The board also notified Barry Wayne that his CEO position would be terminated at the end of the terminal contract term of one year. The board officially suspended Barry Wayne on January 24, 2000.

60. As part of its response to this matter, the GWRC board and finance committee requested an independent assay on the gold in the Peruvian vault in connection with the interim financial statements that had to be publicly reported in Australia in September 1999. This assay appeared to confirm Barry Wayne's representations as to the quantity of gold on deposit in Peru, but it was later learned in February 2000 that the assay report had been constructed in such a manner as to hide the true situation and that no significant gold was available to cover the advances to Panexim.

61. In mid-February, 2000, the GWRC board and finance committee learned that HHRG did not have gold in the Peruvian vault covering the Panexim receivable and that the metal in the vault was actually silver, worth a small fraction of the value represented to be present.

62. Specifically, the GWRC board and the finance committee learned in 2000 that Luis Posada, the smelter administrator at HHRG, had caused HHRG to advance millions of dollars to Panexim on an unsecured basis to permit Panexim to pay VAT to the Peruvian government, all of which was a continuing serious violation of the HHRG policy against such unsecured advances.

63. The GWRC board also learned in 2000 that although the unsecured advances to Panexim started earlier, they had increased significantly during the period July 1998 through January 1999.

64. The GWRC board also learned in 2000 that during this period of significant increase in unsecured advances, the Peruvian government was refunding VAT payments to Panexim, which refunds permitted Panexim to repay the unsecured advances made to it by HHRG. In the latter months of 1998, the Peruvian government stopped refunding VAT payments to Panexim, and Panexim stopped repaying the unsecured advances made to it by HHRG.

65. The GWRC board also learned in 2000 that during the period November, 1998 through January, 1999, the unsecured advances to Panexim for VAT grew to an outstanding balance in excess of $(US)10 million. This balance was never reduced below $(US)10 million thereafter.

66. The amount of unsecured advances to Panexim that accumulated during the latter months of 1998 and January 1999 was so large that HHRG could not continue as a going concern with these unsecured advances outstanding.

67. Upon the discovery in 2000 that there was no substantial quantity of gold in the vault in Peru covering the unsecured advances to Panexim, the GWRC and HHRG boards reported the situation to Credit Suisse and Fleet, both of whom terminated financing facilities with HHRG within days. This caused HHRG to shut down all refining operations within days and to file a Chapter 11 bankruptcy petition in the United States Bankruptcy Court for the District of Connecticut on March 28, 2000.

68. Once the financial exposure of more than $(US)10 million to HHRG because of Panexim became known to the market, HHRG customers demanded return of precious metals "on deposit" with HHRG. HHRG was not able to comply with these requests and ultimately these customers became unsecured creditors of HHRG.

69. I was present in Connecticut during this time working at HHRG, and I know that the loss of confidence in HHRG by the financial institutions and refining customers could not be overcome by actions I took or those of Sean Russo, who was also in Connecticut at that time.

70. As a result of the unsecured advances to Panexim that were contrary to company policy, HHRG was forced to stop operating as a going concern and had no alternative but to liquidate its assets.

71. If the unsecured advances to Panexim had been disclosed by PwC in June 1998 to me, the audit committee, or the GWRC board, the GWRC board would have prevented any future unsecured advances to Panexim. If we had been able to take this action, HHRG would have continued as a going concern and its value as of June 1998, before the significant increase in unsecured advances to Panexim, would not have been destroyed.

72. If the GWRC board had known of the unsecured advances to Panexim in June 1998, I and the board would have taken immediate action to stop all such future unsecured advances, just as we did in May 1999 and thereafter.

73. Because the board of GWRC and board members of HHRG were not advised by PwC of unsecured advances in June 1998, I and the boards were not able to take

steps and institute actions to prevent unsecured advances from accumulating after June 1998.

