UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1379(MRK) |
| ALEC SHARP, et al.<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK) |

### AFFIDAVIT OF RICHARD HAYES

I, Richard Hayes, being duly sworn hereby state as follows:

1. I am over the age of eighteen and believe in the obligations of the oath.

2. I have personal knowledge of the facts set forth herein, and the statements made herein are true to the best of my knowledge and belief.

3. I am a citizen of Australia.

4.  I am a certified practicing accountant and have a Masters of Business Administration. I also am a chartered secretary.

5.  I became the chief financial officer of Golden West Refining Corporation ("GWRC") in November 1997. I was recruited for that position by NM Rothschild & Sons. I held that position until November 1998, when I became the chief financial officer of the AGR Joint Venture of which GWRC controlled 50%.

6.  I am currently the chief financial officer for Gold Corporation. Gold Corporation is one of Australia's leading precious metals refining, minting and value adding groups, providing high quality services and precious metal products to domestic and international markets. It was created by the Gold Corporation Act 1987 and is wholly owned by the Government of Western Australia.

7.  As part of my responsibilities as chief financial officer of GWRC, I was responsible for the corporate financial management of GWRC and its subsidiaries. I also was responsible for the financial reporting to the Stock Exchange since GWRC was publicly traded.

8.  As chief financial officer, I reported to Michael Ryan, who was chief executive officer of GWRC.

9.  During my tenure at GWRC, I regularly attended board meetings of Golden West, occasionally attended board meetings of HHRG, and was a member of the finance committee of the board of directors of GWRC. Non-executive GWRC board members, Sean Russo, Chris Wiggins, and latterly Robert Guy, were the other members of the finance committee. Michael Ryan was appointed to the finance committee at the February 1999 GWRC board meeting.

10. One of the GWRC subsidiary corporations whose financial management I oversaw was Handy & Harman Refining Group, Inc. ("HHRG")

11. It is a well established policy in the precious metals refining industry that a refiner does not make advances or extend credit to a refining customer unless the precious metal of that customer to properly back the advance is in the possession of the refiner or an authorized agent.

12. This policy is critical in the precious metals refining industry because of the extremely high price of precious metal, especially as contrasted to the margins earned by refiners when metal is refined.

13. It also is well known in the industry that a violation of this policy against unsecured advances could cause substantial financial losses or the destruction of the refiner's business, depending on the size of the loss caused by the violation of the policy.

14. Because of the foregoing both GWRC and HHRG had well established policies prohibiting unsecured advances or extensions of credit to customers unless precious metal was in the possession of GWRC or HHRG or an authorized agent.

15. At no time during my tenure as chief financial officer of GWRC was I aware of any advance to Panexim in violation of this policy.

16. During my tenure as chief financial officer of GWRC, I worked with PricewaterhouseCoopers, LLP ("PwC") in connection with the annual financial audits and six month financial reviews of HHRG, both of which were required for the financial reports that had to be publicly filed with the Stock Exchange in Australia

17. In connection with its audits of HHRG, PwC made detailed recommendations each year concerning the internal control structure at HHRG, which HHRG typically

3

responded to with remedial action. For example, in connection with its audit of the 1997 financial statements, PwC made the recommendations set forth in the June, 1997 letter attached hereto as Exhibit 1. HHRG replaced a software system and instituted a new computer program or system, for example, to respond to an issue on accounts receivable segregation and recording raised by PwC.

18. Notwithstanding its practice of making recommendations on the internal control structure at HHRG, and notwithstanding the fact that it regularly did so, at no time during my tenure as chief financial officer did PwC ever inform me of any unsecured advance to Panexim for value added tax payments ("VAT") by Panexim or unsecured advances to any other customer in violation of HHRG's policy against unsecured advances.

19. As the chief financial officer responsible for the financial reporting of GWRC and its subsidiaries, including HHRG, I expected to receive and I relied upon PwC to make recommendations concerning the internal control structure and deficiencies or violations of company policy discovered by PwC at HHRG. The investigation of unsecured advances was one of the specific deliverables included in the audit scope for the 1997/98 year end audit.

20. I understand from others that during its audit of the financial statements dated June 30, 1998, PwC became aware of a violation of the HHRG policy against unsecured advances to customers. I absolutely would have expected and relied upon PwC to report that to me immediately.

21. PwC certainly was aware of the importance of complying with this policy and its audit team knew of the HHRG policy against unsecured advances.

22. If PwC had informed me of violations of HHRG's policy against unsecured advances to customers in South America for VAT payments in an amount that exceeded $(US)1 million, I immediately would have informed Michael Ryan, my immediate superior.

23. I also would have informed Sean Russo, the chairman of the finance committee of GWRC.

24. I would have considered any such violation to be an extremely serious matter and one that required immediate responsive action.

25. I also would have closely investigated and monitored this situation to be certain that corrective action was immediately taken and that no additional advances in violation of policy were occurring.

26. I would have taken immediate action to advise Mr. King, the treasurer of HHRG, who reported to me on a dotted line relationship to take direct action to require his and my approval of any transaction with Panexim and to further act to collect any amounts due from Panexim.

27. Based on my experience as chief financial officer and as a member of the finance committee of GWRC, I firmly believe the GWRC board would have taken prompt action to prevent additional unsecured advances to Panexim for VAT or any other purpose if advised of such advances by PwC.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 2nd Sept, 2005.

_____
Richard Hayes