UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1379(MRK) |
| ALEC SHARP, et al.<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK) |

### AFFIDAVIT OF JOHN BULLOCK

I, John Bullock, being duly sworn hereby state as follows:

1. I am over the age of eighteen and believe in the obligations of the oath.

2. I have personal knowledge of the facts set forth herein, and the statements made herein are true to the best of my knowledge and belief.

3. I am a citizen of the United States.

4. I am an attorney licensed to practice in the State of Connecticut.

5. In 1986, after ten years in private practice, I joined Handy & Harman ("HH"), a long standing, internationally famous precious metals company, as its environmental counsel.

6. In 1996 I became the General Counsel to Handy & Harman Refining Group, Inc. ("HHRG") when it purchased the assets of the precious metals refining division of HH. I was General Counsel to HHRG until August, 1999.

7. Since I left HHRG in August, 1999, I have been in private practice providing legal services to refiners and users of precious metals.

8. As part of my responsibilities as General Counsel of HHRG, I was on the board of HHRG and had broad responsibilities consistent with the traditional role of a general counsel. I served on the Board of HHRG.

9. During my tenure at HHRG, I regularly attended board meetings of HHRG. Board members of Golden West Refining Corporation ("GWRC"), the parent company to HHRG, were also on the board of HHRG and regularly attended those board meetings.

10. It is a well established policy in the precious metals refining industry that a refiner does not make advances to a refining customer unless the precious metal of that customer to fully back the advance is in the possession of the refiner or an authorized agent.

11. This policy is critical in the precious metals refining industry because of the extremely high price of precious metal, especially as contrasted to the margins earned by refiners when metal is refined.

12. It also is well known in the industry that a violation of this policy against unsecured advances could cause substantial financial losses or the destruction of the refiner's business, if the customer defaults upon its obligation to deliver metal depending on the size of the loss.

13. Because of the foregoing HHRG had a well established policy prohibiting unsecured advances to customers unless precious metal was in the possession of HHRG or an authorized agent.

14. At no time prior to May, 1999, was I aware of any advance to Panexim in violation of this policy.

15. During my tenure as General Counsel of HHRG, I worked with PricewaterhouseCoopers, LLP ("PwC") in connection with the annual financial audits and six month financial reviews of HHRG. I did not know of the ASE requirements.

16. At no time during my tenure as General Counsel of HHRG did PwC ever inform me of any unsecured advance to Panexim for value added tax payments ("VAT") by Panexim or unsecured advances to any other customer in violation of HHRG's policy against unsecured advances.

17. As the General Counsel of HHRG, I expected to receive and I relied upon PwC to report violations of company policy discovered by PwC at HHRG.

18. I understand from others that during its audit of the financial statements dated June 30, 1998, PwC became aware of a violation of the HHRG policy against unsecured advances to customers. I absolutely would have expected and relied upon PwC to report to the Audit Committee of GWRC.

19. If PwC had informed me of violations of HHRG's policy against unsecured advances to customers in South America for VAT payments in any amount, I immediately would have informed the boards of both HHRG and GWRC or the Audit Committee of GWRC or the Chairman of GWRC.

20. I would have informed John King, the treasurer of HHRG.

21. If I had been told that such an unsecured advance had been made that exceeded $(US)1 million, I would have considered that to be an extremely serious matter and one that required immediate responsive action by the Boards of HHRG and GWRC.

22. I also would have closely investigated and monitored this situation to be certain that corrective action was immediately taken.

23. Based on my experience as General Counsel and as a member of the board of HHRG, I firmly believe the HHRG board would have taken prompt action to prevent additional unsecured advances to Panexim for VAT or any other purpose if advised of such advances by PwC.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 1, 2005.

John Bullock