## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP and<br>COOPERS & LYBRAND, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1379(MRK) |
| ALEC SHARP, et al.<br>Plaintiffs<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP d/b/a<br>PRICE WATERHOUSE, LLP<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>Plaintiff<br><br>VS.<br><br>PRICEWATERHOUSECOOPERS, LLP,<br>Defendant | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK) |

### AFFIDAVIT OF RODNEY WARREN

I, Rodney Warren, being duly sworn hereby state as follows:

1. I am over the age of eighteen and believe in the obligations of the oath.

2. I have personal knowledge of the facts set forth herein, and the statements made herein are true to the best of my knowledge and belief.

3. I am a citizen of Australia.

4. I am an attorney and currently am employed in Fremantle Australia by the firm of Warren, Syminton Ralph Pty. Ltd.

5. I became a member of the board of Golden West Refining Corporation ("GWRC") in 1990. I served on the board for over 10 years.

6. I was chairman of the audit committee of the GWRC board from August 1996 to March 2000.

7. I have served on the board of directors of three public companies.

8. As part of my responsibilities as chairman of the audit committee, I was involved in meetings with the auditors of GWRC. I was also involved in review of the financial reporting for GWRC and its subsidiaries.

9. During my tenure at GWRC, I regularly attended GWRC board meetings and meetings of the audit committee of the board of GWRC.

10. It was a well established policy of GWRC that advances to a refining customer were not to be made unless the precious metal of that customer sufficient to cover completely the advance was in the company's possession or under its control.

11. At no time prior to May 1999 was I aware of any advance to a company in South America known as Panexim in violation of this policy.

12. As chairman of the audit committee of GWRC, I worked with PricewaterhouseCoopers Australia ("PwC Australia"), especially Alan Goode, in connection with the annual financial audits of GWRC that were required for the financial reports that had to be publicly filed with the Stock Exchange in Australia.

13. In connection with the audits of GWRC, arrangements were made with PricewaterhouseCoopers LLP in the United States ("PwC-US") for audit and accounting

services. As chair of the audit committee, I met with PwC-US in connection with the annual financial audits of HHRG that were required for the financial reports that had to be publicly filed with the Stock Exchange in Australia

14. At no time during my tenure as audit committee chair did PwC Australia or PwC-US ever inform me of any unsecured advances to Panexim for value added tax payments ("VAT") or unsecured advances to any other customer.

15. As chairman of the audit committee, I expected to receive and I relied upon the auditors of both GWRC and HHRG to make recommendations concerning deficiencies or violations of company policy discovered by PwC-US at HHRG or by PwC Australia at GWRC. Indeed at all meetings with both auditors, an interval was set aside at which only the audit partners and the non-executive members of the audit committee – Mr. Christopher Wiggins and myself - were present and at which the auditors were expressly requested to advise the audit committee of any concerns they may have had in relation to the audit or the operations of the relevant company discovered in the course of the audit.

16. I understand that during its audit of the financial statements dated June 30, 1998, PwC-US became aware that HHRG had made unsecured advances for VAT to Panexim and Orion and that PwC-US were aware that this was in violation of the HHRG policy against unsecured advances to customers. I absolutely would have expected and relied upon PwC-US to report that to the boards of HHRG and GWRC immediately and not later than its audit opinion and letter of June 30, 1998.

17. If PwC-US had informed me or the GWRC board of violations of HHRG's policy against unsecured advances to customers, Orion and Panexim in South America for VAT

3

        payments in an amount that exceeded $(US)1 million in June 1998, I immediately would have informed the board and we would have acted promptly.

18. As a member of the GWRC audit committee, I would have considered any such violation to be an extremely serious matter and one that required immediate responsive action.

19. I and the GWRC board would have closely investigated and monitored this situation to be certain that corrective action was immediately taken and that no additional advances in violation of policy could occur.

20. Based on my experience as chair of the audit committee and as a member of the board of GWRC, I firmly believe the GWRC board would have taken actions to prevent additional unsecured advances to Panexim for VAT or any other purpose if advised of such advances by PwC-US in June 1998.

21. In May 1999, I attended a board meeting of HHRG in South Windsor, CT. Also attending the meeting was Christopher Wiggins, a GWRC board member and member of the GWRC audit committee.

22. After this board meeting, John King, the treasurer of HHRG, told me he had concerns about the dealings of HHRG with a company called Panexim and that he was not involved in the management of the Panexim account. John King further advised me that the Panexim account was managed by Barry Wayne and that he thought the account was out of order and somebody should inquire into it.

23. At a follow-on meeting in mid-May, Christopher Wiggins and I and PwC-US auditors met with Barry Wayne.

24. Christopher Wiggens and I told Barry Wayne that, amongst other things, we were concerned because we had heard the Panexim account was a problem. Barry Wayne

assured us that Panexim was a customer of high standing and its principals were men of integrity and that there were advances made in the amount of approximately $(US)300,000-$(US)400,000 for VAT to assist that company in its businesses which were outstanding but on which Panexim was paying 14% interest and that provision had been made for repayment. He explained that there were large volumes of gold held in a secure vault under the control of HHRG, export to HHRG having been delayed because the Peruvian Government had instituted a policy to temporarily curtail exports of gold from Peru. Barry Wayne also said we should not be concerned, because it would all be sorted very soon.

25. At the meeting in South Windsor in May 1999, I spoke to the PwC-US auditors about Panexim.

26. In July 1999, the GWRC Board met to consider the actions it should take regarding the Panexim situation. In due course, after several meetings to consider what actions it should take, the Board reached a decision to terminate Barry Wayne.

27. At no time in 1998 or 1999 was I aware of unsecured advances for VAT for gold with Panexim that totaled over $(US)10 million by early 1999.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on 7ᵗʰ September, 2005.

Rodney Warren

5