UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED,<br>                Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP and COOPERS & LYBRAND LLP,<br>                Defendants. | CIVIL ACTION NO.<br>3:02 CV 1379 (MRK) |
| ALEC SHARP, et al.,<br>                Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP d/b/a PRICE WATERHOUSE LLP,<br>                Defendant. | CIVIL ACTION NO.<br>3:02 CV 1572 (MRK) |
| HANDY & HARMAN REFINING GROUP, INC.,<br>                Plaintiff,<br>VS.<br>PRICEWATERHOUSECOOPERS LLP,<br>                Defendant. | CIVIL ACTION NO.<br>3:02 CV 1803 (MRK)<br><br>September 19, 2005 |

**PRICEWATERHOUSECOOPERS LLP'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AGAINST GOLDEN WEST REFINING CORP. LIMITED**

David J. Elliott
Thomas D. Goldberg
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
Tel: (203) 977-7300
Fax: (203) 977-7301

PricewaterhouseCoopers LLP ("PwC") respectfully submits this reply memorandum of law in support of its motion for summary judgment on all claims asserted by Golden West Refining Corp., Limited ("GWRC" or "plaintiff"), in *Golden West Refining Corp. Limited v. PricewaterhouseCoopers LLP*.[1]

## PRELIMINARY STATEMENT

The crux of GWRC's claim is that the loss of the entire equity value of GWRC after June 30, 1998 -- over an alleged $46 million Australian dollars -- was proximately caused by PwC. As set out in our opening memorandum, however, GWRC has disclosed no expert witness testimony or other competent evidence that demonstrates, in light of the subsequent almost two-year period before public investors in the Australian stock market could have become aware of the Panexim losses, that PwC's alleged conduct proximately caused the loss that GWRC claims.

In response, GWRC points to facts and opinions that reiterate, as PwC *assumed* in its opening memorandum, that HHRG's collapse led to GWRC's insolvency. This cannot, however, demonstrate that PwC caused the entire decline of GWRC's market capitalization after June 30, 1998. Next, GWRC relies heavily upon the expert opinion offered by Ian Hobson, which expressly measures damages based upon GWRC's market capitalization as it existed on June 30, 1998. Any alleged loss proximately caused by PwC, however, cannot be measured by GWRC's equity value as it existed in June 1998, which then steadily eroded as the business of its principal asset, HHRG, was impacted by industry, operating and other circumstances separate and apart from anything to do with PwC or Panexim. This theory cannot be reconciled with

---

[1] GWRC has submitted a memorandum in opposition to PwC's motion, as well as joining in an opposition submitted on behalf of both HHRG and GWRC. Issues relating to both HHRG and GWRC are addressed in PwC's Reply Memorandum of Law in Support of Its Motion for Summary Judgment Against Handy & Harman Refining Group, Inc. ("PwC Reply Mem. to HHRG") and are incorporated herein.

plaintiffs' position that HHRG's business was destroyed when its creditors and customers became aware of the Panexim losses in February 2000. Plaintiff's efforts to rehabilitate this fundamental shortcoming in Mr. Hobson's expert opinions are unavailing.

Plaintiff has also failed to rebut PwC's showing that, as a matter of law, PwC owed no fiduciary duty to GWRC. Instead, plaintiff points to facts which, even if assumed to be true, amount at best to a non-contractual, business relationship. As a result, PwC is entitled to summary judgment.

## ARGUMENT

### A. GWRC Must Offer Expert Testimony To Establish Proximate Causation, But The Expert Testimony On Which It Relies Fails Adequately To Establish That PwC Proximately Caused GWRC's Claimed Loss.

Plaintiff argues that the requirement of expert testimony in a professional services case in Connecticut is not "necessarily" applicable in this accountant services case.[2] GWRC, however, has made no effort whatsoever to analyze the cases on which PwC relied in its opening memorandum, including the Connecticut cases which do not distinguish accountant from other professional malpractice in other contexts.[3] And it has provided no principled basis to show that

---

[2] (GWRC's Memorandum of Law in Opposition to PwC's Motion for Summary Judgment, dated September 2, 2005 ("GWRC Mem."), at 4-5.)

