Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
**(Cite as: 2005 WL 88973 (N.D.Ill.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Irene ABRAMS, on behalf of herself and all others
similarly situated,
Plaintiffs,
v.
VAN KAMPEN FUNDS, INC., Van Kampen
Investment Advisory Corporation, Van Kampen
Prime Rate Income Trust, Richard F. Powers, III,
Stephen L. Boyd, and Dennis J.
McDonnell, Defendants.
**No. 01 C 7538.**

Jan. 13, 2005.

Marvin Alan Miller, Matthew Eric Van Tine,
Jennifer Winter Sprengel,   Miller Faucher and
Cafferty, LLP, Chicago, IL, Joel H. Bernstein,
Christopher J. Keller, Stephanie E. Katz, David J.
Goldsmith, Goodkind, Labaton, Rudoff & Sucharow,
New York, NY, Paul Jeffrey Geller, Cauley Gellar
Bowman & Coates, LLP, Boca Baton, FL, for
Plaintiff.

Michael B. Slade, Kirkland & Ellis LLP, Charles F.
Smith, Jr., Lee Price Garner, Skadden Arps Slate
Meagher & Flom, LLP, Chicago, IL, William H.
Pratt, Joseph Serino, Jr., Maria Ginzburg, Kirkland
and Ellis, New York, NY, Victoria Aisen Birov, Law
Offices of Victoria A. Birov, Wilmette, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*
*A. BACKGROUND*

HART, J.

**\*1** This is a consolidated class action alleging federal
securities violations involving defendant Van
Kampen Prime Rate Income Trust's (the "Fund")
valuation of senior loans and is subject to the Private
Securities Litigation Reform Act of 1995 ("PSLRA"),
15 U.S .C. § 77z-1. A class has been certified
consisting of all persons who purchased shares in the
Fund between September 30, 1998 and March 26,
2001, inclusive, with defendants and certain related

parties excluded. *See Abrams v. Van Kampen Funds,
Inc., 2002 WL 1989401 (N.D.Ill. Aug.27, 2002)*
("*Abrams II*"). Named as defendants are the Fund;
Van Kampen Funds, Inc. ("Van Kampen"), the
Fund's administrator; Van Kampen Investment
Advisory Corp. (the "Adviser"), the Fund's
investment adviser; Richard Powers, Fund Chairman
of the Board, President, and Trustee during the
relevant time period; Dennis McDonnell, former
Fund Chairman of the Board, President, and Trustee
and Fund Portfolio Manager from July 1999 until
December 1999; and Stephen Boyd, Fund Executive
Vice President and Chief Investment Officer and
Adviser Officer during the relevant time period.
Count I of the Consolidated Amended Complaint
alleges violations of § 11 of the Securities Act, 15
U.S.C. § 77k, against Van Kampen, the Fund,
Powers, McDonnell, and Boyd. Against Van Kampen
and the Adviser, Count III alleges control person
liability under § 15 of the Securities Act, 15 U.S.C. §
77o, based on the alleged § 11 violations. [FN1]
Following a ruling on the parties' cross motions for
summary judgment, *see Abrams v. Van Kampen
Funds, Inc., 2004 WL 1433620 (N.D.Ill. June 25,
2004)* ("*Abrams III*" ), the parties filed their final
pretrial order. Pending are the parties' various
motions in limine.

> FN1. Claims for violations of § 12 of the
> Securities Act, 15 U.S.C. § 77l, and state
> law claims, as well as claims against two
> individual defendants, were voluntarily
> dismissed. Following notice and a fairness
> hearing, the voluntary dismissal of those
> claims was approved by the court. *See* Order
> dated Dec. 8, 2004. *See also Abrams v. Van
> Kampen Funds, Inc., 2004 WL 1433620 \*1
> n. 1, \*9 n. 3 (N.D.Ill. June 25, 2004)*.

Plaintiffs contend that defendants violated § 11 by
making the following misrepresentations in various
prospectuses that were issued during the class period.
First,   plaintiffs   contend   that   defendants
misrepresented the value of shares of the Fund in that
they overvalued the loans held by the Fund. Plaintiffs
contend that using available market quotations and
properly determining fair value based on what the
loans would have currently sold for would have
resulted in lower daily net asset values ("NAV") for
the Fund. Second, plaintiffs contend the prospectuses
contained misrepresentations that the Fund used
market quotations where available when this was not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
**(Cite as: 2005 WL 88973 (N.D.Ill.))**

done. [FN2]

> FN2.    Allegations    regarding
> misrepresentations as to the Fund's goals
> were dismissed on summary judgment. *See
> Abrams III,* 2004 WL 1433620 at * 9.

