UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION, LTD., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:02 CV 1379 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP and COOPERS & LYBRAND, LLP, | ) ) ) | |
| Defendants. | ) ) ) | |
| ALEC SHARP, et al., | ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 3:02 CV 1572 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a PRICE WATERHOUSE, LLP, | ) ) ) | |
| Defendant. | ) ) ) | |
| HANDY & HARMAN REFINING GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:02 CV 1803 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) | |
| Defendant. | ) ) | |

**<u>CORRECTED REPLY IN SUPPORT OF UNDERWRITERS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

283293.1

## TABLE OF CONTENTS

I. THERE IS NO FACT DISPUTE ON ANY MATERIAL FACT ESTABLISHING A BREACH OF CONTRACT………………………………….. 1

    A. GAAS Compliance is Irrelevant for Purposes of Underwriters' Motion …………………………………………………………………….. 1

    B. Meaning Of The 1998 Engagement Letter And Service Plan Not A Question Of Fact……………………………………………………… 2

    C. Any Dispute About Reliance Is Not Material…………………………….. 2

II. UNDERWRITERS ARE ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM ……………………………………… 3

    A. The Existence Of A Contract…………………………………………… 3

    B. The Breach Of That Contract…………………………………………... 4

    C. Causation………………………………………………………………. 4

    D. Damages……………………………………………………………….. 6

III. UNDERWRITERS ARE ENTITLED TO SUMMARY JUDGMENT ON PwC's AFFIRMATIVE DEFENSES …...…………………………………….. 7

    A. Unclean Hands and In *Pari Delicto*…………………………………... 8

    B. Mitigation Of Damages……………………………………..……………. 9

    C. Expressed Indemnification..……………………………………………... 9

    D. Comparative Negligence……………………………………………….. 10

# TABLE OF AUTHORITIES

*Aslanidis v. United States Lines*, 7 F.3d 1067 (1993)............................................................. 6

*Grynberg Petroleum Company v. FERC*, 77 F.3d 517 (D.C. Cir. 1996)......................... 1

*In re Leasing Consultants, Inc.*, 592 F.2d 103 (2nd Cir. 1979).......................................... 9

*Orange Improvements P'ship v. Cardo, Inc.*, 984 F.Supp. 85 (D.Conn. 1997)............... 2

*Orselet v. Dematteo*, 206 Conn. 542, 546 (1988)................................................................ 9

*Pappas v. Pappas*, 164 Conn. 242, 320 A.2d 809 (1973)............................................... 8

*Powel v. Nat'l Board of Medical Examiners*, 364 F.3d 79 (2nd Cir. 2004)..................... 6

*Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995)................................................................ 8

*Town of Monroe v. Underground Constr. & Survey*, 2004 Conn. Super. LEXIS 1283.......... 10

*William Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559 (1995)............................... 10

I.  **THERE IS NO DISPUTE ON ANY MATERIAL FACT[1] ESTABLISHING A BREACH OF CONTRACT**

    A.  <u>GAAS Compliance is Irrelevant for Purposes of Underwriters' Motion</u>

PwC cannot demonstrate a <u>fact</u> dispute on Underwriters' breach of contract claim simply by pointing to an expert's testimony regarding compliance with GAAS.

Because each of the necessary elements of Underwriters' breach of contract claim has been established by undisputed facts, PwC's proffered expert testimony on GAAS compliance is irrelevant here. Indeed, the dispute described by PwC is not a dispute over a particular fact, but instead, a disputed conclusion drawn from facts (*i.e.*, whether PwC's audit met certain standards). Expert opinions are not material facts. *See, Grynberg Petroleum Company v. FERC*, 77 F.3d 517 (D.C. Cir. 1996). A dispute among experts about the proper legal conclusion to be drawn from the facts is therefore not a "fact dispute."

    B.  <u>Meaning of the 1998 Engagement Letter and Service Plan Not a Question of Fact</u>

While PwC calls Underwriters' interpretation of the 1998 engagement letter and service plan "distorted" (Opposition at p. 2) and later says that it disputes the meaning of the relevant provisions in the service plan (Opposition at p. 5), PwC fails to offer any alternative interpretation of the commitments that form the contract at issue here. In PwC's own words: "We will assure advances to third world countries are not made unless material is in the possession of [HHRG]." The meaning of this commitment is unambiguous and clear.

