FOCUS - 5 of 18 DOCUMENTS

**GRYNBERG PETROLEUM COMPANY, PETITIONER v. FEDERAL ENERGY REGULATORY COMMISSION, RESPONDENT; ROCKY MOUNTAIN NATURAL GAS COMPANY, INTERVENOR**

No. 95-1173

**UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT**

*316 U.S. App. D.C. 205; 77 F.3d 517; 1996 U.S. App. LEXIS 3979*

**February 5, 1996, Argued
March 8, 1996, Decided**

**PRIOR HISTORY:** [**1] On Petition for Review of an Order of the Federal Energy Regulatory Commission.

**LexisNexis(R) Headnotes**

**COUNSEL:** Nancy J. Skancke argued the cause for the petitioner.

Jill L. Hall, Attorney, Federal Energy Regulatory Commission, argued the cause for the respondent. Jerome M. Feit, Solicitor, and Joseph S. Davies, Deputy Solicitor, were on brief for the respondent.

John T. Miller, Jr. argued the cause for the intervenor.

**JUDGES:** Before: EDWARDS, Chief Judge; WALD and HENDERSON, Circuit Judges. Opinion for the court filed by Circuit Judge HENDERSON.

**OPINIONBY:** KAREN LECRAFT HENDERSON

**OPINION:**

[*518] KAREN LECRAFT HENDERSON, *Circuit Judge*: **Grynberg Petroleum** Company (Grynberg) petitions for review of a Federal Energy Regulatory Commission (FERC) order refusing to reopen a final determination by the Bureau of Land Management (BLM) regarding the geology of a natural gas field underlying federal land. We deny Grynberg's petition.

**I.**

The Natural Gas Policy Act of 1978 (NGPA), *15 U.S.C. § § 3301 et seq.,* established ceiling prices for wellhead sales of natural gas. Section 107 of the NGPA authorized FERC to prescribe incentive prices (prices higher than otherwise applicable ceiling prices) to encourage the production [**2] of natural gas "produced under such ... conditions as the Commission determines to present extraordinary risks or costs." *15 U.S.C. § 3317*(c)(5). Pursuant to this authority FERC decided that natural gas produced from a "tight formation" qualified for section 107 incentive pricing. A tight formation is a geological formation of low permeability, *i.e.,* a formation that impedes the flow of gas, thereby requiring a producer to use enhanced production techniques (*e.g.,* fracturing) to improve the flow of gas. FERC established several criteria an area must meet to qualify as a tight formation, one of which is that "the estimated average *in situ* gas permeability, throughout the pay section, is expected to be 0.1 millidarcy or less." 18 C.F.R. § 271.703(c)(2)(i)(A).

Section 503 of the NGPA *(15 U.S.C. § 3413)* sets forth the procedures for qualifying an area as a tight formation. First, the federal or state agency with regulatory jurisdiction over the production of natural gas (the "jurisdictional agency") reviews geological data and engineering information and, using FERC's criteria, determines whether a formation qualifies as a tight formation. The jurisdictional agency then [**3] notifies FERC of its determination and FERC reviews it to see if it is supported by substantial evidence. FERC can either affirm, reverse, remand, make a preliminary finding on or take no action regarding the determination. The determination automatically becomes final if FERC takes no action on it within 45 days. Judicial review is available only if FERC either reverses or remands. *15 U.S.C. § 3413*(b)(4).

The Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (Decontrol Act), repealed the NGPA's price ceilings, including section 107 incentive prices for tight formation gas, effective January

1, 1993. A tight formation designation remains [*519] of importance, however, because in 1990 Congress reinstituted a tax credit for tight formation gas. *See Omnibus Budget Reconciliation Act of 1990,* Pub. L. No. 101-508, § 11501, 104 Stat. 1388-479 (codified at *26 U.S.C. § 29).* To be eligible for the tax credit the gas must be produced from a well drilled or a facility placed in service between December 31, 1979 and January 1, 1993 and the gas must be sold before January 1, 2003. *26 U.S.C. § 29*(f). Because of the tax credit (and despite the loss of regulatory authority [**4] resulting from the Decontrol Act) FERC issued a series of orders, ending with Order No. 539-C issued on July 12, 1993. The order provided that until April 30, 1994 FERC intended to continue to review the jurisdictional agency's tight formation determination so long as the underlying application for an initial determination was filed with the jurisdictional agency before January 1, 1993. *Order Qualifying Certain Tight Formation Gas For Tax Credit,* Order No. 539-C, III F.E.R.C. Stats. & Regs. P 30,974 (1993).

## II.

Grynberg produces natural gas from the Blue Gravel Gas Field in Colorado, an area located on both federal and state land. The jurisdictional agency for state land in Colorado is the Colorado Oil and Gas Conservation Commission (COGCC). BLM is the jurisdictional agency for federal land. In 1992 Grynberg, desiring a tax credit, filed separate applications with COGCC and BLM to have the field designated as a tight formation. COGCC issued an affirmative tight formation determination for the area underlying state land and the determination became final when FERC took no action on it within 45 days. BLM subsequently issued a negative tight formation determination for the [**5] area underlying federal land after concluding that the record failed to demonstrate an estimated average *in situ* gas permeability of 0.1 millidarcy or less. Grynberg protested the negative determination but FERC again took no action and so it became final 45 days later, on September 30, 1993.

Five months later, on March 1, 1994, BLM petitioned FERC to reopen the negative determination and allow BLM to replace it with a revised determination qualifying the area as a tight formation. The revised determination (prepared by a different engineer and a different geologist) concluded that the *in situ* permeability was expected to be less than 0.1 millidarcy and questioned BLM's earlier analysis. FERC denied the petition to reopen because it did not meet the requirements of section 503(d), which makes the jurisdictional agency's final determination binding unless the agency relied on incomplete or inaccurate information. *61 F.E.R.C. P 61,320 (1994).* n1 FERC denied Grynberg's request for rehearing. *69 F.E.R.C. P 61,509 (1995).* Grynberg petitions for review.

n1 Section 503(d) provides that a jurisdictional agency's final determination no longer subject to review by FERC or the courts is binding. There is a proviso to the binding effect of the determination, however, (1) "if in making such determination [FERC or the jurisdictional agency] relied on any untrue statement of a material fact" or (2) "if there was omitted a statement of material fact necessary in order to make the statements made not misleading, in light of the circumstances under which they were made, to the [jurisdictional agency] in making such final determination or to [FERC] in reviewing such determination."

[**6]

## III.

FERC first challenges Grynberg's standing because it has not suffered an "injury in fact" as a result of FERC's order. It argues that Grynberg sought a tight formation determination to obtain a tax credit but can only speculate that the Internal Revenue Service (IRS) will defer to FERC's refusal to reopen the proceeding to give effect to BLM's revised (affirmative) determination. FERC relies on *Marathon Oil Co. v. FERC, 68 F.3d 1376 (D.C. Cir. 1995).* In that case natural gas producers challenged FERC's refusal to review two jurisdictional agencies' affirmative tight formation determinations. They argued that FERC's failure to affirm made it more difficult, if not impossible, for them to get the tight formation tax credit. We held that the producers could not establish an "injury in fact" for constitutional standing because they could not establish from the record that the IRS would give any weight to FERC's decision.

[*520] We need not decide whether on the facts of this case the IRS would likely defer to FERC's decision not to reopen BLM's negative determination (and thus whether FERC's order would likely affect Grynberg's success in obtaining the tax credit) because [**7] *Marathon Oil* is distinguishable for another reason: FERC's failure to reconsider BLM's negative determination could affect the price of natural gas sold under the 1975 gas purchase contract between Grynberg and Rocky Mountain Natural Gas Company (Rocky Mountain). In a 1984 amendment to the contract Grynberg reserved the right to charge the section 107 incentive price for gas sold to Rocky Mountain. The parties to the contract have been and, it appears, continue to be n2 involved in litigation over the effect of the contract's pricing provisions and, according to Grynberg, an affirmative tight formation determination would enable it to assert that it is entitled to the incentive price. Rocky Mountain's appearance as

an intervenor here confirms that an affirmative tight formation determination may enable Grynberg to collect the incentive price for at least some of the gas sold under the contract--after all, why would Rocky Mountain otherwise care whether Grynberg gets a tax credit? n3 In sum, Grynberg has standing. We turn now to the merits.

n2 *See* Affidavit of Jack J. Grynberg (Nov. 21, 1995), Appendix C-1 to Grynberg's Reply Brief, at 2 ("The contract pricing provision in the 1975 Agreement and the 1984 Amendment between Grynberg and Rocky Mountain is and has been the subject of litigation in the Colorado courts.").

[**8]

n3 When BLM notified FERC of its original determination and Grynberg protested, Rocky Mountain filed a motion to intervene, asserting that "Rocky Mountain, as the purchaser of gas under the 1975 contract ... has a direct and substantial economic interest in the outcome of the above-captioned proceeding before this Commission," Joint Appendix (JA) 41.

IV.

