1 of 3 DOCUMENTS

EMIL ASLANIDIS, Plaintiff-Appellant, v. UNITED STATES LINES, INC., UNITED STATES LINES (S.A.), INC., UNITED STATES LINES, INC., Reorganization Trust, UNITED STATES LINES (S.A.), INC., Reorganization Trust, Defendants-Appellees. EMIL ASLANIDIS, Plaintiff-Appellant, v. BRANDEIS INTSEL & CO., INC., BRANDEIS DIVISION OF PECHINEY WORLD TRADE USA, INC., JOHN DOE I, JOHN DOE II, JOHN DOE III, SAMANCOR, LTD., SOUTH AFRICAN CONTAINER DEPOTS, LTD. and RENNIES FREIGHT SERVICES, LTD., Defendants-Appellees, BRANDEIS INTSEL & CO., INC. and BRANDEIS DIVISION OF PECHINEY WORLD TRADE USA, INC., Third-Party-Plaintiffs, v. SAMANCOR, LTD., SOUTH AFRICAN CONTAINER DEPOTS, LTD. and RENNIES FREIGHT SERVICES, LTD., Third-Party-Defendants.

Docket No. 92-9265, Docket No. 92-9263

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

*7 F.3d 1067; 1993 U.S. App. LEXIS 24857; 26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484*

June 14, 1993, Argued
September 27, 1993, Decided

**PRIOR HISTORY:** [**1] Plaintiff Emil Aslanidis appeals from final judgments of the United States District Court for the Southern District of New York (Kram, J.), dated October 20, 1992, dismissing his complaints in two related law suits arising out of a maritime accident and granting summary judgment to the defendants, Samancor, Ltd., South African Container Depots, Ltd. and Rennies Freight Services, Ltd.

**DISPOSITION:** Affirmed.

**LexisNexis(R) Headnotes**

**COUNSEL:** FRANCIS J. DOOLEY, Orange, New Jersey, for Plaintiff-Appellant.

NANCY J. HELLER, New York, New York (Morris Stern, Stern, Dubrow & Marcus, New York, New York and Maplewood, New Jersey, of counsel), for Defendants-Appellees United States Lines, Inc., United States Lines (S.A.), Inc. and United States Lines, Inc. and United States Lines (S.A.), Inc. Reorganization Trust. JOHN J. WRENN, Brooklyn, New York, for Defendant-Appellee Brandeis Intsel & Co., Inc. JOHN R. FOSTER, New York, New York (Waesche, Sheinbaum & O'Regan, P.C., New York, New York, of counsel), for Defendant-Appellee Samancor, Ltd. PETER J. ZAMBITO, New York, New York (Dougherty, Ryan, Giuffra, Zambito & Barra, New York, New York, of counsel), for Defendants-Appellees South African Container Depots, Ltd., and Rennies [**2] Freight Services, Ltd.

**JUDGES:** Before: CARDAMONE and MAHONEY, Circuit Judges, and PARKER, District Judge. *

* Honorable Fred I. Parker, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

**OPINIONBY:** CARDAMONE

**OPINION:** [*1069] CARDAMONE, Circuit Judge:

Emil Aslanidis appeals from twin October 20, 1992 judgments of the United States District Court for the Southern District of New York (Kram, J.), dismissing his claims against defendants in two related suits arising from a toxic fire that occurred aboard an American vessel sailing on the high seas. Aslanidis, a merchant seaman working on the vessel, was injured by the fumes. He alleges the district court wrongly granted summary judgment to the owner of the ship in one suit, and in favor of the manufacturer, packager, transporter and purchaser of the cargo that caught fire in the other.

With respect to the first cause of action, when the ship's owner declared bankruptcy, plaintiff petitioned for relief from the automatic stay, wrongly thinking that time

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 2 of 17

Page 2
7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

was on his side. But, in so doing, he became the clock-setter; so that when he later sued the owner of the ship, time had run out and his claim was barred by the statute [**3] of limitations. Time limitations similarly barred Aslandis' second suit. Although his intent to sue the manufacturer -- and the other defendants that had charge of the flammable phosphorus -- was properly conceived in the womb of time, notice of it to them was too long [*1070] delayed in delivery. Hence, we affirm both judgments.

BACKGROUND

A. The Phosphorus Fire

In 1985 Aslanidis was employed as a seaman aboard the S.S. American Rigel (RIGEL), a container vessel owned and operated by United States Lines, Inc. (U.S. Lines). In April of that year, the RIGEL commenced a scheduled three-month voyage from its home port in New York City to South Africa and then to South America before returning. Upon arrival in South Africa, the RIGEL loaded a sea container holding 76 steel drums of phosphorus, a highly flammable chemical element, which must be transported in a water blanket to keep it from coming into contact with the air. Phosphorus exposed to air ignites spontaneously.

The phosphorus on the RIGEL was manufactured by Samancor, Ltd. of South Africa; it had been sold to Brandeis Intsel Africa "free-on-board," which company in turn sold the shipment to Brandeis Intsel Ltd., London (Brandeis [**4] London) "free-on-board." Brandeis London then sold the shipment to Brandeis Intsel & Co. (Brandeis New York) "cost-insurance-freight (CIF) New York." During these paper transactions, Samancor had kept the phosphorus drums in its South Africa plant stowed in a sea container supplied by U.S. Lines. When the paperwork was completed, the manufacturer arranged with Rennies Freight Services, Ltd. (Rennies) to carry the sea container from its factory to the Durban, South Africa docks for loading on the RIGEL.

On April 30, 1985 while the phosphorus shipment was en route to Durban, it was damaged in a motor vehicle accident. Upon learning of the accident, Samancor obtained a replacement sea container from U.S. Lines and contracted with South African Container Depots, Ltd. (SACD) to transfer all 76 drums of phosphorus from the damaged receptacle into the new one. Samancor instructed SACD that the phosphorus needed to be kept under water. The restowing was done carelessly, some of the nails that were hammered into supports within the sea container pierced four of the phosphorus drums and its surrounding water shield, causing the container's liquid blanket to commence leaking.

At Samancor's direction, [**5] Rennies transported the new container to the port at Durban, where it was loaded on the RIGEL for transport to the United States. On May 22, 1985 while the merchant vessel was in the South Atlantic off the coast of Brazil, the water blanket deflated and phosphorus from the four damaged drums made contact with the air and self-ignited. The resulting fire was quickly extinguished by the ship's crew, but toxic fumes emitted from the smoldering container had been released. Aslanidis alleges in his complaint that these fumes injured him and seven other RIGEL crew members.

Following the fire, the RIGEL was diverted to Salvadore, Brazil, where its cargo was off-loaded and examined. The 72 undamaged drums of phosphorus were restowed in another container and returned to the ship for its continuing voyage to New York; the four damaged drums were jettisoned at sea. On June 6, 1985 the RIGEL arrived at the Howland Hook Marine Terminal in Staten Island, New York, where the phosphorus-bearing container was stripped by personnel from the New York City Fire Department, U.S. Lines, and its insurers. An ensuing investigation found several of the drums to be leaking, but determined that the chemical [**6] material inside was sound. Nevertheless, Brandeis New York indicated it would not accept the shipment, and Samancor agreed to take back the damaged cargo and replace it with conforming goods.

B. Proceedings Below

1. Action Against U.S. Lines

After the May 1985 fire, plaintiff Aslanidis attempted to file suit against U.S. Lines but was prevented from doing so because on November 24, 1986 the owner of the RIGEL and its parent company sought bankruptcy protection in the Southern District of New York and were granted an automatic stay of all claims under *11 U.S.C. § 362* (1988). As a result, Aslanidis petitioned the Southern District Bankruptcy Court (Blackshear, J.) pursuant to *11 U.S.C. § 108*(c) (1988) for [*1071] limited relief from the stay. On November 27, 1991 the bankruptcy court granted Aslanidis such relief, permitting him to pursue the instant claim.

On January 24, 1992 -- 58 days after the bankruptcy court's action -- Aslanidis commenced suit against U.S. Lines under general maritime law and the Jones Act, *46 U.S.C. App. § 688* (1988), in the Southern District of New York. [**7] In his complaint Aslanidis alleged that U.S. Lines was negligent in its handling of the phosphorus cargo, breached the warranty of seaworthiness of the RIGEL, and violated its duty of maintenance and cure while its employee seaman was unfit for duty. U.S. Lines responded by moving for dismissal of the complaint under Fed. R. Civ. P. 12(b)(6), or in the alternative, for

Case 3:02-cv-01379-MRK   Document 210-3   Filed 09/19/2005   Page 3 of 17

Page 3

7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

summary judgment under Fed. R. Civ. P. 56 because Aslanidis' action was barred under the three-year statutes of limitations found in the Uniform Statute of Limitations for Maritime Torts, *46 U.S.C. App. § 763a* (1988), and the Jones Act. Aslanidis countered that these applicable time bars were "tolled" or suspended while U.S. Lines was protected by the automatic stay provision of the Bankruptcy Code.

