40 of 83 DOCUMENTS

Town of Monroe v. Underground Construction & Survey, Inc.

CV010384754

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF FAIRFIELD, AT BRIDGEPORT

*2004 Conn. Super. LEXIS 1283*

May 6, 2004, Decided
May 6, 2004, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**LexisNexis(R) Headnotes**

**JUDGES:** Joseph W. Doherty, Judge.

**OPINIONBY:** Joseph W. Doherty

**OPINION:**

MEMORANDUM OF DECISION RE ( # 126) PLAINTIFF'S MOTION TO STRIKE

This is an action by the plaintiff, Town of Monroe, against the defendant Underground Construction & Survey, Inc. (Underground), arising from construction work at Masuk High School. The action was brought in two counts: First Count--breach of contract, Second Count--negligence.

The defendant filed an answer with special defenses to the allegations in the complaint.

The plaintiff has moved to have the sixth special defense to the first count, comparative negligence, stricken for the reason that comparative negligence is not a valid defense to a contract claim. The defendant has filed an objection to the relief sought in the motion to strike.

"The purpose of a motion to strike is to contest . . . the legal sufficiency of the allegations of any complaints . . . to state a claim upon which relief can be granted . . . If facts provable in the complaint would support a cause of action, the motion to strike [*2] must be denied." *Peter-Michael, Inc. v. Sea Shell Associates, 244 Conn. 269, 270-71, 709 A.2d 558 (1999).*

"A motion to strike admits all facts well pleaded; it does not admit legal conclusions or the truth or accuracy of opinions stated in the pleadings." *Faulkner v. United Technologies Corp., 240 Conn. 576, 588, 693 A.2d 293 (1997).*

"The purpose of a special defense is to plead facts that are consistent with the allegations of the complaint but demonstrate, nonetheless, that the plaintiff has no cause of action." *Danbury v. Dana Investment Corp., 249 Conn. 1, 17, 730 A.2d 1128 (1999).* "A party wanting to contest the legal sufficiency of a special defense may do so by filing a motion to strike." *Barasso v. Rear Still Hill Road, LLC, 64 Conn.App. 9, 13, 779 A.2d 198 (2001).*

In its motion, the plaintiff notes that in the sixth special defense to the first count, the defendant alleges that the plaintiff's injuries and losses were caused by its own actions. The plaintiff argues that this special defense is insufficient as a matter of law because defenses of contributory negligence are not permitted in contract claims. [*3] The court agrees with the plaintiff's argument.

As set forth in Connecticut *General Statutes Title 52, Chapter 925,* Statutory Rights of Action and Defenses, the concept of comparative negligence is a creation of the legislature. It does not exist in common law.

The prefatory words in Section *52-572h(b)* are: "*In causes of action based on negligence,* contributory negligence shall not bar recovery in an action . . . if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought . . ." (Emphasis added).

"By its own terms, the comparative negligence statute applies only to 'causes of action based on negligence.'" *Durniak v. August Winter & Sons, Inc., 222 Conn. 775, 782, 610 A.2d 1277 (1992).*

In the several cases cited by the defendant in his brief in opposition, the nature of the cause of action is contract--not negligence and the special defenses (nonperformance, inadequate performance, failure to perform services in a good and workmanlike manner) were properly plead as special defenses to breach of contract allegations--not allegations of negligence.

For the foregoing reasons, the court finds that the [*4] defendant's sixth special defense is legally insufficient and the motion to strike it is hereby granted.

By the Court,

Joseph W. Doherty, Judge

2 of 5 DOCUMENTS

WILLIAMS FORD, INC., ET AL. v. THE HARTFORD COURANT COMPANY

(14937)

SUPREME COURT OF CONNECTICUT

232 Conn. 559; 657 A.2d 212; 1995 Conn. LEXIS 99

January 6, 1995, Argued
April 11, 1995, decision released

**PRIOR HISTORY:** [***1]

Action in twelve counts to recover damages for, inter alia, negligent misrepresentation and unfair trade practices in connection with the defendant's sale of advertising space to the plaintiffs, and for other relief, brought to the Superior Court in the judicial district of Hartford-New Britain at New Britain and tried to the jury before Berger, J.; after the court granted in part the defendant's motion for a directed verdict, verdicts for the plaintiffs on the negligent misrepresentation and unfair trade practices counts; thereafter, the court granted the defendant's motion to set aside the plaintiffs' verdicts as to the unfair trade practices counts and rendered judgment for the plaintiffs on the negligent misrepresentation counts only, and the defendant appealed and the plaintiffs cross appealed.

**DISPOSITION:**

Reversed in part; new trial.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Steven M. Greenspan, with whom was Kent L. Scott-Smith, for the appellant-appellee (defendant).

Peter M. Appleton, with whom was Morton W. Appleton, for the appellees-appellants (plaintiffs).

**JUDGES:** PETERS, C. J., and CALLAHAN, BORDEN, KATZ and PALMER, JS. In this opinion the other justices concurred.

**OPINIONBY:** BORDEN

**OPINION:**

[**214] [*561] [***2]

BORDEN, J. The dispositive issue in this appeal is whether the trial court improperly admitted evidence of unrelated conduct between the defendant and automobile dealerships who were not parties to the litigation. The plaintiffs comprise three groups of automobile dealerships: the Newman group;n1 the Hoffman group;n2 and the Morande group n3 (dealerships). The dealerships sued the defendant, The Hartford Courant Company n4 (Courant), alleging intentional misrepresentation or fraud, negligent misrepresentation, and violation of the Connecticut Unfair Trade Practices Act (CUTPA),n5 General Statutes § 42-110a et seq. At the close of evidence, [*562] and prior to submitting the case to the jury, the trial court directed a verdict in favor of the Courant on the dealerships' claims of intentional misrepresentation, thus ruling out of the case the first, fifth and ninth counts of the amended complaint, and the intentional misrepresentation aspects of the third, seventh and eleventh counts.n6

   n1 The Newman group is comprised of Williams Ford, Inc., Newman Chevrolet Geo, Inc., Newman Lincoln Mercury, Inc., Burnside Jeep Eagle, Inc., and Burnside Motors, Inc.
[***3]

   n2 The Hoffman group is comprised of Hoffman Ford, Inc., Hoffman Oldsmobile, Inc., Hoffman of Hartford, Inc., Hoffman Toyota, Inc., and Hoffman of Simsbury, Inc.

   n3 The Morande group is comprised of Morande Ford, Inc., Morande Brothers, Inc., doing business as Morande Lincoln-Mercury-Mazda, Morande Hyundai, Inc., and M & G Imports, Inc.

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 4 of 16

Page 2

232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

n4 The Hartford Courant is a daily newspaper, engaged in the business of, among other things, selling classified advertisements for commercial enterprises,

n5 The dealerships' amended complaint consisted of twelve counts. Counts one through four pertained to the Newman group. Count one alleged intentional misrepresentation, count two alleged negligent misrepresentation, count three alleged that the intentional or negligent misrepresentations were caused by inadequate training and inadequate supervision, and count four alleged a CUTPA violation. Counts five through eight pertained to the Hoffman group and tracked counts one through four. Counts nine through twelve pertained to the Morande group and tracked counts one through four.

n6 The dealerships do not challenge in this appeal the directed verdict on their intentional misrepresentation claims.

