LEXSEE 2004 US DIST LEXIS 780

NUEVO MUNDO HOLDINGS, et al., Plaintiffs, – against – PRICEWATERHOUSE COOPERS LLP, et al., Defendants.

03 Civ. 0613 (GBD)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2004 U.S. Dist. LEXIS 780

January 22, 2004, Decided
January 22, 2004, Filed

**SUBSEQUENT HISTORY:** Complaint dismissed at *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, 2004 U.S. Dist. LEXIS 24900 (S.D.N.Y., Dec. 8, 2004)*

**DISPOSITION:** [*1] Plaintiffs' motion to dismiss was granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff shareholders and directors of a company filed an action, alleging several claims under common law, breach of contract, and a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), *18 U.S.C.S. § 1964* et seq. Defendant accounting firms moved to dismiss.

**OVERVIEW:** The shareholders and directors alleged a Peruvian entity that their company did business with was under the control of one firm and was so identified therewith as to make the firm responsible and liable for the actions and conduct of the Peruvian entity. Absent any allegations of direct liability, in order to hold the firms vicariously liable for the actions of the Peruvian entity, the shareholders and directors had to allege facts in support of one of the following three relationships: a principal/agent relationship; an alter-ego relationship; or a partnership. They, however, did not specifically allege facts in support of any one of these relationships in their complaint. The complaint did not support a bald assertion that an agency relationship existed; inter alia, there was no allegation of a manifestation by either firm that the Peruvian entity was to act on their behalf, and there were no alleged facts suggesting the firms ever participated in the decision as to how audit reports submitted by the Peruvian entity were completed. Having failed to allege vicarious liability, the shareholders and directors did not allege facts sufficient to support tort, contract, or RICO claims.

**OUTCOME:** The motion to dismiss was granted.

**CORE TERMS:** affiliate, accounting, entity, motion to dismiss, partnership, vicarious liability, subsidiary, partners, agency relationship, corporate veil, shareholder, alter-ego, oral argument, conclusory, accounting firm, worldwide, piercing, audit, motions to dismiss, brand name, unsupported, dominated, futile, vicariously liable, audit report, undercapitalized, affiliated, wrongfully, autonomous, withstand

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN1] Fed. R. Civ. P. 12(b)(6) allows a party to move to dismiss a complaint where the complaint fails to state a claim upon which relief can be granted.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN2] In reviewing a motion to dismiss, the court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN3] A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN4] In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*
[HN5] In order to establish a principal/agent relationship, a party must demonstrate the following elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*
[HN6] Actual agency is created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account. Whether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*
[HN7] To establish a principal/agent relationship, a party must allege that the agent acts subject to the principal's direction and control. The importance of control by the principal is paramount. There is no agency relationship where the alleged principal has no right of control over the alleged agent. When the elements of an agency relationship have been proven, the corporation acting as principal will be held liable for the torts committed. by the agent while acting within the scope of the agency.

*Business & Corporate Entities > Agency > Authority to Act > Agent Authority*
[HN8] The authority of an agent can only be established by tracing it to its source in some word or act of the alleged principal. The agent cannot confer authority upon himself or make himself an agent merely by saying that he is one.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
[HN9] A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Fed. R. Civ. P. 12(b)(6).

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*
[HN10] "Alter ego theory" and the doctrine of "piercing the corporate veil" are one and the same under New York law. To pierce the corporate veil under New York law, a plaintiff must prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong"; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff. Courts have recognized that the element of control may be predicated upon the concept of equitable ownership. Pursuant to this approach, an individual who exercises considerable authority over the corporation to the point of completely disregarding the corporate form and acting as though its assets are his alone to manage and distribute may be deemed the equitable owner of the corporation and its assets, notwithstanding the fact that the individual is not a shareholder and does not occupy a formal position of authority.

