LEXSEE 1997 US DIST. LEXIS 7672

**WELDING METALS, INC., Plaintiff, v. FOOTHILL CAPITAL CORPORATION, Defendant.**

No. 3:92CV00607(WWE)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

1997 U.S. Dist. LEXIS 7672

April 14, 1997, Decided
April 14, 1997, filed

**DISPOSITION:** [*1] Judgment in favor of the defendant on all counts of plaintiff's second amended complaint.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff financing buyer filed an amended complaint, arguing that security interest of defendant secured creditor did not attach to toll metal belonging to the buyer on the basis that mere possession by insolvent debtor was not enough to give it rights in the goods to which a security interest could attach. The buyer pleaded common-law conversion, statutory conversion, and violation of Conn. Gen. Stat. § 42-110a et seq.

**OVERVIEW:** The financing buyer filed an amended complaint on the basis that security interest of the secured creditor did not attach to toll metal belonging to the buyer because mere possession by insolvent debtor was not enough to give it rights in the goods to which a security interest could attach. The buyer argued common-law conversion, statutory conversion under Conn. Gen. Stat. § 52-564, and violation of Conn. Gen. Stat. § 42-110a et seq. The creditor argued that it was a secured creditor with a perfected first-priority security interest in the toll metal and that the buyer's claim was subordinate to its first-priority perfected security interest. The court ruled in the creditor's favor on all counts of the buyer's complaint and stated that the creditor's perfected security interest had to be given priority because the buyer was unsecured creditor and had no control on debtor's purchasing or fabrication process or for that mater on how its funds were used by debtor. The court held that debtor was not agent of his creditor and that the creditor could not be liable for conversion under common law or statute. Thus, the buyer did not have an enforceable security interest in the toll metal.

**OUTCOME:** The court found in favor of the secured creditor on all counts of the financing buyer's second amended complaint and stated that the creditor's perfected security interest must be given priority. The court held that the creditor could not be liable for conversion under common law or statute and that the buyer did not have an enforceable security interest in the toll metal.

**CORE TERMS:** welding, metal, toll, inventory, customer, collateral, wire, raw materials, bailment, security interest, pound, brass, silicon, shipped, conversion, fabricator, commingled, bronze, bailee, copper, perfected security interest, finished goods, raw material, tolling, notice, scrap, lbs, attach, bailor, security agreement

**LexisNexis(R) Headnotes**

*Commercial Law (UCC) > Secured Transactions (Article 9) > Attachment*
[HN1] A security interest attaches to collateral when (a) the collateral is in the possession of the secured party or the debtor has signed a security agreement which contains a description of the collateral, and (b) value has been given, and (c) the debtor has rights in the collateral. Conn. Gen. Stat. § 42a-9-203 (1), (2). Attachment of a security interest is a prerequisite to perfection of that interest.

*Commercial Law (UCC) > Secured Transactions (Article 9) > Attachment*
[HN2] Mere possession of goods, as in a bailment, is not sufficient under Conn. Gen. Stat. § 42a-9-203 (1), (2) to establish rights of the debtor in the collateral. If the debtor, however, has possession of the collateral pursuant to an agreement that gives the debtor any interest other than naked possession, the debtor will have acquired sufficient rights as will permit a security interest to attach.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN3] Agency is defined as the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act. The three elements required to show the existence of an agency relationship are: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN4] A debtor does not become the agent of his creditor simply because he is called an agent.

*Business & Corporate Entities > Agency > Agency Established > Elements of Agency*

[HN5] The existence of an agency relationship depends on the existence of the required factual elements creating a fiduciary relation. An essential element is that the principal has the power to control the agent.

*Real & Personal Property Law > Personal Property > Bailments*

[HN6] A bailment involves a delivery of the thing bailed into the possession of the bailee, under a contract to return it to the owner according to the terms of the agreement. A relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions. In a bailment, the owner or bailor has a general property interest in the goods bailed. The bailee, on the other hand, has mere possession of items left in its care pursuant to the bailment.

*Real & Personal Property Law > Personal Property > Bailments*

[HN7] Where logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value.

*Bankruptcy Law > Creditor Claims & Objections > Types of Claims > Unsecured Claims*

[HN8] Where a recipient of funds is not prohibited from using them as his own and is not prohibited from commingling them with his own funds, a debtor-creditor relationship is generally said to exist.

*Torts > Intentional Torts > Conversion*

[HN9] Conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another to the exclusion of the owner's rights.

**COUNSEL:** Attorney(s) for Plaintiff: William M. Donovan, Birmingham, Mich. George Purtill, Glastonbury, CT.

Attorney(s) for Defendant: Richard Polivy & Cheryl DeGregorio, DeGregorio & Polivy, Hartford, CT.

