http://www.njusao.org/files/mu307_d.htm

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA : Hon. Joseph E. Irenas

v. : Criminal No. 00-83 (JEI)

BARRY WAYNE, : 18 U.S.C. § 371

RICHARD L. SEARLE, 18 U.S.C. § 545

CARLOS AXEL AUGSPACH, : 18 U.S.C. § 1001

MICHEL VERLEYSEN, 18 U.S.C. § 1005

MIGUEL SELIGMANN, : 18 U.S.C. § 1014

EDUARDO VASQUEZ, 18 U.S.C. § 1343

JOHN BARTHOLOMEW, : 18 U.S.C. § 1957

ALVARO MENESES-DIAZ, 12 U.S.C. § 1957

AMANDA AYMAR : 18 U.S.C. § 2

a/k/a "Amanda Espinoza",

VISITACION SOUTO, :

ANTONIO ROBERTO LANUSSE

a/k/a "Henny Mornau" :

and "John Bulk",

ANIBAL GUZMAN MENENDEZ :

a/k/a "Hans Roth"

and "Roy Harper", :

and LUIS MARIA MAZZIOTTI

a/k/a "Thomas Cary" :

and "James Koller"

SUPERSEDING INDICTMENT

The United States Grand Jury for the District of New Jersey,
sitting at Newark, charges that:

3/9/00 4:09 PM

DMC 054056



EXHIBIT
A

http://www.njusao.org/files/mt0307_d.htm

## COUNT 1

(Conspiracy - 18 U.S.C. § 371)

The Defendants and Their Companies

1. At all times relevant to this Indictment:

### Handy & Harman and the Handy & Harman Defendants

a) Handy & Harman, Inc. ("Handy & Harman"), was a Delaware corporation with its principal place of business in New York, New York. Handy & Harman imported metal products from Argentina and other countries into the United States and operated refineries of precious metals in South Windsor, Connecticut and Attleboro, Massachusetts.

b) Defendant BARRY WAYNE, a resident of Woodbridge, Connecticut, was the President of South Windsor Metallurgical, Inc. ("South Windsor"), a subsidiary of Handy & Harman.

c) Defendant RICHARD L. SEARLE, a resident of Palm Desert, California, was Vice-President of Marketing for Handy & Harman. SEARLE was also Vice-President of Marketing & Sales for South Windsor.

d) Defendant CARLOS AXEL AUGSPACH, a resident of Yardley, Pennsylvania, acted as a consultant to Handy & Harman and South Windsor. AUGSPACH was also a Director of Molds, Dies & Novelties ("MDN"), a company located in Holmdel, New Jersey. MDN imported metal products into the United States from Argentina.

e) Defendant MICHEL VERLEYSEN, a resident of Yardley, Pennsylvania, acted as a consultant to Handy & Harman and South Windsor. VERLEYSEN was also a Director of Weekend Novelties ("Weekend"), a company located in Yardley and Newtown, Pennsylvania. Weekend received metal products shipped from Argentina to the United States.

### Casa Piana and the Casa Piana Defendants

f) Casa Piana, S.A. ("CP") was a company located in Buenos Aires, Argentina, which manufactured metal products from platinum, gold, silver, copper, bronze, and steel, and shipped them to various importers in the United States.

g) Defendant MIGUEL SELIGMANN, a resident of Buenos Aires, Argentina, was the Vice-President of, had an ownership interest in, and participated in the management of, CP.

h) Defendant EDUARDO VASQUEZ, a resident of Buenos Aires, Argentina, was an attorney licensed to practice law in Argentina.

3/9/00 4:09 PA

DMC 054057

http://www.njusao.org/files/mtbso7_c.htm

VASQUEZ was a Director, and participated in the management, of CP.

### MTB Bank and the MTB Bank Defendants

i) On or about May 1, 1993, MTB Banking Corp. received a charter from New York State to operate as a bank ("MTB Bank"). On or about May 1, 1995, MTB Bank opened a branch office in the Cayman Islands ("Cayman Branch"). MTB Bank, with its principal place of business in New York, New York, was a "financial institution" within the meaning of Title 18, United States Code, Sections 1343 and 20, as its deposits were insured by the Federal Deposit Insurance Corporation ("FDIC").

j) Defendant JOHN BARTHOLOMEW, a resident of Weston, Connecticut, was the President of MTB Bank.

k) Defendant ALVARO MENESES-DIAZ, a resident of Riverdale, New York, was a Senior Vice-President of MTB Bank.

l) Defendant AMANDA AYMAR a/k/a "Amanda Espinoza", a resident of Montclair, New Jersey, was a Senior Vice-President of International and Correspondent Banking at MTB Bank. Defendant AYMAR's duties included servicing the needs of MTB Bank's clients located in Argentina.

m) Defendant VISITACION SOUTO, a resident of Westfield, New Jersey, was a Vice-President of MTB Bank. Defendant SOUTO's duties included servicing the needs of MTB Bank's clients located in Argentina.

### Banco Baires and the Banco Baires Defendants

n) Banco Baires was a bank organized under the laws of Argentina and located in Buenos Aires, Argentina. Banco Baires engaged in international banking through the use of correspondent and affiliate bank accounts at financial institutions around the world, including New York. MTB Bank provided international banking services for Banco Baires.

o) Defendant ANIBAL GUZMAN MENENDEZ a/k/a

"Hans Roth" and "Roy Harper", a resident of Buenos Aires, Argentina, was the President and a Director of, and had an ownership interest in, Banco Baires.

p) Defendant ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", a resident of Buenos Aires, Argentina, was a Vice-President and Director of, and had an ownership interest in, Banco Baires.

q) Defendant LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", a resident of Buenos Aires, Argentina, was a

3/9/00 4:09 PM

DMC 054058



Vice-President and Director of, and had an ownership interest in, Banco Baires.

## Unindicted Coconspirators

2. At all times relevant to this Indictment:

a) Enrique Piana, who is named as a coconspirator but not as a defendant herein, was a resident of Argentina and the President of CP. In addition to CP, Piana also had an ownership interest in, and controlled the affairs of, Gemmodesign, S.A. ("Gemmodesign"); Argentieri, S.A. ("Argentieri"); Silver Plate, S.A. ("Silver Plate"); American Precious Metals de Argentina, S.A. ("APM"); and American Mint and Metals, Inc. (collectively "CP and its affiliates"). Piana opened bank accounts at MTB Bank for the benefit of CP and Silver Plate.

b) Luis E. Machado, who is named as a coconspirator but not as a defendant herein, was a resident of Argentina, and a Director and employee of Banco Baires. By virtue of his position at Banco Baires, Machado had the authority to direct the movement of money to and from Banco Baires accounts around the world including accounts at MTB Bank.

c) Mauricio Glaser, who is named as a coconspirator but not as a defendant herein, was a resident of Miami, Florida. Glaser created and operated a company in Miami called Intergold, Inc. ("Intergold"). Intergold imported metal products into the United States from CP and its affiliates.

d) William Turnof, who is named as a coconspirator but not as a defendant herein, was a resident of Holmdel, New Jersey. Turnof incorporated MDN and Weekend and maintained their records.

e) John Doe #1, who is named as a coconspirator but not as a defendant herein, was a resident of Buenos Aires, Argentina and an employee of CP. His responsibilities included keeping the books and records of CP and arranging for the payment and receipt of corporate funds.

f) John Doe #2, who is named as a coconspirator but not as a defendant herein, was a resident of Buenos Aires, Argentina and a consultant to CP. He later served the government of Argentina as the Secretary of International Economic Affairs for the Ministry of Foreign Affairs.

g) John Doe #3, who is named as a coconspirator but not as a defendant herein, was a resident of Buenos Aires, Argentina and a consultant to CP. He later served the government of Argentina as the Director of "Exportar", a government agency charged with encouraging exports from Argentina.

## U.S. Customs Entries

DMC 054059

3. At all times relevant to this Indictment:

a) Companies importing goods into the United States ("importers of record") were required to submit certain documents, collectively known as an "Entry", to the United States Customs Service ("U.S. Customs"). Pursuant to Title 19, United States Code, Section 1485, importers of record were required to declare that the statements in the Entry, including invoices and the values claimed therein, were true and correct, and to report to the appropriate U.S. Customs officer, any evidence showing that any such statements were not true or correct.

b) Importing merchandise into the United States through the use of fictitious invoices that falsely described the value of the merchandise and misrepresented the underlying transaction was an importation contrary to law and a felony violation of 18 U.S.C. § 545.

c) U.S. Customs provided information from U.S. Customs Entries, including the value of imported goods as declared by the importer of record in the Entry, to the United States Commerce Department and other governmental bodies for the compilation of trade statistics and other economic information.

