# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION LIMITED, | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1379 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP and | : | |
| COOPERS & LYBRAND LLP, | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALEC SHARP, et al., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1572 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP d/b/a | : | |
| PRICE WATERHOUSE LLP, | : | |
| Defendant. | : | |

| | | |
|---|---|---|
| HANDY & HARMAN REFINING GROUP, INC., | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:02 CV 1803 (MRK) |
| VS. | : | |
| | : | |
| PRICEWATERHOUSECOOPERS LLP, | : | |
| Defendant. | : | October 21, 2005 |

## PRICEWATERHOUSECOOPERS LLP'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO UNDERWRITERS' MOTIONS IN LIMINE NOS. 1-3

PricewaterhouseCoopers LLP ("PwC") respectfully submits this consolidated memorandum of law in opposition to three motions in limine filed by plaintiff Alec Sharp and certain other underwriters ("Underwriters") seeking to exclude evidence relating to insurance: (i) Alec Sharp's Motion in Limine No. 1: Exclusion of Any Reference to Insurance; (ii) Alec Sharp's Motion in Limine No. 2: Exclusion of Other Recoveries; and (iii) Alec Sharp's Motion

in Limine No. 3:  Exclusion of Testimony of Marcus Johnson.  For the following reasons,

Underwriters' motions should be denied.

## FACTUAL BACKGROUND

### A.     Nature of the Case

Underwriters' claims are founded upon a scheme conducted by HHRG management with

South American companies:

> "Between 1996 and 2000, various officers and employees of
> HHRG, and other outsiders, engaged in a seemingly legitimate
> series of business transactions with South American entities
> involving the purchase of gold for smelting.  These transactions
> and the business arrangements that supported them, however, were
> contrary to the rules and policies of HHRG's Board of Directors
> and its lenders.  Even worse, these transactions were unlawful and
> were part of a fraudulent scheme by the employees and others
> against HHRG."[1]

Following discovery of the scheme, HHRG submitted an insurance claim under the fidelity

section of the Bankers Insurance Policy (the "Policy") issued by Underwriters (the "Bond

Claim") for the resulting alleged losses to HHRG.[2]  The fidelity section of the Policy specifically

insured against "loss resulting directly from dishonest, fraudulent or malicious acts by

Employees of the Assured . . . ."[3]  Underwriters settled the Bond Claim by paying $12.5 million

and took a subrogation and assignment of HHRG's claims for losses relating to the Bond Claim.

They have sued PwC, among other parties, and assert that PwC proximately caused losses

---

[1] (Complaint, ¶¶ 1-2.)

[2] (*See id.*, ¶¶ 4-5.)

[3] (Bankers Insurance Policy, at 4, attached as Ex. E to Underwriters' Appendix.)

relating to the Bond Claim in the amount of $15,810,000.[4]  The Complaint alleged damages of $18,330,423, which was the original amount of the Bond Claim.[5]

### B.    Underwriters' Investigation and Payment of the Bond Claim

After HHRG submitted the Bond Claim in February 2000, Underwriters retained professionals to assist them in determining whether and in what amount the Bond Claim represented covered losses under the Policy.  Those professionals included the law firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP ("WEMED") and the accounting firm of Hagen, Streiff, Newton & Oshiro ("HSNO").  Marcus Johnson is the partner at HSNO who led the engagement for HSNO.[6]

In December 2000, HSNO issued a report setting forth factual findings based on its review of HHRG and Panexim records.  The report found that HHRG's assets had been mismanaged and that Panexim could have a monetary liability to HHRG of approximately $8.16 million, which HSNO subsequently reduced to approximately $7.7 million.[7]  Mr. Johnson authorized the issuance of the report for HSNO.[8]

---

[4] (*See* Report of Vincent Love, dated April 5, 2005, at 51-62, attached as Ex. A to PwC's Appendix of Exhibits ("PwC Appendix") separately served today.)

[5] (*See* Complaint, ¶ 4.)

[6] (*See* Dep. of Marcus Johnson, dated June 10, 2005, at 6, 14-15, attached as PwC Appendix Ex. B.)

[7] (*See* Letter from HSNO to N. Mitchell, dated December 21, 2000 (Ex. 2 to the Dep. of Marcus Johnson), at 1, 38-41, attached as PwC Appendix Ex. C; Letter from HSNO to J. Dempsey, dated June 8, 2001, at 6 (Ex. 6 to M. Johnson Dep.), attached as PwC Appendix Ex. D; M. Johnson Dep., at 33, in PwC Appendix Ex. B.)

[8] (*See* M. Johnson Dep., at 22, in PwC Appendix Ex. B.)

