UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION, LTD., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:02 CV 1379 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP and COOPERS & LYBRAND, LLP, | ) ) ) ) | |
| Defendants. | ) ) | |
| ALEC SHARP, et al., | ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 3:02 CV 1572 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a PRICE WATERHOUSE, LLP, | ) ) ) ) | |
| Defendant. | ) ) | |
| HANDY & HARMAN REFINING GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 3:02 CV 1803 (MRK) |
| vs. | ) ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) ) ) | |
| Defendant. | ) ) | |

**ALEC SHARP'S MEMORANDUM IN OPPOSITION TO PWC'S MOTION IN LIMINE TO PRECLUDE UNDERWRITERS FROM SUBMITTING EVIDENCE ON DAMAGES IN EXCESS OF $12.5 MILLION**

Plaintiffs Alec Sharp, et al. ("Sharp") respectfully submit this Memorandum in Opposition to Defendant PricewaterhouseCoopers' ("PWC") Motion in Limine to Preclude Underwriters from Submitting Evidence on Damages in Excess of $12.5 Million ("the Motion").

289170.1

## I. **INTRODUCTION**

PwC contends that, pursuant to the doctrine of subrogation, damages in this case are limited to the amount ($12.5 million) Sharp paid its Insured, Handy & Harman Refining Group, Inc. ("HHRG"), pursuant to a claim for insurance. PwC is incorrect. PwC fails to meet its burden of establishing it is entitled to an order *in limine* on this issue. Moreover, PwC's ignores the undisputed fact that Sharp not only has a right of subrogation against PwC for the $12.5 million, but it also has a claim against PwC for additional losses incurred by HHRG through an *assignment*. PwC's other arguments are baseless.

In summary, HHRG incurred economic injuries totaling approximately $18.3 million, as calculated by HHRG's forensic accountant. HHRG's losses consisted of approximately $14.55 million in loss of money due to unauthorized and unsecured advances concerning precious metals, approximately $3.1 million in unauthorized payments to consultants, $505,000 in bonuses paid by HHRG to former employees, and $160,000 in claim investigation costs.

HHRG submitted a claim for coverage for these losses under the fidelity coverage section of a Banker's Insurance Policy issued by Sharp. Sharp took the position that there was no coverage for any of the losses submitted by HHRG because another policy issued to HHRG by another insurer covered such loss, whereby the policy issued by Sharp was excess of such other insurance. However, notwithstanding such position, Sharp determined that approximately $8 million of the $14.55 million unsecured advances as well as the $160,000 component were covered under the policy. The consultant payments and bonuses were not covered. Upon receipt of additional documentation and further analysis, Sharp determined that the covered loss relating to the unsecured advances was approximately $10.5 million. Prior to the commencement of this action, Sharp never quantified, let alone disputed, the extent to which HHRG incurred economic

losses, but merely disputed the extent to which, if at all, such losses were covered under the Policy.

Ultimately, Sharp and HHRG, through its Liquidating Custodian, entered into a contract for the resolution of the bond claim whereby, *inter alia*, Sharp paid HHRG $12.5 million. Accordingly, the policy compensated HHRG for $12.5 million of its $18.3 million economic losses and HHRG was therefore not made whole on the identified losses.

Pursuant to the powers bestowed upon him by the Bankruptcy Court, HHRG's Liquidating Custodian assigned the right to pursue the balance of its losses to Sharp in exchange for valuable consideration in addition to the $12.5 million payment. HHRG also had other economic losses associated with the destruction of its business, but these losses were not the subject of the bond claim and therefore were not assigned to Sharp. These damages were claimed by HHRG in its case against PwC.

Neither PwC nor Sharp dispute that Sharp has the right by operation of law to pursue claims up to $12.5 million. Sharp also has the right, as assignee, to pursue the remaining $5.8 million that HHRG would have had the right to pursue in its own right. Sharp has determined there is an evidentiary basis to pursue against PwC $15.8 million in damages of the $18.3 million universe of losses incurred by HHRG.

PwC's Motion in Limine should be denied.

