# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

TALBOT HOUSE
426 DANBURY ROAD
WILTON, CT 06897
TEL 203 762 5052
FAX 203 762 9826

October 9, 2000

Michael Ryan
Chief Executive Officer
Handy & Harman Refining Group, Inc.
300 Rye Street
South Windsor, CT 06074-1220

> Re: Handy & Harman Refining Group, Inc.
> Barry Wayne/Panexim Matter
> Lima, Peru

Dear Mr. Ryan:

In accordance with your request we have undertaken a limited review of the books and records of Handy & Harman Refining Group, Inc. ("HHRG") in connection with a determination of loss arising from a scheme to defraud HHRG carried out by certain former employees and consultants.

This letter will summarize the status of our investigation to date and will provide our preliminary conclusions with respect to the actions of the following former employees of HHRG:

- Barry Wayne, President and Chief Executive Officer from August 1996 to February 2000,
- Richard L. Searle, Vice President of Sales and Marketing from August 1996 to February 2000, and
- Luis Posada, Smelter Administrator from August 1996 to March 2000

In addition, this report will also focus on the activities of Michel M. Verleysen, a former employee of Engelhard Corporation with experience in the South American precious metals business, who had become a full-time consultant

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

to H&H in the early 1990's. Verleysen figured prominently in all of the business conducted in South America by HHRG.

Other former employees and consultants may have been involved in the scheme to defraud HHRG. This report addresses only the actions of the above listed individuals.

This report will also provide details concerning the amount of loss incurred to date by HHRG as a result of these actions, as well as other losses that are reasonably tied to the scheme. At the present time, losses are calculated in the amount of $18,330,477.

Our investigation began in June 2000 and is continuing. We have conducted the following activities:

- Conferred with HHRG's present management, including yourself, Sean Russo, and John Downie;
- Reviewed documents and computer files maintained at HHRG's offices in South Windsor, CT;
- Assisted in the formulation of subpoenas issued pursuant to Rule 2004 of the U.S. Bankruptcy code, and analyzed documents produced to date;
- Interviewed H. Roberto Passaro Ponce de Leon, President of Panexim S.A.;
- Interviewed Manuel Seaone Stuva, General Manager of Panexim S.A.;
- Interviewed various executives of Hermes Transportes Blindados S. A. ("Hermes"), the operator of a secure vault in Lima, Peru;
- Interviewed various executives of Alex Stewart (Assayers) del Peru, S.R. Ltda. ("ASA"), which provided supervision and sampling services to HHRG and Panexim; and
- Conferred with represntatives of Crawford & Company and Hagen, Streiff, Newton, & Oshiro, adjusters and auditors representing an All-Risks Insurance policy issued to HHRG and GWRC by certain underwriters at Lloyd's, and a Bankers Insurance Policy issued to N. M. Rothschild & Sons by certain underwriters at Lloyd's.

Attorneys representing Barry Wayne, Michel Verleysen, and Richard L. Searle to date have refused to produce subpoenaed documents, citing Fifth Amendment concerns. Discussions among counsel are continuing in an effort to

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

obtain testimony and documentation. All three individuals are under indictment and awaiting trial in connection with an alleged Argentine export fraud committed in the early 1990's.

Luis Posada has been subpoenaed to give testimony in Rule 2004 proceedings before the U.S. Bankruptcy Court in Hartford. We have not interviewed Mr. Posada in anticipation of his testimony.

We believe that sufficient information exists today to implicate Messrs. Wayne, Searle, and Posada in the scheme to defraud HHRG. However, as noted, our investigation is continuing. While we have concentrated our review on events surrounding the Panexim matter, recent discoveries have cast suspicion on HHRG's dealings with a number of other companies operating in South America. The nature of the business conducted by HHRG with these companies, and the extent of losses incurred, if any, is not fully known. Among these are included entities established with the knowledge of former HHRG management in Bolivia, Brazil, Chile, Ecuador, Mexico, Uruguay, and Venezuela. It should be noted that these companies were established prior to the HHRG purchase.

We will supplement this report with additional relevant data as it becomes available.

## Overview of HHRG's Dealings With Panexim

HHRG commenced operations on August 16, 1996, when certain assets of the Precious Metals Refining Division of Handy & Harman ("H&H") were sold to Golden West Refining Corporation, Ltd. ("GWRC"). (Exhibit 1 – Purchase Agreement)

Barry Wayne, President of the Precious Metals Refining Division, was recruited by GWRC to become the President and Chief Executive Officer of the new company. Richard L. Searle, a former employee of Engelhard Corporation who had been employed by H&H since December 1990, became HHRG's Vice President of Sales and Marketing. Michel M. Verleysen continued as a full-time consultant to HHRG. Luis Posada became HHRG's

Page 3

**DEMPSEY, MYERS & COMPANY LLP**

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Smelter Administrator.  Posada was involved in South American operations because of his fluency in Spanish. (Exhibit 2 – June 16, 1997 Organization Chart)

The primary business of HHRG was to recover precious metals from waste, scrap, mining concentrates, and bullion. HHRG received a fee for this service.  After the determination of value and settlement with the customer, HHRG purchased for its own use the precious metal resulting from refining activities, or, upon request by the customer, returned an equivalent amount of metal to the customer.

Panexim S.A. was organized in Lima, Peru on September 9, 1996.  Its directors were H. Roberto Passaro Ponce de Leon, President, David Manuel Seaone Stuva, and John Francis Phillips, a former consultant to H&H who was closely associated with Verleysen.  Phillips' membership on the original Board of Directors of Panexim was never disclosed to HHRG's Board.  (Exhibit 3 – Panexim S.A. Articles of Incorporation and Registration Receipt produced by Manuel Seaone in Lima on September 11, 2000)

Panexim's profitability depended on an export incentive program created by the Peruvian government in 1995. Under the program, Peruvian manufacturers would be paid 5% of the FOB value of qualifying export products.  Panexim's business plan was to purchase refined gold from local mines and other sources at prevailing market prices, convert the metal into "products" such as gold powder, braising paste, gold chain, and others, export the "products", and recover the 5% export credit.  Since Panexim bought and sold gold at prevailing market rates, and took no price risk, 100% of the company's income would be derived from the 5% credit.  Wayne, Verleysen, and Searle were aware of Panexim's business plan. (Exhibit 4 – Passaro letter to Verleysen dated July 21, 1996)

The government of Peru abolished the export incentive program on July 7, 1998.  Thereafter, Panexim operated alternatively as a gold dealer or sales agent.  As a dealer, Panexim would buy gold from miners at a discount to prevailing market prices, then sell the gold to HHRG at an agreed market price. As a sales agent, Panexim would be paid a commission by miners for handling export sales to HHRG.

