UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GOLDEN WEST REFINING CORPORATION, LTD., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| | ) | 3:02 CV 1379 (MRK) |
| vs. | ) | |
| | ) | |
| PRICEWATERHOUECOOPERS, LLP and COOPERS & LYBRAND, LLP, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ALEC SHARP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION NO. |
| vs. | ) | 3:02 CV 1572 (MRK) |
| | ) | |
| PRICEWATERHOUSECOOPERS, LLP d/b/a PRICE WATERHOUSE, LLP, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| HANDY & HARMAN REFINING GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| vs. | ) | 3:02 CV 1803 (MRK) |
| | ) | |
| PRICEWATERHOUSECOOPERS, LLP, | ) | |
| | ) | |
| Defendant. | ) | |

**Confidential Subject to Protective Order**

---

**Preliminary Expert Report of
Vincent J. Love, CPA
April 5, 2005**

---

**Confidential Subject to Protective Order**

**Preliminary Expert Report of
Vincent J. Love, CPA
April 5, 2005**

**Table of Contents**

I. BRIEF INTRODUCTION .................................................................................................................1

II. SCOPE OF ENGAGEMENT ........................................................................................................3

III. EXECUTIVE SUMMARY ...........................................................................................................3

IV. OPINION ......................................................................................................................................7

V. WORK PERFORMED ..................................................................................................................7

VI. BASES FOR OPINION ...............................................................................................................8

A. GENERAL ......................................................................................................................................8

B. AUDIT FAILURES ..........................................................................................................................9

    *1. Panexim* ....................................................................................................................................*9*

        a. Right of setoff ........................................................................................................................10

        b. Failure to properly audit compliance with the Fleet Agreement covenants .........................14

        c. Violation of the Credit Suisse Agreement ............................................................................17

        d. Failure to communicate a reportable condition .....................................................................19

        e. Failure to understand and document the Panexim transactions .............................................25

        f. Inventories held in public warehouses ...................................................................................28

        g. The confirmation process .......................................................................................................30

    *2. Client Representations* ...........................................................................................................*34*

    *3. Consideration of Fraud in a Financial Statement Audit* .......................................................*35*

    *4. Unauthorized Use of Consultants* ..........................................................................................*37*

    *5. Due Professional Care* ...........................................................................................................*40*

        a. Financing agreements .............................................................................................................41

        b. Warning signs .........................................................................................................................42

        c. Panexim contract ....................................................................................................................43

        d. Planning for the engagement ..................................................................................................44

        e. Lack of supervision ................................................................................................................45

        f. Other audit program and planning deficiencies .....................................................................46

C. SUMMARY ....................................................................................................................................48

D. DAMAGES .....................................................................................................................................51

**Confidential Subject to Protective Order**

E. ADVANCES TO PANEXIM — $12,076,000 ..................................................................................................52

    *1. Gold Advances — $8,275,000* ........................................................................................................53

    *2. Silver Advances — $3,858,000* ......................................................................................................55

    *3. Comarsa Gold Advances —$(141,000)* ..........................................................................................56

    *4. Silver debit — $2,828,550* ............................................................................................................58

    *5. Retainage and transportation charges* ..........................................................................................58

    *6. Other Advances — $84,000* ..........................................................................................................59

F. PAYMENTS TO CONSULTANTS — $3,069,000 ...........................................................................................59

G. EXCESSIVE COMPENSATION — $505,000 ................................................................................................61

H. CLAIM PREPARATION COSTS — $160,000 ..............................................................................................62

I. SUMMARY ............................................................................................................................................62

J. QUALIFICATIONS .................................................................................................................................63

**EXHIBITS:**

    1. Curriculum Vitae of Vincent J. Love, CPA,

    2. Documents Read, Reviewed and/or Analyzed

    3. Covenant Violation Calculations

**Confidential Subject to Protective Order**

**Preliminary Expert Report[1]**
**of**
**Vincent J. Love, CPA**

## I. Brief Introduction[2]

This case involves claims by Plaintiffs, Alec Sharp, et al. ("Underwriters"), as assignees and subrogees of Handy & Harman Refining Group, Inc. ("HHRG"), against PricewaterhouseCoopers, LLP arising from certain losses incurred by HHRG.