74. I have reviewed the expert report of Craig Elson. The valuation is reasonable based on what I believed at that time were the reasonable long term prospects for precious metals prices and lease rates and the consequent benefits to the precious metals refining business globally. I know from personal involvement on the board of GWRC and as managing director of GWRC that there were no circumstances or matters that materially affected the long term business prospects or valuation of HHRG in a negative way, as a going concern during the latter half of 1998 and to January 31, 1999, other than the unsecured advances and payments to or on behalf of Panexim that were contrary to company policy.

75. I also have reviewed the expert reports of Mr. Pinney and Mr. Shivdasani concerning matters they contend could have affected the business prospects of HHRG in 1999 and 2000. I disagree that these matters materially affected the long term business prospects or valuation of HHRG as a going concern.

76. Moreover, in my personal and direct knowledge of HHRG, these matters did not have anything to do with the complete destruction of the going concern value of HHRG and the liquidation of its assets.

77. Since HHRG represented a significant source of income for GWRC, HHRG was critical to the continued viability of GWRC as a going concern. When HHRG ceased operating as a going concern, this caused GWRC's financial collapse as it was not able to meet its loan and other obligations. This forced GWRC into liquidation and caused the complete destruction of GWRC as a going concern.

78. I know from my personal involvement with HHRG and GWRC that:

    (a) The increase in silver metal lease rates in 1999 did not materially affect HHRG's overall financial condition and certainly did not affect the long term value of HHRG. The effect of higher lease rates relating to Warren Buffet's reported silver purchases affected one HHRG term contract for silver refining which was not hedged as effectively as it might have been and turned a profitable refining contract into a loss on that one contract. Subsequently, metal lease rates have been very benign and often at or near historical lows and would have been highly favourable to HHRG had it stayed in business.

    (b) Although HHRG initially had budget and reporting procedures that the GWRC board believed should be updated, these procedures were changed on an ongoing basis from the time of the acquisition and HHRG made substantial improvement. In any event, these reporting issues did not materially affect the overall business prospects and valuation of HHRG as a going concern.

    (c) The Enviromet acquisition in October 1998 and the acquisition of the GWRC owned business in Canada by HHRG similarly did not materially affect the long term valuation and overall business of HHRG. Moreover, it is extremely unlikely that the acquisition of Enviromet would have occurred had the GWRC board learned of the unsecured advances to Panexim in June of 1998.

(d) With respect to the electronic scrap refining business, this was not a significant factor in the long term valuation of HHRG as a going concern, just as it had not been a significant factor in GWRC's decision to acquire the assets of the PMRD. The revenue from this business also fluctuated as the price of precious metals fluctuated. Thus, any temporary reduction in revenue from this business based on a reduction in the price of precious metals would be reversed when the price of precious metals increased.

(e) The low prices and high lease rates that affected precious metal refiners in 1999 were short term temporary issues that were substantially reversed by 2000-2001 when the price of precious metals increased and lease rates declined. These issues also had nothing to do with the failure of HHRG as a going concern, If HHRG had not made the unsecured advances to Panexim and had instead continued as a going concern, today HHRG would be experiencing very high prices on precious metal recoveries and very low metal lease rates, conditions that would be extremely favorable to HHRG's business. HHRG also would have been able to take advantage of these favorable market conditions without quantity limitations on throughput due to the unique financial arrangements that were in place with Credit Suisse and Fleet.

79. If I had been advised as a member of the HHRG board or the GWRC board of the unsecured advances to Panexim in June 1998, I immediately would have taken

steps as outlined above to stop future unsecured advances to Panexim and to recover any outstanding advances by HHRG.

80. In summary, HHRG failed as a going concern business and was forced to liquidate because of the unsecured advances to Panexim known to PwC, which advances were not the subject of any disclosure or advice from PwC to HHRG or GWRC.

81. I submit this affidavit in opposition to the motions for summary judgment filed by PwC against HHRG and GWRC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 1, 2005.

_____
Michael Ryan