[3] (*See* PwC Mem., at 12-13 & n.32.) Moreover, the only cases that plaintiff has elected affirmatively to offer suggest, unsurprisingly, that witnesses may testify about their own obvious medical conditions, such as their pregnancy. (*See* GWRC Mem. at 5 n.1.) However, most of these cases do not actually analyze claims of malpractice, which GWRC's own case law indicates is "[o]ne area where expert medical testimony is regarded as essential . . . ." *Aspiazu v. Orgera*, 205 Conn. 623, 631 (1987). And the two cases that *do* analyze claims of malpractice not only included expert testimony, but also involved the *res ipsa loquitor*-like circumstance of objects left in a patient following surgery. *See Puro v. Henry*, 188 Conn. 301, 306 (1982) and *Slimak v. Foster*, 106 Conn. 366, 367-69 (1927). Indeed, the Connecticut Supreme Court recently cited these cases on that very basis. *See Boone v. William W. Backus Hosp.*, 272 Conn. 551, 567-68 (2005) (decisions applying an exception to the requirement of expert testimony have

the appropriate valuation of a company -- over an approximately two-year period that included significant changes in its performance and prospects and notably a substantial decline in its market capitalization -- is any more within the common knowledge of a lay jury than the medical and legal malpractice cases on which we have relied.[4]

Instead of providing any of these things, GWRC asserts that it "is all the more obvious that no expert testimony is required to show the cause of the next domino to fall, *i.e.*, that HHRG's insolvency subsequently and proximately caused the destruction of GWRC's business as a going concern."[5] This position, however, is one that PwC would contest at trial, but has already assumed for purposes of this motion.[6]

And indeed, the half-hearted nature of these arguments is highlighted by GWRC's reliance upon the expert testimony of Mr. Hobson to demonstrate that HHRG's collapse was the proximate cause of the destruction of GWRC's alleged value.[7] Again, however, this misses the point, since PwC has already assumed for purposes of this motion that Mr. Hobson's opinions may be most favorably construed to indicate that HHRG's failure caused the subsequent failure of GWRC.[8]

---

involved "foreign objects discovered in the body of a patient after surgery or abnormal injuries sustained during surgery.")

[4] (*See* PwC Mem. at 7-9, 16-17. *See also* PwC Reply Mem. to HHRG at 2-4.)

[5] (GWRC Mem. at 3.)

[6] (*See* PwC Mem. at 5-6, 14.)

[7] (*See* GWRC Mem. at 5-6.)

[8] (*See* PwC Mem. at 14.)

Critically, however, Mr. Hobson's opinion does not establish and cannot establish that PwC's alleged conduct proximately caused the destruction of GWRC's value *as it existed on June 30, 1998*. The alleged lost value of GWRC cannot be calculated from GWRC's business as it existed on June 30, 1998, which subsequently eroded as the business of its principal asset, HHRG, was impacted by industry, operating and other circumstances independent of PwC or Panexim. In addition to these factors affecting HHRG, GWRC had other operations that likewise cannot have remained frozen in time as of June 30, 1998, including its Canadian subsidiary prior to its sale to HHRG and its interest in the AGR refining operation.[9] Nor has it ever been the contention of plaintiffs that HHRG's earnings were negatively impacted at the time of PwC's alleged breach in June 1998 or at any point prior to the discovery of the Panexim losses. Instead, it is and always has been their contention that HHRG's business was destroyed when its creditors and customers became aware of the Panexim losses in February 2000. And yet, Mr. Hobson's opinion is clearly and immutably grounded upon GWRC's equity value on June 30, 1998 and attributes the entire loss in GWRC's market capitalization after that date to PwC.[10]

GWRC attempts to obfuscate this fundamental discrepancy. As an initial matter, GWRC notes that Mr. Hobson identified and quantified the alleged components of GWRC's loss arising from the insolvency of HHRG, for purposes of comparison with the market capitalization value of June 30, 1998 on which he opines. However, by far the largest component of Mr. Hobson's

---

[9] (*See* PwC Mem. at 10, 17-18.)

[10] (*See* PwC Mem. at 11, 14-15.) Mr. Hobson's report, for example, concludes: "In our opinion, the market capitalisation of GWRC as at 30 June 1998, adjusted for control premium would amount to A$46.3 million." (Hobson Report § 16.1) Mr. Hobson's deposition testimony, for example, reaffirms that "the entire market capitalization of GWRC as of June 30, 1998 was lost due to the conduct of [PwC]." (Hobson Tr. at 22).

quantification is the alleged value of HHRG as of June 30, 1998, which he adopts wholesale from the report of HHRG's expert, Craig Elson.[11]  Both Mr. Hobson and Mr. Elson were asked by plaintiffs' counsel to use the June 30, 1998 valuation date on the assumed basis that HHRG thereafter was operated inconsistently with its policy regarding advances.[12]  However, Mr. Elson's valuation suffers from terminal defects.  As set out in our reply memorandum in support of summary judgment against HHRG, Mr. Elson's valuation fails entirely to take into account the industry, operating and other circumstances impacting HHRG in the nearly two-year period between June 30, 1998 and the discovery of the Panexim losses and also to consider HHRG's business as it existed immediately before the discovery of those losses.[13]