To succeed on their § 11 claims, plaintiffs must
show that defendants were responsible for untrue
statements of material fact or omitted material facts
in a prospectus. *See Herman & MacLean v.
Huddleston,* 459 U.S. 375, 381-82, 103 S.Ct. 683, 74
L.Ed.2d 548 (1983); *Abrams III,* 2004 WL 1433620
at *1; *Ong v. Sears, Roebuck & Co.,* 2004 WL
2534615 *16 (N.D.Ill. Sept.27, 2004). There is no
scienter or reliance requirement; instead responsible
persons are liable for the material and misleading
statements contained in a prospectus unless they can
affirmatively make certain showings as to their
knowledge and diligence. *See Herman,* 459 U.S. at
382; *Abrams III,* 2004 WL 2534615 at *1; *Ong,* 2004
WL 2534615 at *16. A misstatement is material if
there is a substantial likelihood that it would be
viewed by a reasonable investor as significantly
altering the total mix of available information and
thus important to the investor's decision to invest.
*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438,
449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Abrams
III,* 2004 WL 1433620 at *1; *Ong,* 2004 WL 2534615
at *32.

**\*2** Here, a central issue for plaintiffs' claims is the
method of valuing the senior loans held by the Fund.
The parties do not dispute that the applicable general
principle is that the loans were to be valued on a daily
basis at the amount that could have been obtained
from a current sale. *See* SEC Accounting Release
Series No. 118, 1970 WL 5621 *4 (Dec. 30, 1970)
("ASR 118"); *Abrams III,* 2004 WL 1433620 at *2;
*In re Allied Capital Corp. Securities Litigation,* 2003
WL 1964184 *1 (S.D.N.Y. April 25, 2003); *In re
Eaton Vance Corp. Securities Litigation,* 206
F.Supp.2d 142, 151-52 (D.Mass.2002). *See also* 15
U.S.C. § 80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a).
The parties also agree that current value is to be
determined by "market quotations" where "readily
available," or by "fair value" methods if market
quotations are not readily available. *See* 15 U.S.C. §
80a-2(a)(41)(B); 17 C.F.R. § 270.2a-4(a)(1); ASR
118, 1970 WL 5621 at *3; *Abrams III,* 2004 WL
1433620 at *2; *Eaton Vance,* 206 F.Supp.2d at 147.
Regarding the class period, the parties disagree as to
whether the pricing services that were then available
qualified as readily available market quotations. To
qualify as readily available market quotations that

must be used to value securities, the pricing services
must provide quotes that are sufficiently timely,
sufficiently frequent, and sufficiently accurate.
*Abrams III,* 2004 WL 1433620 at *2; *Eaton Vance,*
206 F.Supp.2d at 148-49. On summary judgment, it
was held that genuine factual disputes existed as to
when market quotations first became readily
available. *See Abrams III,* 2004 WL 1433620 at *4-6.
It was also held that genuine factual disputes existed
as to defendants' affirmative defense that they acted
with due diligence in exercising their business
judgment in determining that market quotations were
not yet readily available. *See id.* at *6. Additionally,
it was held that genuine factual disputes existed as to
whether defendants determined the value of loan
assets in the manner described in the pertinent
prospectuses. *See id.* at *7-8. The parties' agreed
statement of contested issues of fact and law is
consistent with the foregoing. *See* Proposed Final
Pretrial Order Exh. B.

In light of the contested issues and other background
described above, rulings will be made as to the
pending motions in limine. Plaintiffs' motions in
limine will be considered first.

*B. PLAINTIFFS' MOTIONS IN LIMINE*
*1. To Bar Evidence that Traders Issued False Loan
Pricing Data [138-1]*

Defendants contend that certain pricing services
were unreliable because they were based, in part, on
market participants reporting the price at which they
would sell or purchase loans, not actual sales.
Defendants contend such reports were particularly
unreliable because a significant number of market
participants would overstate or understate the price so
as to gain an advantage when actually selling or
buying. Plaintiffs seek to bar any evidence of such
manipulative price reporting on the ground that any
such evidence is hearsay based on rumors, with there
being no potential testimony based on personal
knowledge.

**\*3** Defendants contend that Allison Taylor can
properly provide such testimony. She is a former
senior loan trader, a founding member of the Loan
Syndication and Trading Association ("LSTA"),
[FN3] LSTA's initial Chairman, and, since 1998, the
executive director of LSTA and LSTA/LPC.
Defendants contend she can testify from personal
experience and knowledge regarding her observations
as to how LSTA/LPC functions. Defendants also
point to disclaimers on LSTA/LPC forms regarding
the pricing being based on estimated values provided

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
**(Cite as: 2005 WL 88973 (N.D.Ill.))**

by dealers, not necessarily actual trades. Taylor certainly can testify as to LSTA/LPC's procedures and methodologies. The question is whether any testimony that she believes market participants manipulated price reports would be inadmissible speculation or an observation based on personal experience.