---

[1] PwC identifies 13 issues of material fact in its Local Rule 56(a)2 Statement. Not one of these passes muster under Local Rule 56(a)2 or (a)3 as they are not disputed issues of <u>material</u> fact and/or they are not properly supported in the record. Numbers 1, 2, 3, 5, 7, 10, and 11 are not <u>material</u> issues of fact. Numbers 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 13 are not supported by the record cited to by PwC. In addition, many of the denials in response to Underwriters' statement of facts are not supported by the record cited to by PwC or are otherwise not compliant with Local Rule 56(a)3. These include numbers 20-22, 24, 25, 27, 28, 34, 35, 39, 63-65, 68, 71-73, 75-77 and 83.

PwC also misstates applicable law for the proposition that contract interpretation is a question of fact, relying on *Orange Improvements P'ship v. Cardo, Inc.*, 984 F.Supp. 85, 90 (D.Conn. 1997). That case holds that "[i]f, however, there is definitive contract language, 'the determination of what the parties intended by their contractual commitments is a question of law.'" [Citations omitted.] In this case, there is "definitive contract language". Such language is contained in the engagement letter as well as the service plan specifically discussed and incorporated into the engagement letter. Because PwC has failed to provide an alternative to the interpretation set forth by Underwriters, and based on the plain language of the contractual terms, this Court must find that PwC agreed to assure that advances would not be made unless precious metals were in the possession of HHRG.

C.   Any Dispute About Reliance is Not Material

PwC's arguments regarding the HHRG board's reliance are meritless. First, reliance is not an element of Underwriters' breach of contract claim. *See* Underwriters' Memorandum at 6; *see also,* PwC's Opposition at 9. Therefore, reliance is immaterial. Second, the "evidence" of the purported lack of reliance is simply that the HHRG board never saw the actual engagement documents. This hardly means that the board did not reasonably expect PwC to report management's non-compliance with HHRG policy to the board as soon as PwC learned about it.[2]

---

[2] PwC asserts that HHRG had no *written* policy against unsecured advances. Even assuming that the policy was not in writing, PwC asserts no facts to establish that the policy did not otherwise exist. Indeed, PwC acknowledges that the policy existed (Facts, 20), and was aware of the significance of this policy via its due diligence work (Facts, 3). PwC's further assertion that there was no binding policy is without merit (disputed fact number 6). There is no evidence that the company did not intend for the policy to be binding.

2

283293.1

## II. UNDERWRITERS ARE ENTITLED TO SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM

### A. The Existence of a Contract

PwC does not dispute the existence of the 1998 engagement letter or service plan. Instead, it argues that a statement in the engagement letter somehow limits the obligations set forth in the service plan. It does not. First, the service plan is identified in this very letter as being broader than the audit plan.[3] Because the service plan provides "the foundation" to "accomplish the engagement objectives," PwC clearly agreed to an "engagement" that incorporated more than just an audit. Further, PwC expressly stated in the engagement letter that the service plan would "serve as a benchmark against which [HHRG] will be able to measure [PwC's] performance." In addition, the service plan identifies the Critical Matters and states that such matters "have been highlighted as requiring particular attention during the course of the audit. Our audit scope and procedures have been tailored to address these specific matters." Accordingly, PwC cannot now argue that the scope of the engagement was limited and *did not* include the commitments set forth in the service plan.

### B. The Breach of that Contract

PwC's only argument that it did not breach its contract with HHRG is that, in response to its Critical Matter #5, PwC took steps to "properly assess the collectibility of foreign receivables." PwC's argument ignores the commitment that it made to HHRG. PwC was required not only to *assess* collectibility, but also PwC agreed to *assure* that HHRG would not

---

[3] It says, "Our service plan, <u>which includes our audit plan</u>, is designed to provide a foundation for an effective, efficient, and quality-focused approach to accomplish the engagement objectives..." Exhibit 4 to Underwriters Appendix of Exhibits, p. 2 (emphasis supplied). References to Underwriters' Appendix of Exhibits will be cited as "App. X."

make unsecured advances.[4] These are different obligations. PwC offers no evidence that it took steps to fulfill the latter commitment. Indeed, it cannot be disputed that PwC failed to assure that HHRG would not make unsecured advances, because HHRG did in fact make unsecured advances. Making things worse, PwC knew that unsecured advances were being made to at least two South American entities and did absolutely nothing.[5] Because there is no dispute over any material fact that establishes PwC breached its contract with HHRG, Underwriters are entitled to summary judgment on this element of the claim.

C.  Causation

There is no fact question as to causation. PwC assured advances to third world countries would not be made unless material is in the possession of HHRG. App. 3. PwC <u>knew</u> that such unsecured advances <u>were</u> made throughout 1997 and 1998. App. 7, pp. 71-73, 179-80, 189-91. PwC told no one on the HHRG board of these advances. *Id.* These same advances constitute the Panexim debt, which is uncollectible. App. 14. If PwC properly "assure[d] advances to third world countries, [were] not made unless material was in the possession of [HHRG]," as it had agreed to do, the Panexim loss would not have occurred.