BLM's original (negative) determination became final when FERC took no action on it within 45 days. Section 503(d), however, provides that a jurisdictional agency's final determination is not binding if the agency (1) relied on an untrue statement of material fact or (2) was affected by an omission of a material fact. FERC interprets section 503(d) to mean that a final determination cannot be reopened unless at least one of the two criteria is satisfied. *See* 18 C.F.R. § 275.205(a). Moreover, FERC has declared that if a jurisdictional agency's determination is based on information correct and complete at the time the determination was made and reviewed by FERC, the section 503(d) criteria for reopening are not met. *Mobil Oil Exploration* [**9] *& Producing Southeast Inc., 34 F.E.R.C. P 61,211 (1986).* Further, an expert's analysis of raw data is a professional opinion subject to dispute, not a material fact. When a jurisdictional agency subsequently evaluates and finds persuasive an analysis that, although performed before the agency issued its determination, was not submitted to the agency until after it acted, FERC will not reopen the proceeding. *ANR Pipeline Co., 40 F.E.R.C. P 61,278 (1987), review denied, ANR Pipeline Co. v. FERC, 276 U.S. App. D.C. 303, 870 F.2d 717 (D.C. Cir. 1989).* n4 In short a final determination will not be reopened merely because a jurisdictional agency, upon reflection

or in light of a previously unconsidered analysis of raw data, interprets differently the same data it reviewed in reaching its original determination. Here FERC concluded that BLM did just that.

n4 To support its petition to reopen, ANR Pipeline Company had submitted two items not included in the jurisdictional agency's record: (1) structure maps dated *before* the jurisdictional agency made its determination and (2) a bottom hole pressure survey dated *after* the jurisdictional agency's determination. Applying section 503(d), FERC rejected the structure maps as constituting not a "material fact" but a professional opinion subject to dispute. *40 F.E.R.C. at 61,909; see ANR Pipeline, 870 F.2d at 722* ("Structure maps are not direct geological evidence; rather, they represent interpretations of subsurface conditions based on such evidence as electric logs and core samples."). FERC also rejected the bottom hole pressure survey because it post-dated the jurisdictional agency's determination. *40 F.E.R.C. at 61,909* (relying on *Mobil Oil, supra*).

[**10]

Grynberg argues that section 503(d) is satisfied because BLM's original determination was based on omissions of material fact. Grynberg's strongest point is that BLM, in making its original determination, [*521] did not have access to a written analysis prepared by Grynberg's expert in petroleum and natural gas engineering, Robert Lee, who concluded that the average *in situ* permeability of the formation was expected to be less than 0.1 millidarcy. (BLM's revised determination relied heavily on Lee's analysis.) But we agree with FERC that the absence of Lee's written analysis did not constitute an omission of a material "fact." Lee's written analysis, which relied on the same data (*e.g.*, flow pressures and rates) used by Rocky Mountain in its submission to BLM and reviewed by BLM in reaching its original conclusion, does not constitute a material fact. *See ANR Pipeline, 870 F.2d at 722* ("The phrase "material fact,' as used in section 503(d), relates to the basic information from which geologists and engineers deduce the existence or nonexistence of a new reservoir, and not to the conclusions they may draw from the data."). n5 Moreover, Grynberg has not explained why it did not [**11] submit Lee's written analysis to BLM before BLM made its original determination. (Lee apparently completed his analysis before he testified for Grynberg at the COGCC hearing in December 1992, *see supra* note 5; BLM did not issue its original determination until August 1993.) *See ANR Pipeline, 40 F.E.R.C. at 61,909.*

316 U.S. App. D.C. 205; 77 F.3d 517, *;
1996 U.S. App. LEXIS 3979, **

n5 Although BLM did not have a copy of Lee's written analysis (calculating an average *in situ* permeability of 0.032 millidarcy), BLM was aware of his conclusions. COGCC held a hearing on *in situ* permeability and Lee testified there as Grynberg's expert. JA 527. In the course of his testimony he summarized, albeit briefly, his methodology and results. JA 111-12 (explaining he calculated permeability of 0.03 millidarcy). BLM reviewed a transcript of Lee's testimony in preparing its original determination. JA 2, 10.

Grynberg's other alleged omissions of material fact fare no better. Grynberg complains that BLM's original determination omitted, *inter alia,* an independent calculation [**12] of permeability values, a verification of Rocky Mountain's data, a permeability distribution map which would have highlighted some of the problems with Rocky Mountain's data, a normalization of Rocky Mountain's data and an appropriate comparison of the data submitted by Rocky Mountain and Grynberg. In effect Grynberg assails BLM's original analysis and contends that any shortcoming in the analysis constitutes an omission of material fact. Section 503(d), however, relates to the accuracy and completeness of the record before the jurisdictional agency, not the soundness and thoroughness of the jurisdictional agency's analysis of the record. *See ANR Pipeline, 870 F.2d at 721* (section 503(d) focuses on "accuracy and completeness of the information submitted" to jurisdictional agency). Section 503(d) is not a back door for "arbitrary or capricious" review. n6

n6 Grynberg also argues that BLM relied on untrue statements of material fact. But Grynberg did not raise below the "untrue statements" arguments it now raises and therefore we will not consider them. *See 15 U.S.C. § 3416*(a)(4) (court will not consider issue "not urged before the Commission in the application for rehearing unless there was reasonable ground for the failure to do so"); *ANR Pipeline, 870 F.2d at 723.*

[**13]

Sidestepping section 503(d), Grynberg points out that the NGPA contemplated that FERC would defer to a jurisdictional agency's fact finding and technical analysis. True, but it does not follow that FERC must reopen a final determination whenever a jurisdictional agency simply changes its opinion. Grynberg also insists that as a matter of sound public policy an agency should be allowed to correct its mistakes. This argument, which assumes that BLM sought to correct a mistake rather than merely change its opinion, ignores section 503(d) which FERC has reasonably declared to be the exclusive route to reopen a final determination. Moreover, the argument overlooks the strong interest in finality that counsels against reopening when an agency simply reinterprets, *via* an additional expert opinion, the same data it reviewed in rendering an earlier determination. *See ANR Pipeline, 870 F.2d at 721* (stressing importance of finality).

* * *

For the foregoing reasons Grynberg's petition for review is

*Denied.*

3 of 3 DOCUMENTS

**ORANGE IMPROVEMENTS PARTNERSHIP, Plaintiff, -against- CARDO, INC., Defendant.**

**3:97 CV 661 (GLG)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

*984 F. Supp. 85; 1997 U.S. Dist. LEXIS 17837*

**November 6, 1997, Decided**

**DISPOSITION:** [**1] Plaintiff's motion for summary judgment DENIED.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Plaintiff: John K. Atticks, III, Marlowe, Snow & Atticks, Madison, CT.

For Defendant: John J.L. Chobor, Greenberg, Hurwitz, Cooper & Silverman P.C., New Haven, CT.

**JUDGES:** United States District Judge Gerard L. Goettel.

**OPINIONBY:** Gerard L. Goettel

**OPINION:**

[*87] OPINION

**GOETTEL, District Judge:**

Pursuant to *Federal Rule of Civil Procedure 56*, plaintiff Orange Improvements Partnership moves for summary judgment on the issue of the liability of defendant, Cardo, Inc. For the reasons discussed below, plaintiff's motion (Document # 12) is DENIED.

BACKGROUND

Plaintiff, Orange Improvements Partnership ("Orange Improvements"), owns a shopping center in Orange, Connecticut known as the Orange Promenade Center (the "Center"). Orange Improvements leases a portion of the premises to defendant, Cardo, Inc. ("Cardo"), in which Cardo has operated a package and liquor store for over thirty years. Cardo originally entered into a lease agreement in 1965 (the "1965 Lease") for its package and liquor store with Orange Improvements' predecessor, Whiteacre-Orange Associates ("Whiteacre-Orange"). Since the 1965 Lease, the Center's ownership has [**2]

changed hands twice until Orange Improvements assumed ownership on April 30, 1993. When Orange Improvements became the Center's owner, it obtained all of its predecessors' rights, duties, and obligations to the original lease agreements with all the Center's lessees. Orange Improvements currently employs DLC Management Corp. (the "Management Company") to manage the Center.

Under the terms of the 1965 Lease, Cardo paid a minimum annual rent of $ 7,584.00. Additionally, Cardo was required to pay an additional percentage rental based upon its gross sales in excess of $ 250,000.00. The relevant portion of Article IV of the 1965 Lease provides:

> Tenant agrees to pay to Landlord . . . rent at the following rates and times:
> . . . .
> (b) Additional percentage rental as follows: An amount equal to 5 per centum of the total of all gross sales made by the Tenant in, on or from the demised premises during the lease year next preceding in excess of $ 250,000.00.

The term "gross sales" is defined as:

> all receipts from sales made or services rendered in, on or from the demised premises, whether for cash or on credit, and all compensation received for orders taken on the demised [**3] premises . . . less all discounts and allowances to customers, and refunds and credits to customers for merchandise returned or exchanged, and less the amounts of any sales, luxury or

Case 3:02-cv-01379-MRK    Document 210-2    Filed 09/19/2005    Page 6 of 18

Page 2

984 F. Supp. 85, *; 1997 U.S. Dist. LEXIS 17837, **

excise taxes, so-called, collected by Tenant . . . .