In an order dated October 16, 1992 Judge Kram granted U.S. Lines' motion for summary judgment. In so doing, she held the bankruptcy court's stay did not toll the two maritime statutes of limitations. According to the district court, Aslanidis was required to commence his action within three years of the date of his alleged injury, or within 30 days of the lifting of the automatic stay [**8] under the Bankruptcy Code. Aslanidis' January 24, 1992 complaint -- filed over six years after the ship fire and 58 days after the lifting of the bankruptcy stay -- was not timely under either measure and, accordingly, it granted the motion terminating Aslanidis' action against U.S. Lines.

2. Action Against the Other Parties

Meanwhile, Aslanidis had filed a separate complaint on May 23, 1988 in the United States District Court for the District of New Jersey, against various parties -- other than U.S. Lines -- that had handled the phosphorus. Aslanidis alleged they were negligent and reckless and thus liable for the injuries he incurred as a result of the May 22, 1985 fire on the RIGEL. In this complaint, Aslanidis named as defendants Brandeis New York, Union Carbide Corp. (which by consent order was subsequently released from the action), and three "John Does." Aslanidis maintains he employed the "John Doe" pleading because he was unable to ascertain the names of the other defendants involved in the transportation and packaging of the phosphorus.

Following January 1990 discovery, Brandeis New York filed a third-party complaint against the phosphorus manufacturer, Samancor, and the [**9] South African transporters and repackagers, Rennies and SACD. Brandeis New York's pleading apparently alerted Aslanidis to the identities of the parties that had handled the sea container, and on May 25, 1990, he amended his complaint to substitute Rennies, SACD, and Samancor for the "John Does." These three new defendants were served by mail in June 1990. All four replied to Aslanidis' amended complaint with motions to dismiss this complaint, which in June 1990 had been transferred from the District of New Jersey to the Southern District of New York pursuant to *28 U.S.C. § 1404*(a) (1988).

On October 16, 1992 Judge Kram issued an opinion and order granting defendants' motions in this other action. She granted Rennies' and SACD's motion to dismiss Aslanidis' complaint pursuant to Fed. R. Civ. P. 12(b)(5) and (6) because she found plaintiff had failed to demonstrate in personam jurisdiction over either South African defendant. She also granted summary judgment to Rennies, SACD, and Samancor under Fed. R. Civ. P. 56 because defendants had been served with the amended complaint five years after the fire and the alleged injury -- well beyond the [**10] expiration of the three-year maritime statute of limitations. See *46 U.S.C. App. § 763a*. The district court further found that Brandeis New York, as the consignee, could not reasonably have been expected to know whether the goods in question were loaded in a proper manner and thus could not be held liable. Accordingly, it [*1072] also granted Brandeis New York's motion for summary judgment.

On October 20, 1992 the district court handed down two final judgments terminating plaintiff's cases against both U.S. Lines and the other defendants. Aslanidis appeals from both final judgments, raising objections as to each of the district court's rulings. In the interest of judicial economy, we consider both of Aslanidis' appeals together.

DISCUSSION

I Summary Judgment

We review de novo the district court's grant of summary judgment to defendants. See *Brass v. American Film Technologies, Inc., 987 F.2d 142, 146 (2d Cir. 1993)*. Summary disposition is appropriate when all the papers before a trial court show that there are no genuine issues of material fact. Fed. R. Civ. P. 56(c). A litigant seeking such relief bears the initial [**11] burden of demonstrating the absence of any genuine factual issues. See *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once this burden is met, the non-moving party is obligated to produce probative evidence supporting its view that a genuine factual dispute exists. To do so successfully, the non-moving party must demonstrate more than "some metaphysical doubt as to the material facts, . . . [it] must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* (quoting Fed. R. Civ. P. 56(e)).

Our role is to determine whether the district court correctly concluded that there were no genuine issues for trial as to Aslanidis' claims, thereby entitling the appellees to "judgment as a matter of law." *H.L. Hayden Co. of N.Y., Inc. v. Siemens Medical Sys., Inc., 879 F.2d 1005, 1011 (2d Cir. 1989)*. In carrying out this task, we view the evidence in a light most favorable to appellant, the non-moving party, and draw all reasonable inferences in his favor. See *United States v. Diebold, Inc., 369 U.S.*

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 4 of 17

Page 4
7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

*654, 655, 8 L. Ed. 2d 176, 82 S. Ct. 993 (1962)* [**12] (per curiam).

II Tolling the Maritime Statutes of Limitations

Appellant initially asserts that the district court erred in granting U.S. Lines' motion for summary judgment on the grounds that the seaman's cause of action against the shipping company was barred by the three-year maritime statutes of limitations. He contends the limitations periods found in the Uniform Statute of Limitations for Maritime Torts, *46 U.S.C. App. § 763a*, and the Jones Act, *46 U.S.C. App. § 688*, were tolled while U.S. Lines was under protection of the bankruptcy court stay. Since 18 months remained under the time bars -- within which he was required to commence his personal injury action -- when U.S. Lines initially entered bankruptcy protection, appellant posits that this period continued to be available to him to file his claim after the bankruptcy stay was lifted.

Aslanidis' argument is predicated in large part on his reading of the "Extension of Time" provision of the Bankruptcy Code, *11 U.S.C. § 108*(c), which he believes provides for tolling of all externally imposed statutes of limitations [**13] while a debtor is in bankruptcy. This code section states, in pertinent part:

> If applicable nonbankruptcy law . . . fixes a period for commencing or continuing a civil action in a court other than a bankruptcy court on a claim against the debtor . . . and such period has not expired before the date of the filing of the petition, then such period does not expire until the later of-
>
> (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
>
> (2) 30 days after notice of termination or expiration of the stay under section 362 . . . .

*11 U.S.C. § 108*(c) (emphasis added).

Analysis of this provision must commence with the language of the statute itself because, when looking at its language, a court should presume that the statute says what it means. See *Connecticut Nat'l Bank* [*1073] *v. Germain, U.S. , 112 S. Ct. 1146, 1149, 117 L. Ed. 2d 391 (1992)*. If the words of a statute are unambiguous, judicial inquiry should end, and the law interpreted according to the plain meaning of its words. See *Rubin v. United States, 449 U.S. 424, 430, 66 L. Ed. 2d 633, 101 S. Ct. 698 (1981);* [**14] *Sturges v. Crowninshield, 17 U.S. (4 Wheat.) 122, 202, 4 L. Ed. 529 (1819)* (Marshall, Ch.J.). Only where doubt or ambiguity resides in a Congressional enactment -- i.e., the legislature's finished product -- may legislative history and other tools of interpretation beyond a plain reading of the statute's words be utilized to shed light on verbiage that is unclear. See, e.g., *SEC v. Robert Collier & Co., 76 F.2d 939, 940-41 (2d Cir. 1935)* (L. Hand, J.).

Commencing with the plain meaning, we observe that by its terms § 108(c) does not provide for tolling of any externally imposed time bars, such as those found in the two maritime statutes of limitations. The bankruptcy section only calls for applicable time deadlines to be extended for 30 days after the termination of a bankruptcy stay, if any such deadline would have fallen on an earlier date. The reference in § 108(c)(1) to "suspension" of time limits clearly does not operate in itself to stop the running of a statute of limitations; rather, this language merely incorporates suspensions of deadlines that are expressly provided in other federal or state statutes.

Any [**15] ambiguity with respect to this "suspension" reference in § 108(c)(1) is cleared up by examining the provision's legislative history. This history makes evident that § 108(c)(1) refers to only "special suspensions" that are found in non-bankruptcy provisions such as the Internal Revenue Code. 124 Cong. Rec. H11,109 (daily ed. Sept. 28, 1978); accord 2 Lawrence P. King, Collier on Bankruptcy P 108.04 (15th ed. 1993); see also H.R. Rep. No. 595, 95th Cong., 1st Sess. 318, reprinted in 1978 U.S.C.C.A.N. 5787, 6275.