[***4]

Thereafter, the jury returned verdicts in favor of the dealerships on both the negligent misrepresentation claims and the CUTPA claims, and awarded damages accordingly, reducing the dealerships' award by 10 percent, which represented the degree of contributory negligence ascribed to them by the jury.n7 Thereafter, the trial court granted the Courant's motion to set aside the verdicts with respect to the CUTPA claims, and rendered judgment for the dealerships on the jury's verdicts with respect to the negligent misrepresentation claims. The defendant appeals and the plaintiffs cross appeal.n8

n7 The jury awarded $ 124,005.27 to the Newman group, and reduced that award by $ 12,400.53, representing that group's 10 percent contributory negligence, for a total damage award of $ 111,604.74. The jury awarded $ 59,560.13 to the Hoffman group, and reduced that award by $ 5956.01, representing that group's 10 percent contributory negligence, for a total damage award of $ 53,604.12. The jury awarded $ 54,509.44 to the Morande group, and reduced that award by $ 5450.94, representing that group's 10 percent contributory negligence, for a total damage award of $ 49,058.50. The jury also awarded the dealerships $ 111,604.74, $ 53,604.12, $ 49,058.50, respectively, for violations of CUTPA.

[***5]

n8 The defendant appealed and the plaintiffs cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and *General Statutes § 51-199(c)*.

[*563]

In its appeal, the Courant claims that: (1) Connecticut law does not recognize negligent misrepresentation as a cause of action between commercial parties under the facts of this case; (2) the dealerships' contributory negligence acts as an absolute bar to recovery in negligent misrepresentation actions; [**215] (3) the trial court improperly rendered judgment against the Courant with respect to the Morande group's claims because there was insufficient evidence from which the jury reasonably could have concluded that any misrepresentation was made; and (4) the trial court improperly admitted evidence of unrelated conduct between the Courant and nonparty automobile dealerships that was irrelevant to the dealerships' claims and prejudicial to the Courant.

In their cross appeal, the dealerships claim that: (1) the trial court improperly refused [***6] to charge the jury on innocent misrepresentation; (2) neither contributory nor comparative negligence is a proper defense to innocent misrepresentation, which the dealerships claim to have pleaded; and (3) the trial court improperly set aside the jury verdicts in favor of the dealerships on their CUTPA claims.

We agree with the Courant that the trial court improperly admitted evidence of unrelated conduct and that the Courant was prejudiced thereby. Accordingly, we reverse the trial court's judgment in part and remand the case for a new trial,

The jury reasonably could have found the following facts. From the early 1980s through at least 1991, the dealerships purchased advertising space from the Courant on a regular basis. Two of the dealership groups, Newman and Hoffman, typically expended between 80 and 90 percent of their advertising budget with the Courant. In some years, that amount exceeded one million [*564] dollars. The Courant generally refused to negotiate prices, and the dealerships considered the Courant to hold a monopoly position in the market.

The Courant published its classified rates in a Classified Advertising Rate Card (rate card), which it mailed annually [***7] in late November with a cover letter announcing rate adjustments for the following year. The rate card set forth numerous price schedules detailing the

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 5 of 16

Page 3
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

cost of classified advertising for the various types of purchasers. For example, an individual placing an advertisement for a single day would pay a certain rate, whereas a company placing larger advertisements with more frequency would pay a lesser rate. The rate card detailed two methods of classified advertising relevant to this appeal: "bulk rate" and "consecutive contract." These two methods were available for advertisers willing to contract one year in advance for a certain minimum volume or frequency.

A bulk rate contract reduced the per line rate as annual volume increased. The advertiser could meet its volume obligation at any time during the period of the contract. A consecutive contract differed in that the advertiser did not agree to any specific volume of advertising, but agreed to advertise every day.

Until the 1991 rate schedule was introduced, the most cost effective method of advertisement for the dealerships was the bulk rate contract, which the dealerships generally used. The bulk rate contract provided significant [***8] savings over other methods of advertising offered by the Courant. Accordingly, each of the dealerships executed a bulk rate contract for 1990. The price of the 1990 bulk contracts had been established in the Courant's rate card that the dealerships had received in late 1989.

In November, 1990, the Courant mailed the 1991 rate card to the dealerships. The rate card included a cover [*565] letter that said "advertising rates will be adjusted effective January 1, 1991." A change in the 1991 rate card expanded the consecutive contract to make it more cost effective than a bulk contract for the dealerships. Each plaintiff received the 1991 rate card with complete and accurate rate information in advance of their 1991 contract. Two of the dealership groups, Newman and Hoffman, had previously entered into consecutive contracts and were familiar with the requirements of those contracts. The dealerships nonetheless entered into bulk contracts as they had done in previous years.n9

n9 Although the Morande group did not produce a copy of its 1991 advertising contract, there was testimony that the contract had been executed, and the jury's verdict in favor of the Morande group indicates that the jury found that the Morande group had executed a bulk contract for 1991.

[***9]

[**216] The dealerships dealt with the Courant through the Courant's sales representatives, J. Ernest Scharper and Warren Smith. Scharper was the Courant's sales representative for the Newman dealerships and the Hoffman dealerships. Smith was the Courant's sales representative for the Morande dealerships. These sales representatives believed that it was their responsibility to advise their customers of the availability of rates and the most cost-effective methods of advertising.

The dealerships frequently complained about the high cost of advertising in the Courant. Each of the dealerships specifically asked its respective sales representative whether there was any way to lower its advertising costs for 1991. In early 1991, Robert Newman, owner and operator of the Newman dealerships, asked Scharper "if there wasn't some way we could save some money somehow, someway?" Scharper responded that the Courant did not negotiate and that the only way to reduce costs was to buy a bigger contract.

Prior to entering into the 1991 bulk contract with the Courant, Eric Tulin, a representative of the Hoffman [*566] dealerships, specifically asked Scharper "whether a [consecutive] . [***10] . . contract was available to the Hoffmans." Scharper responded that the "[consecutive] contract was not available for auto dealers, and if it was it would not have saved the Hoffmans money."

Smith had a telephone conversation with Robert Morande, of the Morande dealerships, and later met with him in Morande's office to sign a contract for 1991. During the telephone conversation and the meeting, Smith informed Morande that the only way to reduce the cost of advertising with the Courant was to increase the quantity of its advertising under the bulk contract. Although the Courant disputes the date that this conversation took place, Smith testified that it had occurred sometime around December, 1990.

Each of the dealerships entered into a bulk rate contract for 1991, relying on the statements of the Courant's representatives that it was the most cost effective method of advertising in the Courant. Had the Courant's representatives advised the dealerships of the availability of the consecutive contract and had they chosen to take advantage of it, the dealerships would have realized a savings of approximately 22 percent over the bulk contract.

At some time in November, 1991, the Courant [***11] learned about discussions between the dealerships and a corporation considering the formation of a new publication that would compete with the Courant. According to William Richardson, the sales manager for the Courant, "the news of a new competitor was very concerning for us, and we wanted to make sure that we did anything that we could to compete against the competitor."

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 6 of 16

Page 4

232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

In December, 1991, after learning about the potential advertising competition, Richardson told the dealerships, at a meeting of trade organizations attended by [*567] approximately seventy-two automobile dealers, that in 1991 there had been a significant reduction in the consecutive contract rates and that the dealerships could have made use of them. Until this disclosure, none of the dealerships had known that the consecutive contract was available to it for 1991. Also, neither Scharper nor Smith knew, until they were so informed by Richardson late in 1991, that the consecutive contract rate had changed for 1991 such that it would be more attractive to the dealerships than the bulk contract. Richardson also testified that he did not know until late 1991 of the change in the consecutive contract rates.

I [***12]

We address first the Courant's claim that the trial court improperly admitted evidence that none of seventy-two nonparty automobile dealers had entered into consecutive contracts in 1991. The Courant argues that this evidence was not relevant to any issue before the trial court and that its admission allowed the jury to speculate that none of the other automobile dealers had entered into the consecutive contract because of misrepresentations made to them similar to those that the dealerships claimed in this case, thus unfairly prejudicing the Courant. We agree.