*Business & Corporate Entities > Corporations > Shareholders & Other Constituents > Disregard of Corporate Entity*
[HN11] The element of control is established by factors indicating that the corporation is the mere alter ego of another corporation or an individual, such as: (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*
*Business & Corporate Entities > General Partnerships > Formation*
[HN12] Under New York law, the party pleading the existence of a partnership has the burden of proving its existence.

*Business & Corporate Entities > General Partnerships > Formation*
[HN13] The elements of a partnership are (1) the shar-

ing of profits and losses of the enterprise; (2) the joint control and management of the business; (3) the contribution by each party of property, financial resources, effort skill or knowledge; and (4) an intention of the parties to be partners.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*
[HN14] Despite the liberal policy toward amendment embodied in Fed. R. Civ. P. 15(a), leave to amend should not be granted where it is futile. For example, leave to amend is properly denied when the amended complaint would not survive a motion to dismiss.

**COUNSEL:** For Nuevo Mundo Holdings, SA, Jacques Simon Levy Calvo, Vitaly Franco Varon, Herbert Herschkowicz Grosman, ISY Levy Calvo, David Levy Pesso, Jacques Franco Sarfaty, Sassone Franco Sarfaty, Jose Porudominsky Gabel, PLAINTIFFS: Paul S Edelman, Kreindler & Kreindler, Lewis M Smoley, New York, NY USA.

For Pricewaterhousecoopers, LLP, DEFENDANT: Francis P Barron, Cravath, Swaine & Moore, Michael Alan Paskin, Cravath Swaine Et Ano, LLP, New York, NY USA.

For Arthur Andersen, LLP, DEFENDANT: Beth Ann Schultz, Reginald R Goeke, Mayer, Brown, Rowe & Maw, New York, NY USA.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINIONBY:** GEORGE B. DANIELS

**OPINION:** GEORGE B. DANIELS, DISTRICT JUDGE:

Plaintiffs bring suit alleging several claims under common law, breach of contract and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *18 U.S.C. § 1964 et. seq.* Defendants filed a motion to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6) and 12(b)(7).* Defendants' motion to dismiss is granted.

I. Background [*2]

Plaintiffs Nuevo Mundo Holdings S.A., Jacques Simon levy Calvo, Vitaly Franco Varon, Herbert Herschkowicz Grosman, Isy Levy Calvo, David Levy Pesso, Jacques Franco Sarfaty, Sassone Franco Sarfaty and Jose Porudominsky Gabel are the Peruvian and Panamanian shareholders and directors of Banco Nuevo Mundo S.A. ("Nuevo Mundo"), a bank organized under Peruvian law that is not a party to this action. Plaintiffs' claims arise from the loss that plaintiffs allegedly suffered when the Peruvian government placed Neuvo Mundo into administration.

The named defendants, PricewaterhouseCoopers LLP ("PWC") and Arthur Andersen LLP ("Andersen")(collectively, "Defendants"), are accounting firms located in New York City. Plaintiffs make no allegations that defendants directly participated in any of the events that led to Nuevo Mundo being placed into administration by the Peruvian government. Rather, plaintiffs' sole allegation against these defendants is that Sociedad de Auditoria Medina, Zalvidary Asociados ("Medina") and Collas Dongo-Soria y Asociados ("CDSA"), the two accounting firms with which Nuevo Mundo conducted business, "operate under the control of" Andersen and PWC and are "so identified [*3] therewith" as to make the defendants liable for the actions of Medina and CDSA. Complaint PP 47, 58.

The events central to plaintiffs' claims all occurred in Peru. There are no allegations that any events that occurred in the United States. On December 5, 2000, the Superintendency of Banking and Insurance of Peru ("SBS") ordered Neuvo Mundo into administration after an inspection conducted by SBS found that Nuevo Mundo was in poor financial condition and presented "the highest risk of liquidity due to withdrawals of" cash deposits. Complaint P 35. Plaintiffs allege that after being ordered into administration, "control of the administration, operations and assets of [Nuevo Mundo] was wrongfully taken from its officers, directors, shareholders, and/or investors." Complaint P 38. Subsequently, the Peruvian government advised plaintiffs that Nuevo Mundo would be sold and that the investors would lose their entire investment. Investment banks were invited to take charge of the sale of Nuevo Mundo, and the government ruled that any transfer of equity in Nuevo Mundo could not benefit the shareholders. n1 Complaint PP 43-45.