**JUDGES:** WARREN W. EGINTON, Senior United States District Judge

**OPINIONBY:** WARREN W. EGINTON

**OPINION:**

Findings of Fact and Conclusions of Law

On September 20, 21, 22, and 23, 1994, this case was tried to the court. Thereafter the trial was suspended to enable the parties to conduct additional discovery. On October 5, 1994, plaintiff filed a Second Amended Complaint, and subsequently, in February, 1996, the parties entered into a joint stipulation as to the remainder of the evidence to be presented. In late September, 1996, the parties submitted post-trial briefs. Based on the evidence presented at trial and the parties' stipulations, the court, pursuant to *Fed. R. Civ. P. 52(a)*, makes the following findings of fact and conclusions of law.

Findings of Fact

1. This lawsuit arises as a result of the financial demise of Seymour Specialty Wire Company ("Seymour"), a Connecticut corporation engaged in the [*2] manufacture of wire on a special order basis for clients such as plaintiff, Welding Metals, Inc. ("Welding"). Defendant Foothill Capital Corporation ("Foothill") was a secured creditor of Seymour.

2. On November 29, 1990, Foothill extended a revolving line of credit facility to Seymour to the extent of $7,500,000 pursuant to a General Loan and Security Agreement ("GLSA"). To secure repayment of the sums advanced under the credit facility, Seymour granted to Foothill a continuing security interest in "all presently existing and hereafter acquired or arising Collateral," which was defined by the agreement as, inter alia, the accounts, general intangibles, inventory, negotiable col-

lateral, and money or other assets of Seymour.

3. To perfect its security interest, Seymour executed a UCC-1 financing statement in favor of Foothill, which Foothill filed with the Connecticut Secretary of State on October 23, 1990. The UCC-1 covered the following types of property:

> All of Debtor's now owned, existing, hereafter acquired and arising accounts, fixtures, inventory, chattel paper, general intangibles, equipment, instruments, and documents wheresoever located, as more fully described [*3] on the Attachment to Uniform Commercial Code Financing Statement which is attached hereto.

The attachment to the UCC-1 included, inter alia, all present and future accounts, all present and hereafter acquired inventory wherever located, including but not limited to raw materials, work in process and finished goods.

4. The amount of funds available to be borrowed by Seymour on a given day was determined by a formula referred to as the borrowing base. n1 Additionally, in accordance with the terms of the GLSA, all funds and/or income received by Seymour had to be deposited either into a lock box account at a Foothill-designated bank or directly into an account maintained by Foothill at Mellon Bank.

> n1 The exact terms of the "borrowing base" are not important for purposes of this decision. Suffice it to say that the borrowing base as defined in the GLSA was based in part on the borrower's eligible inventory. "Eligible inventory" was defined as the borrower's metals inventory processed and held for resale and located at the borrower's premises. Eligible inventory specifically excluded, inter alia, inventory at the premises of third parties or subject to a security interest or lien in favor of any third party, bill and hold goods, inventory which was not subject to Foothill's perfected security interest, and inventory purchased on consignment.

[*4]

5. Seymour had been experiencing financial difficulties for at least a year at the time the credit facility was entered into with Foothill. By the spring of 1991, Seymour had borrowed the maximum amount of funds available under the credit facility. As its cash flow constricted, Seymour fell behind in paying many of its creditors, including its raw material suppliers, and eventually, several of them refused to sell to Seymour except on a C.O.D. basis.

6. Seymour had been Welding's primary source for the silicon bronze welding wire that Welding needed to supply to its customers.

7. The normal course of the business relationship between Welding and Seymour consisted of Welding's placing an order for welding wire, known as Silicon Bronze Alloy No. 656. n2 Seymour would then acquire the raw materials (copper, manganese, and silicon) necessary to fabricate the wire to the specifications of Welding. Upon completion of fabrication, Seymour would then ship the finished goods and invoice Welding for the price of the wire. Welding would then sell the wire to its customers, which were primarily in the automotive industry.

> n2 Alloy 656 silicon bronze welding wire was also designated as alloy number 6556 by the mill and production departments at Seymour and as alloy number 6561 by the sales and marketing departments at Seymour.

[*5]

8. When Welding learned of Seymour's financial difficulties in the fall of 1991, given its dependence on Seymour to supply it with bronze welding wire, Welding agreed to enter into a "tolling" arrangement whereby it would pay Seymour in advance to purchase the necessary raw materials. This arrangement was not committed to writing in the form of a written contract, nor did Welding and Seymour enter into a security agreement to give Welding a security interest in the metals that Seymour purchased with the funds Welding advanced.