## The Bank Secrecy Act

4. At all times relevant to this Indictment:

a) Title I of the Bank Secrecy Act ("BSA"), 12 U.S.C. §§ 1730d, 1829b, 1951-59, required banks and other financial institutions to maintain certain financial records. The primary purpose of the record keeping requirements of the BSA was to identify the source, volume, and movement of money in international commerce to aid law enforcement in the detection and investigation of financial and other crimes.

b) MTB Bank, as a financial institution, was subject to the record keeping provisions of the Bank Secrecy Act, 12 U.S.C. §§ 1829b and 1951-1959, including those regulations promulgated under the Act known as the "Know Your Customer" rules. The "Know Your Customer" rules obligated MTB Bank to keep accurate records regarding the identity of individuals: a) having signatory authority over each deposit account, and b) directing the payment of funds of $3,000 or more. 12 U.S.C. §§ 1829b; 31 C.F.R. §§ 103.11, 103.33, and 103.34.

The Banking Relationship Between

Banco Baires, Its Affiliates, and MTB Bank

5. At all times relevant to this Indictment:

a) Nuborn, Inc. ("Nuborn") was a corporation established under the

DMC 054060



laws of the Republic of Panama on August 18, 1983 by certain owners of Banco Baires. As of May 1, 1993, Nuborn held an account (#62539) at MTB Bank. On or about May 1, 1995, Nuborn established an account (#162539) at the Cayman Branch.

b) Financiera Timbal, S.A. ("F. Timbal") was a corporation established under the laws of Uruguay on April 6, 1959 by certain owners of Banco Baires. As of October 11, 1993, F. Timbal established an account (#67140) at MTB Bank.

c) Banco Baires had a "correspondent account" at MTB Bank, account #71165. A correspondent account was an arrangement between a foreign bank and a U.S. bank whereby the foreign bank received needed banking services in the United States and the U.S. bank obtained both the benefit of the correspondent bank balance and the income from the sale of its services to the foreign bank's customers.

The "Black Accounts" of Argentina

6. At all times relevant to this Indictment:

a) As a service to its clients in Argentina, the owners and directors of Banco Baires maintained accounts at financial institutions located outside Argentina for the purpose of hiding funds of Banco Baires's customers from the Argentinean tax authorities. The existence of these accounts and the records regarding them were not reported on the official books of Banco Baires in Argentina. These accounts were known in Argentina as "Black Accounts."

b) The owners and directors of Banco Baires used the Nuborn and F. Timbal accounts at MTB Bank and the Cayman Branch as Black Accounts. In order to conceal the relationship between Banco Baires and the Black Accounts from Argentinean authorities, the owners and directors of Banco Baires, with the assistance and knowledge of MTB Bank officers, adopted Anglicized aliases to open, and transfer funds through, the Nuborn and F. Timbal accounts at MTB Bank.

Argentinean Export Incentives

7. At all times relevant to this Indictment:

a) In order to encourage the export of domestically manufactured goods, in or about October 1992 the government of Argentina established an export incentive program which paid Argentinean exporters a sum of money based upon a percentage of the declared value of products exported from Argentina.

b) Under this program, from 1993 through 1996, CP and its affiliates obtained monetary payments from the government of Argentina based, in part, on the declared value of metal products CP and its affiliates exported from Argentina to the United States.

DMC 054061

http://www.njusao.org/files/mtu507_c.htm

### The Conspiracy

8. From in or about September 1992 through in or about April 1996, at Mercer and Monmouth counties, in the District of New Jersey, and elsewhere, defendants

BARRY WAYNE,

RICHARD L. SEARLE,

CARLOS AXEL AUGSPACH,

MICHEL VERLEYSEN,

MIGUEL SELIGMANN,

EDUARDO VASQUEZ,

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

AMANDA AYMAR a/k/a "Amanda Espinoza",

VISITACION SOUTO,

ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau"and "John Bulk", ANIBAL
GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper",

and

LUIS MARIA MAZZIOTTI, a/k/a "Thomas Cary" and "James Koller"

did knowingly and willfully combine, conspire, confederate, and
agree with Enrique Piana, Luis E. Machado, Mauricio Glaser, William
Turnof, John Doe #1, John Doe #2, John Doe #3, and with others, to
commit offenses against the United States, that is to:

a) knowingly and willfully violate the record keeping requirements
of the Bank Secrecy Act in furtherance of a violation of Federal
law punishable by imprisonment for more than one year, in violation
of Title 12, United States Code, Sections 1829b and 1957;

b) fraudulently and knowingly import and bring into the United
States merchandise contrary to law, namely, Title 19, United States
Code, Section 1485, by making and using false invoices and U.S.

3/9/00 4:09 PM

DMC 054062



http://www.njusao.org/files/mt0307_d.htm

Customs entries, in violation of Title 18, United States Code, Section 545;

c) knowingly and willfully make false statements in a matter material to a federal agency, in violation of Title 18, United States Code, Section 1001;

d) knowingly and willfully make and cause to be made material false entries in books, reports, and statements of a bank insured by the FDIC, with the intent to injure and defraud a body politic, in violation of Title 18, United States Code, Section 1005;

e) knowingly and willfully make and cause to be made material false statements for the purpose of influencing a financial institution the accounts of which were insured by the FDIC, in violation of Title 18, United States Code, Section 1014; f) knowingly and willfully transmit and cause to be transmitted by means of wire, radio, or television communications in interstate or foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing a scheme and artifice to obtain money and property by means of materially false, and fraudulent pretenses, representations, or promises, which scheme and artifice affected a financial institution in violation of Title 18, United States Code, Section 1343; and

g) knowingly engage and attempt to engage in monetary transactions affecting interstate and foreign commerce in criminally derived property of a value greater than $10,000 from specified unlawful activity, more specifically wire fraud proceeds, in violation of Title 18, United States Code, Section 1957.

The Object of the Conspiracy

9. The object of the conspiracy was for the defendants to enrich themselves and their employers by: a) defrauding the Argentinean government by generating false bank documents, purchase orders, sales invoices, U.S. Customs Entries, and other documents which enabled CP and its affiliates to fraudulently obtain export incentives; b) defrauding MTB Bank, a federally insured institution, by overstating the volume of sales of metal products by CP and its affiliates to Handy & Harman, MDN, Weekend, Intergold, and MTB Bank, in order to obtain credit from the bank; and c) using the proceeds of the frauds perpetrated against the government of Argentina and MTB Bank to promote, finance, and expand their fraudulent scheme.

Means and Methods of the Conspiracy

10. Among the means and methods employed by the defendants and their co-conspirators to carry out the conspiracy and effect its unlawful objects were those set forth in paragraphs 11 through 74 below.

DMC 054063

### The Scheme to Defraud the Argentinean Government

#### Through Overvalued Exports of Metal-Containing Products

11. From in or about September 1993 through April 1996, defendants BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, EDUARDO VASQUEZ, JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR a/k/a "Amanda Espinoza", VISITACION SOUTO, ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", along with Enrique Piana, Luis Machado, William Turnof, Mauricio Glaser, John Doe #1, John Doe #2, and John Doe #3 executed a scheme to defraud the Argentinean government (the "Overvaluation Scheme"). Members of the conspiracy made unlawful cash payments to high-level Argentinean officials to ensure governmental actions which would facilitate and protect the Overvaluation Scheme. The Overvaluation Scheme was executed in two versions.

Version #1

12. In the first version of the Overvaluation Scheme, CP sold and delivered gold products manufactured in Argentina to Handy & Harman in the United States. However, in order to defraud the Argentinean government of export incentives, members of the conspiracy overstated the purchase price of the goods to Argentinean and U.S. Customs officials when the goods were exported from Argentina and imported into the United States. Since the export incentive awarded by the Argentinean government was based on a percentage of the declared value of the goods exported from Argentina, overvaluing the goods increased fraudulently the amount of export incentives CP received from the Argentinean government.

13. In this version of the Overvaluation Scheme, Handy & Harman paid CP the inflated price for the goods. In order to recoup the difference between the inflated price of the imported goods and the real purchase price, Handy & Harman invoiced CP for non-existent "marketing services."