On April 23, 2001, Underwriters acknowledged that some covered loss existed under the fidelity clause for funds that HHRG had paid to Panexim.[9]  At the same time, Underwriters noted that unresolved issues remained with respect to the amount of loss to Panexim and the other components of the claimed losses.[10]  As a result, Underwriters and their representatives continued to investigate the amount of the Panexim loss and the remaining components.  One major area of dispute remained HHRG's claim for about $2.8 million of "retainage fees" – essentially, HHRG's refining profits.  Mr. Johnson and HSNO determined that neither the retainage fees nor transportation costs claimed by HHRG were properly considered part of HHRG's covered losses.[11]  Similarly, WEMED, through its lead partner on the engagement, informed HHRG that about $3 million of fees paid to consultants in South America, most of which were unrelated to Panexim, were not covered losses.[12]

Pursuant to an agreement dated December 31, 2001, Underwriters paid $12.5 million to settle HHRG's claim.  In so doing, Underwriters acknowledged that a covered loss existed for "losses arising from acts, errors, or omissions on the part of former employees/consultants of HHRG Barry Wayne, Richard L. Searle, Luis Posada . . . ('the Former Employees') and others . . . ."[13]

---

[9] (*See* Letter from D. McMahon to C. Lee, dated April 23, 2001 (Ex. 11 to 30(b)(6) Dep.), attached as PwC Appendix Ex. E.)

[10] (*See id.*, at 1.)

[11] (*See* Letter from HSNO to J. Dempsey, dated June 8, 2001, at 3, in PwC Appendix Ex. D; M. Johnson Dep., at 34-35, in PwC Appendix Ex. B.)

[12] (*See* Notes of Meeting dated July 17, 2001, (Ex. 8 to M. Johnson Dep.), at 1, attached as PwC Appendix Ex. F.)

[13] (Settlement Agreement, at 1, attached as Ex. A to Underwriters' Appendix.)

C.    **The Importance of the Insurance Investigation to Underwriters' Damages Claim**

Plaintiffs' damages claim relies heavily on the work done by HHRG's expert, Dempsey, Myers & Co., and HSNO in their investigation of the Bond Claim.  Underwriters' damages expert, Vincent Love, begins his analysis by explaining that his methodology was to "reconcile" the analyses performed by HSNO and Dempsey Myers.  Mr. Love explains:

> "We compared the claims analyses and amounts in the DM [Dempsey Myers] and HSNO reports and gained an understanding of, and reconciled differences in, amounts and methodology. . . .
>
> "Based on the information in the HSNO and DM reports including the reconciliation prepared by DM, the supporting documentation that both HSNO and DM had gathered in their investigations, and a review of the PWC working papers, we determined the losses incurred by HHRG amounted to approximately $15,810,000. . . ."[14]

Mr. Love's methodology notwithstanding, plaintiffs now seek to preclude Mr. Johnson from testifying and the introduction of Mr. Johnson's reports and correspondence that Mr. Love reviewed.

D.    **Underwriters' Assertions Regarding HHRG in Suits as Subrogee and Assignee of HHRG and Their Recovery of at Least $2.5 Million**

Underwriters filed suit as subrogee and assignee of HHRG in Connecticut state court against Barry Wayne and others "seeking recovery of losses submitted by HHRG in the Bond Claim."[15]  In its action filed on March 5, 2002, Underwriters articulated numerous assertions regarding HHRG management and employees, the HHRG Board and HHRG Board committees

---

[14] (Love Report, at 51, in PwC Appendix Ex. A.)

[15] (Sharp Mot. in Limine #2, at 2.)

and the damages suffered as a result of management's conduct.[16]  After additional factual

investigation and approximately one year and four months later, Underwriters submitted to the

state court in connection with a motion to amend a more detailed Proposed Second Amended

Complaint ("Second Complaint").[17]

      In the Second Complaint, as in the one before it, Underwriters made numerous factual

allegations regarding HHRG, over a dozen HHRG managers, employees and consultants and the

HHRG Board and Board committees, with respect to HHRG's relationship with Panexim and

related transactions.  For example, Underwriters described the early interactions between HHRG

and Panexim and Panexim's dependence on "the 5% export incentive paid by the Peruvian

government upon the export of precious metals . . . ."[18]  Underwriters stated that HHRG used

"fictitious orders that overstated the quantity of gold purportedly purchased" from Panexim.[19]

Underwriters made assertions regarding the scope of the inquiry into the Panexim receivable by

HHRG Board committees and the responses made by HHRG employees, including requests

---

[16] (*See* Underwriters' Complaint against Barry Wayne, et al., dated March 5, 2002, at ¶ 2 and *passim*, attached as Ex. G to Underwriters' Appendix.)

[17] (*See* Underwriters' Proposed Second Amended Complaint against Barry Wayne, et al., dated July 2003 (Ex. 12 to 30(b)(6) Dep.), attached as PwC Appendix Ex. G.)  During the deposition of Underwriters' Rule 30(b)(6) representative, PwC asked the representative to admit as facts various allegations in the Second Complaint.  When it became clear that the witness had no knowledge of Underwriters' claims, the parties reached a stipulation in lieu of testimony. (*See* Tr. of Underwriters' 30(b)(6) Dep., dated February 24, 2005, at 149-151, attached as PwC Appendix Ex. H.)  Underwriters stipulated that, when they submitted the Second Complaint to the state court, Underwriters believed the assertions therein to be true and capable of being proved and that, had the motion to amend been granted, Underwriters were prepared to formally sign the Second Complaint.  (*See id.*)

[18] (*See* Second Complaint, at ¶ 24d; *see generally* ¶¶ 20-25.)