## II. ARGUMENT

### A.    PWC HAS NOT SATISFIED ITS BURDEN TO EXCLUDE THE EVIDENCE

Evidence should not be excluded on a motion *in limine* unless such evidence is clearly inadmissible on all potential grounds.[1] A court's ruling regarding a motion *in limine* is "subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer." *Luce v. U.S.*, 469 U.S. 38, 41 (1984). When a motion *in limine* seeks to limit damages, it is treated as a motion for partial summary judgment. *Barnes Group v. United States*, 872 F.2d 528, 532 (2d Cir. 1989).

Moreover, "the 'standard of relevance established by the Federal Rules of Evidence is not high.'" *United States v. Southland Corp.*, 760 F.2d 1366, 1375 (2d Cir. 1985) (quoting *Carter v. Hewitt*, 617 F.2d 961, 966 (3d Cir. 1980)) (Friendly, J.). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994). This Court's determinations of relevancy will not be overturned unless they are "arbitrary or irrational." *Amuso*, 21 F.3d at 1263; *see also United States v. Cruz*, 797 F.2d 90, 95 (2d Cir. 1986).

Moreover, under Federal Rule of Evidence 403, relevant evidence may be excluded only if its probative value is substantially outweighed by the danger of unfair prejudice. PwC therefore has the burden of showing that (1) the evidence of damages exceeding $12.5 million is

---

[1] *See Noble v. Sheahan*, 116 F. Supp. 2d 966, 969 (N.D. Ill. 2000); *see also Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, 1998 U.S. Dist. LEXIS 15093, No. 94 Civ. 5520, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (denying a motion in limine to preclude presentation of evidence regarding a potential punitive damages claim because the motion was too sweeping in scope to be considered prior to trial). Indeed, courts considering a motion in limine may reserve judgment until trial, so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co.*, 937 F. Supp. at 287 (citing *Hawthorne Partners v. AT&T Technologies, Inc.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993)).

289170.1                                                4

completely irrelevant, **and** (2) such evidence would result in prejudice to PwC. PwC has not satisfied its burden.

The evidence of HHRG's damages sought to be recovered by Sharp – $15.8 million – is unquestionably relevant. PwC's arguments in its motion are legally and factually baseless. *See infra*, Sections B and C. In any event, even if PwC was correct and Sharp's recovery must be capped at $12.5 million, that does not mean that Sharp is precluded from presenting evidence on the full $15.8 million damage claim in order to maximize the likelihood that it will recovery the capped amount. The question of whether the cap applies is one of law for this Court to decide, not a jury question. It is for the jury to decide the measure of damages incurred by HHRG as the result of PwC's conduct. If the jury awards damages in excess of $12.5 million, this Court may reduce the judgment award as a matter of law if it determines any cap applies. To the extent it is determined Sharp's claims are subject to a cap, that is not a basis to conclude that evidence on the full $15.8 million in damages is irrelevant, because any component part of that $15.8 million may be aggregated to reach the total sum of the $12.5 million recoverable. *See Wafra Leasing Corp. v. Prime Capital Corp.*, 339 F.Supp.2d 1051, 1054 (N.D.Ill. 2004)(if potential damages possible or subject to an issue of fact, motion *in limine* to limit damages should be denied); *Brennan v. The Paul Revere Life Ins. Co.*, No. 00 V 07025, 2002 U.S.Dist. LEXIS 10505, *6 (N.D.Ill. 2002).

Further, such evidence would not be prejudicial to PwC. PwC does not reference any potential harm in its Motion – indeed there is none: if this Court determines as a matter of law that there is a cap on Sharp's recoveries, then the Court can eliminate any damages awarded exceeding the amount of the cap by remitting the judgment award. Moreover, prejudice *will* occur if the evidence is not admitted at trial: if after an appeal it is determined that the Court

erred on the question of law regarding application of a cap and the Court erroneously barred evidence on the full $15.8 million, the parties will have to engage in another trial to determine the damages exceeding $12.5 million. One District Court has already reviewed the issue here, and it decided that such evidence should not be barred from trial. *See Hartford Ins. Co. v. The Newark Group, Inc.*, No. 01 C 2350, 2004 U.S.Dist. LEXIS 21225, *1-6 (N.D.Ill. 2004)(motion *in limine* concerning whether insurer limited to amounts previously paid to insured denied).

PwC fails to meet its burden, and for that reason alone the Motion should be denied. In any event, for the reasons set forth below, PwC's position is otherwise not well-founded based on the law or the facts.