Page 4

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

HHRG was Panexim's primary customer, accounting for over 95% of Panexim's sales during the 1996-2000 time period. The volume of business transacted with Panexim can be summarized as follows:

| $000,000's | Gold | Silver | Comarsa | Total |
|---|---|---|---|---|
| Funds Advanced by HHRG | $ 242.6 | $ 56.8 | $ 14.3 | $ 313.7 |
| Metal Received from Panexim | -230.0 | -47.8 | -14.2 | -292.0 |
| Cash Received from Panexim | -0.0 | -7.2 | -0.0 | -7.2 |
| Outstanding Receivable | $ 12.6 | $ 1.8 | $ 0.1 | $ 14.5 |

*Source: Panexim Accounts Receivable Summaries*
*Note: Amounts have not been adjusted to correct improper postings between gold and silver accounts.*

Under the initial arrangement, HHRG "fixed" the purchase of an agreed quantity of gold with Panexim at the prevailing market price. HHRG then advanced funds to Panexim to enable Panexim to consummate the purchase of gold from Peruvian miners. Utilizing equipment sold to it by HHRG or available at its rented space within the Remega refinery in Lima, Panexim converted the gold bullion into "products", and then exported the "products" to HHRG's refinery in Attleboro, Massachusetts.

HHRG accounted for these transactions utilizing its Accounts Receivable system. When HHRG advanced funds to Panexim, the Panexim account would be debited, indicating Panexim's debt to HHRG, payable in gold or cash. When the corresponding value of gold was received in Attleboro, the Panexim account would be credited and the deal "settled".

Initially, Panexim paid HHRG a "commission" of 1.25% of gold value received, which represented HHRG's share of the 5% export incentive or "drawback" paid to Panexim by the government of Peru. HHRG was responsible for sampling and supervision charges when the metal was received at the Hermes vault in Lima, and for transportation and handling charges to the Attleboro refinery. When the export credit was abolished in 1998, Panexim paid HHRG a fee ranging from 0.7% to 1% of gold value.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

HHRG did not distribute the "products" exported by Panexim. Instead, HHRG used its refinery processes to recover the fine gold and silver content from the "products". The recovered metal was sold to HHRG's regular customers.

HHRG's dealings with Panexim seem closely related to a scheme allegedly conducted by Wayne, Searle, and Verleysen during the early 1990's in Argentina, which is the subject of indictments unsealed in February 2000 by the U.S. District Court for the District of New Jersey. In that case, the former employees and consultants of H&H stand accused of conspiracy, money laundering, smuggling, and wire fraud in an alleged scheme to defraud the government of Argentina through the export of various "products" containing gold. (Exhibit 5 – Indictment and Docket Summary, Case No. 2000-0083)

The Scheme to Defraud HHRG

Between September 1996 and February 2000, Wayne, Searle, Verleysen, Posada, and others conspired with Passaro and Seaone to cause HHRG to advance unsecured funds to Panexim. The funds were used to finance gold purchases in Peru. No HHRG employee had authority to enter into such transactions, which were expressly prohibited by the GWRC Credit Policy. Neither the Finance Committee nor the Board of Directors of HHRG was informed of these unauthorized extensions of credit. When questions were raised in May 1999 concerning HHRG's relationship with Panexim, Wayne, Posada, Verleysen, and others went to great lengths to conceal the true nature of these transactions from the boards of both HHRG and GWRC.

Before we provide details of the scheme, it should be noted that HHRG has submitted claims under an "All-Risks" insurance policy issued by certain underwriters at Lloyd's. As we understand it, the policy provides coverage for physical loss or damage to "stock", including precious metals, and also provides coverage for "Counterfeit Bullion" losses. The policy contains no exclusion for dishonest or fraudulent acts of employees of HHRG.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

We have yet to establish conclusively that a physical loss of precious metals occurred with respect to the Panexim matter. Our investigation of this aspect of the case is continuing, and we have not excluded the possibility that such losses occurred. However, coverage under the "Counterfeit Bullion" provision may apply to approximately $11.7 million of the $14.5 million Panexim cash shortfall. The relevant coverage clause reads as follows:

Counterfeit Bullion

This policy shall pay any loss sustained by the assured as a result of accepting 'Counterfeit Bullion', subject to immediate advise to Underwriters upon the Assured becoming aware of such a loss, where such discovery occurs within twelve months of the Assured taking delivery.

In respect of the above it is agreed:

a) The term 'Bullion' shall be deemed to refer to Precious Metals of all kind whatsoever form and articles made therefrom.
b) The term 'Counterfeit' shall be deemed to refer to material which is represented to the Assured as, and is accepted by them as being Bullion of a specific metal type and finesse (sic) but which subsequently proves to differ in terms of its actual Precious Metal content by more than 5% of the stated Precious Metal content.
(Exhibit 6 – All-Risks Policy)

This clause may apply because in February 2000, HHRG discovered that 38,740 troy ounces of fine gold with a value of $11.7 million was missing from the Hermes vault in Lima. In its place had been substituted a similar quantity of silver with a value of approximately $160,000. The silver had been purchased by HHRG in May 1999, but, under instructions of Barry Wayne, never shipped to Attleboro. Up until the February discovery, Wayne and other HHRG employees and consultants had advised HHRG's Board that the vault contained gold. Our report of August 18, 2000 sets forth the events leading up to the discovery, and summarizes the misrepresentations of Wayne, Posada, Verleysen, and others in concealing the truth from the various committees and boards.
(Exhibit 7 – Counterfeit Bullion report)

Page 7

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

## The Transfer of Unsecured Funds to Panexim

Panexim had no financial resources of its own. On September 16, 1996, without the knowledge of the HHRG Board, Barry Wayne authorized the first unsecured advance to Panexim: $74,000 in working capital to begin operations in Peru.

Under Peruvian law as it existed in 1996, all domestic purchases of gold required the purchaser to pay sales taxes in the amount of 18% of metal value. This value-added tax, also known as "VAT" or by its Spanish acronym "IGV", was fully refundable upon exportation of the gold.

The Panexim/HHRG financial model called for the purchase and sale of gold at market prices. HHRG was to wire transfer dollars to Panexim to consummate the initial purchase from Peruvian miners. Barry Wayne was initially opposed to advancing Panexim money to pay corresponding VAT, and through Verleysen advised Panexim to establish a line of credit at a local bank for this purpose. The borrowings would consist of a short-term loan to pay VAT on gold purchases, which would be repaid upon receipt of the government refund. In the normal course, refunds were to be paid within 10 days of export.

The basic elements of the initial gold transactions between HHRG and Panexim were as follows:

## Sample Gold Transaction

1. Panexim agrees to purchase 100 troy ounces from local miners @ $300/oz

2. Panexim and HHRG "fix" a purchase of 100 ounces @ $300/oz

3. HHRG wire transfers $30,000 (100 @ $300) to Panexim

4. Upon receipt of HHRG funds, Panexim withdraws $30,000 in cash from its bank

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

5. Panexim pays $30,000 in cash to the miners and takes delivery of 100 ounces of gold

6. Panexim converts refined gold into "products" such as gold powder

7. "Products" with a value of $30,000 are exported to HHRG

8. At month-end, Panexim remits 18% VAT to SUNAT, the Peruvian sales tax authority ($5,400)

9. SUNAT refunds VAT of $5,400 in 10 days*

10. SUNAT pays 5% export credit ($1,500) in 10 days

11. Panexim pays HHRG commission of 1.25% of gold value ($375)

* Panexim initially had no internal resources from which to pay VAT taxes. Initial expectations were to purchase approximately $2 million of gold per month, creating the need for up to $360,000 in short term financing.