Golden West Refining Company, Ltd. ("GWRC"), an Australian corporation, formed HHRG in August, 1996 to acquire the assets of the Precious Metals Refining Division of Handy & Harman ("H&H"). At all relevant times, GWRC owned 100% of HHRG.

Panexim S.A. ("Panexim") was a company organized and operating in Peru. Panexim was formed in 1996 to engage in the business of purchasing and exporting precious metals, principally gold and silver, from Peru to HHRG.

The Peruvian taxing authority, National Superintendence of Tributary Administration ("SUNAT") levied an 18% valued added tax ("VAT") on any precious metals purchased in Peru. Accordingly, as the purchaser, Panexim was liable for the VAT payment.

Upon export of refined metal, SUNAT would refund the 18% VAT as an incentive. Because Panexim did not have the means to satisfy the growing VAT liability as the HHRG/Panexim relationship progressed, HHRG's management agreed to advance money for the payment of Panexim's VAT liability, with the understanding that upon receipt of the refund from SUNAT, the over-advance would be satisfied by either a cash payment or additional purchase and exportation of an equal amount of gold.

---

[1] This expert report is preliminary since fact discovery is not complete. I reserve the right to revise, augment and supplement this report as necessary upon completion of fact discovery.

[2] This section of the report is designed to acquaint the reader with the background leading up to the filing of the claim in court. It is not a statement of stipulated facts, or assumptions of facts used as a basis of any opinion given in this report. The section "Bases of Opinions" contains the assumptions that are used in formulating my opinions.

Confidential Subject to Protective Order

Between September 1996 and February 2000, Messrs. Wayne, Searle, Verleysen, Posada and others allegedly conspired with Messrs. Passaro and Seoane of Panexim to cause HHRG to advance unsecured funds to Panexim and other South American entities. The funds were used to finance gold purchases and the related VAT in Peru and other South American entities. This type of advance was expressly prohibited by the GWRC Credit Policy and HHRG's loan covenants, and neither the Finance Committee nor the Board of Directors of HHRG, or the GWRC Board of Directors or Audit Committee was informed of these unauthorized extensions of credit.

During this time, PricewaterhouseCoopers, LLP, formerly doing business as Coopers & Lybrand, LLP, (collectively "PWC") was the outside, independent auditor for HHRG and also advised GWRC and HHRG on its acquisition of the Precious Metal Refining Division of H&H. PWC audited the annual consolidated financial statements of HHRG in 1997, 1998 and 1999 and reviewed the semi-annual financial statements of HHRG in each of those years. PWC issued an unqualified opinion on the HHRG consolidated financial statements in each of the above years.

On or about March 28, 2000, HHRG filed for protection under Chapter 11 of the U.S. Bankruptcy laws in the District of Connecticut.

On or about April 7, 2000, PWC withdrew its reports on the consolidated financial statements of HHRG for the years ended March 31, 1999 and 1998.

Dempsey, Myers & Company LLP ("DM"), on behalf of HHRG, conducted a review of the books and records of HHRG to determine the losses arising from the alleged scheme to defraud HHRG carried out by its former employees and consultants.

Hagen, Streiff, Newton & Oshiro, PC, ("HSNO"), on behalf of certain insurers including Underwriters, completed a review of the books and records of HHRG. Their review was conducted to assist the insurers in determining the extent of loss, if any, resulting from

2

Confidential Subject to Protective Order

the initial claimed loss arising from the purported mysterious disappearance of gold and silver bullion discovered on or about February 29, 2000.

Reports computing the amount of loss were prepared by DM on behalf of HHRG and HSNO on behalf of Underwriters.