GWRC then argues that its expert has acknowledged the diminution in GWRC's business after June 30, 1998 by noting the significant decline in GWRC's share price from A$0.66 on June 30, 1998 to A$0.36 on February 23, 2000, the day before trading was suspended: "Hobson acknowledges the decline of GWRC's share price from A$0.70 to A$0.36 between July 1, 1999 and February 23, 2000 . . . ."[14]

But the very fact that GWRC's expert *has* acknowledged the relevancy of the period immediately before trading was suspended, *has* acknowledged that GWRC's share price -- in a

---

[11] (*See* Hobson Report § 11.2.)  The HHRG valuation opinion of Mr. Elson that Mr. Hobson adopts is of $30.7 million, which, converted to Australian dollars, represents approximately A$49 million of the total A$66 million of Mr. Hobson's component-based comparison value. (*See id.* § 15.1.)

[12] (*See* PwC Mem. at 11 and Elson and Hobson Trs. (Exs. 26 and 34 to PwC's Consolidated Local Rule 56(a)(1) Statement).)

[13] (*See* PwC Reply Mem. to HHRG at 1-3, 8-10.)

[14] (*See* GWRC Mem. at 6, citing Hobson Report §§ 7.1 – 7.4.  *See also* Hobson Report §§ 5.1-5.2 (stating that February 2000 should be considered).)

market that it vehemently contends was efficient -- was only about half of its June 1998 value at that critical juncture, and *has* acknowledged that its expert nonetheless opines based upon the earlier date provided to it by counsel, really only underscores the problem. Indeed, Mr. Hobson even writes at one point that the appropriate measure of GWRC's loss is the difference between its current position and "its financial position ***prior to the collapse of HHRG***."[15] As a result, while GWRC has offered an expert opinion on GWRC's market capitalization as of June 1998, it has not, in light of the independent factors impacting HHRG and the concomitant severe decline in GWRC's value thereafter, offered any expert testimony to support that PwC proximately caused the loss of GWRC's June 1998 value.

    **B.    GWRC Otherwise Has Failed to Establish That PwC Proximately Caused GWRC's Claimed Losses.**

In our opening memorandum, we discussed the principle, set out in the Second Circuit and beyond, that a plaintiff must show, taking into account other factors, that it was the defendant's conduct that caused the specific loss that it seeks.[16] Not only does GWRC fail to address the legal principle, it also fails to offer evidence that PwC's alleged conduct is responsible for the entire loss in GWRC's market capitalization after June 30, 1998. Instead, other than the foregoing, plaintiff relies upon statements by Mr. Ryan and Mr. Russo that the collapse of HHRG caused the collapse of GWRC.[17] PwC, however, already assumed this position for purposes of its motion.[18] And moreover, for the reasons set out above, these

---

[15] (Hobson Report § 5.1 (emphasis added).)

[16] (*See* PwC Mem. at 15-18.)

[17] (*See* GWRC Mem. at 4 and the affidavits cited therein.)

[18] (*See* PwC Mem. at 5-6, 14.)

statements simply do not demonstrate that PwC's alleged conduct proximately caused the destruction of GWRC's value as it existed on June 30, 1998.

### C. GWRC Has Failed To Establish the Existence Of Any Fiduciary Duty Owed By PwC To GWRC.

Plaintiff argues that PwC owed GWRC a fiduciary duty based upon certain purportedly unique aspects of their limited interactions. Even if, however, GWRC's factual assertions were true, they amount only to a non-contractual, business relationship clearly insufficient, as a matter of law, to establish the existence of any fiduciary duty.

GWRC cannot and has not identified any document that establishes a contractual relationship with PwC. Rather, plaintiff relies upon assertions that PwC was aware that GWRC relied on its audit work for HHRG, that members of the GWRC audit committee provided input on the timetable of that work, and that a PwC partner was replaced for failure to comply with this timetable.[19] Plaintiff concludes, therefore, that "there is no question that PwC (US) performed its audits of HHRG's financial statements with the full knowledge and expectation that they would be used by GWRC to satisfy its reporting obligations . . . ."[20] Even assuming these allegations were both supported and true, however, GWRC supplies not a single case holding that PwC's awareness of GWRC's alleged reliance suffices to show that PwC undertook to represent the individual interests of GWRC or otherwise to create a fiduciary relationship. Indeed, the cases cited in our opening brief, which plaintiff has entirely failed to address, plainly hold that awareness that a plaintiff relies on a defendant to fulfill its obligations to a third party "does not rise to the level of a confidential relationship for purposes of establishing a fiduciary

---

[19] (GWRC Mem. at 8-9 and the exhibits cited therein.)