> FN3. LSTA is a senior loan pricing service first formed in 1995. In 1999, it merged with the Loan Pricing Corporation ("LPC"), which had began gathering data on senior loans in 1985. See *Abrams III*, 2004 WL 1433620 at *5-6.

Since neither party provides Taylor's deposition testimony that is pertinent to this motion, [FN4] this issue cannot be resolved on the documents before the court. If Taylor were to testify that others told her participants were manipulating their price reports, that would be inadmissible hearsay. If she were to testify that she determined that actual participants were manipulatively reporting prices, that would likely be testimony based on personal observations. As long as there is a proper foundation, she could report such observations and conclusions. She need not be an expert to provide such testimony. *See* Fed.R.Evid. 701. At this time, with a very limited description of the testimony, no ruling can be made as to the admissibility of Taylor's testimony on this subject. Also, a question remains as to whether defendants actually relied on Taylor's findings.

> FN4. Short excerpts of Taylor's deposition testimony in this case and another case are provided regarding other motions in limine.

Defendants also contend that they have "corroborating evidence" that is consistent with Taylor's observations. This consists of testimony from Van Kampen representatives regarding conversations with senior loan market participants making clear they had no intention of honoring bids or asks they had reported and an email from a Citibank trader expressing concerns about price reporting manipulation. Defendants do not contend that this evidence is admissible to prove the truth of the matters reported by the participants and Citibank trader. They instead contend that it is admissible to show defendants' reasoning in not accepting certain price information. Plaintiffs contend that is an irrelevant purpose because intent need not be shown to prove a § 11 violation. However, information available to defendants would be relevant to defendants' business judgment defense. This evidence

will not be excluded. If desired, plaintiffs may submit a proposed limiting instruction regarding the jury's use of this evidence.

This motion in limine will be denied as to the "corroborating evidence." As to Taylor's testimony, the motion will be denied without prejudice to raising objections at trial.

*2. To Exclude the Testimony of Kevin Meenan and Anthony DeLuca [139-1]*

**\*4** At trial, defendants intend to call Kevin Meenan as a witness and may call Anthony DeLuca. Meenan started a senior loan pricing service while working for his own firm. That firm was later purchased by Societe Generale Bank ("SocGen") and Meenan continued to provide pricing services through SocGen. SocGen was one of the pricing services used by the Fund. DeLuca was a managing director for Morgan Stanley, the parent of Van Kampen. In 1999, DeLuca conducted a review of third-party pricing of senior loans, including pricing by LPC, and reported his findings to Van Kampen's Board.

Plaintiffs object to both witnesses on the ground that they were not disclosed in response to interrogatories. Plaintiffs also contend that these two would be expert witnesses, but were not disclosed as such and no expert reports were provided. Defendants contend they did not have to update their interrogatory responses because these two potential witnesses were disclosed to plaintiffs during deposition testimony. Defendants contend they are fact witnesses, not experts.

There is no dispute that Meenan and DeLuca were omitted from certain discovery responses for which their names and knowledge or involvement would have been responsive to the queries. However, defendants were not required to supplement those prior responses if the corrective information was otherwise made known to plaintiffs during the discovery process. *See* Fed.R.Civ.P. 26(e). Also, even if there was an improper failure to disclose, the evidence should not be excluded if the nondisclosure was harmless. Here, Meenan's role at SocGen was disclosed during two depositions, including a Van Kampen Vice President testifying that Meenan was the person at SocGen most knowledgeable about third-party pricing. DeLuca's involvement in the review was disclosed in the deposition of Van Kampen's General Counsel and the Board minutes for the meeting at which he made his report. Meenan's and DeLuca's knowledge and potential as witnesses

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
**(Cite as: 2005 WL 88973 (N.D.Ill.))**

were adequately disclosed during discovery. Therefore, defendants were not obliged to supplement their prior interrogatory responses.

Plaintiffs still complain that the witnesses were not disclosed as providing expert testimony. Since these witnesses were not retained or specially employed to provide expert testimony, the requirement of providing an expert report cannot apply to their testimony. *See* Fed.R.Civ.P. 26(a)(2)(B); *Musser v. Gentiva Health Services,* 356 F.3d 751, 756-57 (7th Cir.2004). If some of their testimony would include opinions "based on scientific, technical, or other specialized knowledge," then they should have been disclosed as expert witnesses in accordance with Fed.R.Civ.P. 26(a)(2)(A). *Musser,* 356 F.3d at 756 & n. 2.