PwC argues that the evidence of causation is "pure conjecture" based upon the statements of a member of the HHRG board of directors. On the contrary, a member of the board of directors can certainly testify to what he would have done had PwC informed him in or around April 1998 that a $2.6 million unsecured receivable was attributable to unsecured advances to

---

[4] Thus, contrary to disputed fact number 5, PwC did not perform <u>all</u> steps contemplated in the 1998 service plan by merely assessing collectibility of certain accounts. The plain language of that service plan provides that PwC would assure that no unsecured advances would be made.
[5] PwC's argument that the HHRG policy was ambiguous as it was "subject to interpretation" is based upon a misquoting of the cited materials. Opposition, p. 6. This quote refers only to <u>trade payables</u>, which concern only incidental charges to the actual trade transactions, such as shipping costs, and which are very different from financing someone else's tax obligation. *See* Pl. Ex. 12, pp. 152-3; Def. Ex. 26.

three South American companies. Indeed, the evidence before this Court is that the board of directors immediately took steps to prevent any further <u>unsecured</u> advances[6] upon learning in May 1999 of the advances to a single South American entity, Panexim. App. 11, pp. 218-27; App. 12, pp. 131-33. These undisputed facts further support the testimony of Mike Ryan and Sean Russo as to what they would have done had they been advised of the unsecured advances to *three* South American entities in April 1998 when PwC was first aware of them.[7]

The evidence PwC offers in response is itself wholly inadequate. PwC argues that a handwritten note from a board meeting regarding high risk opportunities in South America proposed by Barry Wayne "evidences" that non-management board members of HHRG knew unsecured advances were being made. PwC's evidence falls short of its mark, however, as opportunities presented by Barry Wayne do not equal board knowledge or approval of unsecured advances.[8] PwC next argues that a statement made by Barry Wayne that the Peruvian business was "profitable" coupled with putative evidence that such business was dependant on an export incentive program means that the board of directors must have known unsecured advances were being made. PwC again misses its mark. Contrary to the suggestion of PwC, there is no evidence that indicates any unsecured advances were approved or would even need to be made to continue doing business in Peru. The board of directors showed no "concern" because they had no reason to believe that established company policy was not being adhered to. Contrast this to

---

[6] PwC's attempt to refute this point merely shows that further advances were made to Panexim after May 1999. Such advances were <u>secured</u> however, and therefore, in compliance with HHRG policy. *See,* testimony of Ryan and Russo cited to herein. PwC cannot point to any <u>unsecured</u> advances that were made to Panexim once the board discovered the large receivable owed by Panexim. PwC's further argument on this point (its support for its denial of Fact 75) is likewise inadequate. While the board may have been fooled by Wayne's claim that there was gold securing the outstanding receivable, this hardly means that the board would not have reacted to prevent further unsecured advances had it been informed of Wayne's breaches of HHRG policy in early 1998.

[7] In addition to Underwriters Rule 56(a)1 Statement of Facts, *see also* the affidavits of Mike Ryan and Sean Russo filed by HHRG in opposition to PwC's motion for summary judgment, at paras. 57 and 54-5, respectively.

[8] Russo testified that this deal was simply a proposal that was rejected by the board. Pl. Ex. 12, pp. 55-57.

the board's reaction in May 1999 when they learned of the significant receivable balance due from Panexim (at the time considered to be secured). Certainly, if PwC advised the board in 1998 that an *unsecured* balance was outstanding from three companies, significant "concern" would have been expressed and action would have been taken.

Only PwC's proffered evidence is based on "pure conjecture" as it attempts to conjure a scenario whereby the board either knew of the unsecured advances and failed to act or would not have done anything if it did know. The evidence, however, does not support either scenario, and a jury would have *no basis to conclude* that the HHRG board of directors would *not* have taken steps to stop the unsecured advances of funds to Panexim and other South American companies if it had been informed by PwC that this was taking place. Because PwC has failed to come forward with more than a scintilla of evidence to support its position on causation, summary judgment on this element of Underwriters' breach of contract claim must be granted. *See Powel v. Nat'l Board of Medical Examiners*, 364 F.3d 79, 84 (2nd Cir. 2004) ("there must be evidence on which a jury could reasonably find for the nonmovant"); *Aslanidis v. United States Lines*, 7 F.3d 1067, 1072 (2nd Cir. 1993) (in order to survive summary judgment, the non-moving party must come forward with specific facts showing that there is a genuine issue for trial).