As of 1965, Cardo's gross sales included receipts from liquor, beer, and soda sales.

On February 25, 1967, Whiteacre-Orange wrote to Cardo in order to modify the 1965 Lease (the "1967 Letter") with respect to the [*88] provision on additional percentage rent. The relevant portion of the 1967 Letter provides:

> It is true that I had promised you that Stop and Shop would carry no liquor or beer in the shopping center. However, their lease was signed before yours.
>
> In consideration of the fact that they are carrying beer, we will exclude beer and soda from overage percentage rent.

According to this letter, Whiteacre-Orange and Cardo calculated the amount of additional percentage rent based on Cardo's receipts from its liquor sales only, and excluded receipts from its beer and soda sales. On April 21, 1976, the 1967 Letter was recorded with the 1965 Lease in the Orange Land Records in volume 255 at page 533 and volume 255 at page 506, respectively. [**4]

The consideration stated for the exclusion of beer and soda sales was the existing competition from Stop and Shop. Stop and Shop subsequently vacated the Center in 1989. Orange Improvements asserts that since Stop and Shop left, no other tenant competes with Cardo by selling beer and soda for off-premises consumption in the regular course of business.

In 1990, Cardo negotiated a modification of the 1965 Lease ("1990 Lease Modification") with one of Orange Improvements' predecessors, Orange White Acres, Inc. ("Orange White Acres"). As part of Orange White Acres' plan to improve the Center, Cardo's leased premises were renovated, improved, and enlarged. The 1990 Lease Modification therefore modified provisions of the 1965 Lease relating to the definition of the demised premises, the amount of annual minimum rent, and the amount of insurance that Cardo was required to carry.

During the construction period, the parties agreed, inter alia, to modify the rent provision due to the need to temporarily relocate Cardo's package store. The rent provision stated that "'additional percentage rental' as set forth in Article IV(b) [of the 1965 Lease] shall continue to be due and payable in accordance [**5] with said

Lease." The 1990 Lease Modification defines the term "lease" as a certain lease agreement entered into on May 14, 1965 between Cardo and Whiteacre-Orange.

Upon termination of the construction period, the parties agreed to modify and amend the 1965 Lease, inter alia, in order to increase the amount of the minimum annual rent. According to the modified provision, Cardo agreed to pay a minimum annual rent of $ 13,704.00. Finally, the penultimate paragraph of the 1990 Lease Modification provides that "all of the terms and conditions of the [1965] Lease . . . not . . . modified and amended above shall remain in full force and effect as if restated herein in all of its parts. . . ." The 1990 Lease Modification does not make any reference to the 1967 Letter. Moreover, the definition of the term "lease," as the 1965 Lease, makes no reference to the modification in the 1967 Letter.

After Orange Improvements became the Center's owner in 1993, Cardo continued paying rent according to the terms of the 1965 Lease as modified by the 1967 Letter. While Orange White Acres was lessor from 1990-93, it never requested additional percentage rent based on Cardo's beer and soda sales. Instead, [**6] Orange White Acres accepted the override based only on Cardo's liquor sales. According to Orange Improvements, Cardo has accounted to it for all of Cardo's gross sales, including beer and soda sales, since 1993. Each month, Cardo would pay its minimum monthly rent and annually, it would separately pay an amount for the additional percentage rent.

Orange Improvements asserts that it conducted a review of the Center's lease documents in the winter of 1996-97 at which time it determined that Cardo had not paid additional percentage rent on its beer and soda sales. On February 11, 1997, Orange Improvements made a demand upon Cardo to pay additional percentage rent based on the sale of liquor, beer, and soda. Accordingly, it presented a bill to Cardo in the amount of $ 87,236.00 for past due additional percentage rent based on Cardo's receipts from beer and soda sales for the period from April 1993 through December 1996.

In a supplemental agreement dated October 13, 1966, the term of the 1965 Lease was set for a twenty year period to expire on October 31, 1986. On February 19, 1986, [*89] Hyman Gluck, Cardo's then-president, exercised Cardo's option to extend the 1965 Lease for a further term [**7] of five years with a termination date of October 31, 1991. In a letter dated May 25, 1991, Gluck again exercised Cardo's option to extend the termination date for a five year period until February 27, 1997. Cardo's current president, Robert Wardle, wrote to the Management Company on July 23, 1996 in order to exercise Cardo's option to extend the lease for another

Case 3:02-cv-01379-MRK    Document 210-2    Filed 09/19/2005    Page 7 of 18

Page 3

984 F. Supp. 85, *; 1997 U.S. Dist. LEXIS 17837, **

five year period to expire on February 27, 2002. In the 1991 and 1996 extension letters, Cardo's presidents refer to the lease dated May 14, 1965 and the supplemental agreements dated October 13, 1966 and September 6, 1990. They do not mention the 1967 Letter as having modified the 1965 Lease.

Orange Improvements commenced this action on April 8, 1997, as amended on April 24, 1997, after Cardo did not pay the $ 87,236.00 bill for additional percentage rent based on its beer and soda sales. In its amended complaint, Orange Improvements seeks money damages, an accounting, reasonable attorney's fees in accordance with the lease, and other such relief as to which law or equity may pertain. In particular, Orange Improvements claims that Cardo is "indebted to [it] for an amount equal to five percent of [Cardo's] sales of beer [**8] and liquor [sic, soda?] from April 30, 1993 to and including the lease year last ending." Orange Improvements then made this motion for summary judgment on August 25, 1997 on the issue of Cardo's liability.

DISCUSSION

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact. *Fed. R. Civ. P.* 56(c). When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Orange Improvement bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).* If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).*

In an action involving contract interpretation, summary judgment is appropriate only when the terms of the agreement are wholly [**9] unambiguous, *Heyman v. Commerce and Indus. Ins. Co., 524 F.2d 1317, 1320 (2d Cir. 1975),* considering the surrounding circumstances and undisputed evidence of intent. *Sharkey v. Ultramar Energy Ltd., 70 F.3d 226, 230 (2d Cir. 1995).* Contractual language is unambiguous if it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989)* (alteration in original) (quoting *Breed v. Insurance Company of North America, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)).*

Language does not become ambiguous solely because the parties offer conflicting interpretations during the course of litigation. See *Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985)* (stating that "contorted semanticism must not be permitted to create an issue where none exists."). Instead, the moving party must prove that the contractual language is not susceptible to at least two fairly reasonable meanings. Id.; see *Cable Science Corp. v. Rochdale [**10] Village, Inc., 920 F.2d 147, 151 (2d Cir. 1990)* (finding that both language and inferences to be drawn from it must not be reasonably susceptible to more than one meaning). If the moving party cannot establish unambiguous contract language, "a material issue exists concerning the parties' intent, and the non-moving party has a right to present extrinsic evidence regarding the meaning of the contested term." *Wards, 761 F.2d at 120;* see *Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9 (2d Cir. 1983)* (stating that where contractual language may be susceptible to at least two fairly reasonable meanings, [*90] summary judgment is improper if the evidence presented is conflicting). If the contractual language is ambiguous and subject to varying reasonable interpretations, the issue of the parties' intent is a question of fact, thereby rendering summary judgment inappropriate. *Thompson v. Gjivoje, 896 F.2d 716, 721 (2d Cir. 1990).*

Generally, contract interpretation involves issues of the parties' intent and thus presents a question of fact. *Bead Chain Mfg. Co. v. Saxton Prods., Inc., 183 Conn. 266, 274-75, 439 A.2d 314, 319 (1981).* If, however, there is definitive contract language, [**11] "the determination of what the parties intended by their contractual commitments is a question of law." *Thompson & Peck, Inc. v. Harbor Marine Contracting Corp., 203 Conn. 123, 131, 523 A.2d 1266, 1270 (1987);* see *Mycak v. Honeywell, Inc., 953 F.2d 798, 802 (2d Cir. 1992)* (affirming district court's grant of summary judgment in favor of an employer in a breach of contract case because the trial court had found the contract language unambiguous, thereby permitting it to consider the parties' conduct as it pertained to their contractual duties); *Rothenberg v. Lincoln Farm Camp, Inc., 755 F.2d 1017, 1019 (2d Cir. 1985)* (finding that a question of law is presented if contract language is unambiguous and reasonable people could not differ as to its meaning); *Mulligan v. Rioux, 229 Conn. 716, 740-41, 643 A.2d 1226, 1239 (1994)* (construing the termination provision of a contract as a question of law, according to the parties' intent, because the contract contained definitive language).