Our reading of the plain language and legislative history is buttressed by examining how other courts have treated this section of the code. We note that in *Grotting v. Hudson Shipbuilders, Inc., 85 Bankr. 568, 569 (W.D. Wash. 1988)*, the district court faced a question quite similar to the one presented here and flatly rejected a plaintiff's argument that the three-year time limit found in the Uniform Statute of Limitations for Maritime Torts, *46 U.S.C. App. § 763a*, was tolled by *11 U.S.C. § 108*(c). In so doing, the district court noted that if Congress had intended [**16] for § 108(c) to operate as a tolling provision it would have expressly provided for such a suspension of time limits, as it had in a predecessor to § 108. *Id. at 570*. The court reasoned that Congress did not plan for such tolling because tolling the limitations period would not comport with the fair administration and expeditious handling of a bankrupt's estate: "parties have more certain knowledge of when claims will expire, and the potential claims period is not unduly extended because of the length -- which may be

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 5 of 17

Page 5
7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

great in complex cases -- of the bankruptcy proceedings." Id. Similarly, in *In re Baird, 63 Bankr. 60 (Bankr. W.D. Ky. 1986)*, a bankruptcy court rejected an argument that § 108(c) by itself suspended a state statute of limitations because such suspension was not compatible with the legislative history of the Bankruptcy Code provision. *Id. at 62.*

Aslanidis argues for an alternative interpretation of § 108(c), citing for support our decision in *In re Morton, 866 F.2d 561 (2d Cir. 1989)*. Morton concerned the validity of a bank judgment lien on [**17] a bankruptcy debtor's residential property. The debtor argued that the lien -- which had a ten-year life under New York State law -- had expired while she was in bankruptcy. The bank raised several points to the contrary, including the argument that *11 U.S.C. § 108*(c) preserved the lien beyond the 10-year period. We accepted the lienholder's position and held "that § 108(c) . . . tolls New York's ten-year period until the automatic stay is terminated." *Id. at 565* (emphasis added).

Aslanidis contends that this and other similar language in Morton compels us to rule that § 108(c) operates to toll the maritime time bars and to reverse the district court's grant of summary judgment. This proposition is more beguiling when initially encountered than it is after a longer acquaintance; that is, while at first glance our holding in Morton would seem on point, careful analysis [*1074] reveals it is not. In the first place, Morton only addresses what happens during the period when a bankruptcy stay is in effect, not the period after the stay has been terminated or otherwise removed, which is the situation in Aslanidis' [**18] case. See *id. at 566.* Second, the plaintiff bank in Morton believed that it should have only 30 days after the stay was lifted to renew its lien; the bank did not contend, as appellant does here, for tolling beyond this 30-day grace period. See *id. at 566* ("bank argues that [the ten-year time bar] was suspended . . . so that, under subsection (2) of § 108(c) the bank will have 30 days after the automatic stay is terminated to enforce its claim") (emphasis added). Accordingly, the holding in Morton is inapposite to the instant dispute, and Aslanidis may take no comfort from it.

Appellant also insists that *McKinney v. Waterman S.S. Corp., 739 F. Supp. 678 (D. Mass. 1990)*, aff'd, *925 F.2d 1 (1st Cir. 1991)*, supports his view that § 108(c) tolls the statutes of limitations. Aslanidis points out that the district court in McKinney inferred that the time clock for beginning a maritime law suit was suspended while a defendant was in bankruptcy, and began running again only when the bankruptcy stay was lifted. See *id. at 682.* [**19] We decline to follow this decision. McKinney's statements about tolling are dicta, for the court there actually held that whether or not the statute of limitations was suspended, the plaintiff's case was time barred because he had "overslept his rights after the stay was lifted." *Id. at 683.*

Appellant next asserts the Jones Act, *46 U.S.C. App. § 688*, and the Uniform Statute of Limitations for Maritime Torts, *46 U.S.C. App. § 763a*, provide independent bases for suspending the normally applicable three-year limitations period while a debtor is in bankruptcy. He asserts these statutes are "special suspension" laws, referenced in *11 U.S.C. § 108*(c)(1). To this end, Aslanidis notes that the Jones Act limitations period -- which is borrowed from the Federal Employers' Liability Act (FELA), *45 U.S.C. § 56* (1988), see *Engel v. Davenport, 271 U.S. 33, 38-39, 70 L. Ed. 813, 46 S. Ct. 410 (1926)* -- has not been found "totally inflexible" but has instead been extended beyond three years where "a plaintiff has not [**20] slept on his rights but, rather, has been prevented from asserting them." *Burnett v. New York Cent. R.R. Co., 380 U.S. 424, 429, 13 L. Ed. 2d 941, 85 S. Ct. 1050 (1965)*. Appellant insists such a time extension is warranted in the instant action because U.S. Lines' bankruptcy stay prevented him from exercising his rights.

Although Aslanidis cites a number of cases brought under FELA and the Jones Act in which the statutes of limitations have been tolled, he points to no cases that suspend the applicable three-year statutory period during pendency of bankruptcy. Statutes of limitations are designed to ensure fairness to defendants and to prevent surprises brought about by the attempt to breathe life into causes that have lain dormant for so long that proof, witnesses and memories all, have disappeared. See *Burnett, 380 U.S. at 428*; *Order of R.R. Tel. v. Railway Express Agency, 321 U.S. 342, 348-49, 88 L. Ed. 788, 64 S. Ct. 582 (1944)*. As appellant notes, these policies must on occasion give way so as to permit vindication of a plaintiff's rights, and tolling may be appropriate where particular external forces beyond a claimant's power to control disable [**21] plaintiff from suing. See, e.g., *Glus v. Brooklyn Eastern Dist. Terminal, 359 U.S. 231, 235, 3 L. Ed. 2d 770, 79 S. Ct. 760 (1959)*; *Osbourne v. United States, 164 F.2d 767, 768-69 (2d Cir. 1947)*. But such a tolling rationale does not apply in the bankruptcy arena because plaintiffs have advance knowledge of when claims are to expire and may act to protect themselves. See *In re Pettibone Corp., 110 Bankr. 848, 855-57 (Bankr. N.D. Ill.)*, aff'd sub nom. *Pettibone Corp. v. Baker, 119 Bankr. 603 (N.D. Ill. 1990)*, rev'd and remanded on other grounds sub nom. *Pettibone Corp. v. Easley, 935 F.2d 120 (7th Cir. 1991)*; see also *Easley v. Pettibone Mich. Corp., 990 F.2d 905, 912 & n.6 (6th Cir. 1993)*.

Such was the case here. Aslanidis was not caught off-guard when the 30-day limitations period began to run; rather, by applying to the bankruptcy court for a

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 6 of 17

Page 6
7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

waiver of the stay, he himself set that clock ticking. It is thus [*1075] not correct for him to declare that he was "prevented" from exercising his rights. The current scenario, though an unfortunate [**22] one for plaintiff, provides no basis for tolling the applicable time limits.

Making one further point, Aslanidis maintains that equitable principles commend the tolling of the two three-year maritime statutes of limitations. He asserts these deadlines should be extended because he was misled by the actions of U.S. Lines and its insurer, and that those misrepresentations prevented him from suing defendants timely. Cf. *Glus, 359 U.S. at 235* (tolling the FELA time bar where defendant misled plaintiff about the time available within which to file suit). Yet, aside from rather vague and general references to appellee's alleged misdeeds, Aslanidis has failed to advance any credible proof of wrongful actions on the part of this appellee or its insurance company. A party asserting equitable estoppel must demonstrate that it is warranted, see *McKinney v. Waterman S.S. Corp., 925 F.2d 1, 6 (1st Cir. 1990)*; see also *Larios v. Victory Carriers, Inc., 316 F.2d 63, 66-67 (2d Cir. 1963)* (Friendly, J.), and to avoid summary judgment on this issue must do more than show that some metaphysical doubt exists [**23] regarding the material facts. See *Matsushita, 475 U.S. at 586*. Since appellant failed to meet this standard, summary judgment to U.S. Lines was properly granted.

III Relation Back and Fed. R. Civ. P. 15(c)

We turn now to Aslanidis' other appeal. On May 23, 1988 Aslanidis timely sued Brandeis New York, Union Carbide, and three "John Does." Two years later, in May, 1990, he amended his complaint by naming Samancor, SACD, and Rennies as defendants in lieu of the "John Does." It is conceded that by the time the amended complaint was filed and the new defendants were served, the three-year limitations period set out in Uniform Statute of Limitations for Maritime Torts had expired. Appellant contends in this second suit that the amended complaint naming the three South African parties was not barred by the statute of limitations because it relates back to the time of the original "John Doe" pleading.

It is familiar law that "John Doe" pleadings cannot be used to circumvent statutes of limitations, see *Talbert v. Kelly, 799 F.2d 62, 66 n.1 (3d Cir. 1986); Wood v. Worachek, 618 F.2d 1225, 1229 (7th Cir. 1980)*, [**24] because replacing a "John Doe" with a named party in effect constitutes a change in the party sued. See *Varlack v. SWC Caribbean, Inc., 550 F.2d 171, 174 (3d Cir. 1977)*; accord *Britt v. Arvanitis, 590 F.2d 57, 60-62 (3d Cir. 1978)*. Such an amendment may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met. See *Alexander v. Beech Aircraft Corp., 952 F.2d 1215, 1226-27 (10th Cir. 1991)*; see also *Juz-*

*win v. Asbestos Corp., Ltd., 900 F.2d 686, 690 n.4 (3d Cir.), cert. denied, 498 U.S. 896, 112 L. Ed. 2d 204, 111 S. Ct. 246 (1990)*.