[**217] The dealerships offered testimony on three different occasions during the trial that other dealerships had not taken advantage of the consecutive contract in 1991. The trial court admitted this evidence over the objections of the Courant.

In the first instance, a witness for the dealerships testified that Richardson had told him that "he was kind of dumbfounded that none of the dealers, some seventy-two or seventy-three, I forgot the exact number . . . utilized the annual consecutive contract." The Courant objected, claiming that the evidence was irrelevant. The Courant also argued that admission of [*568] [***13] the testimony would require the Courant to litigate the circumstances of the other "seventy-two collateral issues."

The trial court overruled the Courant's objection and admitted the testimony. Shortly thereafter, however, the trial court warned the jury that its "focus is on the plaintiffs in this case, and the defendant in this case. The fact that we just heard about other car dealerships is of no importance to our case, okay. We are not trying--we don't really care about other car dealerships at the moment. We are not going to try the arrangements between a, b, c car companies and the Hartford Courant, that's not before us. What's before us are the plaintiffs in this courtroom."

Later in the dealerships' case, Robert Newman, of the Newman group, testified that Richardson had told him "that he could not understand why real estate dealers use this twenty-three percent discount that we've all been talking about, but not one out of seventy-two or seventy-three dealers ever took advantage of it." The trial court again admitted the testimony over objection, with the cautionary instruction that "we've heard this statement about seventy-two other dealers, but I want to remind you ladies [***14] and gentlemen, this case involves fifteen automobile dealerships, it does not involve seventy-two. We are not here to try the issues in the other cases, we don't know what those cases are about. We just heard a statement, and it's just a statement, but that's not what this case is about."n10

---

n10 When asked, on cross-examination, specifically how Richardson had informed him that the consecutive contract was available to the dealership, Newman responded that Richardson had told him that "he didn't understand why the automobile dealers, some seventy two or seventy-three of them, did not use the consecutive contract. [Richardson] was amazed." The Courant did not move to strike the answer, but instead exhorted Newman to respond only to the question posed.

---

[*569]

Finally, Scharper, testifying for the dealerships, stated that he believed that every single contract that he had sold in 1991 was a bulk rate contract. His testimony was allowed over the Courant's objection on relevancy grounds.

"Evidence is [***15] admissible only if it is relevant. Accordingly, the [trial court legally could have] excluded any evidence that [was] irrelevant. . . . The trial court would have had no basis for ruling otherwise." *Tomlinson v. Board of Education, 226 Conn. 704, 728, 629 A.2d 333 (1993).* "Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue. Evidence is admitted, not because it is shown to be competent, but because it is not shown to be incompetent. No precise and universal test of relevancy is furnished by the law, and the question must be determined in each case according to the teachings of reason

Case 3:02-cv-01379-MRK   Document 210-5   Filed 09/19/2005   Page 7 of 16

Page 5
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

and judicial experience. . . . *State v. Schaffer, 168 Conn. 309, 317, 362 A.2d 893 (1975)*, quoting *Federated Department Stores, Inc. v.* [***16] *Board of Tax Review, 162 Conn. 77, 82, 291 A.2d 715 (1971). State v. Sharpe, 195 Conn. 651, 659, 491 A.2d 345 (1985); State v. Holliman, 214 Conn. 38, 50, 570 A.2d 680 (1990)*. The trial court is given broad discretion in determining the relevancy of evidence and its decision will not be disturbed absent a clear abuse of that discretion. *State v. Holliman, supra, 50; State v. Parker,* [**218] *197 Conn. 595, 601, 500 A.2d 551 (1985).*" (Internal quotation marks omitted.) *State v. Willis, 221 Conn. 518, 522, 605 A.2d 1359 (1992).* [*570]

Furthermore, "the issues are framed by the pleadings and are controlled by substantive law." C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.1.2; see *Miko v. Commission on Human Rights & Opportunities, 220 Conn. 192, 211, 596 A.2d 396 (1991).* The issues in this case were the dealerships' negligent misrepresentation claim and the Courant's special defense of contributory negligence.n11

------

n11 The fact that the disputed evidence may have been relevant to the intentional misrepresentation and CUTPA claims, which were eventually ruled out of the case by the trial court, does not help the dealerships. The evidence was offered and admitted in an unrestricted manner, and thus its validity must be measured against the remaining claim, namely, the negligent misrepresentation claim.

------

[***17]

The dealerships' negligent misrepresentation claims presented the following issues for trial: (1) whether the Courant had negligently made untrue statements to the dealerships regarding the availability of the consecutive contract for the dealerships in the 1991 advertising year; (2) whether the dealerships justifiably relied on the allegedly untrue misrepresentations; and (3) whether the dealerships suffered pecuniary loss caused by their reliance on the allegedly untrue statements. See 3 *Restatement (Second), Torts § 552* (1977). The Courant's special defense of contributory negligence raised only the additional issue of whether the dealerships' reliance on the alleged negligent misrepresentations was reasonable. See W. Prosser & W. Keeton, Torts (5th Ed. 1984) § 108, pp. 750-51.

The dealerships argue that the evidence was relevant because the jury could have inferred from it that (1) similar misrepresentations had been made to other dealerships, and (2) the plaintiff dealerships' reliance on the misrepresentations was reasonable. We conclude, however, that the conduct of nonparty dealerships was not relevant to the issues in this case because the dealerships failed to provide [***18] an adequate evidentiary [*571] foundation to establish the logical connection between the conduct of the other dealerships in relation to the transactions between the plaintiff dealerships and the Courant in this case.

The evidence admitted in this trial is similar to that which a plaintiff in an accident case offers regarding other accidents in order to prove some element of the negligence claim. In such a case, the party offering the evidence of the other accident must lay a proper foundation establishing, to the court's satisfaction, a substantial similarity of conditions between the instant and the prior accident. *Hall v. Burns, 213 Conn. 446, 451-52, 569 A.2d 10 (1990).* Otherwise, the objecting party is faced with the burden of demonstrating dissimilarities, and the result is likely to be a trial within a trial on the collateral issues of similarity and dissimilarity. See id. Unless such a proper foundation is established, the evidence of the other accidents is irrelevant. *Id., 452.* "The question of whether the essential preliminaries have been established is for the court, and the court's decision will not be disturbed unless there is clear and manifest error." [***19] (Internal quotation marks omitted.) Id. Similarly, in this case, the admissibility of the transactions between the Courant and the seventy-two nonparty dealerships depended on a proper foundation having been laid.

This test, as applied to the facts of this case, required the dealerships to demonstrate that: (1) the nonparty dealerships were in substantially the same circumstances as the plaintiff dealerships, namely, that they were negotiating a new contract, and in negotiating that contract, had requested that the Courant provide them with information regarding the availability of the consecutive contract; (2) the Courant had misrepresented that availability; and (3) the nonparty dealerships would have taken advantage of the consecutive contract if [*572] they had known of its availability.n12 The dealerships provided [**219] no evidence to satisfy any part of this foundational requirement to the admissibility of evidence of conduct between the Courant and nonparty dealerships. Furthermore, the improperly admitted evidence cast on the Courant the impermissible burden of litigating the facts of the other seventy-two transactions. Thus, we conclude that the trial court abused [***20] its discretion in admitting evidence of nonparty dealership conduct.