> n1 Subsequently, on August 19, 2003, the Superior Court of Justice of Lima, Lima's highest court, reversed "the Order of the Superintendent of Banking and Insurance, which declared that Banco Nuevo Mundo had zero capital and, therefore, the shareholders, Plaintiff, [Nuevo Mundo Holdings] had no further rights or interest in the bank. The decision holds the action of the Superintendent to be illegal and unconstitutional. The decision orders the Superintendent to restore the rights of the shareholders of Plaintiff, NMH, which owns the bank." Furthermore, "the deci-

sion of the Supreme Court, of May 2003, orders the Superintendent to stop the liquidation of the bank." Affirmation of Jacques Simon Levy Calvo at 2.

[*4]

CDSA, a Peruvian accounting firm alleged to be affiliated with defendant PricewaterhouseCoopers, was retained by Nuevo Mundo "to be its independent auditor for the calendar year 1999." Complaint P 47. Plaintiffs allege that in April 2001, after CDSA submitted an audit report regarding Neuvo Mundo's financial status, SBS "wrongfully required and demanded that [CDSA] make several changes in the said draft audit report, including devaluing [Nuevo Mundo's] loan portfolio, and make other changes so as to revalue [Neuvo Mundo's] asset balance so that it would become a negative instead of a positive amount." Complaint P 49. Plaintiffs assert that CDSA submitted its allegedly unlawful final audit report in July 2001.

Medina, a Peruvian accounting firm alleged to be affiliated with defendant Arthur Andersen, was retained by SBS in March or April, 2001 to conduct a financial audit of Neuvo Mundo for the year 2000. Plaintiffs allege that SBS "wrongfully, fraudulently and illegally directed [Medina] to revise previous audit reports issued on [Neuvo Mundo's] financial condition ... [and] undervalued [Nuevo Mundo's] loan portfolio by approximately U.S. $200,000,000.00 ... in violation [*5] of generally accepted accounting principles, standards and practices." Complaint PP 59-60.

Plaintiffs allege nine causes of action against defendants including common law claims for fraud, tortious interference, negligence, malpractice, prima facie tort and punitive damages. Plaintiffs have also alleged a claim under R.I.C.O, *18 U.S.C. § 1964 et. seq.* against both defendants and a breach of contract claim against PricewaterhouseCoopers LLP.

II. Discussion

*Federal Rule of Civil Procedure 12(b)(6)* [HN1] allows a party to move to dismiss a complaint where the complaint "fails ... to state a claim upon which relief can be granted[.]" *FED.R.CIV. P. 12(b)(6)*. [HN2] In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*. [HN3] A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See *Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1494 (2d Cir. 1992)*. [*6] [HN4]

In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*; see also *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998)* (in evaluating motions to dismiss, a court must limit its review to the allegations contained within the four corner's of the complaint).

A. Defendants' Liability

In their complaint, plaintiffs allege that "[CDSA] operates under the control of defendant PWC, and is so identified therewith, as to make Defendant PWC responsible and liable for the actions and conduct of its Peruvian affiliate." Complaint P 47. Against defendant Andersen, plaintiffs allege that "[Medina] operates under the control of Defendant Andersen, and is so identified therewith as to make Defendant Andersen responsible and liable for the actions and conduct of [Medina]." Complaint P 58. Plaintiffs make no allegations of direct liability on the part of defendants [*7] Andersen or PWC. Rather, plaintiffs' allegations assert a vicarious relationship between the accounting firms in Peru and their respective defendant affiliates in the United States. Other than the allegations contained in paragraphs 47 and 58, plaintiffs proffer no other facts specifically describing the nature of the relationship upon which their claims are based.