9. This was a change in the relationship between Welding and Seymour as it had existed since 1985 and was done to accommodate Seymour's financial needs at the time. Welding chose to have Seymour purchase the raw materials for it since Welding had never been in the business of purchasing raw materials. Welding's president testified that he considered Seymour to be Welding's purchasing agent.

10. In order to effectuate this new arrangement, Welding would wire money into Seymour's designated account, and Seymour would then purchase the necessary raw materials and fabricate the wire products, which it would then ship to Welding and then bill Welding for the fabrication [*6] costs of the product shipped.

11. Initially, Welding wired the money to Seymour's account at Marine Midland Bank. However, in May, 1992, Welding was instructed to wire its money to

the Foothill-designated account at Mellon Bank. This change was made at the request of Foothill. Foothill was aware of all monies wired by Welding into the Mellon Bank account. Upon receipt, Foothill would then wire the funds immediately to Seymour's operating account. According to Mr. Donald Coulson, Seymour's treasurer, the money from Welding simply passed through the Foothill account and did not affect the amount that Seymour could borrow pursuant to the terms of the credit facility with Foothill. Representatives of Seymour further advised Foothill that the wire transfers from Welding were to be used by Seymour to purchase inventory.

12. The term "toll metal" as used in the industry refers to customer-supplied raw material. Seymour, however, considered toll metal to include not only customer-supplied raw material but also raw material purchased with funds provided by a customer in advance of or concurrent with the production of a customer's order, as in the case of Welding. In both instances these customers [*7] were considered to be "toll customers."

13. Seymour maintained separate "toll metal accounts" to account for the metal by pound and type of each toll metal customer. Two such accounts were for Welding and for J.W. Harris Company, Inc., another customer of Seymour that purchased silicon bronze welding wire. Whenever raw materials were supplied by a customer or purchased with funds from a customer, the customer's toll metal account was adjusted to reflect this acquisition. Whenever a shipment was made by Seymour to a toll customer, the toll metal account was adjusted in accordance with the equivalent amount of toll metal theoretically utilized to manufacture the finished products being shipped. Thus, the toll accounts represented pounds of raw materials shipped in versus pounds shipped out, with the balance representing the amount of "equivalent metals" owed to the customer.

14. Seymour would periodically report to its toll customers concerning the status of their toll metal accounts. The toll metal accounts, however, did not necessarily reflect actual pounds of metal on hand at Seymour. There was often a discrepancy between Seymour's book inventory and the actual physical inventory [*8] at Seymour.

15. The last toll report that Welding received was on July 29, 1992, reflecting toll metal balances of 104,836 lbs. of copper, 5,284 lbs. of silicon, and 1,770 lbs. of manganese. This was the amount of toll metal that Welding considered was owed to it by Seymour and which Seymour considered that it owed to Welding.

16. Seymour obtained raw materials from a variety of sources. The raw materials utilized by Seymour in its manufacturing process were not segregated or stored according to the source of the metal. However, they were segregated and stored by type of metal. For every delivery of raw materials to Seymour, a metals receiving report was generated, detailing the weight of the metal received. This information was used by Seymour to calculate its inventory. However, Seymour deducted from its schedule of inventory the amounts in its toll metal accounts.

17. The last physical inventory conducted by Seymour was performed in late December 1991 and early January 1992, which resulted in a 150,000 pound discrepancy between Seymour's book inventory and the actual physical inventory of raw materials.

18. The processing of a toll customer's purchase order was done no differently [*9] than the processing of a non-toll customer's order, although the accounting was different.

19. The raw materials, including waste, reworks, and scrap from the manufacturing process were commingled, melted, remelted, and otherwise combined by Seymour throughout the manufacturing and production process. Commingling was necessary for the operations of Seymour. There was no other practical way to operate without commingling. Thus, it was not possible to identify the source of the raw materials used to manufacture any particular work-in-process or finished product. Moreover, because the toll metal was commingled with the non-toll metal, a physical inventory of toll metal could not be conducted.

20. Further, since all metals were commingled and used interchangeably in Seymour's manufacturing process, it was impossible to trace the actual metal delivered to Seymour by or on behalf of a toll customer into the finished goods being shipped to or on behalf of a toll customer.

21. On June 4, 1992, Welding placed an order by telephone with Seymour for 104,000 pounds of silicon bronze welding wire. This order was confirmed by a purchase order no. 7877. That same day, Welding made a wire transfer [*10] in the amount of $110,382.07 to Seymour's Foothill account at Mellon Bank.

22. On June 9, 1992, Welding confirmed the earlier purchase order, but increased the total purchase to 180,000 pounds of silicon bronze welding wire. Welding made another wire transfer of $111,123.39 to Seymour's Mellon Bank account.