Version #2

14. In the second version of the Overvaluation Scheme, CP exported non-gold metal products manufactured in Argentina to Handy & Harman and other companies in the United States at grossly inflated prices. However, unlike Version #1 of the Overvaluation Scheme, except in certain limited circumstances no purchase and sale at any price occurred between CP and the U.S. customer. Instead, the coconspirators agreed to create front companies, and use existing companies, to act as sham purchasers for the goods.

15. As with Version #1 of the Overvaluation Scheme, the shipments from CP to the sham U.S. purchasers were overvalued by overstating to Argentinean and U.S. Customs officials the "purchase price" of the goods exported from Argentina and imported into the United States, increasing fraudulently the amount of export incentives CP received from the Argentinean government.

16. Because the intrinsic value of the non-gold products was significantly lower than the exported gold products, the non-gold items shipped to the U.S. under Version #2 of the Overvaluation Scheme were overvalued at a much greater percentage than the gold

DMC 054064

products in order to maximize the amount of export incentives. As
described in paragraphs 40 through 52 below, Version #2 of the
scheme required the creation and use of false bank documents in
order to create the illusion of a legitimate transaction when in
fact no real purchase and sale had occurred between CP and the U.S.
customer.

<u>The Handy & Harman Gold Transactions (Version #1)</u>

17. Handy & Harman was one of the world's largest dealers in
precious metals and operated several plants which extracted raw
precious metals from other items and resold the raw metals in
refined form.

18. In or about 1992, the defendants **BARRY WAYNE, RICHARD L.
SEARLE, CARLOS AXEL AUGSPACH,** and **MICHEL VERLEYSEN** learned that the
government of Argentina had enacted a program of export incentives
for goods manufactured from gold and other metals.

19. In or about the fall of 1992, Enrique Piana met with defendants
**BARRY WAYNE, CARLOS AXEL AUGSPACH,** and **MICHEL VERLEYSEN** in Buenos
Aires, Argentina. The defendants **WAYNE, AUGSPACH,** and **VERLEYSEN**
proposed a scheme to CP and four other separate Argentinean
companies not related to CP (collectively "the G5") in which the G5
would sell Argentinean gold products to Handy & Harman's refining
division in the United States at inflated prices. The defendants
**WAYNE, AUGSPACH,** and **VERLEYSEN** selected the members of G5 because
they were all large manufacturers capable of manufacturing products
necessary for the scheme. Further, the defendants **WAYNE, AUGSPACH,**
and **VERLEYSEN** coordinated and regulated the flow and types of
products exported by the G5 to minimize scrutiny by the governments
of Argentina and the United States.

20. The physical aspects of the scheme worked in the following way.
First, CP would buy refined gold in bar form from an Argentinean
bank which imported the gold into Argentina from banks in
Switzerland. Next, CP would manufacture the raw gold into gold
coins in Argentina and ship the coins to Handy & Harman's refining
division in the United States. After the gold coins reached Handy &
Harman's refining division in the United States, they were melted
back down into pure, refined, gold.

21. The financial aspects of the scheme worked in the following
way. The defendants **BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL
AUGSPACH,** and **MICHEL VERLEYSEN** agreed with Piana that Handy &
Harman would pay a predetermined price for the quantity of refined
gold obtained after the gold coins were melted down by Handy &
Harman's refining division. However, in order to increase the
amount of export incentives CP received from the Argentinean
government, the defendants agreed to cause Handy & Harman to "buy"
the coins at a price 10% higher than the predetermined value of the
gold content of the coins. For example, the defendants caused Handy

DMC 054065



& Harman to agree that it would pay $110 for a gold coin containing
$100 worth of gold, even though Handy & Harman intended to melt
down the gold coin solely for its $100 gold content.

22. The defendants **BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL
AUGSPACH,** and **MICHEL VERLEYSEN** proposed these overvalued sales in
exchange for a share of the export incentives CP fraudulently
obtained from the Argentinean government when CP exported the
overvalued coins to Handy & Harman's refining division. In order
for the Handy & Harman defendants to: a) receive their share of the
export incentives and b) recoup the 10% premium it had overpaid for
the coins, the defendants caused Handy & Harman to issue two series
of fraudulent invoices to CP.

23. The first series of invoices issued by Handy & Harman to CP
charged CP 10% of the coins' value for "marketing services." For
example, Handy & Harman issued an invoice to CP for $10 for every
$110 coin imported into the United States. This invoice was
fraudulent in that Handy & Harman did not perform any marketing
services for CP and was designed solely to recoup the 10% Handy &
Harman had overpaid CP for the coins in furtherance of the
Overvaluation Scheme.

24. The defendants **BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL
AUGSPACH,** and **MICHEL VERLEYSEN** also caused Handy & Harman to issue
a second fraudulent series of invoices to CP for "sales services"
or "sales commissions." This second series of invoices was
fraudulent in that Handy & Harman did not perform any services for
CP except to assist CP in defrauding the Argentinean government and
was designed solely to allow Handy & Harman to realize its share of
the proceeds of the fraud.

25. This second series of invoices was 3% of the declared value of
the overvalued coins (described as "sales services") if Handy &
Harman paid for the initial purchase of gold from the Swiss banks.
If CP initially paid for the Swiss gold, the invoice, and Handy &
Harman's share of the fraud proceeds, was .5% of the overvalued
coins (described as "sales commissions"). Neither of these services
was provided, but the terminology used indicated to the
coconspirators the percentage of the export incentive to be paid. At
the direction of the defendants BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL
AUGSPACH, and MICHEL VERLEYSEN, CP paid a portion of the sales
service fees and sales commissions to bank accounts located outside
the United States.

26. Between September 1993 and September 1994, CP and its
affiliates shipped gold coins from Argentina to Handy & Harman's
refining division in the United States and declared the value of
those shipments to Argentinean and U.S. Customs to be approximately
$80 million when the true value of those shipments was
approximately 10% less. These items were overvalued 10% in order to
increase fraudulently the amount of export incentives CP received

DMC 054066

from the Argentinean government.

Other Handy & Harman Transactions (Version #2)

27. As the Overvaluation Scheme progressed over time, CP and its affiliates also delivered silver-containing products from Argentina to Handy & Harman's refining division in the United States. These items were overvalued at percentages far in excess of 10% of the metal content in order to increase fraudulently the amount of export incentives CP received from the Argentinean government. Unlike the gold transactions, Piana had an understanding with defendants **BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, and MICHEL VERLEYSEN**, that Handy & Harman would not have to pay the grossly inflated price in the invoices that accompanied the shipments to the United States. As the scheme progressed, the defendants abandoned the use of fraudulent "sales services" and "sales commissions" invoices and directed Piana to pay the defendants **WAYNE, SEARLE, AUGSPACH, and VERLEYSEN** their share of the export incentives to accounts outside the United States.

28. From in or about March 1994 through in or about December 1994, Handy & Harman imported CP's silver-containing products from Argentina in the United States and in doing so, falsely declared the value of those shipments to Argentinean and U.S. Customs to be approximately $30 million when the true value of those shipments was significantly less. As in the Handy & Harman gold transactions, the values of the silver products declared to U.S. Customs were overstated in order to increase fraudulently the amount of the export incentives CP received from the Argentinean government.

The Decision to Use Additional U.S. Front

Companies to Further the Overvaluation Scheme

The Intergold Transactions (Version #2)

29. In or about September 1993, Enrique Piana met Mauricio Glaser and agreed with Glaser to use Intergold as an importer of record for shipments of CP metal products to the United States. As in the Handy & Harman gold transactions, the values of the metal products declared to U.S. Customs were overstated in order to increase fraudulently the amount of the export incentives CP received from the Argentinean government.

30. Also, as in the Handy & Harman gold transactions, metal products were physically shipped to the United States from Argentina. However, unlike the Handy & Harman gold transactions, where Handy & Harman had agreed to purchase the refined metal content of the finished metal products, Piana and Glaser agreed that Intergold would never actually purchase anything. In exchange for a share of the export incentives, Glaser agreed to import the metal products at inflated prices into the United States from Argentina as if a real purchase and sale had occurred. 31. From in

DMC 054067



or about September 1993 through in or about July 1994, Mauricio
Glaser caused Intergold to import into the United States from
Argentina approximately forty (40) shipments of overvalued metal
products from CP. Glaser later sold the metal products for scrap.