[19] (*See id.*, at ¶¶ 34, 37; *see generally* ¶¶ 26-40.)

made as late as the fall of 1999 by the "newly formed" Finance Committee.[20]    Underwriters
made numerous assertions regarding the origin and circumstances of the other categories of
losses they seek to recover in this litigation.[21]    Underwriters further asserted that HHRG suffered
the losses in the Bond Claim because of the conduct of HHRG managers, employees and
consultants.[22]

Separately, in an action against Federal Insurance Company, Underwriters also made
assertions regarding HHRG, the conduct of HHRG management and employees and the losses
caused by the theft of employees.[23]    As Underwriters notes in the motions in limine, these suits
as subrogees and assignees of HHRG under the Bond Claim have resulted, thus far, in the receipt
by Underwriters of at least $2.5 million.[24]    Underwriters may recover additional amounts from
Federal and/or from two additional state court actions it is pursuing against Panexim and Mr.
Passaro and Handy & Harman.[25]

---

[20] (*See id.*, at ¶ 56; *see generally* ¶¶ 44-71.)

[21] (*See id.*, at ¶¶ 72-89.)

[22] (*See id.*, at ¶ 2.)

[23] (*See* Underwriters' Complaint against The Chubb Corporation and Federal Insurance Company, dated March 27, 2002, at ¶ 19 (Ex. 15 to 30(b)(6) Dep.), attached as PwC Appendix Ex. I.)

[24] (*See* Sharp Mot. in Limine #2, at 3; Settlement Agreement with Federal Insurance Company et al., dated April 1, 2004, at 5, attached as Ex. H to Underwriters' Appendix; Settlement Agreement with Augspach, dated April 2004, at 2, attached as Ex. I to Underwriters' Appendix.)

[25] (*See* Settlement Agreement with Federal, at 5-6 (describing Underwriters' right to up to an additional $275,000); Sharp Mot. in Limine #2, at 3 (describing Underwriters' additional state court complaints and Exs. K and S to Underwriters' Appendix cited therein.))

**ARGUMENT**

I.     **Underwriters' Assertions Related to the Insurance Claim Are Relevant to Specific Issues in Dispute in this Litigation.**

PwC seeks to offer evidence regarding the clear and often detailed assertions made by Underwriters and their representatives in investigating and resolving the Bond Claim which are directly relevant to the disputed issues of causation and damages in this case.   It is black-letter law that evidence is admissible if it tends to bear even slight probative value to an issue in dispute.  *See, e.g.,* 22 Charles Alan Wright & Kenneth W. Graham Jr., *Federal Practice and Procedure* § 5165 (1978) ("Under Rule 401, evidence is relevant if it has the slightest bit of probative worth; only evidence that has no value as proof of a consequential fact is irrelevant"); *United States v. Griffith*, 385 F.3d 124, 126 (2nd Cir. 2004) (expressing the strong principle favoring the admissibility of relevant evidence at trial) (citing *United States v. Nixon*, 418 U.S. 683, 710 (1974) ("Whatever their origins . . . exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth.")).  Underwriters cannot reasonably contest that this evidence is probative of issues in this case.

A.     **The Evidence Is Relevant to the Issue of Causation.**

In its determination that coverage for the Bond Claim was warranted under the fidelity section of the Policy, Underwriters acknowledged that HHRG had presented to Underwriters sufficient evidence of losses resulting from the dishonest, fraudulent or malicious acts of HHRG management, employees and consultants.  Underwriters admit that coverage was based on its conclusion that HHRG had established that such fraudulent acts "directly caused" HHRG's loss,

-8-

a standard that Underwriters says was a *far higher* one than the standard of proximate cause in a tort suit.[26]

Underwriters' acknowledgement of the misconduct occurring at HHRG and its causal relationship with the losses asserted in the Bond Claim is directly relevant to PwC's anticipated defenses that such conduct was the sole proximate cause of some or all of the losses that Underwriters seek here and/or that Underwriters have not met their burden of proof that PwC was a proximate cause of those losses. Indeed, Underwriters' argument that its determination of coverage under the Policy required the satisfaction of a *higher* threshold of evidence than does proximate causation only underscores that this is so.[27]

**B.    The Evidence Is Relevant to the Issue of Damages.**

During its investigation of the Bond Claim, Underwriters and its representatives presented positions regarding losses covered under the policy. Mr. Johnson of HSNO, for example, made various factual determinations and found at certain junctures that covered losses approximated just above or below $8 million. Mr. Johnson and WEMED's lead partner asserted that certain categories of loss did not constitute covered losses. Here, Underwriters take the position that the losses covered under the Bond Claim are approximately $15.8 million and

---

[26] (Sharp Mot. in Limine #1, at 5-6 (arguing that the proximate cause standard involves "far less strict limitations than the requirement of direct or actual case which triggers fidelity coverage . . . .")