**B.      SHARP IS ENTITLED TO PURSUE THE FULL $15.8 MILLION IT SEEKS**

   **1.      A Subrogation Claim Is Distinct From A Claim Obtained By Assignment**

PwC argues that a subrogation claim would limit an insurer to the amount of loss previously paid by the insurer under the policy, and therefore Alec Sharp's damages in this action should be limited to $12.5 million, the amount Sharp paid to its insured, HHRG. PwC, however, misstates the law in Connecticut concerning subrogation and assignment.

In Connecticut, like in other states, subrogation and assignment are not one in the same. Subrogation – also called "equitable subrogation" or "legal subrogation" by some Connecticut courts – "takes place as a matter of equity, with or without an agreement to that effect." *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, 672 A.2d 939, 944 (Conn. 1996)(citations omitted). Subrogation "is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it." *Id.* Thus, when a party (the subrogee) pays the debt of another (the subrogor), the subrogee is entitled – through operation of

law – to obtain the amount it paid from the third party responsible for causing the debt to the subrogor. *Id.*

Conversely, an assignment – also called "conventional subrogation" by some Connecticut courts – refers to a ***contract*** by which a party (the assignee) obtains all of the rights and privileges inherent in a claim (or other property owned by the assignor), in exchange for ***consideration*** (usually a payment to the assignor, or forgiveness of the assignor's debt to the assignee). *Id. See also Infinity Ins. Co. v. Worcester Ins. Co.*, No. CV20817023, 2005 Conn.Super. LEXIS 794 (Super.Ct.Conn. 2005)(payment by insurer to insured, without additional consideration, did not give rise to assignment). According to the Connecticut Supreme Court:

> "An assignment is a contract between the assignor and the assignee, and is interpreted or construed according to rules of contract construction." 6 Am.Jur.2d 153, Assignments § 1 (1999).
> …
>
> "Generally, to constitute an assignment there must be a purpose to assign or transfer the whole or a part of some particular thing, debt, or chose in action, and the subject matter of the assignment must be described with such particularity as to render it capable of identification." [Citations omitted.] … Under the hornbook law of assignments, "the assignee of a chose in action stands in the shoes of the assignor." [Citations omitted.] Indeed, "succession by an assignee to exclusive ownership of all or part of the assignor's rights respecting the subject matter of the assignment … is precisely the effect of a valid assignment." [Citations omitted.]

*Schoonmaker v. Lawrence Brunoli, Inc.*, 828 A.2d 64, 79-80 (Conn. 2003).

In an (equitable) subrogation, the subrogee has a pre-existing obligation to pay the subrogor's debt, and after the subrogee pays that debt it may then seek reimbursement from the culpable third party. *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, 672 A.2d 939 (Conn. 1996)(*generally*); *Schoonmaker v. Lawrence Brunoli, Inc.*, 828 A.2d 64, 79-80 (Conn. 2003). In

an assignment, the assignee has *no* pre-existing obligation to pay the consideration (again, usually a payment to the assignor, or forgiveness of the assignor's debt to the assignee). *Id.* In an (equitable) subrogation, the subrogor pays the debt after the loss to the subrogor is established. *Id.* In an assignment, the assignee pays the assignor the consideration *before* the loss to the assignor is established in the claim assigned. *Id.*

While a subrogation claim allows the party holding the claim to obtain the amount of the debt it paid, an assignment entitles the party obtaining it through contract to "step into the shoes" of the assignor, such that the assignee is given *all* rights in the matter or claim assigned. *Id. See also Newman v. Gaul*, 129 A. 221, 225 (Conn. 1925). Therefore, if a claim is assigned, the assignee is not limited to the amount of the consideration it paid to the assignor to obtain the claim, but can recover from the third party anything which could have been recovered by the assignor. *Id.*

Sharp has located no Connecticut authority precluding an insurer from obtaining an assignment, and no authority stating a liquidating custodian in bankruptcy cannot assign claims to an insurer.[2] The only restrictions Sharp has found on assignment of claims in Connecticut are that claims for "personal injuries" cannot be assigned. The Connecticut Supreme Court stated in *Berlinski v. Ovellette*, 325 A.2d 239 (Conn. 1973)(*rev'd on other grounds*):

> Under common law a cause of action for personal injuries cannot be assigned, and in the absence of a statutory provision to the contrary a right of action for personal injuries resulting from negligence is not assignable before judgment. 6 Am.Jur.2d 220, Assignments, § 37. The rule is succinctly stated in the Restatement, 2 Contracts § 547(1)(d): "An assignment of a claim against a third person or a bargain to assign such a claim is illegal and ineffective if the claim is for ... (d) damages for an injury the gist of which is to the person rather than to property, unless the

---

[2] PwC's counsel also cited no case law for this proposition.