According to Manuel Seaone, the idea of HHRG financing Panexim's VAT requirements was first discussed with Michel Verleysen in 1996. Verleysen indicated that Barry Wayne's approval was needed to extend such credit. The day after the conversation, Verleysen informed Seaone that Wayne would not finance VAT directly, but would agree to guaranty a bank loan in Peru. Shortly thereafter Panexim obtained a $200,000 line of credit from Banco de Lima Sudameris. However, with Wayne's agreement the line was secured by HHRG gold purchased from Panexim and held as collateral in the Banco de Lima vault. This unauthorized gold guaranty was never disclosed to the HHRG Board.

As the volume of Panexim's business grew, additional VAT financing was required. By mid-1998, the Banco de Lima credit line had increased to $1.5 million, all of it secured by HHRG's gold. (Exhibit 8 – Banco de Lima account statements)

In July 1998, the government of Peru abolished the incentive on gold exports. Panexim's "product" business came abruptly to a halt, but with HHRG's support new opportunities emerged. Since it was no longer constrained by its capacity to manufacture powder, chain, and the other "products",

Page 9

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Panexim, with HHRG's financial backing, was free to export as much gold as
could be acquired in Peru. With the abolition of the export incentive, the gold
market returned to a "normal" pricing framework, with purchasers obtaining a
3% to 3.5% discount from world market value. Panexim's profits would now
come from selling the same gold to HHRG for market value. HHRG received a
reduced "commission" of 1% of value, which was later reduced to 0.7%.

In this new environment, Panexim's gold purchases skyrocketed, as
shown on the following chart:

Figure 1: Panexim's Monthly gold purchases – troy ounces



*Source: Panexim "Kardex" inventory system*

According to Seaone, HHRG asked Panexim to increase the Banco de
Lima line of credit beyond the $1.5 million already in use, but the bank refused.
As a result, Barry Wayne agreed to finance Panexim's VAT directly. Verleysen,
Posada, and perhaps other HHRG employees and consultants knew of this
arrangement. As with the Banco de Lima gold guaranty, it was not disclosed to
the HHRG Board.

Page 10

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

The method utilized by HHRG management and Panexim to conceal VAT financing was quite simple. When HHRG and Panexim "fixed" a transaction, the quantity of gold and price were established. HHRG's trading desk prepared a "pre-price" or "G" ticket summarizing the terms. Panexim sent a confirming fax with a pro forma invoice containing the same information. This documentation was sufficient for Luis Posada to authorize an advance payment by wire transfer for the full amount of the transaction. Although Posada, Wayne, and Verleysen would later claim that evidence of physical receipt and an assay certificate were required prior to the release of funds, both Passaro and Seaone have stated that this procedure began only after the HHRG Board began questioning HHRG's relationship with Panexim in May 1999. (Exhibit 9 – **HHRG Interview Notes – Raphael Noriega, Roberto Passaro, Luis Posada, Michel Verleysen, Barry Wayne,**)

According to Seaone, beginning in July 1998 the quantity of gold "fixed" with HHRG was inflated by 18% so that HHRG's cash advance would cover the market value of gold and applicable VAT taxes. Wayne, Verleysen, and Posada were aware of and endorsed this arrangement. In fact, because neither HHRG nor Panexim wished to assume price risk, Wayne required that Panexim "hedge" the amount of VAT financing so that gold could be purchased at a future date (with VAT refunds) at the "fixed" price.

These hedging transactions were conducted through a metal trading firm by the name of ED&F Man International in New York. HHRG's books reflect dozens of payments to ED&F Man on Panexim's account. On October 5, 2000 we received copies of Panexim's ED&F Man trading accounts. We are now in the process of analyzing specific transactions to determine the extent to which HHRG funds were used to purchase futures contracts related to VAT financing.

HHRG's cash transfers to Panexim climbed to the level of $20 million per month in the second half of 1998, a sum that included growing VAT requirements. In November 1998, SUNAT began to withhold payment of VAT refunds. This condition was originally thought to be a normal year-end phenomenon that indicated SUNAT had run out of money. Unphased, Panexim continued to purchase gold on HHRG's behalf at the accelerated levels, and continued to pay to SUNAT the corresponding 18% VAT.

Page 11

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

In February 1999 Panexim learned that VAT refunds were being withheld not because of a shortage of funds, but due to a SUNAT investigation into alleged tax fraud in the gold supply chain. By that time, Panexim was owed over $10 million in VAT refunds. These funds had been advanced to Panexim by HHRG in the months of October, November, December 1999, and January 2000. Although known to Wayne and his management team, the tax problems in Peru were not disclosed to the HHRG Board.

On May 18, 1999, during a review of the fiscal year end March 31, 1999 balance sheet by the HHRG Audit Committee, John King, HHRG's Treasurer, expressed concern at the size of a large outstanding receivable from Panexim. This was the first knowledge any non-executive member of the Audit Committee had concerning the receivable. As later explained by Rick Ollett, HHRG's CFO, using information provided by Posada, the receivable, which was reported at $21.9 million, comprised four elements:

1. Gold being held "in quarantine" at the Hermes vault valued at $11.8 million;
2. Gold and silver received at HHRG's Attleboro refinery after the balance sheet cut-off date valued at $7.8 million;
3. Advances of $1.0 million paid to Panexim to finance silver VAT taxes[i]; and
4. Unpaid refining charges (commissions) and transportation charges of $1.3 million.

(Exhibit 7, Tab 1)

Our analysis of the gold transactions comprising the quantities allegedly held at Hermes revealed that only $1.8 million of the lots comprising the $11.8 million allegedly held in the Hermes vault had been received at Hermes prior to the March 31, 1999 balance sheet date. The remaining lots were received in April, and in some cases May 1999, well after the cut-off date. In addition, all the $5.3 million in gold lots allegedly received in Attleboro after the balance sheet date were duplicated in the listing of Hermes stock. These were material

---

[i] Wayne later explained to the Audit Committee that he had always maintained an "internal" lending limit of $300-400,000, but that recent events in Peru had resulted in a breach of this policy. Sean Russo, an HHRG director and Chairman of the Finance Committee, advised Wayne that the limit had never been disclosed to the HHRG Board or the GWRC Board either at the time of the acquisition or subsequently, despite the GWRC Board having been assured on more than one occasion that HHRG was not in breach of the GWRC Credit Policy, which prohibited such lending. (Exhibit 7, Tab 2)

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

misrepresentations designed to conceal the fact that HHRG had advanced unsecured funds to Panexim.

Regarding the large quantity of metal allegedly held in "quarantine" in Peru, Wayne indicated that the gold was to be released gradually so as not to attract the attention of the Peruvian authorities. As evidence of its physical existence, Wayne told the Board that HHRG advanced money to Panexim only upon receipt of documentation evidencing the receipt of metal in the Hermes vault. (Exhibit 7, Tab 9)

Wayne's explanation was not true, as Passaro and Seaone have indicated. Panexim's financial statements, purchase journal, hedging transactions, tax situation, and other documentation support Passaro's and Seaone's version of events.

In September 1999, under instruction from the GWRC Finance Committee, the HHRG Finance Committee ordered HHRG management to conduct an independent inspection of the HHRG material held in the Hermes vault, which at the time was said to contain approximately one metric ton of fine gold. HHRG management arranged for the inspection to be carried out by Alex Stewart (Assayers) del Peru S.C.R. Ltda. ("ASA"), the firm that was responsible for supervising and sampling all of Panexim's gold transactions.