## II. Scope of Engagement

I have been retained by Wilson, Elser, Moskowitz, Edelman & Dicker, LLP, on behalf of Underwriters to, (i) evaluate the professional services provided by PWC to HHRG, (ii) determine if PWC complied with the relevant auditing and other applicable professional standards and (iii) provide an expert opinion on my findings. I will also determine if, and in what amount, HHRG was damaged as a result of any failure by PWC to perform its services in accordance with the relevant professional standards.

## III. Executive Summary

When performing its audits of HHRG for the period ended March 31, 1997 and the years ended March 31, 1998 and 1999, PWC was aware of the HHRG credit policy that advances to entities in third world countries (including South America) were prohibited unless the precious metals securing the entire advance was in the possession of HHRG. PWC was engaged to perform a due diligence review of HHRG prior to its acquisition by GWRC. In that due diligence review, it was noted that "Management has stated that cash will not be given to its customers until the outside armored car company has verified the deposit of a customer's metal to designated vaults, as opposed to extending advances and obtaining security insurance bonds as was the previous practice". The predecessor company had incurred credit losses in South America and GWRC wanted to prevent these types of losses from recurring.

During the 1997 audit of HHRG, PWC prepared a working paper which they entitled Critical Matter #5-Collectibility of Foreign Accounts Receivable. This working paper

3

Confidential Subject to Protective Order

focused on advances to third world countries in South America and reiterated the policy, already familiar to PWC, that advances are not made unless the precious metals were in the possession of, or in transit to, HHRG. PWC's response to this critical matter was that they will ensure that there are no collectibility issues with regards to such accounts. No unsecured advances were authorized.

In both 1998 and 1999, PWC issued service plans to HHRG indicating the critical matters to be addressed during their audit. In both service plans, PWC stated that they "will assure advances to third world countries are not made unless material is in the possession of Handy & Harman."

In violation of its credit policy, HHRG advanced funds, in essence made loans to Panexim and other South American entities to pay its liability for a value added tax on the precious metals it purchased for export to HHRG. The loans to these companies were a violation under one of HHRG's financing agreements. In spite of PWC being aware of the prohibition against unsecured advances during their due diligence work and in their audit planning as evidenced by Critical Matter #5 and their service plans, PWC failed to report the existence of these loans or unsecured advances and financing covenant violations to the HHRG Board of Directors, or to the Board of Directors or to the Audit Committee of HHRG's parent company, GWRC. HHRG failed to comply with this specific control directive by making unsecured advances to companies domiciled in South America. This by itself and together with the financing agreement covenant violation was a reportable condition, as defined in the professional standards, requiring the auditor to communicate with the board of directors or the audit committee. PWC professionals assigned to the HHRG audit have testified in deposition that they knew of the prohibition against these unsecured advances as they were performing their audit procedures. The working papers and deposition testimony evidence that the auditors knew about the VAT advances no later than April, 1998 yet they testified that they did not inform anyone about this material internal control violation.

4

Confidential Subject to Protective Order

Total unsecured advances made by HHRG at fiscal year-ends 1997 and 1998 totaled approximately $700,000 and $2.8 million, respectively. The fact that approximately 94% and 99% in 1997 and 1998, respectively, of the unsecured advances were to third world countries should have been a red flag to PWC. The unsecured advances to Panexim alone were approximately $38,000 and $1,252,000, respectively, at fiscal year ends 1997 and 1998. Ladison, Orion and Darwill were other beneficiaries in 1997, as unsecured advances to those South American customers at March 31, 1997 totaled approximately $628,000. These unsecured advances were in actuality unsecured loans, or extensions of credit. The total accounts receivable recorded by HHRG from Panexim at March 31, 1998 was $26,834,156. Also at March 31, 1998, the unsecured advance to Orion, another South American domiciled company, was in excess of $1.3 million and represented over one-third of the total amount advanced to Orion. The amount recorded in accounts receivable at March 31, 1999 for Panexim was approximately $16.1 million. Although a majority of this amount was represented to be secured by gold in a Peruvian vault, it was later learned that the full amount of the gold did not exist.