[20] (GWRC Mem. at 9.)

duty."[21] *High-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 41-42 (2000) (quoting *Garrison Contractors, Inc. v. Liberty Mutual Ins. Co.*, 927 S.W.2d 296, 301 (Tex. App. 1996)); *see also Facchini v. Miller*, No. CV 990587686S, 2000 Conn. Super. LEXIS 245, at *9 (Conn. Super. Ct. Jan. 28, 2000).

Similarly, plaintiff argues that PwC had superior knowledge and a dominant position vis a vis GWRC, in that PwC supposedly had "superior knowledge regarding HHRG's financial statements" and that GWRC relied upon PwC's audit work.[22] Plaintiff so argues notwithstanding that PwC personnel performed periodic audits of HHRG, while GWRC executives such as Messrs. Ryan and Russo, who plaintiffs have portrayed as sophisticated, international businessmen knowledgeable of the industry, were in regular contact with the management of GWRC's primary subsidiary.[23] However, even assuming that these assertions were supported and true, the law does not create a fiduciary duty on the basis of superior skill and knowledge, and only implies such a duty where a party's dominant position renders the other "unable to fully protect its interests."[24] And indeed, even if an auditor gained superior knowledge during the course of an audit, that alone could not create a fiduciary relationship. If so, the entire notion of

---

[21] Although GWRC has attempted to distinguish *Hi-Ho Tower* factually, it does not contest the principles set out therein or explain why they are less applicable in this context than in any other. (*See* GWRC Mem. at 10-11.)

[22] (GWRC Mem. at 10 and the exhibits cited therein.)

[23] (*See, e.g.,* Aff. of Michael Ryan, dated September 2, 2005; Aff. of Sean Russo, dated September 2, 2005.)

[24] (*See* PwC Mem. at 19-20.)

independence, which is the hallmark of the auditor-client relationship, would be emasculated.[25] Thus, GWRC's assertions here fail as a matter of law.

GWRC does not dispute that courts have widely held that the accountant-client relationship does not create a fiduciary duty. Instead, GWRC argues that its relationship with PwC was somehow *more* fiduciary in nature than an accountant-client relationship.[26] However, GWRC has offered no facts suggesting that its limited interactions with PwC involved a greater degree of trust and confidence than an accountant-client relationship. To the contrary, GWRC's assertions -- that it relied upon PwC to supply it with accurate and complete audit information, that PwC's audit work was incorporated into its financial statements and that GWRC required that this work be completed within certain time parameters – are reminiscent of the accountant-client relationships that are held *not* to be fiduciary in nature.

As a result, there is no evidence that PwC was ever hired by GWRC, no evidence that PwC ever represented to GWRC that it would occupy a position of trust, and no evidence that their relationship was otherwise marked by unique indicia of trust and confidence. In other words, if plaintiff were correct that the meager record here could establish such a duty, then every auditor would be converted into a fiduciary for the parent of the companies with whom it contracted. In sum, there is no basis to conclude that PwC owed broader duties to GWRC than PwC owed to HHRG, its own audit client.

---

[25] (PwC Mem. at 22-23 & n.46.)

[26] (GWRC Mem. at 11-12.)

## CONCLUSION

For the foregoing reasons and those set forth in PwC's opening submission, the Court should grant summary judgment to PwC on all counts of GWRC's complaint, and dismiss the complaint with prejudice.

DEFENDANT,
PRICEWATERHOUSECOOPERS LLP


By: ____/s/ Thomas D. Goldberg_____
      David J. Elliott (ct 04301)
      Thomas D. Goldberg (ct 04386)
      Day, Berry & Howard LLP
      One Canterbury Green
      Stamford, Connecticut 06901-2047
      Tel: (203) 977-7300
      Fax: (203) 977-7301
      Its Attorneys

## ELECTRONIC CERTIFICATE OF SERVICE

I hereby certify that on September 19, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

          /s/ Thomas D. Goldberg
David J. Elliott (ct 04301)
Thomas D. Goldberg (ct 04386)
Day, Berry & Howard LLP
One Canterbury Green
Stamford, Connecticut 06901-2047
Tel: (203) 977-7300
Fax: (203) 977-7301
Its Attorneys

Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd St.
New York, NY 10017-5639

William H. Champlin, III, Esq.
Michael T. McCormack, Esq.
William S. Fish, Jr., Esq.
Tyler Cooper & Alcorn, LLP
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103

Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Daniel E. Tranen, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
120 N. LaSalle Street
Chicago, IL 60602

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
3 Gannett Drive
White Plains, NY 10604-3407

Steven R. Humphrey (ct06053)
Dina S. Fisher (ct14896)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Jed Horwitt, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Ave.
P.O. Box 3186
Bridgeport, CT 06605-0186