It is doubtful that Meenan and DeLuca would be testifying as experts. Like Taylor, Meenan can testify about practices at SocGen, including drawing conclusions and expressing some opinions about what happened there, without having to rely on scientific, technical, or specialized knowledge. And even if his testimony could be properly characterized as including some expert testimony, the deposition testimony disclosing his role at SocGen would have served to disclose that possibility. Meenan's testimony would not be excluded for failure to name him as an expert. DeLuca's testimony also does not appear likely to include expert testimony. Presumably he will testify as to what he reported to the Board and possibly as to methods he used during his investigation. But, even if some of DeLuca's testimony is properly classified as expert testimony, his potential testimony was also adequately disclosed. His testimony will not be excluded.

**\*5** Although there was discovery in which Meenan and DeLuca were disclosed and therefore no technical violation of Rule 26, defendants still should have clarified to plaintiffs that Meenan and DeLuca were potential witnesses, especially if defendants have any intention of eliciting expert testimony from either witness. Counsel for defendants likely were aware of Meenan's and DeLuca's roles prior to their names being mentioned at depositions and should have disclosed them prior to the depositions. Moreover, as plaintiffs point out, they were limited as to the number of witnesses they were permitted to depose and therefore focused on persons who were expressly named by defendants as potential witnesses. Had Meenan and DeLuca been expressly identified by defendants, plaintiffs may have chosen to depose one or both of them. The court will

exercise its discretion to reopen discovery for the limited purpose of permitting the deposition of these two witnesses. However, DeLuca is listed as a possible witness, not a definite witness. If defendants represent to plaintiffs that they have decided not to use him as a witness, plaintiffs will not be permitted to depose DeLuca and defendants will not be permitted to present him at trial.

For the foregoing reasons, this motion in limine will be granted in part and denied. Plaintiffs may depose Meenan and DeLuca within 45 days after the date of today's order.

*3. To Exclude the Testimony and Report of Michael P. McAdams [140-1]*

Michael P. McAdams, whom defendants intend to use as an expert witness, has more than 20 years of experience in investment management and banking. From its inception in 1988 until 1995, he managed Pilgrim Prime Rate Trust, the first retail, floating-rate loan fund. Since 1995, he has had high-level positions at two other asset management firms. He was an early member of LSTA and has served on its Board, including as Chairman of the Board. He has also been a member of LSTA's valuation project committee. Plaintiffs do not dispute that he has the credentials to be an expert in the field of senior loans. However, plaintiffs contend that the opinions expressed in his expert report are not adequately supported and therefore he does not meet the requirements to testify as an expert that are set forth in Fed.R.Civ.P. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). [FN5]

> FN5. Although the title of plaintiffs' motion refers to excluding McAdams's report, the request for relief refers only to excluding his testimony. The report itself would not be admissible evidence absent a stipulation by the parties that the report itself represents McAdams's testimony.

In 2000, Rule 702 was amended to conform with *Daubert* and its progeny, including *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Expert testimony is not to be presented to a jury unless "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts in the case." Fed.R.Evid. 702. *Daubert,* 509 U.S. at 592-94, sets forth a list of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
**(Cite as: 2005 WL 88973 (N.D.Ill.))**

factors to consider in determining reliability. The list is not definitive; particular factors in that list may or may not be pertinent in evaluating particular expert testimony. _Kumho,_ 526 U.S. at 150-51 (quoting _Daubert,_ 509 U .S. at 593); _United States v. Romero,_ 189 F.3d 576, 584 (7th Cir.1999), _cert. denied,_ 529 U.S. 1011, 120 S.Ct. 1286, 146 L.Ed.2d 232 (2000). The <u>Rule 702</u> inquiry is "flexible." _Kumho,_ 526 U.S. at 150 (quoting _Daubert,_ 509 U.S. at 594). The flexibility of the inquiry is particularly important to keep in mind when the field of expertise is not a scientific one as in _Daubert. See Romero,_ 189 F.3d at 584; _Pease v. Production Workers of Chicago & Vicinity Local 707,_ 2003 WL 22012678 *4 (N.D.Ill. Aug.25, 2003). In determining the reliability of the proffered testimony, the focus must be on the soundness of the methodology that is used, not on whether the conclusions that the expert reaches are correct. _Deputy v. Lehman Brothers, Inc.,_ 345 F.3d 494, 506 (7th Cir.2003); _Dewick v. Maytag Corp.,_ 324 F.Supp.2d 894, 898 (N.D.Ill.2004); _Pease,_ 2003 WL 22012678 at *4.

**\*6** McAdams presently offers the following five opinions: [FN6]

> FN6. The opinion numbered 1 is no longer at issue following the court's ruling on summary judgment.