D.  Damages

PwC has no expert on damages and offers no explanation or argument to refute the findings and conclusions of Underwriters' expert, Vincent Love. Indeed, PwC acknowledged that the losses suffered by HHRG relate to advances made to Panexim after its 1998 audit. Opposition at 7. It logically follows that had PwC not breached its contract with HHRG by failing to assure unsecured advances would not be made and failing to advise the board in April 1998 when it learned such advances were being made, the losses PwC admits occurred thereafter

6

283293.1

would not have been incurred. Further, Underwriters' theory of liability does not depend upon PwC conducting an audit during the period that HHRG suffered its loss. The continuous flow of unsecured money to South America in the months *after* PwC failed to fulfill its contractual obligations caused the damages calculated by Love.

PwC's last argument that Love somehow "rejected" the analysis of Underwriters' forensic accountant (not "expert" as alleged by PwC), Marcus Johnson, is unavailing. First, Johnson's analysis was based on what losses incurred by HHRG were covered under an insurance policy. Love's analysis was not so limited. For purposes of this case, Love calculated the losses incurred by HHRG resulting from PwC's negligence and breach of contract that relate to the circumstances giving rise to the insurance claim. Neither has refuted the other's calculations in respect of the premise from which those calculations were made. *See* Affidavits of Marcus Johnson and Vincent Love.[9]

### III. UNDERWRITERS ARE ENTITLED TO SUMMARY JUDGMENT ON PWC'S AFFIRMATIVE DEFENSES

In response to Underwriters' motion, PwC makes arguments in support of only a handful of its affirmative defenses. PwC offers no support for many of its other remaining defenses and each of these should be dismissed as well.

---

[9] These Affidvaits are being filed contemporaneously with this brief. PwC appears to rely on Johnson's calculations as expert testimony in opposition to Love. PwC however has not identified Johnson as an expert, nor have any of the other parties. PwC should not be entitled to rely on Johnson's prior calculations to refute Love's calculations or to support PwC's thirteenth disputed issue of material fact. Underwriters expressly reserve the right to challenge any such testimony at the appropriate time. Underwriters also note PwC's cited calculation of losses by Johnson ($7.7 million) is incomplete and therefore inaccurate. Johnson testified in his deposition that a $2.8 million silver transaction was covered under the policy, bringing Johnson's calculated covered loss to no less than $10.5 million.

A.      <u>Unclean Hands and *In Pari Delicto*</u>

As noted in Underwriters' brief, in order to be successful, PwC's defenses require either willful misconduct or unlawful misconduct by the Plaintiff with regard to the matter in litigation. PwC fails to explain how the alleged withholding of certain other conduct by HHRG's management from PwC falls within the parameters of either defense. *See e.g. Pappas v. Pappas*, 164 Conn. 242, 246, 320 A.2d 809 (1973) ("The clean hands doctrine is applied not for the protection of the parties but for the protection of the court."). The alleged misconduct (not informing PwC of certain facts) is certainly not illegal. Nor does this alleged misconduct adversely affect the court system. Moreover, PwC does not explain how either of these facts relates to the present litigation, particularly since PwC already knew that HHRG's management was making unsecured advances to South American companies to finance their value added tax obligations.[10] As these are apparently the best facts PwC has to support these two defenses, PwC has not made a showing that these defenses are sufficiently viable to be taken to a jury.

PwC also fails to establish that these defenses should be applied to Underwriters, an assignee and subrogee of HHRG's claims. Instead, it merely cites to general hornbook law that insurers take nothing by subrogation but the rights of the insured. While this is generally true, it ignores Underwriters' status as an assignee, not merely a subrogee. *See, Scholes v. Lehman, previously cited*. It also ignores the fact that courts do not follow this rule to apply punitive defenses such as *in pari delicto* because these defenses are created to punish wrongdoers. Even if that were not the case, and PwC's argument were accepted by this court, Underwriters' rights,

---

[10] The only misrepresentation identified for the 1997 or 1998 audits identified in the much cited Temkin report is the alleged misrepresentation recorded in a PwC working paper during the 1997 audit, where two HHRG employees stated that, as a matter of policy, no advances are made unless material is in HHRG's possession. However, as PwC was clearly aware that unsecured advances were being made in violation of company policy, it

(continued . . .)

assigned to them by the liquidating custodian of HHRG, would still be immune from the *in pari delicto* defense. *See e.g., In re Leasing Consultants, Inc.*, 592 F.2d 103, 110-11 (2nd Cir. 1979).