When examining the parties' intent, the court must look to the intent expressed in the contractual language and not to any intention that may have existed in the parties' minds. *Gateway Co. [**12] v. DiNoia, 232 Conn. 223, 231-32, 654 A.2d 342, 347 (1995);* see *Water and*

Case 3:02-cv-01379-MRK    Document 210-2    Filed 09/19/2005    Page 8 of 18

Page 4

984 F. Supp. 85, *; 1997 U.S. Dist. LEXIS 17837, **

*Way Properties v. Colt's Mfg. Co., 230 Conn. 660, 666, 646 A.2d 143, 145-46 (1994)* (upholding the trial court's grant of summary judgment in favor of the landlord on the issue of the tenant's liability because the unambiguous contract language did not support the tenant's strained construction as to what the parties may have intended as to the tenant's rent obligations). The parties' intention can be determined by examining the language used, interpreted in light of the parties' situation and circumstances surrounding the transaction. *Ives v. City of Willimantic, 121 Conn. 408, 411, 185 A. 427 (1936).*

1. Actual and Constructive Notice

As a federal court sitting in diversity jurisdiction, this Court applies state substantive law. *Erie R.R. Co. v. Tompkins, 304 U.S. 64, 82 L. Ed. 1188, 58 S. Ct. 817 (1938).* Accordingly, this Court will apply Connecticut state law on contracts and leases to resolve the present dispute.

Orange Improvements contends that when it purchased the Center in 1993 it had no actual or constructive notice of the 1967 Letter. In order for Orange Improvements to avoid [**13] the contractual rights and obligations of the 1967 Letter, Orange Improvements must have been a bona fide purchaser without notice of the written modification (the 1967 Letter) of Cardo's 1965 Lease with Whiteacre-Orange. *Conn. Gen. Stat. Ann. § § 47-10, 47-19; see Clean Corp. v. Foston, 33 Conn. App. 197, 201, 634 A.2d 1200, 1202 (1993)* (holding that a lease conveying an "interest in land for more than one year is not effectual against a bona fide purchaser of the leased land unless the lease is recorded on the land records or the purchaser has actual notice of the lease prior to purchase."). It is undisputed that prior to February 1997, Orange Improvements had no actual notice of the 1967 Letter. The issue is whether the Orange Land Records gave Orange Improvements constructive notice of the 1967 Letter.

Under Connecticut law, "no lease of any building . . . for any term exceeding one year . . . shall be effectual against any persons other than the lessor and lessee and their respective . . . successors . . . unless it is in writing, executed, attested, acknowledged and recorded in the same manner as a deed of land. . . ." *Conn. Gen. Stat. Ann. § 47-19.* The purpose of Connecticut's [**14] recording act is to invalidate leases as against third parties, but not as against the parties themselves. *Johnson v. Phoenix Mut. Life Ins. Co., 46 Conn. 92, 97 (1878).* As used in the recording [*91] act, the term successor refers to parties who take property by will or inheritance and not generally to successors-in-interest. *Drazen Properties Ltd. Partnership v. E.F. Mahon, Inc., 19 Conn. App. 471, 475, 562 A.2d 1142, 1144 (1989).*

In February 1997, after receiving Orange Improvements' demand for overdue payment of additional percentage rent based on its beer and soda sales, Cardo forwarded a copy of the 1967 Letter to an officer of the Management Company. Orange Improvements' receipt of the 1967 Letter placed it on actual notice that the rent provision in the 1965 Lease had been modified to exclude beer and soda sales from the calculation of additional percentage rent. See *Guffey v. Smith, 237 U.S. 101, 110, 119, 59 L. Ed. 856, 35 S. Ct. 526 (1915)* (finding that, in case involving multiple leases for same tract from common lessor, subsequent lessees were on actual notice of prior lessees' existence when successors-in-interest of prior lessees contacted subsequent lessors to [**15] inform them of their prior leases).

As Whiteacre-Orange's successor-in-interest, Orange Improvements has constructive notice only of that which is revealed by a search of its predecessor's chain of title. See *Genovese Drug Stores, Inc. v. Connecticut Packing Co., 732 F.2d 286, 290 (2d Cir. 1984)* (stating the traditional rule that a purchaser of property is charged with constructive notice "only of those encumbrances that appear in his direct chain of title"). The 1967 Letter had been recorded in the Orange Land Records in volume 255 at page 533, directly following the 1965 Lease which was recorded in the same volume at page 506. Thus, the recordation of the 1967 Letter placed Orange Improvements on constructive notice that the additional rent provision in the 1965 Lease had been modified because a search of Whiteacre-Orange's chain of title would reveal the existence of the 1967 Letter.

Consequently, Orange Improvements cannot seek protection of Connecticut's recording statute first, because as a successor-in-interest it is not considered the type of third party entitled to protection, and second, because the recording of the 1967 Letter placed it on constructive notice. The [**16] lease between Cardo and Whiteacre-Orange "was perfected as to the parties thereto, and firmly established the contractual rights and obligations of both parties." *Farmers and Mechanics Sav. Bank v. First Fed. Sav. and Loan Ass'n, 167 Conn. 294, 302, 355 A.2d 260, 264 (1974).* Thus, unless the 1990 Lease Modification modified the parties' rights and obligations, Orange Improvements is bound to comply with the contractual language which provides that it is entitled to an additional percentage rent based only on Cardo's liquor sales.

2. Effect of the 1990 Lease Modification on the 1967 Letter

Orange Improvements argues that there is no genuine issue of material fact because the plain language of the 1990 Lease Modification refers only to the 1965 Lease, and not to the 1965 Lease as modified by the

Case 3:02-cv-01379-MRK    Document 210-2    Filed 09/19/2005    Page 9 of 18

Page 5

984 F. Supp. 85, *; 1997 U.S. Dist. LEXIS 17837, **

1967 Letter. Orange Improvements also contends that, even if the 1967 Letter modified the 1965 Lease at one time, the 1967 Letter no longer has any contractual effect because its underlying rationale ceased to apply once Stop and Shop vacated the Center in 1989. Accordingly, Orange Improvements urges this Court to find that the 1990 Lease Modification had rendered the 1967 Letter [**17] ineffectual as a matter of law.

a. Modification of the 1965 Lease

It is undisputed that the 1967 Letter was a valid modification of the 1965 Lease because "parties to an existing contract may, by a subsequent contract, alter any term of their original one." *Gordon v. Indusco Management Corp., 164 Conn. 262, 267, 320 A.2d 811, 816 (1973)* (citations and internal quotation marks omitted). In *Agreda v. Lopez, 1997 Conn. Super. LEXIS 150, Civ. No. 960382147, 1997 WL 35821* (Conn. Super. Jan. 21, 1997), the court granted relief according to the terms of a second agreement instead of the first agreement because it found that a "contract containing a term inconsistent with a term of an earlier contract between the same parties is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Id.* at *1.

[*92] To constitute a valid modification, the agreement must be supported by sufficient consideration which can take the form of mutual promises. *Three S. Dev. Co. v. Santore, 193 Conn. 174, 178, 474 A.2d 795, 798 (1984);* see *Lamb v. Emhart Corp., 47 F.3d 551, 559 (2d Cir. 1995)* (construing Connecticut contract law as requiring consideration for any material modification [**18] of a contract). Here, Cardo and Whiteacre-Orange exchanged mutual promises in the 1967 Letter by which Cardo promised to pay and Whiteacre-Orange promised to accept additional percentage rent based on the exclusion of beer and soda sales. Additionally, the 1967 Letter does not provide that the exclusion of beer and soda sales would be effective only so long as Stop and Shop remained a tenant in the Center or other competition existed which infringed on Cardo's beer and soda sales.

Finally, a valid modification remains effective until the agreement terminates by its terms, or until the parties agree to rescind the contract. See *Jones v. Management and Computer Servs., Inc., 976 F.2d 857, 860 (3d Cir. 1992)* (providing that "it is a deeply imbedded general principle of contract law that the validity of a contract is to be determined as of the time it is made."). Accordingly, the 1967 Letter continued to govern the payment of additional percentage rent even if the reason for granting the exclusion - the competition by Stop and Shop - no longer existed. Indeed, the 1967 Letter does not provide that the existence of competition was a condition precedent to the exclusion of beer and [**19] soda from

the calculation of the additional percentage rent. Nor does the 1967 Letter contain a provision on the termination of the exclusionary clause.

The only issue is whether the parties, when they entered into the 1990 Lease Modification and referred to the 1965 Lease for its terms, meant the original 1965 Lease or the 1965 Lease as modified by the 1967 Letter.

b. Incorporation By Reference

Orange Improvements urges this Court to consider only the 1965 Lease and the 1990 Lease Modification because it asserts that these writings constitute the entire contractual agreement between the parties. It further argues that the 1990 Lease Modification restated the terms of the 1965 Lease, to the exclusion of the 1967 Letter. By not mentioning the 1967 Letter in the 1990 Lease Modification, Orange Improvements contends that the parties had de jure excluded it.