Rule 15(c), applicable at the time of the filing of the amended complaint, stated:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment changing the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action [**25] against the party to be brought in by amendment that party (1) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

Fed. R. Civ. P. 15(c) (amended Dec. 1, 1991). In *Schiavone v. Fortune, 477 U.S. 21, 91 L. Ed. 2d 18, 106 S. Ct. 2379 (1986)*, the Supreme Court read this rule as establishing four requirements in order for an amended complaint to relate back to the original complaint. Each of the following conditions must be met: (1) the claim must have arisen out of conduct set out in the original pleading; (2) "the party to be brought in must have received [*1076] such notice that it will not be prejudiced in maintaining its defense"; (3) that party should have known that, but for a mistake of identity, the original action would have been brought against it; and (4) the second and third criteria must have been fulfilled within the established limitations period. *Id. at 29*.

Changes in the wording of the rule -- designed to avoid [**26] the outcome under Schiavone -- now provide a slightly revised standard for amendments. Under the revised rule an amended complaint relates back to the time of the original if the new party was aware of the action within 120 days of the filing of the original complaint. See *Worthington v. Wilson, 790 F. Supp. 829, 833 (C.D. Ill. 1992)*. As amended, Fed. R. Civ. P. 15(c) continues to retain the old Schiavone requirements that a new party (1) receive adequate notice of an action so as not to be prejudiced in maintaining a defense, and (2)

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 7 of 17

Page 7
7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

knew or should have known that the action would have been brought against it earlier but for a mistake of identity. See 3 James W. Moore & Richard D. Freer, Moore's Federal Practice P 15.15[4.-2], at 161 (2d ed. 1993).

The district court properly applied the version of Rule 15(c) in effect during the relevant time period. It found Aslanidis had failed to fulfill the second and third factors of the Schiavone test, and appellant has presented no evidence that this determination was clearly erroneous. Under the second factor, Aslanidis has not shown that Samancor, SACD, and Rennies had received notice of [**27] the instant action prior to the service of process on them in June, 1990, well after the expiration of the limitations period. Nor has appellant demonstrated under the third factor that these parties knew that they were intended to be sued and would have been but for a mistake in their identity.

Aslanidis insists these defendants were aware of the phosphorus accident a few days after its occurrence. But accepting as true this hotly contested assertion does not save appellant's claim, for Rule 15(c) and the Supreme Court's test in Schiavone require notice of plaintiff's cause of action, not simply notice of the accident. See 6A Charles A. Wright et al., Federal Practice & Procedure § 1498, at 125 (2d ed. 1990); see also *Honeycutt v. Long, 861 F.2d 1346, 1350-51 (5th Cir. 1988)* (looking to whether party had sufficient notice of federal law suit); *Worachek, 618 F.2d at 1229-30* (same). And, even if the rule is interpreted to call for notice of the accident rather than the suit, Aslanidis has failed to satisfy the further requirement of the second Schiavone factor that the notice be such that the defendants will [**28] not be prejudiced in their ability to maintain a defense on the merits.

The alternative equitable tolling of the limitations period and equitable estoppel arguments appellant additionally included are of insufficient merit to warrant discussion. Thus, summary judgment was properly granted to SACD, Rennies, and Samancor, and there is therefore no need to determine whether the district court also correctly dismissed SACD and Rennies from this litigation due to a lack of personal jurisdiction over them.

IV Responsibility of a Consignee

Aslanidis maintains finally it was error to hold that Brandeis New York, as the consignee of the phosphorus, was not liable to him as a matter of law. According to appellant, Brandeis New York was owner of the phosphorus when it caught fire because title and risk of loss to the goods had passed to it under the terms of the "cost-insurance-freight" (CIF) contract. As owner of the cargo, so appellant's argument runs, Brandeis New York became liable for all the damage and injuries caused by the combustion of the exposed drums.

Accepting as true this disputed contention that Brandeis New York held title to the goods at the time of the fire will not impose [**29] liability on it as the consignee. Aslanidis posits that Brandeis New York as the phosphorus owner should be liable, for example, under a theory of negligence. Yet, plaintiff points to no act or omission on the part of Brandeis New York that was negligent. The consignee had no involvement with the packaging of the 76 steel drums, and it had no contract with the entities that stowed the [*1077] goods. In such case, imposing liability on the purchaser of goods would be both unjustified and illogical. Cf. *Rector v. General Motors Corp., 963 F.2d 144, 147 (6th Cir. 1992)* (finding consignee not liable because it could not "reasonably be expected to know whether the goods were loaded in a safe or reasonable manner prior to shipping").

Aslanidis asserts that liability may be imposed under the rationale employed in *Poliskie Line Oceaniczne v. Hooker Chem. Corp., 499 F. Supp. 94 (S.D.N.Y. 1980)*, which he refers to as a strikingly similar case. There, a container of sulphur dichloride belonging to Hooker Chemical leaked while on board a ship in the North Atlantic, resulting in injury to the ship's crew and damage to the vessel. The district [**30] court held the chemical company liable for the damages caused by its negligent stowage of the chemical in the sea container. See *id. at 102*. Under these facts Poliskie is quite distinguishable. Hooker Chemical, unlike Brandeis New York, was the party actually responsible for the shipping and packaging of the container and was found liable for its own acts and omissions. Poliskie thus cannot stand for the proposition advanced by Aslanidis: that a consignee, by virtue of that status alone, is responsible for injuries and damages caused by a third party's mishandling of goods. In fact, the consignee of the sulphur dioxide -- who stood in the same position as Brandeis New York does here -- was not named as a defendant in Poliskie.

More analogous to the case at hand is *Di Gregorio v. N.V. Stoomvaart Maatschappij "Nederland", 411 F. Supp. 331, 335 (S.D.N.Y. 1975), aff'd, 531 F.2d 1143 (2d Cir. 1976)* (per curiam), in which the district court overturned the jury's finding of negligence on the part of the GTE Company. GTE had purchased four crates of antennas and mountings from Ainslie [**31] Antenna Co., Ltd. of Montreal and was shipping them to a purchaser in Saudi Arabia. While the crates were being loaded on a vessel in Brooklyn, New York, the top of one of the crates collapsed, injuring a longshoreman. The district court thought Ainslie was properly found negligent in its packaging of the antennas but determined that such negligence could not be attributed to GTE because "[a] buyer normally has no duty under the law to supervise the seller in the process of producing or packing the purchased goods." *Id. at 335*. As a consequence, the trial

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 8 of 17

7 F.3d 1067, *; 1993 U.S. App. LEXIS 24857, **;
26 Fed. R. Serv. 3d (Callaghan) 1451; Bankr. L. Rep. (CCH) P75,484

Page 8

court decided -- and we agreed -- that imposing liability on GTE would be an inappropriate "interference with normal and sound commercial practice." *Id. at 335.* This reasoning applies here. Hence, summary judgment was properly granted to Brandeis New York.

Aslanidis has raised additional arguments seeking to hold Brandeis New York liable on theories of strict liability and breach of warranty. As these points were not raised in the trial court they come too late for our consideration since a party opposing summary disposition of a case must raise all arguments against such [**32] remedy in the trial court and may not raise them for the first time on appeal. See *Liberles v. County of Cook,* 709 F.2d 1122, 1126 (7th Cir. 1983); see also *Singleton v. Wulff,* 428 U.S. 106, 120, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976).

CONCLUSION

We have considered all the other arguments raised by the parties and find discussion unnecessary because they are without merit. Accordingly, for the reasons stated the October 20, 1992 judgments of the district court in each case are affirmed.

62 of 80 DOCUMENTS

Andrew Pappas v. George Pappas

[NO NUMBER IN ORIGINAL]

Supreme Court of Connecticut

*164 Conn. 242; 320 A.2d 809; 1973 Conn. LEXIS 921*

November 14, 1972, Argued
January 18, 1973, Decided

**PRIOR HISTORY:** [***1]
Action for the reconveyance of property, for damages and other relief, brought to the Superior Court in New London County and referred to *Hon. Thomas E. Troland,* state referee, who, exercising the powers of the Superior Court, rendered judgment for the plaintiff, from which the defendant appealed.

**DISPOSITION:**

*Error; judgment directed.*

**LexisNexis(R) Headnotes**

**COUNSEL:**

*Jackson T. King, Jr.,* for the appellant (defendant).