------

n12 The dealerships argue that the evidence that most of the seventy-two nonparty dealerships switched to the consecutive contract shortly after the plaintiff dealerships learned of its availability

Case 3:02-cv-01379-MRK   Document 210-5   Filed 09/19/2005   Page 8 of 16

Page 6
232 Conn. 559, \*; 657 A.2d 212, \*\*;
1995 Conn. LEXIS 99, \*\*\*

demonstrates that they would have taken advantage of the consecutive contract had they known of its availability. Without a proper evidentiary foundation, absent here also, the jury again was left to speculate that the nonparty dealerships were in circumstances substantially the same as the plaintiff dealerships.

Having concluded that the evidence of nonparty conduct was inadmissible under these circumstances, we next determine whether the court's evidentiary rulings constituted harmful error. "The defendant is entitled to relief from the trial court's improper rulings only if one or more of those rulings were harmful. *DiBerardino v. DiBerardino*, 213 Conn. 373, 385, 568 A.2d 431 (1990); *Manning v. Michael*, 188 Conn. 607, 611, [\*\*\*21] 452 A.2d 1157 (1982); *McCahill v. Town & Country Associates, Ltd.*, 185 Conn. 37, 40, 440 A.2d 801 (1981). It is well settled that the burden of establishing harm rests on the appellant. *Swenson v. Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990); *Hensley v. Commissioner of Transportation*, 211 Conn. 173, 184, 558 A.2d 971 (1989); *Brookfield v. Candlewood Shores Estates, Inc.*, 201 Conn. 1, 7, 513 A.2d 1218 (1986). To meet this burden in a civil case, the appellant must show that the ruling 'would likely affect the result.' *Swenson v. Sawoska*, supra [153]." *Borkowski v. Borkowski*, 228 Conn. 729, 747, 638 A.2d 1060 (1994). The Courant argues that the evidentiary ruling was harmful because "rather than focusing simply on whether the statements [\*573] [made by the Courant's sales representatives to the dealerships] were negligent misrepresentations, the jury was allowed to speculate regarding why no other automobile dealer entered into a Consecutive Contract." We agree.

We conclude that the improperly admitted evidence, that none of seventy-two nonparty dealerships in Connecticut entered into a consecutive contract with the [\*\*\*22] Courant in 1991, was likely to have affected the jury's perception of the remaining evidence and to have affected the verdict in this case. As a result of the improperly admitted evidence, the jury was permitted to speculate that: (1) the other dealerships purchased advertising in such a volume as to make the consecutive contract more attractive to them than the bulk rate contract; (2) the Courant had been asked by the other dealerships whether the consecutive contract was available to them and that the Courant's representatives had incorrectly stated that they were not; (3) the other dealerships relied on these misrepresentations in making their advertising decisions; and (4) each of the other dealerships was not already contractually committed to a bulk contract when the misrepresentations were made.n13

n13 We note that the Courant's standard advertising contract provides for termination of the contract by either party and, therefore, even a dealership that was committed to a contract could have terminated that contract to take advantage of a more attractive rate. That same contract, however, provides that in the event of cancellation by the advertiser, the advertiser would have to pay for the space used at the applicable rate for that amount, rather than the contract rate. Thus, for example, if an advertiser contracted for 1000 lines at a specified per line rate, and terminated the contract early, purchasing only 500 lines, that advertiser would be required to pay the 500 line rate rather than the presumably lower 1000 line rate included in the original contract.

Without details on the contractual obligations of the nonparty automobile dealerships, determining whether they would have taken advantage of a consecutive contract in 1991 would be pure speculation.

[\*\*\*23]

Indeed, the dealerships themselves articulate the most compelling reason for our determination that [\*574] allowing this evidence impermissibly harmed the Courant: "The jury could have also inferred from this evidence that similar misrepresentations had been made to other automobile dealers." The unjustified inference that the Courant had engaged in misrepresentation to seventy-two other dealerships more probably than not affected the jury's determination that the Courant engaged in misrepresentation to the three dealership groups involved in this case.

Further, the improperly admitted evidence was likely to have affected adversely the [\*\*220] jury's perception of the Courant's contributory negligence claim. The dealerships' negligent misrepresentation claim was based on a few brief conversations in which the Courant's representatives gave information that contradicted the rate card that each of the dealerships had received prior to signing an advertising contract for 1991. Evidence that none of seventy-two nonparty dealerships entered into a consecutive contract for 1991 was likely to make the failure of these three dealership groups to identify the benefits of the consecutive [\*\*\*24] contract seem more reasonable to the jury and, therefore, was likely to have diminished the degree of fault the jury determined to be attributable to the plaintiff dealerships.

Moreover, the prejudice caused by the improper admission of this evidence on three separate occasions was not cured by the trial court's brief and cryptic limiting instructions. Although the trial court told the jury that

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 9 of 16

232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

Page 7

evidence regarding nonparty dealerships was not before the court, that evidence, in fact, had been admitted on three separate occasions. This was a close case, and the instructions were inadequate to restrict the unjustified inferences that the jury was likely to have made.

Although we order a new trial on the dealerships' claims of negligent misrepresentation, it is necessary [*575] for us to resolve the other issues raised by the parties in this appeal. We therefore turn to those issues.

II

The Courant claims that the trial court improperly refused to set aside the jury verdicts as to the negligent misrepresentation claims because the alleged oral misrepresentations do not support claims of negligent misrepresentation. The Courant argues that such a claim does not exist between "two [***25] sophisticated commercial parties with full access to information concerning a business transaction," and that a "special relationship" between the parties is a necessary predicate to liability for negligent misrepresentation. We disagree.

"This court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth. *Richard v. A. Waldman & Sons, Inc.*, 155 Conn. 343, 346, 232 A.2d 307 (1967); see also *J. Frederick Scholes Agency v. Mitchell*, 191 Conn. 353, 359, 464 A.2d 795 (1983); *Johnson v. Healy*, 176 Conn. 97, 102, 405 A.2d 54 (1978); *Warman v. Delaney*, 148 Conn. 469, 473, 172 A.2d 188 (1961); *Boucher v. Valus*, 6 Conn. Cir. Ct. 661, 665-66, 298 A.2d 238 (1972). The governing principles are set forth in similar terms in $S 552 of the Restatement (Second) of Torts* (1977): 'One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss [***26] caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' See also *Ultramares Corporation v. Touche*, 255 N.Y. 170, 174 N.E. 441 (1931); *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275 (1922); W. [*576] Prosser & W.P. Keeton, [supra,] § 107, p. 745." (Internal quotation marks omitted.) *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, 202 Conn. 206, 217-18, 520 A.2d 217 (1987).

The arguments supporting the Courant's claim that the tort of negligent misrepresentation does not apply to the facts of this case essentially fall into three categories. First, the Courant, quoting *Palco Linings, Inc. v. Pavex, Inc.*, 755 F. Supp. 1269, 1274 (M.D. Pa. 1990), argues that the tort of negligent misrepresentation applies only to those "'in the business of selling information on which its customers rely upon in taking additional action.'" To limit the tort of negligent misrepresentation to those in the business of selling information, however, is contrary to our precedent. We have already decided that the tort of negligent misrepresentation [***27] is not limited to those in the business of selling information. In *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School*, supra, 202 Conn. 217-18, we concluded that a private school could be liable for negligent misrepresentation by [**221] stating to a teacher that she would be rehired the following year, when it should have known that that would not be the case. The language of $S 552 of the Restatement (Second) of Torts*, which we adopted in *D'Ulisse-Cupo*, plainly does not limit the tort of negligent misrepresentation to those in the "business of selling information." To the contrary, § 552 applies to anyone who supplies information "in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest." Providing information in the course of one's business is plainly more expansive than selling information as the purpose of one's business.n14

n14 Any doubt in this regard is resolved by examining illustration 4 of the comments on subsection (2) of $S 552 of the Restatement (Second) of Torts*, regarding the intended scope of the tort of negligent misrepresentation. In that illustration, A, having real estate lots for sale, negligently supplies misinformation about those lots to a multiple listing agent for the purpose of having the information incorporated into a multiple listing available to numerous potential customers. B, in reliance upon the misinformation, purchases one of A's lots and in consequence suffers pecuniary loss. A is subject to liability to B.