Allegations of an affiliate relationship, however, are insufficient to hold defendants liable for the actions of either Medina or CDSA. Member firms in an international accounting association are not part of a single firm and are neither agents nor partners of other member firms simply by virtue of using the same brand name. See e.g., *In re Lernout & Hauspie Sec. Litig., 230 F. Supp. 2d 152, 170 (D. Mass. 2002)*. During oral argument, defendants articulated that "the U.S. entities are member firms, and they use the Andersen and Price Waterhouse Coopers name ... And what they have in common is simply that they both use ... the brand name Andersen or PWC in order to provide accounting services in their respective countries." Transcript of Oral Argument dated Sept. 17, 2003 at 34. Defendants maintain that [*8]

> the member firms are all autonomous. U.S. Firms are autonomous from the Peruvian firms and all the other member firms throughout the world. They have separate capital structure. They have separate management and organization. They are autonomous firms. They have contracts with

Case 3:02-cv-01379-MRK    Document 228-2    Filed 10/11/2005    Page 5 of 9

Page 5
2004 U.S. Dist. LEXIS 780, *8

the worldwide entity, which requires them to follow certain kinds of standards and procedures in order to be able to use the brand name. But that's the only relationship between the U.S. entities and the Peruvian entities.

Id. at 35. Indeed, courts have declined to treat different firms as a single entity, holding them liable for one another's acts, simply because they shared an associational name and/or collaborated on certain aspects of a transaction. See *In re Lernout*, 230 F. Supp.2d at 170-71 (D.Mass.2002) (rejecting theory that KPMG entities should be held jointly and severally liable for each other's acts and statements because they hold themselves out as a single entity); see also *In re AM Int'l Inc. Sec. Litig.*, 606 F. Supp. 600, 607 (S.D.N.Y. 1985)(dismissing complaint against Price Waterhouse entities outside the U.S. after rejecting argument that [*9] all Price Waterhouse affiliates worldwide were "in fact one entity, and acted as agents of one another"); see also *Reingold, v. Deloitte, Haskins & Sells*, 599 F. Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984)(holding that existence of DH&S International, "an organization composed of a large number of affiliated accounting firms," did not prove DH&S was "a single worldwide entity" even though some brochures described DH&S as "a single cohesive worldwide organization").

Absent any allegations of direct liability, in order to hold the defendants vicariously liable for the actions of the Peruvian accounting firms, plaintiffs must allege facts in support of one of the following three relationships: a principal/agent relationship; an alter-ego relationship; or a partnership. Plaintiffs, however, have not specifically alleged facts in support of any one of these relationships in their complaint.

Plaintiffs proffer all three relationships in their responsive papers, arguing that the "defendants and the overall companies overseeing the activities of local affiliates are implicated because there is overall training and supervision of all affiliates and peer review meetings held [*10] to assure compliance with the accepted professional standards and ethical requirements of what each affiliate is doing." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Brief") at 3. Plaintiffs also claim that the main purpose of [PricewaterhouseCoopers International Limited] and [Arthur Andersen Worldwide S.C.], separate corporate entities that are not parties to this litigation, is "to assure that the affiliates act properly and in accordance with their worldwide requirements. This is the essence of our Alter Ego Theory of Liability ... There is ... a common bond requiring that all affiliates act honestly and according to prescribed rules, regulations and accounting standards." Plaintiffs' Brief at 11. Furthermore, plaintiffs argue that "Arthur Andersen may be a partnership of all its affiliates," and that "at one time, ... all [Arthur Andersen] officers were partners." Id. at 7, 11.

During oral argument, plaintiffs' counsel, in response to the Court's query to further explain the basis for vicarious liability, responded: "I think we have already articulated one aspect of this relationship. I think it can be shown that a principal/agent [*11] relationship exists. The nature of the relationship should make the principal liable for the acts of its agent. And I think we can show that in the way in which we describe the relationship between these affiliates and the global and/or New York entities that we've already joined." Transcript of oral argument heard September 17, 2003 at 79.