23. Following each of these wire transfers, Foothill caused the funds to be wired to Seymour's general operating account at Marine Midland Bank. Seymour then

purchased a total 177,096 pounds of copper, 1,000 pounds of manganese, and 2,988 pounds of silicon from various suppliers of metals, which upon receipt were allocated by Seymour to an inventory sub-account for Welding. (All of the metal purchased was allocated to Welding's purchase order no. 7877 for the June 4th and June 9th orders except for 40,000 pounds of copper which were allocated to Welding's inventory sub-account for a prior order). Seymour paid the suppliers in full for these metals and the metals were put into production almost immediately upon receipt.

24. In an effort to put people on notice of Welding's interest in the raw materials that Seymour had purchased for it, on July 2, 1992, Welding filed two UCC-1 [*11] financing statements with the Connecticut Secretary of State, each of which covered 92,664 lbs. of # 1 copper ingots, 2,896 lbs. of silicon, and 965 lbs. of maganese [sic].

25. However, as noted above, Welding did not claim to have a security interest in these metals. It is undisputed that Seymour had not executed a security agreement with Welding with respect to the June 4 or June 9 funds and that Welding did not give notice to Foothill of its UCC-1 filings.

26. On July 16, 1992, Foothill declared Seymour to be in default of its obligations under the GLSA and accelerated the obligations due thereunder. On July 21, 1992, Seymour declared that it had ceased operation of its business and consented to Foothill's foreclosure of its security interests in the collateral as defined by the GLSA. Seymour granted Foothill access to its premises for the purposes of assessing the collateral surrendered to Foothill.

27. On or about July 28, 1992, Welding received a letter dated July 27, 1992, from counsel for Foothill, which indicated that Seymour had surrendered possession of its collateral consisting of machinery, equipment, accounts receivable, inventory and general intangibles to Foothill. [*12] The letter stated that Foothill intended to conduct one or more private sales of the collateral in its possession pursuant to *Conn. Gen. Stat. § 42a-9-504(3)*, as amended, on or after August 4, 1992.

28. Foothill had conducted a UCC search for Seymour which indicated that Welding had filed two UCC-1 statements claiming a security interest in metals valued at $110,382.07 and $111,123.39, respectively.

29. Between July 21, 1992, and July 27, 1992, Foothill sent a representative to Seymour to view the inventory and to conduct a physical inventory of all remaining raw material, work-in-process and finished goods. Foothill did identify certain raw materials that had been segregated and identified as belonging to a customer other than Welding. Foothill did not identify any raw materials belonging to Welding. Foothill determined that no work-in-process or finished goods were segregated or otherwise identified as being property of any party other than Seymour.

30. There was very little raw material inventory. n3 Of the approximately 400,000 pounds of work-in-process and finished goods, approximately 160,000 pounds was Alloy 6556 inventory. n4 None of this was identified by Foothill as [*13] belonging to Welding.

> n3 There was considerable dispute as to the actual inventory of Seymour at the time it surrendered possession to Foothill. However, in light on the court's findings, it is not necessary for the court to make a determination as to the actual amount of inventory on hand at the time Foothill took possession.
>
> n4 See note 2, supra.

31. Mr. Coulson, the former treasurer of Seymour, was hired by Foothill to assist in the liquidation of Seymour. Mr. Coulson testified that he gave the records of Welding's toll account to Foothill at the time of the liquidation and that he told representatives of Foothill that Welding had materials on site.

32. It is undisputed that Foothill knew of Seymour's tolling arrangement with Welding and was aware by late 1991 that the majority of Seymour's inventory was toll metal. However, by that time, Foothill was not loaning money on inventory.

33. The audit reports prepared for Foothill in early 1992 specifically alerted Foothill to the fact that most [*14] of the inventory was toll metal and that Seymour did not physically segregate the tolling inventory at the plant. Indeed, Foothill's own audit reports deduct toll metal inventory from Seymour's assets.

34. After Welding received the Sales Notice, Welding did not send a representative to Seymour to view the property being sold by Foothill nor did Welding contact Foothill to advise it that it claimed an interest in the silicon bronze welding wire prior to the sale.

35. Beginning on August 4, 1992, Foothill disposed of the collateral in accordance with *Conn. Gen. Stat. § 42a-9-504* and applied the proceeds thereof against the outstanding obligations due Foothill. Of the 160,000 pounds of Alloy 6556, J.W. Harris Company claimed ownership of and received possession of 113,000 pounds and the remainder was acquired by Thalheimer Brothers,

Inc. and Central Wire Industries, LTD.

36. Foothill's liquidation efforts were interrupted on August 10, 1992, when an involuntary bankruptcy petition was filed against Seymour in the United States Bankruptcy Court for the District of Connecticut.