32. Upon the importation of each shipment of CP's metal products
into the United States, CP's false invoices to Intergold were
presented by Mauricio Glaser to U.S. Customs. The false invoices
overstated the true value of the metal products and represented a
fictitious purchase of the goods by the importing company.

The Weekend and MDN Transactions (Version #2)

and the Meeting in Princeton, New Jersey

33. On or about November 18, 1993, Enrique Piana traveled to New
Jersey from Argentina for a meeting in Princeton with William
Turnof, defendants MIGUEL SELIGMANN, EDUARDO VASQUEZ, CARLOS AXEL
AUGSPACH, MICHEL VERLEYSEN, and others. In order to expand the
Overvaluation Scheme and the fraud against the Argentinean
government, defendants SELIGMANN, VASQUEZ, AUGSPACH, and VERLEYSEN
agreed with Piana and Turnof to create several companies in the
United States to import CP's metal products at inflated prices.

34. Piana, Turnof, and defendants MIGUEL SELIGMANN, EDUARDO
VASQUEZ, CARLOS AXEL AUGSPACH, and MICHEL VERLEYSEN further agreed
to create invoices and purchase orders purporting to document
the sale of metal products from CP in Argentina to these importing
companies in the United States. As a result of the Princeton
meeting, Turnof incorporated Weekend and MDN in Pennsylvania and
New Jersey, respectively.

35. As with the Intergold transactions, Piana agreed with Turnof
and defendants MIGUEL SELIGMANN, EDUARDO VASQUEZ, CARLOS AXEL
AUGSPACH, and MICHEL VERLEYSEN that Weekend and MDN would never
actually purchase anything. In exchange for a share of the export
incentives, Piana, Turnof, and defendants SELIGMANN, VASQUEZ,
AUGSPACH, and VERLEYSEN agreed to use MDN and Weekend to import the
metal products at inflated prices into the United States from
Argentina even though no real purchase and sale had occurred.

36. From in or about February 1994 through in or about May 1995,
defendants MIGUEL SELIGMANN, EDUARDO VASQUEZ, CARLOS AXEL AUGSPACH,
and MICHEL VERLEYSEN caused MDN and Weekend to import into the
United States from Argentina approximately two hundred (200)
shipments of overvalued metal products from CP. Turnof later sold
the metal products for scrap.

37. Upon the importation of each shipment of CP's metal products
into the United States, CP's false invoices to Weekend and MDN were
presented by William Turnof to U.S. Customs. The false invoices
overstated the true value of the metal products and represented a

DMC 054068

fictitious purchase of the goods by the importing companies.

The Decision to Use MTB Bank

As An Additional Front Company (Version #2)

And Use of the Black Accounts in the Overvaluation Scheme

The Use of Anglicized Aliases

and the Nuborn and F. Timbal Black

Accounts to Further the Overvaluation Scheme

38. On or about September 1, 1993 and January 20, 1994, Luis Machado and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", signed MTB Bank signature account cards for F. Timbal and Nuborn using Anglicized aliases. For the purpose of transacting business in the Black Accounts, Machado adopted the aliases "Paul Sharpe" and "Tom Stewart." Defendant LANUSSE adopted the aliases "Henny Mornau" and "John Bulk", MENENDEZ adopted the aliases "Hans Roth" and "Roy Harper", and MAZZIOTTI adopted the alias "Thomas Cary" and "James Koller."

39. Defendants JOHN BARTHOLOMEW, AMANDA AYMAR a/k/a "Amanda Espinoza", and VISITACION SOUTO knew that Machado and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", used aliases to transfer funds to, from, and through the F. Timbal and Nuborn accounts at MTB Bank. These officers of MTB Bank also knew that the use of fictitious names was a violation of the BSA and its "Know Your Customer" rules.

CP's Need for Bank Documentation

40. On some occasions, in order to obtain export incentives from the Argentinean government on the shipments of metal products to Handy & Harman, Intergold, MDN, and Weekend in Version #2 of the Overvaluation Scheme, CP required documentation that the false and inflated invoices from CP to these entities were actually paid, even though Piana and defendants MIGUEL SELIGMANN and EDUARDO VASQUEZ had agreed with Turnof, Glaser, and the other coconspirators that the importers were not obligated to pay the inflated prices stated on the invoices for the non-gold metal products.

41. Defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", along with Luis Machado,

DMC 054069

http://www.njuseo.org/tiles/mtc/307_d.htm



agreed to accept a fee from CP to provide the company with false bank documentation purportedly showing the movement of money to CP through MTB Bank in payment of the fraudulent CP invoices issued to Handy & Harman, Intergold, MDN, and Weekend.

42. From on or about October 21, 1993 through on or about June 28, 1995, Luis Machado, acting at the direction of defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller" directed defendants AMANDA AYMAR a/k/a "Amanda Espinoza" and VISITACION SOUTO to transfer funds using the Nuborn and F. Timbal accounts at MTB Bank and the Cayman Branch to create the illusion that Handy & Harman, Intergold, MDN, and Weekend were paying monies to CP.

43. These transfers created bank documentation which Machado gave to CP for presentation to the Argentinean government to mislead it into believing that Handy & Harman, Intergold, MDN, and Weekend had actually purchased the products CP shipped to those entities under Version #2 of the Overvaluation Scheme at the prices stated in the inflated invoices. For this service, A CP paid Machado and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller" a percentage of each transfer of funds in cash.

44. Between on and about April 29, 1994 and on or about March 17, 1995, Piana, Machado, and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", AMANDA AYMAR a/k/a "Amanda Espinoza", and VISITACION SOUTO caused approximately fifty-six (56) book transfers of funds to be entered on the books of MTB Bank in a total amount of approximately $32 million. These transfers, made to, form, and through the Nuborn and F. Timbal Black Accounts, credited Banco Baires's account at MTB Bank with instructions for further credit to CP's account at Banco Baires in Argentina on behalf of MDN.

45. These book transfers were designed to make it appear that MDN had paid approximately $32 million to CP for some of the products received by MDN. These entries on the records of MTB Bank were false in that MDN did not actually transfer funds to CP.



46. Between on or about June 27, 1994 and on or about March 30, 1995, Piana, Machado, and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", AMANDA AYMAR a/k/a "Amanda Espinoza", and VISITACION SOUTO caused approximately thirty-six (36) book transfers of funds to be entered on the books of MTB Bank in a total amount of approximately $16 million. These transfers, made to, from, and through the Nuborn and F. Timbal Black Accounts, credited Banco Baires's account at MTB Bank with instructions for further credit to CP's account at Banco Baires in Argentina on behalf of Weekend.

DMC 054070

http://www.njusao.org/files/mtb5u7_d.htm



47. These book transfers were designed to make it appear that Weekend had paid approximately $16 million to CP for some of the products received by Weekend. These entries on the records of MTB Bank were false in that Weekend did not actually transfer funds to CP.

48. Between on or about October 21, 1993 and on or about September 15, 1994, Piana, Machado, and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", AMANDA AYMAR a/k/a "Amanda Espinoza", and VISITACION SOUTO caused approximately twelve (12) book transfers to be entered on the books of MTB Bank in a total amount of approximately $14 million. These transfers, made to, from, and through the Nuborn and F. Timbal Black Accounts, credited Banco Baires's account at MTB Bank with instructions for further credit to CP's account at Banco Baires in Argentina on behalf of Intergold.

49. These book transfers were designed to make it appear that Intergold had paid approximately $14 million to CP for some of the products received by Intergold. These entries on the records of MTB Bank were false in that Intergold did not actually transfer funds to CP.



50. Between on or about January 4, 1995 and on or about January 11, 1995, Piana, Machado, and defendants ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", AMANDA AYMAR a/k/a "Amanda Espinoza", and VISITACION SOUTO caused approximately four (4) book transfers to be entered on the books of MTB Bank in a total amount of approximately $1.4 million. These transfers, made to, from, and through the Nuborn and F. Timbal Black Accounts, credited Banco Baires's account at MTB Bank with instructions for further credit to CP's account at Banco Baires in Argentina on behalf of Handy & Harman.

51. These book transfers were designed to make it appear that Handy & Harman had paid approximately $1.4 million to CP for some portion of the products received by Handy & Harman. These entries on the records of MTB Bank were false in that Handy & Harman did not actually transfer funds to CP for those transactions.