[27] Underwriters' citations on this score are not to the contrary. In *Finkel v. St. Paul Fire and Marine Ins. Co.*, the court interpreted the scope of a fidelity clause and held that it did not cover the insured's liabilities to third parties. *See* 3:00 CV 1194 (AHN), 2002 U.S. Dist. LEXIS 11581 (D. Conn. June 6, 2002). This Court is not being asked to construe the Policy. Likewise, Underwriters' citation to *Svege v. Mercedes Benz Credit Corp.*, which addressed the admissibility of pleadings rather than an insurance claim is likewise inapposite on this point. *See* 329 F. Supp. 2d 285 (D. Conn. 2004) (Kravitz, *J.*); *see also Mahoney v. Beatman*, 110 Conn. 184, 197, 147 A. 762 (1929) (stating the proximate causation standard).

include categories that it previously asserted were not covered losses. As a result, the earlier inconsistent positions taken on behalf of Underwriters are directly relevant to the issue of damages in this case.

The relevance of the analyses made by Underwriters' representatives to the damages calculations asserted by Underwriters here are only underscored by Mr. Love's reliance on them. Indeed, Mr. Love devotes virtually his entire discussion of damages to his evaluation of the Dempsey Myers and HSNO analyses.[28] Moreover, he made clear in his deposition testimony that Underwriters' damages in this case are the same losses covered under the insurance policy, which are the subject of the HSNO analysis.[29]

The statements made by HSNO and WEMED are admissions by Underwriters that do not constitute hearsay. Under Rule 801(d)(2)(D) of the Rules of Evidence, a statement is not hearsay if it is made "by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Here, Underwriters requested HSNO and WEMED to investigate the Bond Claim and directed that each entity perform its work in that regard. *See, e.g.,* Restatement (Second) of Agency § 1 cmt. b (1958); *Lenoble v. Best Temps, Inc.,* 352 F. Supp. 2d 237, 250 & n. 12 (D. Conn. 2005); *Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP*, No. 3 Civ. 0613 (GBD), 2004 U.S. Dist. LEXIS 780, at *13 (S.D.N.Y. Jan. 22, 2004); *Welding Metals, Inc. v. Foothill Capital Corp.*, No. 3:92CV00607 (WWE), 1997 U.S. Dist. LEXIS 7672, at *20-22 (D. Conn. Apr. 14, 1997).[30] HSNO and

---

[28] (Report of Vincent Love, at 51-62, in PwC Appendix Ex. A.)

[29] (*See id.*, at 6-7.)

[30] All unreported cases cited herein, unless already attached to the Underwriters' Appendix of Exhibits, are attached to the Appendix that PwC is manually filing today.

WEMED's statements also concerned their investigation of the Bond Claim and were made during their relationship with Underwriters.[31]

Finally, PwC does not seek to offer Mr. Johnson as an expert witness.[32]  Mr. Johnson will testify as a fact witness.  He will testify as to admissions of fact made by Underwriters during their investigation of the Bond Claim, and to the work he performed that is relied upon by Mr. Love in his damages analysis.

### C.    The Admission of Evidence in Connection with the Insurance Claim Is Not Unduly Prejudicial.

This is not a case where a party seeks to influence the jury by disclosing the existence of insurance coverage which is unrelated to the issues of fact for the jury.  Rather, PwC intends to offer particular evidence regarding the investigation and resolution of the Bond Claim that tends to show that PwC did not proximately cause the alleged losses and that plaintiffs' damages claims are overstated.[33]

Of course, relevant evidence is generally admissible notwithstanding vague claims of possible prejudice by plaintiffs.  *See, e.g.,* 22 Wright & Graham, at  § 5214 (1978) ("Unless the judge concludes that the probative worth of the evidence is 'substantially outweighed' by one or more of the countervailing factors, there is no discretion to exclude; the evidence must be admitted." (citing Fed. R. Evid. 403)); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 269-70 (2nd Cir.

---

[31] The statements made by Underwriters' representatives are also admissible as statements that Underwriters adopted and statements made by persons authorized to speak for them about the Bond Claim.  *See* Fed. R. Evid. 801(d)(2)(B) & (C).

[32] (*See* Sharp Mot. in Limine #3, at 2.)

[33] Plaintiffs argue that the admission of such evidence could prejudice the jury as against *HHRG*.  To the extent that these motions in limine assert arguments with respect to HHRG, those arguments are mooted by the proposed settlement and are not addressed herein.

1999) (affirming court's decision to reject plaintiff's contention that certain comments plaintiff made should have been excluded as unduly prejudicial); *Chnapkova v. Koh*, 985 F.2d 79, 82 (2nd Cir. 1993) (holding that court had abused its discretion when it excluded as unfairly prejudicial evidence regarding plaintiff's hospital records and tax returns).