289170.1                                           8

>claim has been reduced to judgment." ... The reasons underlying the rule have been variously stated: unscrupulous interlopers and litigious persons were to be discouraged from purchasing claims for pain and suffering and prosecuting them in court as assignees; [and] actions for injuries that in the absence of statute did not survive the death of the victim were deemed to personal in nature to be assignable ... . [Citations omitted.]

*Berlinski*, at 241-42.

Here, the claims assigned to Sharp are not bodily injury[3] claims. Rather, they are breach of contract and other claims concerning PwC's performance of audit and other business services to HHRG. *See, generally,* Complaint. Alec Sharp contends PwC breached its contract to provide audit services, that it negligently provided those services, and that it made negligent misrepresentations concerning those services. There is no Connecticut authority barring the assignment of such claims, and PwC presents no such authority in its Motion.[4]

### 2. Alec Sharp Received A Valid Assignment Of The Claims Asserted In This Action

Since the claims against PwC can be assigned, the question then becomes whether Alec Sharp received a valid assignment of those claims from HHRG. The answer is clearly "Yes."

The events leading up to the assignment leave no doubt as to why. As set forth above, HHRG submitted economic losses totaling $18,330,423 for coverage under an insurance policy. *See* Dempsey Letter, attached hereto as Exhibit 1, pps.31-33. HHRG's losses consisted of approximately $14.55 million in loss of money due to unauthorized and unsecured advances,

---

[3] One Connecticut case extends *Berlinski* to legal malpractice claims, likely inasmuch as attorneys are fiduciaries of their clients. *Gurski v. Rosenblum*, 838 A.2d 1090 (Super.Ct.Conn. 2003). No legal malpractice claims are at issue here, though, and this Court has already concluded that no fiduciary duties exist between an auditor and its client. *See* Memorandum Decision, October 11, 2005, p.10.

[4] Moreover, as demonstrated in the *Berlinski* case, the Connecticut Supreme Court looks to American Jurisprudence rules concerning the doctrine that personal injuries cannot be assigned. Pursuant to American Jurisprudence rules, breach of contract claims are assignable. 6 Am.Jur.2d Assignments § 58. Further, per 6 (continued ...)

approximately $3.1 million in unauthorized payments to consultants, $505,000 in excessive bonuses paid by HHRG to former employees, and $160,000 in claim investigation costs. *Id.*

Sharp advised HHRG that: (1) the $3.1 million in unauthorized payments to consultants and the $505,000 in bonuses were not losses covered by the policy; (2) as to the other losses, there was also no coverage unless and until another policy issued to HHRG by another insurer covered such losses," whereby the policy issued by Sharp was excess of such other insurance and only paid proceeds *after* the limits of the other policy were exhausted; and (3) even if the other insurance policy had never been issued to HHRG, the amount of covered "loss" was only approximately $8 million. HHRG provided additional documentation to support further covered losses bringing Sharp's analysis to $10.5 million. *See* Johnson Letter, PwC's Motion for Partial Summary Judgment Exhibits ("PwC MSJ Exs."), Ex. 18; Johnson Affidavit, Ex. L, Sharp Motions Limine Appendix of Exhibits ("Sharp Limine Exs."); Motion to Compromise and Settle Insurance Loss Claim Under Handy & Harman Refining Group Inc.'s Bankers Insurance Policy, ¶6, attached hereto as Exhibit 2. *See also* Marcus Johnson Dep. at pp.45-46,49-52, Ex. M, Sharp Limine Exs.