On September 21, 1999 ASA submitted a report indicating that sixteen boxes containing 38,741 troy ounces of an unspecified metal (1,204.979 kg) were contained in the vault. The report also indicated that 11 of 16 boxes had been sampled by ASA, found to contain gold of various fineness, and new seals applied. (Exhibit 7, Tab 19)

The HHRG and GWRC Finance Committees viewed the ASA report as confirmation that 38,741 ounces of gold were contained in the vault. Although it did not explicitly say so, the report was requested for the sole purpose of confirming the physical existence of gold. Thereafter, HHRG management used 38,741 ounces as the benchmark for computing the quantity of gold contained in the Hermes vault. Monthly reports prepared by HHRG management tracked changes in this quantity at the request of the HHRG Finance Committee.

Page 13

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Subsequent analysis revealed that the Finance Committee was misled by the ASA report, as the sixteen boxes listed at the top of the page actually contained silver, and the sixteen boxes listed at the bottom of the page contained a small quantity of gold just received at the Hermes vault. (Exhibit 7, Tabs 19, 38)

The ASA "stock check" was a sham orchestrated by Posada with the approval of Wayne. According to Seaone, in May 1999, when the HHRG Board first learned of the Panexim receivable, Luis Posada instructed him to place one metric ton of silver into the Hermes vault. Seaone complied, using material purchased for HHRG (with HHRG advance funds) from Doe Run del Peru.

In September 1999, Posada advised Seaone that "the Australians" were coming to Lima to inspect the boxes. To attempt to conceal the truth, Posada first asked Seaone to falsify vault receipts known as "Comprobantes de Servicio" so they would reflect $11.8 million of gold instead of the much lower silver value that appeared on the original receipts. Seaone refused Posada's request because such changes were reported to SUNAT, and unfavorable tax consequences were probable.

Posada reported back to Seaone the next day, indicating that the Australians were not coming after all, but that the ASA inspection was required. First, in a memorandum faxed to Seaone, Posada instructed ASA to verify that the original seals on the sixteen boxes containing silver were intact. Second, Posada verbally instructed Seaone to place sixteen boxes of gold in the vault, and to further instruct ASA to open these boxes, take random samples, and re-seal the boxes. Posada specifically asked that ASA be instructed not to weigh these boxes. (Exhibit 7, Tab 38)

In this way, ASA was able to construct a truthful albeit incomplete report that complied with Posada's and Seaone's instructions. Hugo Ricaldi, the ASA engineer that performed the inspection, denies that ASA did anything improper. He was well aware that the first group of boxes contained silver, but ASA was asked only to verify that the original seals were intact. ASA was not asked to assay or otherwise disclose the type of metal contained in the boxes. Ricaldi took random samples of the gold contained in the second group of 16 boxes, but, as

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

instructed, did not weigh them. The result of this deception was a report that
was "true, but not true", as Passaro later observed. (Exhibit 7, Tabs 19, 38)

According to Seaone, Barry Wayne knew that Posada and Panexim were
going to somehow falsify the ASA report, but did not want to know any details.
According to Seaone, Wayne told him, "Do what you need to do, but I don't
need to know what you're doing." Seaone explained that Wayne's position was,
"Officially, I'm not involved."

The Finance Committee of HHRG accepted the ASA report as evidence
that 38,741 troy ounces of gold was contained in the Hermes vault. (Exhibit 7,
Tab 22)

The sixteen boxes containing gold with a value of approximately $1.3
million were exported to HHRG on September 20, 1999. The silver boxes were
ultimately exported to HHRG.

In November 1999, GWRC appointed an internal auditor, John Downie,
to HHRG with instructions to look into the Panexim situation. The review
suggested that information passed to the HHRG Finance Committee was not
based on fact, and that there seemed to be an organized effort to conceal the
true nature of the Panexim relationship. It was also noted that despite
management statements to the contrary, the balance of gold supposedly held in
quarantine had changed little since May 1999.

As a consequence of his mismanagement of the Panexim situation and
other areas of concern, Barry Wayne, who had previously been censured by the
GWRC Board, was suspended from his duties on January 24, 2000.

Because ASA had acted as the day-to-day supervisor of all Panexim
deliveries, the new HHRG management decided that a completely independent
inspection of the contents of the Hermes vault was warranted. On February 16,
2000, instructions were given to Alfred H. Knight del Peru S.C.R. Ltda.
("AHK"), who arranged to perform the inspection on Monday, February 21.

On Thursday, February 17, 2000, Sean Russo, Chairman of the HHRG
Finance Committee, interviewed Raphael Noriega Zegarra, a Peruvian who had

Page 15

# DEMPSEY, MYERS & COMPANY LLP
CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

flown to New York to meet with Luis Posada. The purpose of the meeting with Posada was to sign a consulting contract covering Noriega's efforts to help Panexim recover the SUNAT tax refund. However, Posada did not appear for the meeting, scheduled for February 16. Therefore Noriega's English-speaking sister had called HHRG's offices to find out why, and had then come in contact with Russo.

According to Noriega, Panexim was owed 39,570,000 Peruvian Nuevo Soles (approximately $11.8 million) in VAT refunds. He understood that most of the money was owed to HHRG. Nothing had been refunded by SUNAT since October 1998 because of the government investigation. Noriega denied that SUNAT had made partial payments to Panexim in 1999, which Barry Wayne had cited as evidence that progress was being made in Panexim's negotiations with SUNAT. Noriega was not aware of any gold contained in the Hermes vault, and had never heard it mentioned by any representative of Panexim or HHRG. Noriega could not see how SUNAT could restrict the export of gold, as it was outside their jurisdiction. This also contradicted Wayne's earlier statements.

In a subsequent telephone conversation, Noriega denied statements Barry Wayne attributed to him concerning alleged confusion within SUNAT concerning the identities and actions of the old Handy & Harman versus the new HHRG. Noriega said the statements were completely false, and that he had never relayed such information. He also denied giving Panexim advice to maintain a low profile to avoid attention, as Wayne had also alleged. (Exhibit 9)

Immediately after the Noriega meeting on February 17, Russo met with Roberto Passaro. Passaro confirmed Noriega's belief that there was no gold in the Hermes vault. He claimed that up until seven or eight months before he had a handshake agreement with Barry Wayne under which HHRG would advance funds for the purchase of gold and the financing of VAT. All Panexim needed to do was submit an invoice. Evidence of physical delivery of gold was not required. Passaro also admitted that he signed whatever documents Barry Wayne asked him to sign, and indicated that he realized that Wayne was in trouble when Wayne asked Panexim to put silver in the Hermes vault.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Passaro explained in detail three partial payments during 1999 that were misrepresented to the HHRG Board as partial refunds of VAT taxes. According to Passaro, Wayne told him that HHRG would no longer be in a position to support Panexim unless payments were made. The first payment ($350,000) came from personal funds of Passaro and Seaone. The second payment ($525,000) came from funds raised by closing out hedge positions. The third and last payment ($200,000) came from funds advanced to Panexim by HHRG to pay for a 10-ton lot of silver purchased from Doe Run.[ii] (Exhibit 9)

Barry Wayne resigned from HHRG on February 18, 2000.