At each fiscal year end, HHRG prepared a schedule entitled "Price, Not Booked" that compared the preliminary inventory value of precious metals purchased to the amount of the advances that were made against that material. This schedule clearly shows the amount of unsecured advances and the company to which each advance was made. Based on deposition testimony, PWC was unaware of exactly where any of the material was located that "secured" a portion of the advances made. Additionally, there were no audit procedures performed to test the existence or quality of the supposed precious metals securing a portion of the advances made. Inventory allegedly held in a Peruvian vault was totally ignored by the PWC auditors.

PWC had a professional obligation to report the fact that HHRG was operating in violation of its stated policy and in violation of its loan covenants. The partner and manager on the account in 1997 and 1998 had a phone conference in March, 1997 where they were told by the GWRC Audit Committee to report on whether proper internal controls have been maintained.

5

Confidential Subject to Protective Order

It is clearly evident from a review of the PWC working papers and the depositions of the PWC auditors assigned to the HHRG engagement that PWC did not understand the relationship between Panexim and HHRG. During the period August 1996 to February 2000, it was determined that approximately $242 million was advanced to Panexim. More striking is the fact that the total advances (secured and unsecured) to Panexim outstanding and receivable at March 31, 1998 were $26,834,156 out of a total of all advances made by HHRG to all of its customers as of that date of $39,484,456, or 68% of the total. PWC never did a review to determine the volume of transactions with Panexim. This is a significant amount of money advanced to a company that the auditors had no information about and that was domiciled in South America. Total accounts receivable from Panexim increased from approximately $700,000 to $26.8 million from 1997 to 1998. This should have been a glaring red flag to PWC that Panexim was not an ordinary customer. PWC's working papers acknowledged awareness of these VAT advances to both Panexim and Orion at March 31, 1998.

In addition to not reporting the unsecured advances, PWC omitted reporting various loan covenant violations to the HHRG Board of Directors and to the GWRC Board of Directors and Audit Committee. PWC also allowed improper accounting to occur in 1997 and 1998 that materially understated the amount of liabilities displayed on the HHRG consolidated financial statements by allowing the off setting of the unsecured advances against other unrelated companies' precious metals and performed no reliable collectibility analysis for the HHRG accounts and advances receivable, particularly for advances to Panexim and the other South American entities.

PWC had an obligation to report the unsecured advances made to companies domiciled in South America, the violations of loan covenants that were related to these advances and how they were treated in the HHRG consolidated financial statements. If PWC complied with their obligation under GAAS by notifying the HHRG Board of Directors and the GWRC Board of Directors and Audit Committee, these directors would have been in a

6

Confidential Subject to Protective Order

position to stop these unauthorized transactions and the resultant losses from the Panexim transactions would not have occurred.

Also included among the violations of the professional standards by PWC were the failure to exercise due professional care and a failure to adequately plan and supervise their audits.

## IV. Opinion

Based on the work performed as addressed in the following section of this report, I hold the following opinions to a reasonable degree of professional certainty:

- The PWC audits of HHRG's consolidated financial statements at and for the period ended March 31, 1997, and the years ended March 31, 1998 and 1999 were not conducted in accordance with generally accepted auditing standards ("GAAS").

- As a result of PWC's failure to comply with the relevant professional standards during its audits of the HHRG consolidated financial statements at and for the period ended March 31, 1997 and the years-ended March 31, 1998 and 1999, HHRG suffered losses of $15,810,000. The foregoing amount is exclusive of pre and post judgment interest, litigation costs and any legally applicable offsets.

## V. Work Performed

I and/or others working for me and under my direction have read the complaint and other legal documents related to this litigation. We also read and analyzed the various reports and analyses of HSNO and DM, the audited financial statements of HHRG for the period ended March 31, 1997 and the years ended March 31, 1998 and 1999, and the PWC working papers provided for the years 1997 through 1999 for their audits and reviews of

7