2. Market quotations in the traditional sense--i.e. prices that reflect where bona fide transactions between willing buyers and sellers actually took place or where a buyer or seller definitely would transact business--do not exist in the senior loan market except in the most unusual and unpredictable circumstances. Market indications are not the same thing as market quotations.
3. From September 1998 through January 25, 2000, Van Kampen's method of valuing senior loans, and particularly how it used third-party pricing data when and if it was reasonably available, was consistent with the markets' development at that time and was consistent with the methodology set forth in the prospectus.
4. In January 2000, Van Kampen's decision to base its fair value determinations on LSTA/LPC indications where there were at least three bids, three asks and a spread of less than 100 basis points was reasonable given the market's development at that time and was consistent with the methodology set forth in the prospectus.
5. In November 2000, Van Kampen's decision to base its fair value determinations on LSTA/LPC indications where there were at least two bids, two

asks and a spread of less than 200 basis points, was reasonable given the status of the market's development at that time, and was consistent with the methodology set forth in the prospectus.
6. In making its fair value determinations, Van Kampen made a good-faith effort to consider factors important to an arms-length [sic] buyer in assessing what they would pay for the loans on a current sale.
McAdams Report at 5-6 (April 4, 2003).

Plaintiffs do not dispute that McAdams is an expert in the field. His experience qualifies him to testify as to how pricing services function, particularly how LSTA/LPC functioned. Opinion 2 is essentially descriptive and historical. It does not require applying any sort of testing or statistical methodology in order to be reliable. This opinion also does not involve a particularized application to the Fund's procedures. Therefore, questions that plaintiffs raise regarding McAdams's knowledge of the Fund's procedures are not pertinent to this opinion. McAdams's experience is enough to support reliability as to Opinion 2. _Cf. Den norske Bank AS v. First National Bank of Boston,_ 75 F.3d 49, 57-58 (1st Cir.1996) (employee of defendant bank with 40 years of banking experience was qualified to testify as to banking industry practices); _Dahlin v. Evangelical Child & Family Agency,_ 2002 WL 31834881 * 6-7 (N.D.Ill.Dec.18, 2002) (expert was qualified to testify as to history of adoption practices and information being provided to adoption professionals at various periods of time).

Opinion 3 is different than Opinion 2. While it still requires an expert understanding of the pricing services that were available, it also requires an understanding of the Fund's actual practices. Plaintiffs contend that McAdams was not fully informed as to the Fund's practices because defendants did not supply him with all the pertinent evidence. Plaintiffs also contend that this opinion is unreliable because McAdams never examined the Fund's particular valuations to determine if they were accurate.

**\*7** Plaintiffs contend that McAdams is not qualified to opine as to whether the Fund's practices corresponded with pricing resources available in the market because McAdams has insufficient knowledge of the Fund's actual practices. In particular, plaintiffs complain that (a) McAdams has not read a July 1999 PricewaterhouseCoopers LLC ("PwC") review of the Fund's valuation practices and (b) at his deposition, McAdams could not recall SEC

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
(Cite as: 2005 WL 88973 (N.D.Ill.))

correspondence questioning the Fund's valuation methods. While familiarity with the PwC report may have provided McAdams with additional information about the Fund's actual practices, the other documents that he was provided should have been sufficient to allow McAdams to be familiar with the practices. His lack of complete familiarity and recall goes more to the weight of his opinion, not whether it is admissible. The jury will be able to determine whether McAdams's assumptions about actual practices of the Fund correspond with the evidence of actual practices that will be presented at trial. Similarly, to the extent the SEC correspondence sets forth factual findings and not legal analysis, McAdams's failure to recall details of the correspondence goes to the weight to be given his testimony and the jury will resolve factual questions as to the actual practices that were in place. Plaintiffs do not contend that McAdams was not shown the correspondence when preparing his report, only that, at the time he was disposed, he could not recall having seen it.

The other issue raised by plaintiffs is that McAdams should not be permitted to testify about the Fund reasonably applying valuation methods when he never tested the accuracy of the valuations. Plaintiffs contend McAdams is not qualified to testify as to the efficacy of the Fund's actual valuation procedures because he made no comparison between the values given to particular loans and the prices the loans may have sold at during the same time period. According to McAdams's admissible testimony, however, there is only limited available data as to actual prices that loans sold for in the secondary market. Plaintiffs would like to rely on pricing information provided by LSTA/LPC and other services as being accurate, but the accuracy of those prices is a question of fact for the jury. McAdams may properly testify that the valuation practices of the Fund complied with the price information for loans that were contemporaneously available. Plaintiffs may cross examine him as to the lack of any price comparison study in order to raise questions as to the weight or credibility of his testimony, but that is not enough to make his testimony inadmissible.

Plaintiffs also generally raise the contention that McAdams's opinions are conclusory and lack supporting details. *See generally Mid-State Fertilizer Co. v. Exchange National Bank of Chicago,* 877 F.2d 1333, 1339-40 (7th Cir.1989). McAdams's discussion of Opinion 3, however, is sufficiently detailed and not conclusory. *See* McAdams Report at 21-24.