B.  Mitigation of Damages

PwC offers two facts to support this defense: (1) the board did not act "decisively" to terminate Barry Wayne after learning of the Panexim receivable in May 1999; and (2) the board accepted Wayne's misrepresentations regarding the Panexim relationship. PwC fails to explain how either "decisive action" to terminate Wayne, or action taken to stop "accepting" Wayne's misrepresentations, would have mitigated this loss. It is undisputed that by March 1999, the loss was more than $12 million. App. 14, ¶6. Confirmations sent to Panexim in early April 1999 and relied on by PwC show an outstanding receivable of more than $16 million. Given those facts, and given the fact that once the board learned of the Panexim receivable it took immediate steps to prevent further unsecured advances to Panexim, the board did in fact mitigate what could have been an even greater loss. *See* Facts, 77; *see also* affidavits of Ryan and Russo, *supra* at note 8.

PwC's only other argument on this defense is a misplaced attack on the affidavit of Roberto Passaro. This affidavit meets the requirements set forth in 28 U.S.C. § 1746. It is sworn, unrefuted testimony. It is also supported by the very confirmation sent to Panexim in April 1999 during the course of PwC's audit work.

C.  Expressed Indemnification

PwC misstates this Court's prior ruling and Underwriters' argument regarding PwC's claim for indemnification. This court did not rule that PwC had a right to seek indemnification from Underwriters. It merely declined to grant Underwriters' motion to dismiss the counterclaim

---

( . . . continued)
cannot claim to have been deceived by the alleged misrepresentations. In addition, PwC has alleged no deception in 1998.

for indemnity in the weeks that followed PwC's first assertion of this claim. Since that time, PwC has not developed any evidence that would allow it to seek indemnity from Underwriters in the form of a counterclaim. To the extent that indemnity is even a defense to Underwriters' claim (which Underwriters deny, since it does not actually affirmatively nullify it), PwC has not come forward with any evidence or authority to support such a "defense" that can be wielded against Underwriters. There is certainly no legal support for the notion that an insurer which stands in the shoes of its insured as assignee and subrogee somehow assumes the *liabilities* of its insured by virtue of its lawsuit. Indeed, PwC's own authority, *Orselet v. Dematteo*, 206 Conn. 542, 546 (1988), relied upon at several points in its opposition brief, provides that "the insurer can take nothing by subrogation but the *rights* of the insured." (emphasis supplied)

    D.    <u>Comparative Negligence</u>

"By its own terms, the comparative negligence statute applies only to causes of action based on negligence." *Town of Monroe v. Underground Constr. & Survey*, 2004 Conn. Super. LEXIS 1283; *see also Curtis Packaging, previously cited*. Simply because courts look at the duties created by contract in determining professional negligence matters does not mean that affirmative defenses, specially created by statute to address negligence claims, can be applied outside their prescribed parameters. The comparative negligence defense cannot be so applied. *See William Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559 (1995).

In addition, there is no need to analyze PwC's breach of this contract term "based upon deficient professional services." Underwriters are not relying upon professional malpractice to prove their contract claim. Instead, Underwriters have pointed to a specific contract term which was breached by PwC, and which caused HHRG a substantial loss. As such, this defense must not be applied to Underwriters' breach of contract claim.

283293.1

10

Respectfully submitted,

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP,


By: /s/ Fred Knopf
     Fred Knopf, Esq. (ct 09427)
     E-mail: knopff@wemed.com
     Edward Boyle, Esq.
     E-mail: boylee@wemed.com
     WILSON, ELSER, MOSKOWITZ,
     EDELMAN & DICKER LLP
     150 E. 42nd Street
     New York, NY 10017
     Phone: 212-490-3000
     Fax: 212-490-3038


     Daniel J. McMahon, Esq. (Ill. Bar 0162590)
     E-mail: mcmahond@wemed.com
     Stefan R. Dandelles, Esq. (Ill. Bar 6244438)
     E-mail: dandelless@wemed.com
     WILSON, ELSER, MOSKOWITZ,
     EDELMAN & DICKER LLP
     120 N. LaSalle Street
     Chicago, IL 60602
     Phone: 312-704-0550
     Fax: 312-704-1522

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that on September 19, 2005, a copy of the foregoing was filed electronically (and served by mail on anyone unable to accept electronic filing) on each of the following counsel of record in each of the consolidated cases. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system (or by mail to anyone unable to accept electronic filing). Parties may access this filing through the Court's system.

Thomas D. Goldberg, Esq.
Steven Greenspan, Esq.
David J. Elliott, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
City Place I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103-3597

William H. Champlin III, Esq.
Michael T. McCormack, Esq.
Tyler Cooper & Alcorn, LLP
City Place, 35th Floor
185 Asylum Street
Hartford, CT  06103

/s/ Fred Knopf
Fred Knopf

283293.1