Under Connecticut law, "where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties." *Batter* [**20] *Bldg. Materials Co. v. Kirschner, 142 Conn. 1, 7, 110 A.2d 464, 468 (1954);* see *Randolph Constr. Co. v. Kings E. Corp., 165 Conn. 269, 275, 334 A.2d 464, 467 (1973)* (providing that when parties incorporate existing documents by reference they produce a single contract which includes the terms of the incorporated documents); *Housing Auth. of Hartford v. McKenzie, 36 Conn. Supp. 515, 518, 412 A.2d 1143, 1145 (1979)* (stating that if the terms and conditions of one document are incorporated into another document by reference, the two writings will be interpreted together as the agreement of the parties). A corollary to the principle of incorporation is that if there are multiple writings regarding the same transaction, the writings should be considered together to determine the parties' intent. See *Mongillo v. Commissioner of Transp., 214 Conn. 225, 229-30, 571 A.2d 112, 115 (1990)* (considering stipulated judgment and deed to resolve ambiguity in parties' agreement).

It is undisputed that by restating the terms of the 1965 Lease in paragraph 12 of the 1990 Lease Modification, the parties expressed their intent that the rental agreement would encompass at least the 1965 Lease [**21] and the 1990 Lease Modification. Cardo contends that it and the then-lessor, Orange White Acres, also intended to and did incorporate the 1967 Letter by reference into the 1990 Lease Modification. To support this claim, Cardo points to the parties' conduct following the effective date of the 1990 Lease Modification by which Cardo continued to pay and Orange White Acres continued [*93] to accept additional percentage rent on

Case 3:02-cv-01379-MRK    Document 210-2    Filed 09/19/2005    Page 10 of 18

Page 6

984 F. Supp. 85, *; 1997 U.S. Dist. LEXIS 17837, **

Cardo's liquor sales only. While the 1990 Lease Modification uses clear language to define the lease between the parties as the 1965 Lease, it is unclear whether the parties intended this to mean the 1965 Lease as originally executed or the 1965 Lease as modified by the 1967 Letter.

There are three possible reasons why the parties to the 1990 Lease Modification did not refer to the 1967 Letter: (1) accidental omission on the drafters' part because they did not remember or have direct knowledge of the 1967 Letter; (2) all parties knew of the 1967 Letter and did not raise it as an issue because they assumed it would continue to be effective due to the parties' twenty-three year history of excluding beer and soda; or (3) Cardo assumed the 1967 Letter would remain effective [**22] as part of the 1990 Lease Modification and Orange White Acres assumed the 1990 Lease Modification would exclude the 1967 Letter.

Orange Improvements, as assignee of the Center's leases, stands in the shoes of its predecessor-assignors, and has no greater rights to collect additional percentage rent based on Cardo's beer and soda sales than its predecessors would have had to those amounts. See *Fairfield Credit Corp. v. Donnelly, 158 Conn. 543, 552, 264 A.2d 547, 551 (1969)* (finding that the plaintiff, as assignee, could not prevail on its breach of installment contract claim because its assignor would have been unable to recover under the installment contract). It is possible that the reason Orange White Acres, through its president Doug Benach, never requested additional percentage rent based on Cardo's beer and soda sales was because it knew that the 1967 Letter modified the 1965 Lease. If Benach knew of the beer and soda exclusion, Orange White Acres would not have been able to assert a claim under the lease agreement. Additionally, if Orange White Acres did not intend that Cardo would pay additional percentage rent on its beer and soda sales, it would create an equitable right [**23] in Cardo, as the tenant.

This Court finds that Orange White Acre's conduct from 1990-93 demonstrates an ambiguity as to the meaning of the term lease as defined in the 1990 Lease Modification. Due to Orange Improvements' failure to sustain its burden of showing that the 1990 Lease Modification is susceptible to only one fairly reasonable interpretation, Cardo is entitled to present extrinsic evidence on the parties' intent as of 1990. *Wards Co. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir. 1985).* Thus, a trier of fact will have to consider the 1967 Letter's role in the negotiations of the 1990 Lease Modification. See *Schubert v. Ivey, 158 Conn. 583, 587, 264 A.2d 562, 564 (1969)* (stating that, where an agreement is evidenced by multiple writings, all writings must be considered to ascertain the expressed intent of the contract as a whole); *Cooper v. Malavese, 1 Conn. Cir. Ct. 484, 486, 188 A.2d*

*266, 267-68, 24 Conn. Supp. 168* (finding that the contract between the parties consisted of an exclusive agency agreement and an exclusive sales agreement because the separate agreements related to the same transaction, thus requiring the court to read all writings together [**24] and to construe each document with reference to the other), cert. denied, *150 Conn. 717, 197 A.2d 928 (1962).* The trier of fact will also have to examine Orange White Acre's intent as to whether the 1967 Letter's exclusion would continue to govern the parties' lease agreement.

c. Rescission of the 1967 Letter

One strong reason for finding in favor of Cardo, the nonmoving party, is that it is possible to find that the 1990 Lease Modification did not constitute an agreement to rescind the 1967 Letter. Orange Improvements argues that the 1967 Letter had no legal effect after Stop and Shop vacated the Center in 1989. It further contends that the 1990 Lease Modification canceled the operative effect of the 1967 Letter because the 1990 Lease Modification restated the unamended terms of the 1965 Lease without reference to the 1967 Letter.

To escape contractual duties arising from an agreement that was expressly entered into, however, the parties must affirmatively act to disclaim any provisions that they no longer wish to be part of their agreement. [*94] Parties to a contract may agree to rescind or abandon their contractual duties. *Yale Co-operative Corp. v. Rogin, 133 Conn. 563, [**25] 568, 53 A.2d 383, 385 (1947);* see *Rowe v. Cormier, 189 Conn. 371, 373-74, 456 A.2d 277, 278 (1983)* (finding ample evidence of abandonment where the testimony established that the parties agreed to "forget about" their agreement and where neither party had attempted to perform or compel performance of the agreement).

A valid agreement of rescission must be supported by sufficient consideration, similar to that required for an effective modification. See *Smith and Smith Bldg. Corp. v. DeLuca, 36 Conn. App. 839, 844, 654 A.2d 368, 370 (1995)* (comparing requirements for a valid modification with those needed for a valid agreement of rescission). Accordingly, an agreement of rescission is effective if it is based on an exchange of mutual promises. See *Savage Arms Corp. v. United States, 266 U.S. 217, 220, 69 L. Ed. 253, 45 S. Ct. 30 (1924)* (holding that parties to a contract may release themselves of their contractual obligations by mutual agreement and stating that the "release of one is sufficient consideration for the release of the other"); *Smith and Smith, 36 Conn. App. at 844, 654 A.2d at 370* (canvassing state appellate and supreme court cases to determine that "a [**26] rescission or nullification of a contract may be effected solely on the ba-

Case 3:02-cv-01379-MRK    Document 210-2    Filed 09/19/2005    Page 11 of 18

Page 7

984 F. Supp. 85, *; 1997 U.S. Dist. LEXIS 17837, **

sis of an exchange of mutual promises by the parties without other forms of consideration.").

The determination of whether the parties intended to rescind or abandon the contract or terms of the contract may be inferred from the parties' conduct and attendant circumstances, *Yale Co-operative, 133 Conn. at 568, 53 A.2d at 385-86,* because the agreement of rescission does not need to be express. See *Osborn v. Stevens, 132 Conn. 410, 414, 45 A.2d 160, 162 (1945)* (finding evidence of mutual assent to terminate an agreement for the sale of real estate despite the lack of an express agreement of rescission, where would-be buyer indicated that he could not raise the money for the purchase price, record title remained in would-be seller's name, and parties' relationship could reasonably be construed as one of landlord-tenant).

Additionally, it is ordinarily a question of fact whether the parties manifested an intent to rescind or cancel their agreement. *Rowe, 189 Conn. at 373, 456 A.2d at 278;* see *First Hartford Realty Corp. v. Ellis, 181 Conn. 25, 33, 434 A.2d 314, 318 (1980)* (finding, in dicta, that [**27] the meaning to be given to an oral agreement to cancel a debt "depends upon the intention of the parties, which is a question of fact"). It could be argued that, here, however, no issue of fact is involved merely because plaintiff's attorney has proposed one way of interpreting the language in the 1990 Lease Modification without any factual evidence to support this construction. See *Mycak v. Honeywell, Inc., 953 F.2d 798, 802 (2d Cir. 1992)* (stating that the mere assertion of an ambiguity does not preclude summary judgment and granting summary judgment in breach of contract case where record was "barren" of evidence showing the contract at issue was unclear). Orange Improvements has not offered any evidence to support its allegation that the parties intended to agree to rescind the 1967 Letter, other than referring to the contractual language. Nor does Orange Improvements claim that the parties orally agreed to rescind the 1967 Letter. Instead, Orange Improvements contends that the failure to refer to the 1967 Letter as modifying the 1965 Lease in the 1990 Lease Modification implies that the parties intended to be bound by the additional percentage rent provision in the 1965 Lease, [**28] such that the calculation would be based on Cardo's sales of liquor, beer, and soda. Thus, Orange Improvements argues that the 1967 Letter was de jure excluded from the parties' lease agreement.