*Paul B. Groobert,* with whom, on the brief, were *C. George Kanabis* and *Melvin Scott,* for the appellee (plaintiff).

**JUDGES:**

House, C. J., Shapiro, Loiselle, MacDonald and Bogdanski, Js.

**OPINIONBY:**

BOGDANSKI

**OPINION:**

[*243] [**809] The plaintiff, Andrew Pappas, brought this action seeking a reconveyance of an interest in three parcels of land located in the town of East Lyme, property which, it is claimed, was conveyed to the defendant, George Pappas, by the plaintiff under an agreement wherein the defendant would reconvey the property back to the plaintiff on demand. From a judgment rendered for the plaintiff by a state referee, exercising the powers of the Superior Court, the defendant has appealed to this court.

[**810] The defendant assigned several errors relating [***2] to the court's finding but two of these were expressly withdrawn and since he failed to brief the remainder they are treated as abandoned. *State v. Grayton, 163 Conn. 104, 109, 302 A.2d 246,* cert. denied, *409* [*244] *U.S. 1045, 93 S. Ct. 542, 34 L. Ed. 2d 495; State v. Benson, 153 Conn. 209, 217, 214 A.2d 903.*

The facts in this case may be stated as follows: In December, 1962, the plaintiff, Andrew Pappas, age 67, while on a visit to Greece, married a twenty-three-year-old woman. On their return to Connecticut difficulties arose in the marriage and in October, 1968, the plaintiff became aware that his wife was contemplating a divorce action against him. The plaintiff then consulted with his children, Constantine Pappas, Pauline Millaras and the defendant George Pappas, and formulated a plan to transfer his real estate to them until his marital difficulties were over and then have the property transferred back to him. Prior to the transfer, the defendant agreed to reconvey the property after the plaintiff had settled his problems with his wife. On October 23, 1968, the plaintiff transferred to his three children real estate consisting of a residence and certain [***3] commercial property having a value in excess of $ 100,000. After the transfer, the plaintiff continued to reside in the residence and to receive the income from the commercial property. The plaintiff had been a longtime resident of East Lyme, and had been engaged in business there for many years, acquiring ownership of substantial amounts of real estate and other assets.

On October 30, 1968, the plaintiff's wife instituted a suit for divorce and alimony. In count two of that action she sought to set aside the abovementioned property transfer as a fraudulent conveyance. At a deposition taken in connection with the divorce action, the plaintiff testified that he transferred the real estate to his children

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 10 of 17

Page 2

164 Conn. 242, *; 320 A.2d 809, **;
1973 Conn. LEXIS 921, ***

in satisfaction of certain financial and other obligations to them. The plaintiff had, in addition, paid a conveyance [*245] tax on the transfer of the property indicative of consideration having passed, when in fact no consideration was ever given. The divorce action was concluded in November, 1969, wherein the plaintiff paid a lump sum alimony award to his wife of $ 25,000. Immediately thereafter the plaintiff demanded a reconveyance of the property from his children. [***4] The defendant's brother and sister reconveyed their interest but the defendant refused. Subsequently, the plaintiff brought this action seeking specific performance of the agreement to reconvey the property. The trial court imposed a constructive trust and ordered the defendant to convey the property to the plaintiff.

The issues pressed by the defendant in this appeal are: (1) Did the court err in lending its aid to a plaintiff who had defrauded both his wife and the court; and (2) did the court err in imposing a constructive trust where no such relief was specifically requested?

As already noted, the transfer was made one week before the divorce action was instituted. The court expressly found that "[i]t was the plaintiff's plan to transfer his real estate to his three children until his marital difficulties were over, and then have them transfer it back to him." Nevertheless, as part of his plan for the ultimate retention of this property, the plaintiff misrepresented the transfer as being absolute. The plaintiff persisted in this misrepresentation when, in connection with the divorce action, he testified falsely under oath concerning the consideration given for the transfer. [***5] This testimony, given after the initiation of the divorce action, along with the plaintiff's testimony in this case, constituted a fraud on the court.

It is a fundamental principle of equity jurisprudence [*246] that for a complainant to show that he is entitled to the benefit of equity he must establish that he comes into court with "clean hands." *Murphy v.* [**811] *Dantowitz, 142 Conn. 320, 326, 114 A.2d 194; Gest v. Gest, 117 Conn. 289, 296, 167 A. 909.* The clean hands doctrine is applied not for the protection of the parties but for the protection of the court. *Mas v. Coca-Cola Co., 163 F.2d 505, 507 (4th Cir.); Niner v. Hanson, 217 Md. 298, 309, 142 A.2d 798.* It is applied not by way of punishment but on considerations that make for the advancement of right and justice. *Johnson v. Yellow Cab Co., 321 U.S. 383, 387, 64 S. Ct. 622, 88 L. Ed. 814.* Thus, where the granting of relief would amount to a condonation of perjury, the court should deny relief to protect its own integrity. *Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S. Ct. 146, 78 L. Ed. 293;* cf. *Niner v. Hanson, supra, 309-11.* [***6]

In the *Keystone Driller* case, supra, the United States Supreme Court found that the plaintiff's corruption of a witness in a prior case concerning the validity of a patent was sufficient to deny the plaintiff equitable relief in a subsequent case concerning infringement of rights under the same patent because the decree in the first case was obtained by the plaintiff's fraud. Here, there is likewise a direct relationship between the plaintiff's perjury in the divorce action concerning the transfers and his attempt to regain the property in this action. There is no question that the plaintiff testified as he did to save this property from the claims of his wife, but in so doing he committed perjury in furtherance of his plan to retain ultimate possession of the property. It can thus be seen that the equity which the plaintiff now seeks in this action is directly and inseparably connected with his prior perjury. [*247] Were we to grant him the relief requested, we would be condoning an unpurged act of fraud on the court. *Keystone Driller Co. v. General Excavator Co., supra.* Consequently, the judgment of the trial court imposing a constructive trust on the property [***7] in favor of the plaintiff must be reversed.

We had occasion recently to consider a similar case; *Hieble v. Hieble, 164 Conn. 56, 316 A.2d 777;* wherein a mother sought a reconveyance of real property from her son, claiming that he had agreed to reconvey the property to her, on request, if she recovered from an illness. There, the relief sought was granted to the mother. In that case, however, there was no issue of perjury or fraud on the court or other indication of unclean hands on the part of the plaintiff mother as there is on the part of the plaintiff father in this case.

There is error, the judgment is set aside and the case is remanded with direction to render judgment for the defendant.

In this opinion the other judges concurred.

LEXSEE 592 F2D 103

IN RE: LEASING CONSULTANTS INCORPORATED, Bankrupt .PODELL & PODELL, Claimant-Appellant-Appellee, v. GEORGE FELDMAN, as trustee in Bankruptcy of LEASING CONSULTANTS INCORPORATED, Respondent-Appellee-Appellant.

No. 94, Docket 78-5034

UNITED STATES COURT OF APPEALS, SECOND CIRCUIT

592 F.2d 103; 1979 U.S. App. LEXIS 17291; Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

October 6, 1978, Argued
January 25, 1979, Decided

**PRIOR HISTORY:** [**1]

Appeal by trustee in bankruptcy of Leasing Consultants, Inc. from a judgment of the United States District Court for the Eastern District of New York, Jack B. Weinstein, Judge, reversing the judgment of the Bankruptcy Court, William J. Rudin, Bankruptcy Judge, awarding recovery to the trustee on a counterclaim asserted against claimant law firm Podell & Podell.

**DISPOSITION:** Reversed and remanded with instructions to reinstate the judgment of the bankruptcy court.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Marshall C. Berger, New York City (George A. Hahn, Hahn, Hessen, Margolis & Ryan, New York City, of counsel), for respondent-appellee-appellant.

Daniel M. Shientag, New York City, for claimant-appellant-appellee.

**JUDGES:**

Before MEDINA, MANSFIELD and MESKILL, Circuit Judges.

**OPINIONBY:**

MESKILL

**OPINION:**

[*104]

This appeal is the latest of several judicial proceedings which have played a role in determining the various legal consequences of a misdeed which took place about ten years ago. The parties before the Court are appellant George Feldman, trustee in bankruptcy for Leasing Consultants Incorporated ("Leasing"), and appellee Podell & Podell, a now defunct New York law firm. The major participants in the transactions [**2] giving rise to this litigation were Martin Miller, the former president of Leasing, and Bertram Podell, a former Congressman and a former member of Podell & Podell. Because the interrelationship of the many proceedings preceding this appeal is crucial to our decision today, a rather detailed recital of what has gone before is necessary.