In this context, it is clear that A is not in the business of selling information. Rather, A is in the business of selling lots. A's liability arises out of its dissemination of misinformation in the course of selling the lots, not in the course of selling information about the lots.

[***28] [*577]

The Courant's second argument is that liability for negligent misrepresentation does not exist "between two sophisticated commercial parties with full access to information concerning a business transaction." Thus, the Courant argues, it had no duty to refrain from negligently misrepresenting the availability of the consecutive contract to the dealerships. In support of this argument, the Courant cites to *Ultramares Corp. v. Touche*, supra, 255

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 10 of 16

Page 8
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

*N.Y. 174,* in which the New York Court of Appeals disallowed a cause of action for negligent misrepresentation against a public accounting firm for inaccurately prepared financial statements. The Courant contends that this case stands for the proposition that a relationship more significant than that suggested by the present factual situation is required to establish liability for negligent misrepresentation.

We read that case differently. In *Ultramares Corp. v. Touche, supra,* 255 N.Y. 181, the court analyzed the class of persons to whom a duty was owed under principles of contract law. The court stated that "even in that field, however, the remedy is narrower where the beneficiaries of the promise are indeterminate [***29] or general. Something more must then appear than an intention that the promise shall redound to the benefit of the public or to that of a class of indefinite extension. The promise must be such as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost." (Internal quotation marks omitted.) Id. The special relationship [*578] with which the court was concerned was that which purportedly existed between the defendant and an indeterminate class of plaintiffs. The court concluded that liability for negligent misrepresentation could not attach in the facts of that case because "no one would be likely to urge that there was a contractual relation, or even one approaching it, at the root of any duty that was owing from the defendants now before us to the indeterminate class of persons who, presently or in the future, might deal with the [defendant] in reliance on the audit." *Id., 183.*n15

n15 We recognize that some jurisdictions do not recognize the tort of negligent misrepresentation where the situation involves business adversaries in the commercial sense. See, e.g., *Onita Pacific Corp. v. Trustees of Bronson,* 315 Ore. 149, 165, 843 P.2d 890 (1992) ("in an arm's-length negotiation, a negligent misrepresentation is not actionable"). We find these cases unpersuasive and contrary to the language and intent of $S 552 of the Restatement (Second) of Torts. Instead, we adopt the reasoning of Professors Prosser and Keeton that "there would seem to be very little justification for not extending liability to all parties and agents to a bargaining transaction for making misrepresentations negligently." W. Prosser & W. Keeton, supra, § 107, p. 745.

[***30]

In this case, we need not decide whether the tort of negligent misrepresentation extends to an indeterminate class of people. The jury found that the Courant, in the course of its direct dealings with the dealerships, supplied false information for the guidance [**222] of these specific dealerships in their business transactions and failed to exercise reasonable care or competence in obtaining or communicating the information. See *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra,* 202 Conn. 218; see also 3 *Restatement (Second), Torts §* 552 (1977). Neither the language of the Restatement nor our decision in *D'Ulisse-Cupo* suggests that liability for negligent misrepresentation should be precluded as a matter of law in this case. To the contrary, we believe that the language of the Restatement contemplates precisely the facts of this case. [*579]

The Courant argues further that where the controversy concerns purely economic losses allegedly caused by statements made during the course of a contractual relationship between businesses, it is contract law rather than tort law, that should apply. A similar argument was rejected in *D'Ulisse-Cupo.* [***31] There, the defendants argued that "if they [could not] be held liable in contract for their representations based on promissory estoppel, they likewise [could not] be held liable in tort for negligent misrepresentation." *D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra,* 202 Conn. 218. We stated that "if the plaintiff's complaint otherwise contains the necessary elements of negligent misrepresentation, it survives a motion to strike even though the . . . counts grounded in promissory estoppel must fall." *Id., 218-19.* It follows, therefore, that a remedy on the contract is independent of a remedy for negligent misrepresentation. The dealerships were not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim.

Finally, the Courant argues that "the misstatement itself must be the culmination of the service performed, not a mere casual response for information." (Internal quotation marks omitted.) Also, they argue that a "'special relationship with the defendant. . . generally implies a closer degree of trust than the ordinary buyer-seller relationship.' . . . Such a duty to speak cannot arise simply because [***32] two parties may have been on opposite sides of the bargaining table when a deal was struck between them."

We believe that both of these arguments go to the issue of whether the reliance on the misstatements was justified rather than to the existence of a duty. Although we conclude that no special relationship is required to state a claim of negligent misrepresentation, the plaintiff must allege and prove that the reliance [*580] on the misstatement was justified or reasonable. We have consistently held that reasonableness is a question of fact for the trier to determine based on all of the circumstances. See *State v. Duhan,* 194 Conn. 347, 359, 481 A.2d 48

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 11 of 16

Page 9
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

(1984); *Peterson v. Oxford, 189 Conn. 740, 745-47, 459 A.2d 100 (1983); Rene Dry Wall Co. v. Strawberry Hill Associates, 182 Conn. 568, 573, 438 A.2d 774 (1980);* see also *In re Davon M., 16 Conn. App. 693, 696, 548 A.2d 1350 (1988).* In making this determination, the fact finder certainly could take into account the casualness of the allegedly false statements and the context in which they were made. Although the reliance upon casual misstatements might not be reasonable in a given case, we are [***33] not persuaded that the absence of a special relationship between the parties is a justification for precluding a cause of action based on negligent misrepresentation in all cases involving casual misstatements.

III

The Courant next claims that the jury's finding of contributory negligence operates as a complete bar to recovery for negligent misrepresentation. The Courant correctly asserts that under *§S 552A of the Restatement (Second) of Torts,* "the recipient of a negligent misrepresentation is barred from recovery for pecuniary loss suffered in reliance upon it if he is negligent in so relying." The Courant concedes that *General Statutes § 52-572h (b)* n16 has eliminated this rule in [**223] favor of [*581] comparative negligence for "damages resulting from personal injury, wrongful death or damage to property," but argues that this statute does not apply to purely commercial losses.

  n16 *General Statutes § 52-572h (b)* provides: "In causes of action based on negligence, contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages resulting from personal injury, wrongful death or damage to property if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought including settled or released persons under subsection (n) of this section. The economic or noneconomic damages allowed shall be diminished in the proportion of the percentage of negligence attributable to the person recovering which percentage shall be determined pursuant to subsection (1) of this section."

[***34]

We agree with the Courant that the reference in § 52-572h (b) to "property damage" does not include purely commercial losses, unaccompanied by damages to or loss of the use of some tangible property. We disagree, however, with the Courant's argument that any amount of negligence on the part of the plaintiff should act as a complete bar to recovery in a negligent misrepresentation action where alleged damages are solely such commercial losses. We conclude rather that the policy underlying § 52-572h (b) ought to apply to negligent misrepresentation as a matter of common law.