Lastly, in a subsequent letter to the Court dated October 1, 2003 submitted in support of plaintiffs' proposed Second Amended Complaint, they "allege ... that all principals of [Arthur Andersen], wherever they may be, are, or were, partners. As partners, the actions of any one subjects all to liability." Plaintiff's letter dated October 1, 2003 at 2, P 2. Plaintiffs also reiterated its principal/agent allegation: "in addition, we believe that the Peruvian affiliates cloaked with the names respectively of [Arthur Andersen] and [PricewaterhouseCoopers] and under the aegis of the other accounting firms (present and future defendants), are the 'apparent agents' of those latter accounting firms." Id. Plaintiffs further proffered an alter-ego argument as the basis for vicarious liability: "moreover, we allege that the corporate veil may be [*12] pierced since we have information and so allege that the Peruvian accounting firms are seriously undercapitalized so as to limit liability in an improper manner." Id.

Regardless of which relationship plaintiffs argue, if their claims are to withstand defendants' motion to dismiss, their complaint must clearly and specifically articulate allegations of fact which can support the existence of at least one of these relationships. n2

> n2 Plaintiffs also attempt to argue that CDSA and Medina are the subsidiaries of the named defendants. Although their complaint is devoid of any factual allegations of a subsidiary/parent relationship, plaintiffs cite *U.S. v. Bestfoods, Inc.*, 524 U.S. 51, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1999) for the proposition that the "defendants, their world wide overseers and the local affiliates are integrated in terms of responsibilities for

good accounting practices and there is a symbiosis of the companies." Plaintiffs' Brief at 8. The Supreme Court in Bestfoods, however, rejected that plaintiff's failure to supervise argument; holding that activities that involve a subsidiary's facility but which are consistent with the parent corporation's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct parental liability. *Id., 524 U.S. at 72, 118 S. Ct. 1876.*

[*13]

1. Agency Relationship

[HN5] In order to establish a principal/agent relationship, a party must demonstrate the following elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking. See Restatement (Second) of Agency § *1 cmt. b (1958)*; see also *Rubin Bros. Footwear, Inc. v. Chemical Bank, 119 B.R. 416, 422 (S.D.N.Y.1990).* [HN6] Actual agency is created by "written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service Ltd., 909 F.2d 698, 702 (2d Cir. 1990)* (quoting Restatement § 26)). "Whether such an agency exists depends upon the actual interactions of the putative agent and principal and not on the perception a third party may have of the relationship." See *Manchester Equipment Co., Inc. v. American Way and Moving Co., Inc., 60 F. Supp.2d 3, 8 (E.D.N.Y.1999).* [*14]

Furthermore, [HN7] a party must allege that "the agent acts subject to the principal's direction and control." *Shulman Transport Enterprises, Inc. v. Pan American World Airways, Inc., 744 F.2d 293, 295 (2d Cir.1984).* The importance of control by the principal is paramount. "There is no agency relationship where the alleged principal has no right of control over the alleged agent." *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau, 657 F. Supp. 1475, 1481 n. 2 (S.D.N.Y.1987)*; see also *Rubin Bros., 119 B.R. at 422* ("No agency relationship can be established where the alleged principal lacks the essential right of control over the alleged agent.") (citing *Shulman Transport, 744 F.3d at 295)*; *Lee v. Kim, 1994 U.S. Dist. LEXIS 15275, No. 93 Civ. 8280, 1994 WL 586435, *3 (S.D.N.Y. Oct. 25, 1994)* ("Where the principal does not exercise control over the professed agent, no agency relationship exists."). When the elements of an agency relationship have been proven, the corporation acting as principal will be held liable for the torts committed by the agent while acting within the scope of the agency. See, e.g., *Fletcher v. Atex, Inc., 861 F. Supp. 242, 247 (S.D.N.Y. 1994)* [*15] ("Principals are liable for the tortious acts of their agents"), aff'd, *68 F.3d 1451 (2d Cir.1995).*

In their complaint, plaintiffs make two allegations regarding defendants Andersen and PWC in support of their claims:

> Plaintiffs BNM and NMH relied on representations made by [CDSA] that it was part of and operated under the control of Defendant PWC, the well-known international accounting firm, and that [CDSA] used the same international accounting standards as are used by Defendant PWC in providing accounting services throughout the world ... [CDSA] operates under the control of defendant PWC, and is so identified therewith, as to make Defendant PWC responsible and liable for the actions and conduct of its Peruvian affiliate.