Conclusions of Law

Welding's second amended complaint sounds in three counts: common-law conversion, [*15] statutory conversion, *Conn. Gen. Stat. § 52-564*, and violation of Connecticut's Unfair Trade Practices Act, *Conn. Gen. Stat. § 42-110a* et seq. ("CUTPA"). At the heart of these claims is whether Foothill's security interest attached to the toll metal of Welding.

Article 9 of the Uniform Commercial Code, *Conn. Gen. Stat. § 42a-9-101* et seq., ("UCC") governs this issue. In order for Foothill's security interest to include Welding's toll metal, it must have attached to this collateral. *Kinetics Technology Internat'l Corp. v. Fourth National Bank of Tulsa, 705 F.2d 396, 398 (10th Cir. 1983)*. [HN1] Under the UCC, a security interest attaches to collateral when (a) the collateral is in the possession of the secured party or the debtor has signed a security agreement which contains a description of the collateral, and (b) value has been given, and (c) the debtor has rights in the collateral. *Conn. Gen. Stat. § 42a-9-203 (1), (2)*. Attachment of a security interest is a prerequisite to perfection of that interest. *In re. Southern Vermont Supply, Inc., 58 B.R. 887, 891 (Bankr. D. Vt. 1986)*.

Foothill's security interest in the collateral was broad enough to cover the toll metal [*16] inventory purchased by Seymour and for which Welding had advanced funds. The definition of "inventory" in *Conn. Gen. Stat. § 42a-9-109(4)* includes raw materials, work in process, or materials used or consumed in a person's business. The toll metal was certainly "raw materials, work in process, or materials used" in Seymour's business. There is also no question in this case that value was given. Thus, the first two requirements for attachment have been met. At issue is whether Seymour had sufficient "rights" in the toll metal purchased with the funds advanced by Welding for Foothill's security interest to attach.

Welding does not claim a security interest in the toll metal. Rather it asserts an ownership interest and claims that Seymour had no rights in this metal. Welding argues that where the goods are entirely owned by a third party, mere acquisition of possession by the debtor will not be enough to give it rights in the goods to which a security interest may attach. See White and Summers, Uniform Commercial Code 916 (2d ed., 1980). Welding attempts to explain its relationship with Seymour by claiming that Seymour was its agent in purchasing the metal and then became a [*17] bailee of the metal. Welding states that Seymour never asserted any ownership interest over the metal; in fact Seymour specifically adjusted its records by deducting the toll metal from its assets in reporting to Foothill.

Foothill claims that it was a secured creditor with a perfected first-priority security interest in the toll metal. It characterizes Welding as a "financing buyer," a buyer who pays in advance to enable the seller to manufacture the very goods for which the buyer has contracted. Foothill claims that Seymour was indebted to Welding for the amount of money advanced or loaned to Seymour on an unsecured basis, which Seymour agreed to repay in kind once the finished product was completed. Thus, Foothill asserts that Welding had at best an unsecured, unperfected claim against Seymour for the dollar value of the equivalent metals detailed on Welding's toll account, which claim was subordinate to it first-priority perfected security interest.

Foothill asserts that Seymour was not Welding's agent because there was no control by Welding over Seymour's use of the funds or the metal. Further, a bailment did not exist because Welding furnished funds, not goods, and there was [*18] no requirement or expectation that Seymour would return the items bailed. Moreover, it asserts that courts which have considered this type of tolling arrangement have concluded that it does not constitute a bailment.

The UCC does not define the term "rights," although it does make clear that full ownership is not required. See *Conn. Gen. Stat. § 42a-9-112*; *Kinetics Tech., 705 F.2d at 398*; *Litwiller Machine & Manufacturing, Inc. v. NBD Alpena Bank, 184 Mich. App. 369, 374, 457 N.W.2d 163, 165 (1990)*. [HN2] Mere possession of goods, as in a bailment, is not sufficient under the UCC to establish "rights" of the debtor in the collateral. *Cain v. Country Club Delicatessen of Saybrook, Inc., 25 Conn. Supp. 327, 333, 203 A.2d 441, 444 (1964)*; *Morton Booth Co. v. Tiara Furniture, Inc., 564 P.2d 210, 214 (Okla. 1977)*. If the debtor, however, has possession of the collateral pursuant to an agreement that gives the debtor any interest other than naked possession, the debtor will have acquired sufficient rights as will permit a security interest to attach. *Morton Booth, 564 P.2d at 214*; *Litwiller, 184 Mich. App. at 375, 457 N.W.2d at 166*. Thus, the inquiry in this case must [*19] focus on whether Seymour had "rights" in the collateral greater than mere possession as an agent or bailee.