52. Each of the aforementioned transfers referred to in paragraphs 42 through 51 above was made on the books and records of MTB Bank to enable CP and its affiliated companies to defraud the Argentinean Government of export incentives.



The Use Of MTB Bank As A Sham Purchaser (Version #2)

53. After an introduction from Luis Machado, Enrique Piana and

DMC 054071



defendant MIGUEL SELIGMANN met in June 1994 with defendants JOHN BARTHOLOMEW and AMANDA AYMAR a/k/a "Amanda Espinoza" in Buenos Aires, Argentina at the offices of CP. Enrique Piana and SELIGMANN explained the Overvaluation Scheme to BARTHOLOMEW and AYMAR and invited MTB Bank to act as a sham purchaser of CP metal products. BARTHOLOMEW and AYMAR agreed that MTB Bank would act as the importer of record and sham purchaser of silver products CP would deliver to Handy & Harman. 54. Defendants JOHN BARTHOLOMEW and AMANDA AYMAR a/k/a "Amanda Espinoza" agreed to allow MTB Bank to act as a sham purchaser in exchange for a "commission" paid to MTB Bank by CP. BARTHOLOMEW and AYMAR further agreed to create false invoices and purchase orders purporting to document the overvalued sale of metal products from CP in Argentina to MTB Bank in the United States. Enrique Piana and defendant MIGUEL SELIGMANN explained to BARTHOLOMEW and AYMAR that the goods would be overvalued in order to increase the amount of incentives CP received from the Argentinean government.

55. From in or about December 1994 through in or about May 1995, defendants JOHN BARTHOLOMEW and AMANDA AYMAR a/k/a "Amanda Espinoza" caused MTB Bank to import into the United States from Argentina approximately twenty - two (22) shipments of overvalued silver products from CP.

56. As in the Handy & Harman, Weekend, MDN, and Intergold importations, the false invoices accompanying these shipments were submitted to U.S. Customs. The invoices were false in that they overstated the true value of the metal products and represented a fictitious purchase of the goods by MTB Bank. As in the transactions with Handy & Harman, Weekend, MDN, and Intergold, the values of the metal products declared to U.S. Customs were overstated in order to increase the amount of the export incentives CP received from the Argentinean government.

57. In addition to silver products, defendants JOHN BARTHOLOMEW, AMANDA AYMAR a/k/a "Amanda Espinoza", and ALVARO MENESES-DIAZ agreed to have MTB Bank act as a sham purchaser of copper and bronze products. Defendants BARTHOLOMEW, AYMAR, and MENESES-DIAZ further agreed to create false invoices and purchase orders purporting to document the sale of copper and bronze products from CP and affiliates in Argentina to MTB Bank. As with the Intergold, MDN, and Weekend transactions under Version #2 of the scheme, Piana and defendant MIGUEL SELIGMANN agreed with defendants BARTHOLOMEW, AYMAR, and MENESES-DIAZ that MTB Bank would never actually purchase copper or bronze products from CP and its affiliates or the raw metal contained in the products. In exchange for a share of the proceeds of scrap or other sales to be paid to MTB Bank, BARTHOLOMEW, AYMAR, and MENESES-DIAZ agreed to use MTB Bank to import the metal products at inflated prices into the United States from Argentina as if a real purchase and sale at the inflated price had occurred.

DMC 054072



58. From in or about December 1994 through in or about

September 1995, defendants JOHN BARTHOLOMEW, AMANDA AYMAR a/k/a "Amanda Espinoza", and ALVARO MENESES-DIAZ caused MTB Bank to import into the United States from Argentina approximately fifty (50) shipments of overvalued copper and bronze metal products from CP. MTB Bank later sold some of the products for scrap.

59. Upon the importation of each shipment of CP's

copper and bronze products into the United States, CP's false invoices to MTB Bank were presented to U.S. Customs. The false invoices overstated the true value of the metal products and represented a fictitious purchase of the goods by MTB Bank. As in the transactions with Handy & Harman, Weekend, MDN, and Intergold, the values of the copper and bronze products declared to U.S. Customs were overstated in order to increase the amount of the export incentives CP received from the Argentinean government.

The "Tequila Effect" and the Use of Additional

MTB Bank Accounts to Further the Overvaluation Scheme 60. In or about December 1994, the Mexican Peso suffered a severe devaluation in worldwide currency markets. This event, known in the financial world as the "Tequila Effect", destabilized many South American financial institutions, including Banco Baires. Each of these institutions suffered losses in its loan portfolio and other adverse effects on its capital base.

61. As a result of the Tequila Effect, Banco Baires lacked sufficient capital to circulate funds through the Black Accounts at MTB Bank to make it appear that the U.S. purchasers were paying CP the inflated prices stated on the sales invoices. By March 1995, both the F. Timbal and Nuborn accounts had negative balances.

62. In March 1995, defendant MIGUEL SELIGMANN asked defendant AMANDA AYMAR a/k/a "Amanda Espinoza" to engage in a series of financial transactions at MTB Bank that would make it appear that CP had received payment from MTB Bank for MTB Bank's fraudulent importations of metal products from CP and its affiliates.

63. On or about March 14, 1995, defendant AMANDA AYMAR a/k/a "Amanda Espinoza" opened up an account in the name of Silver Plate at the direction of defendant MIGUEL SELIGMANN. 64. Between on or about March 20, 1995 and on or about June 28, 1995, Enrique Piana, Luis Machado, and defendants AMANDA AYMAR a/k/a "Amanda Espinoza", VISITACION SOUTO, and MIGUEL SELIGMANN caused approximately seven (7) book transfers to be entered on the books of MTB Bank in a total amount of approximately $17 million. These transfers, made to, from, and through the Silver Plate account, credited CP's

DMC 054073



account at MTB Bank.

65. These book transfers were designed to make it appear that MTB Bank had paid approximately $17 million to CP for the products imported by MTB Bank. These entries on the records of MTB Bank were false in that MTB Bank did not actually pay CP for metal products.

### The Scheme to Obtain Insured Bank Funds From MTB Bank

### In Furtherance of the Fraudulent Export Incentive Scheme

66. In or about May 1995, Piana, John Doe #1, and defendants MIGUEL SELIGMANN and EDUARDO VASQUEZ decided to expand the Overvaluation Scheme to products manufactured from platinum. In order to finance CP's purchases of platinum, in or about April 1995, Piana, John Doe #1, and defendants SELIGMANN and VASQUEZ applied to MTB Bank, on behalf of CP, for a $2,880,000 unsecured line of credit to lease approximately 200 kilograms of platinum. Piana agreed with officers of MTB Bank that he would import the platinum into Argentina, fabricate metal products, and import them into the United States at inflated prices.

67. In or about April 1995, Piana, John Doe #1, and defendants MIGUEL SELIGMANN and EDUARDO VASQUEZ, in support of this application for credit, submitted to MTB Bank financial statements for CP for the years 1993 and 1994. These financial statements were false in that they included in CP's gross sales figures tens of millions of dollars in fraudulent, overvalued sales to Handy & Harman, Intergold, MDN, Weekend, and MTB Bank. The defendants JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, and AMANDA AYMAR a/k/a "Amanda Espinoza" knew that the financial statements were false.

68. On or about May 10, 1995, the Chief Credit Officer of MTB Bank distributed to the members of the MTB Bank Credit Committee copies of a summary of the CP application, including copies of the false financial statements submitted by Piana, John Doe #1, and defendants MIGUEL SELIGMANN and EDUARDO VASQUEZ.

69. Despite an obligation to do so as officers of MTB Bank, defendants JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, and AMANDA AYMAR a/k/a "Amanda Espinoza" failed to correct material misrepresentations in the CP credit application, known to them to be false, and failed to disclose to the Credit Committee their knowledge regarding the Overvaluation Scheme.

70. On or about May 11, 1995, the Credit Committee at MTB Bank met to discuss and vote on credit applications including the application made on behalf of CP. After discussing the proposed line of credit and based, in part, on CP's false financial statements, the Credit Committee voted to approve it, subject to approval by MTB Bank's Board of Directors.

DMC 054074

71. On or about May 16, 1995, a member of the Board of Directors of MTB Bank reviewed the application and approved a $2,880,000 line of credit for CP, based, in part, on his reliance on CP's false financial statements and the failure of the defendants JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, and AMANDA AYMAR a/k/a "Amanda Espinoza" to disclose their knowledge of the Overvaluation Scheme to the Board of Directors of MTB Bank.