Indeed, the unwarranted exclusion of this evidence would substantially injure PwC's ability adequately to present its own defenses. PwC's examination of plaintiffs' damages expert would be severely and unfairly curtailed. PwC would be unfairly hampered in showing that the conduct of HHRG management and Wayne's co-conspirators in Peru was the sole proximate cause of the claimed losses. Similarly, the positions taken by Underwriters regarding covered losses directly impact whether they can meet their burden of proof on damages. If, as Underwriters posit, the case had unfolded such that Underwriters sued as HHRG without reference to insurance, the jury would be invited to speculate erroneously about the damages that HHRG may have suffered beyond any losses claimed here and to take them into account in rendering a verdict. In sum, Underwriters have not offered and cannot offer a single reason of real substance to find that the probative value of this evidence is substantially outweighed by any unfair prejudice.[34] *See, e.g.,* 22 Wright & Graham, at § 5214 (1978) (relevant evidence must be admitted "[u]nless the judge concludes that the probative worth of the evidence is 'substantially outweighed' by one or more of the countervailing factors . . ."); *see also Leopold*, at 269-70; *Chnapkova*, at 82.

---

[34] Underwriters' proposition that they could have sued in HHRG's name does not establish the separate issue of whether they have shown that the admission of evidence here would result in unfair prejudice.

II.    **Evidence of the Underwriters' Investigation Does Not Constitute Settlement Materials and Need Not Be Sheltered from the Jury.**

Underwriters asserts broadly that Federal Rule of Evidence 408 precludes evidence concerning the investigation and resolution of the Bond Claim.[35]

At the outset, communications made during Underwriters' investigation of whether a covered loss existed form part of the claim investigation process and are not settlement discussions. Underwriters are insurers whose business is to determine whether an insurance claim is covered under an applicable policy. Accordingly, in analogous contexts, courts have held that materials generated during the claim investigation process are part of the insurer's ordinary course of business, rather than made in anticipation of litigation, and are thus admissible. *See, e.g., Travelers Cas. & Sur. Co. v. J.D. Elliott & Co., P.C.*, No. 03 Civ. 9720, 2004 U.S. Dist. LEXIS 20712, at *4-7 (S.D.N.Y. Oct. 5, 2004) (after assessing whether an insurer's investigation was performed in the ordinary course of business or in anticipation of litigation, the court refused to preclude the testimony of an accounting firm which was retained to verify the claim); *Weber v. Paduano*, No. 02 Civ. 3392 (GEL), 2003 U.S. Dist. LEXIS 858, at *23-24 (S.D.N.Y. Jan. 14, 2003) (in determining that correspondence between an insurer and its counsel was not protected, the court stated that "an investigation into the potential for subrogation is simply part of an insurer's ordinary practice of investigating all issues arising from an accident involving its insureds . . ."); *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 90 Civ. 7811 (AGS), 1994 U.S. Dist. LEXIS 17768, at *5 (S.D.N.Y. Dec. 13, 1994) ("if the claim has not yet been rejected, the documents are part of the claim investigation process and are not work product"); *see also Amoco Oil Co. v. Hartford Accident &*

_____

[35] (*See* Sharp's Mot. in Limine #1, at 6.)

*Indemnity Co.*, No. 93 Civ. 7295 (SS), 1995 U.S. Dist. LEXIS 13532, at *2-3 (S.D.N.Y. Sept.

18, 1995).  Since evidence generated during the claim investigation process does not constitute

work product made in anticipation of litigation, such evidence *a fortiori* cannot constitute

settlement materials.

      Moreover, evidence relating to compromise discussions over an earlier claim -- separate

from the claim under adjudication -- is regularly admitted as outside of the scope of Rule 408.  In

one recent case, for example, Zurich American Insurance Company insured two companies who

successfully sued Zurich in state court for defense costs, and then Zurich petitioned the federal

district court to compel arbitration.  *See Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682

(7th Cir. 2005).   After the court granted Zurich's petition, one of the insureds argued on appeal

that the court erroneously had considered a settlement communication in violation of Rule 408.

The Seventh Circuit rejected this argument.  It explained that the Rule required the trial court to

balance the need for the evidence against the risk of chilling settlement negotiations.  *See id.*, at

689.  This balancing, the Circuit stated, "is especially likely to tip in favor of admitting evidence

when the settlement communications at issue *arise out of a dispute distinct from the one for

which the evidence is being offered*."  *Id.* (emphasis added).  This was true even though the

earlier state action and the federal action were not completely unrelated.  *See id.*, at 689-90.

      Other federal courts have reached the same result.  In *Vulcan Hart Corp. v. NLRB*, for

instance, the Eighth Circuit underscored that "Rule 408 excludes evidence of settlement offers

only if such evidence is offered to prove liability for or invalidity of the *claim under

negotiation*."  718 F.2d 269, 277 (8th Cir. 1983) (emphasis added).  *See also Towerridge, Inc. v.