Later, in December 2001, Sharp entered into a contract with HHRG's Liquidating Custodian whereby Sharp paid HHRG $12.5 million, waived the policy's £500,000 deductible, and agreed to pay significant legal fees and expenses to prosecute HHRG's action against its other insurer. *See* Ex. A to PwC's Motion in Limine. In exchange for such consideration, HHRG released Sharp from the claim it made under the fidelity policy, and assigned to Sharp the right to pursue any culpable third parties, specifically including PwC, for the losses covered by the Sharp

---

( . . . continued)
Am.Jur.2d Assignments § 64, negligent misrepresentation and general negligence claims are *not* personal injury torts.

289170.1                                         10

policy, and those losses *beyond* the scope of coverage, which make up the $18.3 million universe of damages transferred to Sharp. *Id.* Thus, even assuming the $12.5 million payment constituted a contractual obligation under the policy giving rise to equitable subrogation rights, that portion of the claims assigned to Sharp in excess of the $12.5 million relates to the portion of HHRG's $18.3 million loss that was not subject to coverage and therefore *could not* have been transferred to Sharp by operation of law. Instead, the balance of HHRG's losses were transferred pursuant to a valid assignment.

If these rights were not assigned to Sharp, they would have remained with the HHRG estate and the estate would have a balance of $5.8 million on its losses and an opportunity to pursue third-party claims in an attempt to recover those losses that were not covered by the policy. Instead, however, given the uncertainties of pursuing third-party recoveries and to preserve assets and resources of the estate, the Liquidating Custodian agreed to assign those claims to Sharp in exchange for valuable consideration including the $12.5 million payment, waiver of the "excess insurance" position, waiver of the £500,000 deductible, and the agreement on costs and recoveries in the action against HHRG's other insurer. The contract between the Liquidating Custodian and Sharp constituted a valid assignment under Connecticut law. *See* Section II.B.1, *supra*. The assignment furthermore was approved by the Bankruptcy Court presiding over the HHRG estate. *See* Order, attached hereto as Exhibit 3. Thus, limiting damages in this case to $12.5 million would effectively eliminate a claim validly transferred by HHRG to Sharp for valuable consideration. In the process, PwC would escape its liability for the difference between $12.5 million and the damages it caused HHRG which HHRG assigned to Sharp. There is no equity in such an outcome.

The assignment from the HHRG estate to Sharp is supported by a written contract, acknowledged by PwC. Attached to PwC's Motion as Exhibit A is the settlement agreement between HHRG and Alec Sharp ("the Settlement Agreement"); and attached to the settlement agreement is a written acknowledgement of assignment. The Settlement Agreement, Paragraph 10, titled "Subrogation and Assignment," states:

> [HHRG] assigns to [Alec Sharp] all rights, title and interest in any and all claims which [HHRG] has, had, or may ever have as to all losses asserted by [HHRG] in the Claim, plus interest, costs, and punitive damages arising from such losses, including but not limited to, any and all such claims against ... Price WaterhouseCoopers [*sic*] and its predecessors, successors, agents and assigns ... [HHRG] acknowledges that this assignment is full and complete, and without reservation, for Underwriters to pursue recovery of all losses asserted by [HHRG] ...

*Id.*

Pursuant to the assignment, the Liquidating Custodian, who pursuant to the Second Amended Plan of Reorganization ("the Plan") expressly has the right to assign claims belonging to the bankrupt estate of HHRG,[5] clearly assigned all rights, title and interest in any and all claims HHRG has against PwC in exchange for the $12.5 million payment "and the other promises made by [Alec Sharp]," (*i.e.*, the promises to waive the policy deductible and the "excess insurance" position, and to pay certain legal fees and expenses to prosecute jointly with HHRG the claim against another insurer). *Id.* The assignment in the Settlement Agreement therefore comports not only with the letter of an assignment, but also the spirit: Sharp paid *new*

---

[5] The HHRG Plan of Reorganization in bankruptcy ("the Plan") sets forth the liquidating custodian's right to assign claims belonging to the bankruptcy HHRG estate. Per Page 35 of the Plan, attached hereto as Exhibit 4, "The Liquidating Custodian is empowered to ... assign any right, title or interest in or about the Property ... ." The Plan was approved by the bankruptcy court presiding over the HHRG estate.

contract consideration to HHRG in exchange for the right to sue PwC "in the shoes" of HHRG for the losses incurred by HHRG.