AHK's February 21 vault inspection revealed the contents of the sixteen boxes to be silver and not fine gold. The boxes, with a gross weight of 38,741 ounces – identical to the September 1999 ASA report – contained a total of 32,209 net ounces of silver. HHRG had paid for this silver when it was purchased from Panexim in May 1999. (Exhibit 7, Tab 37)

On the afternoon of February 21, 2000, Luis Posada was interviewed by Steve Humphrey of Robinson & Cole, HHRG's counsel. Posada denied knowledge of HHRG extending credit to Panexim, with the exception of the initial $74,000 working capital advance and Wayne's agreement to finance VAT on silver purchases. Posada claimed that four documents were required before advancing funds: 1) a pre-pricing document, 2) an invoice from Panexim, 3) an assay from ASA, and 4) a Hermes document indicating physical receipt. (Exhibit 9)

Luis Posada was terminated from employment on March 10, 2000.

Richard L. Searle announced his intention to retire from HHRG in September 1999, and on February 25, 2000 agreed to an early retirement and consulting package effective February 29, 2000. The consulting arrangement was terminated on March 14, 2000.

---

[ii] Manuel Seaone later revealed that at Barry Wayne's instructions Panexim withheld a payment of $1.7 million to Doe Run, $200,000 of which was repaid to HHRG, and the balance used to purchase gold that was later delivered to HHRG. Seaone has personally guaranteed the debt to Doe Run, and presently owes approximately $1.3 million. Also note that Seaone's recollection of the source of funds was slightly different than Passaro's.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Personnel files and records for Barry Wayne, Luis Posada, and Richard Searle are enclosed as separate exhibits. These documents are produced in the order received by us from HHRG's files.

To summarize the scheme, former HHRG management extended unauthorized credit to Panexim for the purchase of gold and silver, the payment of applicable VAT taxes, and for general corporate purposes. Neither the Finance Committee nor the HHRG Board was aware of these transactions, which were prohibited by the GWRC Credit Policy. When the Peruvian sales tax authority stopped paying VAT refunds, Panexim was unable to repay the unauthorized loans. Of the $14.5 million in outstanding receivables, Panexim is owed approximately $11.3 million (at current exchange rates) in VAT refunds. Approximately $500,000 of the remainder can be accounted for in exchange rate declines. The disposition of the remaining $2.7 million is still being investigated. We believe that the majority of this sum was utilized by Panexim to pay overhead and for other purposes.

Investigation Concerning Improper Financial Gain

To date, neither Passaro nor Seaone have confessed to paying any illicit consideration to or on behalf of any HHRG employee or consultant, whether in the form of cash, gifts, or other financial or material benefits. However, a growing body of evidence suggests that such payments were contemplated when Panexim was formed, and that such payments may have been directed to an entity organized for that specific purpose.

According to a July 1996 13-page handwritten memorandum and attachments discovered in Barry Wayne's files at HHRG's South Windsor headquarters, an entity known as "MASS" was to share in the profits of Panexim. Neither the legal standing nor precise ownership of "MASS" is known. However, according to statements contained in the memo, which was addressed to Wayne and Searle, "MASS" appears to involve all three individuals, and could potentially involve other former H&H employees, consultants, and customers. (Exhibit 10 – Verleysen memorandum and attachments dated July 26/27, 1996)

Page 18

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

The memorandum discloses that an entity by the name of "Ladison S.A." would be used as a "funneling agent" to siphon off profits earned by Panexim and other H&H South American trading partners. The ultimate beneficiary of these funds would be "MASS".

Among the funds to be directed to "MASS" were the following:

5.  A 30% share of the 5% export incentive payable by the government of Peru to Panexim. According to "Attachment H" of the Verleysen memorandum, Passaro and Verleysen had agreed to split the drawback as follows:

    *H&H 1.25%*
    *\*MASS 1.50%*
    *Panexim 2.25%*

    *\* (Passaro) does not know of the existence of MASS only thinks of it as myself.*

Verleysen noted that Ladison S.A. could be used "as a funneling agent for this project", and observed that Passaro "does not know of relationships & I think we should keep it that way – let him think he is dealing with [Verleysen] only."

• Profits from a 50% ownership interest in Turpial Panamerican Holdings, Ltd., a corporation organized on June 3, 1996 in the British Virgin Islands. Turpial was established to act on H&H's behalf in certain business dealings in Venezuela. Verleysen was one of three original directors. Verleysen suggested to Wayne and Searle that Ladison S.A. funds be used to pay for "MASS's" 50% share of legal fees incurred in the incorporation.

• Profits relating to a suspected ownership interest in Darwil Bol SA, an H&H trading partner domiciled in La Paz, Bolivia. Verleysen suggested that Ladison S.A. be used as the "vehicle" for collecting their "split", since Ladison would immediately "transfer and credit the proper accounts".

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

According to Verleysen, "the idea would be to keep [the money] totally in
Latin America (i.e., Bolivia/Uruguay)".

- Profits relating to certain transactions contemplated with an entity called
  "Benedictine Ltd."  From Verleysen's memorandum, Benedictine appears to
  be associated with Mexican business interests.  It was to pay Ladison 5% of
  the value of gold purchased by H&H ("5% stays in Uruguay &
  distributed") and 1.5% to H&H.

(Exhibit 10)

Our investigation to date has uncovered no documentation evidencing
actual payments by H&H, HHRG, or Panexim to Ladison S. A. or "MASS".
However, we have located a Technology Use Agreement that Ladison entered
with H&H on January 11, 1996, and understand that HHRG accounts reveal
that some limited business was conducted between the companies into 1998.
The Technology Use Agreement provided that Ladison would pay H&H
royalties for the use of certain technology transferred to Ladison.  (Exhibit 11 –
Technology Use Agreement – Ladison S.A.)

A document located in files produced to Raymond Veillette, HHRG's
former Director of Security, by Michel Verleysen, suggests intent on the part of
Roberto Passaro to pay Verleysen a monthly fee.  In a handwritten note
authored by Passaro in February 1997, the arrangement to pay Verleysen
(known by his initials "MMV") $2,500 per month was disclosed to Passaro's
Lima-based partner in Panexim, Manuel Seaone.  The note, translated from
Spanish, read as follows:

> According to this fax, $7,500 has been received in my account.  Please
> transfer $1,546.78 to Fernando Lima.  For my part, Panexim, (which has
> received this 7,500) has to pay $2,500 to MMV for October – first month of
> operation – 1996.  Thereafter Panexim has to pay $2,500 monthly to MMV
> (compensation for this group of partners) you understand.  Consequently, I
> am going to send to MMV the first check for $2,500 (Oct 1996) from the
> account of Panexim, and the balance will be kept in the account of HRP NY
> for January compensation

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

**(Exhibit 12 – Interview of Robert Passaro, Tab 10)**

When confronted with these documents, neither Passaro nor Seaone would admit to such an arrangement with Verleysen. According to Passaro, he and Barry Wayne had agreed to split profits of Panexim equally between the Panexim partners and HHRG, but he had no recollection of agreeing to pay Verleysen $2,500 per month, and in fact never paid Verleysen anything. Passaro recalled and confirmed the accuracy of every other point made in "Exhibit H" to Verleysen's memorandum, and recalled the circumstances leading to the February 1997 handwritten note. He had no recollection of agreeing to pay "MASS" or Verleysen.