*8 There is one aspect of Opinion 3 as to which McAdams will not be permitted to testify. He opines that the Fund's actual valuation practices were consistent with the description of those practices contained in the prospectuses. That is a purely factual question of comparing the evidence of actual practices with the descriptions contained in the prospectuses. No expertise is required to make such a comparison. McAdams's testimony as to this issue would not assist the jury. McAdams will not be permitted to testify as to that aspect of Opinion 3.

Opinions 4 and 5 both concern whether the particular practices involved, the "3 x 3 x 100 screen" and "2 by 2 x 200 screen," *see Abrams III,* 2004 WL 1433620 at *6, were reasonable in light of pricing information then available in the market. His testimony concerns the reasonableness of each particular practice in light of then-available information, not whether the Fund's actual application produced accurate valuations. McAdams may properly testify as to these opinions. As with Opinion 3, however, McAdams will not be permitted to testify as to whether the Fund's actual practice was consistent with the descriptions of the practices contained in the prospectuses.

Although McAdams's summarized statement of Opinion 6 refers only to the Fund's good-faith intent, the specifics of this opinion explain why it is unnecessary to discount from the par value of a loan to take into account the illiquid nature of senior loans. He opines that the "illiquidity discount" is taken into account at the time par is first set. He also opines as to the effect on the value of a loan that a breach of a bank covenant or a bankruptcy filing may have. McAdams may testify regarding his opinions on these subjects. However, he will not be permitted to testify as to whether he believed any defendant acted in good faith in determining the price an arm's length buyer would pay for a loan. That is a factual issue of intent that is for the jury to decide. The jury's determination of intent would not be assisted by McAdams's opinion on that issue. *See Dahlin,* 2002 WL 31834881 at *3.

For the foregoing reasons, this motion in limine will be granted in part and denied in part. This motion will be denied except that McAdams will not be permitted to testify as to (a) whether any actual valuation practice of the Fund is consistent with a description of the practice contained in a prospectus nor (b) whether any defendant acted in good faith or with some other type of intent.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
(Cite as: 2005 WL 88973 (N.D.Ill.))

*4. To Exclude Testimony of Expert Witnesses Daniel R. Fischel and David J. Ross [141-1]*

Defendants intent to use Daniel Fischel and David Ross as damages liability experts. The two provided a joint report, but defendants now clarify that they intend to have Fischel testify regarding two of the opinions expressed therein and Ross testify as to one. Plaintiffs argue that neither of the witnesses should be allowed to testify as to one of the opinions. Plaintiffs also argue that the two witnesses are duplicative and only one should be permitted to testify.

**\*9** Both experts are officers of Lexecon Inc., a consulting firm that specializes in the application of economics to legal and regulatory issues. Plaintiffs do not question the qualifications of either of these experts. Plaintiffs only question the methodology used to reach the conclusions contained in Opinion 1 below. [FN7]

> FN7. In a separate motion in limine, plaintiffs also object to an aspect of Opinion 2. *See* § B(5) *infra*.

Fischel and Ross were retained to examine the conclusions set forth by plaintiffs' valuation expert, Linda Allen, and damages expert Michael J. Barclay. Allen opines as to the amounts by which the Fund overvalued its NAV during the class period. Barclay, in part based on Allen's overvaluation calculations, provides a calculation of damages to the class of plaintiffs.

As summarized by defendants, Fischel's and Ross's opinions and defendants' contention as to the related evidence they will submit may be summarized as follows:

*Opinion 1:* Barclay's calculations do not account for factors other than the alleged wrongdoing that caused the Fund's NAV to decline during the Class Period. The experts opine that adverse market conditions account for all or a substantial portion of the decline in NAV, in particular an increase in loan default rates and a widening credit spread. Defendants intend to introduce testimony regarding Opinion 1 through Fischel. This will include evidence that is intended to show that all senior loan funds and a published index of senior loans experienced declines in value comparable to the decline in the NAV of the Fund.

*Opinion 2:* Barclay's calculations do not measure the class's economic loss attributable to the alleged overpricing of the Fund. A drop in NAV does not strictly correlate with economic loss to the class plaintiffs. Defendants intend to introduce testimony regarding Opinion 2 through Fischel. Defendants will present evidence that they contend will show that Barclay's methodology for calculating damages is flawed because it creates windfall recoveries that bear no relationship to the alleged overpricing of the Fund's shares.

*Opinion 3:* On the assumption that the Fund should have used LPC prices, Ross calculates the amount that the NAV was overvalued to be somewhat different from Allen's initial calculation. Ross then uses this overvaluation calculation and a different methodology than Barclay to calculate the amount of purported damages to be substantially less than Barclay's total. Ross proposes a number of alternative calculations based on different methods or assumptions. In their report, this Opinion is stated to be that of Ross only. Defendants intend to introduce testimony regarding Opinion 3 through Ross.