To the contrary, it is possible to find that the 1990 Lease Modification, to the extent that it concerns the additional percentage rent provision but does not refer to the 1965 Lease as modified by the 1967 Letter, adopts the entire 1965 Lease as modified by the 1967 Letter. We further note that Cardo never expressly agreed to rescind the 1967 Letter. Parties usually cannot merely ignore their contractual obligations through an [*95] omission where, as here, in the 1990 Lease Modification the parties failed to refer to the 1965 Lease as having been modified by the 1967 Letter. As successor-in-interest to the original lessor, Orange Improvements was required to establish the full extent of the agreements with its lessees, including Cardo.

The parties' conduct supports the finding that the 1990 Lease Modification did not include an agreement to rescind the 1967 Letter. See *Yale Co-operative, 133 Conn. at 568-69, 53 A.2d at 386* (finding that the parties effectively terminated their agreement, [**29] where the defendant orally informed the plaintiff that he could not perform under the contract, the parties did not communicate with each other after this conversation, and the parties' subsequent activities showed they understood that their original agreement had terminated). After the effective date of the 1990 Lease Modification, the parties to that agreement continued to act in conformity with the terms of the 1967 Letter. Cardo paid additional percentage rent based on its liquor sales, excluding its sales of beer and soda. Orange Improvements' predecessor accepted this form of payment for the duration of its ownership of the Center. Moreover, Orange Improvements also accepted rent from Cardo in this manner from its assumption of ownership in 1993 until it conducted a review of the leases in 1997. These issues, however, will be left for the trier of fact to decide because this Court finds that whether the parties intended to agree to rescind the 1967 Letter is a question of fact.

CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED.

**SO ORDERED.**

**Dated: November 6, 1997**

    **Waterbury, CT**

    **United States District Judge**

    **Gerard L. Goettel** [**30]

3 of 21 DOCUMENTS

**MARIE POWELL, Plaintiff-Appellant, v. NATIONAL BOARD OF MEDICAL EXAMINERS, UNIVERSITY OF CONNECTICUT SCHOOL OF MEDICINE, BRUCE M. KOEPPEN, Defendants-Appellees.**

**Docket No. 02-9385**

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

*364 F.3d 79; 2004 U.S. App. LEXIS 19474; 15 Am. Disabilities Cas. (BNA) 705;*11 **Accom. Disabilities Dec. (CCH) 11-095**

**October 7, 2003, Argued**
**April 7, 2004, Decided**

**SUBSEQUENT HISTORY:** [**1] As Amended September 16, 2004.

**PRIOR HISTORY:** Plaintiff Marie Powell appeals from the grant of summary judgment in favor of defendants National Board of Medical Examiners, the University of Connecticut School of Medicine and Bruce M. Koeppen, its Dean of Academic Affairs, entered in the United States District Court for the District of Connecticut (Thompson, J.) on October 7, 2002. Plaintiff, a student at the school of medicine, was required by the school to pass an examination administered by the National Board. She unsuccessfully requested an accommodation on account of her alleged disability. As a result of that denial, plaintiff filed suit against defendants under the Americans with Disabilities Act and the Rehabilitation Act.

*Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 2004 U.S. App. LEXIS 6682 (2d Cir., 2004)*

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** AARON DAVID FRISHBERG, New York, New York, for Plaintiff-Appellant.

ALBERT ZAKARIAN, Hartford, Connecticut (Jennifer L. Sachs, Day, Berry & Howard, LLP, Hartford, Connecticut, of counsel), for Defendant-Appellee National Board of Medical Examiners.

JANE D. COMERFORD, Assistant Attorney General, University of Connecticut Health Center, Farmington, Connecticut (Richard Blumenthal, Attorney General, Hartford, Connecticut, of counsel), for Defendants-Appellees [**2] University of Connecticut School of Medicine, and Bruce M. Koeppen.

**JUDGES:** Before: WALKER, Chief Judge, NEWMAN, and CARDAMONE, Circuit Judges.

**OPINIONBY:** CARDAMONE

**OPINION:** [*81] CARDAMONE, Circuit Judge: Plaintiff Marie Powell (plaintiff or appellant) appeals from a judgment of the United States District Court for the District of Connecticut (Thompson, J.) entered October 7, 2002, granting motions for summary judgment made by defendants the National Board of Medical Examiners (National Board), the University of Connecticut School of Medicine, and Bruce M. Koeppen, M.D., its academic dean (collectively, UConn or school). In two complaints, plaintiff alleges that defendants discriminated against her based on her alleged disability in contravention of the Americans with Disabilities Act of 1990, as amended, *42 U.S.C. § 12101 et seq.* (ADA), and the Rehabilitation Act of 1973, as amended, *29 U.S.C. § 701 et seq.* (Rehabilitation Act). Plaintiff contends UConn discriminated against her when it required that she pass the United States Medical Licensing Examination (licensing examination) administered by the National Board in order to continue [**3] into the third year of the school's medical program. She asserts further that the National Board discriminated against her when it refused her application for an accommodation on the examination. Several state law claims were also alleged in plaintiff's complaints, but the grant of summary judgment to defendants on these claims is not appealed.

364 F.3d 79, *; 2004 U.S. App. LEXIS 19474, **;
15 Am. Disabilities Cas. (BNA) 705

Plaintiff is a young woman now in her 30's who 12 years ago matriculated at medical school where, after completing two years of course work, she experienced difficulties in passing the licensing examination required by the defendant medical school and administered nationally by the defendant testing service. After twice failing the licensing examination, plaintiff asked for an accommodation of more time to take it on the grounds that she had a learning disability.

That request was denied and plaintiff took the test and failed it [*82] for the third time, and later was dismissed from medical school, prompting the litigation now before us on appeal. To decide an appeal where what is involved is right versus wrong is not difficult; but where, as here, neither party has acted wrongfully, to make a just determination between the parties is difficult. [**4] A review of the record reveals plaintiff's perseverance and dedication to her studies and also reveals defendant school of medicine's truly extraordinary efforts to help plaintiff succeed. Applying the relevant legal standards, we affirm the grant of summary judgment in defendants' favor.

BACKGROUND

A. Plaintiff's Medical School History

Powell enrolled in UConn's medical program in August 1992. She was discontinued as a student in 1997. At the time of her enrollment the school was unaware that plaintiff allegedly suffered from a disability. Of the 11 courses she took that made up the first-year curriculum, Powell was deficient in two of them. The first-year courses are referred to as Basic Medical Sciences I (BMS-I). After successfully completing remedial work with respect to one of the courses, plaintiff was promoted to the second-year curriculum, referred to as Basic Medical Sciences II (BMS-II). In her second year, Powell was deficient in four out of ten courses, resulting in the award of an unsatisfactory grade for BMS-II. In addition, in June 1994 Powell failed Step I of the United States Medical Licensing Examination.

Developed and administered by the defendant National [**5] Board, a private, non-profit corporation, the medical licensing examination is a comprehensive test. It is composed of three parts, or steps, and most medical schools in the United States require their students to pass Step I before advancing to the third-year medical school curriculum. Further, in all United States jurisdictions, passage of all three steps of the medical licensing examination is mandated in order to satisfy state licensing requirements to become a doctor. Step I, the part at issue in this case, is designed to assess a medical student's ability to apply the concepts, knowledge and principles that make up the fundamentals of patient care.

The 1992-93 UConn student handbook states that at the end of each of the first two years students are required to take a comprehensive examination, and that taking Step I fulfills the second-year requirement. The handbook further provides that the school may place conditions for promotion on a student who receives an unsatisfactory in BMS-II, including retaking and passing Step I. UConn stated that two to five students per year are asked to obtain a passing score on Step I as a condition for promotion to the third-year medical school [**6] curriculum.

In June 1994 plaintiff was informed by the Promotions Committee that in order to convert her BMS-II grade to satisfactory, and thus be eligible to begin the third year, she needed to pass Step I and remediate three of her course deficiencies. For two years -- from June 1994 until June 1996 -- plaintiff repeatedly attempted to fulfill these and other requirements for advancement to the third-year clinical curriculum. The school actively assisted her in these efforts by providing free tutoring services, overlooking an honor code violation she committed, expressing its concern with her level of stress and allowing her the opportunity to remediate certain subjects multiple times.

In June 1996 UConn conditionally promoted plaintiff to the third-year curriculum, again subject to her passing Step I of the medical licensing exam. The school [*83] wanted evidence that plaintiff had mastered the BMS-I and BMS-II subject matter since it had taken four years for her successfully to complete the first two years of the school's curriculum. UConn believed passage of Step I would provide them with that proof. In October 1996, after the school paid for plaintiff to take a prepatory course, [**7] she failed Step I again. In response, the school developed a six-month tutorial program for plaintiff to follow during the spring of 1997 in preparation for the June 1997 Step I exam, and did not charge plaintiff tuition for this period.