In July, 1973, Bertram Podell was indicted by a grand jury sitting in the Southern District of New York. The indictment charged Podell with conspiracy, solicitation and acceptance of bribes, criminal conflict of interest and perjury. At trial before Judge Robert L. Carter the government introduced evidence that in 1969, while Podell was a member of Congress, his law firm received $ 12,350 in "legal fees" from Leasing and his reelection committee received $ 29,000 as a campaign contribution from Leasing's president, Martin Miller. The government contended that these sums were received in return for Podell's advocating the interests of Florida Atlantic Airlines, a subsidiary of Leasing, before various government agencies. On the tenth day of the trial, in October of 1974, Podell pleaded guilty to one count of conspiracy to defraud the United States and [**3] to violate the conflict of interest statute, *18 U.S.C. § 371,* and to one count of accepting compensation in violation of the conflict of interest statute, *18 U.S.C. § 203.* n1 Subsequently, [*105] this Court affirmed the trial court's denial of a post-conviction motion by Podell to withdraw his guilty

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 12 of 17

592 F.2d 103, *; 1979 U.S. App. LEXIS 17291, **;
Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

Page 2

plea and upheld the judgment of conviction. *United States v. Podell, 519 F.2d 144* (2d Cir.), Cert. denied, *423 U.S. 926, 96 S. Ct. 270, 46 L. Ed. 2d 252 (1975)*. n2

n1. The conflict of interest statute provides, and provided, in pertinent part:

(a) Whoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly receives or agrees to receive, or asks, demands, solicits, or seeks, any compensation for any services rendered or to be rendered either by himself or another

(1) at a time when he is a Member of Congress . . .

in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency, court-martial, officer, or any civil, military, or naval commission . . .

Shall be fined not more than $ 10,000 or imprisoned for not more than two years, or both; and shall be incapable of holding any office of honor, trust, or profit under the United States. *18 U.S.C. § 203*.

[**4]

n2. Miller, indicted and tried with Podell, also pleaded guilty, in the course of the trial, to the portion of the indictment charging conspiracy to defraud the United States and to violate the conflict of interest statute, and then unsuccessfully appealed his conviction to this Court. *United States v. Podell, 519 F.2d 144* (2d Cir.), Cert. denied, *423 U.S. 926, 96 S. Ct. 270, 46 L. Ed. 2d 252 (1975)*.

Meanwhile, across the river, Bankruptcy Judge William J. Rudin of the Eastern District of New York was presiding over Leasing's bankruptcy. Leasing, not having gotten what it paid for, began having financial difficulties and in August, 1970, a petition was filed under Chapter XI. In September of 1970 Podell & Podell filed a proof of claim for $ 16,000, representing the balance purportedly due to Podell & Podell for professional services rendered. In response, George Feldman, Leasing's trustee in bankruptcy ("trustee"), filed a counterclaim to recover the $ 12,350 in "legal fees" paid by Leasing to Podell & Podell in 1969.

In March, 1977, after a trial of the claim and [**5] of the counterclaim, n3 Bankruptcy Judge Rudin made the following findings of fact. In 1968 Leasing had acquired Florida Atlantic Airlines, which flew between Florida and the Bahamas. Shortly after the purchase, Leasing learned that Florida Atlantic did not have the authority to land its planes in the Bahamas, and that unless authority could be obtained, the airline would have to cease all its operations. After being referred to Bertram Podell by Melvin Heiko, Leasing's attorney in the Florida Atlantic purchase, Martin Miller agreed to pay Podell for his services in obtaining landing rights. Leasing paid Podell & Podell $ 12,350 pursuant to this agreement. Heiko then suggested that Podell & Podell be retained at $ 1,000 per month to obtain business for Florida Atlantic. The $ 16,000 claim filed by Podell & Podell in the bankruptcy proceeding was based on this retainer agreement.

n3. An adversary proceeding was conducted pursuant to Bankruptcy Rule 611. See 4B Collier on Bankruptcy P 70.90(1), at 1027 (14th ed. 1978). Before the hearing Podell & Podell made an application under Bankruptcy Rule 305 to withdraw its claim, presumably in hopes of depriving the court of jurisdiction over the counterclaim. The bankruptcy judge denied the application.

[**6]

Bankruptcy Judge Rudin concluded, however, that "(n)o services of any kind, nature or description were ever rendered for and on behalf of the debtor by the firm of Podell & Podell to earn the ($ 16,000) claimed (under the retainer agreement) or any (part) thereof." In addition, he concluded that the $ 12,350 already paid to Podell & Podell by Leasing was "illegally paid and accepted." n4 Judgment was entered striking the $ 16,000 claim of Podell & Podell and awarding the trustee recovery against Podell & Podell on the counterclaim in the amount of $ 12,350, with interest.

n4. Although the trustee had initially proceeded on the theory that no services had been rendered and thus no consideration had been given in exchange for the money paid to Podell & Podell, at the hearing the trustee presented evidence tending to show that the payments made were in exchange for illegal services. The bankruptcy judge granted the trustee's motion to have the pleadings conform to the proof.

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 13 of 17

592 F.2d 103, \*; 1979 U.S. App. LEXIS 17291, \*\*;
Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

Page 3

Podell & Podell appealed Bankruptcy [\*\*7] Judge Rudin's decision. Judge Jack B. Weinstein of the Eastern District, in an oral opinion, rejected the firm's argument that there was no substantial basis in the evidence to support the bankruptcy court's determination that the $ 12,350 at issue had been paid pursuant to the illegal conspiracy admitted by Podell's guilty plea in the criminal case. Nevertheless, Judge Weinstein remanded the case to the bankruptcy judge for reconsideration of the judgment on the counterclaim in light of a decision, by Judge Kevin Thomas Duffy, entered in the Southern District of New York after Bankruptcy [\*106] Judge Rudin's order had been filed in the Eastern District but before Judge Weinstein heard the appeal.

In the Southern District proceedings before Judge Duffy, commenced in January of 1976, the government had sought to recover, in a civil action, the $ 41,350 allegedly paid by Leasing and Miller to Podell and his law firm in violation of *18 U.S.C. § 203.* n5 The government proceeded on the theory that Podell had received this money in violation of the fiduciary duty he owed to the government and that under equitable principles he should therefore be held accountable [\*\*8] by means of a constructive trust. In an opinion and order filed May 31, 1977, Judge Duffy granted the government's motion for summary judgment, noting that "courts have not been reluctant to recognize and remedy the misuse of a confidential relationship with the United States by employees or officials serving inconsistent interests for their own gain." The summary judgment in favor of the government, like the earlier criminal conviction, was appealed to and upheld by this Court. *United States v. Podell, 572 F.2d 31 (2d Cir. 1978).*

---

n5. The government sought to recover the $ 29,000 paid by Miller to Podell as a campaign contribution and the $ 12,350 paid by Leasing to Podell & Podell, purportedly as fees for legal services. Judge Duffy awarded the government only $ 40,000, noting that $ 1,350 of the sum paid by Leasing to Podell & Podell covered a trip to Puerto Rico by Podell's father (also a member of the law firm) and that there was no evidence indicating that as a matter of law this money had been paid as compensation for Podell's illegal activities on behalf of Leasing.

---

[\*\*9]

Shortly after Judge Duffy rendered his decision, Podell moved that Judge Duffy reopen the proceedings, for the first time calling to Judge Duffy's attention the bankruptcy proceedings pending in the Eastern District in which the trustee in bankruptcy for Leasing had recently been awarded a $ 12,350 judgment against Podell & Podell. In an order adhering to his original decision Judge Duffy wrote:

> Of (Bankruptcy Judge Rudin's) award, $ 11,000 appears to be the subject matter of my May 31, 1977 order, as well. Bankruptcy Judge Rudin's award is presently on appeal (to the Eastern District).
>
> The fact of these (bankruptcy) proceedings (was) never made known to me by the parties, particularly defendant and his counsel, who now appears incredulous that "although (a) matte(r) of public record" these proceedings did not "appear to have been considered" by me. . . . What appears incredible to me is that defendant's counsel merely represents that the (Leasing) Trustee was awarded judgment during the pendency of the motion before this Court, while ignoring the fact that Bankruptcy Judge Rudin's opinion on the award was dated March 25, 1977 eleven days prior to defendant's filing [\*\*10] any papers in opposition to the summary judgment motion. It would thus appear that plaintiff and/or his counsel deemed that award to be irrelevant to my consideration of the summary judgment motion at that time. Instead, more than 30 days after the rendering of my opinion and order, during the pendency of the appeal from Bankruptcy Judge Rudin's award to another court, this matter is suddenly deemed crucial to my determination. Yet defendant has not even attempted to explain the basis for his present supposition. His counsel merely points out that "(patently), it would be unfair and inequitable to require the defendant to pay twice." . . . However, Bankruptcy Judge Rudin's award presently lacks finality; defendant might never be the subject of conflicting judgments. In any event, defendant is free to raise his argument on appeal in the Eastern District.