"We approach this question [i.e., whether the phrase 'damage to property' within § 52-572h (b) includes within its meaning purely commercial losses] according to well established principles of statutory construction designed to further our fundamental objective of ascertaining and giving effect to the apparent intent of the legislature. . . . *Lauer v. Zoning Commission, 220 Conn. 455, 459-60, 600 A.2d 310 (1991).* In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed [***35] to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter. . . ." (Internal quotation marks omitted.) *Fahy v. Fahy, 227 Conn. 505, 512, 630 A.2d 1328 (1993).* We also note the rule of statutory construction that statutes in derogation of common law "should receive a strict construction and [should not] be extended, modified, repealed or enlarged in its scope by the mechanics of construction." *Edmundson v. Rivera, 169 Conn. 630, 633, 363 A.2d 1031 (1975).* [*582]

Section 52-572h (b) limits its application to "damages resulting from . . . damage to property." Absent from the statutory language, however, is any reference to purely commercial damages. We recognize that the phrase "damage to property" is susceptible to a broad interpretation and could be extended beyond its usual and ordinary connotation of physical damage to tangible property, so as to include purely commercial damage. For example, in *Verdon v. Transamerica Ins. Co., 187 Conn. 363, 372-73, 446 A.2d 3 (1982),* in the context of General Statutes (Rev. to 1981) § 38-175,n17 we concluded that the phrase "damage to the [***36] property of any person" included purely commercial loss.n18 Our [*583] reasoning in that case was [**224] based, in part, on our determination that the legislative history of another statute, General Statutes (Rev. to 1981) § 52-572m,n19 "contained a clear indication that the phrase 'damage to property' in [its] definition was intended to encompass economic harm"; *id., 372;* and that the policy reasons for including economic harm within the definition under the product liability statute applied equally to the direct action statute. Subsequent to our decision in *Verdon,* however, the legislature amended § 52-572m (d) in 1984, specifically to exclude purely commercial loss from the definition of "harm." Public Acts 1984, No. 84-509, § 1. We infer, therefore, that the legislature was mindful of a distinction between property damage and commercial losses when it amended the comparative negligence statute in 1987. Public Acts 1987, No. 87-227, § 3.

Case 3:02-cv-01379-MRK     Document 210-5     Filed 09/19/2005     Page 12 of 16

Page 10
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

n17 General Statutes (Rev. to 1981) § 38-175 provided: "LIABILITY OF INSURER UNDER LIABILITY POLICY. Each insurance company which issues a policy to any person, firm or corporation, insuring against loss or damage on account of the bodily injury or death by accident of any person, or damage to the property of any person, for which loss or damage such person, firm or corporation is legally responsible, shall, whenever a loss occurs under such policy, become absolutely liable, and the payment of such loss shall not depend upon the satisfaction by the assured of a final judgment against him for loss, damage or death occasioned by such casualty. No such contract of insurance shall be canceled or annulled by any agreement between the insurance company and the assured after the assured has become responsible for such loss or damage, and any such cancellation or annulment shall be void. Upon the recovery of a final judgment against any person, firm or corporation by any person, including administrators or executors, for loss or damage on account of bodily injury or death or damage to property, if the defendant in such action was insured against such loss or damage at the time when the right of action arose and if such judgment is not satisfied within thirty days after the date when it was rendered, such judgment creditor shall be subrogated to all the rights of the defendant and shall have a right of action against the insurer to the same extent that the defendant in such action could have enforced his claim against such insurer had such defendant paid such judgment."

[***37]

n18 *Verdon v. Transamerica Ins. Co.*, supra, 187 Conn. 363, involved a dispute between the plaintiff, who had recovered an unsatisfied judgment for the diminution of an estate in a negligence action brought against the attorney for that estate, and the negligent attorney's insurance carrier. *Id.*, 364. The plaintiff had sued the insurance carrier directly under § 38-175. The insurance carrier moved to strike the complaint on the ground that the plaintiff's financial loss was not "damage to property" as contemplated by the direct action statute. *Id.*, 365.

n19 At the time of our decision in *Verdon v. Transamerica Ins. Co.*, supra, 187 Conn. 363, General Statutes (Rev. to 1981) § 52-572m (d) provided that the harm for which relief was afforded was defined to include "damage to property, including the product itself and personal injuries including wrongful death." See *id.*, 372.

Reading § 52-572h (b) in light of its history, we conclude that the legislature intended the phrase "damage to property" to encompass only its usual and traditional meaning in the law of negligence [***38] actions, namely, damage to or the loss of use of tangible property, as opposed to damages for personal injury. When the legislature first enacted § 52-572h, abrogating the absolute bar of contributory negligence in favor of the doctrine of comparative negligence, that statutory abrogation applied only to "injury to persons or damage to property" arising out of "the ownership, maintenance or use of a private passenger motor vehicle . . . ." Public Acts 1972, No. 273, § 6. In 1973, the legislature broadened the comparative negligence doctrine to include negligence claims outside of the automobile [*584] no-fault system. The doctrine remained limited, however, to claims alleging injury to persons and damage to property. Public Acts 1973, No. 73-622, § 1. In 1987, the type of damages subject to comparative rather than contributory negligence was expanded to include wrongful death. *General Statutes § 52-572h (b)*; Public Acts 1987, No. 87-227, § 3. Furthermore, the legislative history of § 52-572h is silent regarding the legislative intent behind the use of the phrase "damage to property." We can find no justification in that history, therefore, for reading that phrase in other [***39] than its traditional sense of physical damage to tangible property. As a matter of statutory interpretation, therefore, we simply cannot stretch the meaning of "damage to property," as used in § 52-572h (b), to include commercial losses unaccompanied by physical damage to or loss of use of tangible property. In light of this legislative language and history, therefore, we conclude that the term "damage to property," as used in § 52-572h, does not include purely commercial losses.

That conclusion, however, does not end our inquiry. The Courant argues that the legislature, by its use of the term "damage to property" and by the absence of any concomitant reference to commercial losses, intended to create a different set of rules for negligence actions involving property losses and commercial losses. We are not convinced.

"It is true that, in interpreting statutes we have on occasion read specific statutory references to indicate a legislative intent to exclude, by implication, other related potential referents. See, e.g., *Roto-Rooter Services Co. v. Department of Labor*, 219 Conn. 520, 525, 593 A.2d 1386 (1991). Furthermore, if in this case either the explicit language or [***40] the legislative history of [§

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 13 of 16

Page 11

232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

52-572h], had indicated such a legislative intent, we would be required to respect that implication, and we would be precluded from reaching a result by way of [*585] common law adjudication that was contrary to that intent. Neither the statutory language nor that legislative history, however, indicates such an intent." *Fahy v. Fahy, supra,* 227 Conn. 512-13.

[**225] "Plainly, every statute has some boundaries, and the question then arises whether, and when, it is appropriate to apply the statute, as a matter of common law beyond its desiguated boundaries." E. Peters, "Common Law Judging in a Statutory World: An Address," *43 U. Pitt. L. Rev. 995, 1005 (1982).* In other contexts "we have previously used statutes as a useful source of policy for common law adjudication, particularly if there was a close relationship between the statutory and common law subject matters," *Fahy v. Fahy, supra, 227 Conn. 514;* accord *New England Savings Bank v. Lopez, 227 Conn. 270, 281, 630 A.2d 1010 (1993); Hamm v. Taylor, 180 Conn. 491, 495, 429 A.2d 946 (1980); Canton Motorcar Works, Inc. v. DiMartino 6 Conn. App. 447,* [***41] *453, 505 A.2d 1255,* cert. denied, *200 Conn. 802, 509 A.2d 516 (1986).* We consider this adjudicative technique to be appropriate in this case.