Complaint P 47. Plaintiffs further allege that:

> Upon information and belief, [Medina] represented itself, directly, indirectly or implicitly, as Defendant Andersen, the well-known international accounting firm, to show its ability and experience as auditor ... [Medina] operates under the control of Defendant Andersen, and is so identified therewith as to make Defendant Andersen responsible and liable for the actions [*16] and conduct of [Medina].

Complaint P 58.

Without any further factual allegations, plaintiffs' complaint fails to support a bald assertion that an agency relationship existed between the defendants and their Peruvian affiliates. Plaintiffs make no allegation of a manifestation by either PWC or Andersen that CDSA or Medina were to act on their behalf. Plaintiffs make no allegation that there was an understanding between PWC and CDSA or between Andersen and Medina that the U.S. entities were to be in control of the Peruvian entities' accounting services. Furthermore, there are no facts alleged which suggest that the defendants ever participated in the decision as to how the audit reports submitted by CDSA or Medina were completed, and cer-

tainly none which would support an inference that the defendants were either aware of, or in fact contributed to, the decision to alter those audit reports.

Plaintiffs solely allege that they "relied on representations made by [CDSA] that it was part of and operated under the control of [PWC]," and that "[Medina] represented itself, directly, indirectly or implicitly, as Defendant Andersen." Complaint P 47, 58. At best, plaintiffs' agency [*17] claim is based on alleged representations not made by the defendants, but made by the defendant's Peruvian affiliates who are not parties to this litigation. The Second Circuit, however, has held that [HN8] the authority of an agent can only be established by tracing it to its source in some word or act of the alleged principal. See *Karavos Compania Naviera S.A. v. Atlantica Export Corp., 588 F.2d 1, 10 (2d Cir.1978)*. The agent cannot confer authority upon himself or make himself an agent merely by saying that he is one. Id.

Plaintiffs' conclusory allegations that Medina and CDSA were "agents" of defendants Andersen and PWC, because they represented themselves as part of defendants, are therefore insufficient to withstand defendants' motion to dismiss. See *DeJesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir.1996)* [HN9] ("A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of *Rule 12(b)(6)*.") (internal quotations omitted); *Neubauer v. Eva-Health USA, Inc., 158 F.R.D. 281, 285 (S.D.N.Y.1994)* (holding that bare allegation of control did not suffice to allege control [*18] person liability "as the Court need not accept as true on a motion to dismiss allegations which amount simply to legal conclusions"); *Coraggio v. Time Inc. Magazine Co., 1996 U.S. Dist. LEXIS 3770, No. 94 Civ. 5429, 1995 WL 242047, *3 (S.D.N.Y. April 26, 1995)* (allegation that parent "controls" subsidiary held insufficient to allege single employer liability under Title VII; "While a claim should not be dismissed unless it appears plaintiff can prove no set of facts entitling her to relief, some reasonable particularity is required ... The instant complaint contains nothing more than a conclusory and unsupported allegation of control.") (citation omitted).

Construing the factual allegations in the complaint in plaintiffs' favor, those allegations are insufficient as a matter of law to demonstrate the existence of a principal/agent relationship between defendant PWC and CDSA, or between defendant Andersen and Medina.