Agency

The first theory that Welding advances to explain its

relationship with Seymour is that Seymour was acting as its agent in purchasing the raw materials. Foothill counters that an agency relationship could not exist between Welding and Seymour because Seymour, an independent business owner, did not act subject to Welding's direction and control. Rather it asserts that Welding merely directed the end result, by placing a purchase order for a certain quantity of welding wire. Foothill further argues that because there was no requirement that Seymour maintain the Welding advances in a separate account in trust or for the benefit of Welding, Seymour had the unrestricted ability to use the Welding advances. Foothill maintains that Seymour cannot be said to have acted as Welding's agent absent control by Welding over Seymour's purchases of metal and its use thereof.

[HN3] Agency is defined as "the fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the [*20] other so to act. . . ." *Beckenstein v. Potter & Carrier, Inc.,* 191 Conn. 120, 132, 464 A.2d 6, 13 (1983), citing Restatement (Second) 1 Agency § 1. The three elements required to show the existence of an agency relationship are: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. *Id.* at 133, 464 A.2d at 13, citing Restatement (Second) 1 Agency § 1, comment b (1958). Where the rights of third parties are involved, the relationship between contracting parties must be determined by its real character and not based upon the terminology used by the parties. *In re. Shulman Transport Enterprises, Inc.,* 744 F.2d 293, 295 (2d Cir. 1984). [HN4] "A debtor does not become the agent of his creditor simply because he is called an agent." Id., quoting *Standard Fashion Co. v. Magrane-Houston Co.,* 258 U.S. 346, 354, 66 L. Ed. 653, 42 S. Ct. 360 (1922).

[HN5] The existence of an agency relationship depends on the existence of the required factual elements creating a fiduciary relation. *Cabrera v. Jakabovitz,* 24 F.3d [*21] 372, 386 (2d Cir. 1994). An essential element is that the principal has the power to control the agent. *In re. Shulman Transport,* 744 F.2d at 295; *Maritime Ventures Internat'l, Inc. v. Caribbean Trading & Fidelity, Ltd.,* 689 F. Supp. 1340, 1353 (S.D.N.Y. 1988).

The facts of this case indicate that, while Welding certainly controlled the orders that it was placing and the amount of money that it advanced, it had no other control over the undertakings of Seymour. Welding did not control any other aspect of the purchasing process or any aspect of the fabrication process. Welding did not control from whom Seymour bought metals. It did not control whose metals were used in the production of the welding wire that would ultimately be shipped to it nor did it control how its toll metals were used. Indeed, Welding did not even control how its funds were used once they were wired to Seymour. Seymour and Welding were two distinct businesses. The arrangement between Welding and Seymour did not require the segregation of Welding's financial advances. Its funds were commingled with other funds of Seymour in Seymour's operating account and its Foothill account, maintained pursuant to the GLSA. [*22] Courts have found the absence of segregation of funds is a factor inconsistent with an agency relationship. See *In re. Shulman Transport,* 744 F.2d at 295; *In re. Morales Travel Agency,* 667 F.2d 1069, 1071-72 (1st Cir. 1981).

Absent the critical element of control by Welding over Seymour's use of the funds it advanced and the metal it purchased, Seymour cannot be said to have been acting as Welding's agent. It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries, and the agency agreement from other agreements. *In re. Shulman Transport,* 744 F.2d at 295. Such control did not exist in this case.

Bailment

Welding next argues that Seymour held the toll metals as its bailee. The leading Connecticut case on whether a bailment arises in the context of a toll account is *B.A. Ballou and Company, Inc. v. Citytrust,* 218 Conn. 749, 591 A.2d 126 (1991). In Ballou, plaintiff, a jewelry manufacturer, delivered leftover scrap brass to a metal fabricator. The fabricator commingled it with scrap brass from other companies and then shipped the accumulated scrap to a processing mill, which added new base metal [*23] as required and reconstituted it into finished brass, which then became part of the fabricator's inventory. The fabricator would then supply plaintiff with sheets of brass as needed from which plaintiff would manufacture jewelry. A record of the brass sent by the plaintiff was maintained by the fabricator in a "toll metal account" that listed by weight each brass metal sent by plaintiff. The type of brass needed by a given customer varied from time to time and, therefore, the new brass returned to the customer could have an entirely different composition than the scrap sent by the customer. For example, the plaintiff might deliver brass scrap composed of 70 percent copper and 30 percent zinc and return brass composed of 85 percent copper and 15 percent zinc.

The Connecticut Supreme Court held that this arrangement did not constitute a bailment.