72. On or about June 20, 1995, Piana, acting on behalf of CP, signed a contract with MTB Bank to lease approximately 200 kilograms of platinum utilizing the $2,880,000 line of credit. From July 1995 through the fall of 1995, an agent of MTB Bank delivered 200 kilograms of platinum to CP in Buenos Aires, Argentina in several shipments.

73. The contract between CP and MTB Bank regarding the lease of platinum obligated CP to return a like amount of platinum at a future date. On or about December 14, 1995, CP defaulted on this obligation after the Argentinean government discovered the Overvaluation Scheme and froze the accounts of CP.

## Overt Acts

74a-74i. In furtherance of the conspiracy and to effect its unlawful objects, defendants BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, EDUARDO VASQUEZ, JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR a/k/a "Amanda Espinoza", VISITACION SOUTO, ANTONIO ROBERTO LANUSSE a/k/a "Benny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", and others committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

a) In or about November 1993, defendants MIGUEL SELIGMANN, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, EDUARDO VASQUEZ and others traveled to Princeton, New Jersey.

b) In or about November 1993, defendants MIGUEL SELIGMANN, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, EDUARDO VASQUEZ and others traveled to Attleboro, Massachusetts and met with defendants BARRY WAYNE, RICHARD L. SEARLE, and others.

c) In or about September 1994, defendants MIGUEL SELIGMANN, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, and others traveled to New York, New York and met with defendants JOHN BARTHOLOMEW and ALVARO MENESES-DIAZ.

d) In or about October 1994, defendants JOHN BARTHOLOMEW and ALVARO MENESES-DIAZ met with Luis Machado in Madrid, Spain.

e) In or about March 1995, defendant MIGUEL SELIGMANN placed a

DMC 054075

http://www.njusao.org/files/mt0307_d.htm

telephone call from Buenos Aires, Argentina to defendant **AMANDA AYMAR a/k/a "Amanda Espinoza"** in New York, New York.

f) On or about April 17, 1995, defendants **JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, and AMANDA AYMAR a/k/a "Amanda Espinoza"** caused MTB Bank to import into the United States from Argentina under Entry Number 34100959070 items described as medallions valued at $772,740 and said to contain copper and other metals.

g) On or about April 27, 1995, defendants **JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, and AMANDA AYMAR a/k/a "Amanda Espinoza"** caused MTB Bank to import into the United States from Argentina under Entry Number 16401060757 items described as numismatic medals valued at $998,000 and said to contain silver.

h) On or about June 6, 1995, defendants **BARRY WAYNE and RICHARD L. SEARLE** caused Handy & Harman to import into the United States from Argentina under Entry Number 16401069220 items described as electrical contacts valued at $142,542 and said to contain silver.

i) On or about June 8, 1995, **BARRY WAYNE and RICHARD L. SEARLE** caused Handy & Harman to import into the United States from Argentina under Entry Number 16401069683 items described as electrical contacts valued at $142,542 and said to contain silver.

All in violation of Title 18, United States Code, Section 371.

<u>COUNTS 2 through 4</u>

(Importation Contrary to Law - 18 U.S.C. § 545)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. On or about the dates set forth below, at Mercer and Monmouth counties, in the District of New Jersey, and elsewhere, defendants

CARLOS AXEL AUGSPACH,

MICHEL VERLEYSEN,

MIGUEL SELIGMANN,

and

EDUARDO VASQUEZ

fraudulently and knowingly did import and bring, cause to be imported and brought, and aided and abetted the importation and bringing, into the United States merchandise contrary to law, specifically Title 19, United States Code, Section 1485, by

DMC 054076

http://www.njusao.org/files/mt030/_d.htm

presenting U.S. Customs with invoices that were false and
fraudulent, in that the invoices: a) overstated the true value of
metal products imported into the U.S., and b) purported to
represent a sale of such products when, in fact, no sale of the
products described in the invoices actually occurred, as follows:

Shipments from CP to MDN

| Count | Approx. Date | Shipper/Importer/ Entry # | Description/ False value declared to U.S. Customs | Defendants |
|---|---|---|---|---|
| 2 | 4/24/95 | CP/MDN/20701172924 | Steel Dies/ $820,000 | CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 3 | 4/28/95 | CP/MDN/20701173153 | Steel Dies/ $820,000 | CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 4 | 5/5/95 | CP/MDN/20701173559 | Steel Dies/ $820,000 | CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |

All in violation of Title 18, United States Code, Sections
545 and 2.

### COUNTS 5 through 17

(Importation Contrary to Law - 18 U.S.C. § 545)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged
and incorporated as if set forth in full herein.

2. On or about the dates set forth below, in New York, and
elsewhere, defendants

BARRY WAYNE,

RICHARD L. SEARLE,

CARLOS AXEL AUGSPACH,

MICHEL VERLEYSEN,

3/9/00 4:09 PM

DMC 054077

http://www.njusao.org/tiles/mru30/_a.htm

MIGUEL SELIGMANN,

EDUARDO VASQUEZ,

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ, and

AMANDA AYMAR a/k/a "Amanda Espinoza"

fraudulently and knowingly did import and bring, cause to be
imported and brought, and aided and abetted the importation and
bringing, into the United States merchandise contrary to law,
specifically Title 19, United States Code, Section 1485, by
presenting U.S. Customs with invoices that were false and
fraudulent, in that the invoices: a) overstated the true value of
metal products imported into the U.S., and b) purported to
represent a sale of such products when, in fact, no sale of the
products described in the invoices actually occurred, as follows:


Shipments from APM to Handy & Harman

| Count | Approx. Date | Shipper/Importer/ Entry # | Description/ False value declared to U.S. Customs | Defendants |
|---|---|---|---|---|
| 5 | 6/6/95 | APM/Handy&Harman/ 16401068362 | Silver Connectors/ $171,050 | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 6 | 6/7/95 | APM/Handy&Harman/ 16401069451 | Silver Connectors/ $171,050 | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 7 | 6/9/95 | APM/Handy&Harman/ 16401069527 | Silver Connectors/ $171,050 | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |

3/9/00 4:09 PM

DMC 054078

Shipments from CP, Argentieri, and Gemmodesign to MTB Bank

| Count | Approx. Date | Shipper/Importer/ Entry # | Description/ False value declared to U.S. Customs | Defendants |
|---|---|---|---|---|
| 8 | 4/11/95 | CP/MTB Bank/ 16401057480 | Silver Medals/ $998,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 9 | 4/19/95 | CP/MTB Bank/ 34100958395 | Copper Medals/ $772,740 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 10 | 4/24/95 | CP/MTB Bank/ 34100960516 | Copper Medals/ $772,740 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| Count | Approx. Date | Shipper/Importer/ Entry # | Description/ False value declared to U.S. Customs | Defendants |
| 11 | 4/26/95 | CP/MTB Bank/ 34100961696 | Copper Medals/ $772,740 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 12 | 4/21/95 | Gemmodesign/ MTB Bank/ 34100960292 | Bronze Masks/ $530,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 13 | 5/1/95 | Gemmodesign/ MTB Bank/ 34100963429 | Bronze Masks/ $455,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 14 | 6/9/95 | Gemmodesign/ MTB Bank/ 34100974426 | Bronze Masks/ $976,500 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |

DMC 054079

| 15 | 6/6/95 | Argentieri/<br><br>MTB Bank/<br>34100973857 | Copper Medals/<br><br>$291,924 | JOHN BARTHOLOMEW,<br>ALVARO MENESES-DIAZ,<br>AMANDA AYMAR,<br><br>MIGUEL SELIGMANN, and<br><br>EDUARDO VASQUEZ |
| 16 | 6/9/95 | Argentieri/<br><br>MTB Bank/<br>34100974442 | Copper Medals/<br><br>$291,924 | JOHN BARTHOLOMEW,<br>ALVARO MENESES-DIAZ,<br>AMANDA AYMAR,<br><br>MIGUEL SELIGMANN, and<br><br>EDUARDO VASQUEZ |
| 17 | 6/23/95 | Argentieri/<br><br>MTB Bank/<br>34100978237 | Copper Medals/<br><br>$571,828 | JOHN BARTHOLOMEW,<br>ALVARO MENESES-DIAZ,<br>AMANDA AYMAR,<br><br>MIGUEL SELIGMANN, and<br><br>EDUARDO VASQUEZ |

All in violation of Title 18, United States Code, Sections

545 and 2.