T.A.O., Inc.*, 111 F.3d 758, 770 (10th Cir. 1997) (upholding the admission of evidence reflecting

that T.A.O. had earlier submitted claims for damages and received a settlement, since the earlier

settlement concerned a different claim that the one being litigated); *Broadcort Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992) (holding that Rule 408 did not bar evidence since it related to settlement discussions "that involved a different claim than the one at issue in the current trial."); *see also* 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 408 (1991) ("Where the settlement negotiations and terms explain and are part of another dispute they must often be admitted if the trier is to understand the case").  Similarly, here, the discussions which gave rise to the evidence sought to be admitted occurred in the separate context of the resolution of the Bond Claim under the Policy submitted by HHRG to Underwriters.  Thus, Rule 408 should not bar admission of such evidence.

Furthermore, the purpose underlying Rule 408 is to protect a party against the use of statements against interest that are offered for the purpose of proving or disproving liability. Here, to the extent that Underwriters take positions inconsistent with those taken during discussions over the Bond Claim, PwC should be able to offer the earlier positions as admissions of fact.  *See, e.g.*, *Urico v. Parnell Oil Co.*, 708 F.2d 852, 854 (1st Cir. 1983) (evidence concerning negotiations is admissible to establish admissions of fact); *Westchester Specialty Ins. Servs., Inc. v. U.S. Fire Ins. Co.*, 119 F.3d 1505, 1512-13 (11th Cir. 1997) (settlement agreements were offered "for the permissible purpose of resolving a factual dispute about the meaning of the settlement agreements' terms."); *Am. Bridge Co. v. Providence Place Group Ltd. P'shp*, 263 F. Supp. 2d 330, 335 (D. R. I. 2003) ("Rule 408 is not offended if the [compromise] letter is admitted to establish only that ABC already released its overtime claims."); *see generally Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 293 (2nd Cir. 1999) (evidence of a settlement agreement "can fall outside the Rule if it is offered for "another purpose', *i.e.*, for a

purpose other than to prove or disprove the validity of the claims that [the agreement was] meant to settle.") (citations omitted).

## III.    Underwriters' Other Recoveries for the Covered Losses and Other Complaints Are Relevant in this Case.

### A.    Underwriters' Other Recoveries, while Appropriately Reserved from the Jury, Must Be Deducted from Any Judgment Against PwC.

Underwriters argue that the payments they have received in recovery of the losses set out in the Bond Claim should not be offered as evidence before the jury.[36]  As set forth above, Underwriters previously filed suit as subrogee and assignee of HHRG "seeking recovery of losses submitted by HHRG in the Bond Claim."[37]  Underwriters and HHRG specifically agreed that the subrogation and assignment included all claims against the persons and entities it has sued.[38]  Underwriters' suits have resulted in the receipt of at least $2.5 million thus far, and may result in additional amounts from Federal Insurance Company and pending state court actions.[39]

PwC does not object to the consideration of Underwriters' other recoveries by the Court rather than by the jury.  PwC submits, however, that Underwriters' recoveries as subrogee and assignee under the Bond Claim must be deducted from any judgment received as subrogee and

---

[36] (*See* Sharp's Mot. in Limine #2, at 4-6 (arguing that the payments received by Underwriters are not admissible as alleged settlement materials under Rule 408, alleged collateral source payments and alleged insurance payments).)  While PwC does not agree with Underwriters' characterizations, as set forth above, PwC does not object to the consideration of these recoveries by the Court rather than the jury.

[37] (*See id.*, at 2.)

[38] (*See* Settlement Agreement, at 6, at Ex. A to Underwriters' Appendix.)

[39] (*See* Sharp Mot. in Limine #2, at 3 and Exs. K and S cited therein; Settlement Agreement with Federal, at 5-6, at Ex. H to Underwriters' Appendix; Settlement Agreement with Augspach, at 2, at Ex. I to Underwriters' Appendix.)

assignee under the Bond Claim in this case.[40]  *See Alfano v. Ins. Ctr. of Torrington*, 203 Conn.

607, 610, 525 A. 2d 1338 (1987); *Peck v. Jacquemin*, 196 Conn. 53, 71, 491 A. 2d 1043 (1985).

While evidence of such other recoveries need not be admitted at trial, "[i]n making its post

verdict determination on the issue of any claimed excessiveness or inadequacy, the trial court

was directed to consider the amount of money paid to a plaintiff" as the result of a settlement

with another tortfeasor.  *Peck*, 196 Conn. at 71.  In *Alfano*, for example, the jury found that the

plaintiff had sustained economic damages of $30,000 as a result of defendant's failure to procure

insurance coverage and that plaintiff was contributorily negligent and returned a verdict in the

amount of $19,5000.  *See* 203 Conn. at 608-09.  The trial court ordered a remittitur of $15,000,

representing the amount that plaintiff previously had received in settlement.  *See id.*  The

Connecticut Supreme Court affirmed and explained:  "Since the resulting verdict of $19,500

represents a legally unassailable determination of fair compensation for the plaintiff's loss . . .

any additional compensation received by the plaintiff for that loss must be deemed excessive as a

matter of law."  *Id.*, at 611.  Here too, any damages that Underwriters may recover will be

economic damages determined by the jury's verdict and must be reduced by Underwriters' other

recoveries as subrogee and assignee under the Bond Claim.