Nothing demonstrates this more clearly than HHRG's damages regarding HHRG's payments of bonuses and consulting fees. When HHRG submitted its claim under the fidelity coverage section of the policy issued by Alec Sharp, HHRG asserted that it had incurred losses totaling $18,330,423. *See* Dempsey Letter, attached hereto as Exhibit 1, pps.31-33. HHRG's losses consisted of approximately $14.55 million in loss of money due to unauthorized and unsecured advances, approximately $3.1 million in unauthorized payments to consultants, $505,000 in excessive bonuses paid by HHRG to former employees, and $160,000 in claim investigation costs. *Id.* While Sharp conceded the unauthorized and unsecured advances could conceivably constitute losses covered by the policy, Sharp concluded the bonuses and payments to consultants could not – yet, by virtue of the Settlement Agreement, HHRG agreed to forego its claim for such damages (against PwC or anyone else) so that Alec Sharp could assert that claim against parties such as PwC.

Moreover, if Alec Sharp is not allowed to assert the assigned claims against PwC, then the Settlement Agreement is invalidated. That would undo a contract that already once received court approval: on November 2, 2001, the Settlement Agreement and the Assignment Contract was approved by the court presiding over the HHRG bankruptcy.[6] *See* Order, attached hereto as Exhibit 3.

Finally, it should not be forgotten that an assignment is a contract like any other. *Schoonmaker v. Lawrence Brunoli, Inc.*, 828 A.2d 64, 79-80 (Conn. 2003). In Connecticut, like in other states, if the terms of a contract are clear, they must be enforced. *Marcolini v. Allstate*

*Ins. Co.*, 278 A.2d 796, 799 (Conn. 1971). Further, a contract cannot be rewritten by judicial fiat. *Bergen v. The Standard Fire Ins. Co.*, No. CV 93044099S, 1997 Conn.Super. LEXIS 3494, *13 (Super.Ct.Conn. 1997). The assignment at issue here is plain and clear, and thus should be enforced.

### C.  PWC'S ARGUMENTS ARE BASELESS

PwC argues on Pages 3-5 of its Motion that Sharp has a right of (equitable) subrogation, and thus it cannot obtain damages exceeding $12.5 million. First, Sharp does not only have a right of (equitable) subrogation, but also a more extensive claim via assignment. Second, even if there had never been an assignment contract (as clearly there was), Sharp's subrogation claim would *not* be limited to $12.5 million. More than $12.5 million in value was transferred from Alec Sharp to HHRG. In addition to the $12.5 million, Sharp waived the £500,000 policy deductible (worth approximately $800,000 at the time), and Sharp bore the burden of prosecuting the action against the other insurer. Thus, if Sharp had never been given an assignment and only had a subrogation right, the amount Sharp would be subrogated to (the amount of value conferred) exceeds $12.5 million.

PwC argues on Pages 5-7 of its Motion that Alec Sharp's damages in this case can be no greater than the losses covered under the policy. PwC presents no authority for this bald assertion – and there is none. PwC asserts that "[i]n their motion for partial summary judgment, [Alec Sharp] argued that their damages claims are broader than the losses covered under the Policy." Such is in fact true: while Alec Sharp has automatic subrogation rights for the value which has already been conferred upon HHRG, it also can collect damages against PwC for the claims that were *assigned*. PwC presents no authority or evidence contradicting this.

---

(. . . continued)
[6] Moreover, PwC never objected to the Settlement Agreement, or the assignment therein.

The testimony of Sharp's expert, Vince Love, does not affect the validity of the assignment. PwC argues that the expert concluded that Sharp's damages in this case are limited to the loss covered by the fidelity policy. This argument is clearly a mischaracterization of the expert's testimony. The expert was not retained to offer an opinion (and he did indeed did not offer an opinion) as to the amount of coverage under the policy. *See* Love Expert Report, pps.1-7, attached hereto as Exhibit 5. He also was not retained to offer an opinion (and he did not offer an opinion) as to whether the law in Connecticut limits an insurer from asserting assigned claims, or limits damages in assigned claims.[7] *Id*. Mr. Love was retained, and he offered an opinion, concerning the extent of damages **HHRG** suffered due to PwC's actions at issue in the claims *assigned* to Sharp. *Id*. His testimony has absolutely no effect upon the breadth of damages HHRG (and thus Sharp by assignment) could obtain from PwC.