Seaone's recollection was slightly different. According to him, Passaro and Verleysen had negotiated an agreement to pay John Francis Phillips, the former HHRG consultant who sat on Panexim's Board, $2,500 per month as a "director's fee". Panexim reneged on that agreement after Seaone saw Passaro's February 1997 note, because Seaone then realized that Phillips had provided no services to Panexim and had attended no Board meetings.

Neither Passaro nor Seaone could recall neither the role Barry Wayne played in negotiating the Verleysen/Phillips payments, nor what Verleysen's reaction may have been to Panexim's unilateral decision not to pay him $2,500 per month. Panexim had only been in business for five months and was dependent upon HHRG for financing and distribution of its gold "products". This suggests to us that an alternative arrangement was established, perhaps to better conceal the ultimate recipient of Panexim's payments. It should be noted that the bulk of Panexim's business was done in cash at this time, because, as Seaone explained, unsophisticated Peruvian miners trusted cash alone.

We believe that Passaro and Seaone have provided accurate information with respect to the operations of Panexim, the agreement of Wayne to provide unsecured financing, and the nature of business conducted with HHRG. We do not believe that they are being totally candid with respect to monies directed to HHRG employees and consultants. Despite Passaro's recollection of a general agreement with Wayne to split profits, and his specific handwritten notation concerning Verleysen, he refused to admit that money actually changed hands. In the circumstances, we do not find this credible.

Page 21

# DEMPSEY, MYERS & COMPANY LLP
CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

We recently obtained bank records that may shed light on this question. Specific transactions in the accounts of Barry Wayne, MMV International (Verleysen's company), Luis Posada, Axel Corporation (owned by Carlos Axel Augspach, another South American consultant), Panexim, and others are now being analyzed. This analysis may uncover the existence of additional accounts relevant to our investigation. We will supplement our report as additional information becomes available.

<u>South American "Consultants"</u>

We have referred to various "consultants" ostensibly operating on HHRG's behalf in South America. Some clarification is necessary.

Prior to the asset purchase, the Precious Metals Refining Division of H&H employed several outside consultants to assist in South American activities. The precise nature of this work is not known. All told, approximately $3.1 million was disbursed to these consultants between September 1996 and March 2000.

GWRC ordered Barry Wayne to terminate all consulting agreements effective August 16, 1996, with the exception of Verleysen's. GWRC believed that any business HHRG would conduct in South America would be with established U.S. or Canadian firms, and could be handled by HHRG's domestic sales force. Therefore a presence in South America was not required. Verleysen, who operated out of Yardley, Pennsylvania, was retained as a consultant because of his experience with H&H's existing South American business.

The records indicate that of four South American-based consultants employed at the time, only two – John Francis Phillips and Jorge Washington Correa Nevas – were actually terminated. Two others – Erick B. Claudet and Linneo Klocker de Vasconcellos Filho – continued to be paid consulting fees and expenses by HHRG. Carlos Axel Augspach, like Verleysen a resident of Yardley, was not paid during September and October 1996, but payments of expenses resumed in November 1996.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

In mid-1997 Phillips and Washington resumed their consulting roles, and a new consultant, Fernando Rodriguez Lima, was added. Rodriguez Lima had actually been hired in December 1996 to replace yet another consultant, the so-called "rent-a-cop" Robert Bedell, who had observed the startup of Panexim's operation in Lima. Rodriguez Lima's role was to "control cash and gold" at Panexim. He was terminated after only a few months, and was transferred to Brazil to assist in other HHRG operations.

Manuel Seaone Stuva's brother, Mario Seaone Stuva, was retained as an HHRG consultant in March 1999. Roberto Passaro's brother, Jorge R. Passaro, was retained in September 1999.

As noted, the precise role played by these consultants has not yet been determined. From the information reviewed to date, the following details have emerged:

| | |
|---|---|
| Michel Verleysen | Verleysen was the lead consultant, and was associated with H&H from at least August 1993. According to a contract dated January 12, 1996, he was employed eight days per month as a Central and South American sales representative. For his efforts, Verleysen was paid a monthly fee of $3,000 plus expenses and a 3% commission on sales. The agreement was modified to a full-time arrangement on May 13, 1996, with a daily fee set at $375 (increased to $475 in September 1999). Verleysen was the only consultant whose contract was renewed by GWRC following the asset purchase. His company, MMV International, Inc. seemed to serve as a conduit through which funds were distributed to other consultants. During the period September 1996 – February 2000, Verleysen was paid fees, commissions, and expenses totaling $1,029,872. In February 2000 Verleysen was indicted on various counts relating to the alleged Argentine export fraud. |
| Carlos Axel Augspach | Augspach began consulting for H&H in November 1994. We have not been able to locate a copy of his |

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

contract in HHRG's files. He was paid consulting fees ranging from $1,000 to $5,000 per month, plus expenses. Although his contract was terminated when GWRC bought H&H's refining assets, he was paid a total of $281,073 between September 1996 and March 2000. Augspach is also under indictment in the Argentine case. His expense reports indicate regular travel to Buenos Aires.

John Francis Phillips

Frank Phillips was a key player in the various South American businesses operated by or partnered with HHRG. He was a close associate of Verleysen, and began consulting for H&H in February 1995. Phillips was one of three original Board members of Panexim S.A., a position that was apparently arranged during his brief hiatus from H&H in the fall of 1996. Phillips was also associated with the HHRG trading partners "Darwil Bol SA" of La Paz, Bolivia, "Regy's Palace SA" of Monevideo, Uruguay, and "Ladison SA", also of Montevideo. Phillips' expense reports indicate considerable travel throughout South America, including Argentina, Bolivia, Brazil, Ecuador, and Uruguay. Between September 1996 and February 2000 he was paid $594,176 in fees and expenses.

Erick B. Claudet

Claudet became an H&H operations and technical consultant in November 1995, responsible for "implementation, start-up, technical and operatinal aspects of refining customers, marketing/sales, and fabrication facilities in Latin America." He was based in Chile. The original contract, dated July 1, 1995, provided for a $60,000 annual salary, 3% sales commission, plus expenses. The contract was renewed as of July 1, 1996, but like the others was terminated when the GWRC deal closed. Claudet was paid $308,369 in fees and expense reimbursements from September 1996 to February 2000. Claudet was associated with "Orion

Page 24

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

|  |  |
|---|---|
| | SA", HHRG's trading partner in Chile, and "SMR Ecuador SA", HHRG's trading partner in Ecuador. |
| Linneo Klocker | Klocker became an H&H consultant in January 1996. He was stationed in La Paz, Bolivia, and with Frank Phillips looked after the business of "Darwil Bol SA". We have located no signed copy of Klocker's contract, but a draft version indicates a $2,000 monthly fee plus expenses. He was paid a total of $250,690 between September 1996 and February 2000. Klocker also spent considerable time in Brazil. |
| Jorge Washington | Jorge Washington Nevas Correa became an H&H technical consultant in June 1995, concentrating on operations in Uruguay. His contract provided for a monthly fee of $5,000 plus expenses. Washington's contract was terminated with the GWRC purchase, but payments of his fee and expenses resumed in November 1997. The first payment included back fees to June 1997. Between November 1997 and February 2000 Washington was paid $301,957. |
| Fernando Rodriguez Lima | As noted above, Rodriguez Lima, a Brazilian friend of Frank Phillips, became involved in HHRG's South American business in December 1996 when he was assigned to the Panexim account. According to Manuel Seaone, Rodriguez Lima's role was to observe Panexim's fabrication business during the early stages of its existence. Rodriguez Lima was terminated in February 1997 (by whom is unclear) because he was not paying close enough attention to the operation. His responsibilities were assumed by ASA. In June 1997 he was assigned to HHRG's Bolivian trading partner, Darwil Bol SA, and began to be paid a $2,500 monthly fee plus expenses. HHRG paid Passaro $7,500 in February 1997 to reimburse Lima for three months of |

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

consulting work relating to the Panexim account. In addition to that amount, Rodriguez Lima was paid a total of $302,201 between June 1997 and February 2000.