In Opinion 1, defendants' experts rely on a Standard & Poor/Loan Syndication and Trading Association ("S & P/LSTA") index of loans to establish an increase of loans in default or bankruptcy during the pertinent time period, from near zero in 1996 to significantly higher from 1999 through 2001. As stated in their report: "An increase in default rates obviously will reduce the value of senior loans and the value of funds holding such loans." Fischel & Ross Report at 6 (April 30, 2003). They also rely on the London Interbank Offered Rate ("LIBOR") to establish an increasing credit spread between October 1998 and October 2001. LIBOR is the rate at which major international banks in London lend dollars to each other and is often used as a benchmark for floating rates. The credit spread relied upon is the difference between the yield of leveraged loans and LIBOR. As stated by defendants' experts: "Because there is an inverse relationship between the price of any given loan and the relevant credit spread, the increase in credit spreads also reduced the value of senior loans and the value of funds holding such loans."

**\*10** Plaintiffs do not dispute the general principles that increased default rates and an increased credit spread will result in a general decline in the value of floating-rate loans, nor do they dispute that default rates and the credit spread increased during the pertinent time period. Plaintiffs, however, object that the experts failed to apply any methodology for connecting the general economic conditions to an

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
**(Cite as: 2005 WL 88973 (N.D.Ill.))**

effect on senior loans in general or the Fund's NAV in particular. The experts provide no data purporting to show how much of the Fund's drop in NAV was caused by these conditions. The experts do not give any consideration to the actual loans held by the Fund nor do they attempt to correlate the Fund's NAV changes over the class period with particular changes in economic conditions during the class period. Under § 11, decreases in the value of the security are presumed to be caused by the material misstatements that are shown. *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 65 F.3d 1044, 1048 (2d Cir.1995), *cert. denied*, 517 U.S. 1190, 116 S.Ct. 1678, 134 L.Ed.2d 781 (1996); *In re Dynegy, Inc. Securities Litigation*, 339 F.Supp.2d 804, 867 (S.D.Tex.2004); *In re Initial Public Offering Securities Litigation*, 241 F.Supp.2d 281, 351 n. 80 (S.D.N.Y.2003). If plaintiffs prove liability, the burden is on defendants to show that drops in NAV were caused by something other than the alleged misstatements in the prospectuses. [FN8] 15 U.S.C. 77k(e); *In re Adams Golf, Inc. Securities Litigation*, 381 F.3d 267, 277 (3d Cir.2004); *McMahan*, 65 F.3d at 1048; *Dynegy*, 339 F.Supp.2d at 867-68; *Nielsen v. Greenwood*, 1996 WL 563539 *12 (N.D.Ill. Oct.1, 1996). Here, however, the experts do not attempt to connect changes in loan default rates and the credit spread to changes in the Fund's NAV nor do they make any attempt to show how much of an effect there may have been. Therefore, it has not been shown that this testimony is relevant to the damages issues in this case.

> FN8. This is often referred to as the defense of "negative causation." *See McMahan*, 65 F.3d at 1048.

Defendants' experts do point to general data regarding decreases in loan values and senior loan fund NAV's during the class period. The loan indices used, however, do not index senior loans. Instead, the indices used were for all loans, B-grade loans, and BB-grade loans. While there is some overlap between the indices used and the types of loans held by the Fund, apparently none of the indices correspond with the mix of loans held by the Fund. Fischel and Ross do not explain the correlations or possible differences between the indices used and the assets of the Fund. Also, Fischel and Ross provide no statistical or other sufficient method for correlating changes in the indices to changes in default rates or credit spreads . [FN9] As to other senior loan funds, the experts generally do not consider similarities and differences with the Fund nor whether the other funds may or may not have overstated NAV.

> FN9. In rebuttal, Barclay opines that multiple regression analysis shows a lack of statistically significant correlations between the indices and changes in the Fund's NAV.

Because not supported by adequate methodology nor shown to be relevant to issues in the present case, Fischel and Ross will not be permitted to testify regarding Opinion 1.

**\*11** Still to be considered is whether both Fischel and Ross will be permitted to testify. Defendants agree that ordinarily only one expert per side should opine on a particular subject. *See* N.D. Ill. Loc. R. Form 16.1.1 n.7; *Dahlin*, 2002 WL 31834881. Defendants contend, however, that Fischel will testify as to Opinion 2 and Ross as to Opinion 3. The two opinions, however, are closely related. Ross will not be able to opine as to Opinion 3 without also addressing many aspects of Opinion 2. Defendants will be precluded from using both experts. They may choose which expert they prefer to use. [FN10] *See id.*

> FN10. Fischel did not join in Opinion 3. Therefore, testimony as to both Opinions would probably require the use of Ross. No ruling is made as to whether Fischel could testify as to Opinion 3 if, prior to trial and because he fully agrees with Ross as to Opinion 3, he supplements his report by adopting Opinion 3 as well.