Powell failed the test again in June 1997 and the school initiated the process of dismissal. Final decision regarding the student's dismissal was deferred pending the outcome of her lawsuit against the National Board regarding its failure to grant her accommodation request, a matter which will be discussed below. If the National Board prevailed, plaintiff would be dismissed. If plaintiff prevailed, she would be given another chance to sit for Step I and, if she passed, would be allowed to continue to the third year of the medical program. As it turned out plaintiff did not prevail, and was later discontinued as a student.

B. Plaintiff's Application to the National Board of Medical Examiners

364 F.3d 79, *; 2004 U.S. App. LEXIS 19474, **;
15 Am. Disabilities Cas. (BNA) 705

In February 1997 plaintiff was referred to a neuro-psychologist, Dr. A. Wallace Deckel. Dr. Deckel was employed by UConn's Department of Psychiatry and the medical school paid for his examination of plaintiff. Dr. Deckel's report concluded that, based on [**8] a battery of tests, Powell appeared to be suffering from dyslexia and attention deficit disorder (ADD), but the doctor also was of the opinion that anxiety and depression could not be ruled out as the causes of her academic problems. He recommended Powell be given extra time to take the Step I examination.

Plaintiff submitted a redacted version of Dr. Deckel's evaluation to the National Board as part of her application for an accommodation of extended or double time to take the June 1997 exam. The National Board rejected her request because it concluded Powell's documentation failed to establish that she was disabled and thus a covered individual under the ADA. It further noted that her documentation did not include objective evidence of difficulties she experienced before entering medical school, as would be expected were the disability a significant functional impairment. The National Board also faulted Dr. Deckel, stating that when making his diagnosis he did not provide full clinical data to support his conclusions, and that the role of plaintiff's anxiety and depression was not ruled out as the cause of her academic difficulties.

Powell later submitted an unredacted version [**9] of Dr. Deckel's evaluation, accompanied by an additional letter from him, addressing the National Board's concerns and stating his diagnosis. These materials were received too late for the June 1997 exam. Powell was told she could resubmit them for a later examination, although the National Board informed plaintiff that the additional information and documents she had submitted did not appear to support a test accommodation.

Having failed to obtain an accommodation and having been dismissed as a medical student in 1997, plaintiff filed two complaints against the National Board and UConn in 1999. The first complaint claimed violations of a number of state and federal statutes and sought all possible relief, including injunctive relief allowing plaintiff to sit for the medical licensing examination with an accommodation, and [*84] to be allowed to continue the third-year curriculum at the medical school. In the second, she claimed that UConn violated Titles II and III of the ADA and the Rehabilitation Act, and that the National Board violated Title III of the ADA and the Rehabilitation Act, but sought only damages, not injunctive relief. In November 1999 the two complaints were consolidated. [**10] Defendants moved for summary judgment in April 2001, on all of plaintiff's claims. The district court granted defendants' motion.

On this appeal plaintiff asks us to review the district court's grant of summary judgment only with respect to her ADA and Rehabilitation Act claims.

DISCUSSION

I Standard of Review

Both parties moved for summary judgment in the district court. When that court denied plaintiff's motion and granted defendants', it prompted this appeal. The standard applicable to a motion for summary judgment, resolution of which we review de novo, is a familiar one. Summary judgment shall be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. This form of relief is appropriate when, after discovery, the party -- here plaintiff -- against whom summary judgment is sought, has not shown that evidence of an essential element of her case -- one on which she has the burden of proof -- exists. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. This form of remedy is inappropriate when the issue to be [**11] resolved is both genuine and related to a disputed material fact. An alleged factual dispute regarding immaterial or minor facts between the parties will not defeat an otherwise properly supported motion for summary judgment. See *Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990)*. Moreover, the existence of a mere scintilla of evidence in support of nonmovant's position is insufficient to defeat the motion; there must be evidence on which a jury could reasonably find for the nonmovant. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

If the movant demonstrates an absence of a genuine issue of material fact, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts," and come forward with "specific facts showing that there is a genuine issue for trial." *Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)*. If the nonmovant fails to meet this burden, summary judgment will be granted against it. *Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)*.

II Provisions [**12] of the Acts

A. ADA Provisions

We turn now to the provisions of the Acts which plaintiff claims were violated in her case. The ADA, which serves to protect the rights of individuals with disabilities, states that a disabled individual is one who suffers from "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." *42 U.S.C. § 12102(2)(A) (2000)*. Title II of that Act proscribes discrimination against the dis-

abled in access to public services. *Section 202* states "No qualified individual with a disability shall . . . be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Id. *§ 12132.* A qualified [*85] individual with a disability is defined as a disabled person who, whether or not given an accommodation, "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." Id. *§ 12131(2).* Title II applies to any state or local government or instrumentality of a state or local government. [**13] Id. *§ 12131(1).* UConn concedes it is an instrumentality of the state of Connecticut.

Title III of the ADA proscribes discrimination against the disabled in public accommodations. "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of pubic accommodation." Id. *§ 12182(a).* UConn concedes that, as an educational institution, it meets the definition of public accommodation and is therefore subject to Title III. See id. *§ 12181(7)(J).* The defendant National Board of Medical Examiners also concedes that its services constitute a public accommodation covered by Title III.

B. Rehabilitation Act Provisions

Enacted before the ADA, the focus of the Rehabilitation Act is narrower than the ADA's in that its provisions apply only to programs receiving federal financial assistance. *29 U.S.C. § 794(a) (2000).* Section 504 states that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, [**14] be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under" any covered program or activity. Id.

In short, the Rehabilitation Act and Titles II and III of the ADA prohibit discrimination against qualified disabled individuals by requiring that they receive "reasonable accommodations" that permit them to have access to and take a meaningful part in public services and public accommodations. See *Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003); Felix v. New York City Transit Auth., 324 F.3d 102, 104 (2d Cir. 2003)* (quoting *42 U.S.C. § 12112(b)(5)(A))* ("The statute defines 'discriminate' to include 'not making reasonable accommodations [available to a qualified person with a disability] unless [the provider of the service] can demonstrate that the accommodation would impose an undue hardship on [its operations].'"). Since the standards adopted by Titles II and III of the ADA are, in most cases, the same as those required under the Rehabilita-

tion Act, see *Henrietta D., 331 F.3d at 272,* we consider the merits of these claims together.

In order [**15] for a plaintiff to establish a prima facie violation under these Acts, she must demonstrate (1) that she is a "qualified individual" with a disability; (2) that the defendants are subject to one of the Acts; and (3) that she was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [her] disability." *Id.*

III Analysis

A. Injunctive Relief

Turning to plaintiff's consolidated complaint, plaintiff alleges the National Board of Medical Examiners violated the Acts by turning down her request for an accommodation of extended time when taking Step I of the medical licensing examination, and that UConn violated the [*86] same Acts by making her continued advancement in the medical school contingent on her passage of the test. In her complaint, she sought compensatory damages, punitive damages, attorneys' fees and costs. Monetary relief, however, is not available to private individuals under Title III of the ADA. *42 U.S.C. § 12188(a)(1)* (same remedies available under Title III of ADA as under *Title II of Civil Rights Act of 1964*). A private [**16] individual may only obtain injunctive relief for violations of a right granted under Title III; he cannot recover damages. See *Newman v. Piggie Park Enters., Inc., 390 U.S. 400, 402, 19 L. Ed. 2d 1263, 88 S. Ct. 964 (1968)* (only injunctive relief available as remedy for violation of Title II of Civil Rights Act of 1964). The district court granted summary judgment to the National Board and UConn on the Title III claims based on the fact that plaintiff failed to request injunctive relief specifically against defendants. This ruling was error.

Under *Rule 54(c) of the Federal Rules of Civil Procedure,* a court can grant any relief to which a prevailing party is entitled, whether or not that relief was expressly sought in the complaint. See *Holt Civic Club v. City of Tuscaloosa, 439 U.S. 60, 66, 58 L. Ed. 2d 292, 99 S. Ct. 383 (1978);* see also *Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 142 (2d Cir. 2000).* The sole exception to this rule is when a court grants relief not requested and of which the opposing party has no notice, thereby prejudicing that party. In such case, unasked for relief should not be granted. See *Albemarle Paper Co. v. Moody, 422 U.S. 405, 424, 45 L. Ed. 2d 280, 95 S. Ct. 2362 (1975).* [**17] *Lightfoot v. Union Carbide Corp., 110 F.3d 898, 910 (2d Cir. 1997),* which defendant National Board relies on, is distinguishable from the case at hand and from the above cited cases. In that case there was a general prayer for relief in the complaint, and the court recognized that under *Rule 54(c)* plaintiff might have been

364 F.3d 79, *; 2004 U.S. App. LEXIS 19474, **;
15 Am. Disabilities Cas. (BNA) 705

entitled to some form of equitable relief after establishing his claim. Yet, damages were time-barred, reinstatement had been refused, and plaintiff was unable to articulate what activity ought to be enjoined; we ruled that in those circumstances the general prayer for relief was, as a matter of law, insufficient to defeat summary judgment. *Id.*

Here, those sorts of circumstances are not present. Nor would defendant be prejudiced were the plaintiff awarded injunctive relief since plaintiff's first complaint - - consolidated with plaintiff's ADA and Rehabilitation Act complaint -- put the defendants on notice of Powell's request to be allowed to take Step I with the accommodation and/or be allowed to continue with her medical education. After being placed on notice of plaintiff's request for injunctive relief to attain these ends, defendants cannot [**18] successfully maintain that they would be prejudiced were plaintiff to receive that relief. Consequently, even though plaintiff failed to request injunctive relief in her complaint alleging violations of the ADA and the Rehabilitation Act, the district court could not have granted summary judgment to the defendants on this ground, absent a showing of prejudice to defendants.