Back in the Eastern District, when the bankruptcy claim and counterclaim were reconsidered on remand, Bankruptcy Judge Rudin, like Judge Duffy, adhered to his original decision. n6 Rejecting the claim that [\*107] it would not be equitable to require Podell to pay the same sum twice, Bankruptcy Judge Rudin wrote:

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 14 of 17

Page 4

592 F.2d 103, *; 1979 U.S. App. LEXIS 17291, **;
Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

n6. When Bankruptcy Judge Rudin's original decision was appealed to the district court, Judge Weinstein raised the matter of the $ 1,350 that Judge Duffy had indicated should not be charged against Podell. In response to Judge Weinstein's suggestion, the parties stipulated that the trustee's counterclaim would be reduced by $ 1,350. When Bankruptcy Judge Rudin reconsidered the matter on remand he reaffirmed his earlier decision, as modified by this stipulation. The trustee was thus awarded judgment in the sum of $ 11,000 rather than $ 12,350 as previously ordered.

[**11]

This Court has no jurisdiction over the proceedings pending in the Southern District of New York. In fact, for reasons best known to defendant, knowledge of its institution and pendency was not brought to this Court's attention. It is noted that the opinion and order made by District Judge Duffy in the Southern District granting summary judgment to the government is dated May 31, 1977, while this Court's decision is dated March 25, 1977. Some 30 days after Judge Duffy rendered his opinion, defendant moved to reargue or reopen the proceedings to seek credit for whatever amount he may be required to pay here and that application was denied by an opinion dated July 28, 1977.

The defendant put himself in the position from which he seeks relief. If he could have had succor from Judge Duffy, he foreclosed himself by not bringing his problem to the Judge's attention at the time of the motion for summary judgment.

Bankruptcy Judge Rudin's decision was again appealed to Judge Weinstein. In a decision rendered from the bench, Judge Weinstein reversed Bankruptcy Judge Rudin's reaffirmation of his decision in favor of the trustee, recommending at the same time that an appeal [**12] be taken to this Court for the "edification of the courts and the Bar." It is the trustee's appeal from Judge Weinstein's decision that we are called on to decide today. We reverse the district court's judgment and remand with instructions to reinstate the judgment of the bankruptcy court.

DISCUSSION

Judge Weinstein reversed the judgment of the bankruptcy court on the ground that it would be inequitable to require Podell to pay the same sum twice. We agree with Judge Weinstein's observation that a bankruptcy court acts essentially as a court of equity. See *Pepper v. Litton*, 308 U.S. 295, 304, 60 S. Ct. 238, 84 L. Ed. 281 (1939); *Matter of Stirling Homex Corp.*, 579 F.2d 206, 212 (2d Cir. 1978), Cert. denied, 439 U.S. 1074, 99 S. Ct. 847, 59 L. Ed. 2d 40 (1979); See also *11 U.S.C. § 11*(a). Were the rights of other parties not at stake we might also agree with the district court's compassionate assessment that Bertram Podell has been punished enough for the crime of which he stands convicted. n7 But the rights of others are involved and we are unable to agree that justice will be served by defeating the trustee's right [**13] of recovery, recognized by both the bankruptcy court and the district court itself, in order to extricate Podell and his law firm from a predicament of their own creation.

n7. Podell has been sentenced to two years' imprisonment, to serve six months. He has been fined $ 5,000. He is precluded by the terms of *18 U.S.C. § 203* from holding any office of honor, trust or profit under the United States. He has been disbarred. He has paid the $ 40,000 judgment obtained by the government in its civil action in the Southern District of New York.

The government's civil action in the Southern District was grounded on the theory that Podell's receipt of money in violation of the conflict of interest statute constituted a breach of the fiduciary duty owed to the government by Podell and that Podell was thus accountable by means of a constructive trust. Such an equitable accounting is designed to prevent unjust enrichment by requiring the disgorgement of any benefits or profits received as a result [**14] of a fiduciary's breach of the duty of loyalty. See *United States v. Podell, supra*, 572 F.2d at 35, Citing *United States v. Carter*, 217 U.S. 286, 305-06, 30 S. Ct. 515, 54 L. Ed. 769 (1910). The bankruptcy court's earlier award in favor of the trustee served this purpose of stripping Podell of his ill-gotten gains, and the existence of that [*108] award would clearly have been relevant to Judge Duffy's determination of the extent to which Podell had "profited" by his wrongful act. Yet although Podell attempted to raise issues of fact regarding the amount of money subject to disgorgement, he chose not to raise Bankruptcy Judge Rudin's award to the trustee as an affirmative defense to the government's summary judgment motion, and he therefore precluded Judge Duffy from harmonizing his decision with the earlier judgment of the bankruptcy court. When Podell moved to reopen, Judge Duffy was understandably unwilling to modify the judgment on the basis of information which, although available to Podell prior to his filing any papers in opposition to the summary judgment motion, was not revealed to the court in a timely manner.

Case 3:02-cv-01379-MRK   Document 210-3   Filed 09/19/2005   Page 15 of 17

Page 5
592 F.2d 103, *; 1979 U.S. App. LEXIS 17291, **;
Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

Podell and his law firm also [**15] had available to them the interpleader provisions of *Fed.R.Civ.P. 22(1)*, n8 incorporated in Bankruptcy Rule 722 n9 and designed specifically to protect a litigant who may be exposed to multiple liability. Cf. *Diamond v. Oreamuno, 24 N.Y.2d 494, 504, 301 N.Y.S.2d 78, 86, 248 N.E.2d 910, 915 (1969)*.

n8. *Fed.R.Civ.P. 22(1)* provides:

Persons having claims against the plaintiff may be joined as defendants and required to interplead when their claims are such that the plaintiff is or may be exposed to double or multiple liability. It is not ground for objection to the joinder that the claims of the several claimants or the titles on which their claims depend do not have a common origin or are not identical but are adverse to and independent of one another, or that the plaintiff avers that he is not liable in whole or in part to any or all of the claimants. A defendant exposed to similar liability may obtain such interpleader by way of cross-claim or counterclaim. The provisions of this rule supplement and do not in any way limit the joinder of parties permitted in Rule 20.

n9. *Rule 22(1) of the Federal Rules of Civil Procedure* applies in adversary proceedings.

Bankruptcy rule 722.

[**16]
The failure of Podell and his firm, both of whom were represented by the same counsel, to notify either court of the pendency of the other action is at the very least remarkable. It is difficult for us to resist the inference that this silence was prompted by the fear that the chances of a favorable outcome in each forum would be diminished if each court were aware of the other's proceedings. Judge Weinstein, however, resisting this very inference, accepted the contrary explanation of counsel who ascribed his own conduct to "naivete and stupidity" and found no attempt to conceal anything from the court. However, our balancing of the equities is not affected by our assessment of the motive for the silence maintained by Podell and his firm. We are unable to conclude that the judgment obtained by the trustee, suing on behalf of creditors not party to any illegal payments, should be forfeited because of either the "naivete and stupidity" or the unsuccessful strategic gamble of his opponent.

The district court, in attempting to deal fairly with Podell, in our view unfairly deprived the trustee of the benefit of a judgment to which he is entitled. The trustee has pursued his counterclaim [**17] diligently and has in no way contributed to the creation of the bind from which his opponents now seek to escape at his expense. To suggest, as has appellee, that the trustee should look to the United States for any relief is to ignore the fact that because of the failure of Podell and his firm to avoid the double payment problem in a timely fashion, the trustee has already been required to present his case to the bankruptcy court, the district court, the bankruptcy court again, the district court again, and now the Court of Appeals. He too, in our view, has been punished enough.

But our inquiry does not end here. If the trustee had not been authorized to recover the illegal payments made by Leasing to Podell & Podell, then the district court would have reached the right result but for the wrong reason and we would be obliged to affirm. *Helvering v. Gowran, 302 U.S. 238, 245, 58 S. Ct. 154, 82 L. Ed. 224 (1937); In re Lovich, 117 F.2d 612, 614 (2d Cir. 1941); In re Schwartz, 89 F.2d 172, 173 (2d Cir. 1937);* 2A Collier on Bankruptcy P 25.30(1), at 1022-23 (14th ed. 1978). However, counsel for Podell & Podell has advanced no [*109] basis [**18] on which we can uphold the judgment of the district court.