"The purpose of comparative negligence is to ameliorate the harshness of the complete bar to liability resulting from the common law defense of contributory negligence. W. Prosser, Torts (4th Ed. 1971) P 67. This change in policy was accomplished by mandating a comparison by the fact finder of the relative degrees of negligence of the plaintiff and the defendant. [Section] 52-572h (b) provides that 'contributory negligence shall not bar recovery in an action by any person . . . to recover damages resulting from personal injury [or damage to property] . . . if the negligence was not greater than the combined negligence of the person or persons against whom recovery is sought . . . .' The purpose of the comparative negligence statute was to replace the former rule, under which contributory negligence acted as a complete defense, with a rule under [*586] which contributory negligence would operate merely to diminish recovery of damages based upon the degree of the plaintiff's own negligence. *Gomeau v. Forrest, 176 Conn. 523,* [***42] *525, 409 A.2d 1006 (1979);* see W. Prosser, [supra,] § 67." *Giles v. New Haven, 228 Conn. 441, 454-55, 636 A.2d 1335 (1994).*

Where possible, courts should, as a matter of common law adjudication, "assure that the body of the law--both common and statutory--remains coherent and consistent." *Fahy v. Fahy, supra, 227 Conn. 513-14.* It would be consistent with that goal for the doctrine of comparative negligence, which by statute applies to actions based on negligence resulting in damage to person or property, also to apply to the tort of negligent misrepresentation resulting in commercial loss. Furthermore, it would undermine the legislative purpose of § 52-572h (b) if we were to require a plaintiff to be free from contributory negligence as a prerequisite to recovery under a theory of negligent misrepresentation merely because the damages sought were commercial losses rather than property damage. The doctrine of contributory negligence should not, therefore, consistent with our entire body of law, both statutory and common, act as an absolute bar to recovery for plaintiffs seeking recovery for negligent misrepresentation.

We conclude, therefore, as a matter of common [***43] law, that the policy of the comparative negligence statute, § 52-572h, applies to negligence actions where only commercial losses are sustained. Thus, the trial court properly refused to set aside the jury's verdict on negligent misrepresentation on the ground that the dealerships had been contributorily negligent.

IV

The Courant's final claim is that there was insufficient evidence adduced at trial to sustain the verdict [*587] in favor of the Morande group and that the trial court, therefore, improperly refused to set aside the verdict. We disagree.

"Our role in addressing this claim is extremely limited. The trial court's refusal to set aside the verdict is entitled to great weight in our assessment of the claim that its decision is erroneous. *Kalleher v. Orr, 183 Conn. 125, 126, 438 A.2d 843 (1981); Waldron v. Raccio, 166 Conn. 608, 618, 353 A.2d 770 (1974).* The evidence and record must be given the most favorable construction in support of the verdict which is reasonable. *Kalleher v. Orr, supra, 127; Murteza v. State, 7 Conn. App. 196, 203, 508 A.2d 449 (1986)." Norrie v. Heil Co., 203 Conn. 594, 606, 525 A.2d 1332 (1987).* [***44]

[**226] The theory of the Morande group's negligent misrepresentation claim was that Warren Smith, the sales representative for the Courant, made statements to the Morande group that the consecutive contract was not available to the Morande group, that such a statement was false, and that the Morande group, in justifiable reliance on that misstatement, suffered pecuniary loss. The Courant argues that this theory was unsupported because the evidence necessarily leads to the conclusion that Smith's conversations with Robert Morande took place sometime in early 1990, rather than in January, 1991, and therefore Smith's representation about the consecutive contract was true at the time it was made.

The relevant evidence was that the Morande group signed an automatically renewable one year advertising contract in April, 1990. The Morande group was unable to produce any other advertising contract that would

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 14 of 16

Page 12

232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

have been in effect in 1991, although it claimed that one existed. Further, Morande testified that he was certain that he had signed an advertising contract on the same date on which he had met with Smith and [*588] Smith had made the allegedly false statements. The Courant [***45] argues that the evidence, therefore, leads to the conclusion that the conversation between Smith and the Morande group occurred in April, 1990, when Smith's representation that the consecutive contract was not available, or at least not commercially beneficial for the Morande group, was true, and therefore no misrepresentation was made. We disagree with the Courant's characterization of the evidence.

In addition to the above testimony, Smith testified that he had had a conversation with Morande in which he had stated that the bulk rate contract, rather than the consecutive contract, applied, and that this conversation had taken place approximately one year before he had learned about the availability of the consecutive contract in December, 1991. Thus, there was testimony from the Courant's representative from which the jury reasonably could have found that a misrepresentation of fact had been made to the Morande group in or around December, 1990.

V

The dealerships, in their cross appeal, first claim that the trial court improperly refused to charge the jury on the theory of innocent misrepresentation. The dealerships requested a charge on innocent misrepresentation, and the trial [***46] court denied the request, stating that innocent misrepresentation falls within the family of negligent misrepresentation. The Courant counters that innocent misrepresentation was never pleaded, and therefore the dealerships were not entitled to have that issue go to the jury. We agree with the Courant. n20 [*589]

Notwithstanding the dealerships' arguments to the contrary, the claim of innocent misrepresentation was not raised in the pleadings. "The trial court need charge only on those points of law that arise pursuant to the claims of proof advanced by the parties in their pleadings. *Nesbitt v. Mulligan*, 11 Conn. App. 348, 351, 527 A.2d 1195, cert. denied, 205 Conn. 805, 531 A.2d 936 (1987); see *Tierney v. American Urban Corporation* 170 Conn. 243, 250, 365 A.2d 1153 (1976)." *Drummond v. Hussey*, 24 Conn. App. 247, 248-49, 588 A.2d 223 (1991).

   n20 The dealerships also argue that neither contributory nor comparative negligence constitutes a valid defense to a claim of innocent misrepresentation. Because we conclude that the trial court properly refused to allow the claim of innocent misrepresentation to go to the jury, we need not address this issue.

[***47]

The dealerships' amended complaint alleged only intentional misrepresentation, negligent misrepresentation, and violation of CUTPA. A fair, even generous, reading of the amended complaint does not disclose a claim for innocent misrepresentation.n21 "'It [**227] is the duty of the court to submit to the jury only those issues [that] are relevant . . . to the pleadings . . . .'" *State v. James*, 211 Conn. 555, 583, 560 A.2d 426 (1989). The trial court properly refused to submit the issue of innocent misrepresentation to the jury.

   n21 Although the trial court agreed with the dealerships that innocent misrepresentation was included in their pleadings, it declined to submit the issue to the jury on the basis that it considered that innocent misrepresentation "falls within the family of negligent misrepresentation, it is one of the same, it is a type of negligent misrepresentation. I'm not charging it at all." We affirm the decision of the trial court not to charge on the issue of innocent misrepresentation, because of our conclusion that the dealerships failed to plead this issue. We therefore need not consider this basis of the trial court's ruling.

[***48]

VI

The dealerships' second claim is that the trial court improperly concluded that, because there was no evidence of fraud, the dealerships could not prevail on a CUTPA claim and, therefore, the trial court improperly set aside the jury's verdict on the CUTPA counts. n22 [*590] The Courant argues, to the contrary, that negligence alone does not sustain a claim under CUTPA, either as a general matter or on the facts of this case. We agree with the Courant that, under the facts of this case, no CUTPA violation has been proved, and affirm the ruling of the trial court on that basis.

   n22 The dealerships argue also that their claim of innocent misrepresentation states a claim under CUTPA. Our determination that the dealerships failed to allege innocent misrepresentation and were thus not entitled to have that issue go to the jury is dispositive of this claim.