2. Alter-Ego Claim

[HN10] "Alter ego theory" and the doctrine of "piercing the corporate veil" are one and the same under New York law. See *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138 (2d Cir. 1991)* (finding that the doctrine [*19] of piercing the corporate veil and the "alter ego theory" are indistinguishable and "should be treated as interchangeable"). To pierce the corporate veil under New York law, a plaintiff must prove that: (1) the owner exercised such control that the corporation has become a mere instrumentality of the owner, who is the real actor; (2) the owner used this control to commit a fraud or "other wrong"; and (3) the fraud or wrong results in an unjust loss or injury to the plaintiff. See *Freeman v. Complex Computing Co., Inc., 119 F.3d 1044, 1052 (2d Cir. 1997)* (citations omitted). Courts have recognized that the element of control may be predicated upon the concept of equitable ownership. See *id. at 1051-53*. Pursuant to this approach, an individual who "exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute" may be deemed the equitable owner of the corporation and its assets, notwithstanding the fact that the individual is not a shareholder and does not occupy a formal position of authority. *Id. at 1051* [*20] (citation omitted).

[HN11] The element of control is established by factors indicating that the corporation is the mere alter ego of another corporation or an individual, such as:

> 1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e. issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arm's length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Passalacqua, 933 F.2d at 139* (quoted in *Carte Blanche*

*Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 1993 WL 316985, [*21] at *2, 1993 U.S.App. LEXIS 21214, at *4-5).

Plaintiffs make no factual allegations in their complaint that support an alter ego theory for piercing the corporate veil. Their argument arises for the first time in their opposition brief where plaintiffs suggest an "Alter Ego Theory of Liability" premised on the unpleaded assertions that (1) non-parties PWC International and Andersen Worldwide Societe Cooperative "oversaw the activities of the affiliates," and (2) "the supervisory groups and all affiliates were in close contact, with periodic meetings following mandated training." Plaintiffs' Brief at 7 and 11. Outside of their conclusory allegations of control, the complaint is devoid of any factual allegations to support a finding of alter-ego. Without any supportive factual allegations, plaintiffs have failed to allege sufficient facts to avoid dismissal of their alter ego claim.

3. Partnership

[HN12] Under New York law, the party "pleading the existence of a partnership has the burden of proving its existence." *Central Nat'l Bank, Canajoharie v. Purdy*, 249 A.D.2d 825, 826, 671 N.Y.S.2d 866 (N.Y.App.Div.1998). Thus, plaintiffs' claim of vicarious liability on this basis [*22] cannot survive a motion to dismiss unless plaintiff pleads sufficient facts in support of each of the required elements of a partnership. See *US Airways Group v. British Airways PLC*, 989 F. Supp. 482, 493 (S.D.N.Y.1997). [HN13] Those elements are 1) the sharing of profits and losses of the enterprise; 2) the joint control and management of the business; 3) the contribution by each party of property, financial resources, effort skill or knowledge; and 4) an intention of the parties to be partners. See *NYNEX Corp. v. Shared Resources Exch.*, 1990 N.Y. Misc. LEXIS 759, No. 89 Civ. 14577, 1990 WL 605347, at *5 (N.Y.Sup.Ct. Sept. 10, 1990); *Hoskin v. New Grovetown Assoc.*, 129 Misc. 2d 222, 492 N.Y.S.2d 685, 687 (N.Y.Sup.Ct.1985).

As previously noted, the only allegations in plaintiffs' complaint that can support vicarious liability through a partnership are found in P 47 and P 58. In their opposition brief, plaintiffs argue that "in fact, Arthur Andersen *may be* a partnership of all its affiliates." Plaintiffs Memo at 7 (emphasis added). They further argue that "at one time, ... all [Andersen] officers were partners." Plaintiffs Memo at 11. Even accepting these arguments, [*23] plaintiffs still have not plead facts that would establish all four elements of a partnership. Equally important is plaintiffs own admission in their opposition brief that "defendants may not be partners in the legal sense." Plaintiffs' Brief at 11. Similar to their other attempts to establish vicarious liability, plaintiffs have failed to allege sufficient facts to establish the existence of a partnership.