[HN6]
A bailment "'involves a delivery of the thing bailed into the possession of the bailee, under a contract to return it to the owner according to the terms of the agreement.'" *Seedman v. Jaffer*, 104 Conn. 222, 226, 132 A. 414 (1926), quoting *Murray v. Paramount Petroleum & Products Co.*, 101 Conn. 238, 242, 125 A. 617 (1924). "A [*24] relationship of bailor-bailee arises when the owner, while retaining general title, delivers personal property to another for some particular purpose upon an express or implied contract to redeliver the goods when the purpose has been fulfilled, or to otherwise deal with the goods according to the bailor's directions." *Maulding v. United States*, 17 Alaska 592, 257 F.2d 56, 60 (1958). "In a bailment, the owner or bailor has a general property [interest] in the goods bailed . . . " *McKesson & Robbins, Inc. v. Walsh*, 132 Conn. 158, 162, 42 A.2d 841 (1945). The bailee, on the other hand, has mere possession of items left in its care pursuant to the bailment. *Sturm v. Boker*, 150 U.S. 312, 330, 14 S. Ct. 99, 104-05, 37 L. Ed. 1093 (1893).

218 Conn. at 753, 591 A.2d at 129 (footnote omitted). The Court made clear that the fact that the toll metal had been commingled with like property of other customers did not defeat a bailment when the bailor specifically intended to retain ownership of a share of the commingled goods. 218 Conn. at 754, 591 A.2d at 130. See also *Public Service Electric & Gas Co. v. Federal Power Commission*, 371 F.2d 1 (3d Cir.), cert. denied, [*25] 389 U.S. 849, 19 L. Ed. 2d 119, 88 S. Ct. 33 (1967).

The Court held, however, that a different rule applies where the purpose of the bailment was to alter or remanufacture goods surrendered to the alleged bailee. In that instance the bailment is termed a "bailment locatio operis faciendi," i.e. a bailment where work and labor are to be performed upon the thing delivered to the bailee. The Court stated that, in a bailment of this type, the question of whether a bailment exists is determined by whether the identical article delivered is to be returned to the party making the advance. The Court stated:

[HN7]
'Thus, where logs are delivered to be sawed into boards, or leather to be made into shoes, rags into paper, olives into oil, grapes into wine, wheat into flour, if the product of the identical articles delivered is to be returned to the original owner in a new form, it is said to be a bailment, and the title never vests in the manufacturer. If, on the other hand, the manufacturer is not bound to return the same wheat or flour or paper, but may deliver any other of equal value,'

it is not a bailment. 218 Conn. at 755, 591 A.2d at 130, quoting *Powder Co. v. Burkhardt*, [*26] 97 U.S. 110, 116, 24 L. Ed. 973 (1877). See also *In re A-1 Hydro Mechanics Corp.*, 92 B.R. 451, 460 (Bankr. D. Hawaii 1988).

In the instant case, Welding did not deliver actual goods to Seymour, but instead delivered funds for the purchase of the necessary raw materials for Seymour to fabricate the welding wire that would ultimately be delivered to Welding. Compare *In re Bristol Industries Corp.*, 690 F.2d 26 (2d Cir. 1982)(Mansfield, J., concurring)(indicating that a toll metal account would constitute a bailment where scrap metal was shipped to a fabricator for conversion into alloy strips). Welding has failed to cite any case in which a bailment was found to exist where the alleged bailor delivered money for the purchase of goods rather than the goods themselves. Moreover, in this case as in Ballou, the final product returned to Welding was not necessarily composed of the identical goods originally delivered. To paraphrase the opinion in Ballou, because there is no evidence that the metal returned to Welding was the product of the metal originally delivered, except 'solely by chance,' the arrangement between Welding and Seymour could not constitute a bailment. [*27] *Ballou*, 218 Conn. at 756, 591 A.2d at 130. See also *In re Etch-Art, Inc.*, 65 B.R. 183 (Bankr. D.R.I. 1986). Plaintiff seeks to distinguish Ballou on the basis that the fabricator consistently represented to the creditor that it owned all the scrap metal in its possession, in contrast to this case where Seymour made Foothill aware of its tolling arrangements with Welding and other customers. However, representations made by the debtor to its creditor do not control the relationship between the debtor and the alleged bailor/customer.

Finally, there is no evidence that Welding could demand the return of its toll metal at any time. Compare *In re Sitkin Smelting & Refining, Inc.*, 639 F.2d 1213, 1217 (5th Cir. — Unit B 1981). While the parties testified that they considered the balance of Welding's toll metal account to reflect the "equivalent" weight of metals due and owing to Welding, there is nothing to show that Welding could demand the return of this metal at any point in the

fabrication process or that it could demand return of the metals purchased with its funds. Once the metal went into fabrication, it would not have been available for return to Welding and as noted [*28] above, there is no evidence that Welding's toll metals were used to fabricate the welding wire ultimately shipped to Welding.