### COUNTS 18 through 26

(False Statements - 18 U.S.C. § 1001)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. On or about the dates set forth below, in the Southern District of New York, and elsewhere, in a matter within the jurisdiction of the Executive Branch of the government of the United States, defendants

MIGUEL SELIGMANN,

EDUARDO VASQUEZ,

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

and AMANDA AYMAR a/k/a "Amanda Espinoza"

willfully and knowingly made and used, caused to be made and used, and aided and abetted the making and use of, false writings and documents knowing the same to contain false, fictitious, and fraudulent material statements and entries in that the defendants

3/9/00 4:09 PM

DMC 054080

http://www.njusao.org/files/mt0307_d.htm

issued, and caused to be issued, purchase orders from MTB Bank to APM and Argentieri which were false and fraudulent, in that they a) substantially overstated the true value of metal products imported by MTB Bank into the U.S., and b) purported to represent a purchase of such products when, in fact, no purchase of the products described in the purchase orders actually occurred, as follows:

| Count | Approx. Date | Shipper/Importer/ Entry # | Description/ False value declared to U.S. Customs | Defendants |
|---|---|---|---|---|
| 18 | 6/21/95 | Argentieri/ MTB Bank/ 34100976835 | Bronze Masks/ $1,053,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 19 | 6/27/95 | Argentieri/ MTB Bank/ 34100979862 | Bronze Masks/ $257,400 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 20 | 7/14/95 | Argentieri/ MTB Bank/ 34100985117 | Bronze Masks/ $402,550 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 21 | 9/13/95 | APM/MTB Bank/ 34100996197 | Bronze Medals/ $617,400 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 22 | 9/14/95 | APM/MTB Bank/ 34100995868 | Bronze Medals/ $617,400 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 23 | 9/22/95 | APM/MTB Bank/ 34100997260 | Bronze Medals/ $617,400 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 24 | 9/29/95 | APM/MTB Bank/ 34100998177 | Platinum Beakers/ $84,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, |

DMC 054081

http://www.njusao.org/files/mt0307_d.htm

| | | | | MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
|---|---|---|---|---|
| 25 | 10/3/95 | APM/MTB Bank/ 34100997948 | Platinum Beakers/ $21,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| Count | Approx. Date | Shipper/Importer/ Entry # | Description/ False value declared to U.S. Customs | Defendants |
| 26 | 10/3/95 | APM/MTB Bank/ 34100998284 | Platinum Beakers/ $168,000 | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |

All in violation of Title 18, United States Code, Sections 1001 and 2.

### COUNTS 27 through 32

#### (False Bank Entries - 18 U.S.C. § 1005)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. On or about the dates set forth below, in the Southern District of New York, and elsewhere, defendants

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

and AMANDA AYMAR a/k/a "Amanda Espinoza"

acting as officers, agents and employees of an insured bank, made, caused to be made, and aided and abetted the making of, material false entries in books, reports, and statements of such bank, with the intent to injure and defraud a body politic, by causing bank book transfers to be made in New York and elsewhere crediting Casa Piana's account at MTB Bank in New York for fraudulent purchases of silver coins, with the intent to defraud the Argentinean government of export incentives, as follows:

DMC 054082



http://www.njusao.org/files/mt0307_d.htm

| Count | MTB Book Transfers Crediting the Account of Casa Piana at MTB in New York For Fraudulent Purchases of Silver Coins | |
|---|---|---|
| | Date | Amount (U.S.) Dollars |
| 27 | March 20, 1995 | $2,335,850 |
| 28 | March 21, 1995 | $3,342,390 |
| 29 | March 22, 1995 | $3,406,071 |
| 30 | March 23, 1995 | $2,558,982 |
| 31 | May 5, 1995 | $3,010,567 |
| 32 | June 28, 1995 | $2,599,827 |

In violation of Title 18, United States Code, Sections 1005 and 2.

## COUNT 33

(False Credit Application - 18 U.S.C. § 1014)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1

are realleged and incorporated as if set forth in full herein.

2. On or about May 10, 1995, in the Southern District of New York, and elsewhere, defendants

MIGUEL SELIGMANN,

EDUARDO VASQUEZ,

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

and AMANDA AYMAR a/k/a "Amanda Espinoza"

knowingly and willfully made, caused to be made, and aided and abetted the making of, a material false statement and report for the purpose of influencing the action of MTB Bank, an institution the accounts of which were insured by the Federal Deposit Insurance Corporation in that they made, caused to be made, and aided and abetted the making of, a false statement as to the dollar volume of sales made by Casa Piana, when in fact, as the defendants then and there well knew, Casa Piana's sales volume was greatly overstated as a result of the Overvaluation Scheme. In violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT 34

(False Credit Application - 18 U.S.C. § 1014)

3/9/00 4:09 PM

DMC 054083



1. Paragraphs 1 through 7 and 9 through 74 of Count 1

are realleged and incorporated as if set forth in full herein.

2. On or about May 10, 1995, in the Southern District of New York, and elsewhere, defendants

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

AMANDA AYMAR a/k/a "Amanda Espinoza",

and

VISITACION SOUTO

knowingly and willfully made, caused to be made, and aided and abetted the making of, a material false statement and report for the purpose of influencing the action of MTB Bank, an institution the accounts of which were insured by the Federal Deposit Insurance Corporation in that they falsely stated that Casa Piana had been known to defendants BARTHOLOMEW and MENESES-DIAZ for five (5) years as of that date, when in fact, as the defendants then and there well knew, Piana had been introduced to them no earlier than 1994 for the purpose of enlisting MTB Bank in furthering the Overvaluation Scheme.

In violation of Title 18, United States Code, Sections 1014 and 2.

COUNTS 35 through 40

(Wire Fraud Affecting a Financial Institution - 18 U.S.C. § 1343)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. Between in or about October 1992 and in or about

July 1995, in the District of New Jersey and elsewhere,

defendants BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, EDUARDO VASQUEZ, and others did knowingly and willfully devise and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of material false, and fraudulent pretenses, representations, or promises, as set forth in paragraphs 9 through 74 of Count 1 of this Indictment. This scheme and artifice to defraud affected MTB Bank, a financial institution within the meaning of Title 18, United States Code, Sections 1343 and 20.

3. On or about the dates set forth below, at Mercer and Monmouth counties, in the District of New Jersey and elsewhere, defendants

DMC 054084

BARRY WAYNE,

RICHARD L. SEARLE,

CARLOS AXEL AUGSPACH,

MICHEL VERLEYSEN,

MIGUEL SELIGMANN,

and

EDUARDO VASQUEZ

did knowingly and willfully transmit, aided and abetted in the transmission of, and caused to be transmitted, by means of wire, radio, or television communications in interstate and foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing a scheme and artifice to obtain money and property by means of material false, and fraudulent pretenses, representations, or promises, as follows:

| Count | Approx. Date | Nature of Wire Transmission | Defendants |
|-------|--------------|-----------------------------|------------|
| 35 | 7/18/94 | Wire transfer from MTB Bank in New York, New York to United Jersey Bank, Marlboro, New Jersey | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 36 | 8/11/94 | Wire transfer from MTB Bank in New York, New York to United Jersey Bank, Marlboro, New Jersey | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 37 | 8/22/94 | Wire transfer from MTB Bank in New York, New York to United Jersey Bank, Marlboro, New Jersey | BARRY WAYNE, RICHARD L. SEARLE, |

DMC 054085

http://www.njusao.org/files/mt0307_d.htm

| Count | Approx. Date | Nature of Wire Transmission | Defendants |
|---|---|---|---|
| | | | CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 38 | 10/27/94 | Wire transfer from MTB Bank in New York, New York to United Jersey Bank, Marlboro, New Jersey | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 39 | 1/31/95 | Wire transfer from MTB Bank in New York, New York to United Jersey Bank, Marlboro, New Jersey | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| Count | Approx. Date | Nature of Wire Transmission | Defendants |
| 40 | 2/24/95 | Wire transfer from MTB Bank in New York, New York to United Jersey Bank, Marlboro, New Jersey | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS 41 through 45

3/9/00 4:09 PM

DMC 054086

http://www.njusac.org/files/mt0307_d.htm

(Wire Fraud Affecting a Financial Institution - 18 U.S.C. § 1343)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. Between in or about October 1992 and in or about

July 1995, in the Southern District of New York and elsewhere, defendants BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, EDUARDO VASQUEZ, JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR a/k/a "Amanda Espinoza", ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper", LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller", and others did knowingly and willfully devise and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of material false, and fraudulent pretenses, representations, or promises, as set forth in paragraphs 9 through 74 of Count 1 of this Indictment. This scheme and artifice to defraud affected MTB Bank, a financial institution within the meaning of Title 18, United States Code, Sections 1343 and 20.