### B.    Underwriters' Prior Complaints Are Relevant and Admissible.

In its prior law suits to recover reimbursement from third parties for amounts under the

Bond Claim, Underwriters made numerous allegations regarding HHRG and the effect of the

conduct of HHRG management with respect to the same losses asserted in this case.  In

Underwriters' Second Complaint, as in its original Complaint in the state court action,

---

[40] (*See also* PwC's Mot. in Limine to Preclude Underwriters from Submitting Evidence on Damages in Excess of the $12.5 Million Loss They Paid on the Claim, dated October 11, 2005, at 3 n. 4.)

Underwriters articulated numerous allegations regarding over a dozen HHRG managers, employees and consultants and the HHRG Board and committees of the Board, all indisputably interwoven with the basis for Underwriters' claims and PwC's defenses in this litigation.

Underwriters made:

- Assertions setting out the early interactions between HHRG and Panexim and Panexim's dependence on "the 5% export incentive paid by the Peruvian government upon the export of precious metals;"[41]

- Assertions setting out HHRG's advances to Panexim, including the use of "fictitious orders that overstated the quantity of gold purportedly purchased;"[42]

- Assertions regarding the scope of HHRG's investigation into the Panexim receivable and the efforts to obfuscate that investigation made by Mr. Wayne and certain other HHRG employees, including as to requests made by the "newly formed" Finance Committee in the fall of 1999;[43]

- Assertions regarding the origin and circumstances of the other categories of losses Underwriters seek to recover in this litigation; and[44]

- Assertions regarding the losses suffered by HHRG on the Bond Claim, including because of the conduct of HHRG managers, employees and consultants.[45]

As set forth in detail above, Underwriters' assertions regarding HHRG, the conduct of HHRG management and the results of that conduct are relevant to PwC's anticipated defenses.[46]

---

[41] (*See* Second Complaint, at ¶ 24d; *see generally* ¶¶ 20-25.)

[42] (*See id.*, at ¶¶ 34, 37; *see generally* ¶¶ 26-40.)

[43] (*See id.*, at ¶ 56; *see generally* ¶¶ 44-71.)

[44] (*See id.*, at ¶¶ 72-89.)

[45] (*See, e.g., id.*, at ¶ 2.)

[46] In addition, Underwriters submitted an affidavit and expert report in the state court action in which Mr. Love concluded, "to a reasonable degree of professional certainty, that the damages proximately caused by the conduct of Defendants Luis Posada, David Manuel Seoane Stuve, John Francis Phillips, Jorge Washington, Erick Claudet, Linneo Klocker de Vasconellos Filho, Fernando Rodrigues Limo, Mario Seoane, and Jorge Rolando Passaro Ponce de Leon, as

Underwriters' assertions in their own court pleadings constitute admissions that are generally admissible in evidence. *See Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 285, 287 (D. Conn. 2004) ("As a general rule, of course, a party's pleadings are admissible as admissions, either judicial or evidentiary, as to the facts alleged in that pleading.") In *Svege*, the Court ruled that certain pleadings were not admissible, but under very different circumstances from those presented here.

In *Svege*, plaintiffs sought recovery following a motor vehicle accident which resulted in death and bodily injuries, and thus *Svege* occurred in the context most often present in cases which hold against the admissibility of prior pleadings. *See id.*, at 287 (noting that this position, where adopted, is "often in the context of cases involving personal injury or product liability claims.") The defendant sought to introduce separate complaints, one filed in Connecticut federal court and the other in Pennsylvania state court. Those complaints, which "were filed at the outset of those actions, before discovery and before any adjudication of the claims asserted," *id.*, at 287-89, were essentially notice pleadings, putting other defendants on notice of various theories of liability. The Court held that those complaints should be excluded, because the interest in admitting a judicial admission was outweighed by the policy embedded in the Federal Rules of Civil Procedure to permit inconsistent pleadings.

This, of course, is a not a personal injury case but a commercial case alleging a complex fraud that, according to plaintiffs, should have been detected by HHRG's auditors. The Second Complaint, the principal pleading which PwC seeks to introduce, is not a "notice"

---

alleged in the Complaint, total $15,810,000." (Affidavit of Vincent Love, dated December 6, 2004 (Ex. 3 to V. Love Dep.), attached as PwC Appendix Ex. J, at 2.) Not only is this a judicial admission of Underwriters, but PwC is entitled to examine Mr. Love on his findings and how they relate to his opinion that PwC caused precisely the same losses.

pleading, but an amended pleading prepared after plaintiffs had completed an extensive factual investigation. It sets forth in detail the factual basis for the allegations against the defendants in that case, including numerous assertions regarding HHRG, which bear directly on the facts at issue in this case. PwC properly sought to have a designated representative of Underwriters admit the allegations in the Second Complaint. When it proved that he lacked sufficient knowledge to do so (despite his having been designated as the proper representative under Rule 30(b)(6)), counsel stipulated that plaintiffs believed the facts in the Second Complaint to be true. Thus, any concern about inconsistent pleading simply is not implicated here.