PwC's argues on Pages 7-8 of its Motion that Sharp did not receive an assignment. PwC offers no authority or evidence for this proposition – and there is none. PwC furthermore attempts to mischaracterize the facts in arguing that "[o]nce [Sharp] admitted coverage under the Policy, the only issue in dispute with its insured was the amount of the covered loss." Such is not true. Sharp disputed that there was *any* coverage under the policy, given it was specifically excess to another policy issued to HHRG by another insurer. *See* Johnson Letter, PwC's Motion for Partial Summary Judgment Exhibits ("PwC MSJ Exs.")., Ex. 18; Johnson Affidavit, Sharp Motions Limine Appendix of Exhibits ("Sharp Limine Exs."), Ex. L; Motion to Compromise and Settle Insurance Loss Claim Under Handy & Harman Refining Group Inc.'s Bankers Insurance Policy, ¶6, attached hereto as Exhibit 2. *See also* Marcus Johnson Dep. at pp.45-46, 49-52, Ex.

---

[7] *Even if* Alec Sharp had retained Mr. Love to opine of such issues (which it clearly did not), the issue of whether damages in this case are capped is an issue of law, not fact. Mr. Love's opinion on such issues would not have been authoritative.

289170.1                                                  15

M, Sharp Limine Exs. Also, the loss concerning HHRG's payments of bonuses and consultant fees was not subject to coverage by the policy. *Id.*

PwC also asserts that "[b]y law, ***and absent further consideration*** [from Sharp], HHRG could only assign to [Sharp] its right to assert third party claims to recover [the $12.5 million]." (Emphasis added.) PwC, however, ignores that Sharp ***did*** pay additional consideration. *See* discussion *supra*. Accordingly, those losses incurred by HHRG in excess of the *covered* losses, were validly transferred to Sharp by assignment in exchange for the consideration given by Sharp.

Sharp received a valid, court-approved assignment from the Liquidating Custodian, who was authorized by the Bankruptcy Court to manage and dispose of the very assets of the estate that were assigned to Sharp. PwC submits no evidence or authority indicating otherwise.

### III. CONCLUSION

For the foregoing reasons, PwC's motion should be denied.

        Respectfully submitted,

        WILSON, ELSER, MOSKOWITZ,
        EDELMAN & DICKER LLP

By: /s/ Fred Knopf
        Fred Knopf, Esq. (ct 09427)
        E-mail: knopff@wemed.com
        Edward Boyle, Esq.
        E-mail: boylee@wemed.com
        WILSON, ELSER, MOSKOWITZ,
        EDELMAN & DICKER LLP
        150 E. 42nd Street
        New York, NY 10017
        Phone: 212-490-3000
        Fax: 212-490-3038

        Daniel J. McMahon, Esq. (Ill. Bar 0162590)
        E-mail: mcmahond@wemed.com
        Stefan R. Dandelles, Esq. (Ill. Bar 6244438)

        E-mail: dandelless@wemed.com
        WILSON, ELSER, MOSKOWITZ,
        EDELMAN & DICKER LLP
        120 N. LaSalle Street
        Chicago, IL 60602
        Phone: 312-704-0550
        Fax: 312-704-1522

## CERTIFICATE OF SERVICE

  THIS IS TO CERTIFY that on October 21, 2005, a copy of the foregoing was filed electronically (and served by mail on anyone unable to accept electronic filing) on each of the following counsel of record in each of the consolidated cases. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system (or by mail to anyone unable to accept electronic filing). Parties may access this filing through the Court's system.

Thomas D. Goldberg, Esq.
Steven Greenspan, Esq.
David J. Elliott, Esq.
William H. Erickson, Esq.
Day, Berry & Howard
City Place I
Hartford, CT 06103

Steven Humphrey, Esq.
Dina Fisher, Esq.
Robinson & Cole
280 Trumbull Street
Hartford, CT 06103-3597

William H. Champlin III, Esq.
Michael T. McCormack, Esq.
Tyler Cooper & Alcorn, LLP
City Place, 35th Floor
185 Asylum Street
Hartford, CT  06103

              /s/ Fred Knopf
              Fred Knopf