Mario Seaone Stuva    Mario Seaone Stuva, Manuel's brother, was a consultant to HHRG for a brief time in 1999. He was assigned to various projects in South and Central America, and also traveled occasionally to the U.S. Seaone was paid a $2,000 monthly fee plus expenses. Total payments in 1999 were approximately $50,000.

Jorge R. Passaro    Roberto Passaro's brother was retained by HHRG in September 1999 for unknown purposes. He was paid a total of $6,000.

Consulting contracts covering Verleysen, Phillips, Claudet, Klocker, Washington, and Rodriguez Lima may be found at Exhibits 13-18. These were among the documents seized from Michel Verleysen. Although Barry Wayne signed a number of the contracts, no copies have been found in HHRG's files.

A monthly summary of South American consulting fees may be found at **Exhibit 19**. This information was derived from information downloaded from HHRG's old and new computer systems, including accounts payable files and detailed general ledgers. We have not undertaken a comprehensive review of this information to determine that all posted charges were actually paid. We have obtained photocopies of the expense reports and invoices for all South American consultants, which we continue to analyze.

The consultants' fees and expenses paid between September 1996 and February 2000 may be summarized as follows:

# DEMPSEY, MYERS & COMPANY LLP
CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Figure 2: <u>Consulting fees and expenses 9/1996-3/2000</u>

| | |
|---|---:|
| Michel Verleysen | $1,029,872 |
| Carlos Augspach | $281,073 |
| Frank Philips | $594,176 |
| Jorge Washington | $301,957 |
| Erick Claudet | $308,369 |
| Linneo Klocker | $250,690 |
| Fernando Lima | $302,201 |
| Mario Seaone | $43,702 |
| Jorge Passaro | $6,000 |
| Total | $3,118,039 |

*Source: Accounts Payable, General Ledger, Expense Reports*

<u>Other Events Demonstrating Fraudulent Conduct</u>

1.    <u>Back-dating of Panexim Contracts</u>

An "Export Sales Agreement" dated August 25, 1996 was the only signed agreement between Panexim and HHRG found in HHRG's files. The agreement was attached to a May 27, 1999 memorandum prepared by Frederick Ollett, HHRG's treasurer, concerning the large Panexim receivable outstanding as of March 31, 1999. (Exhibit 7, Tab 1)

Documents seized from Michel Verleysen indicate that the first draft of the above agreement and a separate "Financing Services and Export Sales Agreement" were faxed to Roberto Passaro on September 6, 1996. Passaro suggested modifications in a September 7, 1996 letter to Verleysen. Although a draft of the agreement may be found on the computer of Barry Wayne's secretary, a hard copy has not been located at HHRG, and Panexim has been unable to produce a copy from their records. (Exhibit 12, Tabs 5-7)

Regarding the contradictory dates, Passaro claims that he was asked to sign the agreements only after SUNAT stopped refunding VAT taxes. He

Page 27

# DEMPSEY, MYERS & COMPANY LLP
CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

recalled that Barry Wayne was having difficulty with the HHRG Board, and signed agreements were suddenly needed. Passaro believed this took place between March and May 1999.

Two amendments were attached to the signed Sales Agency Agreement. The first, dated August 16, 1997, changed the name of South Windsor Metallurgical (the H&H refining subsidiary that was party to the original agreement) to HHRG. The second amendment, dated February 15, 1998, outlined the conditions under which HHRG would advance funds to Panexim. The conditions included receipt of a pre-pricing advice, an ASA assay certificate, and a certificate of delivery evidencing the receipt of materials consigned to HHRG, including their weight. According to Passaro and Seaone, none of these conditions were in place until mid-1999. Prior to that time, HHRG made advances strictly on the basis of Panexim's pro forma invoice.

Verleysen signed the Sales Agency Contract and both amendments "For and On Behalf of Barry Wayne – President". (Exhibit 7, Tab 1)

2.    Fraudulent Financial Statements Requested by Barry Wayne

After discovery of the Panexim receivable, the HHRG Finance Committee requested copies of Panexim's most recent financial statements. Given the size of the receivable, of primary concern was Panexim's size and net worth.

According to Passaro, Barry Wayne instructed Panexim to falsify its financial statements to show more assets than were actually on hand. Wayne initially contacted Passaro, then Seaone. An agreement was ultimately reached to engage another accounting firm (Panexim already had a statutory auditor) to do the work. Wayne claimed that he needed to demonstrate to the HHRG Board that Panexim was creditworthy.

The "true" financial statements of Panexim as of December 31, 1998 (Exhibit 12, Tab 16) indicate a net worth of s/. 2,061,210 (US$653,378). The fraudulent statements (Exhibit 12, Tab 17) show net worth of 26,012,731 (US$8,245,706), an overstatement of $7,592,328. This was accomplished by

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

overstating assets by $2,960,243 and understating liabilities by $4,632,086. An additional falsification eliminated all mention of HHRG's cash advances to finance VAT from Panexim's balance sheet and accompanying footnotes.

Barry Wayne presented the false financial statements to the GWRC Board in Sydney in late July 1999. We understand that Wayne told the Board that the Panexim principals were prepared to give personal guarantees regarding the outstanding debt.

3.    Misrepresentations of the Situation in Peru

Wayne, Verleysen, and Posada materially misrepresented the status of Panexim's negotiations with SUNAT and other events taking place in Peru. According to Passaro, the purpose was to buy time with the HHRG Board until SUNAT refunded Panexim's VAT payments. Partial repayments of VAT and Verleysen's physical inspection of the Hermes vault to view the "quarantined" gold were among the more serious fabrications.

In a letter dated August 19, 1999, Manuel Seaone informed Barry Wayne that Panexim was about to receive its first refund and was preparing to ship small quantities of gold from the Hermes vault. According to Passaro, Wayne had requested this letter because he needed to show movement on the Panexim situation. In fact, there was no imminent sign of a refund, and there was no gold in the Hermes vault to begin shipping. (Exhibit 12, Tab 23)

Michel Verleysen's trip report of September 6, 1999 indicated he had visited the vault and seen the boxes of gold. (Exhibit 12, Tab 29) Hermes has recently confirmed that they have no record of Verleysen actually visiting the vault in either August or September 1999. (Exhibit 21 – E-mail message from Jaime Freundt, Hermes)

In memoranda dated September 29, 1999 and September 30, 1999, Barry Wayne informed the HHRG Board that Panexim had received $350,000 from a SUNAT refund, and had repaid that amount to HHRG. (Exhibit 12, Tabs 31, 32) According to Passaro, Wayne knew that this was false, and knew that Panexim had liquidated hedging positions to come up with the money.