For the foregoing reasons, this motion in limine will be granted in part and denied in part. Fischel and Ross will be barred from testifying as to Opinion 1 and defendants will be limited to using one expert to testify as to the remaining opinions contained in the Fischel/Ross Report.

*5. To Preclude Evidence and Argument Concerning Dividends Paid by the Van Kampen Prime Rate Income Trust to Shareholders [142-1]*

Section 11 itself contains a provision as to damages for violations of § 11(a).
> The suit authorized under subsection (a) of this section may be to recover such damages as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and (1) the value thereof as of the time such suit was brought, or (2) the price at which such security shall have been disposed of in the market before suit, or (3)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 88973 (N.D.Ill.)
(Cite as: 2005 WL 88973 (N.D.Ill.))

the price at which such security shall have been disposed of after suit but before judgment if such damages shall be less than the damages representing the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and the value thereof as of the time such suit was brought: Provided, That if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading, such portion of or all such damages shall not be recoverable....

15 U.S.C. § 77k(e).

As discussed in § B(4) *supra,* the decrease in value of a security (in this case, effectively the decrease in NAV of the Fund) is presumed to have been caused by any material misstatements that are proven to have been included in one or more of the Fund's prospectuses. On the issue of damages, the burden is on defendants to prove that any such decrease was caused by factors other than the material misstatements. The decrease in value of the security (during the relevant time period) is the exclusive measure of damages for violations of § 11(a); other standard measures of contractual damages are inapplicable under the statute. *McMahan,* 65 F.3d at 1048; *Goldkrantz v. Griffin,* 1999 WL 191540 *3 (S.D.N.Y. April 6, 1999), *aff'd by unpublished order,* 201 F.3d 431 (2d Cir.1999).

*12 Defendants want to introduce evidence that members of the plaintiff class received dividend payments from the Fund. They contend that evidence would show that an investor who held a single share of the Fund during the class period would have had a drop in NAV of $1.18, but also would have received $1.69 in dividends for a net gain of $0.51 on the share. Defendants contend this evidence will fit into the statutory method for measuring damages because the receipt of dividends is part of their evidence showing negative causation. Defendants contend that paying dividends caused a decrease in the Fund's NAV. They point to a conclusory statement in their damages experts' report as supporting this contention. *See* Fischel & Ross Report at 8 n.7 (April 30, 2003) ("Professor Barclay's calculations do not measure Class members' out-of-pocket losses because he ignores the dividends paid by the Fund to its shareholders."). *See also* Ross Suppl. Report at 8-9

(Oct. 17, 2003) ("I understand that the defendants contend that plaintiffs cannot recover under Section 11 for declines in the value of a security attributable to factors other than the alleged material misstatements and omissions. If defendants' contention is correct, then an offsetting adjustment for dividend payments should be made, because the payment of dividends necessarily caused the value of the fund to decline by the amount of dividends paid.").

In a somewhat lengtheir, but still essentially conclusory manner, plaintiffs' damages expert stated that the payment of dividends does not decrease NAV. As he sees it, the effect of dividends on NAV is that retaining dividends, instead of distributing them, would increase NAV.

Q. And if a fund pays out dividends, what impact, if any, would that have on the NAV Of the fund?

\* \* \*

A. At some level, it's correct that a dividend paid on the fund would reduce the NAV of the fund. However, it's clear from looking at the fund's NAV that it was possible to pay these dividends over a long period of time without having the fund's NAV vary from $10 per share by more than a penny or two.

So what happens in these cases is that the senior loans held by the fund pay interest to the fund. The fund takes those interest payments that are received from the loans and passes them through to investors.

So rather than thinking about the dividends as reducing NAV, which clearly they didn't over the history of the fund prior to the class period, since the fund's NAV never varied by more than a couple of pennies from $10 per share, what you're doing is paying out those dividends rather than retaining them in the fund and reinvesting them which, in fact, would tend to increase the fund's NAV.

Barclay Dep. at 75-76.

One issue that goes to the admissibility of the testimony is whether the potential effect of dividends on NAV is a question of law as to the measure of damages or a question of fact as to whether or not paying dividends affects NAV. Here, the Fund's stated goal was to achieve a high level of current income consistent with preservation of capital. If, as Barclay indicates, dividends simply represented the distribution of interest earned on the loans, such a distribution would be independent of the value of the shares themselves that is represented by NAV. Defendants point to no evidence that this is not true.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.