B. Plaintiff Not Prevailing Party

Nevertheless, plaintiff cannot take advantage of this rule to avoid summary judgment being taken against her. The reason is because she was not the prevailing party -- she did not make the necessary showing under *Fed. R. Civ. P. 54(c)* that she was entitled to injunctive relief under the Acts. *Rule 54(c)* states: "every final judgment shall grant the relief to which the party in whose favor it is rendered is [*87] entitled, even if the party has not demanded such relief in the party's pleadings" (emphasis added). Thus, plaintiff was not entitled to injunctive relief, and summary judgment for the defendant was warranted due to the lack of merit of any claim plaintiff might have made for injunctive relief.

C. Proof of Entitlement to [**19] Continue

Appellant did not make a showing of entitlement to injunctive relief because she failed to make out a prima facie case of discrimination under the Acts. First, we note she did not demonstrate that she was a qualified individual with a disability. Even assuming for purposes of our review, that plaintiff met the definition of being a disabled person under the Acts, she still did not present evidence showing she was otherwise qualified to continue to be a medical student at UConn.

It seems worthwhile at this juncture to set out appellant's educational background which supports the argument that she lacked academic eligibility, and thus was not otherwise qualified. She attended elementary parochial school where her best grades were in science, and

although she now concedes she was slow, she did not require tutoring. In junior high school at St. Matthew's and at Cardinal Spellman High School she maintained a B average and was on the high school honor roll. Her major academic problem was slowness, although she never was held back a grade. Powell attended Hunter College where she majored in biology and psychology.

Further, the record reveals that despite long hours of [**20] study and much assistance from family members and members of the educational community, appellant was an average student for her entire educational life. The average to low-average results of an I.Q. examination led her own neuropsychologist, Dr. Deckel, to conclude that she would be likely to encounter difficulties in her advanced post-secondary courses such as those given in medical school. Powell's 3.16 undergraduate grade point average (GPA) was significantly below the average 3.45 GPA of an incoming medical student in her class, and her composite MCAT score of 20 was significantly lower than those of her colleagues of 28.4 as well. These facts suggest that she did not meet the essential eligibility requirements for participation in this medical school program. See *42 U.S.C. § 12131(2)*.

Plaintiff presented no additional proof to show that in fact she met those requirements and, in her own words, described the difficulties she experiences with basic memory function, vision, and reading comprehension in general. Thus, she failed to carry her burden to demonstrate she was otherwise qualified, as she needed to in order to establish her prima facie [**21] case and move forward to trial. See *Heilweil v. Mt. Sinai Hosp., 32 F.3d 718, 722 (2d Cir. 1994)*.

D. Proof of Discrimination on Basis of Plaintiff's Alleged Disability Lacking

1. UConn

Moreover, even if plaintiff proved she was otherwise qualified to be a medical student and to take Step I, she produced no proof that she was discriminated against under the Acts on account of her alleged disability, by either UConn or the National Board. On the contrary, nothing suggests that UConn did anything other than support Powell in her efforts to succeed in her medical program. The school supplied tutors for her, excused an honor code violation ostensibly because of its sympathy for her high level of stress, allowed her to remain matriculated without paying tuition, and gave her multiple opportunities to remediate classes that she [*88] had previously failed. In the end, the school decided that it needed to be certain that appellant had integrated all of the learning from BMS-I and BMS-II in a way that she could utilize in her clinical rotations, and later as a treating physician.

A defendant is not required to offer an accommodation that imposes an undue hardship on [**22] its program's operation; it is only required to make a reasonable accommodation. *28 C.F.R. § 41.53 (2002)*. The ADA defines undue hardship as one requiring significant difficulties or expense when considered in light of a number of factors, one factor being the type of service or product being offered. Cf. *Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 221 (2d Cir. 2001)* (defendant employer failed as a matter of law to show that accommodation to plaintiff employee would cause it undue hardship) (citing *42 U.S.C. § 12111(10)(A) & (B)*). In addition, a defendant need not make an accommodation at all if the requested accommodation "would fundamentally alter the nature of the service, program, or activity." *28 C.F.R. § 35.130(b)(7)*; *Henrietta D., 331 F.3d at 281*.

It was well within UConn's authority to decide that in order for it to adhere to the demanding standards of a medical school responsible for producing competent physicians, it needed to require plaintiff to pass Step I. The accommodation requested by plaintiff, that she be allowed to continue in the program [**23] without first passing Step I, would have changed the nature and substance of UConn's program. Other underperforming students were required to prove their mastery of this knowledge before being allowed to advance. Permitting a student who did not definitively prove her mastery of basic medical sciences to advance into the later stages of medical school, and become a treating physician who had direct contact with patients was something the medical school correctly believed would unreasonably alter the nature of its program. See *28 C.F.R. § 35.130(b)(7)*.

When reviewing the substance of a genuinely academic decision, courts should accord the faculty's professional judgment great deference. See *Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 225, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985)*. A sister circuit facing a similar issue observed that the medical school had diligently assessed the available options and then made an academic judgment that a reasonable accommodation was not available and, that to accommodate the student would work a change in the substance of its medical program, and impose an undue hardship on its academic program. *Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 795 (1st Cir. 1992)*. [**24] In the pending case, after diligent review, UConn made a similar rational decision.

Plaintiff failed to produce evidence to create an issue of fact with respect to whether UConn's decision was made on a discriminatory basis. Her failure to present such proof, accordingly, entitled defendants to an award of summary judgment dismissing her complaint.

2. National Board

With respect to the National Board, it is clear that it followed its standard procedure when it determined that appellant was not entitled to a test accommodation. Its procedures are designed to ensure that individuals with bona fide disabilities receive accommodations, and that those without disabilities do not receive accommodations that they are not entitled to, and which could provide them with an unfair advantage when taking the medical licensing examination. As administrator of the national exam used by a number of [*89] states for licensing medical doctors, the National Board has a duty to ensure that its examination is fairly administered to all those taking it.

Contrary to Powell's allegations, neither the timing of the National Board's review of her application or its response to it, nor the nature [**25] of that review and response, are in any way discriminatory. Appellant did not produce any evidence in support of such allegations. She simply declares that Dr. Deckel's diagnosis of her condition relating to her alleged disability is enough to establish that she is disabled and thus entitled to an accommodation. The National Board, however, upon review of the documentation submitted in conjunction with plaintiff's application, determined that Dr. Deckel's diagnosis was unsound and that he had not ruled out emotional issues, stress or low intellectual capacity in general as reasons for appellant's difficulties in passing the Step I test.

Were the National Board to depart from its procedure, it would be altering the substance of the product because the resulting scores would not be guaranteed to reflect each examinee's abilities accurately. Nothing in the record suggests that the National Board's review and rejection of plaintiff's application for an accommodation was anything other than standard procedure. Nor is there evidence that the standard procedure itself was unreasonable or discriminatory in nature. Thus, appellant has not identified a material issue of fact that exists with [**26] respect to her allegations of discrimination against the National Board.

IV Money Damages

In order to obtain money damages as a remedy for UConn's alleged violation of Title II of the ADA, plaintiff would need to show not only that there was a violation, but that such violation was motivated by either discriminatory animus or ill will stemming from plaintiff's disability. *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn, 280 F.3d 98, 112 (2d Cir. 2001)*. In order to recover monetary damages under the Rehabilitation Act against the National Board, plaintiff would need to show that any violation resulted from "deliberate indifference" to the rights the disabled enjoy under the Act. *Id. at 115*. As stated earlier we find that the defendants did not vio-

364 F.3d 79, *; 2004 U.S. App. LEXIS 19474, **;
15 Am. Disabilities Cas. (BNA) 705

late the Acts. Moreover, we agree with the district court that plaintiff failed to present evidence showing the existence of either ill will or animus on the part of UConn, or deliberate indifference on the part of the National Board. Hence, she would not be entitled to money damages, in any event. Finally, since we have disposed of this appeal on the lack of merit to plaintiff's claims, we need [**27] not reach or decide the sovereign immunity issue raised by the district court as it is unnecessary to our holding.

    CONCLUSION

In sum, even if the plaintiff is disabled, she has produced no evidence to show she is otherwise qualified to continue in medical school and has offered no evidence of discrimination by either the National Board or UConn. She is thus unable to show that a material issue of fact exists that would prevent defendants from being entitled to summary judgment. Accordingly, we affirm the district court's grant of summary judgment for defendants on all claims.

    Affirmed.