We have been cited no New York case addressing the precise issue presented by this appeal, that is, the right of a creditor or a trustee in bankruptcy to recover corporate payments from one who received such payments in violation of the federal conflict of interest statute, nor does our independent research reveal any such cases. Where a state law question has not been clearly decided by the state courts, we must make our best estimate of what the state court would rule to be its law. *Marina Management Corp. v. Brewer, 572 F.2d 43, 46 (2d Cir.), Cert. denied, 439 U.S. 829, 99 S. Ct. 104, 58 L. Ed. 2d 123 (1978),* Citing *Holt v. Seversky Electronatom Corp., 452 F.2d 31, 34 (2d Cir. 1971).* Here, we accept the reasonable and carefully considered analysis by the bankruptcy judge, adopted by the district court, on this unanswered question of New York law. Cf. *Bernhardt v. Polygraphic Co., 350 U.S. 198, 204, 76 S. Ct. 273, 100 L. Ed. 199 (1956)* (diversity jurisdiction); *Lomartira v. American Automobile Insurance Co., 371 F.2d 550, 554 (2d Cir. 1967)* (diversity [**19] jurisdiction).

Both the bankruptcy court and the district court concluded that the trustee was authorized by the Bankruptcy Act to recover the illegal payments made by Leasing to Podell & Podell. Section 70(e) of the Act, *11 U.S.C. § 110(e),* n10 authorizes a trustee in bankruptcy to avoid any transfer made by the bankrupt which is voidable under either state or federal law by any creditor of the debtor having a claim provable under the Act.

n10. Section 70(e) of the Bankruptcy Act provides in part:

Case 3:02-cv-01379-MRK    Document 210-3    Filed 09/19/2005    Page 16 of 17

592 F.2d 103, *; 1979 U.S. App. LEXIS 17291, **;
Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

Page 6

(1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor.

(2) All property of the debtor affected by any such transfer shall be and remain a part of his assets and estate, discharged and released from such transfer and shall pass to, and every such transfer or obligation shall be avoided by, the trustee for the benefit of the estate: Provided, however, That the court may on due notice order such transfer or obligation to be preserved for the benefit of the estate and in such event the trustee shall succeed to and may enforce the rights of such transferee or obligee. The trustee shall reclaim and recover such property or collect its value from and avoid such transfer or obligation against whoever may hold or have received it, except a person as to whom the transfer or obligation specified in paragraph (1) of this subdivision is valid under applicable Federal or State laws.

   11 U.S.C. § 110(e).

[**20]

In this case the applicable state law is Section 720 of New York's Business Corporation Law, n11 which provides in relevant part that a trustee in bankruptcy, acting as the representative of creditors, may bring an action against a director or officer of a corporation to set aside an unlawful transfer of corporate assets. Accordingly, for purposes of § 70(e) the creditors had a right to void the transaction under state law.

   n11. Section 720 provides in part:

   (a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

   (2) To set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness.

   (b) An action may be brought for the relief provided in this section . . . by a . . . trustee in bankruptcy . . . .

   N.Y.Bus.Corp.Law § 720 (McKinney).

The predecessor of Section 720 has been held by New York courts to impose liability not only on officers and directors, as stated on the [**21] face of the statute, but also on "the actual recipient of money wrongfully withdrawn from the corporation." *Singer v. State Laundry, Inc.,* 188 Misc. 583, 586-87, 68 N.Y.S.2d 808, 812 (Sup.Ct.N.Y.County 1947). See also *Oil & Gas Ventures First 1958 Fund, Ltd. v. Kung,* 250 F. Supp. 744, 748-49 (S.D.N.Y.1966); *In re Cohen's Estate,* 137 N.Y.S.2d 300, 309 (Sup.Ct.N.Y.County 1954), Aff'd 285 App.Div. 1119, 141 N.Y.S.2d 819 (1st Dep't), Aff'd 309 N.Y. 935, 132 N.E.2d 311 (1955) ("settled law that the [*110] officers and directors of a corporation stand in a fiduciary relation to it and owe it a duty not to divert its property to other than proper corporate purposes, that if they wrongfully divert it they breach that duty, and The wronged corporation is entitled to follow the diverted property . . . as long as the diverted property may be traced and identified or until it comes into the hands of a bona fide purchaser for value ") (emphasis added). Cf. *Rubenstein v. Berch,* 261 App.Div. 265, 267, 25 N.Y.S.2d 202, 204-05 (2d Dep't 1941) (common law cause of action coexists with statutory remedy). There are [**22] clear indications that the New York courts would consider payment out of corporate funds in furtherance of a conspiracy to violate 18 U.S.C. § 203 to be a diversion of property "to other than proper corporate purposes." The New York courts have recognized that commission by a corporation of illegal acts, even if intended to be advantageous to the corporation, may entail hazards to the corporation, its stockholders and creditors, who may, therefore, seek relief in court. See, e. g., *Abrams v. Textile Realty Corporation,* 97 N.Y.S.2d 492, 495 (Referee 1949); *Roth v. Robertson,* 64 Misc. 343, 344-46, 118 N.Y.S. 351, 352-53 (Sup.Ct.Erie County 1909). See also *Miller v. American Telephone & Telegraph Co.,* 507 F.2d 759, 762 (3d Cir. 1974).

Only one further point requires discussion. Podell & Podell unsuccessfully urged both Bankruptcy Judge Rudin and Judge Weinstein to deny recovery to the trustee on the ground that the trustee's counterclaim was barred by the doctrine of In pari delicto, frequently invoked by courts to justify their refusal to allow recovery under illegal agreements. This argument, however, misperceives both [**23] the scope of the trustee's power and the nature of the In pari delicto doctrine.

The trustee in bankruptcy stands not only in the shoes of the bankrupt he fits as well into the overshoes of the bankrupt's creditors. *Schneider v. O'Neal,* 243 F.2d 914, 918 (8th Cir. 1957). Section 70(e) empowers the trustee to avoid certain transfers irrespective of the existence of a cause of action in the bankrupt, *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135, 137-38 (7th Cir.), Cert. denied, 396 U.S. 838, 90 S. Ct. 98, 24 L. Ed. 2d 88 (1969); *Buchman v. American Foam Rubber Corp.,*

Case 3:02-cv-01379-MRK     Document 210-3     Filed 09/19/2005     Page 17 of 17

Page 7

592 F.2d 103, *; 1979 U.S. App. LEXIS 17291, **;
Bankr. L. Rep. (CCH) P67,040; 5 Bankr. Ct. Dec. 34

*250 F. Supp. 60, 65 (S.D.N.Y.1965).* When acting under this section, a trustee is vested with the rights of creditors and is not limited to the rights of the bankrupt. 4B Collier on Bankruptcy P 70.90, at 1029 (14th ed. 1978). Thus, even if Leasing itself would be barred by the defense of In pari delicto from recovering the payments made to Podell, it does not follow that an action taken by the trustee acting as the representative of Leasing's Creditors must similarly fail. Cf. *J. M. Deutsch, Inc. v. Robert Paper Co., 13 App.Div.2d 768, 215 N.Y.S.2d 939, 941,* [**24] Appeal denied, *14 A.D.2d 531, 218 N.Y.S.2d 938* (1st Dep't 1961).

The rationale of the In pari delicto doctrine supports such a result. The doctrine denies judicial relief, in the form of either enforcement or rescission, to parties to illegal contracts. *McConnell v. Commonwealth Pictures Corp., 7 N.Y.2d 465, 469, 199 N.Y.S.2d 483, 485, 166 N.E.2d 494, 496 (1960); 17 Am.Jur.2d Contracts § 216* (1964). However, this principle is based not on solicitude for the defendant, but on concern for the public welfare, and thus when application of the doctrine would not be in the public interest, the courts will permit recovery. *Seligson v. New York Produce Exchange, 378 F. Supp. 1076, 1085-86 (S.D.N.Y.1974);* 2 Restatement of Contracts § 598, Comments a and b, § 601 and Illustrations, § 604 and Illustrations (1932); *17 Am.Jur.2d, Contracts §§ 222, 227* (1964). As Judge Weinstein observed when this case first came before him, "recovery here will enforce the public policy against this kind of illegal contract and give recovery to those who are blameless." Thus our conclusion that under § 70(e) of the Bankruptcy Act the trustee is entitled to sue on behalf [**25] of the creditors does not undercut the purpose of the doctrine of In pari delicto. The creditors of Leasing are not alleged to have been involved in the illegal payment in any [*111] way. Permitting them to recover does not involve the Court in a dispute between scoundrels but rather extends aid to innocent creditors, in furtherance of the aims of the Bankruptcy Act, and strips a government servant of profit derived from a breach of duty, in furtherance of the aims of the federal conflict of interest statute.

Given our conclusion that the trustee was entitled under § 70(e) to the judgment rendered by the bankruptcy court and our view that the equities of the case do not dictate reversal of that judgment, we reverse the judgment of the district court and remand with instructions to reinstate the judgment of the bankruptcy court.