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 15 of 16

Page 13
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

The facts relevant to this issue are as follows. The dealerships, in their amended complaint, alleged that the Courant's "misrepresentations of material [***49] fact . . . constitute unfair trade practices prohibited by, § 42-110a, et seq. of the Connecticut General Statutes. Thereafter, the Courant moved to strike these claims from the jury docket, claiming that CUTPA violations are essentially equitable and therefore not triable to a jury. The trial court disagreed, denying the motion to strike the issues from the jury docket.n23

> n23 In our recent decision in *Associated Investment Co. Ltd. Partnership v. Williams Associates IV, 230 Conn. 148, 162, 645 A.2d 505 (1994)*, not available to the trial court at the time of trial in this case, we concluded that "our state constitution does not give rise to a right of a jury trial for claims brought under CUTPA. The trial court, therefore, properly granted the plaintiff's motion to strike the defendant's counterclaim from the jury docket." Because the trial court ultimately set aside the verdict on the CUTPA counts, and because we affirm that ruling, the submission of the CUTPA counts to the jury is not before us in this appeal.

[***50]

At the conclusion of the evidence, the Courant moved for a directed verdict as to all counts, including the CUTPA violation. The trial court denied this motion with respect to the CUTPA counts. Thereafter, the jury returned verdicts in favor of the dealerships on the negligent misrepresentation and CUTPA counts. The Courant then moved to set aside the verdicts. The trial court granted the motion with respect to the CUTPA claims and denied the motion as to the negligent misrepresentation claims.n24

> n24 In granting the motion to set aside the verdicts with respect to the CUTPA claims, the trial court stated that "I am setting aside the CUTPA verdict. I think all there was was negligent misrepresentation. . . . Fraud was not an issue in this case, there was nothing that was left. . . There [are] no grounds, other than negligence."

[*591]

The Courant argues that our decision in *A-G Foods, Inc. v. Pepperidge Farm, Inc., 216 Conn. 200, 215-16, 579 A.2d 69 (1990)*, supports the trial court's ruling. [***51] We agree, because we read that decision as holding that there is no CUTPA violation when the sole basis of the claim is the defendant's negligence and the jury determines that the plaintiff was contributorily negligent.n25

> n25 We therefore need not decide whether negligence of the defendant alone, unaccompanied by contributory negligence of the plaintiff, will establish a CUTPA violation.

Section 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." In determining whether certain acts constitute a violation of this act, "we have adopted the criteria set out in the cigarette rule by the federal trade commission . . . (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established [***52] concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial [**228] injury to consumers [(competitors or other businessmen)]. *Conaway v. Prestia, [191 Conn. 484, 492-93, 464 A.2d 847 (1983)]*, quoting *FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244-45 n.5, 92 S. Ct. 898, 31 L. Ed. 2d 170 (1972)*. *McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984);* see Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, *29 Fed. Reg. 8324, 8355 (1964)*. *Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234, 239,* [*592] *520 A.2d 1008 (1987); Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 254, 550 A.2d 1061 (1988)*.

"Moreover, in 1980 the commission reviewed those factors and concluded that unjustified consumer injury is the primary focus of the FTC Act, and the most important of the three . . . criteria. D. Rice, Consumer Unfairness at the FTC: Misadventures in Law and Economics, *52 Geo. Wash. L. Rev. 1, 4 (1983)*, quoting [***53] letter from FTC commissioners, December 17, 1980. The Commission explained that regulation is permissible only if a practice causes [unjustified] injury that is substantial . . . . Id. *Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234 at 242-43*.

"In discussing the third criterion, the federal trade commission has stated: The independent nature of the consumer injury criterion does not mean that every consumer injury is legally unfair, however. To justify a finding of unfairness the injury must satisfy three tests. It

Case 3:02-cv-01379-MRK    Document 210-5    Filed 09/19/2005    Page 16 of 16

Page 14
232 Conn. 559, *; 657 A.2d 212, **;
1995 Conn. LEXIS 99, ***

must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided. Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980) (reprinted in Averitt, The Meaning of Unfair Acts or Practices in 5 of the Federal Trade Commission Act, *70 Geo. L.J. 225, 291* [1981]). . . . *McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558 at 569-70, 473 A.2d 1185*. This test is equally applicable when a business person or competitor claims substantial injury. *Id., 570*." (Internal quotation [***54] marks omitted.) *A-G Foods, Inc. v. Pepperidge Farm, Inc., supra, 216 Conn. 215-16*.

The dealerships have not satisfied either the second or third prong of the "cigarette rule." We conclude, therefore, that the Courant's negligence was not an [*593] unfair practice within the meaning of CUTPA. The record does not support a conclusion that the Courant's negligence constituted an "immoral, unethical, oppressive or unscrupulous" practice. Moreover, because the jury found that the dealerships were 10 percent contributorily negligent, the dealerships have not proved that they "could not reasonably have avoided" any injury. On the basis of this record, we conclude that the dealerships have failed to show that the Courant caused an unjustified consumer injury, "a necessary predicate for recovery under CUTPA. *American Financial Services v. F.T.C., 247 U.S. App. D.C. 167, 767 F.2d 957, 971 (D.C. Cir. 1985)*, cert. denied, *475 U.S. 1011, 106 S. Ct. 1185, 89 L. Ed. 2d 301 (1986)*. Contrary to the claim of the [dealerships], the first prong, standing alone, is insufficient to support a CUTPA violation, at least when the underlying claim is grounded solely in negligence. [***55] *Id*.; see *Atlantic Richfield Co. v. Canaan Oil Co., supra*, [202 Conn.] 242." *A-G Foods, Inc. v. Pepperidge Farm, Inc., supra, 216 Conn. 217*.n26

n26 As an appellate issue, the dealerships claim for the first time in their reply brief that the allegations in their amended complaint that "after numerous complaints by the [dealerships] about the excessive cost of advertising with the defendant, the plaintiffs were informed by William Richardson, [the Courant's classified manager], that the [dealerships] and other area automobile dealers could have realized substantial savings in 1991 if they had contracted for automobile advertising under the defendant's then available 'Annual Consecutive Contract Rates' instead of under 'Annual Bulk Contract Rates,'" constitute a valid claim under CUTPA, and that the trial court therefore improperly set aside the jury's CUTPA verdict.

This claim apparently was argued before the trial court, which declined to rule on the issue because it had not been properly alleged in the dealerships' amended complaint. The dealerships, however, did not claim that the trial court's ruling was improper until their reply brief. "We decline to consider this claim. It is a well established principle that arguments cannot be raised for the first time in a reply brief. *Protter v. Brown Thompson & Co., 25 Conn. App. 360, 363-64 n.2, 593 A.2d 524 (1991); L. F. Pace & Sons, Inc. v. Travelers Indemnity Co., 9 Conn. App. 30, 45 n.8, 514 A.2d 766*, cert. denied, *201 Conn. 811, 516 A.2d 886 (1986)*. Claims of error by an appellant must be raised in his original brief . . . so that the issue as framed by him can be fully responded to by the appellee in its brief, and so that we can have the full benefit of that written argument. Although the function of the appellant's reply brief is to respond to the arguments and authority presented in the appellee's brief, that function does not include raising an entirely new claim of error. (Citation omitted; internal quotation marks omitted.) *Commissioner v. Youth Challenge of Greater Hartford, Inc., 219 Conn. 657, 659 n.2, 594 A.2d 958 (1991)*." *State v. Torres, 31 Conn. App. 443, 445-46 n.1, 625 A.2d 239 (1993)*.

[***56] [**229] [*594]

The judgment is reversed in part, and the case is remanded for a new trial on the second, sixth and tenth counts of the amended complaint, and on the negligent misrepresentation allegations of the third, seventh and eleventh counts of the amended complaint.

In this opinion the other justices concurred.