Having failed to sufficiently allege a theory of vicarious liability either under a theory of agency, alter-ego, or partnership, plaintiffs have not alleged sufficient facts to support any tort or contractual claims against defendants PWC and Andersen, nor any claim under the Racketeer Influenced and Corrupt Organizations Act, *18 U.S.C. § 1964 et. seq.* Defendants' motion to dismiss the complaint in its entirety is therefore granted. n3

> n3 Defendants make three additional arguments: that plaintiffs' complaint must be dismissed for failure to join necessary and indispensable parties; plaintiffs' claims are precluded under the Act of State Doctrine and the Foreign Sovereign Compulsion Defense; and plaintiffs have generally failed to state a claim. As this Court has granted defendants' motions to dismiss on alternative grounds, it will not further address the merits of these arguments.

[*24]

B. Leave to File a Second Amended Complaint

Plaintiffs also moved to again amend their complaint. Defendants' oppose such a motion as untimely and futile. At the time they submitted their motion, plaintiffs failed to submit a proposed second amended complaint. At the time of oral argument, the Court allowed plaintiffs to submit a *proposed* Second Amended Complaint. A review of the Second Amended Complaint shows that despite additional allegations, plaintiffs' complaint still suffers from the deficiencies inherent in their original. Plaintiffs' Second Amended Complaint would similarly fail to withstand motions to dismiss under *Fed. R. Civ. P. 12(b)(6)* for failing to allege vicarious liability.

In their Second Amended Complaint, plaintiffs seek to add two additional defendants: PricewaterhouseCoopers International Limited ("PWC International") and Andersen Worldwide Societe Cooperative ("Andersen Worldwide") and hold them also vicariously liable for the actions of CDSA and Medina. Plaintiffs, however, have added insufficient additional allegations to support their claims against current defendants PWC and Andersen. Plaintiffs now [*25] attempt to shift their focus toward finding PWC International and Andersen Worldwide vicariously liable for the actions of CDSA and Medina. n4 Their proposed claims against these entities, however, would fail for the same reasons they fail against defendants

Andersen and PWC; plaintiffs' conclusory allegations of agency, partnership or alter-ego are unsupported by sufficient factual allegations.

> n4 In support of their vicarious liability theory, plaintiffs have added the following further assertions:
>
>> Upon information and belief, [CDSA and Medina] were and are undercapitalized at about $300,000 each and, as such, Plaintiffs can prove that the accounting firm Defendants herein are liable under the theory of piercing the corporate veil. By use of interchangeable names given to the public and undercapitalized subsidiaries, Defendant accounting firms become liable for the acts of [CDSA and Medina], which were purposefully limiting their liability due to undercapitalization.
>
> Complaint at 24-5, P 74.
>
>> Defendant accounting firms act as principals in that they cloaked [CDSA and Medina] with apparent authority and made them agents. The acts of the Peruvian affiliate are binding on Defendant accounting firms.
>
> Complaint at 25, P 75.

[*26]

[HN14] Despite the liberal policy toward amendment embodied in *Rule 15(a) of the Federal Rules of Civil Procedure*, "leave to amend should not be granted where it is futile." *Bruce v. Martin, 702 F. Supp. 66, 69 (S.D.N.Y.1988)*; see *Foman v. Davis, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962)*; *Albany Ins. Co. v. Esses, 831 F.2d 41, 45 (2d Cir.1987)*. For example, leave to amend is properly denied when the amended complaint "would not survive a motion to dismiss." *Prudential Ins. Co. of America v. BMC Indus., Inc., 655 F. Supp. 710, 711 (S.D.N.Y.1987)*; see also *S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Building 1 Housing Dev. Fund Co., 608 F.2d 28, 42 (2d Cir.1979)*; *Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990)*("where ... there is not merit to the proposed amendments, leave to amend should be denied") Id. In the absence of additional allegations sufficient to support their claims, plaintiffs' motion to amend is denied as futile.

Dated: January 22, 2004

SO ORDERED:

GEORGE B. DANIELS

United States [*27] District Judge