Therefore, the court finds that the relationship between Welding and Seymour did not constitute a bailment. See *Powder Co. v. Burkhardt, 97 U.S. at 120.*

Debtor-Creditor

The court finds that the relationship between Welding and Seymour under their tolling agreement was that of debtor and creditor. See *Powder Co. v. Burkhardt, 97 U.S. at 118.* [HN8] Where a recipient of funds is not prohibited from using them as his own and is not prohibited from commingling them with his own funds, a debtor-creditor relationship is generally said to exist. *In re. Black & Geddes, Inc., 35 B.R. 830, 836 (Bankr. S.D.N.Y. 1984).*

Seymour had rights in the toll metal greater than mere possession. It had the right to incorporate the metal into products that it fabricated and sold. It had control over which metal was used, when to use it, and how the manufacturing was to be done. Thus, Seymour had rights in the toll metal sufficient for Foothill's security interest to attach. See *Litwiller, 184 Mich. App. at 374-75, 457 N.W.2d at 165-66; Morton Booth, 564 P.2d at* [*29] *214.*

Because there was no security agreement between Welding and Seymour, signed by Seymour, Welding did not have an enforceable security interest in the toll metal. *Conn. Gen. Stat. § 42a-9-203(1)(b).* Accordingly, Foothill's perfected security interest must be given priority.

While this may seem to produce a harsh result, Welding knew or should have known of Foothill's perfected security interest at the time it advanced funds to Seymour to purchase raw materials for its purchase orders. Welding could have taken steps to protect its interests in that inventory. For example, it could have perfected a purchase money security interest n5 and given notice to Foothill in the manner set forth in *Conn. Gen. Stat. § 42a-9-312(3).* See *In re. Southern Vermont Supply, 58 B.R. at 891; Kinetics Tech., supra, 705 F.2d at 400; Litwiller, supra, 184 Mich. App. at 378, 457 N.W.2d at 167.* Welding did not do this. Even after Foothill gave due notice of its intent to dispose of the collateral through private sale pursuant to *Conn. Gen. Stat. § 42a-9-504,* Welding did not respond to the notice, ostensibly because it assumed that Foothill was only disposing of collateral to which Welding [*30] did not claim an ownership interest.

n5 See *Conn. Gen. Stat. § 42a-9-107(b).*

While Welding characterizes this as "a classic case of shoot first, ask questions later," Welding fails to offer any explanation for why it took no steps to protect its interests in light of its knowledge of Seymour's precarious financial situation, as well as Foothill's loan and interest in the collateral. Now, after the fact, Welding seeks to hold Foothill liable for various forms of conversion. This it cannot do. Any claim of Welding to the toll metal inventory was subordinate to Foothill's perfected security interest.

[HN9] Conversion occurs when one, without authorization, assumes and exercises the right of ownership over property belonging to another to the exclusion of the owner's rights. *Luciani v. Stop & Shop Co., 15 Conn. App. 407, 409, 544 A.2d 1238, 1239,* cert. denied, *209 Conn. 809, 548 A.2d 437 (1988).* Because Foothill had a valid and perfected security interest in the collateral, including the toll metal to which [*31] Welding claims an interest, and because Foothill followed the statutory procedure for disposing of the collateral, it cannot be liable for conversion under the common-law or *Connecticut General Statutes § 52-564.* Similarly, Foothill cannot be liable for "immoral, oppressive and/or unscrupulous" acts that would constitute an unfair or deceptive trade practice in violation of CUTPA, *Conn. Gen. Stat. § 42-110b,* since it was authorized to take the steps that it did in disposing of the collateral that is at issue in this case and gave Welding notice of its intention to do so. See generally *Caldor, Inc. v. Heslin, 215 Conn. 590, 598, 577 A.2d 1009, 1014 (1990),* cert. denied, *498 U.S. 1088, 112 L. Ed. 2d 1053, 111 S. Ct. 966 (1991); Web Press Services Corp. v. New London Motors, Inc., 203 Conn. 342, 355, 525 A.2d 57, 64 (1987); Boulevard Assoc. v. Sovereign Hotels, Inc., 72 F.3d 1029 (2d Cir. 1995).*

Conclusion

Given its valid security interest in the collateral and its compliance with the sale requirements of Article 9, Foothill cannot be liable for conversion, statutory conversion, or violation of CUTPA. The court finds in favor of the defendant on all counts of plaintiff's [*32] second amended complaint and directs the Clerk to enter judgment in favor of defendant accordingly.

Dated this 14th day of April, 1997, in Bridgeport, Connecticut.

WARREN W. EGINTON,

Senior United States District Judge