3. On or about the dates set forth below, in the Southern District of New York, and elsewhere, defendants

BARRY WAYNE,

RICHARD L. SEARLE,

CARLOS AXEL AUGSPACH,

MICHEL VERLEYSEN,

MIGUEL SELIGMANN,

EDUARDO VASQUEZ,

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

AMANDA AYMAR a/k/a Amanda Espinoza,

ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau" and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper",

and

LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller"

DMC 054087

http://www.njusao.org/files/mt0307_a.htm

did knowingly and willfully transmit, aided and abetted in the
transmission of, and caused to be transmitted, by means of wire,
radio, or television communications in interstate and foreign
commerce, writings, signs, signals, pictures, or sounds for the
purpose of executing a scheme and artifice to obtain money and
property by means of material false, and fraudulent pretenses,
representations, or promises, as follows:

| Count | Approx. Date | Nature of Wire Transmission | Defendants |
|---|---|---|---|
| 41 | 3/20/95 | Facsimile from Enrique Piana in Buenos Aries, Argentina to MTB Bank in New York, New York | BARRY WAYNE, RICHARD L. SEARLE, CARLOS AXEL AUGSPACH, MICHEL VERLEYSEN, MIGUEL SELIGMANN, and EDUARDO VASQUEZ |
| 42 | 3/21/95 | Facsimile from Enrique Piana in Buenos Aries, Argentina to MTB Bank in New York, New York | MIGUEL SELIGMANN, EDUARDO VASQUEZ, JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, ANTONIO ROBERTO LANUSSE, ANIBAL GUZMAN MENENDEZ, and LUIS MARIA MAZZIOTTI |
| Count | Approx. Date | Nature of Wire Transmission | Defendants |
| 43 | 3/22/95 | Facsimile from Luis Machado in Buenos Aries, Argentina to MTB Bank in New York, New York | MIGUEL SELIGMANN, EDUARDO VASQUEZ, JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, AMANDA AYMAR, ANTONIO ROBERTO LANUSSE, |

3/9/00 4:09 PM

DMC 054088

http://www.njusao.org/files/mt0307_d.htm

| | | | ANIBAL GUZMAN MENENDEZ, and LUIS MARIA MAZZIOTTI |
|---|---|---|---|
| 44 | 3/23/95 | Facsimile from Luis Machado in Buenos Aries, Argentina to MTB Bank in New York, New York | MIGUEL SELIGMANN,<br><br>EDUARDO VASQUEZ,<br><br>JOHN BARTHOLOMEW,<br><br>ALVARO MENESES-DIAZ,<br><br>AMANDA AYMAR,<br><br>ANTONIO ROBERTO LANUSSE,<br><br>ANIBAL GUZMAN MENENDEZ, and LUIS MARIA MAZZIOTTI |
| 45 | 5/3/95 | Facsimile from Luis Machado in Buenos Aries, Argentina to MTB Bank in New York, New York | MIGUEL SELIGMANN,<br><br>EDUARDO VASQUEZ,<br><br>JOHN BARTHOLOMEW,<br><br>ALVARO MENESES-DIAZ,<br><br>AMANDA AYMAR,<br><br>ANTONIO ROBERTO LANUSSE,<br><br>ANIBAL GUZMAN MENENDEZ, and LUIS MARIA MAZZIOTTI |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS 46 through 48

(Bank Secrecy Act - 12 U.S.C. § 1957)

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. On or about the dates set forth below, in the Southern District of New York, and elsewhere, defendants

AMANDA AYMAR a/k/a "Amanda Espinoza",

VISITACION SOUTO,

ANTONIO ROBERTO LANUSSE a/k/a "Henny Mornau"and "John Bulk", ANIBAL GUZMAN MENENDEZ a/k/a "Hans Roth" and "Roy Harper",

3/9/00 4:09 PM

DMC 054089

and LUIS MARIA MAZZIOTTI a/k/a "Thomas Cary" and "James Koller"

did knowingly and willfully violate, caused the violation of, and
aided and abetted the violation of, the record keeping requirements
of the Bank Secrecy Act in furtherance of a violation of Federal
law punishable by imprisonment for more than one year, namely,
Title 18, United States Code, Section 545, as follows:

| Count | Approx. Date | False Bank Secrecy Act Record | Defendants |
|---|---|---|---|
| 46 | 3/7/95 | Payment Order from "Thomas Cary" in Buenos Aries, Argentina to MTB Bank in New York, New York in the amount of $292,800 | AMANDA AYMAR, VISITACION SOUTO, ANTONIO ROBERTO LANUSSE, ANIBAL GUZMAN MENENDEZ, and LUIS MARIA MAZZIOTTI |

| Count | Approx. Date | False Bank Secrecy Act Record | Defendants |
|---|---|---|---|
| 47 | 3/10/95 | Payment Order from "Thomas Cary" in Buenos Aries, Argentina to MTB Bank in New York, New York in the amount of $569,800 | AMANDA AYMAR, VISITACION SOUTO, ANTONIO ROBERTO LANUSSE, ANIBAL GUZMAN MENENDEZ, and LUIS MARIA MAZZIOTTI |
| 48 | 3/17/95 | Payment Order from "Tom Stewart" in Buenos Aries, Argentina to MTB Bank in New York, New York in the amount of $699,048.50 | AMANDA AYMAR, VISITACION SOUTO, ANTONIO ROBERTO LANUSSE, and ANIBAL GUZMAN MENENDEZ |

All in violation of Title 12, United States Code, Sections 1829b
and 1957 and Title 18, United States Code, Section 2.

<u>COUNTS 49 through 51</u>

(Money Laundering - 18 U.S.C. § 1957)

DMC 054090

http://www.njusao.org/files/mt0507_d.htm

1. Paragraphs 1 through 7 and 9 through 74 of Count 1 are realleged and incorporated as if set forth in full herein.

2. On or about the dates set forth below, in the Southern District of New York and elsewhere, defendants

BARRY WAYNE,

RICHARD L. SEARLE,

CARLOS AXEL AUGSPACH,

MICHEL VERLEYSEN,

JOHN BARTHOLOMEW,

ALVARO MENESES-DIAZ,

and

AMANDA AYMAR a/k/a Amanda Espinoza,

did knowingly engage and attempt to engage in, caused, and aided and abetted, a monetary transaction affecting interstate and foreign commerce in criminally derived property that is of a value greater than $10,000 and which is derived from specified unlawful activity, more specifically wire fraud, Title 18, United States Code, Section 1343, as follows:

DMC 054091

| Count | Approx. Date | Amount | Source Account/ Receiving Account | Defendants |
|---|---|---|---|---|
| 49 | 2/24/95 | $22,014.00 | Banco Baires Account #71165 at MTB Bank/<br><br>MTB Bank | JOHN BARTHOLOMEW, ALVARO MENESES-DIAZ, and AMANDA AZMAR |

| Count | Approx. Date | Amount | Source Account/ Receiving Account | Defendants |
|---|---|---|---|---|
| 50 | 2/24/95 | $67,165.34 | Banco Baires Account #71165 at MTB Bank/<br><br>South Windsor Account #890-0069-244 at Bank of New York | BARRY WAYNE,<br><br>RICHARD L. SEARLE,<br><br>CARLOS AXEL AUGSPACH,<br><br>and MICHEL VERLEYSEN |
| 51 | 3/8/95 | $46,487.47 | Banco Baires Account #71165 at MTB Bank/<br><br>South Windsor Account #890-0069-244 at Bank of New York | BARRY WAYNE,<br><br>RICHARD L. SEARLE,<br><br>CARLOS AXEL AUGSPACH,<br><br>and MICHEL VERLEYSEN |

All in violation of Title 18, United States Code,

Sections 1957 and 2.

A TRUE BILL

_____

FOREPERSON

_____

ROBERT J. CLEARY

United States Attorney

3/9/00 4:09 PM

DMC 054092