Further, and even more fundamentally, the policies underlying the pleading standards in the Federal Rules should not hold sway where the pleading sought to be admitted is a Connecticut *state* court complaint which would be admissible in a subsequent Connecticut *state* court proceeding.[47] Under Connecticut law, statements made in a complaint are admissible as judicial or evidentiary admissions in a Connecticut state court proceeding. In *Dreier v. Upjohn Company*, the Connecticut Supreme Court rejected the argument that allegations made in an earlier complaint, which had even been withdrawn, were not admissible in the subsequent trial of plaintiff's case. *See* 196 Conn. 242, 492 A.2d 164 (1985). Noting an abundance of authority in Connecticut contrary to that argument, the Court reiterated that "the rule concerning the admissibility into evidence of admissions in pleadings is too well established in law and sound in reason to be modified as the plaintiff urges. The time has passed when allegations in pleading will be treated as mere fictions, rather than as statements of the real issues in the cause and hence

---

[47] The fact that, in *Svege,* one of the complaints at issue was a Pennsylvania state court complaint is not to the contrary. In that case, the Court did not address and may not have been presented with argument regarding whether and to what extent a *Pennsylvania* state court would permit the introduction of a prior *Pennsylvania* state court pleading.

as admissions of the parties." *Id.*, at 247-48 (internal quotation marks and citation omitted). The

Court expressly considered and rejected that the pleading standards in Connecticut should dictate

a contrary result:

> "We do not believe that the policy supporting the liberal pleading
> rules controlling in this jurisdiction requires any such limitation on
> the use of superceded or abandoned pleadings as evidence of
> admissions contained therein. While alternative and inconsistent
> pleading is permitted, it would be an abuse of such permission for
> a plaintiff to make an assertion in a complaint that he does not
> reasonably believe to be the truth."

*Id.*, at 246.[48]  *See also Ferreira v. Pringle*, 255 Conn. 330, 345-46, 766 A. 2d 400 (2001) (and

cases cited therein) (allegations in separate complaint arising from same course of conduct as the

claims at bar are admissible).   While there is no reason to suppose that the jury is not capable of

appropriately considering such evidence, any potential risk that it may speculate about the

resolution or other aspects of the state court action can be addressed through jury instructions.

For all of these reasons, Underwriters' prior pleadings are admissible as judicial admissions.

---

[48] The Court further noted that any concerns about the admissibility of the allegations
could be ameliorated since "the circumstances under which they are made, as with any other
'admission,' go to the weight to be accorded the statements rather than their admissibility." *Id.*,
at 247.

**CONCLUSION**

For the foregoing reasons, the Court should deny Underwriters' three motions in limine to exclude evidence regarding insurance.

DEFENDANT,
PRICEWATERHOUSECOOPERS LLP


By: _____/s/ Thomas D. Goldberg_____
        David J. Elliott (ct 04301)
        Thomas D. Goldberg (ct 04386)
        Day, Berry & Howard LLP
        One Canterbury Green
        Stamford, Connecticut 06901-2047
        Tel:  (203) 977-7300
        Fax: (203) 977-7301
        Its Attorneys

**ELECTRONIC CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2005, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


      /s/ Thomas D. Goldberg
      David J. Elliott (ct 04301)
      Thomas D. Goldberg (ct 04386)
      Day, Berry & Howard LLP
      One Canterbury Green
      Stamford, Connecticut 06901-2047
      Tel:  (203) 977-7300
      Fax: (203) 977-7301
      Its Attorneys


Edward J. Boyle, Esq.
Wilson, Elser, Moskowitz, Edelman &
Dicker LLP
150 East 42nd St.
New York, NY  10017-5639

William H. Champlin, III, Esq.
Michael T. McCormack, Esq.
William S. Fish, Jr., Esq.
Tyler Cooper & Alcorn, LLP
CityPlace - 35th Floor
185 Asylum Street
Hartford, CT 06103


Daniel McMahon, Esq.
Stefan Dandelles, Esq.
Daniel E. Tranen, Esq.
Wilson, Elser, Moskowitz, Edelman &
Dicker LLP
120 N. LaSalle Street
Chicago, IL  60602

Fred N. Knopf, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker
LLP
3 Gannett Drive
White Plains, NY 10604-3407


Steven R. Humphrey (ct06053)
Dina S. Fisher (ct14896)
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

Jed Horwitt, Esq.
Zeisler & Zeisler, P.C.
558 Clinton Ave.
P.O. Box 3186
Bridgeport, CT 06605-0186