Page 29

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Panexim's account at Banco de Credito del Peru ("BCP") in New York reflects the receipt of funds from ED&F Man International with repayment to HHRG.

A second "refund" in the amount of $525,000 was booked in October 1999. According to Manuel Seaone, these funds were derived from two advances paid by HHRG. The money was simply returned upon receipt. These transactions also appear at Panexim's account at BCP.

The third "refund" in the amount of $200,000 was booked in November 1999. Barry Wayne informed the HHRG Board on November 18, 1999 that the payment was imminent. (Exhibit 12, Tab 33)  According to Passaro, Wayne had earlier instructed Panexim to repay HHRG $200,000 from funds advanced by HHRG to Panexim to buy silver from Doe Run Peru. Panexim's account at BCP shows the receipt of these funds and payment to HHRG on the same day. Panexim was instructed to buy gold with the remaining funds, which it proceeded to do, according to Kardex inventory records. On November 24, 1999 Panexim shipped 222 kilograms of gold with a value of $1.7 million to the Attleboro refinery. The gold was purchased with funds that Panexim should have paid to Doe Run.

4.    Breach of Ethics Policy

Barry Wayne was familiar with the Handy & Harman Business Code of Ethics, having signed a Certification in October 1992 that he had read the Code, would comply with the policies, and would report any possible violation to the appropriate person. (Exhibit 22 – H&H Business Code of Ethics and Barry Wayne Certification dated October 13, 1992)

An October 15, 1992 memorandum indicates that Searle and Posada also signed certifications, but copies have not been located in HHRG's files.

Among the policies set forth by H&H were the following:

- Adherence to law.  Employees agreed to abide by the spirit and the letter of all applicable laws and regulations.

Page 30

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

- Adherence to high ethical standards. Employees agreed to act in a manner that enhanced H&H's standing as a "vigorous and ethical competitor".
- Avoidance of potential conflicts of interest. Employees agreed to avoid any "investments, business interests, or other associations" which influence their objectivity.
- Acceptance of payments. The Code of Ethics prohibited all employees from accepting payments, fees, services or other gratuities from any person, company or organization doing business with H&H. Gifts of cash or cash equivalents were strictly prohibited.

Although HHRG had no written Code of Ethics during Wayne's tenure as CEO, Wayne' employment contract required that he carry out his duties in a professional and ethical manner. As we understand it, GWRC had a Corporate Governance policy that Barry Wayne as a director was closely involved in formulating, approving, and implementing.

It is clear now that Wayne was in breach of H&H's stated policies. It is also clear that such behavior continued during his employment with HHRG.

## Calculation of Loss

We have reviewed spreadsheets prepared internally by HHRG, and have examined records of wire transfers, metal receipts at the Attleboro refinery, and other documentation. The loss of money associated with unauthorized advances to Panexim is presently calculated in the amount of $14,547,054.10, which can be summarized as follows:

| | |
|---|---|
| Outstanding Receivable – Gold | $12,595,958.58 |
| Outstanding Receivable – Silver | $ 1,810,131.62 |
| Outstanding Receivable – Comarsa Gold | $ 140,963.90 |
| | |
| Total Loss - Metal Transactions | $14,547,054.10 |

A detailed listing of gold and silver transactions is attached at **Exhibit 20.**

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

Our review of these transactions is continuing. In light of the volume of transactions and the state of HHRG's accounting system, minor modifications to the loss amount may result. We will supplement this report if any material changes come to light.

Until the precise activities of HHRG's cadre of South American consultants is known, we believe it appropriate to include payments of consulting fees, commissions, and expenses in the measurement of loss. No tangible benefit can be discerned from HHRG's records at this time. Manuel Seaone has noted that Michel Verleysen made no contribution whatsoever to Panexim's business. Verleysen assisted neither in buying nor selling gold, yet he was paid a 3% share of HHRG's commissions. In light of the Verleysen and Augspach indictments, and suspicions created regarding "MASS", Ladison SA, Turpial SA, and other entities, we believe these payments could represent intentional takings on the part of Wayne, Searle, and Posada to the deprivation of HHRG. As noted above and on Exhibit 19, total payments to consultants were in the amount of $3,118,039.

Finally, Wayne, Searle, and Posada participated in an incentive compensation plan that provided bonuses based on HHRG profitability. A recap of these incentive payments by year is as follows:

Figure 3: Excessive Compensation Paid to HHRG Employees

|        | Wayne    | Searle   | Posada   | Total    |
|--------|----------|----------|----------|----------|
| 1996   | $0       | $5,000   | $5,000   | $10,000  |
| 1997   | $132,692 | $5,000   | $3,000   | $140,692 |
| 1998   | $302,692 | $30,000  | $22,000  | $354,692 |
| 1999   | $0       | $0       | $0       | $0       |
| 2000   | $0       | $0       | $0       | $0       |
| Total  | $435,384 | $40,000  | $30,000  | $505,384 |

It should be noted that Barry Wayne requested incentive payments in the amount of $20,000 and $15,000 for Searle and Posada, respectively, for the 1999 fiscal year. Thee HHRG Remuneration Committee did not approve his request.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000

As we understand it, the Bankers Insurance Policy issued to N. M. Rothschild & Sons and subsidiaries contains specific coverage for "bonuses, commissions, or similar emoluments paid to an employee in respect of any specific transaction which subsequently proves to have been a dishonest, fraudulent or malicious transaction." Accordingly, we have included the above amounts in the measurement of loss. We understand that the policy of insurance issued by Federal Insurance Company does not contain such a provision.

We further understand that the Bankers Insurance Policy provides coverage of up to GBP 100,000 (US$160,000 at discovery date) for claim preparation costs. This amount has also been included in the measurement of loss. We understand that the Federal Insurance Company policy does not include such coverage.

The loss can be summarized as follows:

| | |
|---|---|
| Loss of money through unauthorized advances | $14,547,054 |
| Payments to consultants | 3,118,039 |
| Excessive remuneration | 505,384 |
| Claim preparation costs (policy limit) | 160,000 |
| Total Loss | $18,330,477 |

Additional details in support of these calculations are contained in our files and in the books and records of HHRG. All documentation will be made available upon request.

Organization of this Report

Accompanying this narrative are two binders containing the various exhibits referred to above. The copies of the report being transmitted to Federal Insurance Company and Bankers Insurance Policy underwriters also include copies of the personnel files of Barry Wayne, Richard L. Searle, and Luis Posada.

Please refer to the attached Table of Contents for a complete listing of exhibits enclosed.

# DEMPSEY, MYERS & COMPANY LLP

CERTIFIED PUBLIC ACCOUNTANTS

Mr. Ryan
October 9, 2000


Summary

     This report summarizes the basis of our opinion that a scheme to defraud HHRG was carried out by Barry Wayne, Richard Searle, Luis Posada, and potentially other employees and consultants of HHRG.  Losses incurred to date have been calculated in the amount of $18,330,477.

     Our file contains additional detail in support of our conclusions.  We will supplement this report with additional relevant data as it becomes available.

Very truly yours,

Dempsey, Myers & Company

Enclosures

cc:    Patricia Duffy – Federal Insurance Company (2)
       Isobel Baxter – NMR
       Kent Chaplin – Aon London (2)
       Maureen Richmond – Aon New York
       Eric Henzy – Reid & Riege